# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

O. JOHN BENISEK

et. al.

v.

BOBBIE S. MACK, Chairman,
Maryland State Board of Elections

et. al.

In their official capacities

Civil No.:_____JKB-13-CV-3233_____

FILED ENTERED
LODGED RECEIVED

NOV 20 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____DEPUTY

* * * * * * * *

## AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

Jurisdiction                                    3

Overview of Claim                               3

Facts                                           6

Relevant Case Law                              10

Requested Relief                               24

Signatures                                     28

Index of Exhibits                              29

## Jurisdiction

1. Jurisdiction is based on a Federal question (provisions of the United States Constitution).

## Overview of claim

2. Understanding that this Court has previously found the Congressional Districts established by the General Assembly of Maryland, specifically Sections 8-702 through 8-709 of the Election Law Article, not to be a "partisan gerrymander" (*Fletcher v. Lamone*) in violation of the 14th Amendment, we contend that the essentially non-contiguous structure and discordant composition of the separate distinct pieces comprising the 4th, 6th, 7th, and 8th Congressional districts impermissibly abridge our rights, and those of similarly situated Marylanders, of representation as protected by Article 1 Section 2 of the U.S. Constitution; our right to vote for our Representatives to Congress, as protected by both the first and second clauses to the 14th Amendment to the U.S. Constitution; and our First Amendment rights of political association. Our claim is distinct from the partisan gerrymandering claim decided in *Fletcher* in that we are challenging the narrow ribbons and orifices used to tie de-facto non-contiguous and demographically inconsistent segments into individual districts—and not the overall partisan make-up of the state's Congressional districts.  This is a critical and significant distinction— which does not rely on the reason or intent of the legislature—partisan or otherwise--in its incorporation of these features;  this distinction impacts both the standard we offer for determining the adequacy of representational rights as well as the requested relief to restore such abridged rights.  Such relief includes elimination of the orifices and ribbons but, except for the

3

supplemental relief requested in paragraph 36, does not include options that would change the overall (7 Democratic – 1 Republican) partisan make-up of the enacted districts. Therefore the focus of our claim is not so much that the State incorporated too much focus on impermissible partisan gerrymandering—but rather that the State incorporated too little focus on affording adequate representation to voters in the abridged sections of the 4th, 6th, 7th, and 8th districts. We take this action now to obtain relief—prior to 2022—for the over 700,000 Marylanders who live in the parts of these districts where their representational rights are infringed, and to ensure that future maps afford greater regard for representational rights.

3. We contend that the presence of either (1) geographic or (2) demographic/political commonality—i.e., real or de-facto contiguity OR similarity in the demographic/partisan composition of non-contiguous (including essentially or de-facto non-contiguous) segments—is a manageable standard for judging whether minimal representational rights are afforded or abridged within the smaller segments of the 4th, 6th, 7th, and 8th districts. The representation afforded within such districts is infringed for residents of both the dominant (larger) and smaller sections, though it is most pernicious for residents of the smaller sections. This standard reflects the impermissible abridgement of the representational rights of voters within these smaller sections as a logical extension of W*esberry v. Sanders (376 U.S. 1)*, notwithstanding the broad authority of the State of Maryland to determine the boundaries of such districts under Article 1 Section 4 of the U.S. Constitution and to regulate elections. As we demonstrate in paragraphs 14 & 15, federal courts are already making similar judgments as extensions of *Wesberry*.

4. We recognize that under current case law, States have very broad discretion under the Constitution to fashion Congressional districts as they see fit to bring about the political and other objectives desired by the legislature. However, as established by *Wesberry*, voters also have representational rights under the Constitution—and we contend that States must afford a modicum of respect to those representational rights, including but not limited to equal population, regardless of the other factors or objectives the State opts to take into account when exercising its authority and responsibility to establish Congressional districts.

5. In addition to infringement of representational and voting rights, we also claim that the structure and composition of the abridged sections constitute infringement of First Amendment rights of political association, as each of the abridged sections voted strongly Republican in the 2008 Presidential election. The abridgement of representational, voting, and association rights is exacerbated by the significant differences in size between the discrete segments of each district, and Maryland's closed primary system for electing Representatives to Congress.

6. We respectfully request that the Court convene a 3-member District Court to further consider our claims under 28 U.S.C. 2284 and to grant relief to include enjoining the defendants from holding the 2014 elections for Representatives to Congress using the current districts in Sections 8-702 through 8-709 of the Election Law Article, and by revising the boundaries of such districts to be used for the 2014-2020 elections in a manner that resolves the abridgement. We have attached examples of prospective maps that resolve the abridgement, and (1) maintain the

legislature's intent to the fullest extent practicable; or (2) that reduce deference to the legislature's intent as justified in paragraph 36.

