FILED — ENTERED
LOGGED — RECEIVED

DEC 3 1 2013

AT BALTIMORE
CLERK U.S DISTRICT COURT
DISTRICT OF MARYLAND

DEPUTY

BY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

O. JOHN BENISEK, et al

        Plaintiffs

v.

BOBBIE S. MACK, Chairman,
Maryland State Board of Elections, et al

In their official capacities

        Defendants

Civil No.:    JKB-13-CV-3233

\* \* \* \* \* \* \* \*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

We oppose Defendants' motion to dismiss our Amended Complaint for the reasons below.

Summary

1. Defendants have not applied recent Supreme Court precedent on *Res Judicata*, nor have they

properly interpreted the prior 4th Circuit precedence.  Similarly, their defense based on

insubstantiality fails to incorporate longstanding Supreme Court precedence and misinterprets

4th Circuit precedence.  Lastly, we refute Defendants' contention that we have failed to state a

claim by clarifying their motion's misinterpretation of our proposed standard, reviewing the

facts we presented in our Amended Complaint, and providing applicable case law to

demonstrate that our claims are arguable, plausible, and compelling.  We also show, through

applicable Supreme Court and 4th Circuit precedence, which aspects of Defendants' motion are properly before this single-judge Court and which should be referred to a three-judge panel.

## Res Judicata

2. Defendants have moved to dismiss due to *Res Judicata*, which they base on our virtual representation by the *Fletcher* plaintiffs. In Section II.A. of the Supreme Court's opinion in *Taylor v. Sturgell* (553 U.S.), the Court cites *Res Judicata* as encompassing both claim and issue preclusion, and notes that a person who was not party to a prior suit has generally not had a full and fair opportunity to litigate the claims and issues settled in the prior suit. The 2008 *Taylor* opinion resolved prior conflicts in the application of virtual representation among the circuit courts by forbidding preclusion based on virtual representation by prior litigants and went on to cite six narrow exceptions allowing non-party preclusion: (1) Agreement to be bound; (2) preexisting legal relationship; (3) otherwise adequate representation by a party with identical interests, such as a member of a class or a fiduciary: (4) control over the prior litigation; (5) proxy or agent for prior party: and (6) under special statutory schemes such as bankruptcy or probate. None of the exceptions apply to the current plaintiffs. *Taylor* is very clear that the "otherwise adequate representation" exception is quite narrow, and cites a "properly conducted class action" under Rule 23 and prior suits by "trustees, guardians, and other fiduciaries" as examples. The *Taylor* opinion went on to cite two prior decision (*Richards v. Jefferson County*, 517 U.S. 793; and *South Central Bell v. Alabama*, 526 U.S. 160) where the right of successive plaintiffs to further challenge a prior-litigated tax in a subsequent action was upheld.

3. Prior to the *Taylor* opinion, in *Tyus v. Schoemelh* (93 F.3d 449), the 8th Circuit upheld

dismissal of a case alleging racial gerrymandering due to virtual representation preclusion.   The

Court noted that the *Tyus* plaintiffs included a number of actual plaintiffs from the earlier

litigation as well as new plaintiffs closely aligned with them.   However, even here, the 8th

Circuit Court ruled that the subsequent litigation should not have been dismissed based on claim

preclusion but upheld the dismissal on issue preclusion since the new plaintiffs were so closely

aligned with the original plaintiffs and *raised the identical specific issues* (emphasis added).

The *Fletcher* plaintiffs were African-American voters who primarily alleged violation of the

Voting Rights Act.   While they also claimed partisan gerrymandering, this Court's opinion and

Judge Titus' concurring opinion noted that the partisan gerrymandering claim was not

significantly pursued by the *Fletcher* plaintiffs and to the extent that it was, it was inextricably

linked to their racial discrimination claim.   In light of *Taylor*, it would not appear appropriate to

apply even issue preclusion to *Tyus* or to post-*Fletcher* challenges to the Maryland

Congressional districts.   We further discuss the significant differences among the issues we raise

from those raised by the *Fletcher* plaintiffs in paragraph 6 below.

4.  It is noteworthy that, even prior to *Taylor*, the 4th Circuit expressly declined to adopt the

broader scope of preclusion based on virtual representation that the 8th Circuit used in *Tyus*

*(Martin v American Bancorporation Retirement Plan,* 407 F.3d 643, Section II), citing the *Tyus*

case by name.   In *Martin*, the 4th Circuit also confirmed its earlier position that

3

> The doctrine of virtual representation does not authorize application of a bar to relitigation of a claim by a nonparty to the original judgment where the interests of the parties to the different actions are separate or *where the parties to the first suit are not accountable to the nonparties who file a subsequent suit.* (emphasis added)   *In addition,* a party acting as a virtual representative for a nonparty must do so with at least the tacit approval of the court.

We have already noted the differences of interest between us and the *Fletcher* plaintiffs in paragraph 3 above.  Even if *Martin* still held after *Taylor* and even if the *Fletcher* court's action cited by Defendants constituted "tacit approval," both doubtful, the *Fletcher* plaintiffs had no accountability to us; neither the identical interest nor the accountability preconditions of *Martin* are met—and both were necessary under *Martin* to preclude.

5.  The 4th Circuit dealt with a similar case in *Washington v Finlay* (664 F.2d 913), ruling it inappropriate for a District Court to take action that would preclude subsequent relitigation in a redistricting challenge.  In paragraphs 60-64 of the *Washington* opinion, the 4th Circuit reversed the District Court's post-trial certification of black citizens of Columbia, S.C. as a class under Rule 23 due in part to the preclusive effect such certification would have on such citizens beyond the original plaintiffs.  In addition to raising procedural concerns regarding class certification made after trial, the 4th Circuit held that the District Court's earlier pre-trial *denial of class certification was in accord with circuit precedence* (emph. added), noting in para. 63:

> If judgment on the merits goes for the individual plaintiffs, the members of the putative class will be fully benefitted by it in practical, if not technically legal, terms; if judgment goes against the individual plaintiffs, the members of the putative class will not be legally

4

bound by it. Obviously, however, the same irrelevance of consequences does not attend a subsequent determination to certify the class and thus bind it to an unfavorable judgment.

The 4th Circuit's opinion in *Washington* would not appear to permit preclusion based on any sort of tacit action in a redistricting case such as *Washington* or *Fletcher*, even if such preclusion were still permitted after the Supreme Court's opinion in *Taylor,* and would clearly further auger against more formal class certification precisely due to such certification's preclusive impact.

6. If issue preclusion could still be applied against a distinct non-party to earlier litigation, even after *Taylor*, we note that the issues before the Court in this case differ significantly from the issues raised by the *Fletcher* plaintiffs. Contrary to Defendants' contention, we are most certainly "plowing new ground." As we noted in our complaint, we are not relitigating a claim of undue partisan gerrymandering under the 1st Section of the 14th Amendment (Equal Protection Clause), nor are we relitigating a claim that prisoners should not be counted at their home of record—the only claim from *Fletcher* to be appealed to the Supreme Court. Rather, we are primarily claiming that specific districts do not afford adequate representation under Article 1, Section 2, and that this defect similarly constitutes an abridgment of voting rights under the 2nd section of the 14th Amendment and the rights of political association under the 1st Amendment. Accordingly, the standard we offer in our complaint (we note the *Fletcher* plaintiffs did not offer a standard for judging their Equal Protection claim) focuses on determining whether representation is adequate and not whether partisan-related gerrymandering was excessive. In this regard, we actually cite the *Fletcher* court's holding that the 4th and 7th

districts are proper minority-majority districts as a *basis* for our claim—we are certainly not relitigating that holding (further demonstrating our lack of linkage to or privity with the *Fletcher* plaintiffs). Similarly, our requested relief increases the level of relief afforded to voters within the challenged districts; our primary requested relief does not change the partisan make-up of the current districts and our supplemental requested relief does so only as a by-product of further restoring the level of representation afforded to residents of the challenged districts. These representational and voting adequacy issues were not litigated in *Fletcher* or in other litigation related to the current Maryland Congressional districts. Our claim, proposed standard, and requested relief would necessarily be markedly different if we were litigating or relitigating a partisan gerrymander claim per *Davis v Bandemer*.

