FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2014 APR -8  A 10: 32

O. JOHN BENISEK, *et al.*,

    Plaintiffs,

v.

BOBBIE S. MACK, Chair,
Maryland State Board of Elections, *et al.*,
in their official capacities,

    Defendants.

CLERK'S OFFICE
AT BALTIMORE

BY    *    DEPUTY

\*    CIVIL No. JKB-13-3233

\*

\*

\*

\*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

O. John Benisek, Stephen M. Shapiro, and Maria B. Pycha (collectively "Plaintiffs") brought this suit against Bobbie S. Mack, Chair of the Maryland State Board of Elections, and Linda H. Lamone, State Administrator of the Maryland State Board of Elections, (collectively "Defendants"), in their official capacities, alleging that the 2011 congressional districts established by the Maryland General Assembly violate Plaintiffs' rights under Article I, Section 2 of the United States Constitution, as well as under the First and Fourteenth Amendments to the United States Constitution. Now pending before the Court is Defendants' motion to dismiss for failure to state a claim (ECF No. 13). The issues have been briefed and no hearing is required. Local Rule 105.6. For the reasons set forth below, the motion will be granted.

## I.   BACKGROUND[1]

In 2011, following the 2010 decennial census, the Maryland General Assembly enacted a

congressional redistricting plan.  Md. Code Ann., Elec. Law §§ 8-701 *et seq.*; (Am. Compl., ECF

No. 11, at ¶¶ 7-8.)  This plan closely followed the recommendations of the Governor's

Redistricting Advisory Committee ("GRAC"), which included the President of the Maryland

Senate and the Speaker of the Maryland House of Delegates.  (Am. Compl. at ¶ 8.)  Several of

the districts created under this plan—in particular the 4th, 6th, 7th, and 8th congressional

districts—are composed of two "de-facto non-contiguous segments—i.e., discrete segments that

would be wholly non-contiguous but for the placement of one or more narrow orifices or ribbons

connecting the discrete segments." (*Id.* at ¶ 10.)  Further, in each of these districts, one of the

two "de-facto non-continuous segments" is "far more populous than the other as well as being

socioeconomically, demographically, and politically inconsistent with the other segment." (*Id.* at

¶ 11.)

> For example, Plaintiffs describe the 4th congressional district as follows[2]:
>
> This district is a majority African-American district that was first developed in
> 1990 to account for the increasing population of African-American residents
> within Prince George's County.  The dominant portion of the 4th district is
> centered in the portion of Prince George's County within the Capital Beltway and
> bordering the District of Columbia.  This portion of the [congressional] district
> contains 450,000 residents who are predominantly (74%) African-American (and
> 16% Hispanic and 6% white), urban, lower-middle income, and overwhelmingly
> Democratic voters.  President Obama received 96% of the vote within this portion
> in 2008.  This segment is attached through a narrow ribbon to the smaller segment
> of 185,000 residents in northeastern Anne Arundel County who are
> predominantly Republican voters.  President Obama received 42% of the vote
> within this portion in 2008.  These Anne Arundel residents share little in common
> with their Prince George's counterparts that is relevant to effective or meaningful
> representation. . . . Given the composition of this district, its Representative will
> be elected by the voters of the Prince George's segment, and will almost certainly

---

[1] The facts are recited here as alleged by the Plaintiff, this being a motion to dismiss.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).
[2] Plaintiffs make similar claims as to the 6th, 7th, and 8th congressional districts. (*Id.* at ¶¶ 12(b)-(d).)

be a Democrat. . . . As [a] practical matter, the election of the district's
Representative will be determined by the Democratic primary election.

(*Id.* at ¶¶ 12(a)(1)-(2).)

