## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Stephen M. Shapiro**

**Maria A. Pycha**

**O. John Benisek**

**Edmund Cueman**
1201 Woods Road
Westminster, MD 21158
Carroll County

**Jeremiah DeWolf**
4709 Mount Briar Road
Keedysville, MD 21756
Washington County

**Charles W. Eyler, Jr.**
13249 Creagerstown Road
Thurmont, MD 21788
Frederick County

**Kat O'Connor**
9321 Watkins Road
Gaithersburg, MD 20882
Montgomery County

**Alonnie L. Ropp**
8410 Myersville Road
Middletown, MD 21769
Frederick County

**Sharon Strine**
12709 Martin Road
Smithsburg, MD 21783
Frederick County

Case No. 13-cv-3233

Three-Judge Court

                                **Plaintiffs,**

**vs.**

**David J. McManus, Jr.,**[*] **et al.,**
*in their official capacities,*

                                **Defendants.**

## SECOND AMENDED COMPLAINT

---

[*]    By operation of Federal Rule of Civil Procedure 25(d), David J. McManus, Jr., in his official capacity as Chair of the Maryland State Board of Elections, is automatically substituted for defendant Bobby S. Mack.

Plaintiffs Stephen M. Shapiro, Maria A. Pycha, O. John Benisek, Edmund Cueman, Jeremiah DeWolf, Charles W. Eyler, Jr., Kat O'Connor, Alonnie L. Ropp, and Sharon Strine, for their complaint against defendants Linda H. Lamone and David J. McManus, Jr., in their official capacities, allege by and through their attorneys, as follows.

## TABLE OF CONTENTS

Introduction ................................................................................................................ 3

Jurisdiction and Venue .............................................................................................. 6

The Parties ................................................................................................................. 6

    A. The plaintiffs ..................................................................................................... 6

    B. The defendants .................................................................................................. 9

Conceptual and Legal Framework ............................................................................ 9

    A. What partisan gerrymandering does ................................................................ 9

    B. Why partisan gerrymandering violates the Constitution ............................... 11

    C. The burden imposed by a partisan gerrymander .......................................... 12

Factual Allegations ................................................................................................. 13

    A. The Plan was drafted in secret by known partisans and passed by the legislature and signed by Governor O'Malley with no Republican input and no opportunity for public review ..................................................... 13

    B. The Plan produced a map that cracks and packs Republican voters, ignores traditional political boundaries, and divides communities of common political and social interests, with the result of preventing Republican voters in the pre-2011 6th District from electing a Republican representative ......................................................................... 16

    C. The purpose of the Plan was to burden Republican voters by reason of their political views, voting history, and political-party affiliation .................... 29

        1. Direct and circumstantial facts ................................................................ 29

        2. Statistical facts ......................................................................................... 32

        3. Chilling .................................................................................................... 34

    D. The Plan's burden on Republican voters cannot be explained by geography or compliance with legitimate redistricting criteria ........................... 35

Claims for Relief ..................................................................................................... 37

    A. Violation of the First Amendment ..................................................................... 37

    B. Violation of Article 1, Sections 2 and 4 ........................................................... 38

Prayer for Relief ...................................................................................................... 39

## INTRODUCTION

1.      This is a constitutional challenge to Maryland's 2011 congressional redistricting plan (the "Plan," attached as Exhibit A), and specifically to the "cracking" of Maryland's 6th Congressional District, which was purposefully and successfully flipped from Republican to Democratic control by strategically moving the district's lines by reason of citizens' voting records and known party affiliations.

2.      Voters in Maryland and throughout the Nation ought to be able to organize politically, to support political campaigns, to register with their preferred political parties, and to vote for their preferred candidates without fear that—if they succeed in electing the public officials of their choice—they will be retaliated against by the legislature. Yet that is just what the Maryland legislature did when it enacted the Plan in 2011.

3.      In 2010, registered Republican voters—comprising 32% of the party-affiliated registered voters in Maryland—were able to elect two of the eight members of the House of Representatives from Maryland, those from the 1st and the 6th Congressional Districts. But in 2011, the Democratic-controlled Maryland legislature violated the First Amendment and Article I of the Federal Constitution when it used data reflecting the political party memberships, party registrations, and voting histories of Republican and Democratic voters in the 6th and surrounding districts to gerrymander the 6th District for the purpose and with the effect of enhancing the effectiveness of votes cast in favor of Democratic candidates and diluting the effectiveness of votes cast in favor Republican candidates in the general election for a representative from the 6th District.

4.      The legislature gerrymandered the boundaries of the 6th District to remove a net total of over 65,000 registered Republican voters from the district (and disburse them among surrounding districts with large Democratic majorities) and add a net total of over 30,000 Democratic voters to the district. The purpose and the effect of this cracking of the

6th District was to nullify the ability of Republican voters in the former 6th District to elect a Republican of their choice to Congress and to the prevent them from reelecting Representative Roscoe Bartlett, the 20-year Republican incumbent from the 6th District, in the 2012 general election. That purpose was achieved: In 2012 congressional election, the 6th District was flipped by the Plan from Republican to Democratic control. The district remained under Democratic control after the 2014 congressional election and is nearly certain to remain so in all future congressional elections under the Plan.

5.      The Plan is widely regarded as one of the worst partisan gerrymanders in American history. Earlier in this case, Judge James K. Bredar of this Court acknowledged that "[i]t may well be that the 4th, 6th, 7th, and 8th congressional districts . . . fail to provide 'fair and effective representation for all citizens.'" *Benisek v. Mack*, 11 F. Supp. 3d 516, 526 (D. Md.) *aff'd*, 584 F. App'x 140 (4th Cir. 2014) *rev'd sub nom. Shapiro v. McManus*, 136 S. Ct. 450 (2015). And in separate litigation challenging the Plan on different grounds, Judge Paul Niemeyer observed that "[m]any obvious communities of interest are divided" and the 3rd District is so contorted that it is "reminiscent of a broken-winged pterodactyl, lying prostrate across the center of the state." *Fletcher v. Lamone*, 831 F. Supp. 2d 887, 902 n. 5 (D. Md. 2011) *summarily aff'd*, 133 S. Ct. 29 (2012).

6.      The Plan is manifestly unconstitutional. The drafters of the Plan focused predominantly on the voting histories and political-party affiliations of the citizens of the State in deciding how to draw district lines. And it did so with the clear purpose and effect of diluting the votes of Republican voters and preventing them from electing their preferred representatives in Congress. In particular, the legislature succeeded in "cracking" the formerly Republican 6th District, where a Republican bloc of voters was divided by the Plan among the 1st, 6th, 7th and 8th Districts, giving the Democrats a majority in the new 6th District and allowing them to flip the seat to Democratic control.

