IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| STEPHEN M. SHAPIRO, <u>et al.</u>, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.:  1:13-cv-03233-JKB |
| | * | |
| DAVID J. MCMANUS, JR., <u>et al.</u>, | * | |
| | * | |
| Defendants. | * | |
| | * | |

---

COMMON CAUSE; THE BRENNAN CENTER
FOR JUSTICE AT N.Y.U. SCHOOL OF
LAW; THE CAMPAIGN LEGAL CENTER, INC.,

    Amici Supporting Plaintiffs.

---

Michael B. Kimberly and Paul Whitfield Hughes, MAYER BROWN LLP, Washington, D.C., for plaintiffs.

Jennifer L. Katz and Jeffrey Lewis Darsie, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for defendants.

Benjamin W. Thorpe, Emmet J. Bondurant, BONDURANT MIXSON AND ELMORE LLP, Atlanta, Georgia, Gregory L. Diskant, Susan Millenky, PATTERSON BELKNAP WEBB AND TYLER LLP, New York, New York, and Michael A. Pretl, Riverton, Maryland, for Amicus Common Cause.   Charles E. Davidow, Washington, D.C., Pietro Signoracci, Robert A. Atkins, New York, New York, PAUL WEISS RIFKIND WHARTON AND GARRISON LLP, and Michael Li, New York, New York, for Amicus The Brennan Center for Justice at N.Y.U. School of Law.   Paul March Smith, JENNER AND BLOCK LLP, Washington, D.C., for Amicus The Campaign Legal Center, Inc.

Filed:  August 24, 2016

Before Niemeyer, Circuit Judge, and Bredar and Russell, District Judges.

Judge Niemeyer wrote the opinion in which Judge Russell joined. Judge Bredar wrote a dissenting opinion.

NIEMEYER, Circuit Judge:

The plaintiffs, who are Maryland voters and registered Republicans, challenge the constitutionality of Maryland's 2011 congressional redistricting law under the First Amendment and Article I, §§ 2 and 4, of the U.S. Constitution.  They allege in their second amended complaint (1) that the State drew the lines of Maryland's Sixth Congressional District with the specific intent to punish and retaliate against them and similarly situated voters by reason of how they voted and their political party registration; (2) that the State, in furtherance of this purpose, drew the Sixth District's lines in such a manner as to dilute their vote and burden their political expression; and (3) that the State succeeded in its efforts, inflicting a tangible and concrete adverse effect.  The question presented is whether the plaintiffs' complaint states a justiciable claim that survives the State's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  We conclude that it does, recognizing, as the Supreme Court stated in remanding this case to this three-judge court, that the plaintiffs' "legal theory [is] . . . uncontradicted by the majority in any of [the Court's] cases," Shapiro v. McManus, 136 S. Ct. 450, 456 (2015), and that their complaint adequately employs First Amendment

jurisprudence to state a plausible claim for relief. Accordingly, we deny the State's motion to dismiss.

I

A

At this stage, we take the factual allegations of the plaintiffs' complaint as true.

Based on the results of the 2010 census, Maryland was entitled to eight seats in the U.S. House of Representatives, the same number it had been allotted since the 1960 census. Although Maryland's population increased by 9% from 2000 to 2010, its population growth was not evenly distributed throughout the State, necessitating redistricting to ensure districts of equal population. See Evenwel v. Abbott, 136 S. Ct. 1120, 1124 (2016) (recognizing that because "States must draw congressional districts with populations as close to perfect equality as possible," States "must regularly reapportion districts to prevent malapportionment").

On July 4, 2011, Governor Martin O'Malley, a Democrat, appointed five individuals to the Governor's Redistricting Advisory Committee: (1) Jeanne Hitchcock, Maryland's Secretary of Appointments and a former Deputy Mayor of Baltimore, a Democrat; (2) State Senate President Thomas V. Mike Miller, Jr., a Democrat; (3) House of Delegates Speaker Michael E. Busch, a

Democrat; (4) Richard Stewart, a businessman who chaired Governor O'Malley's reelection campaign for Prince George's County, a Democrat; and (5) James J. King, a businessman who had previously served one term in the Maryland House of Delegates, a Republican.

The Advisory Committee was charged with the task of drafting a redistricting plan and proposing a map for the State's eight congressional districts in light of the 2010 census results. To that end, it held 12 public meetings across the State between July 23 and September 12, 2011, receiving more than 350 comments from members of the public. The plaintiffs allege, however, that the Advisory Committee conducted its actual "deliberations and calculations entirely behind closed doors." Second Am. Compl. ¶ 45. When drawing its redistricting map, the Advisory Committee had access to the Maryland Board of Elections' statistical data, which provided "highly detailed geographic information about voter registration, party affiliation, and voter turnout across the State," including "voter registration by precinct, election day turnout by precinct and party, party share of vote by voting category, and voter consistency." Id. ¶¶ 46-47.

The Advisory Committee completed its map on October 4, 2011, with King, the Committee's lone Republican, casting the sole dissenting vote, and presented it to the Governor. After

posting the map online and receiving additional comments from the public, the Governor announced on October 15 that he would submit to the legislature a plan that was "substantially similar" to the Advisory Committee's proposal.   Two days later, on October 17, the Governor's proposed redistricting map was introduced as Senate Bill ("S.B.") 1 at an emergency legislative session.   That same day, the Senate Committee on Reapportionment and Redistricting, along with the House Rules Committee, held a joint hearing on S.B. 1 before voting to approve the bill. After adopting minor technical amendments, the Senate passed the bill the next day, October 18, sending it to the House of Delegates, which, after making additional technical amendments, passed it on October 19.   The Senate concurred in the House's technical amendments, and the Governor signed S.B. 1 into law on October 20, 2011, three days after it had been introduced.   See Md. Code Ann., Elec. Law §§ 8-701 to -709.

The enacted State Plan created eight congressional districts that were mathematically equal in population -- seven of the districts having an adjusted population of 721,529 and the eighth having an adjusted population of 721,528.   The changes effected by the State Plan, however, were far more extensive than those needed to achieve population equality. Indeed, while "six of the eight existing congressional districts remained within 3% of the ideal size of 721,529 people[,] . . .

the Plan shuffled nearly one-in-three Marylanders from one district to another, scrambling the representation of 1.6 million people." Second Am. Compl. ¶ 61.

The reshuffling of Maryland's population was particularly extensive with respect to Maryland's Sixth Congressional District. Historically, the Sixth District included western Maryland and much of north-central Maryland. In the years following the Supreme Court's 1964 holding in Wesberry v. Sanders, 376 U.S. 1 (1964), that States must conduct regular redistricting to ensure districts of equal population, Maryland adopted a series of five maps that were used in the 23 congressional elections held from 1966 through 2010. Under those maps, the Sixth District always included the State's five most northwestern counties in their entirety: Garrett, Allegany, Washington, Frederick, and Carroll Counties. Over the years, the Sixth District also included various portions of Baltimore, Howard, Montgomery, and Harford Counties to achieve the appropriate population count. But the identifiable core, consisting of the five northwestern counties, stayed constant, constituting not only a majority of the Sixth District's territory but also most of its population. Specifically, after the State revised its district lines in 1991 using the data from the 1990 census, 83% of the Sixth District's population lived in

the five northwestern counties, and that number rose to 88% under the State's 2002 Redistricting Plan.

The 2010 census showed that, compared to the ideal district population of 721,529 residents, the Sixth District had 10,186 extra residents, a variation of only 1.4%. Yet, while the census data would have required only a small adjustment to remove some 10,000 residents from one of the counties along the District's eastern edge, but not from the five northwestern counties, the State completely reshuffled the Sixth District. It moved 360,000 residents out of the Sixth District -- virtually one-half of its population -- and then added to the District 350,000 residents from Montgomery County, a Democratic stronghold that includes Washington, D.C. suburbs. The plaintiffs allege that this wholesale shifting and transfer was done not "by reference to geography or compliance with legitimate redistricting criteria," Second Am. Compl. ¶ 7(c), but rather to dilute the Republican voters' voice in the next election. The complaint alleges further that "a net total of over 65,000 registered Republican voters" were transferred from the Sixth District and "a net total of over 30,000 Democratic voters" were imported into the District, for a swing of some 95,000 voters. Id. ¶ 4. Moreover, although Frederick County had been included in the Sixth District continuously since 1872, the redistricting split the County's population roughly in half

between the Sixth and Eighth Districts.   Similarly, while
Carroll County had been included in the Sixth District since
1966, the redistricting removed it from the Sixth District
entirely and split its population between the Eighth and First
Districts.