**Relevant Facts:**

7. The 2010 Census allocated Maryland eight Representatives in Congress, the same number as in recent decades.

8. In October 2011, the Maryland General Assembly enacted Senate Bill 1, creating the state's current Congressional districts (shown in Exhibit 1), codified in Sections 8-702 through 8-709 of the Election Law Article, during a special session called by the Governor to consider new Congressional districts that he proposed following the 2010 Census.   The Governors' proposal closely followed the districts recommended by the Governor's Redistricting Advisory Committee (GRAC).   The GRAC, which included the Senate President and House Speaker, provided explanations for its recommendations in Exhibit 2.  Senate Bill 1 was subsequently petitioned to referendum by voters opposed to the Bill, as provided by the Maryland Constitution.  After being petitioned to referendum, it was ratified by the voters in the November 2012 General Election.  However, litigation challenging the ratification over the clarity of the ballot language drafted by the Maryland Secretary of State is pending before the Maryland Court of Special Appeals (*Parrott v. McDonough*).

9. Maryland's Congressional districts were reviewed by this Court in December 2011 in *Fletcher v Lamone*, in which those plaintiffs claimed violations of the Voting Rights Act as well

as that the new districts constituted a state-wide partisan gerrymander under *Davis v Bandemer*. This Court found no violation of the Voting Rights Act and denied the state-wide partisan gerrymander claim pursuant to *Vieth v Jubelirer*.

10.  Several of the newly enacted districts contain de-facto non-contiguous segments—i.e., discrete segments that would be wholly non-contiguous but for the placement of one or more narrow orifices or ribbons connecting the discrete segments; such districts are essentially identical to those that would exist without such orifices or ribbons.

11.  The 4th, 6th, 7th, and 8th districts each consist of two distinct segments—one segment of which being far more populous than the other as well as being socioeconomically, demographically, and politically inconsistent with the other segment.  In each of these districts, the larger and smaller sections are technically connected through a narrow ribbon or orifice. Thus they are essentially or de-facto non-contiguous.

12.  Exhibits 3-10 are maps of the dominant and smaller sections of these districts, which are described below.

(a) (1) Exhibits 3&4 show the dominant and smaller sections of the 4th Congressional District. This district is a majority African-American district that was first developed in 1990 to account for the increasing population of African-American residents within Prince George's County. The dominant portion of the 4th district is centered in the portion of Prince George's County within the Capital Beltway and bordering the District of Columbia.  This portion of the district

contains 450,000 residents who are predominantly (74%) African-American (and 16% Hispanic and 6% white), urban, lower-middle income, and overwhelmingly Democratic voters. President Obama received 96% of the vote within this portion in 2008. This segment is attached through a narrow ribbon to the smaller segment of 185,000 residents in northeastern Anne Arundel County who are predominantly outer-suburban, 84% white (and 7% black and 4% Hispanic), middle income, and predominantly Republican voters. President Obama received 42% of the vote within this portion in 2008. These Anne Arundel residents share little in common with their Prince George's counterparts that is relevant to effective or meaningful representation.

(2) Given the composition of this district, its Representative will be elected by the voters of the Prince George's segment, and will almost certainly be a Democrat. Indeed, if the very different voters of the Anne Arundel segment could have any significant impact on the outcome, then the district would almost certainly be in violation of the Voting Rights Act due to dilution of African-American voters—and this Court found no such violation in *Fletcher v Lamone*. As practical matter, the election of the district's Representative will be determined by the Democratic primary election.

(b) Exhibits 5&6 show the dominant and smaller sections of the 6th Congressional District. The population of this district is centered in Montgomery County, Maryland's largest county. Its population is overwhelmingly suburban and Democratic. Its residents live and work primarily in the Washington, D.C. metropolitan area. The dominant Montgomery and southern Frederick County segment of the district contains 470,000 residents. This portion is 52% white, 15%

African-American, and 15% Hispanic.  President Obama received 66% of the vote of this

segment in 2008.  This segment is connected to Maryland's three westernmost counties,

containing 250,000 residents, through a narrow orifice at the southern end of the Washington-

Frederick county line.   These three counties are predominantly rural, with significant industries

including agriculture, railroads, energy, and mining in the far west.  Economically the region is

relatively depressed, as manufacturing activity has decreased in recent years.  Politically it is

predominantly Republican; minorities are few in number.  This abridged segment is 86% white,

8% African American, and 3% Hispanic.  President Obama received 39% of this segment's vote

in 2008.  Plaintiff John BENISEK is a Republican resident of this segment.