7. Lastly, Defendants cite timeliness as final factor justifying dismissal in the section of their motion on *Res Judicata*. Claims challenging the constitutionality of election districts are considered timely when further elections based on such districts are yet to be held. In *Knox v Milwaukee County Board of Election Commissioners* (607 F. Supp. 1112), the Eastern District of Wisconsin held that a challenge to districts filed 26 months after enactment and 14 months after the first election held under those districts was timely. The 4th Circuit opinion in *White v. Daniel* (909 F.2d 99), particularly paragraphs 10, 12, and 15, strongly suggests that the Court would have allowed that case to have been decided on its merits if it had been filed within even ten years of the most recent redistricting and if further elections under the challenged districts were yet to be held. The Solicitor General of the United States issued a brief as *Amicus Curiae*

to the U.S. Supreme Court on *White* (Solicitor General brief 90-891) recommending that the Court's review was not warranted as there was no case law or controversy among the circuits in considering redistricting challenges timely when further elections under such districts remained.

Insubstantiality

8. Complaints challenging the constitutionality of Congressional districts are required to be referred to a three-judge District Court (28 U.S.C. 2844) unless they are "insubstantial." See *Idlewild Bon Voyage Liquors v Epstein* (370 U.S. 713):

> When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute.

Also, *Lake Carriers' Assn. v. MacMullan* (406 U.S. 498): "...a three-judge court is the proper forum for all claims against the challenged statute so long as there is a nonfrivolous constitutional claim..."

9. Defendants contend that our claims are "insubstantial" pursuant to *Duckworth v State Administrative Board of Election Laws* (332 F.3d 769). They interpret the 4th Circuit opinion in *Duckworth* as establishing the *Iqbal* standard for surviving a Rule 12(b)(6) challenge as the standard for surviving a challenge of insubstantiality. When the 4th Circuit's opinion is read in

the context of the original District Court opinion and in light of other case law, it is clear that this is not the case.

10. The Supreme Court issued its *Iqbal* and *Twombly* opinions on Rule 12(b)(6) standards in 2009 and 2007, respectively. Nothing in these Supreme Court opinions suggests their applicability to determinations of insubstantiality. When the 4th Circuit wrote *Duckworth* in 2003, the *Iqbal* and *Twombly* standards did not exist yet, and so the 4th Circuit could not have possibly intended to apply them to insubstantiality. This is also clear from the District Court's opinion in *Duckworth* (AMD-02-2064), which cited the *Conley v Gibson* precedent for Rule 12(b)(6) determinations, which was the (pre-*Iqbal/Twombly*) standard at that time. Thus when the 4th Circuit wrote its 2003 opinion suggesting commonality between the Rule 12(b)(6) and insubstantiality standards, the two standards were much closer at that time. They are not now, in light of *Iqbal* and *Twombly*, and neither the Supreme Court nor the 4th Circuit has ever applied the newer *Iqbal/Twombly* standard for Rule 12(b)(6) to insubstantiality.

11. While this Court in *Duckworth* cited *Conley v Gibson* with respect to Rule 12(b)(6), it also cited--and used--the standard for insubstantiality prescribed by the Supreme Court in *Goosby v. Osser* (409 U.S. 512):

> Title 28 U.S.C. § 2281 does not require the convening of a three-judge court when the constitutional attack upon the state statutes is insubstantial. "Constitutional insubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," *Bailey v. Patterson*, 369 U.S. at 369 U. S. 33; "wholly insubstantial," ibid.; "obviously frivolous," *Hannis Distilling Co. v. Baltimore*, 216 U. S. 285, 216 U. S. 288

(1910); and "obviously without merit," *Ex parte Poresky*, 290 U. S. 30, 290 U. S. 32 (1933). The limiting words "wholly" and "obviously" have cogent legal significance. In the context of the effect of prior decisions upon the substantiality of constitutional claims, those words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial for the purposes of 28 U.S.C. § 2281. A claim is insubstantial only if "'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.'"

*Goosby* remains current precedent for determining insubstantiality, and was also cited by Judge Titus in granting the convening of a three-judge court to decide *Fletcher*.

12. The Supreme Court said again in *Lake Carriers' Assn. v. MacMullan* (406 U.S. 498) that "…a three-judge court is the proper forum for all claims against the challenged statute so long as there is a nonfrivolous constitutional claim…" *Lake Carriers* was cited by the 2nd Circuit as defining "substantial" to be "nonfrivolous." *New York State Waterways Association v Diamond* (469 F.2d 419, para. 5).

13. Similarly, in *Crosby v. Holsinger (816 F.2d 162, 163)*, the 4th Circuit held that:

the stringent prerequisites for a finding of frivolousness have not been met in this case. It is within the power of a district court to dismiss a claim sua sponte; federal question jurisdiction requires the presentation of a "substantial" federal question. e.g., *Hagans v. Lavine*, 415 U.S. 528, 537-38, 94 S.Ct. 1372, 1379-80, 39 L.Ed.2d 577 (1974). But "a claim is insubstantial only if ' "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that

the questions sought to be raised can be the subject of controversy." ' " *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 859, 35 L.Ed.2d 36 (1973) (quoting *Ex parte Poresky*, 290 U.S. 30, 31, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933), further quoting *Hannis Distilling Co. v. Baltimore*, 216 U.S. 285, 288, 30 S.Ct. 326, 327, 54 L.Ed. 482 (1910)); see also *Vaughns v. Board of Education*, 574 F.Supp. 1280, 1288 (D.Md.1983), aff'd in part and rev'd in part on other grounds, 758 F.2d 983 (4th Cir.1985). The test for dismissal under circumstances such as these is, indeed, "a rigorous one and if there is any foundation of plausibility to the claim federal jurisdiction exists." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* Sec. 3564, at 70-71 (1984). We are presented with no authority, either by counsel for Holsinger or by the district court, that clearly forecloses the plaintiffs' claims in this case.

14. We note the repeated linkage of "insubstantiality" to "frivolousness" in usage by the Supreme Court, 4th Circuit, and other Circuits. The same term "frivolous" is also used as the standard for dismissals under 28 U.S.C. § 1915(d).

15. In *Neitzke v. Williams* (490 U.S. 319) the Supreme Court unanimously held that the standards for dismissals under 28 U.S.C. § 1915(d) and for dismissals under (even pre-*Iqbal/Twombly*) Rule 12(b)(6) are not the same:

> Under Rule 12(b)(6)'s failure to state a claim standard -- which is designed to streamline litigation by dispensing with needless discovery and fact finding -- a court may dismiss a claim based on a dispositive issue of law without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one, whereas, under § 1915(d)'s frivolousness standard -- which is intended to discourage baseless lawsuits -- dismissal is proper only if the legal theory (as in *Williams'* Fourteenth Amendment claim) or the factual contentions lack an arguable basis. The considerable common ground

> between the two standards does not mean that one invariably encompasses the other, since, where a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate, but dismissal on the basis of frivolousness is not.

The Supreme Court's discussion here is directly analogous to the dismissal of frivolous claims for insubstantiality by single-judge Courts, but requiring the further consideration for dismissal of nonfrivolous claims on Rule 12(b)(6) grounds by three-judge Courts under 28 U.S.C. § 2284.

16. In *Prather v Norman* (901 F.2d 915), the 11th Circuit interpreted *Neitzke* as authorizing 1915(d) dismissal "only to be ordered when the claims 'lack an arguable basis in law.'  Claims can be inarguable because of legal and factual inadequacies. Factual allegations are frivolous for purposes of Sec. 1915(d) when they are 'clearly baseless.'  Legal theories are frivolous when they are 'indisputably meritless.'"