On November 11, 2013, Plaintiffs filed this suit challenging "the narrow ribbons and
orifices used to tie de-facto non-contiguous and demographically inconsistent segments into
individual districts." (*Id.* at ¶ 2.) Specifically, Plaintiffs allege that the "non-contiguous
structure and discordant composition of the separate distinct pieces comprising the 4th, 6th, 7th,
and 8th [c]ongressional districts" violates their rights "of representation as protected by Article I
Section 2 of the U.S Constitution," their "right to vote for . . . Representatives to Congress, as
protected by both the first and second clauses to the 14th Amendment of the U.S. Constitution,"
and their "First Amendment rights of political association." (*Id.*)

On December 2, 2013, Plaintiffs filed an amended complaint. (Am. Compl.) Defendants
now move to dismiss this amended complaint for failure to state a claim for which relief can be
granted. (ECF No. 13.)

## II.    LEGAL STANDARD

The present action challenges the "constitutionality of the apportionment of congressional
districts" and is therefore required to be heard and determined by a "district court of three
judges." 28 U.S.C. § 2284(a). However, the single judge to whom the request for a three-judge
panel is presented may "determine[] that three judges are not required" and "may conduct all
proceedings except the trial and enter all orders permitted by the rules of civil procedure except
as provided in this subsection."[3] § 2284(b)(1), (3). In particular, the single judge may grant a
defendant's motion to dismiss under Rule 12(b)(6) where a plaintiff's pleadings fail to state a

---

[3] The statute further provides that "[a] single judge shall not appoint a master, or order a reference or hear and
determine any application for a preliminary or permanent injunction or motion to vacate such an injunction, or enter
judgment on the merits." § 2284(b)(3).

claim for which relief can be granted. *Duckworth v. State Admin. Bd. Of Election Laws*, 332 F.3d 769 (4th Cir. 2003).

This motion to dismiss, like all others under Rule 12(b)(6) of the Federal Rules of Civil Procedure, is a test of the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). *See also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. v. Twombly, 550 U.S. 544, 556-57 (2007).* The Court will therefore evaluate it under the usual Rule 12(b)(6) standard.

The Court recognizes that some early cases appear to eschew the traditional 12(b)(6) standard in favor of one that looks to whether a plaintiff's complaint sets forth a "substantial question." *Faustino v. Immigration and Naturalization Services*, 302 F. Supp. 212, 213 (S.D.N.Y. 1969), *aff'd* 386 F.2d 449, *cert. denied* 391 U.S. 915; *Lamont v. Commissioner of Motor Vehicles*, 269 F. Supp. 880, 884 (S.D.N.Y. 1967), *aff'd* 386 F.2d 449, *cert. denied* 391 U.S. 915. In *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 D.2d 606 (4th Cir. 1970), for example, the Fourth Circuit held that "[w]hen it appears that there is no *substantial question* for a three-judge court to answer, dismissal of the claim for injunctive relief by the single district judge is consistent with the purpose of the three-judge statutes, and it avoids the waste and delay inherent in a cumbersome procedure." *Id.* at 611 (emphasis added); *see also Simkins v. Gressette*, 631 F.2d 287, 295 (4th Cir. 1980) ("[T]he plaintiffs have not alleged sufficient facts to raise a *substantial claim* requiring the convening of a three-judge court.") (emphasis added).

However, in fact, in the present context, the "substantial question" standard and the legal sufficiency standard are one and the same. In *Duckworth*, 332 F.3d 769, the Fourth Circuit clarified that where a plaintiff's "pleadings do not state a claim, then by definition they are

4

insubstantial and so properly are subject to dismissal by the district court without convening a three-judge court." *Id.* at 772-73. Further, in *Fletcher v. Lamone*, 831 F. Supp.2d 887 (D. Md. 2011), a three-judge panel of this Court held that "[f]or purposes of construing § 2284, we find no material distinction" between the Rule 12(b)(6) standard and the "substantial question" standard. *Id.* at 892. Therefore, the Court will apply the usual Rule 12(b)(6) standard in deciding this motion.