7.     A State violates the First Amendment when it "enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring). A three-part analysis demonstrates that Maryland's 2011 partisan gerrymander violates the First Amendment in just this way.

   a.     *First*, the Maryland legislature expressly and deliberately considered Republican voters' protected First Amendment conduct, including their voting histories and political party affiliations, when it redrew the lines of the 6th Congressional District; and it did so with an intent to disfavor and punish those voters by reason of their constitutionally protected conduct.

   b.     *Second*, the Plan, in actual effect, has burdened Republican voters in the former 6th Congressional District.  Republican voters in the former 6th District would have been able to elect a Republican representative in 2012 and 2014, but for the cracking of the district under the Plan. In other words, the vote dilution resulting from the cracking of the 6th District achieved its goal of preventing Republicans in the former 6th District from continuing to elect a Republican representative to the United States House of Representatives, as they had in the prior ten congressional elections.

   c.     *Finally*, the State cannot justify the cracking of the 6th District by reference to geography or compliance with legitimate redistricting criteria.

8.     The injury inflicted on Republican voters in this case is, moreover, clear and perceptible. Prior to enactment of the Plan, Republican voters comprised a sufficiently great share of the 6th District that they were reliably able to elect a Republican representative. In the 70 years between January 1943 and January 2013, the district was represented in Congress by members of the Republican Party in four years out of every five, including for the entire two decades between 1993 and 2013. But after the Plan cracked the

6th District in 2011, Republicans kept *in* the 6th District and those moved *out* of the 6th District were no longer able to elect their preferred representative to the House—precisely as the mapmakers, legislators, and governor intended.

9.      Maryland's 2011 redistricting plan therefore violates the First Amendment. The legislature adopted the contorted districts at issue here—and the shapes of the 1st, 6th, 7th, and 8th Districts in particular—with an eye to citizens' voting histories and party affiliations and with the purpose of punishing Republicans and preventing them from electing a Republican representative from the 6th District. The legislature succeeded in its efforts. And there is no plausible justification for the Plan's cartographic convolutions to save it from invalidation.

10.     The Plan accordingly should be declared a violation of the First Amendment and of Article I, Sections 2 and 4 of the Constitution; the defendants should be enjoined from enforcing the Plan at any stage of any future election; and the legislature should be ordered to enact a new and valid plan within a reasonable time.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a), and 2284(a) and 42 U.S.C. § 1983. It has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and its general equitable powers.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the defendants are domiciled in this district and because a substantial part of the events or omissions giving rise to the claims asserted occurred in this district.

## THE PARTIES

**A.      The plaintiffs**

13.     Plaintiffs are qualified, registered voters in the State of Maryland. Together with other supporters of the Republican Party, plaintiffs have been harmed by the Plan's

unlawful partisan gerrymander because it burdens citizens by reason of their voting history and political party affiliation.

14.     Stephen M. Shapiro is a citizen of the United States and a resident of and registered voter in Maryland. He was a registered Democrat but occasionally voted for Republican candidates prior to 2011. Before enactment of the Plan, Mr. Shapiro's residence was in the 8th Congressional District. Following enactment of the Plan, his residence remains in the 8th Congressional District. He has since continued occasionally to support Republican candidates and policies and will continue doing so from time to time.

15.     Maria A. Pycha  is a citizen of the United States and a resident of and registered voter in Maryland. She was a registered Republican and voted for Republican candidates prior to 2011. She has since continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office. Ms. Pycha is the Vice Chair of the Baltimore County Republican Central Committee and served as the finance director for the campaign committee of the 2014 Republican nominee for United States House of Representatives from the 6th District, Dan Bongino.

16.     O. John Benisek is a citizen of the United States and a resident of and registered voter in Maryland. Before enactment of the Plan, Mr. Benisek's residence was in the 6th Congressional District. Following enactment of the Plan, his residence remains in the 6th Congressional District. He was a registered Republican and voted for Republican candidates prior to 2011. He has continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office.

17.     Edmund Cueman is a citizen of the United States and a resident of and registered voter in Maryland. Before enactment of the Plan, Mr. Cueman's residence was in the 6th Congressional District. As a result of the Plan, his residence is now in the 8th Congressional District. He was a registered Republican and voted for Republican can-

didates prior to 2011. He has continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office.

18.     Jeremiah DeWolf is a citizen of the United States and a resident of and registered voter in Maryland. Before enactment of the Plan, Mr. DeWolf's residence was in the 6th Congressional District. Following enactment of the Plan, his residence remains in the 6th Congressional District. He was a registered Republican and voted for Republican candidates prior to 2011. He has continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office. Mr. DeWolf is a member of the Washington County Republican Central Committee.

19.     Charles W. Eyler, Jr., is a citizen of the United States and a resident of and registered voter in Maryland. Before enactment of the Plan, Mr. Eyler's residence was in the 6th Congressional District. As a result of the Plan, his residence is now in the 8th Congressional District. He was a registered Republican and voted for Republican candidates prior to 2011. He has continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office.

20.     Kat O'Connor is a citizen of the United States and a resident of and registered voter in Maryland. Before enactment of the Plan, Ms. O'Connor's residence was in the 6th Congressional District. Following enactment of the Plan, her residence remains in the 6th District. She was a registered Republican and voted for Republican candidates prior to 2011. She has continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office. Ms. O'Connor serves as the Communications Chair for the Montgomery County Republican Central Committee.

21.     Alonnie L. Ropp is a citizen of the United States and a resident of and registered voter in Maryland. Before enactment of the Plan, Ms. Ropp's residence was in the 6th Congressional District. As a result of the Plan, her residence is now in the 8th

Congressional District. She was a registered Republican and voted for Republican candidates prior to 2011. She has continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office. Ms. Ropp formerly served as the Chair for the Frederick County Republican Central Committee.

22.     Sharon Strine is a citizen of the United States and a resident of and registered voter in Maryland. Before enactment of the Plan, Mrs. Strine's residence was in the 6th Congressional District. As a result of the Plan, her residence is now in the 8th Congressional District. She was a registered Republican and voted for Republican candidates prior to 2011. She has continued to support Republican candidates and policies and will continue voting for Republican candidates for elective office. Mrs. Strine served as the campaign manager for the 2014 Republican nominee for United States House of Representatives from the 6th District, Dan Bongino.

**B.     The defendants**

23.     David J. McManus, Jr., is the chairman of the Maryland State Board of Elections, acting in his official capacity.

24.     Linda H. Lamone is the Maryland State Administrator of Elections, acting in her official capacity.

25.     The mission of the Maryland State Board of Elections is to ensure compliance with the requirements of Maryland and federal election laws by all persons involved in the election process. It bears responsibility for administering federal elections under the Plan.