The plaintiffs' complaint alleges that the major
reshuffling of the Sixth District's population directly affected
the District's political complexion.   Historically, the Sixth
District was reliably Republican.   Indeed, "[i]n the 70 years
between January 1943 and January 2013, the [D]istrict was
represented in Congress by members of the Republican Party in
four out of every five years."   Second Am. Compl. ¶ 78.   In the
2010 election, Representative Roscoe Bartlett, the Republican
candidate who had represented the Sixth District in Congress
since 1993, won reelection by a margin of 28 percentage points.
But because the areas removed from the Sixth District were
predominantly Republican while the area added was predominantly
Democratic, the parties' respective shares of the District's
registered voters roughly reversed so that, at the time of the
2012 general election, 33% of the new Sixth District's
registered voters were registered as Republicans, while 44% were
registered as Democrats.   In that election, Democratic candidate
John Delaney, a newcomer to politics, defeated Representative
Bartlett by 21 percentage points, with "the long-time

Congressman's share of the vote dropp[ing] from 61.45% to 37.9% in a single election cycle." Id. ¶ 86. Delaney won reelection in 2014.

Maryland's 2011 Redistricting Plan also affected the contours of other districts, most particularly Maryland's Eighth District. That district had previously included most of the portion of Montgomery County that was reassigned to the Sixth District, and it also absorbed many of the citizens of Frederick and Carroll Counties who were removed from the Sixth District. After redistricting, the Eighth District's proportion of registered Republicans rose significantly, but registered Democrats continued to outnumber registered Republicans by a sizeable margin. Specifically, prior to redistricting, registered Democrats outnumbered registered Republicans in the Eighth District by three to one; after redistricting, the ratio was roughly two to one. After redistricting, Representative Chris Van Hollen, a Democrat, continued to win reelection to represent the Eighth District after redistricting.

B

Three Maryland citizens, acting pro se, commenced this action in November 2013, naming as defendants the Chair and the Administrator of the State Board of Elections and alleging that the 2011 Redistricting Plan violated their rights under the

First Amendment and Article I, § 2, of the U.S. Constitution.  A
single district court judge granted the State's motion to
dismiss, Benisek v. Mack, 11 F. Supp. 3d. 516 (D. Md. 2014), and
the Fourth Circuit Court of Appeals summarily affirmed, Benisek,
584 F. App'x. 140 (4th Cir. 2014).  The Supreme Court, however,
reversed, concluding that the plaintiffs' constitutional
challenge was not "wholly insubstantial" and that therefore it
had to be decided by a district court composed of three judges,
as required by 28 U.S.C. § 2284.  See Shapiro, 136 S. Ct. at
456.  In doing so, the Court recognized that the theory
underlying the plaintiffs' First Amendment claim had originally
been suggested by Justice Kennedy and was "uncontradicted by the
majority in any of [the Court's] cases."  Id.

After remand, the plaintiffs, now represented by counsel,
filed a second amended complaint, adding six additional
plaintiffs and refining the theory underlying their
constitutional challenge to the 2011 congressional Redistricting
Plan.  The six new plaintiffs, as well as at least one of the
original plaintiffs, are all registered Republicans who lived in
the Sixth District prior to the Plan's enactment.  While three
of these plaintiffs still reside in the Sixth District, four of
them now live in the Eighth District as a result of the Plan.
The plaintiffs' complaint challenges the State's "cracking" of
the Sixth District, alleging that those responsible for the 2011

Plan "purposefully and successfully flipped [the District] from Republican to Democratic control by strategically moving the [D]istrict's lines by reason of citizens' voting records and known party affiliations." Second Am. Compl. ¶ 1. They allege that "[t]he drafters of the Plan focused predominantly on the voting histories and political-party affiliations of the citizens of the State in deciding how to" redraw the Sixth District's lines and that they "did so with the clear purpose . . . of diluting the votes of Republican voters and preventing them from electing their preferred representatives in Congress." Id. ¶ 6. They allege further that the Plan achieved its intended effect, imposing a significant burden on the former Sixth District's Republican voters by preventing them in 2012 and 2014 "from continuing to elect a Republican representative . . . , as they had in the prior ten congressional elections." Id. ¶ 7(b). And they maintain that "the State cannot justify the cracking of the [Sixth] District by reference to geography or compliance with legitimate redistricting criteria." Id. ¶ 7(c). Based on these allegations, they claim that the Plan's redrawing of the Sixth District's boundaries violated their rights under the First Amendment and §§ 2 and 4 of Article I of the U.S. Constitution.

The State again filed a motion to dismiss the complaint, arguing that the plaintiffs' claims are nonjusticiable because

the plaintiffs "fail[ed] to set forth a discernable, manageable standard that would permit this Court to adjudicate their claims" under either the First Amendment or Article I.  The State accepts that "unlawful political gerrymandering claims may be justiciable in concept" but emphasizes that the Supreme Court has yet to identify a judicially discernable and manageable standard for adjudicating such claims and has twice indicated that, in the absence of such a standard, political gerrymandering claims must be dismissed.  See League of United Latin American Citizens v. Perry (LULAC), 548 U.S. 399 (2006); Vieth v. Jubelirer, 541 U.S. 267 (2004).  The State argues further that the plaintiffs "failed to allege that the Plan imposed any actual restriction on any of their recognized First Amendment rights."

The plaintiffs contend that their complaint "offers . . . what was missing in Vieth and LULAC: a clear and objective standard for identifying a constitutionally significant burden on the plaintiffs' representational rights."  Relying on Justice Kennedy's statement in his separate opinion in Vieth that "First Amendment concerns arise where an apportionment has the purpose and effect of burdening a group of voters' representational rights," 541 U.S. at 314 (Kennedy, J., concurring in the judgment), they contend that the First Amendment offers a well-settled framework for considering political gerrymandering

claims.  They state that the framework would require the court to determine _first_, whether "the State consider[ed] citizens' protected First Amendment conduct in deciding where to draw district lines, and did . . . so with an intent to dilute the votes of those citizens by reason of their protected conduct"; _second_, whether "the redistricting map, in actual fact, dilute[d] the votes of the citizens whose constitutionally-protected conduct was taken into account to such a degree that it imposed a concrete adverse impact"; and _third_, whether the map was "necessary as drawn to achieve some compelling state interest."  When assessed against this framework, they maintain that their complaint states a justiciable claim upon which relief can be granted.

## II

The U.S. Constitution gives both the States and Congress a role in setting the procedural rules by which citizens select the members of the House of Representatives.  Specifically, Article I provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States," U.S. Const. art. I, § 2, cl. 1, and further that "[t]he Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law

make or alter such Regulations," id. § 4, cl. 1.  Article I thus "leaves with the States primary responsibility for apportionment of their federal congressional . . . districts," Growe v. Emison, 507 U.S. 25, 34 (1993), while also granting Congress the power to override the decisions made by the States.  Congress currently uses this power only to require that States establish single-member districts.  See 2 U.S.C. § 2c ("In each State entitled . . . to more than one Representative . . . , there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative").

The process of establishing and revising district lines is a "highly political task."  Growe, 507 U.S. at 33.  Indeed, "[t]he very essence of districting is to produce a different . . . result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats."  Gaffney v. Cummings, 412 U.S. 735, 753 (1973).  Because the supporters of our country's two major political parties are not evenly distributed within any State, "[i]t is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area."  Id.  And those State officials charged with

redistricting will of course "recognize the political consequences of drawing a district line along one street rather than another." Id. The practical "reality is that districting inevitably has and is intended to have substantial political consequences." Id.; see also Vieth, 541 U.S. at 285 (plurality opinion) ("The Constitution clearly contemplates districting by political entities, see Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics").

Because redistricting is quintessentially a political process that the Constitution assigns to the States and Congress, federal courts' supervision is largely limited. See Zivotofsky ex rel. Zivotofsky v. Clinton, 132 S. Ct. 1421, 1427 (2012) (recognizing that "a controversy involves a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it" and that, "[i]n such a case, . . . a court lacks the authority to decide the dispute before it" (internal quotation marks and citations omitted)). For example, because "[p]olitics and political considerations are inseparable from districting and apportionment," a court cannot invalidate a map merely because its drafters took political considerations into account in some manner. See Gaffney, 412 U.S. at 753. Indeed, such an approach "would commit federal and state courts

to unprecedented intervention in the American political process." *Vieth*, 541 U.S. at 306 (Kennedy, J., concurring in the judgment).