(c) Exhibits 7&8 show the pieces of the 7th District.  This district is centered within Baltimore

City—in wards containing 400,000 residents who are almost exclusively African-American,

urban, lower-middle income, and Democratic.  The district extends in a contiguous fashion to

the southwest, picking up 200,000 residents from adjacent similar areas of Baltimore County

and from contiguous but less demographically similar sections of Howard County—which

includes a mixture of white, African-American, middle and upper income, Democratic and

Republican, and suburban and rural voters.  Overall, this dominant contiguous section contains

600,000 residents who are 59% African-American, 29% white, 3% Hispanic.  President Obama

received 80% of this segment's vote in 2008.   Attached to this district through a narrow ribbon

is a wholly inconsistent and de-facto non-contiguous abridged segment of 45,000 voters in

northern Baltimore County.  This area is overwhelmingly (89%) white (and 2% African-

American and 2% Hispanic), rural and suburban, middle-upper income, and predominantly

Republican—comprising some of the most heavily Republican precincts in the entire state.

President Obama received 37% of this segment's vote in 2008. Maria PYCHA is a Republican

resident of this segment. Overall the 7th District is an African-American majority district as

required by the Voting Rights Act. Like the 4th District, its Representative will be a Democrat

who will be elected in the Primary; the General Election will be of no consequence in the 7th.

(d) Exhibits 9&10 show the 8th District. This district contains 470,000 voters in southern

Montgomery County—which is multi-ethnic, suburban, largely but not entirely affluent, and

overwhelmingly Democratic. This dominant segment is 53% white, 15% African-American,

and 18% Hispanic. President Obama received 76% of this segment's vote in 2008. Stephen

SHAPIRO is a Democratic resident of this segment. This segment connects, through a narrow

orifice, to 230,000 de-facto non-contiguous residents of northern Frederick Co. and Carroll Co.

This northern segment is 89% white, 4% African-American, and 4% Hispanic. President

Obama won 39% of this segment's vote in 2008. The 8th District's Representative will also be

a Democrat who will be elected in the Primary; the General Election will be a technicality.

**Review and Application of Relevant Case Law:**

13. Early in the prior century, Congress determined that, as a matter of policy pursuant to its

authority under Article 1 Section 4 of the U.S. Constitution, Congressional districts should be

compact, contiguous, and of equal population (Reapportionment Act of August 8, 1911). The

U.S. Supreme Court determined in 1932 that those policy requirements only applied to districts

created pursuant to the 1910 Census and were no longer in effect (*Wood v Broom, 287 U.S. 1*).

However, three decades later, the Supreme Court determined in *Wesberry v Sanders* (376 U.S.

1) that districts must have equal population as a representational right under Article 1 Section 2

of the U.S. Constitution.   The Supreme Court also held in *Wesberry* that claims regarding

Congressional redistricting are justiciable, that voters within a State have standing to make such

claims, that legislatures may not "draw lines in such a way as to give some voters a greater voice

in choosing a Congressman than others," that the right to vote is embodied within Article 1

Section 2 of the U.S. Constitution, and that the right to vote extends beyond just casting a ballot,

but to have that ballot count equally.   It is noteworthy that the dissenters in *Wesberry* raised

objections similar to the plurality in *Vieth* regarding manageability.   However, courts have

subsequently managed *Wesberry* cases, making essentially similar judgments to what we

propose now.

14. Federal courts have already exercised similar case-by-case judgment in ruling on

redistricting cases regarding equal population—i.e., deciding whether Congressional districts

that are not of precisely equal size do or do not afford adequate representation.   Under *Wesberry*,

states have typically been held to a very tight standard for Congressional districts, with almost

no variations in size permitted.   In *Karcher v Daggett* (462 U.S. 725), the U.S. Supreme Court

found New Jersey did not have adequate justification for a redistricting map with less than 0.7%

difference in population among districts.   However, in *Tennant v Jefferson County.* (567 U.S.),

the Supreme Court decided that West Virginia did have an acceptable basis for a 0.79%

difference in population among districts—i.e., to avoid splitting counties.  The *Karcher* and *Tennant* judgments are essentially the same judgments we are asking this Court to make in this current instance.  The small (0.7% & 0.79%) variances in population within those cases were representationally insignificant.  The districts in those cases were essentially approved or disapproved by the Court based on other aspects affecting the adequacy of representation afforded by those districts.  Given those cases, it is almost inconceivable that the current Maryland maps would have survived earlier judicial scrutiny if our new districts had anything approaching a mere 0.7% population variance.  The paucity of representation afforded within the abridged sections of Maryland's 4th, 6th, 7th, and 8th districts should not be immunized by this Court only because there is no population variance among the overall districts.