17. The 4th Circuit has also relied on *Neitzke* in linking determinations under Section 1915(d) and determinations of substantiality, using language very similar to *Prather*.  In *Roman v Glass* (968 F.2d 1211), the 4th Circuit cited *Neitzke* (with *Crosby*) to authorize dismissal:

> if the legal theories advanced are indisputably without merit or if the factual contentions are baseless. Id. at 327. Similarly, a sua sponte dismissal not premised on § 1915(d) is proper where previous decisions of the court foreclose the subject and leave no foundation of plausibility to the claim. *Crosby v. Holsinger*, 816 F.2d 162, 163

18. This Court previously raised and ascribed merit to questions very similar to those we now pose in *Anne Arundel Republican Central Committee v. State Administrative Board of Election*

*Laws* (SABEL) (781 F.Supp. 394 (1991)).  The *Anne Arundel* case was brought by a bipartisan group of plaintiffs challenging the Maryland Congressional districts enacted in 1991 (Exhibit 1), with particular regard to how the voters of Anne Arundel county were split among multiple districts.  A three-judge Court was convened (i.e., the claims were found to be substantial) and considered challenges based on Article 1 and other provisions of the U.S. Constitution.

19.  The Court found that the average variation of less than three persons among the districts nevertheless triggered the first prong of the *Karcher* test; however, the State's rationale justifiably explained these differences.  While there were significant disagreements among the members of the Court as to the extent of the State's authority and responsibility under Article 1 Section 2, they were unanimous that the State's discretion—even within the context of districts perfectly equal in size—was not without limits under Article 1 Section 2, even though there was no agreement on how to define such limits.  The majority, which upheld the 1991 map, expressed this quandary as follows:

> A federal court, in scrutinizing a congressional redistricting plan, should therefore think long and hard about rejecting the reasons — the justifications — of the state legislature.
>
> It is in such context that we consider and reject the plaintiffs' challenge to what they label as unconstitutional gerrymandering.
>
> We do not, as the dissent suggests, believe that there are no limits upon gerrymandering. We do not hold that the State is correct in conceding that under its interpretation Article I, § 2, would not be violated by a district line drawn to snake through the alleys and cul-de-sacs of 23 different counties in order to match two white people for each black, or two

democrats for each republican, for the purpose of advancing the chances that the favored class would win an election while diluting the vote of the unfavored class. We do not have that specific example before us and therefore do not reach it.

20. The majority of the *Anne Arundel* Court further explained their inquiry:

The point is that carving Anne Arundel County into four pieces — while perhaps enough to raise eyebrows — does not violate any federal constitutional provision, including the mandate of Art. I, § 2, to give full effect to the voice of the "people."... Nothing the plaintiffs have presented to this Court indicates that their vote will necessarily be any less powerful in any of the four congressional districts in which they will now reside.

21. Our claims compare favorably with those considered by this Court in *Anne Arundel* with respect to their substantiality and plausibility.

(a)     First, the *Anne Arundel* Court unanimously accepted that Article 1 Section 2 could be violated, even with districts of precisely equal size.

(b)     Second, while the *Anne Arundel* Court did not discuss or establish a standard to define such violations (and the majority held the 1991 districts to be in compliance with Article 1 Section 2), we have offered and justified such a standard in paragraphs 3 and 14-33 of our Amended Complaint (which we further address in paragraphs 41-42 of this Response).

(c)     Third, the districts we challenge from the current map (Exhibit 2) much more closely resemble the hypothetical district that the Court suggested would be in violation of Article 1 Section 2 than the 1991 districts that were before the *Anne Arundel* Court.

(d)     Fourth, the *Anne Arundel* Court stated that the relevant issue was not so much on how Anne Arundel County as a whole was split up (as was raised by the *Anne Arundel* plaintiffs), but rather the representation afforded to the Anne Arundel voters from each of those areas within their respective new districts.  Unlike the *Anne Arundel* plaintiffs, this is precisely our analysis. It is not at all clear whether a majority of the *Anne Arundel* Court would have similarly held the Anne Arundel Co. residents of the *current* 4th district not to be unacceptably harmed by its structure and composition.

(e)     Fifth, unlike in 1991, the rationale of the Governor's Redistricting Advisory Committee do not explain let alone justify any of the features of the 4th, 6th, 7th, and 8th districts we claim are impermissible; we offer multiple versions of prospective maps that accomplish these rationale without resorting to any of these features.

22.  The dissenting opinion in *Anne Arundel* would afford the General Assembly far less discretion and authority, pursuant to *Wesberry*, than we concede.  The dissent would limit the legislature's consideration of almost any classification as well as the incorporation of political motives, partisan or otherwise, in the development of districts.   Districts would incorporate, almost exclusively, neutral criteria.  In addition to significant reliance on *Wesberry*, the dissent noted the Framers' intent under Article 1 that while States were given authority to select their Senators, they were given much more limited roles regarding the selection of Representatives— with the inference that excessive incorporation of motives in setting the manner of elections as authorized under Article 1 Section 4 could effectively become infringement upon voting and

representational rights under Article 1 Section 2. While dissents are certainly not controlling precedent, they can reflect substantiality and plausibility—particularly where relevant questions are not well settled.

23. The Supreme Court also opined on the limits of States' authority granted by the Elections Clause in *Cook v. Gralike* (531 U.S. 510) in a manner consistent with the *Anne Arundel* dissent.

> No constitutional provision other than the Elections Clause gives the States authority over congressional elections. By process of elimination then, the States may regulate the incidents of such elections, including balloting, only within the exclusive delegation of their Elections Clause power. The Court disagrees with petitioner's argument that Article VIII is a valid exercise of that power in that it regulates the "manner" in which elections are held by disclosing information about congressional candidates. The Clause grants to the States "broad power" to prescribe the procedural mechanisms for holding congressional elections, *e. g., Tashjian* v. *Republican Party of Conn.,* 479 U. S. 208, 217, but does not authorize them to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints, U. S. *Term Limits,* 514 U. S., at 833-834. Article VIII is not a procedural regulation. It does not control the "manner" of elections, for that term encompasses matters like notices, registration, supervision of voting, and other requirements as to procedure and safeguards which experience shows are necessary *to enforce the fundamental right involved (*emphasis added*).

24. The Supreme Court suggested its openness to further specifics, beyond equal population, constituting "fair representation" required under Article 1 and the 14th Amendments in its opinion on *Gaffney v Cummings* (412 U.S. 735), citing *Reynolds v Sims*:

> *Reynolds v. Sims*, of course, dealt with more than the statistical niceties involved in equalizing individual voting strength…More fundamentally, *Reynolds* recognized that "the achieving of fair and effective representation for all citizens is . . . the basic aim of legislative apportionment," id., at 565-566, and it was for that reason that the decision insisted on substantial equality of populations among districts.

> This is a vital and worthy goal, but surely its attainment does not in any commonsense way depend upon eliminating the insignificant population variations involved in this case. Fair and effective representation may be destroyed by gross population variations among districts, but it is apparent that such representation does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of. See *Mahan v. Howell*, supra; *Abate v. Mundt*, 403 U.S. 182 (1971); *Dusch v. Davis*, 387 U.S. 112 (1967); *Sailors v. Board of Education*, 387 U.S. 105 (1967); *Burns v. Richardson*, supra. An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement.