To pass the Rule 12(b)(6) legal sufficiency test, a complaint need only present enough factual content to render its claims "plausible on [their] face" and enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff may not, however, rely on naked assertions, speculation, or legal conclusions. *Bell Atl. v. Twombly*, 550 U.S. 544, 556-57 (2007). In assessing the merits of a motion to dismiss, the court must take all well-pled factual allegations in the complaint as true and construe them in the light most favorable to the Plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). If after viewing the complaint in this light the court cannot infer more than "the mere possibility of misconduct," then the motion should be granted and the complaint dismissed. *Iqbal*, 556 U.S. at 679.

### III.    ANALYSIS

Plaintiffs' complaint sets forth two claims. The first is a claim made under both Article I, Section 2 and the Fourteenth Amendment of the United States Constitution. (Am. Compl. at ¶ 2; ECF No. 18 at 28.) Specifically Plaintiffs "claim that the structure and composition of the 4th, 6th, 7th, and 8th districts constitute impermissible abridgment of representational and voting rights." (ECF No. 18 at 28.) The second is a claim under the First Amendment to the United States Constitution. (Am. Compl. at ¶¶ 5, 23, 32, 32; ECF No. 18 at 41.) With regard to this

second claim, Plaintiffs allege that "the intentional structure and composition of the challenged districts, . . . aggravated by the operation of Maryland's closed primary election system" infringes upon their First Amendment rights as Republican voters. (ECF No. 18 at 41.)

The Court will consider these two claims in turn. However, the Court will first address Defendants' assertion that the present action is barred by *res judicata*.

### A. Res judicata

In their motion to dismiss, Defendants assert that because the congressional redistricting plan at issue in this case was previously upheld in *Fletcher v. Lamone*, 831 F. Supp.2d 887 (D. Md.), *summarily aff'd* 133 S. Ct. 29, the instant lawsuit should be dismissed under principles of *res judicata*. Ultimately, however, the Court does not find Defendants' argument persuasive.

*Fletcher* involved a lawsuit brought by nine African-American residents of Maryland against state election officials, in which plaintiffs alleged that the 2011 congressional redistricting plan violated "their rights under Article I, § 2, of the U.S. Constitution; the Fourteenth and Fifteenth Amendments of the U.S. Constitution; and § 2 of the Voting Rights Act of 1965 because the plan dilutes African-American voting strength within the State and intentionally discriminates against African-Americans." *Id.* at 890. Particularly relevant to the case at bar is the *Fletcher* plaintiffs' claim that "Maryland's redistricting plan is an impermissible partisan gerrymander. Specifically, they argue[d] that the redistricting map was drawn in order to reduce the number of Republican-held congressional seats from two to one by adding Democratic voters to the Sixth District." *Id.* at 904. The *Fletcher* Court rejected Plaintiffs' arguments on this count—and all other counts—and entered judgment for the State on a motion for summary judgment. *Id.*

In this Circuit, "[f]or the doctrine of *res judicata* to be applicable, there must be: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and later suit; and (3) an identity of parties or their privies in the two suits." *Martin v. American Bancoporation Retirement Plan*, 407 F.3d 643, 651 (4th Cir. 2005) (quoting *Pueschel v. United States*, 369 F.3d 345 354-55 (4th Cir. 2004)).  With regard to the third element, under the theory of "virtual representation," a non-party whose interests were adequately represented by a party to the original action will be considered in privity with that original party.  *Id.* However, virtual representation is narrowly defined:

> The doctrine of virtual representation does not authorize application of a bar to relitigation of a claim by a nonparty to the original judgment where the . . . parties to the first suit are nor accountable to the nonparties who file a subsequent suit. In addition, a party acting as a virtual representative for a nonparty must do so with at least the tacit approval of the court.

*Id.* (quoting *Klugh v. United States*, 818 F.2d 294, 300 (4th Cir. 1987)).  The essential question in determining whether the "tacit approval" requirement is met is "whether there is a disclosed relationship in which the party is accorded authority to appear as a party on behalf of others." *Id.* (quoting Restatement (Second) of Judgments § 36 (1), cmt. b (1982)).