## CONCEPTUAL AND LEGAL FRAMEWORK

**A.     What partisan gerrymandering does**

26.     The crux of every partisan gerrymander is the dominant party's effort to dilute the effectiveness of the votes in favor of the disfavored party. *See generally* Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*,

82 U. Chi. L. Rev. 831, 834 (2015). This complaint refers to the political party that controls redistricting as the "dominant party" and to the party whose votes are intentionally diluted through redistricting as the "disfavored party."

27.    The goal of a partisan gerrymander is to punish the disfavored party's supporters by reason of their support for the disfavored party, with the specific aim of preventing those supporters from electing their preferred elected officials. According to the Supreme Court, the goal is, in other words, "to subordinate adherents of one political party and entrench a rival party in power." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015).

28.    This end is achieved by drawing district lines so that the dominant party wins a large number of seats by narrow margins and the disfavored party wins a small number of seats by wide margins. These two strategies are often called "cracking" (splitting a party's supporters between districts so they fall short of a majority in each one) and "packing" (stuffing remaining supporters in a small number of districts that they win by wide margins). See generally *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994) (describing cracking and packing); Stephanopoulos & McGhee, *supra*, at 851 (same). All partisan gerrymanders work through some combination of packing and cracking. The net result is to dilute the efficiency and effect of the votes of the disfavored party's supporters.

29.    Although partisan gerrymandering is nothing new (*see, e.g.*, Elmer C. Griffith, *The Rise and Development of the Gerrymander* (1907)), it has never before in the Nation's history so systemically undermined the Constitution's promise of representative democracy. *See generally* Thomas E. Mann & Norman J. Ornstein, *It's Even Worse Than It Looks: How The American Constitutional System Collided with the New Politics of Extremism* (2012). As a result of both increasing partisanship and more sophisticated voter data collection and analysis, map-drawers in recent decades have been able to create

redistricting plans in ways that crack and pack with unprecedented efficiency and accuracy. *See generally* Stephanopoulos & McGhee, *supra*, at 876; Samuel S.-H. Wang, *Three Tests for Practical Evaluation of Partisan Gerrymandering* 9-12 (Dec. 2015), perma.cc/W52P-MQG3 (forthcoming in the Stanford Law Review, vol. 68).

30.     Severe gerrymanders are self-reinforcing and cannot be corrected through the political process. Incumbent state legislators have no incentive to fix an unfair gerrymander, which by definition benefits them and their colleagues in the State's federal delegation; and adherents of the disfavored party are unable to replace the entrenched legislators because their votes have been unfairly diluted. More broadly, gerrymandering has come to be seen as a national "war" in which singular state legislatures are unwilling to "disarm" unilaterally. *See, e.g.*, Jamie Raskin & Rob Richie, *Fair representation for all*, The Balt. Sun (Nov. 7, 2011), perma.cc/QLP5-6QP8.

**B.     Why partisan gerrymandering violates the Constitution**

31.     A successful partisan gerrymander of congressional districts violates the Constitution in two ways.

32.     *First*, it violates the First Amendment when it burdens the supporters of a political party by reason of their protected First Amendment conduct—that is, by reason of the expression of their political views, the casting of their votes, and their affiliations with political parties of their choice. *See Vieth*, 541 U.S. at 314 (Kennedy, J., concurring).

33.     That straightforward conclusion finds repeated support in the Supreme Court's precedents. If a burden were imposed on citizens "because of [their] constitutionally protected speech or associations," the Court has said, "[their] exercise of those freedoms would in effect be penalized and inhibited." *Elrod v. Burns*, 427 U.S. 347, 359 (1976). On that theory, "[a] burden that falls unequally on [particular] political parties, . . . impinges,

by its very nature, on associational choices protected by the First Amendment." *Anderson* v. *Celebrezze*, 460 U.S. 780, 793 (1983).

34.     Thus, a redistricting map can violate the First Amendment when it "has the purpose and effect of burdening a group of voters' representational rights." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring). "If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest." *Id*.

35.     *Second*, and for the same reasons, a successful partisan gerrymander violates the representational rights protected by Article 1, Sections 2 and 4. Although Section 4, also known as the Elections Clause, "grants to the States 'broad power' to prescribe the procedural mechanisms for holding congressional elections," the Supreme Court has admonished that it is not "a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833-834 (1995); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

36.     As States undertake their duties under Article I of the Constitution, therefore, "no classification of the people can be made to advance the state legislature's preference for one class [of voters] to the detriment of another." *Anne Arundel Cty. Republican Cent. Comm.* v. *State Admin. Bd. of Election Laws*, 781 F. Supp. 394, 402 (D. Md. 1991) (Niemeyer, J., dissenting). That is because Article I, like the First Amendment, implies "[a] prohibition . . . against classifications that are based on how the voters voted and can be expected to vote, for the purpose of steering the outcome of an election." *Id.* at 403.

**C.     The burden imposed by a partisan gerrymander**

37.     The gerrymander in this case clearly and concretely "burdens the representational rights of the complaining party's voters for reasons of ideology, beliefs, or political

association." *Vieth*, 541 U.S. at 315 (Kennedy, J., concurring). Justice Kennedy found the claims in *Vieth* insufficient because the plaintiffs in that case failed to provide a "standard by which to measure the burden . . . imposed on their representational rights" on a statewide basis. *Id.* at 313. *Cf. LULAC v. Perry*, 548 U.S. 399, 404 (2006) (rejecting a redistricting claim based on a "sole-motivation theory," where the plaintiffs "explicitly disavow[ed]" a need to "show a burden, as measured by a reliable standard, on the complainants' representational rights").

38.    The same cannot be said here. Maryland legislators and their mapmakers set out to crack the 6th District and thereby to prevent voters in that district from electing a Republican representative to Congress—*and they succeeded in doing so*. Maryland legislators and their mapmakers sorted many Republican voters in the pre-2011 6th Congressional District into the new 8th and 7th Congressional Districts, leaving other Republican voters in the new 6th Congressional District, all by reason of those voters' political party affiliations and voting histories. They did so with a purpose and actual effect of preventing those voters (both those moved out of and those left in the district) from electing their preferred representative to Congress.

## FACTUAL ALLEGATIONS

**A.    The Plan was drafted in secret by known partisans and passed by the legislature and signed by Governor O'Malley with no Republican input and no opportunity for public review**

39.    The Plan was drawn up by the Governor's Redistricting Advisory Committee (the GRAC) and enacted into law without any meaningful Republican input.

40.    The Plan was passed against the backdrop of pervasive gerrymandering throughout Maryland's recent history. In fact, the Democratic Party has maintained majority control over the House of Delegates and State Senate since 1920, and to a degree far greater than the party's statewide share of votes would predict.