Moreover, citizens have no *constitutional* right to reside in a district in which a majority of the population shares their political views and is likely to elect their preferred candidate. Nor do political groups have any right to a district map under which their candidates are likely to win seats in proportion to the party's overall level of support in the State. See *Davis v. Bandemer*, 478 U.S. 109, 130 (1986) (plurality opinion) ("Our cases . . . clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be"); see also *Vieth*, 541 U.S. at 288 (plurality opinion) ("[The Constitution] guarantees equal protection of the law to persons, not equal representation in government to equivalently sized groups").

But even though the districting process is largely political in nature, State officials are nonetheless limited by specific provisions of the U.S. Constitution. *Cf.* *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) ("To the victor belong only those spoils that may be *constitutionally* obtained"

(emphasis added)).  To be sure, for many years, the Supreme Court "resisted any role in overseeing the process by which States draw legislative districts," Evenwel, 136 S. Ct. at 1123, wary of "enter[ing] th[e] political thicket," Colegrove v. Green, 328 U.S. 549, 556 (1946) (plurality opinion).  But this changed with the Supreme Court's decision in Baker v. Carr, 369 U.S. 186 (1962), where the Court held that a claim alleging that a state-legislative map violated the Equal Protection Clause by establishing districts with unequal populations was justiciable.

Building on Baker, the Supreme Court subsequently invalidated a State's malapportioned congressional map in Wesberry, holding that Article I, § 2's provision for the election of Representatives "'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." 376 U.S. at 7-8.  Today, under Wesberry and its progeny, "States must draw congressional districts with populations as close to perfect equality as possible."  Evenwel, 136 S. Ct. at 1124. Similarly, the Court held in Reynolds v. Sims that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis," 377 U.S. 533, 568 (1964), although "jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives" when drawing

these districts, Evenwel, 136 S. Ct. at 1124. Together, Wesberry and Reynolds establish the judicially enforceable rule of "one person, one vote."

Federal courts are also authorized to ensure that the districting process remains free from constitutionally prohibited racial discrimination. Thus, a plaintiff pursuing a racial gerrymandering claim under the Equal Protection Clause states a justiciable claim when he alleges that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Ala. Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1270 (2015) (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995)). By showing "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," Miller, 515 U.S. at 916, a plaintiff triggers strict scrutiny, shifting the burden to the State to "demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest," id. at 920.

In addition to these constitutional limitations on the redistricting process, the Supreme Court has also recognized that political gerrymandering -- a term that has been defined as "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's

voting strength," Black's Law Dictionary 802, 1346 (10th ed. 2014) -- may well violate the Equal Protection Clause. But the Court has struggled to devise a standard for adjudicating political gerrymandering claims under the Equal Protection Clause.

In Bandemer, the Court held that a claim alleging that a State's reapportionment of its legislative districts violated the Equal Protection Clause by diluting the votes of one political party's members was justiciable. 478 U.S. at 113, 118-27. In reaching this conclusion, the Court emphasized that "[t]he question here is the consistency of state action with the Federal Constitution," and that the plaintiffs' claim did not "ask the Court to enter upon policy determinations for which judicially manageable standards are lacking," since "[j]udicial standards under the Equal Protection Clause are well developed and familiar." Id. at 122 (quoting Baker v. Carr, 369 U.S. 186, 226 (1962)). Moreover, six Justices agreed that a plaintiff bringing a political gerrymandering claim under the Equal Protection Clause must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." Id. at 127 (plurality opinion); id. at 161 (Powell, J., concurring in part and dissenting in part). The Bandemer majority splintered, however, with respect to the contours of this standard. Compare id. at

127-43 (plurality opinion), <u>with</u> <u>id.</u> at 161-85 (Powell, J., concurring in part and dissenting in part).

The Supreme Court did not take up another political gerrymandering case for 18 years until it decided <u>Vieth</u>, and then it fractured again.  In that case, the plaintiffs alleged that a State's revised map for its congressional districts "constituted a political gerrymander, in violation of Article I and the Equal Protection Clause."  <u>Vieth</u>, 541 U.S. at 272 (plurality opinion).  All of the Justices appeared to accept that political gerrymandering, if sufficiently extreme, would violate the Constitution, <u>see, e.g.</u>, <u>id.</u> at 292-93, but there remained a lack of consensus as to the appropriate standard for "determining when political gerrymandering has gone too far," <u>id.</u> at 296.  Considering and rejecting the various standards proposed by the plaintiffs and dissenting Justices, as well as the standards proposed by the plurality and the concurrence in <u>Bandemer</u>, a four-Justice plurality in <u>Vieth</u> "conclude[d] that neither Article I, § 2, nor the Equal Protection Clause, nor . . . Article I, § 4, provides a judicially enforceable limit on the political considerations that the States and Congress may take into account when districting," and therefore would have overruled <u>Bandemer</u>'s holding as to the justiciability of political gerrymandering claims.  <u>Id.</u> at 305.  Providing the fifth vote for affirming the dismissal of the plaintiffs'

claims, Justice Kennedy concurred in the judgment on the ground that, "in the case before us, we have no standard by which to measure the burden [that the plaintiffs] claim has been imposed on their representational rights." Id. at 313 (Kennedy, J., concurring in the judgment). But he and the Court's four dissenters refused to join the plurality's conclusion that political gerrymandering claims under the Equal Protection Clause and Article I are necessarily nonjusticiable, declining to "foreclose all possibility of judicial relief if some limited and precise rationale were found to correct an established violation of the Constitution in some redistricting cases." Id. at 306.

Justice Kennedy nonetheless agreed that the plurality had "demonstrate[d] the shortcomings of the . . . standards that [had] been considered to date." Vieth, 541 U.S. at 308 (Kennedy, J., concurring in the judgment). There were, accordingly, five votes in Vieth for rejecting six distinct, albeit related, standards:

> First, the test proposed by the Bandemer plurality, which required a showing of an intent to discriminate plus proof that a political group had been "denied its chance to effectively influence the political process," Bandemer, 478 U.S. at 132-33 (plurality opinion);
>
> Second, the standard proposed by Justice Powell's concurrence in Bandemer, which "focuse[d] on whether the boundaries of the voting districts have been distorted deliberately and arbitrarily to achieve

illegitimate ends," as "determined by reference to . . . criteria that have independent relevance to the fairness of redistricting," id. at 165 (Powell, J., concurring in part and dissenting in part);

Third, the standard proposed by the Vieth plaintiffs, which would have required proof that "the mapmakers acted with a predominant intent to achieve partisan advantage," as well as proof that the effect of the map was to "systematically 'pack' and 'crack' the rival party's voters" in such a way as to "thwart the plaintiffs' ability to translate a majority of votes into a majority of seats," Vieth, 541 U.S. at 284, 286-87 (plurality opinion) (emphasis omitted);

Fourth, Justice Stevens' proposal in his Vieth dissent to "apply the standard set forth in [the Court's racial gerrymandering cases] and ask whether the legislature allowed partisan considerations to dominate and control the lines drawn, forsaking all neutral principles," id. at 339 (Stevens, J., dissenting);

Fifth, a five-element prima facie test proposed by Justice Souter's Vieth dissent through which a plaintiff would show "that his State intentionally acted to dilute his vote, having ignored reasonable alternatives consistent with traditional districting principles" before "shift[ing] the burden to the defendants to justify their decision by reference to objectives other than naked partisan advantage," id. at 351 (Souter, J., dissenting); and

Sixth, the standard proposed by Justice Breyer's Vieth dissent, which focused on whether "partisan manipulation" of district boundaries had been used "to entrench a minority in power," id. at 360 (Breyer, J., dissenting).

The primary focus of all of these rejected standards, however, was determining when the use of political considerations in districting is so underline unfair as to violate the Equal Protection Clause.

The Court addressed political gerrymandering once more in LULAC, but again failed to agree on the standard that should apply. The Court there declined to revisit Bandemer's justiciability holding, but five Justices, although unable to join a single opinion, agreed that the plaintiffs' theory -- which focused on the mid-decennial nature of the redistricting at issue -- failed to "offer the Court a manageable, reliable measure of fairness for determining whether a partisan gerrymander violates the Constitution." LULAC, 548 U.S. at 414; id. at 492-93 (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part); id. at 511-12 (Scalia, J., concurring in the judgment in part and dissenting in part).