15. Federal courts have made similar judgments regarding state legislative redistricting pursuant to *Baker v. Carr* (39 U.S. 186) and *Reynolds v. Simms* (377 U.S. 533).   In *Gaffney v Cummings*, the U.S. Supreme Court noted that state legislative districts are held to a less strict standard than for Congressional districts, and upheld state house districts with a 7.8% variance.  Variances within 10% had been generally viewed as within a state's prerogative for legislative districts— i.e., a "safe harbor."  However, in *Cox v Larios* (542 U.S.) the Supreme Court clarified that there is no absolute safe harbor, even for legislative districts, and ruled that a Georgia map with variances less than 5% was impermissible as the variations were made for unacceptably partisan purposes, rather than to better afford representation—such as by not dividing jurisdictions.

Implementation of the standard we suggest on a district-by-district basis is similarly manageable as the equal population cases noted above and in paragraph 14.

16. The second clause of the 14th Amendment to the U.S. Constitution reduces a state's apportionment where the right to vote for Representatives "is in any way abridged." This clause, in combination with the Equal Protection Clause as well as Article 1, serves as an outright prohibition against abridging the right to vote in any way—as the Equal Protection Clause and Article 1, under *Wesberry*, would not permit a state to take an action which would reduce its apportionment and the voice of its voters.

17. Under *Wesberry*, the Supreme Court held that voters have representational rights under Article 1 that States must respect when determining Congressional districts. The Supreme Court held in *Baker v Carr* (369 U.S. 186) that that voters hold similar voting rights under the 14th Amendment that States must respect when determining Congressional and legislative districts. If, per *Wesberry* and *Baker*, districts established by the State must afford its residents a modicum of representational and voting rights, then it is a logical extension to conclude that such constitutionally adequate representation must consist of more than just equal population. If residents do not share either real geographic contiguity or some degree of demographic or political commonality, then they enjoy no more representational or voting rights than if their districts were of significantly unequal size; in fact, the voters within the abridged sections of these districts enjoy less adequate representation than if they were combined into adjacent but oversized districts.

18. In *Vieth*, a plurality of the U.S. Supreme Court held that partisan gerrymandering claims are not justiciable due to the lack of judicially discoverable and manageable standards as to what constitutes state-wide partisan gerrymandering. *Bandemer* and *Vieth* (and *Fletcher*) addressed allegations of discrimination against voters of a political party as a class. The plurality in *Vieth* and the minority in *Bandemer*—who raised concerns similar to the *Vieth* plurality—felt the Judiciary is not equipped to make judgments as to whether a state-wide districting map unconstitutionally burdens members of a political party. Our claim requires no such judgment. The standard we propose to effectively strike the use of narrow ribbons and orifices to link inconsistent segments is more relevant and manageable than determining how much partisanship is too much for a state-wide configuration.

19. Justice O'Connor, concurring in the Court's judgment in *Bandemer,* contrasted that case's assertion of group rights to an equal share of power and political representation with other cases protecting the rights of individuals to vote. She quoted from *Reynolds v Simms* (377 U.S. 533) "To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote." The construction of these 4th, 6th, 7th, and 8th districts dilutes—and largely marginalizes—the votes of residents within their abridged sections. A potentially decisive vote is worth more than a vote that is, through its design, negligible.

20. While the *Vieth* plurality held that prospective standards for determining unacceptable state-wide partisan gerrymandering were not sufficiently manageable, Justice Scalia noted in *Vieth*

that "courts might be justified in accepting a modest degree of unmanageability to enforce a constitutional command which (like the Fourteenth Amendment obligation to refrain from racial discrimination) is clear." The courts have already exercised such case-by-case judgment in ruling on redistricting cases regarding equal population—i.e., deciding when states may or may not implement districts not of equal size—as noted in paragraphs 14 & 15. The standard we suggest in paragraph 3 is at least as manageable for similarly protecting representational rights.