25. The scope of representational and voting rights under the Constitution, beyond requirements for equal population, is very much an area of unsettled law—even less addressed by prior courts than partisan gerrymandering and far less than racial gerrymandering. *Wesberry* (and *Baker v*

*Carr*, and *Reynolds v Sims)* dealt most specifically with population inequality, as that was the specific complaint raised; further delineation of specific aspects of representational rights under Article 1 Section 2 or voting rights under the 14th Amendment Section 2 or the 14th Amendment Section 1 are neither clearly established nor foreclosed, though the opinions of *Wesberry*, *Baker*, and *Reynolds* strongly suggest them--even if not to the degree of the *Anne Arundel* dissent.  Our amended complaint (in paragraphs 30-31) shows, by way of comparison, that one aspect of the harm resulting from the challenged features could be considered equivalent to that of population variances approximating the size of each smaller segment of the challenged districts.

26.  We are not contending that *Wesberry* is as limiting on the State's discretion as the dissent, though we would certainly not object to the implementation of the dissent.  We concede that the case law affords the State significant authority, responsibility, and discretion to determine the division of the State into districts from which its voters elect Representatives to Congress. However, we contend that there are minimal Constitutional requirements, beyond equal population, to which States must adhere in exercising their discretion in order to afford at least minimally adequate representational and voting rights to its citizens.  Our complaint cites a number of prior cases where the federal courts have mandated an appropriate balancing of state prerogatives and discretion afforded by the Constitution with the representational and voting rights of its citizens under the Constitution.  The requirement for such balance is well settled.

27.  It is substantial and plausible to contend that such requirements for balance have not been met with respect to the challenged districts--and we have so contended through a standard we

propose that is manageable and linked to representational and voting adequacy. We address the manageability and plausibility of our proposed standard in paragraphs 41-42 and 44-46 of this Response. Paragraphs 7-12 our Amended Complaint allege facts showing that the proposed standard for adequacy is not met within these districts.

Justiciability

28. The justiciability of Congressional districting was unsettled until the early 1960s, when several Supreme Court decisions overturned the *Colegrove v Green* (328 U.S. 549) opinion from 1946, which found controversies over unequal Congressional districts to be nonjusticiable:

The short of it is that the Constitution has conferred upon Congress exclusive authority to secure fair representation by the States in the popular House and left to that House determination whether States have fulfilled their responsibility. If Congress failed in exercising its powers, whereby standards of fairness are offended, the remedy ultimately lies with the people. Whether Congress faithfully discharges its duty or not, the subject has been committed to the exclusive control of Congress... Courts ought not to enter this political thicket. The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action.

29. *Baker v. Carr* (369 U.S. 186) overturned *Colegrove* and found controversies over state legislative districts to be justiciable violations of the Equal Protection Clause:

We hold that this challenge to an apportionment presents no nonjusticiable "political question." The cited cases do not hold the contrary. Of course, the mere fact that the suit

seeks protection of a political right does not mean it presents a political question. Such an objection "is little more than a play upon words." *Nixon v. Herndon*... The courts cannot reject as "no law suit" a *bona fide* controversy as to whether some action denominated "political" exceeds constitutional authority... Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if, on the particular facts, they must, that a discrimination reflects no policy, but simply arbitrary and capricious action. Article I, § § 2, 4, and 5, and Amendment XIV, § 2, relate only to congressional elections, and obviously do not govern apportionment of state legislatures. However, our decisions in favor of justiciability even in light of those provisions plainly afford no support for the District Court's conclusion that the subject matter of this controversy presents a political question.... We conclude that the complaint's allegations of a denial of equal protection present a justiciable constitutional cause of action upon which appellants are entitled to a trial and a decision. The right asserted is within the reach of judicial protection under the Fourteenth Amendment.

30. *Reynolds v. Sims* (377 U.S. 533) expanded upon *Baker*:

The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise... Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State.... Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside,

hardly seems justifiable. One must be ever aware that the Constitution forbids "sophisticated, as well as simple-minded, modes of discrimination"... With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. Any suggested criteria for the differentiation of citizens are insufficient to justify any discrimination, as to the weight of their votes, unless relevant to the permissible purposes of legislative apportionment. Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators.

31. *Wesberry v. Sanders* (376 U.S. 1) affirmed the justiciability of state apportionment controversies with respect to Congressional districts:

> We agree with Judge Tuttle that, in debasing the weight of appellants' votes, the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution, that the District Court should have entered a declaratory judgment to that effect, and that it was therefore error to dismiss this suit... To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected "by the People," a principle tenaciously fought for and established at the Constitutional Convention. The history of the Constitution, particularly that part of it relating to the adoption of Art. I, § 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives. William Samuel Johnson of Connecticut had summed it up well: "in *one* branch, the *people* ought to be represented; in the *other*, the *States*."... It would defeat the principle solemnly embodied in the Great Compromise -- equal representation in the House for

equal numbers of people -- for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others… No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

While the specific claims decided through these opinions involved Congressional and legislative districts of unequal size, it appears clear from the language in these opinions that other claims alleging abridgment of rights with respect to districting under Article I, § § 2, 4, and 5, and Amendment XIV, § 2 (these sections all specifically cited above in *Baker*) as well as the Equal Protection Clause are also justiciable.

32. There is, of course, ongoing controversy over the justiciability of a subset of these claims involving partisan gerrymandering—i.e., where district lines are claimed to incorporate partisan motives to an impermissible degree, or where districts impermissibly abridge the voting rights of minority party members as a class. *Davis v Bandemer* (478 U.S. 109) held that such claims, with respect to state legislatures, are justiciable under the Equal Protection Clause, but did not provide standards for their adjudication:

> The claim is whether each political group in the State should have the same chance to elect representatives of its choice as any other political group, and this Court declines to hold that such claim is never justiciable. That the claim is submitted by a political group, rather than a racial group, does not distinguish it in terms of justiciability…. Since *Baker*

*v. Carr,* 369 U. S. 186 (1962), we have consistently adjudicated equal protection claims in the legislative districting context regarding inequalities in population between districts. In the course of these cases, we have developed and enforced the "one person, one vote" principle. *See, e.g., Reynolds v. Sims,* 377 U. S. 533 (1964). Our past decisions also make clear that, even where there is no population deviation among the districts, racial gerrymandering presents a justiciable equal protection claim. In the multimember district context, we have reviewed, and on occasion rejected, districting plans that unconstitutionally diminished the effectiveness of the votes of racial minorities.... Finally, in *Gaffney v. Cummings, supra,* we upheld against an equal protection political gerrymandering challenge a state legislative single-member redistricting scheme that was formulated in a bipartisan effort to try to provide political representation on a level approximately proportional to the strength of political parties in the State. In that case, we adjudicated the type of purely political equal protection claim that is brought here, although we did not, as a threshold matter, expressly hold such a claim to be justiciable. Regardless of this lack of a specific holding, our consideration of the merits of the claim in *Gaffney* in the face of a discussion of justiciability in appellant's brief, combined

with our repeated reference in other opinions to the constitutional deficiencies of plans that dilute the vote of political groups, at the least supports an inference that these cases are justiciable.... Disposition of this question does not involve us in a matter more properly decided by a coequal branch of our Government. There is no risk of foreign or domestic disturbance, and, in light of our cases since *Baker,* we are not persuaded that there are no judicially discernible and manageable standards by which political gerrymander cases are to be decided.... The one person, one vote principle had not yet been developed when *Baker* was decided. At that time, the Court did not rely on the potential for such a rule in finding justiciability. Instead, as the language quoted above clearly indicates, the Court contemplated simply that legislative linedrawing in the

districting context would be susceptible of adjudication under the applicable constitutional criteria.

Furthermore, in formulating the one person, one vote formula, the Court characterized the question posed by election districts of disparate size as an issue of fair representation. In such cases, it is not that anyone is deprived of a vote or that any person's vote is not counted. Rather, it is that one electoral district elects a single representative and another district of the same size elects two or more -- the elector's vote in the former district having less weight in the sense that he may vote for and his district be represented by only one legislator, while his neighbor in the adjoining district votes for and is represented by two or more. *Reynolds* accordingly observed:

"Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of State legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race. . . ." 377 U.S. at 377 U. S. 565-566. *Reynolds* surely indicates the justiciability of claims going to the adequacy of representation in state legislatures. The issue here is, of course, different from that adjudicated in *Reynolds.* It does not concern districts of unequal size. Not only does everyone have the right to vote and to have his vote counted, but each elector may vote for and be represented by the same number of lawmakers. Rather, the claim is that each political group in a State should have the same chance to elect representatives of its choice as any other political group. Nevertheless, the issue is one of representation, and we decline to hold that such claims are never justiciable.