Here, Defendants assert that there is an identity of the cause of action in both the present suit and the *Fletcher* suit.  Indeed, Defendants offer that "[a]lthough not clear in every respect, the *Benisek* Plaintiffs' claims focus on the shapes of the congressional district and the effect that those shapes have on voters.  Those same types of claims were litigated extensively in *Fletcher*, and there can be no doubt that the three-judge court carefully reviewed the shapes of the districts." (ECF No. 13-2 at 10.)  However, at issue in *Fletcher* was the fact that "the redistricting map was drawn in order to reduce the number of Republican-held congressional seats from two to one by adding Democratic voters to the [s]ixth [d]istrict." *Fletcher*, 831 F.

7

Supp.2d at 904. In the case at bar, however, Plaintiffs' claim regards the 4th, 6th, 7th and 8th congressional districts. Further, as Judge Titus wrote in his concurring opinion in *Fletcher*, the *Fletcher* plaintiffs "premised their claim of political gerrymandering on allegedly improper racial motivations." *Id.* at 905. In contrast, the present case does not allege any such improper racial motivations. As a result the Court is unconvinced by Defendants' argument that there is an identity of the cause of action in both this case and *Fletcher*.

In addition, the Court is not convinced by Defendants' claim that the *Fletcher* plaintiffs virtually represented the *Benisek* Plaintiffs. Indeed, Defendants' argument, in this respect, is that the "*Fletcher* plaintiffs had exactly the same interest as the *Benisek* Plaintiffs: throwing out the plan of redistricting and drawing a new one." (ECF No. 13-2 at 11.) However, even if the Court were to credit Defendants' assertion, the doctrine of virtual representation requires more in this Circuit. Indeed, "the doctrine of virtual representation does not authorize application of a bar to relitigation of a claim by a nonparty to the original judgment where the . . . parties to the first suit are not accountable to the nonparties who file a subsequent suit." *Martin*, 407 F.3d at 651. Here, Defendants have not shown the Court how the *Fletcher* plaintiffs were accountable to the *Benisek* Plaintiffs.

Defendants appear to argue that because the *Fletcher* Court gave its tacit approval to the plaintiffs in that case to act as a virtual representative of "all who claimed to be aggrieved by the [redistricting] plan," they, in fact, served as virtual representatives of the *Benisek* Plaintiffs. However, while the tacit approval requirement is necessary to establish virtual representation, it is not sufficient. *Id.* ("*In addition*, a party acting as a virtual representative for a nonparty must do so with at least the tacit approval of the court.") (emphasis added). Defendants have failed to show that the *Fletcher* plaintiffs were accountable to the *Benisek* Plaintiffs—an independent

8

prerequisite—and therefore have failed to persuade the Court of their virtual representation claim.

Therefore, the Court does not find that Plaintiffs' claims are barred by *res judicata*. Ultimately, however, the Court will grant Defendants' motion on dismiss on other grounds.

### B. Plaintiffs' claim under Article I, Section 2 and the Fourteenth Amendment of the United States Constitution

Plaintiffs' first claim is "that the structure and composition of the 4th, 6th, 7th, and 8th [congressional] districts constitute impermissible abridgment of representational and voting rights guaranteed under Article I, Section 2 and the 14th Amendment Sections 1 & 2." (ECF No. 18 at 28.) This claim is not one that is justiciable and therefore must be dismissed.

The courts have long struggled with their role in policing the drawing of districting maps by state legislatures. Indeed, the Constitution appears to entrust the responsibility of overseeing state legislatures in this regard primarily to Congress. Article I, Section 4 gives "state legislatures the initial power to draw districts for federal elections, [but] permits Congress to 'make or alter' those districts if it wish[es]." *Vieth v. Jubelirer*, 541 U.S. 267, 275 (2010) (plurality opinion) (quoting U.S. Const. art I, § 4). However, since *Baker v. Carr*, 369 U.S. 186 (1962), Courts have "consistently adjudicated equal protection claims in the legislative districting context regarding inequalities in population between districts," giving rise to the formulation of the "one person, one vote" rule. *Davis v. Bandemer*, 478 U.S. 109, 118 (1986) (plurality opinion), *rev'd on other grounds*, 541 U.S. 267 (2010); *Reynolds v. Sims*, 377 U.S. 533, 557-661 (1964); *Wesberry v. Sanders*, 376 U.S. 1 (1964). Further, even where there are no population inequalities among districts, courts have "reviewed, and on occasion rejected, districting plans that unconstitutionally diminished the effectiveness of the votes of racial minorities." *Bandemer*, 478 U.S. at 199 (collecting cases).