41.     The state legislature has been dogged by allegations of partisan gerryman-dering for the past 20 years, in particular. In 1992, Maryland's highest court called the legislative redistricting plan "perilously close" to violating the state's constitution. *See Legislative Redistricting Cases*, 629 A.2d 646, 666 (Md. 1993).

42.     In 2002, the Maryland Court of Appeals struck down the state legislative redistricting map for violating the "due regard" provision of the Maryland Constitution and instituted its own districting plan. *See In re Legislative Redistricting*, 805 A.2d 292, 328 (Md. 2002). The current legislative map was also drawn up by GRAC in 2011 and has faced persistent litigation since it was implemented. *See In re 2012 Legislative Districting of the State,* 80 A.3d 1073 (Md. 2013).

43.     In early 2011, Governor O'Malley, a Democrat, appointed the five members of the GRAC, stacking it with reliably partisan confidantes:

a.     Committee Chair Jeanne Hitchcock, who was Governor O'Malley's Secretary of Appointments and former Deputy Mayor of Baltimore;

b.     Senate President Thomas V. Mike Miller, Jr., a Democrat;

c.     Maryland House of Delegates Speaker Michael E. Busch, a Democrat;

d.     Delegate James J. King, a former one-term member of the Maryland House of Delegates who served as a Republican but was chosen without input from Republican leadership; and

e.     Richard Stewart, a private business owner who chaired Governor O'Malley's 2010 re-election campaign in Prince George's County.

44.     The GRAC was tasked with drafting a recommended plan for the State's legislative and congressional redistricting in light of the 2010 census results. Although the GRAC held public hearings around the State in the summer of 2011 and received some 350 comments from members of the public, those hearings were mere window dressing.

45.     In fact, the Plan was developed entirely in secret. The GRAC never discussed or revealed its own plan for the proposed map to the public. Instead, the committee members conducted their deliberations and calculations entirely behind closed doors. This was made possible because the GRAC—by design—was not required by law to abide by the Maryland Open Meetings Act.

46.     The GRAC drew its proposed redistricting map with no input or participation from Republican lawmakers. The GRAC did, however, have access to the Maryland Board of Elections statistical data, which provides highly detailed geographic information about voter registration, party affiliation, and voter turnout across the State.

47.     Precinct-by-precinct voting information available to the GRAC allowed the committee to analyze voting patterns and political affiliation at a granular level. The Maryland State Board of Elections posts a trove of statistics on Maryland voters, including voter registration by precinct, election day turnout by precinct and party, party share of vote by voting category, and voter consistency. This information, among other data, was used to shape partisan congressional districts with pinpoint accuracy.

48.     The committee approved its final map on October 4, 2011, by a 4-to-1 vote. Former Delegate King—the lone Republican—cast the sole dissenting vote.

49.     After receiving the GRAC's proposed plan on October 4, 2011, Governor O'Malley published a "substantially similar" final version on the evening of Saturday, October 15, 2011, just two days before the special session of the legislature he had called to approve it. *See* Annie Linskey & John Fritze, *O'Malley Unveils Proposed Congressional Map*, Balt. Sun (Oct. 15, 2011).

50.     With no opportunity for public comment, the bill was introduced on the following Monday morning, approved by the Senate redistricting committee the same afternoon, and passed a vote of the Senate the next Tuesday morning. *See* Aaron C. Davis,

*Maryland Senate Approves Gov. Martin O'Malley's Redistricting Map*, *33 to 13*, Wash. Post (Oct. 18, 2011). The House of Delegates followed a similarly expedited process, but a Republican parliamentary maneuver held up the vote for a day. *See* Annie Linskey & John Fritze, *O'Malley's Map Easily Wins House Approval*, Balt. Sun (Oct. 19, 2011).

51.    On Thursday, October 20, 2011—barely 72 hours after it was proposed in the Senate—Governor O'Malley signed the Plan into law. *See* Annie Linskey & John Fritze, *O'Malley's Map Signs Congressional Map Into Law*, Balt. Sun (Oct. 20, 2011).

52.    Not a single one of Maryland's 55 Republican legislators voted for the map at any stage of the process, including the nine Republican legislators on the Senate and House redistricting committees and former Delegate James King, who served on the GRAC. Through its public hearings and the inclusion of a Republican lawmaker, the GRAC attempted to create the appearance of bipartisanship and openness. But in reality, the Plan was drafted in secret, and Democratic lawmakers and committee members rushed it through the legislature hastily and with no input from their Republican colleagues.

53.    Without intervention, the Plan will remain in effect through at least 2020.

**B.     The Plan produced a map that cracks and packs Republican voters, ignores traditional political boundaries, and divides communities of common political and social interests, with the result of preventing Republican voters in the pre-2011 6th District from electing a Republican representative**

54.    The Plan is widely regarded as one of the most gerrymandered in the Nation. A detailed analysis conducted by *The Washington Post* confirms that "Maryland and North Carolina are essentially tied for the honor of most-gerrymandered state" overall. *See* Christopher Ingraham, *America's most gerrymandered congressional districts*, The Wash. Post (May 15, 2014), perma.cc/9JP6-FDZD.

55. The following graphic depicts Maryland's 2011 redistricting plan.



56. The congressional districts are held together by narrow ribbons of territory and have evoked comparisons to a "praying mantis" (Ingraham, *supra*), a "Rorschach-like eyesore" (*Fletcher*, 831 F. Supp. 2d at 906 (Titus, J., concurring)), and a "broken-winged pterodactyl, lying prostrate across the center of the State" (*id.* at fn. 5). An unsigned editorial in *The Washington Post* decried that the Plan "mocks the idea that voting districts should be compact or easily navigable," explaining that, "[t]o protect incumbents and for partisan advantage, the map has been sliced, diced, shuffled and shattered, making districts resemble studies in cubism." *Md. redistricting maps are comic and controversial*, The Wash. Post (Oct. 29, 2011), perma.cc/A7BN-6LSD.

57. Several of the districts are essentially noncontiguous, split into two or more segments held together by narrow ribbons along major interstate highways. The 4th, 6th, 7th, and 8th Districts each consist of at least two distinct segments, one segment of which is more populous than the other and is socioeconomically, demographically, and politically

inconsistent with the other segment. In each of these districts, the larger and smaller sections are connected only in a technical sense by a narrow ribbon.

58.     A car driving from Bethesda on a direct route along I-495, I-95, and I-83 through Baltimore to Towson—a mere 50 mile trip—would set out from Maryland's 8th District and in sequence pass through the 3rd District, 4th District, 5th District, 4th District, 3rd District, 2nd District, 3rd District, 7th District, 3rd District, 2nd District, 3rd District, 7th District, 3rd District, and 2nd District, until finally arriving in Towson. That's in and out of six congressional districts 14 times over just 50 relatively straight miles. And that's to say nothing of that fact that Towson—a town of just 55,000—is itself split among the 1st, 2nd, and 3rd Districts.