Taken together, the combined effect of Bandemer, Vieth, and LULAC is that, while political gerrymandering claims premised on the Equal Protection Clause remain justiciable in theory, it is presently unclear whether an adequate standard to assess such claims will emerge.

But the inability of the Supreme Court thus far to agree on a standard for adjudicating political gerrymandering claims brought under the Equal Protection Clause does not necessarily doom a claim that the State's abuse of political considerations in districting has violated any other constitutional provision. See Vieth, 541 U.S. at 294 (plurality opinion) ("It is

24

elementary that scrutiny levels are claim specific.  An action that triggers a heightened level of scrutiny for one claim may receive a very different level of scrutiny for a different claim because the underlying rights, and consequently constitutional harms, are not comparable").  Indeed, in this very case, the Supreme Court recognized that the plaintiffs' legal theory -- which is premised on the First Amendment rather than the Equal Protection Clause -- was "uncontradicted by the majority in any of [its] cases."  Shapiro, 136 S. Ct. at 456.  We therefore turn to the limitations that the First Amendment may impose on a State's redistricting.

### III

Like the Equal Protection Clause, the First Amendment also operates to limit the conduct of state actors.  See Murdock v. Pennsylvania, 319 U.S. 105, 108 (1943) (recognizing that the Fourteenth Amendment makes the First Amendment "applicable to the states").  "[P]olitical belief and association constitute the core of those activities protected by the First Amendment."  Elrod v. Burns, 427 U.S. 347, 356 (1976) (plurality opinion).  Similarly, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society."  Reynolds, 377 U.S. at 555.

In addition to these forms of <u>direct</u> expression, moreover, the First Amendment also works in tandem with other constitutional guarantees to protect <u>representational</u> rights. Indeed, "<u>[t]he right of qualified voters, regardless of their political persuasion, to cast their votes effectively . . . rank[s] among our most precious freedoms</u>." <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 787 (1983) (emphasis added) (quoting <u>Williams v. Rhodes</u>, 393 U.S. 23, 30-31 (1968)). Expounding on the significance of this "representational right," the Supreme Court has explained:

> [R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in th[is] political process[] . . . . Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. <u>Full and effective participation by all citizens . . . requires, therefore, that each citizen have an equally effective voice in the election of [a representative]</u>.

<u>Reynolds</u>, 377 U.S. at 565 (emphasis added). Similarly, the Court in <u>Wesberry</u> recognized that Article I, § 2, of the Constitution requires "that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." 376 U.S. at 7-8.

Thus, at the most basic level, when a State draws the boundaries of its electoral districts so as to dilute the votes of certain of its citizens, the practice imposes a burden on

26

those citizens' right to "have an equally effective voice in the election" of a legislator to represent them.  Reynolds, 377 U.S. at 565.  In particular, the requirement of Article I, § 2, that one person's vote in a congressional election "is to be worth as much as another's," Wesberry, 376 U.S. at 7, provides the premise for recognizing vote "dilution" as a burden on citizens' representational rights, since dilution compromises the equal value requirement.  The Supreme Court has already recognized this basic principle in the context of districts of unequal population.  See, e.g., Bd. of Estimate of City of New York v. Morris, 489 U.S. 688, 693-94 (1989) ("If districts of widely unequal population elect an equal number of representatives, the voting power of each citizen in the larger constituencies is debased and the citizens in those districts have a smaller share of representation than do those in the smaller districts").  Thus, while a State can dilute the value of a citizen's vote by placing him in an overpopulated district, a State can also dilute the value of his vote by placing him in a particular district because he will be outnumbered there by those who have affiliated with a rival political party.  In each case, the weight of the viewpoint communicated by his vote is "debased." Morris, 489 U.S. at 693-94.  And, because, in our political system, "voters can assert their preferences only through candidates or parties or both," Anderson, 460 U.S. at 787, the

devaluation of a citizen's vote by dilution implicates the representational right protected by the First Amendment and Article I, § 2.

The practice of purposefully diluting the weight of certain citizens' votes to make it more difficult for them to achieve electoral success because of the political views they have expressed through their voting histories and party affiliations thus infringes this representational right. See Vieth, 541 U.S. at 314-15 (Kennedy, J., concurring in the judgment).  It penalizes voters for expressing certain preferences, while, at the same time, rewarding other voters for expressing the opposite preferences.  In this way, the practice implicates the First Amendment's well-established prohibition against retaliation, which prevents the State from indirectly impinging on the direct rights of speech and association by retaliating against citizens for their exercise. See Hartman v. Moore, 547 U.S. 250, 256 (2006) ("Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out" (quoting Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998))); see also Rutan, 497 U.S. at 77-78 ("What the First Amendment precludes the government from

commanding directly, it also precludes the government from accomplishing indirectly"). Thus, under the First Amendment's retaliation prohibition, the government may neither penalize a citizen nor deprive him of a benefit because of his constitutionally protected speech and conduct. See Rutan, 497 U.S. at 74-76; Perry v. Sindermann, 408 U.S. 593, 597 (1972). Accordingly, the well-established standards for evaluating ordinary First Amendment retaliation claims can also be used for evaluating claims arising in the redistricting context.

A plaintiff bringing a garden variety retaliation claim under the First Amendment must prove that the responsible official or officials were motivated by a desire to retaliate against him because of his speech or other conduct protected by the First Amendment and that their retaliatory animus caused the plaintiff's injury. See Hartman, 547 U.S. at 260 (recognizing that "any . . . plaintiff charging official retaliatory action . . . must prove the elements of retaliatory animus as the cause of injury").

With respect to the causation element, a retaliation claim requires proof of "but-for causation" or a showing that "the adverse action would not have been taken" but for the officials' retaliatory motive. Hartman, 547 U.S. 260. For while "[i]t may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, . . . action colored by

some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." Id.; see also id. at 256 ("Some official actions adverse to . . . a speaker might well be unexceptional if taken on other grounds, but when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is . . . the but-for cause of official action offending the Constitution").

As for the injury element, the plaintiff must prove that government officials "took some action that adversely affected her First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). The nature of the harm necessary to support a retaliation claim varies depending on the surrounding factual circumstances. See Thaddeus-X v. Blatter, 175 F.3d 378, 397 (6th Cir. 1999) ("[T]he definition of adverse action is not static across contexts"). It is clear, however, that "the retaliatory acts committed by a [government official must] be more than de minimis or trivial," Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000), and that "[h]urt feelings or a bruised ego are not by themselves the stuff of constitutional tort," Zherka v. Amicone, 634 F.3d 642, 645-46 (2d Cir. 2011). Rather, some "concrete harm [must be] alleged and specified," id. at 646, and that harm must be sufficiently serious that it "would likely deter a

person of ordinary firmness from the exercise of First Amendment rights," Constantine, 411 F.3d at 500 (internal quotation marks and citation omitted).

Because there is no redistricting exception to this well-established First Amendment jurisprudence, the fundamental principle that the government may not penalize citizens because of how they have exercised their First Amendment rights thus provides a well-understood structure for claims challenging the constitutionality of a State's redistricting legislation -- a discernable and manageable standard.

When applying First Amendment jurisprudence to redistricting, we conclude that, to state a claim, the plaintiff must allege that those responsible for the map redrew the lines of his district with the specific intent to impose a burden on him and similarly situated citizens because of how they voted or the political party with which they were affiliated.  In the context of redistricting, this burden is the injury that usually takes the form of vote dilution.  But vote dilution is a matter of degree, and a de minimis amount of vote dilution, even if intentionally imposed, may not result in a sufficiently adverse effect on the exercise of First Amendment rights to constitute a cognizable injury.  Instead, to establish the injury element of a retaliation claim, the plaintiff must show that the challenged map diluted the votes of the targeted citizens to such a degree

31

that it resulted in a tangible and concrete adverse effect.  In other words, the vote dilution must make some practical difference.  Finally, the plaintiff must allege <u>causation</u> -- that, absent the mapmakers' intent to burden a particular group of voters by reason of their views, the concrete adverse impact would not have occurred.

When a plaintiff adequately alleges the three elements of intent, injury, and causation, as described above, he states a plausible claim that a redistricting map violates the First Amendment and Article I, § 2.  Of course, as consistent with First Amendment jurisprudence, the State can still avoid liability by showing that its redistricting legislation was narrowly tailored to achieve a compelling government interest. <u>See</u> <u>Elrod</u>, 427 U.S. at 362 ("It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny").