21. In *LULAC v Perry* (548 U.S.), Justice Kennedy wrote that "judicial respect for legislative plans (for Congressional redistricting), however, cannot justify legislative reliance on improper criteria for districting determinations." He also held the standard for statewide gerrymandering offered by the plaintiffs in *LULAC* (mid-decade redistricting with partisan intentions) to be insufficiently reliable, as it would produce different results for a regular decennial redistricting. However, the standard we propose for this case—a presumption of invalidity if an individual district has neither effective geographic nor demographic contiguity—is far more reliable for reviewing individual districts than the statewide standard that was dismissed in *LULAC*. Our proposed standard would not yield variable results, as the Court found to be the case with the proposed state-wide *LULAC* standard. Justice Kennedy also wrote in *LULAC* that "Quite apart from the risk of acting without a legislature's expertise, and quite apart from the difficulties a court faces in drawing a map that is fair and rational, the obligation placed upon the Federal Judiciary is unwelcome because drawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-

governance." This suggests that States, in exercising their responsibility for redistricting under Article 1 Section 4, have a responsible to do so in a manner consistent with affording its citizens their representational rights under Article 1 Section 2.  It also suggests that while State legislatures certainly have the expertise to create districts that are wise, fair, rational, and ensure citizen participation—as well as the responsibility to enact districts that comport with the U.S. Constitution--it is a stretch to presume that a State has in fact done either, particularly when the district-by-district test we suggest for representational rights is clearly not met.  While we do not contend that the Constitution requires the state to enact districts that afford the most ideal representation for its citizens, we do contend that the Constitution requires more than the least ideal--and that the state must incorporate a high priority to affording representation when balancing other competing objectives it may have in configuring Congressional districts.

22. We contend that the design and demographics of the 4th, 6th, 7th, and 8th districts—i.e., lack of contiguity whereas the discrete small section of each of these districts is geographically AND demographically discordant with the larger segment, represents a particular abridgement of the representational rights of voters in such smaller sections under Article 1, analogous to *Wesberry*, as well as their voting rights under Clauses 1 and 2 of the 14th Amendment. The "AND" as used above is significant to our contention. Justice Scalia, writing for the Supreme Court plurality in *Vieth*, held that non-contiguous districts do not inherently constitute impermissible abridgement of voting and representational rights. Our contention is that such non-contiguity, when combined with disparity in demographics affords such paucity of representation that it does

constitute an impermissible abridgement of such rights within the smaller segments.  Both

defects together afford a lesser degree of representation and, therefore, constitute a greater

degree of abridgement than either alone.  Voters in the smaller sections share with those of the

dominant sections neither the proximity of neighbors nor the similarity of political views and the

demographic factors that shape them.  Odds are remote that representatives selected by voters

of the dominant sections can ably, effectively, or empathetically represent voters in the smaller

abridged sections. Citizens of both segments are impacted as their Representative attempts to

effectively represent both.  Representational rights are more than just casting a marginalized

vote.  While the Supreme Court has been reluctant to accept a "totality of the circumstances"

standard for state-wide partisan gerrymandering, our proposed standard affords a manageably

straightforward and decisive district-by-district assessment of representational adequacy.

23. We also contend that since the abridgement most particularly impacts only areas with highly

Republican voting history—all four smaller segments, it also constitutes violation of the First

Amendment's protection of political association—along the lines suggested by Justice Kennedy

in his concurrence in *Vieth*.  In paragraph 36, we cite this contention to further justify

diminished reliance on the legislature's intent in determining the appropriate level of relief; the

higher level of representation afforded to residents of the smaller segments achieved through

incorporation of the supplemental requested relief warrants that relief's degree of departure from

the legislature's map.

24. (a)  Even though the Supreme Court has not held geographic contiguity alone to be a litmus test for representational rights, there is a long history of contiguity being considered important or required by Congress or state legislatures on policy grounds—similar to the history of requirements for equal population.

(b) Our point in providing this historical review is not to establish that there is a current Constitutional or statutory mandate for contiguous districts, but rather to establish that contiguity has long been considered a traditional districting principal for affording representation--and is therefore one proper element for a multi-element standard, such as we have offered, to support determinations of whether requisite representation has been afforded under Article 1 Section 2 of the U.S. Constitution.

(c) Contiguity was the first redistricting standard imposed by Congress, which first required districts be contiguous in 1842 (5 Stat 491).  That law also required districts to be single-member.  Equal population, in addition to contiguity, was mandated in 1872 (17 Stat 492), the same year that Congress codified the 2nd clause of the 14th Amendment (17 Stat 29). Compactness was added as a later requirement in 1901 (26 Stat 736).  These three standards were continued in the Apportionment Act of August 8, 1911 (37 Stat 13).   Congress did not mandate any of these standards further until after *Wesberry*, when Congress restored the single member district requirement in 1967 to prevent at-large voting for Representatives (81 Stat 581). When the House of Representatives passed districting legislation in 1967, the Judiciary Committee issued House Report 90-191, augmenting requirements for equal size, compact, and

contiguous districts with report language defining terms in the House bill to limit "gerrymandering." The House and Senate never reached agreement on details for the equal population standard, leading to the final enactment of only the single member district requirement. At the state level, 22 states mandate that their Congressional districts be contiguous—more states than have adopted any other specific requirement (Congressional Research Service Report R42831, November 2012, page 3). Many states, including Maryland have a similar requirement for state legislative districts. Justice O'Connor in *Shaw v Reno* (509 U.S. 630) cited contiguity as a traditional districting principal which may be considered in determining whether improper factors, such as race, have been unduly incorporated.