33. Regarding Defendants' discussion of *Shaw v. Reno* (509 U.S. 630), in that 1993 case the Supreme Court found that a majority-minority Congressional district impermissibly classified its

residents by race in a suit brought by white voters.   The Court in *Shaw* cited the absence of

traditional districting principles as a trigger for judicial scrutiny, whereas in the past, the

incorporation of traditional districting principles had been relevant to demonstrate non-racial

motives.   The remarks Defendants cited on the absence of a stand-alone mandate for traditional

districting principles were not made as a specific holding of *Shaw*.   To amplify this, after Justice

Stevens noted that such principles were not required in his dissent to the majority's use of them

to trigger scrutiny of a black majority district, he went on to say:

> I believe that the Equal Protection Clause is violated when the State creates the kind of
> uncouth district boundaries seen in *Karcher v. Daggett*, 462 U. S. 725 (1983), *Gomillion
> v. Lightfoot*, 364 U. S. 339 (1960), and this case, for the sole purpose of making it more
> difficult for members of a minority group to win an election.

34.   Eighteen years after *Davis*, a plurality opinion in *Vieth v Jubelirer* (541 U.S.) held that

political gerrymandering claims are not justiciable due to the lack of a manageable standard:

> Over the dissent of three Justices, the Court held in *Davis* v. *Bandemer* that, since it was
> "not persuaded that there are no judicially discernible and manageable standards by
> which political gerrymander cases are to be decided," 478 U. S., at 123, such cases *were*
> justiciable…. this Court has never revisited the unanswered question of what standard
> governs….In her *Bandemer* concurrence, Justice O'Connor predicted that the plurality's
> standard "will over time either prove unmanageable and arbitrary or else evolve towards
> some loose form of proportionality."… See, *e.g.*, *Session*, *supra*, at 474 ("Throughout
> this case we have borne witness to the powerful, conflicting forces nurtured by
> *Bandemer*'s holding that the judiciary is to address 'excessive' partisan line-drawing,
> while leaving the issue virtually unenforceable")… Finally, courts might be justified in

accepting a modest degree of unmanageability to enforce a constitutional command which (like the Fourteenth Amendment obligation to refrain from racial discrimination) is clear; whereas they are not justified in inferring a judicially enforceable constitutional obligation (the obligation not to apply *too much* partisanship in districting) which is both dubious and severely unmanageable.....We dare say (and hope) that the political party which puts forward an utterly incompetent candidate will lose even in its registration stronghold. These facts make it impossible to assess the effects of partisan gerrymandering, to fashion a standard for evaluating a violation, and finally to craft a remedy....The central problem is determining when political gerrymandering has gone too far. It does not solve that problem to break down the original unanswerable question (How much political motivation and effect is too much?) into four more discrete but equally unanswerable questions.

No test—yea, not even a five-part test—can possibly be successful unless one knows what he is testing *for*. In the present context, the test ought to identify deprivation of that minimal degree of representation or influence to which a political group is constitutionally entitled.

35. Two critical factors relate to the applicability of *Vieth* here:

(a) First, in recognition of the concerns expressed in *Vieth* regarding the lack of standards to gauge when political motives are excessive to the point of impermissible, we instead look more fundamentally at where representational and voting rights have been impermissibly abridged. Therefore our claims would be properly justiciable under *Wesberry* and *Baker* even if *Vieth* did render claims alleging and requiring judgment as to excessive partisanship to be nonjusticiable. Contrary to Defendants' contention that we are therefore addressing the wrong question, we note that *Vieth* itself suggests that a more plausible "test ought to identify deprivation of that minimal

degree of representation or influence to which a political group is constitutionally entitled." In fact, we go further (towards the 1960's cases) to test the representation and voting rights that the voters within the challenged districts (not just specifically a political group) are entitled to. Since we are not testing for degrees of partisan impact, our claims are even more plausible and justiciable than those under *Davis* only alleging excessive partisan bias.

(b)  Second, since *Vieth* was a plurality decision, lower courts do not hold it as controlling precedent—i.e., *Davis*, despite its faults, has not been overturned.  Three-judge Courts continue to hold cases justiciable based on *Davis*. *See Radogno v Illinois* (N.D. Ill., 11-04884, Doc. 84):

> The Plaintiffs...filed a complaint alleging that the redistricting plan violates federal and state law. They later amended their complaint, and on October 21, 2011, we issued an order granting in part and denying in part Defendants' motion to dismiss the amended complaint. We granted leave to replead some of the dismissed claims...As we explained in our previous order, the point that we draw from these cases is that political gerrymandering claims remain justiciable in principle but are currently "unsolvable" based on the absence of any workable standard for addressing them. The crucial theoretical problem is that partisanship will always play some role in the redistricting process. As a matter of fact, the use of partisan considerations is inevitable; as a matter of law, the practice is constitutionally acceptable. See *Vieth*, 541 U.S. at 286-88 (plurality opinion); id. at 313 (Kennedy, J., concurring in the judgment). The relevant question is not whether a partisan gerrymander has occurred, but whether it is so excessive or burdensome as to rise to the level of an actionable equal-protection violation. How much is too much, and why? So as things currently stand, minority-party plaintiffs may continue to bring political gerrymandering claims, but they face the Sisyphean task of articulating a standard by which judges may reliably and objectively sort the "routine"

use of partisanship in redrawing district lines from that which is excessive to the point of violating the Equal Protection Clause.

See also *Committee for a Fair and Balanced Map v. Illinois* (N.D. Ill., 11-CV-5065, Doc. 98):

> The Committee is correct that the Supreme Court, a quarter century ago, rejected the argument that partisan gerrymandering claims are not justiciable, *Davis v. Bandemer*, 478 U.S. 109, 118-127 (1986), that the Court had ample opportunity to revisit and reject that position in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), and that while four justices rejected the justiciability of such claims, no majority embraced the opportunity, see *LULAC*, 548 U.S. at 414. The Board of Elections argues that no plaintiff has prevailed in a partisan gerrymandering case during that quarter century, but what other plaintiffs might have (or might not have) accomplished tells us nothing about the sufficiency of the Committee's complaint.

See also *Alabama Legislative Black Caucus v. State of Alabama* (M.D. Ala. 12-CV-691):

> In count three of its complaint, the Black Caucus alleges that the Alabama Legislature engaged in partisan gerrymandering when it created the new districts, but its complaint fails to identify a standard by which we can evaluate that claim. See *Vieth v. Jubelirer*, 541 U.S. 267, 313, 124 S. Ct. 1769, 1796 (2004) (Kennedy, J., concurring in the judgment). Although a claim of partisan gerrymandering is justiciable, *Davis v. Bandemer*, 478 U.S. 109, 143, 106 S. Ct. 2797, 2816 (1986), one problem for the Black Caucus is that a majority of the Supreme Court so far has been unable to identify a judicial standard for a claim of partisan gerrymandering, see *Vieth*, 541 U.S. at 334–35… Where a court "ha[s] no standard by which to measure the burden [plaintiffs] claim has been imposed on their representational rights, [plaintiffs] cannot establish that the alleged political classifications burden those same rights." Id. at 313, 124 S. Ct. at 1796 (Kennedy, J., concurring in the judgment). At the hearing, the Black Caucus moved for

leave to amend count three to allege more facts and constitutional grounds to support its claim of political gerrymandering and to identify a judicial standard by which we can adjudicate the claim. Because count three fails to identify a judicial standard for the adjudication of a claim of political gerrymandering, we dismiss count three without prejudice and grant the Black Caucus leave to amend its complaint. And because we dismiss count three without prejudice, we deny as moot the motion by the State defendants for judgment on the pleadings as to count three.