9

However, here, Plaintiffs make neither an unequal population claim nor a racial discrimination claim.  Rather, Plaintiffs' claim is that because the 4th, 6th, 7th, and 8th congressional districts are composed of "de facto non-contiguous" segments, the voters in those districts—particularly those in the smaller segment of the district—are marginalized in that they enjoy decreased quality of representation and suffer a harm akin to vote dilution. (ECF No. 18 at 29.)  Theirs is, in essence, a claim of political gerrymandering.

In *Davis v. Bandemer*, the Supreme Court further expanded the judiciary's role in overseeing the districting process.  It ruled that political gerrymandering claims—or, as the Court phrased it, "claim[s] that each political group in a State should have the same chance to elect representatives of its choice as any other political group"—were justiciable.  *Id.* at 124.  The Court went on to explain that where unconstitutional vote dilution is alleged with regard to an individual district, courts should focus their inquiry "on the opportunity of members of the group to participate in party deliberations in the slating and nomination of candidates, their opportunity to register and vote, and hence their chance to directly influence the election returns and to secure the attention of the winning candidate." *Id.* at 133.

However, the *Bandemer* standard faced harsh criticism from its inception.  In her dissenting opinion, Justice O'Connor noted that the *Bandemer* opinion implicitly endorsed "some use of simple proportionality as the standard for measuring the normal representational entitlements of a political party." "[T]he plurality opinion," she continued, "ultimately rests on a political preference for proportionality—not an outright claim that proportional results are required, but a conviction that the greater the departure from proportionality, the more suspect an apportionment becomes." *Id.* at 158. The plurality's standard, she predicted, "will over time

either prove unmanageable and arbitrary or else evolve towards some loose form of

proportionality." *Id.* at 155.

Eighteen years later, in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), the Supreme Court,

endorsing Justice O'Connor's dissent, reversed *Bandemer*. Indeed, the Court found that:

> Eighteen years of judicial effort with virtually nothing to show for it justify us in
> revisiting the question whether the standard promised by *Bandemer* exists. As the
> following discussion reveals, no judicially discernible and manageable standards
> for adjudicating political gerrymandering claims have emerged. Lacking them,
> we must conclude that gerrymandering claims are nonjusticiable and that
> *Bandemer* was wrongly decided.

*Id.* at 281.

In so holding, the Court distinguished political gerrymandering claims from claims

involving districts of unequal population. It expressly stated that the one-person, one-vote

standard had "no bearing upon this question [of political gerrymandering], neither in principle

nor in practicality." *Id.* at 290. With regard to principle, echoing Justice O'Connor's dissent in

*Bandemer*, the Court explained that "to say that each individual must have an equal say in the

selection of representatives, and hence that a majority of individuals must have a majority say, is

not at all to say that each discernible group, whether farmers or urban dwellers or political

parties, must have representation equivalent to its numbers." *Id.* The Constitution "guarantees

equal protection of the law to persons, not equal representation in government to equivalently

sized groups." *Id.* at 288.

> And, with regard to practicality, the Court noted that:

> the easily administrable [one-person, one-vote] standard of population equality
> adopted by *Wesberry* and *Reynolds* enables judges to decide whether a violation
> has occurred (and to remedy it) essentially on the basis of three readily
> determined factors—where the plaintiff lives, how many voters are in his district,
> and how many voters are in other districts; whereas requiring judges to decide
> whether a districting system will produce a statewide majority for a majority party

11

casts them forth upon a sea of imponderables, and asks them to make
determinations that not even election experts can agree upon.