59.     In addition to their visual irregularity, the districts do not respect traditional geographic or political boundaries or the composition of communities of interest. This is not an accident. The GRAC moved and split neighborhoods and communities in and out of districts based primarily upon the prevailing voting history and political party affiliation of the residents of those neighborhoods and communities.

60.     As a result, the 2011 Plan has paired voters that do not share the most basic elements of a neighborhood or community: Voters grouped together in single, meandering districts have "different climate[s], root for different sports teams, and read different newspapers." *Fletcher*, 831 F. Supp. 2d at 906 (Titus, J., concurring). The 6th District, for example, brings together voters "who have an interest in farming, mining, tourism, paper production, and the hunting of bears . . . with voters who abhor the hunting of bears and do not know what a coal mine or paper mill even looks like." *Id.* at 906.

61.     Between the 2000 and 2010 censuses, the population of Maryland grew by 9%, but six of the eight existing congressional districts remained within 3% of the ideal size of 721,529 people. Despite the relatively small adjustments needed to accommodate

population growth, the Plan shuffled nearly one-in-three Marylanders from one district to another, scrambling the representation of 1.6 million people. See *Gerrymandered? Maryland voters to decide*, The Wash. Post (Sept. 27, 2012), perma.cc/CL96-PT25. This massive re-sorting of voters was intended to "pack" Republicans into the 1st District and "crack" Republicans in the 6th District, while maintaining close-but-safe margins in favor of Democrats in all other districts.

62.    Prior to 2011, the Democrats Party held six House seats in Maryland, while Republicans held two. In 2012, the first election after the 2011 redistricting, Democratic challenger John Delaney routed 10-term Republican incumbent Roscoe Bartlett. Delaney was reelected in 2014, defeating Republican nominee Dan Bongino, whose campaign was managed by plaintiff Strine and whose fundraising was overseen by plaintiff Pycha.

63.    The defeat of Representative Bartlett in 2012 left seven of Maryland's eight Congressional seats (87.5%) in the hands of Democrats, despite that Democratic candidates received just 63% of the popular vote across the State that year. The 2014 election produced even more inequitable results: Democrats held on to 87.5% of the congressional seats while receiving just 58% of the popular vote.

64.    The **1st District** covers Maryland's Eastern Shore and stretches across a portion of the northern border of the State. It is the State's "packed" Republican district. Prior to 2011, this district included more of suburban Baltimore County, and it was closely contested, shifting into Republican hands by a narrow margin in the 2010 election. As a result of the 2011 redistricting, the 1st District has been flooded with Republican voters from the 6th District and is now the state's only Republican district.

65.     The following map shows the changes to the 1st District made by the Plan.



SOURCES: Post analysis of 2008 election returns, U.S. Census data, Maryland Department of Planning. GRAPHIC: Ted Mellnik, Cristina Rivero and Gene Thorp - The Washington Post. Updated Sept. 27, 2012.

66.     The 2011 redistricting reduced the population of the district by approximately 23,000: 114,161 citizens were added and 135,768 were subtracted. In the 2010 election, the Republican candidate received 54.1% of the votes; in 2012, the same candidate received 63.42% and won the election by a 36-point margin. Wendy Rosen, the 2012 Democratic nominee in the 1st District, told *The Washington Post*: "The party made it almost impossible to have a chance to win [in the 1st District]." Aaron C. Davis, *For Maryland Democrats, redistricting referendum forces a look in the mirror*, Wash. Post (Sept. 30, 2012), perma.cc/8NZF-8QFW.

67.     The **2nd District** defies easy physical description. It contains a number of areas in the vicinity of Baltimore that are essentially non-contiguous except for narrow ribbons of territory between them. The 2011 redistricting moved about 275,000 people in and out of the district, but it remains largely urban and safely Democratic. The Democratic margin of victory fell by 5.47% after the redistricting.

68.     The following map shows the changes to the 2nd District made by the Plan.



SOURCES: Post analysis of 2008 election returns, U.S. Census data, Maryland Department of Planning. GRAPHIC: Ted Mellnik, Cristina Rivero and Gene Thorp - The Washington Post. Updated Sept. 27, 2012.

69.     The **3rd District**, the second most gerrymandered district in the country (Ingraham, *supra*), has a long history of ever-worsening contortions. The following graphic depicts the evolution of the 3rd District over the past seven redistrictings.



SOURCE: Shapefiles maintained by Jeffrey B. Lewis, Brandon DeVine, Lincoln Pritcher and Kenneth C. Martis, UCLA. Drawn to scale.
GRAPHIC: The Washington Post. Published May 20, 2014

70.     As described in *Fletcher*, "[t]he District begins in Pikesville, a northwest suburb of Baltimore City; leaks eastward to capture the northeast suburbs of Baltimore City; then drops down into Baltimore City, taking a slice of the City on its way to Montgomery County, a northwest suburb of Washington, D.C.; then veers eastward in a serpentine manner to include Annapolis, a city on the Chesapeake Bay. . . . The Third District is rated at or near the bottom of all congressional districts in multiple measures of statistical compactness." 831 F. Supp. 2d at fn. 5.

71.     The 2011 Plan shuffled over 450,000 people in or out of the 3rd District. Although the district remains firmly Democratic, the party's margin of victory fell by 12.2% after the redistricting.

72.     The following map shows the changes to the 3rd District made by the Plan.



SOURCES: Post analysis of 2008 election returns, U.S. Census data, Maryland Department of Planning. GRAPHIC: Ted Mellnik, Cristina Rivero and Gene Thorp - The Washington Post. Updated Sept. 27, 2012.

73.     The **4th District** features a long, narrow ribbon of territory connecting portions of Anne Arundel and Prince George's counties. In the 2011 redistricting, the largely Republican voters of Anne Arundel County replaced the heavily Democratic Montgomery County voters, many of whom were moved into the formerly Republican 6th District. The redistricting shifted more than 600,000 people in and out of the district. Although the 4th District remains safely Democratic, the party's margin of victory dropped by 10% between 2010 and 2012.

74.     The following map shows the changes to the 4th District made by the Plan.



SOURCES: Post analysis of 2008 election returns, U.S. Census data, Maryland Department of Planning. GRAPHIC: Ted Mellnik, Cristina Rivero and Gene Thorp - The Washington Post. Updated Sept. 27, 2012.