This standard contains several important limitations that help ensure that courts will not needlessly intervene in what is quintessentially a political process.  <u>First</u>, it does not prohibit a legislature from taking <u>any</u> political consideration into account in reshaping its electoral districts.  A legislature and its mapmakers may, for example, still use data reflecting prior voting patterns to advance legitimate districting considerations, including the maintenance of

"communities of interest," LULAC, 548 U.S. at 433 (citation omitted), and even the "protection of incumbents of all parties," Vieth, 541 U.S. at 284 (plurality opinion). Rather, what implicates the First Amendment's prohibition on retaliation is not the use of data reflecting citizens' voting history and party affiliation, but the use of such data for the purpose of making it harder for a particular group of voters to achieve electoral success because of the views they had previously expressed. See Vieth, 541 U.S. at 315 (Kennedy, J., concurring in the judgment) ("[T]he First Amendment analysis . . . is not whether political classifications were used.  The inquiry instead is whether political classifications were used to burden a group's representational rights").

Second, a plaintiff must rely on objective evidence to prove that, in redrawing a district's boundaries, the legislature and its mapmakers were motivated by a specific intent to burden the supporters of a particular political party. It stands to reason "that whenever a legislature redistricts, those responsible for the legislation will know the likely political composition of the new districts and will have a prediction as to whether a particular district is a safe one for a Democratic or Republican candidate or is a competitive district that either candidate might win." Bandemer, 487 U.S. at 128 (plurality opinion).  But merely proving that the

legislature was aware of the likely political impact of its plan and nonetheless adopted it is not sufficient to prove that the legislature was motivated by the type of intent necessary to sustain a First Amendment retaliation claim.   Rather, the plaintiff must produce objective evidence, either direct or circumstantial, that the legislature specifically intended to burden the representational rights of certain citizens because of how they had voted in the past and the political party with which they had affiliated.

Third, the standard requires proof that the vote dilution brought about by the redistricting legislation was sufficiently serious to produce a demonstrable and concrete adverse effect on a group of voters' right to have "an equally effective voice in the election" of a representative.   Reynolds, 377 U.S. at 565. Not only is this requirement of a palpable and concrete harm indicated by First Amendment retaliation jurisprudence, but it also makes common sense.   Legislators draw political gerrymanders for practical reasons, and it is fitting to measure the effect of the apportionment not by whether it crosses some arbitrary statistical threshold or offends some vague notion of fairness, but by its real-world consequences -- including, most notably, whether the State's intentional dilution of the weight of certain citizens' vote by reason of their views has actually altered the outcome of an election.

The State argues against the First Amendment standard, maintaining that the standard is "arbitrary in the sense that the previous district becomes the norm or baseline against which the fairness of the new district is to be measured" when, in reality, citizens' voting patterns are dynamic.  But its argument fails to account for the necessary elements of a First Amendment retaliation claim.  The retaliation jurisprudence does not, as the State implies, include a presumption of fairness of the status quo ante.  The prior district itself may well have been drawn for partisan reasons, and the State can redraw its boundaries for any number of reasons.  But it cannot do so to retaliate against one group for its past electoral success in that district.

The State also argues that "no individual has a constitutional right to vote in a district that is safe or competitive for that individual's preferred candidates, even where the district has been so in the past."  While that may be true, it is also beside the point.  As the Supreme Court has explained in the political patronage context,

> [E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected

> speech or associations, his exercise of those freedoms
> would in effect be penalized and inhibited.

Rutan, 497 U.S. at 72 (quoting Perry, 408 U.S. at 597). This basic principle applies with equal force in the redistricting context. While citizens have no right to be assigned to a district that is likely to elect a representative that shares their views, the State also may not intentionally drown out the voices of certain voters by reason of their views. And when a State is alleged to have not only intentionally but also successfully burdened "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively," Anderson, 460 U.S. at 787 (quoting Williams, 393 U.S. at 30), by diluting their votes in a manner that has manifested in a concrete way, the allegation supports a justiciable claim under the First Amendment and Article I, § 2.

In sum, we recognize the justiciability of a claim challenging redistricting under the First Amendment and Article I, § 2, when it alleges intent, injury, and causation, as described herein.

IV

With this standard in hand, we assess the plaintiffs' second amended complaint, accepting the pleaded facts as true, to determine whether it states a plausible claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6).

The complaint alleges that, prior to the 2011 redistricting, Maryland's Sixth Congressional District had been "represented for nearly 20 years by Republican Roscoe Bartlett, who won reelection in 2010 by a 28-point margin." Second Am. Compl. ¶ 78. But, according to the complaint, the State's Democratic Governor and its Democratic-controlled legislature "set out to crack the [Sixth] District . . . to prevent voters in that district from [continuing to] elect[] a Republican representative to Congress," id. ¶ 38, a goal openly admitted by members of the Advisory Committee and various legislators, see id. ¶¶ 95-100. The complaint alleges that, without the input or support of any of the State's Republican leaders, and even though only "relatively small adjustments [were] needed to accommodate population growth," id. ¶ 61, the State adopted a redistricting plan that radically redrew the Sixth District's lines, "removing over 360,000 residents from the mostly-Republican northern counties of the district and adding nearly 350,000 residents from predominantly Democratic and urban Montgomery County," id. ¶ 81. It alleges that, relying on data reflecting citizens' voting histories and party registrations, "the Plan accomplished a net transfer of over 65,000 Republican voters out of the district and over 30,000 Democratic voters into the district," id. ¶ 84, thereby altering the balance of power between the two major political parties. The complaint

37

alleges further that the mapmakers' effort was successful insofar as the Sixth District "was flipped by the Plan from Republican to Democratic control" in the 2012 congressional election; "[t]he district remained under Democratic control after the 2014 congressional election"; and the district "is nearly certain to remain [under Democratic control] in all future congressional elections under the Plan." Id. ¶ 4.

These factual allegations adequately state intent, injury, and causation and therefore support a plausible claim that the State's redrawing of the Sixth District's lines violated the plaintiffs' rights under the First Amendment and Article I, § 2. First, the plaintiffs have alleged that they were registered Republicans who voted for Republican candidates in the Sixth District prior to 2011. Second, they have alleged that "the Maryland legislature expressly and deliberately considered Republican voters' protected First Amendment conduct, including their voting histories and political party affiliations, when it redrew the lines of the [Sixth] Congressional District; and it did so with an intent to disfavor and punish those voters by reason of their constitutionally protected conduct." Second Am. Compl. ¶ 7(a) (emphasis added). Third, the plaintiffs have alleged that, precisely as intended, the "actual effect" of the Plan has been to "burden[] Republican voters in the former [Sixth] Congressional District" by "preventing [them] from

continuing to elect a Republican representative to the United States House of Representatives, as they had in the prior ten congressional elections." Id. ¶ 7(b). And fourth and finally, the plaintiffs have adequately alleged the causation element of a retaliation claim: they have alleged (1) that the State's redrawing of the Sixth District "cannot be explained or justified by reference to Maryland's geography or other legitimate redistricting criteria" and therefore that "the cracking of the [Sixth] District would not have taken place without the legislature's [deliberate] targeting of Republican voters on the basis of their First-Amendment-protected conduct," id. ¶ 120-21; and (2) that "but for the cracking of the district under the Plan," "Republican voters in the former [Sixth] District would have been able to elect a Republican representative in 2012 and 2014," id. ¶ 7(b). If the plaintiffs succeed in proving these allegations, they will be entitled to relief, unless the State can establish that the drawing of the Sixth District's lines was narrowly tailored to advance a compelling government interest.

Accordingly, the State's motion to dismiss the plaintiff's complaint for failure to state a justiciable claim is DENIED.