25. In the development of the current Maryland Congressional districts, the State presumed that technical contiguity was a requirement. Citizens offering prospective redistricting plans were directed to make the districts technically contiguous. Indeed the enacted districts are technically contiguous, even though they are not de-facto contiguous. In fact, it is likely that many of the enacted districts, such as the 2nd and 3rd, would be far more comprehensible were they to be wholly non-contiguous. For example, the 3rd district contains de-facto non-contiguous segments of relatively Democratic suburban areas of Baltimore, Howard, and Montgomery Counties, as well as Annapolis and predominantly affluent sections of Baltimore City. However, the ribbons connecting these pieces include relatively poor sections of Baltimore City as well as some highly Republican sections of Anne Arundel Counties. These ribbons made it much harder for the legislature to develop coherent adjacent districts. If there is an actual or perceived

requirement for the districts to be technically contiguous, then it follows that such districts must be de-facto contiguous as well—i.e., not connected through just a narrow ribbon or orifice, as such ribbons or orifices makes no difference or improvement upon the level of representation or any other characteristic of such districts, and in fact serve to make representation of the resulting districts more problematic—for voters and their Representatives.

26. Geographic factors, such as contiguity, are important elements of representation. Representatives can adequately represent us and our neighbors—even if we have differences of opinion that would influence our votes (i.e., where there are demographic and/or political differences within a contiguous district).   Representation is more uncertain and difficult if a single representative represents two or more distinct areas but not the residents who live in between, particularly if the two separate areas are not compatible.   Contiguity has been cited as a factor that can be "an easily applied factor by the courts" (Congressional Research Service Report R42831, November 2012, page 11)—and we suggest that "de-facto" contiguity can be reasonably applied as well.

27. While geographic factors are important to effective representation, they do not guarantee it or "fairness"—or the lack of gerrymandering.  Justice Scalia noted this in *Vieth*.  We do not purport that our primary requested relief will yield districts that are fair or that eliminate partisan gerrymandering—though they will be an improvement in both regards.  Indeed, the districts revised by resolving the non-contiguous small sections of the 4th, 6th, 7th, and 8th districts can still maintain the state's intent and effect to create 7 predominantly Democratic districts and 1

predominantly Republican district. In the maps we provide for examples of request relief, all of the districts—except the packed 1st—had at least a 54% Democratic vote in the 2008 Presidential election. This may be less lopsided than some current districts, but certainly still gerrymandered as intended by the legislature.

28. While our requested relief will not eliminate gerrymandering, it will eliminate a particularly egregious tool—with respect to representational and voting rights--that has been increasingly used in Maryland to accomplish gerrymandering. Justice O'Connor noted in *Bandemer* that "there is good reason to think that political gerrymandering is a self-limiting exercise." States are using increasingly egregious tools to stretch such limits. Maryland incorporated one similar district (the 4th) in 1990, and now there are three—as well as several other districts with exotic features unintended to optimize representation. In discussions with several legislators over the wisdom and fairness of these districts, they voiced a need to make seven of the state's eight districts as solidly Democratic as possible in light of similar efforts by Republican legislators in Texas, Pennsylvania, and other states. Some legislators wished that a fairer level playing field—i.e., at least minimal standards--would be recognized by the Courts or imposed by Congress—but that in the absence of such level playing field, Maryland's reluctance to use any and all such gerrymandering tools would be "unilateral disarmament." One legislator voiced support for reforming Maryland's districting process if an agreement to do so could be reached with a similarly-sized predominantly Republican state.

29. Geographic factors are not the only factors of effective representation.   Representation, almost by definition, is linked to communities of interest.  As noted above, such communities can be geographic.  Communities can also represent shared interests--demographic, ethnic, racial, socioeconomic, and political.  Many of these shared interests are typically intertwined. Many of Maryland's areas that are urban and low-income vote heavily Democratic, while many rural areas vote heavily Republican.   Voters in these different areas may be expected to have different areas of legislative focus and interest.  Rural voters may have business interests in and concerns with agricultural policy while urban voters will focus on other economic policies. Justice Kennedy in *Miller v Johnson* (515 U.S. 900) cited the linkage of "communities of actual shared interests" as a factor to be considered in determining whether improper factors, such as race, have been unduly incorporated—similar to Justice O'Connor in *Shaw v Reno* as noted above.  While we recognize that communities of interest are not entitled to representation, we do contend that commonality of interest, reflected through demographics and voting history, is an important factor of representation—i.e., a suitable element for a multi-element standard to assess representational adequacy--and is particularly critical when contiguity is absent.