### Our claim of violation of Article 1 Section 2 and the 14th Amendment Sections 1 & 2

36. In paragraph 22 of our Amended Complaint, we claim that the structure and composition of the 4th, 6th, 7th, and 8th districts constitute impermissible abridgment of representational and voting rights guaranteed under Article 1 Section 2 and the 14th Amendment Sections 1 & 2. Article 1 Section 2 is most specific with respect to Congressional representational rights. The 14th Amendment Section 2 is also explicit in that right to vote for Representatives to Congress may not be the "denied...*or abridged in any way*" without a loss in apportionment. The Privileges and Immunities Clause and the Equal Protection Clause forbid State actions, such as those constituting any abridgment of voting rights, resulting in a loss of apportionment.

37. In paragraph 3 of our Amended Complaint we offer a standard for determining when the structure and composition of Congressional districts affords minimally adequate representational and voting rights, and when district structure and composition constitute the impermissible abridgment of such rights. Paragraphs 14, 24, 26, and 29-32 of our Amended Complaint

describe the harms reflected by the absence of each of elements of our proposed standard. We have proposed that only the absence of both elements—de-facto contiguity AND demographic (e.g., partisan) similarity—render abridgment to be impermissible.

38. Further to the harms resulting from the absence of elements of our proposed standard, these include (1) the decreased quality of representation across both segments of each challenged district as well as (2) harm akin to vote dilution within the smaller segment of each challenged district. Marginalization of the smaller segment makes each district, as a whole, effectively much smaller in population than the ideal (equal) population.

39. Expressing "representation" as enabling or implementing the public's expression of their collective will is very much discernable from Article 1 Section 2, as reflected by *Wesberry*. It follows that if incorporating certain principles supports representation, then the absence of such principles diminishes representation of the voters within such districts—i.e., harm. In this regard, the voters of a district can also be considered a class—and one created by the legislature. Diminishing (or failing to maximize) the public's expression of their collective will necessarily mean that the choice of Representatives will more greatly reflect the legislature's will—which is also discernibly at odds with Article 1 Section 2 based on *Wesberry* and *Cook v. Gralike* (531 U.S. 510). Further to the concept of diminished representation are the challenges of influencing and being served by a Representative in such a district. While, of course, we presume that all voters may approach and influence their Representative—and that their Representative will do their best to serve them, there should be no doubt this situation is less than ideal—and

29

unnecessarily and unjustifiably so.  Examples of frustrations reflecting the suboptimal

representation for both the represented and the Representative are provided are in Exhibits 3-4 to

this Response.  We discuss these representational challenges in paragraphs 26 and 29 of our

Amended Complaint, as did Judge Titus in his concurring opinion in *Fletcher*.

40.  (a) Even more specific harm accrues to the voters within the smaller segments of each

district.  These small segments constitute classes of voters created by the legislature through

their structure and composition. We address these impacts in paragraphs 19 and 30 of our

Amended Complaint.  The voters in the smaller segments may indeed vote and have their votes

counted, just as voters in unequal sized districts did prior to *Wesberry*.  However, their votes

(including ours, with respect to the two of us plaintiffs who live in such segments) are

diminished as assuredly and effectively as if they were given a fraction of their weight—or if

votes cast from the larger segments were given two or three times their weight—in districts not

so contrived.  This harm is greater and more specific than that which is still within the

prospective districts we offer for primary (albeit limited) relief in paragraphs 34-35 of our

Amended Complaint.  First, the proposed districts do not contain discrete segments or classes of

voters in the same manner as the districts we challenge; there is less demographic segregation

due to the increased contiguity of these districts.  Second, while the prospective districts

maintain the legislature's intent with regard to partisan composition—i.e., seven districts to have

Democratic majorities—the majorities, while still significant are not quite as overwhelming in

all cases as in the current districts.  Indeed, it is not clear whether there is any manner of

construction by which the Democratic majority of the seven current Democratic districts could be stronger—and we have noted above that this level of assumption by the legislature of influence over the selection of Representatives violates the commands of Article 1 Section 2 and Amendment 14 Sections 1 and 2.

(b)  Whereas we have noted above the legislature has most particularly increased its influence at the expense of the influence of the smaller segments, it does so through the class of voters constituting the larger segments.  As the effective weight of voters within the small segments is diminished, the effective weight of votes within the large segment is increased.  We discuss this in paragraph 31 of our Amended Complaint.  This effect has been documented with respect to House elections by Michael McDonald of Binghamton University-SUNY (*A Standard for Detecting and Remedying Gerrymanders*, p. 14-17, August 2005) and has also been described by the Heartland Institute (*Heartland Policy Study #34*, March 1991, p. 12-13).  To the extent that the smaller segment is marginalized and the larger section is designed to largely determine the outcome, the district as a whole is effectively reduced in population to the size of the larger segment—an effective violation of the equal population requirement of Article 1 Section 2. That this is accomplished effectively--through the structure and composition of the district--is no less a violation than if it had been accomplished through a structure containing fewer actual residents.

41.  We investigated options for a discernible and manageable standard by looking into criteria already developed and implemented.  We provide a history of the development of districting

31

principles in paragraph 24 of the Amended Complaint.  The development and implementation of

districting principles was recently catalogued by the Congressional Research Service (CRS),

cited in paragraph 24(c).   The CRS study discusses the specific various statutory criteria that

have been enacted—mostly by the States, for the development of Congressional and/or

legislative districts.  The only current federal statutory requirement for electing Representatives

to Congress is that they be elected from single member districts.   While Representatives

represent individual voters (as well as non-voters), these voters—and by extension their

Representatives—reflect their communities, i.e. their districts.  The review of historic and

current districting principles is important for the insight they provide as to criteria that the States

and Congress have developed over time in order to facilitate representation.  It is obvious that

some of these criteria are focused on supporting the public's expression of their collective will

(i.e., representation)—while other traditional principles reflect typical motives a legislature may

express or accomplish.

42. (a) In developing our proposed standard, we focused on those traditional districting

principles that support representation.  As we note in paragraph 26 of the Amended Complaint,

CRS cites contiguity as the most widely implemented criterion among the States.  It is quite

manageable, and--when it is for real—it, by definition, avoids splitting a district into discrete

segments, thereby avoiding the corresponding impact on representation we have described

above.  It also affords significant discretion to the States; the prospective districts we offer for

affording primary relief are de-facto contiguous and still incorporate the rationale offered by the Governor's Redistricting Advisory Committee.

(b) Another widely used criterion is compactness. While we would recommend compactness as a standard to Congress or the legislature for adoption as a matter of policy, we have not incorporated it in the standard we propose to adjudicate minimal representation. Some experts cite compactness as a critical element for effective representation, other experts are less certain as to the overall public benefits. See *Heartland Policy Study #34*, p. 13-22. CRS notes that compactness as a judicial standard could be challenging to manage. A compactness requirement would be more limiting to the States; most of the districts we offer for affording primary relief are not compact, nor are some of those we offer for supplemental relief.

(c) The third relevant criterion is maintaining communities of interest (See *CRS Report R42831*, p. 13-14). We have not incorporated--as Defendants have interpreted it--a requirement that communities of interest must not be split up (as *Gorell v O'Malley* had claimed), but rather that there should be some commonality among discrete segments—i.e., when there is no contiguity. Our purpose for including this within our standard is to provide additional flexibility to the States. Rather than suggest that all districts must be de-facto contiguous—which may be too firm a standard for this Court to accept in light of current case law—States would have the option of developing districts that consist of multiple segments as long as there was some bona fide degree of commonality relevant to representation demonstrated among a district's segments. One way this could be demonstrated (or lack thereof demonstrated) is through political

composition; this is particularly relevant as it reflects how such interests, demographics, or other commonalities manifest themselves in voting.  If discrete segments comprising a district have significant similarities, then it is less likely each should be considered a discrete class—and there would be less impact on representation despite the lack of contiguity.  Since this element in our proposed standard serves as a waiver of, or a suitable justification for, a lack of contiguity—it is relatively manageable.  See paragraphs 44-46 below.