*Id.* at 290.

The Court in *Vieth* also highlighted the contrast between *political* gerrymandering claims

and *racial* gerrymandering claims. On the one hand, "[t]he Constitution clearly contemplates

districting by political entities, see Article I, § 4, and unsurprisingly that turns out to be root-and-

branch a matter of politics." *Id.* at 285. On the other hand, "the purpose of segregating voters on

the basis of race is not a lawful one." *Id.* at 286. While "[a] purpose to discriminate on the basis

of race receives the strictest scrutiny under the Equal Protection Clause, . . . a similar purpose to

discriminate on the basis of politics does not." *Id.* at 293. In rejecting a proposed test for

political gerrymandering loosely based on racial discrimination cases applying § 2 of the Voting

Rights Act of 1965, 42 U.S.C. § 1973, the Court explained:

> A person's politics is rarely as discernible—and *never* as permanently
> discernible—as a person's race. Political affiliation is not an immutable
> characteristic, but may shift from one election to the next; and even within a given
> election, not all voters follow the party line. We dare say (and hope) that the
> political party which puts forward an utterly incompetent candidate will lose even
> in its registration stronghold. These facts make it impossible to assess the effects
> of partisan gerrymandering, to fashion a standard for evaluating a violation, and
> finally craft a remedy.

*Vieth*, 541 U.S. at 287.

Although the holding in *Vieth* was that the political gerrymandering claim advanced there

was not justiciable, in a concurring opinion, Justice Kennedy, who provided the *Vieth* plurality

with the crucial fifth vote, did leave open the door to judicial relief in future cases "if some

limited and precise rationale were found to correct an established violation of the Constitution in

some redistricting cases." *Id.* at 306 (Kennedy, J., concurring). In *League of United Latin*

*American Citizens (LULAC) v. Perry*, 584 U.S. 399 (2006), the Court explained that "a

successful claim attempting to identify unconstitutional acts of partisan gerrymandering must . . .

show a burden, as measured by a reliable standard, on the complainants' representational rights."

*Id.* at 418. Nonetheless, this reliable standard—described in *Baker* as a "judicially discoverable

and manageable standard[]"—has proved elusive. 369 U.S. at 217. As this Court noted in

*Fletcher*, "all of the lower courts to apply the Supreme Court's *Vieth* and *LULAC* decisions have

rejected" parties' proposed standards. *Fletcher*, 831 F.supp.2d at 904; *see also Radogno v.*

*Illinois State Bd. of Elections*, No. 1:11-cv-04884, 2011 WL 5868225 (N.D. Ill. Nov. 22, 2011)

(reviewing seven standards the Supreme Court has rejected).

In the case at bar, Plaintiffs urge the Court to recognize that "constitutionally adequate

representation must consist of more than just equal population," and they offer a "standard for

judging whether minimal representational rights are afforded or abridged within the smaller

segments of the 4th, 6th, 7th, and 8th districts." (Am. Compl. at ¶¶ 17, 3.) Specifically, Plaintiffs

contend that "the presence of either (1) geographic or (2) demographic/political contiguity—i.e.,

real or de-fact contiguity or similarity in the demographic/partisan composition of non-

contiguous (including essentially or de-facto non-contiguous) segments—" is required by Article

I, Section 2 and the Fourteenth Amendment of the Constitution.

However, the standard Plaintiffs propose is, in substance, markedly similar to tests that

have already been rejected by the courts. Indeed, Justice Kennedy in his concurring opinion in

*Vieth* specifically observed that "even those criteria that might seem promising at the outset (e.g.,

continuity and compactness) are not altogether sound as independent judicial standards for

measuring a burden on representational rights. They cannot promise political neutrality when

used as the basis for relief." *Vieth*, 541 U.S. at 308-09; *see also* M. Altman, Modeling the Effect

of Mandatory District Compactness on Partisan Gerrymanders, 17 Pol. Geography 989, 1000–

1006 (1998) (explaining that compactness standards help Republicans because Democrats are more likely to live in high density regions). And, as this Court pointed out in *Fletcher*, the Supreme Court has made clear that "[t]he Constitution does not mandate regularity of district shape." *Fletcher*, 831 F. Supp. 2d at 903 (quoting *Bush v. Vera*, 517 U.S 952, 962 (1996)).