75.     The **5th District** comprises all of Charles, Saint Mary's, and Calvert Counties, as well as portions of Prince George's and Anne Arundel Counties. It has long been a safely Democratic seat and was the least impacted by the 2011 redistricting.

76.     The following map shows the changes to the 5th District made by the Plan.



SOURCES: Post analysis of 2008 election returns, U.S. Census data, Maryland Department of Planning. GRAPHIC: Ted Mellnik, Cristina Rivero and Gene Thorp - The Washington Post. Updated Sept. 27, 2012.

77.     The **6th District** stretches nearly 200 miles, from the West Virginia border to the Capital Beltway. "[I]t is not a well-kept secret that the plan for the sixth congressional district was developed for the purpose of disadvantaging an incumbent Republican legislator." *Fletcher*, 831 F. Supp. 2d at 905-906 (Titus, J., concurring).

78.     Historically, the 6th District was reliably Republican. In the 70 years between January 1943 and January 2013, the district was represented in Congress by members of the Republican Party in four out of every five years. Prior to the legislature's

2011 adoption of the Plan, the 6th District had been the State's *most* Republican district, represented for nearly 20 years by Republican Roscoe Bartlett, who won reelection in 2010 by a 28-point margin.

79.    Under the 2001 redistricting map, the district included all of western Maryland and stretched across the northern border of the state to encompass other rural areas.



80.    Under the Plan, the 6th District no longer encompasses all of western Maryland and has been combined by a narrow, southward-stretching territory with portions of the Washington, D.C. suburbs, including Potomac.



81.     The redistricting cracked the 6th District by removing over 360,000 residents from the mostly-Republican northern counties of the district and adding nearly 350,000 residents from predominantly Democratic and urban Montgomery County. In particular, the Plan removed from the 6th District all of Carroll County, which had voted 68% Republican and 27% Democratic in the previous congressional election. The removal of Carroll County generated a loss of over 24,000 registered Republican voters from the district.

82.     The Plan also moved specific, majority-Republican precincts of Frederick County to the 8th District, while leaving the majority-Democratic precincts of the county in the 6th District. This facilitated a loss of more than an additional 12,500 Republicans voters from the district. The Frederick County precincts that remained in the 6th District contained over 6,000 more registered Democrats than registered Republicans. In a county with a 12-point Republican majority in the previous Congressional election, the likelihood of producing such a one-sided transfer of voters by chance is zero.

83.     The opposite pattern describes the transfer of voters from Montgomery County: Of the Montgomery County precincts that were added to the 6th District by the Plan, registered Democrats outnumbered registered Republicans by a two-to-one margin. Moving these cherry-picked portions of Montgomery County into the 6th District generated a gain of tens of thousands of Democratic voters.

84.     In total, the Plan accomplished a net transfer of over 65,000 Republican voters out of the district and over 30,000 Democratic voters into the district. *Compare* Eligible Active Voters on Precinct Register, 2010, perma.cc/QQP9-V7YX, *with* Eligible Active Voters on Precinct Register, 2012, perma.cc/V2QU-8SCE. As a result, whereas Republican voters had comprised 47% of all voters in the 6th District before the Plan, they comprise just 33% of 6th District voters after the Plan.

85.     As Editorial Board of *The Washington Post* noted, the 6th District was "suddenly the scene of a competitive race" in 2012, "owing to a gerrymandered electoral map redrawn by Democrats in Annapolis." Editorial Board, *John Delaney for Maryland's 6th District*, The Wash. Post (Oct. 4, 2012), perma.cc/3NCN-Q38U.

86.     Democrat John Delaney defeated Representative Bartlett in the 2012 election by a 21-point margin, as the long-time Congressman's share of the vote dropped from 61.45% to 37.9% in a single election cycle.

87.     Representative Delaney won reelection in 2014, defeating Republican challenger Dan Bongino, whose campaign was managed by plaintiff Strine and whose fundraising was overseen by plaintiff Pycha.

88.     The following map shows the changes to the 6th District made by the Plan.



89.     The **7th District** covers about half of the City of Baltimore, including most of the predominantly black neighborhoods. It has always been safely Democratic. After the 2011 redistricting, the district was reconfigured to include heavily Republican portions of Baltimore County from the formerly Republican 6th District.

90.     The following map shows the changes to the 7th District made by the Plan.



SOURCES: Post analysis of 2008 election returns, U.S. Census data, Maryland Department of Planning. GRAPHIC: Ted Mellnik, Cristina Rivero and Gene Thorp - The Washington Post. Updated Sept. 27, 2012.

91.     The **8th District** was compact and coherent prior to 2011, encompassing most of Montgomery County. The 2011 redistricting altered the makeup of the district both geographically and culturally, adding 115,000 white residents, mostly from rural and predominantly Republican parts of northern Frederick and Carroll Counties, and removing 119,000 minority residents, mostly from Montgomery County. Tens of thousands of Democratic 8th District voters were swapped with Republicans from the 6th District in

order to facilitate the cracking of the 6th District. The 8th District remains safely

Democratic, but the party's margin of victory fell by 17% after the district was redrawn.

92.     The following map shows the changes to the 8th District made by the Plan.



SOURCES: Post analysis of 2008 election returns, U.S. Census data, Maryland Department of Planning. GRAPHIC: Ted Mellnik, Cristina Rivero and Gene Thorp - The Washington Post. Updated Sept. 27, 2012.

**C.     The purpose of the Plan was to burden Republican voters by reason of their political views, voting history, and political-party affiliation**

93.     The goal and purpose of the Plan was to dilute Republican votes by cracking

the 6th District. The predominant purpose of the map, in other words, was to burden

Republican voters in the former 6th District by reason of their political views, voting

history, and political-party affiliation.

**1.     Direct and circumstantial facts**

94.     The contorted and essentially non-contiguous shapes of Maryland's most

gerrymandered congressional districts suggest, in their own right, an intent to connect

rural Republican voting blocs with dominant urban Democratic voting blocs, thereby cracking otherwise geographically and politically contiguous Republican communities in the 6th District. No other purpose can explain the otherwise convoluted nature of Maryland's congressional districts. *Cf. Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960).

95.    Democratic lawmakers conceded that Maryland's map was an act of political retaliation to unseat Republican incumbent Roscoe Bartlett: "Sen. Jamie B. Raskin (D-Montgomery) said . . . that given the way Republicans had stacked the deck in districts in North Carolina, Ohio and elsewhere," his party "had little alternative" except to gerrymander Maryland to the advantage of the Democratic Party. Davis, *Maryland Senate Approves Gov. Martin O'Malley's Redistricting Map, supra*.