BREDAR, District Judge, dissenting:

I respectfully dissent:  I would grant Defendants' motion to dismiss (ECF No. 51).[1]

I begin by emphasizing what this opinion does *not* stand for.  This opinion is not a defense of the State's authority to segregate voters by political affiliation so as to achieve pure partisan ends:  such conduct is noxious and has no place in a

---

[1] In 2014, I presided over this matter while sitting as a single-judge court.  Addressing Plaintiffs' claims as initially framed, I found the allegations wanting under the familiar *Twombly/Iqbal* standard, and—following then-controlling Fourth Circuit precedent—I both denied Plaintiffs access to a three-judge court and dismissed the case.  *See Benisek v. Mack*, 11 F. Supp. 3d 526 (D. Md. 2014).  These two rulings were summarily affirmed by the Fourth Circuit.  *See Benisek v. Mack*, 584 F. App'x 140 (4th Cir. 2014) (mem.).  However, the Supreme Court of the United States later reversed the first ruling, holding that the Fourth Circuit had set too high a bar for access to three-judge district courts under 28 U.S.C. § 2284.  The Supreme Court explained that the Fourth Circuit erred in *Duckworth v. State Administration Board of Election Laws*, 332 F.3d 769, 773 (4th Cir. 2003), in which case the Fourth Circuit had determined that, where a redistricting complainant fails to state a claim, by definition the complainant's pleadings are constitutionally insubstantial and "so properly are subject to dismissal by the district court without convening a three-judge court."  *See Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015) ("We think [the *Duckworth*] standard both too demanding and inconsistent with our precedents.  '[C]onstitutional claims will not lightly be found insubstantial for purposes of' the three-judge-court statute." (alteration in original) (citation omitted)).  Without "expressing any view on the merits" of Plaintiffs' claims, *id.* at 456, the Supreme Court remanded the case for proceedings before a three-judge district court.  On remand, Plaintiffs sought—and received—this Court's permission to amend their Complaint substantially, and it is Plaintiffs' modified constitutional theory that now confronts the Court.

representative democracy.  *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) ("'[P]artisan gerrymanders,' this Court has recognized, '[are incompatible] with democratic principles.'" (alterations in original) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality opinion))).  Nor do I seek in this opinion to understate the prevalence of political gerrymandering:  there is no doubt in my mind that the problem is real and widespread and that entrenched Democratic and Republican state legislatures alike exercise their control over redistricting in an effort to promote party power.  *See* Michael J. Kasper, *The Almost Rise and Not Quite Fall of the Political Gerrymander*, 27 N. Ill. U. L. Rev. 409, 419-23 (2007) (recounting the history of both Democratic and Republican gerrymandering efforts in Texas).  Further, this opinion should not be read as a willing abdication of the judiciary's constitutional obligation to resolve cases and controversies, *see* U.S. Const. art. III, § 2, cl. 1, even when those cases and controversies involve politically charged subject matter.  I have studied Plaintiffs' allegations and, in particular, their proposed First Amendment framework for resolving political gerrymandering claims.  I accept, for purposes of this discussion, that the First Amendment may, as Justice Kennedy opined in *Vieth*, be the most "relevant constitutional provision in . . . cases that allege

unconstitutional partisan gerrymandering," 541 U.S. at 314 (Kennedy, J., concurring in the judgment). I also assume, as I must on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, that Plaintiffs' well-pleaded factual allegations are true: accordingly, I take as a given that the Maryland Governor's Redistricting Advisory Committee ("GRAC") "focused predominantly on the voting histories and political-party affiliations of the citizens of the State" with the "clear purpose and effect of diluting the votes of Republican voters and preventing them from electing their preferred representatives in Congress." (ECF No. 44 ¶ 6.)

But even accepting that the First Amendment supplies the relevant constitutional principle, and even assuming that official misconduct may be afoot on the discrete facts of this case, I cannot responsibly endorse Plaintiffs' proposed standard (or otherwise approve continued litigation in this matter) unless I first conclude that the standard would be viable and manageable *throughout the life* of this case and *beyond the facts* of this case. Two substantial hurdles prevent me from drawing such a conclusion. The first hurdle relates to precedent: the Supreme Court has expressed some degree of tolerance for partisanship in the districting context, but that tolerance creates intractable line-drawing problems. A *per se* rule flatly prohibiting state legislatures from taking account of voting

history or voter affiliation in their mapmaking would streamline the preliminary analysis, but it is not clear that such a rule is available in light of controlling law (or desirable in light of competing interests and objectives).

Even were this Court to implement such a *per se* rule, there remains a second, insurmountable barrier.  Courts are simply not equipped to ascertain those unusual circumstances in which redistricting inflicts an actual, measurable burden on voters' representational rights.  Yet that is precisely what the Supreme Court has required.  *Compare Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality opinion) ("We . . . agree . . . that in order to succeed the . . . plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group."), *and Vieth*, 541 U.S. at 295 (plurality opinion) ("This Court may not willy-nilly apply standards—even manageable standards—having no relation to constitutional harms."), *with League of United Latin Am. Citizens* [*LULAC*] v*. Perry*, 548 U.S. 399, 418 (2006) (Kennedy, J.) ("[A] successful claim attempting to identify unconstitutional acts of partisan gerrymandering must . . . show a burden, as measured by a reliable standard, on the complainants' representational rights.").  Courts cannot reliably distinguish between what Plaintiffs would term impermissible "vote dilution" and the ordinary consequences of

an American political process that is organic, fluid, and often unpredictable.

Constitutional adjudication in the federal courts (and particularly adjudication that has the potential to disrupt democratic process and delegitimize democratically elected officials) must not be inconsistent or *ad hoc* but must instead be "principled, rational, and based upon reasoned distinctions," *Vieth*, 541 U.S. at 278 (plurality opinion). Because Plaintiffs have not shown that their framework would reliably identify those circumstances in which voters' representational rights have been impermissibly burdened, and because I have been unable to discern an acceptable alternative framework, I conclude that Plaintiffs' claims are not justiciable.[2] Accordingly, I would now dismiss Plaintiffs' controlling Second Amended Complaint with prejudice. Because I conclude that Plaintiffs' claims can *never* succeed, I would spare the parties the significant expense of discovery and end this case now. Offensive as political

---

[2] While the majority is quite correct in its observation, *supra* at 25, that Justice Kennedy's First Amendment theory remains "uncontradicted by the majority in any [Supreme Court] cases," *Shapiro*, 136 S. Ct. at 456, it does not follow, as the majority suggests, that Plaintiffs' Second Amended Complaint "adequately employs First Amendment jurisprudence to state a plausible claim for relief." As will be seen, Plaintiffs have failed to state a claim because they, like so many complainants in redistricting cases, have failed to proffer either a reliable standard for measuring the burden of political gerrymandering or allegations on which the Court could construct such a standard.

gerrymandering may be, there is nothing to be gained (and much to be lost) in postponing the inevitable.

## I.   *Partisanship and Precedent*

Before a court can craft a principled standard for rectifying a harm, it must grasp precisely what harm it is trying to rectify.   Political gerrymandering claims have left courts in a quagmire because, on the one hand, courts recognize that districting is among the most inherently political ventures that state legislatures (and their agents) undertake; on the other hand, it goes without saying that the party in power has every incentive to design and implement a map that further entrenches its power.   I am persuaded that *if* courts are to have any role in policing this process (an open question as far as I, and, it would seem, a majority of the Justices of the Supreme Court are concerned[3]), courts must depart from ambiguous

---

[3] There is much discussion in the case law and the scholarly literature about the meaning of *Vieth*, and in particular the meaning of Justice Kennedy's controlling opinion.   While Justice Kennedy apparently remains open to the possibility that political gerrymandering claims may be justiciable, he did not opine that they necessarily *are* justiciable.   On the contrary, he acknowledged that there are "weighty arguments for holding cases like these to be *nonjusticiable*" and that "those arguments may prevail in the long run."   541 U.S. 267, 309 (2004) (Kennedy, J., concurring in the judgment) (emphasis added). Justice Kennedy further opined that the "failings of the many proposed standards for measuring the burden a gerrymander imposes on representational rights make [judicial] intervention improper," though he suggested that if "workable standards do emerge to measure these burdens," courts should stand ready to

precedent and hold, as a first principle, that *any* manipulation on the basis of protected First Amendment conduct is presumptively impermissible.  Under such a regime, if mapmakers were to take account of protected conduct in their districting, and if voters could thereafter point to actual, measurable harms flowing from such districting, the resulting maps would be invalid (or subject to the rigors of strict scrutiny that is, more often than not, fatal in fact).

To be clear, I am not proposing that courts *should* adopt such a *per se* rule:  there are competing interests at stake, and indeed a rule that would preclude the kind of nefarious viewpoint discrimination Plaintiffs describe in their Second Amended Complaint might very well sweep up neutral or even useful political considerations.  In a recent dissenting opinion in a malapportionment and racial gerrymandering case, Judge Diana Gribbon Motz of the Fourth Circuit described those political or quasi-political districting criteria that the

---

order relief.  *Id.* at 317.  The most that should be said, then, about Justice Kennedy's take on the justiciability of political gerrymandering claims, is that he has not absolutely ruled it out.  Perhaps equally plausible is Justice Scalia's read of the Kennedy opinion, *i.e.*, that lower courts should treat the opinion as a "reluctant fifth vote against justiciability," a vote that "may change in some future case but that holds, for the time being, that this matter is nonjusticiable," *id.* at 305 (plurality opinion).