30. The abridged sections of the 7th and 8th districts are adjacent to the 1st district—which stretches from Carroll County to the lower Eastern Shore.  The abridged section of the 4th district is across the Chesapeake Bay Bridge from the 1st district (which it used to be within), separated by a thin ribbon of the 3rd district.  The 1st district is essentially "packed" with outer suburban, rural, and Republican voters of the State.  Attaching the abridged sections of the 4th,

7th and 8th districts to the 1st would afford them far better representation with respect to geography and demography than their current districts. However, such attachment would overpopulate the 1st district and clearly violate *Wesberry*. Since that "better" arrangement would violate *Wesberry*, the current arrangement--which affords voters in those sections far worse representation--should be considered even less permissible.

31. Through extension of the discussion in paragraph 30 above, since the votes of citizens within the abridged sections are largely marginalized, the Representatives from the 4th, 6th, 7th, and 8th districts will essentially be elected by the voters of the dominant sections in the primary. The effective sizes of these districts could therefore be considered comparable to the sizes of their dominant sections--constituting an effective violation of *Wesberry*.

32. The Supreme Court held in *Rosario v. Rockefeller* (410 U.S. 752) that states may adopt and regulate closed primaries as a means of protecting the two-party system, though such regulation must not unduly abridge the voting rights of individual voters. Balancing the authority to establish districts within a closed primary system with the responsibility to avoid undue resulting abridgements of representation and voting rights is consistent with *Rosario*. This is consistent with holding that state authority to regulate the manner of elections must not unduly infringe upon the representational, voting, or political association rights of voters. It is a significant burden of the 1st and 2nd clauses of the 14th Amendment that Maryland has set up both its election processes and these districts such that they, in concert, unduly operate to prevent most voters in the abridged sections of the 4th, 6th, 7th, and 8th districts from voting in the

determinative (primary) election for their Representative.  The balancing of relevant Constitutional rights and responsibilities requires the State to avoid the convergence of factors it controls that lead to this result.

33. Finally, our proposed standard for the adequacy of representational and voting rights within individual Congressional districts represents a very modest intrusion on the prerogatives of state legislatures.  It would give them a clear example of what is not permissible—while still affording them very broad latitude and discretion in developing districts that address their various competing interests—political and otherwise—as afforded by Article 1 Section 4 of the Constitution.  It would provide voters greater protection of their representational and voting rights—as afforded by Article 1 Section 2 of the Constitution—without burdening courts to judge degrees of gerrymandering or leading to outcomes such as proportional representation.

## Requested Relief

34. Primary requested relief.  We respectfully request that the Court order relief to include enjoining the Maryland Board of Elections from holding the 2014 elections for Representatives to Congress using the current Congressional districts delineated in Sections 8-702 through 8-709 of the Maryland Election Law Article, and by revising the boundaries of such districts to be used for the 2014-2020 elections to resolve the claimed abridgement.  Exhibits 11 through 14 are examples of prospective maps that resolve the claimed abridgement, while maintaining the legislature's intent—based on the current map as well as the reasoning for the current map provided by the Governor's Redistricting Advisory Committee (GRAC, Exh. 2)--to the extent

practicable.   Due to the limitations of the redistricting program we had available to develop

these prospective maps, they do not incorporate the adjusted populations from moving Maryland

prisoners to the precincts of their homes of record, as required by state law (affirmed by the

Supreme Court in *Fletcher*).   With the assistance of the Maryland Department of Planning or the

Department of Legislative Services, the Court (or special master supporting the Court) could

easily incorporate such adjustments within an hour.

35. We suggest that maps A and B (Exhibits 11 & 12) are preferable, as they maintain Carroll

Co. within one district, while incorporating other intentions of the legislature.  Map A (Exh. 11)

avoids bridging the Montgomery-Prince George's border (cited by the GRAC) and places

coastal northeast Anne Arundel and Annapolis within the same district, consistent with the

current map—albeit with the 2nd rather than the 3rd.   Map B (Exh. 12 has the 5th district cross

the Montgomery-Prince George's border, which affords extending the 3rd to Annapolis as it does

now (but which was not cited as a priority by the GRAC).  Map C (Exh, 13) is similar to Map B,

but places western Carroll Co. with the 8th, splitting that county, but more consistent with the

current map.  Map C1 (Exh. 14) similarly splits Carroll Co, but avoids crossing the

Montgomery-Prince George's line and places Fort Meade in the 2nd (both cited by the GRAC as

objectives), though this precludes extending the 3rd to Annapolis--which is placed in the 5th.