(d) Other traditional districting principles cited by CRS include the preservation of subdivisions, preservation of former districts, protection of incumbents, and promotion of competition. Preservation of subdivisions would essentially require contiguity (and compactness).  While laudable in many instances, it could be an overly demanding standard.  It is more practical where subdivisions are small in size.  Benefits of preserving former districts are largely dependent on whether such former districts afforded adequate representation and on whether changes in population make this practical or desirable.  Protection of incumbents is more a motive of a legislature; it should be up to the public whether or not to re-elect an incumbent. This is not at all to suggest that a legislature may not incorporate this as a worthy goal; only that it must be incorporated in balance so as not to unduly impact representation.  As such is it not a useful element for a representation standard.  Lastly, promotion of competition can be a worthy goal and certainly supports effective operation of our two-party system.  However, we are not sure how this could be translated into a manageable element of a judicially-applied standard.

43. In paragraphs 7-12 of our Amended Complaint, amplified by Exhibits 1-10 to the Complaint, we allege detailed relevant facts as to the structure and composition of the challenged 4th, 6th, 7th, and 8th districts. These facts, as applied through our proposed standard, demonstrate that representational and voting rights are indeed abridged.

44. Further to the manageability of our proposed standard, Defendant's contend that our proposed standard is not sufficiently manageable or reliable. To address this we apply the standard to each of Maryland's districts:

(a): The First District (Exhibit 5 to this Response) extends from the Atlantic Ocean at the Maryland/Virginia border to the sight of the Blue Ridge Mountains from the Carroll/Frederick County line at the Maryland/Pennsylvania border—admittedly not very compact; nor is it de-facto contiguous, as a thin ribbon across the northern border of Baltimore County connects the Carroll County portion with the rest of the district.   However, Carroll County is very much compatible with northern Harford County and Cecil County.  Both are rural areas in northern Maryland's outer Baltimore suburbs, with a significantly Republican vote in the 2008 Presidential election.  While we do not deny that it is a "packed" Republican district, and may well be part of a statewide unconstitutional partisan gerrymander (as Defendants appear to suggest on page 19 of their Motion), it is an acceptable district based on our proposed standard. While we would not suggest a district of this construction, the representation afforded to its residents is notably better than others that follow.

(b) The Second District (Exhibit 6) includes much of East Baltimore, and waterfront suburbs in Baltimore and Harford Counties to the northeast; South Baltimore and suburbs of Anne Arundel, Baltimore, and Howard Counties to the southwest; and various segments of central and western Baltimore County.  The central and western segment of Baltimore County is connected to the rest of the district through narrow ribbons west of White Marsh and Towson, so it is not de-facto contiguous.  The northeast and southwest segments lean Democratic and the central/western segment is heavily so; the westernmost end of the segment is heavily African-American.  We would recommend acceptance of this district under the standard, though the attachment of the very heavily Democratic and African-American west end gives some pause.

(c) The Third District (Exhibit 7) comprises segments in Montgomery and Howard Counties; northern Anne Arundel Co.; Annapolis; central Baltimore City (extending west to Baltimore Co. and east to East Baltimore); northeast Baltimore and adjacent Baltimore Co; northwest Baltimore and adjacent Baltimore Co.  Ribbons tie all these segments together.  The segments are largely middle class areas, predominantly white, and strongly Democratic.  The ribbons are more diverse including some areas that are highly African-American and others that are highly Republican.  Given the similarities among the segments, we would find this (barely) acceptable, though the incompatible composition of the ribbons (most particularly the highly Republican ribbon through northeast Anne Arundel) raise significant concerns—and perhaps enough to justify striking the Third.  While not a particularly coherent district almost all segments and ribbons but the northeast Anne Arundel ribbon are moderately-highly Democratic.

(d) The Fourth District (Exhibit 8) is described in paragraph 12 of our Amended Complaint. Given the extreme demographic and partisan differences among the two discrete segments, the Fourth would not survive the standard. The stark dissimilarities and long connecting rope make the Fourth perhaps the most egregious district in the State.

(e) The Fifth District (Exhibit 9) including Southern Maryland, South Arundel, most of Prince George's County outside the Beltway, and College Park is fully contiguous; no problem here.

(f) The Sixth District (Exhibit 10) is described in paragraph 12 of our Amended Complaint. Given the demographic and partisan differences among the two discrete segments, the Sixth would not survive the standard.

(g) The Seventh District (Exhibit 11) is described in paragraph 12 of our Amended Complaint. Given the very significant demographic and partisan differences among the two discrete segments, the Seventh would not survive the standard. The dissimilarities and long connecting rope make the Seventh similarly egregious as the Fourth.

(h) The Eighth District (Exhibit 12) is described in paragraph 12 of our Amended Complaint. Given the very significant demographic and partisan differences among the two discrete segments, the Eighth would not survive the standard.

45. While most of the districts are clearly acceptable or unacceptable under the standard, some may indeed be borderline. This is no different from many other standards that are enforced by the Courts. Manageability here is very similar to the more recent equal population cases we

cited in our Amended Complaint (e.g., *Karcher, Tennant,* and *Larios*) that specifically addressed additional representational elements beyond equal population in order to ultimately approve or disapprove the challenged districts. The Court's decisions rested much more on its judgments regarding those other attributes than on the relatively insignificant differences in population. Some of the recent racial gerrymandering cases such as *Shaw, Miller v. Johnson* (515 U.S. 900), and *Abrams v. Johnson* (521 U.S. 74) had similar implications. Manageability and reliability would further improve as experience is gained, similar to the many state legislative district equal population cases that have continued to evolve since *Baker* and *Reynolds*.

46. While our proposed standard is adequately manageable and reliable, both would be improved by modifying the standard to only require de-facto contiguity, with no option to justify multiple discrete segments. Defendants also infer this on pages 18-19 of their Motion. This would also improve representation and reduce such harm as described earlier. With such modification, the first, second, and third districts would fail as well. The only reason we did not make this our proposed standard was out of concern that it could be difficult to reconcile with current case law. We encourage this Court to make such a modification if it can be reconciled.

47. To summarize, in our Amended Complaint, as well as in this Response, we offer legal theories that are arguable, plausible, and compelling to serve as a basis for holding that the facts we allege in our Amended Complaint, as applied through our proposed standard, constitute the impermissible abridgment of representational and voting rights under Article 1 Section 2 as well as under Amendment 14 Sections 1 and 2.

Claim of Partisan Gerrymandering Under the Equal Protection Clause

48. Defendants contend we have failed to state such a claim. While we certainly believe that partisan gerrymandering has occurred, we did not make a claim per *Davis v Bandemer* in our Amended Complaint since the record of success of such claims elsewhere has not been good, and since we believe claims based on constitutional provisions more specific to representation by and to voting for Representatives to Congress are more promising--as those provisions are both more relevant and since Article 1 contains a positive command to afford representation in addition to negative commands to avoid abridgment or discrimination. However, we do believe that the facts we allege in our Amended Complaint can plausibly support a finding of impermissible partisan gerrymandering as well—using approaches similar to (1) *Gomillion v. Lightfoot*, (364 U.S. 339) as well as (2) *Shaw v. Reno* (509 U.S. 630).