The Court is not insensitive to Plaintiffs' contention that Maryland's districts as they are currently drawn work an unfairness to Republicans.[4] Referring to Maryland's third congressional district, Judge Niemeyer despaired that "the original Massachusetts Gerrymander looks tame by comparison, as this is more reminiscent of a broken-winged pterodactyl, lying prostrate across the center of the State." *Id.* at 902 n.5. Further, although "Maryland's Republican Party regularly receives 40% of the statewide vote . . . [it] might well retain only 12.5% of the congressional seats." *Id.* at 903.

It may well be that the 4th, 6th, 7th, and 8th congressional districts, which are at issue in this case fail to provide "fair and effective representation for all citizens." *Reynolds*, 377 U.S. at 565-68. However, as the Supreme Court has made clear in *Vieth* and *LULAC*, this Court lacks "judicially discoverable and manageable standards for resolving" Plaintiffs' claim. *Vieth*, 541 U.S. at 277-281 (quoting *Baker*, 369 U.S. at 217); *see also LULAC*, 548 U.S. at 423. As a result, it is a nonjusticiable political question. The power to address Plaintiffs' concerns thus lies not with the judiciary but rather with the State of Maryland and the United States Congress. *See* United States Constitution art. I, § 4. Plaintiffs' claim must therefore be dismissed.

---

[4] In other states, where Republicans control the state legislature, Democrats contend that they are unjustly disadvantaged by the layout of congressional districts. *See, e.g.*, Suzy Khimm, *Don't Mess with Texas Democrats*, Mother Jones, Sept./Oct. 2010, http://www.motherjones.com/politics/2010/08/matt-angle-texas-redistricting ("The Texas Republican [Tom DeLay], known as 'The Hammer,' had orchestrated a Machiavellian scheme to redraw the state's congressional districts and banish Democrats from power. In 2004, [U.S. Representative] Martin Frost was one of the four Texas Dems in the House picked off as a result.")

14

### C. Plaintiffs' First Amendment Claim

Plaintiffs' second claim is that the structure and composition of the 4th, 6th, 7th, and 8th congressional districts infringe upon their First Amendment rights of political association. (Am. Compl. at ¶ 5.) As Plaintiffs explain, "[m]uch of our contention here rests on the impact on Republican voters, due to their party affiliation, resulting from the intentional structure and composition of the challenged districts and which is aggravated by the operation of Maryland's closed primary election system." (ECF No. 18 at 41.)

However, just as in *Anne Arundel County Republican Central Committee v. State Administrative Board of Elections*, 781 F. Supp. 394, 401 (D. Md. 1991) and *Duckworth*, 213 F. Supp. 2d at 557-58, "nothing [about the congressional districts at issue in this case] . . . affects in any proscribed way . . . [P]laintiffs' ability to participate in the political debate in any of the Maryland congressional districts in which they might find themselves. They are free to join pre-existing political committees, form new ones, or use whatever other means are at their disposal to influence the opinions of their congressional representatives."

Further, as the Fourth Circuit ruled in *Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir. 1981), "to the extent [the First Amendment] protects the voting rights here asserted . . . their protections do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments [sic]."

Accordingly, Plaintiffs' claim under the First Amendment is not one for which relief can be granted, and it must therefore be dismissed.

## IV.   CONCLUSION

The Court therefore GRANTS Defendants' motion to dismiss (ECF No. 13) without referring

the present matter to a three-judge panel.

Dated this _8_ day of April, 2014.

BY THE COURT:

James K. Bredar
United States District Judge