96.    In private briefings after the map was released, GRAC members assured Democratic lawmakers that the map would increase the Democratic Party's power in Congress. "Sen. C. Anthony Muse, the only Democrat to vote against the map, . . . said lawmakers have been told the map is beneficial to the Democratic Party." Brian Witte, *Md. Senate approves U.S. House redistricting bill*, Associated Press (Oct. 18, 2011). Delegate Curt Anderson, a Democrat who supported the Plan, described a briefing given by GRAC Chair Jeanne Hitchcock about the redrawn 6th District: "It reminded me of a weather woman standing in front of the map saying, 'Here comes a cold front,' and in this case the cold front is going to be hitting Roscoe Bartlett pretty hard." *See* Brian Witte, *Proposed redistricting map stirs political shakeup*, Associated Press (Oct. 4, 2011).

97.    GRAC members openly acknowledged their intent to crack the 6th District. GRAC member Michael Busch, the Maryland House Speaker, said for example: "I think the numbers will show that [the Plan] makes [the 6th District] pretty competitive" in favor of Democrats, whereas it previously had been a safely Republican district. *Id.*

98.    GRAC Chair Jeanne Hitchcock confirmed that purpose, noting that the 6th District was now "dominated" by the Democratic voters of Montgomery County. *Id.*

99.    During the limited period of debate on the Plan, several Democratic law-makers embraced the Plan's partisan gerrymander, while at the same time expressing frustration that the GRAC had implemented it at the expense of minority voters. "I have been one of the strongest proponents as a Democrat of drawing a seventh district for Democrats" said Representative Donna Edwards, who represents Maryland's 4th Congres-sional District. "But we can accomplish that in a different way . . . .Where I have a real disagreement is in making superior the political interests to the minority voting rights interests." *See* Aaron C. Davis and Ben Pershing, *Donna Edwards, Montgomery officials line up against redistricting map*, The Wash. Post (Oct. 11, 2011).

100.    Democratic Delegate Emmett C. Burns, Jr., stated on the House floor that although he disapproved of how the map would affect minorities, he ultimately supported the Plan for a simple reason: "more Democrats in the House of Representatives." *See* Annie Linskey & John Fritze, *O'Malley's Map Easily Wins House Approval*, Balt. Sun (Oct. 19, 2011).

101.    To achieve those expressly stated ends, legislators and their map-drawers deliberately drew lines based upon Republican voters' political views, voting history, and political-party affiliation in the mapmaking process.

102.    The secrecy and other circumstances surrounding the Plan's enactment, the Plan's overall disrespect of traditional political boundaries and division of communities of interest, the non-compactness and non-contiguity of the Plan's districts, and on-the-record statements from legislators and members of the GRAC conclusively demonstrate that the primary consideration motivating lawmakers in adopting the Plan was their desire and

intent to  dilute the votes of Republican Marylanders in the 6th District by reason of their political views, voting history, and political-party affiliation.

### 2.    Statistical facts

103.    The foregoing allegations, which demonstrate that the Plan was drawn in violation of the Constitution, are bolstered by statistical analyses that confirm that the cracking of Republican voters in the 6th District was not the product of chance or constitutionally acceptable considerations, but the result of a deliberate effort to disadvantage Republican voters by reason of their voting histories and political party affiliations.

104.    One statistical tool to demonstrate vote dilution is to simulate a State's election using actual election results from other States throughout the Nation. *See* Wang, *supra*. This tool can help determine whether a disproportional election outcome is the product of deliberate manipulation by the legislature.

105.    The Supreme Court has recognized in racial gerrymandering cases that proportionality "is a relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

106.    Applying that same observation to partisan gerrymanders, the normal-district simulation test asks whether a redistricting plan moves the seats-to-vote outcome *toward* partisan proportionality or *away* from it. If a plan moves the outcome away from proportionality, the test asks whether the change could have arisen as a result of normal variation in districting as practiced across the Nation.

107.    Computer simulations looking at election returns nationwide can be used to ask a simple question: If a given State's popular House vote were split into *differently* drawn districts carved from the same statewide voting population and party-affiliation

breakdown, what would its Congressional delegation look like? *See* Wang, *supra*, at 28. Using statistical software on an ordinary laptop computer, it is possible to create millions of hypothetical combinations of districts from around the United States that add up to the same statewide vote total for each party.

108.    Using this statistical tool—that is, evaluating the average of one million random combinations of eight districts from States throughout the Nation that add up to the same statewide vote total for each political party—one researcher has shown that the expected congressional delegation from Maryland in 2014, in the absence of impermissible gerrymandering, would ordinarily comprise 5 Democrats and 3 Republicans. The current composition of Maryland's House delegation is 7 Democrats and 1 Republican.

109.    The next step in the statistical analysis is to ask whether the difference between the normal-district simulation test and actual observed election results are the product of chance or deliberate design. This is called the "zone-of-chance" test. *See* Wang, *supra*, at 24-38, 53. If the results fall within the zone of chance, it is evidence that the difference between the average simulation and actual election outcome can reasonably be attributed to chance. If the results fall outside the zone of chance, it is strongly suggestive (to a statistically-significant degree of confidence) that the imbalance is the product of deliberate legislative design.

110.    The zone of chance test shows to a statistically significant degree of confidence that the difference between the simulated average for Maryland in 2014 and the actual elections outcome under the Plan is the product of a purposeful effort to dilute Republican votes by cracking the 6th District.

111.    Other statistical tests demonstrate the same.

### 3.   Chilling

112.   The dilution of Republicans' votes in Maryland has chilled and manipulated political participation since 2011 in precisely the ways that the Supreme Court had warned against.

113.   Gerrymanders that "pack" votes chill political participation because voters in packed districts understand that their votes "won't count" because they cannot affect the outcome. Voters in packed districts are thus discouraged from voting. Voters in packed districts also understand that other like-minded voters' votes "won't count" and thus are less likely to participate actively in campaigning for their chosen candidates.

114.   The Plan has chilled protected political speech throughout the State in just those ways.

115.   Vote "cracking" chills political speech in an even more pernicious way in Maryland because Maryland employs a closed primary registration system. For a voter to participate in a particular political party's primary, the voter must be a registered member of that party. Registered Republicans cannot participate in Democratic primaries, in other words, and registered Democrats cannot participate in Republican primaries.

116.   In districts where the Democratic Party's candidate is very likely to win the general election, the only real opportunity to influence what person is ultimately elected is the Democratic primary race. Under the closed primary system, residents must register as members of the Democratic party in order to vote in the Democratic primary.

117.   Some Maryland voters who would otherwise register as Republicans have been chilled from doing so. They have chosen, instead, to register (against their preferences) as members of the Democratic Party so that they can participate in the Democratic Party's closed primary. Others who do not register as Democrats against their preference are, the legislature's design, shut out of the Democratic primary and lose any

opportunity to influence meaningfully the outcome of the general election. Voters of that sort are prevented from playing any meaningful role in the selection of their representatives and are therefore directly discouraged from participating in the political process.