Supreme Court has deemed legitimate, which include maintaining the competitive balance among political parties; avoiding contests between incumbents, provided that incumbents of one party are not treated more favorably than those of another; and preserving communities of interest. *See Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, No. 16-1270, 2016 WL 3568147, at *16 (4th Cir. July 1, 2016) (Motz, J., dissenting).

For present purposes, I am simply asserting that *if* courts are going to adjudicate or attempt to adjudicate political gerrymandering claims, they must begin with the proposition that mapmakers may not take account of First Amendment-protected conduct when drawing district lines. The problem, of course, is that I am not writing on a blank slate: even those Justices of the Supreme Court who have remained optimistic about the justiciability of political gerrymandering claims have nevertheless acknowledged the partisan realities of districting. *Vieth* is illustrative: while the decision was highly fragmented, each opinion can be read to include some recognition that partisanship in districting may be inevitable, if perhaps suboptimal. *See* 541 U.S. at 285-86 (plurality opinion) (observing that the "Constitution clearly contemplates districting by political entities, and unsurprisingly that turns out to be root-and-branch a matter of politics"; further describing partisan motives as "ordinary and lawful" (citations

omitted)); *id.* at 307 (Kennedy, J., concurring in the judgment) (explaining that whereas race is an "impermissible classification," politics is "quite a different matter," and agreeing that it would be "idle . . . to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it" (citation omitted)); *id.* at 336 (Stevens, J., dissenting) (explaining that "[j]ust as race can be a factor in, but cannot dictate the outcome of, the districting process, so too can partisanship be a permissible consideration in drawing district lines, so long as it does not predominate"); *id.* at 343 (Souter, J., dissenting) (acknowledging that "some intent to gain political advantage is inescapable whenever political bodies devise a district plan, and some effect results from the intent"); *id.* at 355 (Breyer, J., dissenting) (opining that "pure politics often helps to secure constitutionally important democratic objectives").    The Court has echoed this tolerance for partisanship in other cases and in related contexts, such as in its racial gerrymandering and malapportionment jurisprudence. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 914 (1995) ("It is true that redistricting in most cases will implicate a political calculus in which various interests compete for recognition . . . ."); *Shaw v. Reno*, 509 U.S. 630, 662-63 (1993) (White, J., dissenting) ("Because districting inevitably is the expression of

interest group politics, and because 'the power to influence the political process is not limited to winning elections,' the question in gerrymandering cases is 'whether a particular group has been unconstitutionally denied its chance to effectively influence the political process.'" (citations omitted)); *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("Politics and political considerations are inseparable from districting and apportionment. . . . The reality is that districting inevitably has and is intended to have substantial political consequences."); *cf. Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1310 (2016) (assuming but nevertheless reserving the question whether partisanship is an "illegitimate redistricting factor").

In light of this authority, lower courts may be precluded from implementing a *per se* bar on partisan considerations in districting.  That said, the Supreme Court may have been more willing to tolerate partisanship in weighing the merits of equal protection claims because, as Justice Kennedy observed, "[n]o substantive definition of fairness in districting seems to command general assent," *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring in the judgment).  The Court has never held that discernible political groups are entitled to proportional representation under the Fourteenth Amendment.  Conversely, the First Amendment right is a sacrosanct individual right, and the Court has recognized that targeting on the basis of political

viewpoint or affiliation *outside* the redistricting context presumptively violates the First Amendment. *See id.* at 294 (plurality opinion) ("[A] First Amendment claim, if it were sustained, would render unlawful *all* consideration of political affiliation in districting, just as it renders unlawful *all* consideration of political affiliation in hiring for non-policy-level government jobs." (citing *Elrod v. Burns*, 427 U.S. 347 (1976))). To date, the First Amendment framework in the redistricting context is nothing more (or less) than a "legal theory put forward by a Justice of th[e] Court and uncontradicted by the majority in any . . . cases," *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015). Unless and until a majority of Justices squarely confront the propriety of partisanship in reviewing a redistricting claim brought on First Amendment grounds, it may be possible for lower courts to implement a *per se* rule in this narrow context. *Cf. Vieth*, 541 U.S. at 294 (plurality opinion) ("It is elementary that scrutiny levels are claim specific. An action that triggers a heightened level of scrutiny for one claim may receive a very different level of scrutiny for a different claim because the underlying rights, and consequently constitutional harms, are not comparable. To say that suppression of political speech . . . triggers strict scrutiny is not to say that failure to give

political groups equal representation . . . triggers strict scrutiny.").

This discussion is not strictly academic. To accept that political manipulation is part and parcel of redistricting is to create an insuperable line-drawing problem: how much politicking is too much, and how do we know? From *Bandemer* to the present day, the Supreme Court has been unable to answer that question with anything resembling the degree of clarity lower courts require in order to fairly adjudicate political gerrymandering claims. But if courts were to accept the premise that state authorities may no more use voter history and affiliation for mapmaking than they may use such data for hiring, firing, and contracting decisions, then courts would have, if nothing else, at least a plausible foundation on which to attempt to construct a standard.

Ultimately, I need not resolve this matter. Even were the Court to adopt a *per se* rule forbidding partisan manipulation in districting, I would nevertheless conclude that it is infeasible to ascertain the point at which voter manipulation produces a cognizable injury the likes of which courts are equipped to redress. If there is no provable burden, then there can be no judicial relief. *See id.* at 292 ("The issue . . . is not whether severe partisan gerrymanders violate the Constitution,

but whether it is for the courts to say when a violation has occurred, and to design a remedy.").

## II.   *Burden*

Defendants in this case devoted much of their briefing—and a substantial portion of their oral argument—to pressing their contention that nothing about the GRAC's 2011 map chills voters' First Amendment rights:   voters remain free to affiliate with the party of their choice, to vote, to run for office if they wish, and to participate in vibrant political debate wherever they find themselves.  Candidly, I made a similar observation in dismissing Plaintiffs' original Complaint, *see Benisek v. Mack*, 11 F. Supp. 3d 516, 526 (D. Md. 2014), *aff'd*, 584 F. App'x 140 (4th Cir. 2014) (per curiam), *rev'd and remanded sub nom. Shapiro*, 136 S. Ct. 450.  Since that time, Plaintiffs' theory of the case has evolved, and they now contend that the burden they (along with other Maryland voters) have suffered is not a direct restraint on their political activity but rather an indirect sanction for engaging in First Amendment-protected conduct.  According to Plaintiffs, by consulting data on voting history and party affiliation and by strategically deploying that data in its mapmaking, the GRAC "diluted the votes of the minority party significantly enough that the dilution has inflicted a palpable and concrete adverse effect" (ECF No. 85 at 3) through the cracking of the 6th Congressional District.

For purposes of this discussion, I accept that the burden Plaintiffs allege they have suffered is an indirect burden and that, accordingly, much of Defendants' argument misses the mark. Likewise, much of the discussion in prior cases in which district courts have applied First Amendment principles in resolving political gerrymandering claims is only marginally relevant to the Court's analysis here:  while plaintiffs in those prior cases have occasionally pleaded an indirect burden, presiding courts have generally focused on the absence of a direct restraint.  *But see Radogno v. Ill. State Bd. of Elections*, No. 1:11-cv-04884, 2011 WL 5025251, at *7 (N.D. Ill. Oct. 21, 2011) ("It may very well be that Plaintiffs' ability to *successfully elect* their preferred candidate is burdened by the redistricting plan, but that has nothing to do with their First Amendment rights."); *Kidd v. Cox*, No. 1:06-CV-0997-BBM, 2006 WL 1341302, at *19 (N.D. Ga. May 16, 2006) ("What Plaintiffs demand is the right to have their views represented in state government by the representative of their choice.  We decline to recognize such a right under the First Amendment.").

Nevertheless, even assuming that vote dilution (as Plaintiffs conceive of it) may amount to a constitutional harm,[4]

---

[4]  This, however, remains an open question:  while malapportionment plainly harms the rights of those particular voters who are packed into overcrowded districts and whose votes

I conclude that it is not a harm courts are currently equipped to redress: I can ascertain no reliable, administrable standard, and Plaintiffs have proposed none, for distinguishing electoral outcomes achieved through political gerrymandering from electoral outcomes determined by the natural ebb and flow of politics. Short of exposing voters and their private voting decisions to involuntary interrogative discovery—an obviously

---

are thereby literally diluted, it is less obvious that voters suffer individual harm simply because they are redistricted in such a way that their party of choice is less likely to prevail in congressional elections. Indeed, as Plaintiffs here seem to recognize, and as the majority acknowledges, *supra* at 17, "citizens have no *constitutional* right to reside in a district in which a majority of the population shares their political views and is likely to elect their preferred candidate." *See also Badham v. March Fong Eu*, 694 F. Supp. 664, 675 (N.D. Cal. 1988) ("The First Amendment guarantees the right to participate in the political process; it does not guarantee political success."), *aff'd mem.*, 488 U.S. 1024 (1989). For this reason, I would hesitate to draw a parallel to the one-person-one-vote line of cases, as the majority has done.