Alternately, Fort Meade could be placed in the 5th, and Annapolis in the 2nd.   All of these

options widen the current orifices splitting the 6th and 8th districts, move the northern Baltimore

Co. section of the 7th into the adjacent 1st, and extend the 4th south into Charles Co.  This

maintains a 5th district that is very similar to the current 5th without the current repugnant 4th

district ribbon to Anne Arundel Co. All of these prospective options manageably rectify the

abridgement present within the current 4th, 6th, 7th, and 8th districts, and increase the

representation they afford their residents to more permissible levels--while maintaining the

overwhelming intent of the legislature with respect to all districts' political and geographic

content. They similarly avoiding the partisan composition judgments that Courts, such as in

*Vieth* and *Fletcher,* have been reluctant to undertake.

36. Supplemental requested relief.   While the relief afforded by Exhibits 11-14 would be most

welcome, the degree of that relief—with respect to improved representation--would be

somewhat limited due to those options' very significant reliance on the legislature's intent,

maintaining—albeit to a less extreme extent—significant linkage between demographically

disparate communities, while similar/compatible communities are arbitrarily split up. A

justifiably greater degree of representational adequacy can be achieved for the residents of the

small sections of the 6th, 8th, and 7th districts by combining them together—along with sufficient

adjoining compatible territory to constitute a district. Options D & E (Exhibits 15 & 16) portray

examples of such maps, which admittedly incorporate less deference to the legislature's intent.

We suggest that such diminished deference is appropriate, in light of the infringements to

representation, unless the State can show how its intentions otherwise support or afford better

representation to its citizens. As we have previously noted, the state has an obligation,

established through prior case law, to balance representation with other objectives; maps D and

E afford a greater and more appropriate level of focus on representation for all of Maryland's

residents and particularly for those whose representation is most infringed by the current map.

Additionally, since, as we have shown, the current state-wide map (1) particularly infringes the

representational and voting rights of residents of the smaller segments of four of Maryland's

Congressional districts; and (2) all four such smaller segments—with over 700,000 residents—

are predominantly Republican in voting history, the departure from legislative intent with

respect to political composition (i.e., going to 6 Democratic and 2 Republican districts) that

results from combining the small segments, while not intended (our intent being to afford the

improved representation that results from combining these compatible adjacent segments), is

nevertheless particularly justifiable and appropriate.  Option D (Exh. 15) adds parts of northern

Harford and Cecil Co. to the northern segments of the current 6th, 8th, and 7th districts to form a

consolidated (new 2nd) district.  Option E (Exh. 16) substitutes northwestern Howard Co. in lieu

of northern Cecil in the consolidated district.  Option D results in a 1st district more cohesively

centered on the Chesapeake Bay, whereas Option E results in 1st district that is more solidly

Republican than Option D, with more territory from rural northern Maryland.

Respectfully submitted,

_O. John Benisek_                11/17/13
O. JOHN BENISEK                    (date)
11237 Kemps Mill Rd
Williamsport, MD  21795
Washington County
240-217-1899
johnbenisek@gmail.com


_Stephen M. Shapiro_  11/19/2013
STEPHEN M. SHAPIRO           (date)
5111 Westridge Rd
Bethesda, MD  20816
Montgomery County
301-229-6241
steves@md.net


_Maria B. Pycha_  11-18-13
MARIA B. PYCHA                    (date)
13612 Brookline Rd
Baldwin, MD  21093
Baltimore County
410-599-2716
mpycha@msn.com

## INDEX OF EXHIBITS

1    Current Congressional Districts (Senate Bill 1, Special Session 2011)

2    Reasoning of the Governor's Redistricting Advisory Committee

3    Map of Congressional District 4 – Dominant Section

4    Map of Congressional District 4 – Small/Abridged Section

5    Map of Congressional District 6 – Dominant Section

6    Map of Congressional District 6 – Small/Abridged Section

7    Map of Congressional District 7 – Dominant Section

8    Map of Congressional District 7 – Small/Abridged Section

9    Map of Congressional District 8 – Dominant Section

10   Map of Congressional District 8 – Small/Abridged Section

11   Map of Primary Requested Relief – Option A

12   Map of Primary Requested Relief – Option B

13   Map of Primary Requested Relief – Option C

14   Map of Primary Requested Relief – Option C-1

15   Map of Supplemental Requested Relief – Option D

16   Map of Supplemental Requested Relief – Option E