49. Justice Whittaker, in his concurrence in *Gomillion*, noted the greater applicability of the Equal Protection Clause than the Fifteenth Amendment. Under *Gomillion*, as cited in *Shaw*

> Redistricting legislation that is alleged to be so bizarre on its face that it is unexplainable on grounds other than race demands the same close scrutiny, regardless of the motivations underlying its adoption.

We note this passage not for the reference to "bizarre" but for the qualifier that "it is unexplainable on grounds other than race." The structure and composition of the 4th, 6th, 7th, and

8th Districts, as we have alleged as facts in our Amended Complaint, are, on their face, unexplainable on grounds other than partisan discrimination.

50. Other Courts have not accepted Defendants' position that *Mobile v. Bolden* (466 U.S. 55) requires a greater showing of intent. See *Lodge v Buxton* (639 F.2d 1358), paragraph 55:

> The first possibility is that *Bolden* requires direct evidence of intent. We think this is incorrect. Not only does the plurality opinion say that the circumstantial evidence in Zimmer "may afford some evidence of a discriminatory purpose" 100 S.Ct., at 1503, common sense tells us that in a case such as this, in which it can not be asserted that the system was created for discriminatory purposes, it is likely that no plaintiff could ever find direct evidence that the system was maintained for discriminatory purposes. Clearly, the right to relief cannot depend on whether or not public officials have created inculpatory documents. We must reject this first possibility.

51. In addition to establishing intent akin to *Gomillion*, we note that this Court in *Fletcher* held that the intent of the 2011 redistricting reflected political motivations rather than racial motivations, as alleged by the *Fletcher* plaintiffs. While we concede that some of these political motivations were other than partisan discrimination—such as with the structure and composition of the 3rd district—the structure and composition of the 4th, 6th, 7th, and 8th districts defy any other explanation with respect to the smaller segments of each district.

52. Perhaps some doubt on intent could be raised if there were only one district formed in this manner. As we noted in paragraphs 23 and 36 of our Amended Complaint, there are not one, nor two, nor three, but four such districts with the essentially same structure and composition.

53. The remaining areas of the State with a significantly Republican voting history are packed into the first district or are in Southern Maryland.

54. The harms to the challenged districts are as already noted in paragraphs 38-40 above and can be assessed through our proposed standard discussed in paragraphs 41-42 above.

55. Under the approach taken by the Supreme Court in *Shaw* and in *Miller v. Johnson* (515 U.S. 900)—if presumed for the sake of argument, that the smaller segments of the 4th and 7th districts were predominantly African-American, as are the larger segments, then it would be highly doubtful that either district could pass constitutional muster.

56. It would appear itself to be a violation of the Equal Protection Clause to afford its protection to the voters of the smaller segments of the 4th and 7th districts if they were predominantly African-American, but to deny it since they are predominantly white. Further, the harms we have demonstrated in paragraphs 38-40 above are greater with respect to the actual 4th and 7th districts than those within the hypothetical districts presumed in paragraph 55 above.

Claim of First Amendment Violation

57. We discuss our claim that the First Amendment has been violated in paragraphs 5 and 23 of our Amended Complaint. Much of our contention here rests on the impact on Republican voters, due to their party affiliation, resulting from the intentional structure and composition of the challenged districts, and which is aggravated by the operation of Maryland's closed primary election system. We discuss this aspect in paragraphs 31-32 of our Amended Complaint.

58. Courts have held the impact of a state's primary election system to be a factor into whether classes of voters may be impermissibly denied effective participation in the political process. See *Washington v. Finlay* (664 F.2d 913), paragraph 29, and *Lodge v Buxton* (639 F.2d 1358), paragraph 74: "As the District Court correctly pointed out, '(e)lection in the (Democratic) primary is 'tantamount' to election to the office'." While *Lodge* specifically addressed internal discrimination within another state's Democratic party, Republican voters in the challenged districts are completely precluded from voting in the primary that is "tantamount to election."

59. We discuss in paragraph 32 of our Amended Complaint where Courts have required States to balance voting rights and other laws that may enact that impact voting. While we do not contend that the State is required to adopt an open primary, we do contend that Maryland's closed primary system combined with the intentional structure of the challenged districts results in an intentional impermissible infringement of first amendment rights. Voters in the smaller segments were placed into these districts to minimize their votes because they are largely Republicans. We previously discussed intent in paragraphs 49-53 above, and harms in paragraphs 38-40 above.

60. We expressly disagree with Defendants contention on page 25 of their Motion that has no impact on our First Amendment rights. While Republican voters in the challenged districts may be active in political committees, express their views, and influence their Representatives, the State has designed these districts to make such First Amendment activities of minimal impact. This is true to a far greater extent with respect to the challenged districts than to the 1991

districts that were the subject of the *Anne Arundel* cite on page 25 of the Defendants' Motion. Further, a position that first amendment rights are acceptably afforded in light of the mere expression of views and participation in political activities—without considering the larger context as to whether the influence or effect of such expression and activities have been intentionally muted by the challenged actions—is more in keeping with *Colegrove* than with *Baker*, *Reynolds*, and *Wesberry*.

Conclusion

61. For the reasons set forth in our Amended Complaint and above, the Defendants' Motion to Dismiss for *Res Judicata* and for Insubstantiality should be denied; Plaintiffs' request to convene a three-judge panel of this Court should be granted; and Defendants' Motion to Dismiss for Failure to State a Claim should be referred to and denied by that three-judge panel.

Respectfully submitted,

_____  12/29/13
O. JOHN BENISEK                (date)
11237 Kemps Mill Rd
Williamsport, MD  21795
Washington County
240-217-1899
johnbenisek@gmail.com


_____ 12/29/13
STEPHEN M. SHAPIRO            (date)
5111 Westridge Rd
Bethesda, MD  20816
Montgomery County
301-229-6241
steves@md.net


_____ 12-29-13
MARIA B. PYCHA               (date)
13612 Brookline Rd
Baldwin, MD  21093
Baltimore County
410-599-2716
mpycha@msn.com

## **TABLE OF EXHIBITS**

Exhibit

| | |
|---|---|
| 1 | Map of Maryland's 1991 Congressional Districts |
| 2 | Map of Maryland's Current (2011) Congressional District |
| 3 | Baltimore Sun Article on the Current 8th District |
| 4 | Letter to the Baltimore Sun on the Current 7th District |
| 5 | Map of Maryland's Current (2011) First Congressional District |
| 6 | Map of Maryland's Current (2011) Second Congressional District |
| 7 | Map of Maryland's Current (2011) Third Congressional District |
| 8 | Map of Maryland's Current (2011) Fourth Congressional District |
| 9 | Map of Maryland's Current (2011) Fifth Congressional District |
| 10 | Map of Maryland's Current (2011) Sixth Congressional District |
| 11 | Map of Maryland's Current (2011) Seventh Congressional District |
| 12 | Map of Maryland's Current (2011) Eighth Congressional District |

_____ FILED   _____ ENTERED
_____ LOGGED   _____ RECEIVED

IN THE UNITED STATES DISTRICT COURT     DEC 3 1 2013
FOR THE DISTRICT OF MARYLAND     AT BALTIMORE
CLERK, U S DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

O. JOHN BENISEK

et. al.

**Civil No.:  JKB-13-CV-3233**

v.

BOBBIE S. MACK, Chairman,
Maryland State Board of Elections

et. al.

In their official capacities

\* \* \* \* \* \* \* \*

CERTIFICATE OF SERVICE

I certify that I have served, through first class mail, a copy of the foregoing Plaintiffs'

Response in Opposition to Defendants' Motion to Dismiss, with its exhibits, to the Attorney

for Defendants:

Dan Friedman
Assistant Attorney General
Legislative Services Bldg, Room 104
90 State Circle
Annapolis, MD  21401

_____ 12/30/13
STEPHEN M. SHAPIRO, pro se   (date)
5111 Westridge Rd.
Bethesda, MD  20816
301-229-6241
steves@md.net