118.   More broadly, the Plan has chilled participation in general elections. Voters who feel that the outcomes of elections are preordained by the legislature's map-drawing and discouraged from casting their votes or engaging in the political process at all.

119.   The Plan thus "casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *United States v. Alvarez*, 132 S. Ct. 2537, 2548 (2012).

**D.    The Plan's burden on Republican voters cannot be explained by geography or compliance with legitimate redistricting criteria**

120.   The extreme partisan gerrymander at issue here cannot be explained or justified by reference to Maryland's geography or other legitimate redistricting criteria. It was possible to fashion a plan that does not crack the 6th District or pack the 1st District and that is as good as or better than the Plan in achieving equal population, compactness, respect for traditional political boundaries, and compliance with the Voting Rights Act.

121.   In other words, the cracking of the 6th District would not have taken place without the legislature's targeting of Republican voters on the basis of their First-Amendment-protected conduct.

122.   The GRAC's explanation for many of the changes the Maryland's congressional apportionment are implausible and contradicted by the Plan itself. The new 6th District, for instance, was purportedly drawn to "reflect the North-South connections between Montgomery County, the I-270 Corridor, and the westerns portions of the State." No such connections exist. The sham explanations provided by the GRAC and the Governor

are a pretext for the true purpose of the Plan: to dilute Republican votes and claim an additional congressional seat for the Democratic Party by cracking the 6th District.

123.    The committee received numerous alternative plans from third-parties. Those alternative plans received little consideration from the GRAC or the Governor, even though many accorded better with common sense and would have produced results that, upon information and belief, were more consistent with traditional map-drawing and redistricting principles. *See* Exhibits B & C.

124.    Upon information and belief, several alternative plans would have avoided cracking the former 6th District while better respecting traditional political and community boundaries and achieving equal compliance with the one-person-one-vote standard. The alternative plans also accorded better with the broadly-supported concepts of contiguity and compactness.

125.    Under the plan submitted by the Maryland Republican Party, for example, Montgomery County and its more urban voters would have remained in the geographically compact 8th and 4th Districts around Washington, D.C., respecting the cohesiveness of a region that shares common political, social, and economic interests. The Republican 6th District would have encompassed the rural northern and western counties, which also share common interests; and Baltimore and its immediate surroundings would have occupied the entire 7th District.

126.    The alternative plans would have better respected existing geographic and political boundaries, minimizing split counties and split communities of interest. In most cases, Frederick, Carroll, Anne Arundel, Harford, and Baltimore City Counties would all have remained undivided in their respective districts; under the current Plan, each is currently split between two or more congressional districts.

127.   In keeping communities and political units that share common interests together, the districts in the alternative plans are unsurprisingly more contiguous and compact than the districts under the current Plan.

128.   Upon information and belief, at least one of the alternative plans would have satisfied all of the constitutional requirements for congressional reapportionment without diluting either party's votes to a constitutionally significant degree.

## CLAIMS FOR RELIEF

### A.   Violation of the First Amendment

129.   Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

130.   Plaintiffs and voters throughout the Nation should be able to organize politically, to support political campaigns, to register with their preferred political parties, and to vote in support of their preferred candidates without fear that—if they are successful in electing the public officials of their choice—they will be targeted and retaliated against by the legislature for the exercise of the First Amendment rights.

131.   The Maryland legislature expressly and deliberately considered the voting histories and political party affiliations of Republican voters, including plaintiffs, when it redrew the lines of the 6th Congressional District as part of the Plan.

132.   The legislature redrew the lines of the 6th District with an intent to burden and punish those voters, including plaintiffs, for their First-Amendment-protected conduct.

133.   The Plan, in actual effect, has burdened Republican voters in the former 6th Congressional District, including plaintiffs, as a sanction for the exercise of their First Amendment rights. The cracking of the 6th District would not have taken place without the legislature's targeting of Republican voters on the basis of their First-Amendment-protected conduct; and Republican voters in the former 6th District, including plaintiffs,

would have been able to elect a Republican representative in 2012 and 2014, but for the cracking of the district under the Plan.

134.    The State cannot justify the cracking of the 6th District by reference to geography or compliance with constitutionally legitimate redistricting criteria.

**B.    Violation of Article 1, Sections 2 and 4**

135.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

136.    The Maryland legislature expressly and deliberately considered Republican voters' voting histories and political party affiliations, including those of plaintiffs, when it redrew the lines of the 6th Congressional District as part of the Plan.

137.    The legislature redrew the lines of the 6th District with an intent to sanction those voters, including plaintiffs, for their voting histories and political party affiliations.

138.    The Plan, in actual effect, has burdened Republican voters in the former 6th Congressional District, including plaintiffs. The cracking of the 6th District would not have taken place without the legislature's targeting of Republican voters, including plaintiffs; and Republican voters in the former 6th District would have been able to elect a Republican representative in 2012 and 2014, but for the cracking of the district under the Plan.

139.    The Plan has thus had the effect of burdening Republican voters' representational rights by diluting the efficiency and effect of their votes.

140.    The legislature, rather than Maryland's voters, has in effect chosen the representative to the U.S. House of Representatives for Maryland's 6th District.

141.    The result is a violation of plaintiffs' representational rights, protected under Article I, Sections 2 and 4, of the United States Constitution.

142.    The State cannot justify the cracking of the 6th District by reference to geography or compliance with constitutionally legitimate redistricting criteria.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

A.      declare the Plan unconstitutional and invalid, and the maintenance of the plan for any election of any kind a violation of plaintiffs' constitutional rights;

B.      enjoin defendants and their employees and agents from administering, preparing for, and in any way permitting the nomination or election of any Member of United States House of Representatives from Maryland's 6th, 7th, or 8th Congressional Districts;

C.      in the absence of a state law establishing a constitutional district plan for Maryland's congressional districts, adopted by the Legislature and signed by the Governor in a timely fashion, establish a redistricting plan that is valid under the law;

D.      award plaintiffs their reasonable attorneys' fees, costs, and litigation expenses incurred in bringing this action; and

E.      grant such further relief as the Court deems just and proper.

February 16, 2016

/s/ *Michael B. Kimberly*

Michael B. Kimberly, Bar No. 19086
     mkimberly@mayerbrown.com
Paul W. Hughes, Bar No. 28967
     phughes@mayerbrown.com
Jason R. LaFond, *pro hac vice*
     jlafond@mayerbrown.com
Mayer Brown LLP
1999 K Street NW
Washington, D.C. 20006
(202) 263-3127 (office)
(202) 263-3300 (facsimile)

*Counsel for plaintiffs*