Even if vote dilution, as described by Plaintiffs, does amount to a constitutional harm, I greatly doubt that such a harm is of the same order as the harm citizens suffer in the context of political patronage, the doctrinal comparator on which Plaintiffs largely rely. *See* Samuel Issacharoff & Pamela S. Karlan, *Where to Draw the Line?: Judicial Review of Political Gerrymanders*, 153 U. Pa. L. Rev. 541, 563 (2004) ("[T]he burden that the plaintiffs in the patronage cases experienced fell on them outside the political process: they lost jobs as public defenders or road workers or were denied contracts to haul trash or tow cars. . . . By contrast, in a political gerrymandering case, the question whether 'an apportionment has the purpose and effect of burdening a group of voters' representational rights' requires deciding what voters' 'representational rights' are." (footnote omitted)).

impractical and fundamentally undemocratic undertaking—it is simply not feasible to reverse-engineer elections so as to determine whether the State's dilutive efforts imposed a "real and concrete adverse impact on supporters of the disfavored political party" (ECF No. 68 at 8).

The problem lies in the nature of political affiliation itself. Unlike race, one's status as a Republican or a Democrat is not, as Justice Scalia put it, an "immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line." *Vieth*, 541 U.S. at 287 (plurality opinion). Justice O'Connor made a similar point in *Bandemer*, writing that "while membership in a racial group is an immutable characteristic, voters can—and often do—move from one party to the other or support candidates from both parties. Consequently, the difficulty of measuring voting strength is heightened in the case of a major political party." 478 U.S. at 156 (O'Connor, J., concurring in the judgment). Maryland's 6th Congressional District is illustrative: while in 2012 the Democratic challenger, John Delaney, defeated Roscoe Bartlett, the incumbent Republican, by an almost twenty-one percent margin of victory, just two years later Delaney beat Republican challenger Dan Bongino by a mere

1.5%.[5] Thus, while the majority sensibly contends that the State may not "intentionally drown out the voices of certain voters by reason of their views," *supra* at 36, the problem with Plaintiffs' theory (and, more broadly, with *all* political gerrymandering claims, whether brought on First Amendment or equal protection grounds) is that courts are not equipped to distinguish those circumstances in which the State has drowned out particular voices from those circumstances in which the chorus has voluntarily changed its tune.

Because of the inherent mutability of political affiliation, the Court cannot simply compare the results of an election conducted pursuant to Map X with those of a subsequent election conducted pursuant to Map Y and blame any shift in power on redistricting:  each election cycle is unique, and voter behavior is as unpredictable as the broader societal circumstances that may make one candidate, or one party, more appealing than the other to particular voters and communities. For that matter, treating a prior map as a baseline for measuring the constitutionality of a subsequent map assumes that

---

[5]   These statistics are publicly available at http://elections.state.md.us, and may be considered at the Rule 12(b)(6) stage.  *See Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (explaining that, where voter statistics are publicly available at state legislative website, courts may take judicial notice of this information on motion to dismiss).

the prior map was itself free of impermissible manipulation—yet we know, as a practical matter, that gerrymandering is widespread in our political system and as old as the Republic. *See* Kasper, *supra*, at 411; *cf. LULAC*, 548 U.S. at 446 (Kennedy, J.) ("There is no reason . . . why the old district has any special claim to fairness.").[6]

Plaintiffs hasten to reassure the Court that, whatever the boundaries or implications of their proposed standard in other, future cases, in *this* case the answer could not be clearer: through savvy political engineering, the State cracked a congressional district and wrested a seat from long-held Republican control.  I am compelled to wonder how Plaintiffs might seek to *prove* that claim:  Plaintiffs, after all, are just nine committed or occasional Republican voters residing in two

---

[6] The majority acknowledges, *supra* at 35, that a prior map "may well have been drawn for partisan reasons, and the State can redraw its boundaries for any number of reasons" so long as those reasons do not include partisan retaliation.  But my point here goes, once again, to the question of burden:  if Map X was badly gerrymandered to advance Republican interests, and Map Y is thereafter designed to promote Democratic interests, I am not certain that Republican voters who may have been indirectly impacted by the redistricting initiative have suffered a burden for which the Constitution affords redress.  Put differently, if political gerrymandering is as universal and longstanding a problem as Plaintiffs and *amici* suggest, then it may be unhelpful to treat any one particular map, which may have the effect of correcting for or offsetting a prior gerrymander, as imposing a particularized burden on a discrete partisan subset of the voting population.

districts comprising many hundreds of thousands of residents. Plaintiffs could take the stand and testify about their personal voting histories, and they could perhaps invite their friends and associates to do so as well. But such testimony would shed no meaningful light on the circumstances surrounding the 2012 and 2014 congressional elections. Nor, for the reasons I have already set forth, would statistical sampling, voter registration history, or any other known data set provide reliable evidence from which the Court could ascertain whether *in fact* the alleged gerrymander was outcome determinative.

Even were I to presume on the unusual facts of this case—the broken-winged pterodactyl and so forth—that the gerrymander *was* outcome determinative, such a presumption would bring me no closer to a reliable framework that I, and other judges, might employ in future cases involving subtler partisan engineering. At bottom, Plaintiffs' purported standard is a variation on Justice Stewart's much-maligned adage, "I know it when I see it," *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). *Ad hoc* decision making and judicial stargazing cannot take the place of "clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights," as "[a]bsent sure guidance, the results from one gerrymandering case to the next would likely be disparate and inconsistent,"

*Vieth*, 541 U.S. at 307-08 (Kennedy, J., concurring in the judgment); *see also id.* at 291 (plurality opinion) (explaining that a reliable criterion is "necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking").

### III. *Conclusion*

There may yet come a day when federal courts, finally armed with a reliable standard, are equipped to adjudicate political gerrymandering claims.[7]   Or perhaps political gerrymandering (at

---

[7] In the absence of a reliable standard, the Supreme Court may nevertheless intervene—or, more likely, direct lower-court intervention—should a truly exorbitant fact pattern emerge.   At oral argument in a case heard the same day as this matter, *Parrott v. Lamone*, Civ. No. GLR-15-1849, plaintiffs' counsel hypothesized that highly sophisticated demographic software might make it possible for blatantly partisan redistricting commissions to draw district lines between apartment units or rooms in a single-family home.   The hypothetical is absurd, but the notion that sophisticated mapmakers could draw lines around favored (and disfavored) communities or even streets is not inconceivable. At some point, mapmaking that makes a mockery out of representative democracy may necessitate inelegant judicial intervention, and the Supreme Court may require lower courts to stand guard at the outer perimeter of rationality.   *See Cox v. Larios*, 542 U.S. 947, 950 (2004) (Stevens, J., concurring) ("'[T]he unavailability of judicially manageable standards' cannot justify a refusal 'to condemn even the most blatant violations of a state legislature's fundamental duty to govern impartially.'" (citation omitted)).

least in extreme cases) will be corrected by the voters themselves, who after all bear the ultimate power—if they unite—to bring about political change. *See Bandemer*, 478 U.S. at 144 (Burger, C.J., concurring in the judgment) ("In my view, the Framers of the Constitution . . . placed responsibility for correction of such flaws in the people, relying on them to influence their elected representatives."). In any event, I am not persuaded that Plaintiffs here have discovered a viable solution. And even having accepted several of Plaintiffs' unproven premises for purposes of my analysis on this Rule 12(b)(6) motion (*i.e.*, that the First Amendment is the relevant constitutional provision, that vote dilution as Plaintiffs characterize it might amount to a constitutional harm, and that the GRAC acted with the purpose and effect of targeting Republican voters), I have been unable—like a majority of Justices and every lower court to take up the question since *Vieth*—to devise a standard on which courts might reasonably rely. Consequently, I must part company with my esteemed colleagues on the panel. I would dismiss Plaintiffs' Second Amended Complaint with prejudice.