IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| O. JOHN BENISEK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: 1:13-cv-03233-JKB |
| LINDA H. LAMONE, *et al.*, | * | |
| Defendants. | * | |

---

COMMON CAUSE; THE BRENNAN CENTER FOR JUSTICE AT N.Y.U. SCHOOL OF LAW; THE CAMPAIGN LEGAL CENTER, INC.,

Amici Supporting Plaintiffs.

---

Michael B. Kimberly, Paul W. Hughes, Stephen M. Medlock, E. Brantly Webb, and Micah D. Stein, MAYER BROWN LLP, Washington, D.C., for plaintiffs.

Jennifer L. Katz, Sarah W. Rice, and Kathryn M. Rowe, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for defendants.

Benjamin W. Thorpe, Emmet J. Bondurant, BONDURANT MIXSON AND ELMORE LLP, Atlanta, Georgia, Gregory L. Diskant, PATTERSON BELKNAP WEBB AND TYLER LLP, New York, New York, and Michael A. Pretl, Riverton, Maryland, for Amicus Common Cause. Charles E. Davidow, Washington, D.C., Pietro Signoracci, Robert A. Atkins, New York, New York, PAUL WEISS RIFKIND WHARTON AND GARRISON LLP, and Michael Li, Thomas P. Wolf, New York, New York, for Amicus The Brennan Center for Justice at N.Y.U. School of Law. Paul March Smith, JENNER AND BLOCK LLP, Washington, D.C., for Amicus The Campaign Legal Center, Inc.

Argued: March 6, 2017 Filed: March 13, 2017

Before Niemeyer, Circuit Judge, and Bredar and Russell, District Judges.

Judge Niemeyer wrote the opinion in which Judge Bredar and Judge Russell joined.

# MEMORANDUM AND ORDER

NIEMEYER, Circuit Judge:

The plaintiffs in this action challenge the constitutionality of Maryland's redistricting law enacted on October 20, 2011, alleging that the law violated their rights under the First Amendment and Article I, Sections 2 and 4, of the U.S. Constitution. Pursuant to 28 U.S.C. § 2284(a), this three-judge court was convened to hear and determine the action.

Acting under § 2284(b)(3), Judge Bredar, a member of the three-judge court, issued two discovery orders dated January 31, 2017, and February 3, 2017, in which he rejected claims of legislative privilege asserted by witnesses whom the plaintiffs sought to depose and from whom the plaintiffs sought documents. The witnesses, represented by the Office of the Attorney General of Maryland, filed a motion for review of Judge Bredar's orders by the full court, as authorized by § 2284(b)(3).

The full court, having now received the parties' memoranda and their oral arguments at a hearing on March 6, 2017, affirms Judge Bredar's orders.

## I

### A

Based on the results of the 2010 census, the State of Maryland was required to redraw the lines of its eight congressional districts to ensure that each district had an equal share of the State's population. Governor Martin O'Malley, a Democrat,

established the Governor's Redistricting Advisory Committee by executive order in July 2011, charging the Committee with "holding public hearings around the State and drafting [a] redistricting plan[] for [his] consideration [that would] set the boundaries of the State's . . . 8 congressional districts following the 2010 Census." Joint Stipulation ¶ 18. The Governor selected Jeanne D. Hitchcock — a Democrat who was the Appointments Secretary in the Governor's Office and who had been the Deputy Mayor of Baltimore when O'Malley had been the Mayor — to chair the Committee. And he appointed four other individuals to be members of the Committee: (1) State Senate President Thomas V. Mike Miller, Jr., a Democrat; (2) House of Delegates Speaker Michael E. Busch, a Democrat; (3) Richard Stewart, a businessman who had chaired the Governor's reelection campaign in Prince George's County, a Democrat; and (4) James J. King, a businessman from Anne Arundel County who had previously served in the House of Delegates, a Republican.

The Advisory Committee held 12 public hearings across the State in the summer of 2011, receiving approximately 350 comments from members of the public. The Committee also solicited submissions of plans by third parties for its consideration. Although the Committee held public hearings and solicited public comments, it was "exempt by law from the Maryland Open Meetings Act." Joint Stipulation ¶ 27. The Committee prepared a draft redistricting plan using a computer software program called Maptitude for Redistricting Version 6.0, and, when doing so, it had access to the State Board of Elections' statistical data, including "address-level voter registration data" and "address-level voter-history data." *Id.* ¶ 29. Using the Maptitude software program to

analyze this data, the Committee would have had the ability "to determine how the outcome of historical elections would have changed . . . if the proposed plan had been in place in prior years." *Id.* ¶ 30.

The Advisory Committee completed its proposed map on October 4, 2011, with King, the Committee's lone Republican, casting the sole dissenting vote. After posting the map online and receiving additional comments from the public, the Governor announced on October 15 that he would submit to the legislature a map that was substantially the same as the Advisory Committee's proposal. *See* Joint Stipulation ¶ 33. Two days later, on October 17, Senate President Miller introduced the Governor's proposed redistricting map as Senate Bill 1 at a special legislative session. That same day, the Senate Committee on Reapportionment and Redistricting, along with the House Rules Committee, held a joint hearing on Senate Bill 1 and voted to approve the bill. After adopting minor technical amendments, the Senate passed the bill the next day, October 18, sending it to the House of Delegates, which, after making additional technical amendments, passed it on October 19. The Senate concurred in the House's technical amendments, and the Governor signed Senate Bill 1 into law on October 20, 2011, three days after it had been introduced. *See* Md. Code Ann., Elec. Law §§ 8-701 to -709.

The enacted Plan created eight congressional districts that were equal in population according to the adjusted 2010 census data. The changes effected by the Plan, however, were far more extensive than those needed to achieve population equality, and the reshuffling was particularly extensive with respect to Maryland's Sixth Congressional

District. Historically, the Sixth District had consistently included all of the State's five most northwestern counties — Garrett, Allegany, Washington, Frederick, and Carroll Counties — as well as various portions of Baltimore, Howard, Montgomery, and Harford Counties, and it had been represented in Congress by Representative Roscoe Bartlett, a Republican, since 1992. At the time of the 2010 congressional election — the last held prior to the 2011 redistricting — 46.68% of the Sixth District's eligible voters were registered as Republicans, while 35.84% were registered as Democrats, and Representative Bartlett won reelection that year by a margin of 28.2%. Joint Stipulations ¶¶ 8, 10.

Under the 2011 Plan, the new Sixth District retained Garrett, Allegany, and Washington Counties, as well as roughly half of Frederick County's population. The Plan moved to other districts the remainder of Frederick County, all of Carroll County, and the portions of Baltimore and Harford Counties that had previously been part of the Sixth District, and in their place it added approximately 350,000 residents from Montgomery County. Thus, under the 2011 Plan, roughly half of the Sixth District's residents live in Montgomery County, which has well over twice as many registered Democrats as registered Republicans.

"One widely understood consequence of the Plan was that it would make it more likely that a Democrat rather than a Republican would be elected as representative from the [Sixth] District." Joint Stipulation ¶ 31. This understanding turned out to be accurate. At the time of the 2012 congressional election — the first held under the 2011 Plan — 33.32% of the Sixth District's eligible voters were registered as Republicans, and

44.11% were registered as Democrats. *Id.* ¶ 53. In that election, Democratic candidate John Delaney, a newcomer to politics, defeated Bartlett by a 20.9% margin. *Id.* ¶ 54. Representative Delaney won reelection in 2014 and again in 2016, albeit by smaller margins.

B

The seven plaintiffs in this action, registered Republicans who lived in the Sixth District prior to the 2011 Plan's enactment, challenge the constitutionality of the Plan under the First Amendment and Article I, Sections 2 and 4, of the U.S. Constitution. Their second amended complaint, which names as defendants the Chair and the Administrator of the State Board of Elections (the "State"), alleged that those responsible for the 2011 Plan "purposefully and successfully flipped [the Sixth District] from Republican to Democratic control by strategically moving the [D]istrict's lines by reason of citizens' voting records and known party affiliations." Second Am. Compl. ¶ 1. They alleged that "[t]he drafters of the Plan focused predominantly on the voting histories and political-party affiliations of the citizens of the State in deciding how to" redraw the Sixth District's lines and that they "did so with the clear purpose . . . of diluting the votes of Republican voters and preventing them from electing their preferred representatives in Congress." *Id.* ¶ 6. They alleged further that the Plan achieved its intended effect, imposing a significant burden on the former Sixth District's Republican voters by preventing them "from continuing to elect a Republican representative . . . , as they had in the prior ten congressional elections." *Id.* ¶ 7(b). And they maintained that "the State cannot justify the cracking of the [Sixth] District by reference to geography or

compliance with legitimate redistricting criteria." *Id.* ¶ 7(c). Based on these allegations, the plaintiffs claimed in essence that the Plan's redrawing of the Sixth District's boundaries constituted unlawful retaliation in violation of their rights under the First Amendment and Article I.

In a memorandum opinion dated August 24, 2016, we denied the State's motion to dismiss the plaintiffs' second amended complaint, concluding that the plaintiffs had adequately alleged a justiciable claim for relief. *Shapiro v. McManus*, No. 1:13-cv-03233-JKB, 2016 WL 4445320, at *1, 13 (D. Md. Aug. 24, 2016). We held that to succeed on their claims, the plaintiffs would have to prove three elements: *first*, "that those responsible for the map redrew the lines of [their] district with the *specific intent* to impose a burden on [them] and similarly situated citizens because of how they voted or the political party with which they were affiliated"; *second*, "that the challenged map diluted the votes of the targeted citizens to such a degree that it resulted in a tangible and concrete adverse effect"; and *third*, "that, absent the mapmakers' intent to burden a particular group of voters by reason of their views, the concrete adverse impact would not have occurred." *Id.* at *10. With respect to the intent element, we emphasized that it would not be sufficient "merely [to] prov[e] that the legislature was aware of the likely political impact of its plan and nonetheless adopted it." *Id.* at *11. Rather, we concluded, the plaintiffs "must rely on objective evidence to prove that, in redrawing [the Sixth District's] boundaries, the legislature and its mapmakers were motivated by a specific intent to burden the supporters of a particular political party." *Id.* We further indicated that this objective evidence could be "either direct or circumstantial." *Id.*

C

As part of their discovery efforts in this case, the plaintiffs served notices of deposition and subpoenas on the four Democratic members of the Governor's Redistricting Advisory Committee — that is, Hitchcock, Miller, Busch, and Stewart — as well as on Senator C. Anthony Muse[1] and Delegate Curt S. Anderson.[2] The plaintiffs represent that they "intend to question [the witnesses] regarding (among other things) their intent and motivations for drawing the lines of the Sixth Congressional District as they did, the data that they used and how they used it, and the vote dilution that resulted from the Plan as enacted." In response, the Maryland Office of the Attorney General, representing the State and the witnesses, indicated its intent to file motions to quash the subpoenas served on the members of the Advisory Committee, as well as the current and

[1] Senator Muse was the only Democratic Senator who voted against the 2011 Plan. On the day that the Senate voted on the bill, he stated that the Plan "parcels out minority populations — voters — to other very different communities in order to strengthen the chances of a Democrat being elected." Joint Stipulation ¶ 42(a).

[2] Delegate Anderson voted in favor of the Plan. Describing the briefing Hitchcock provided to the House and Senate Democratic Caucuses about the Advisory Committee's proposed plan on October 3, 2011, Anderson stated, "It reminded me of a weather woman standing in front of the map saying, 'Here comes a cold front,' and in this case the cold front is going to be hitting Roscoe Bartlett pretty hard." Joint Stipulation ¶ 46. And, on the day Senate Bill 1 was introduced, he stated in an interview, "What we're doing is we are trying to get more, in terms of — currently we have two Republican districts and six Democratic Congressional districts and we're going to try to move that down to seven and one, with the additional Congressional district coming more out of Montgomery county and going into western Maryland that would give the Democrats more." *Id.* ¶ 47.

former members of the Maryland General Assembly who seek to assert their state legislative privilege.

The plaintiffs also served document subpoenas on the members of the Advisory Committee,[3] as well as Senator Richard Madaleno.[4] In response, the Office of the Attorney General stated that Hitchcock, the Chair of the Advisory Committee, was not able to locate any documents responsive to the subpoena, while Stewart produced eleven

---

[3] The plaintiffs' third-party document subpoenas sought, among other things:

- "All external communications relating to the planning or drafting of Maryland's 2011 congressional redistricting plan with . . . (a) the Governor; (b) Maryland House Redistricting Committee; (c) Maryland Senate Redistricting Committee; (d) Any current or former member of the Maryland General Assembly, including their staff or agents; (e) Any current or former member of the United States Congress, including their staff or agents; (f) Any current or former officer, member of leadership, or staff member of the Democratic National Committee, including their staff or agents; (g) Any current or former officer, member of leadership, or staff member of the Democratic Congressional Campaign Committee, including their staff or agents; or (h) Any current or former officer, member of leadership, or staff member of the Maryland Democratic Party."

- "All external Communications between or among You and third parties (including consultants, experts, constituents, and members of the press) related in any way to Maryland's 2011 congressional redistricting process, its goals, or its results during the Relevant Time Period."

- "All interim or draft maps or reports related to Maryland's 2011 congressional redistricting plan, whether electronic or in hard copy, provided to You by any third party or by You to any third party during the Relevant Time Period."

[4] Senator Madaleno voted in favor of the Plan. In a taped interview on September 13, 2011, he stated, "What you see going on elsewhere is clearly in other states that are Republican controlled they are drawing maps to try to take out Democrats, so I think there is pressure on saying look, if they are playing that game elsewhere, then in states like Maryland where democrats control we've got to do the opposite." Joint Stipulation ¶ 40(a).

pages of emails and six email attachments. Senate President Miller, House Speaker Busch, and Senator Madaleno produced less than 150 pages in total, and they asserted state legislative privilege as the basis for withholding 36 responsive documents.

On January 4, 2017, the plaintiffs filed a motion (1) to compel the four Advisory Committee members to provide deposition testimony and (2) to compel Miller, Busch, and Madaleno to produce the documents that they had withheld based on legislative privilege. A few days later, the Office of the Attorney General, acting on behalf of four Advisory Committee members, filed a motion for a protective order and to quash the deposition subpoenas served on them "on the ground that their legislative privilege against compulsory evidentiary process protects them from being compelled to testify in this matter about their legislative activity." Not long thereafter, Anderson and Muse also filed a motion for a protective order and to quash the deposition subpoenas served on them, similarly invoking legislative privilege.

In a memorandum and order dated January 31, 2017, Judge Bredar, the member of this three-judge court overseeing discovery and other preliminary matters,[5] granted the plaintiffs' motion to compel and denied the motion for a protective order filed by the four Advisory Committee members, concluding that, in the circumstances of this case, "the legislative privilege claimed by the Non-Parties must yield to the discovery requests of

[5] *See* 28 U.S.C. § 2284(b)(3) ("In any action required to be heard and determined by a district court of three judges . . . [a] single judge may conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure except as provided in this subsection").

Plaintiffs." For the same reasons, Judge Bredar denied Anderson and Muse's motion for a protective order in an order dated February 3, 2017.[6]

On February 9, 2017, the four members of the Advisory Committee, as well as Anderson, Muse, and Madaleno (collectively, the "witnesses"), filed a motion for review by us of the January 31 and February 3 discovery orders and for a stay of those orders.[7] *See* 28 U.S.C. § 2284(b)(3) ("Any action of a single judge may be reviewed by the full court at any time before final judgment"). That same day, we entered an order staying the January 31 and February 3 orders pending our review.

II

At the threshold, the witnesses argue that neither state legislators nor non-legislator members of the Advisory Committee may be compelled to testify in depositions or to produce certain documents, as their communications related to the redistricting process are shielded by an *absolute* legislative privilege. We reject this threshold argument. While all of the witnesses can, in theory, benefit from the federal

---

[6] This order also denied a motion for a protective order to modify the deposition subpoena served on Robert Garagiola, a former State Senator. Garagiola later waived his legislative privilege and participated in a deposition and so that ruling is not before the three-judge court.

[7] Before seeking a stay and review of the discovery orders, Senate President Miller, House Speaker Busch, and Senator Madaleno produced several of the documents that they had previously withheld on the basis of legislative privilege. They continue to withhold 14 documents that represent "communications between legislators and communications between legislators and their close aides containing opinions and advice."

common law doctrine of legislative privilege, that privilege is *qualified*, not absolute, in a context such as this redistricting litigation.

The federal system "has broadly recognized the right 'of legislators to be free from arrest or civil process for what they do or say in legislative proceedings.'" *EEOC v. Wash. Suburban Sanitary Comm'n* ("*WSSC*"), 631 F.3d 174, 180 (4th Cir. 2011) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951)). Legislative immunity for U.S. Senators and Representatives derives from the Speech and Debate Clause, U.S. Const., Art. I, § 6, and it extends broadly to bar criminal prosecution or civil suit based on "anything 'generally done in a session of the House [or Senate] by one of its members in relation to the business before it.'" *Gravel v. United States*, 408 U.S. 606, 624 (1972) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881)).

While the Speech and Debate Clause by its terms protects only federal officials, the Supreme Court has developed a similar doctrine of immunity that shields state, regional, and local officials from civil liability based on their actions taken "in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376; *see also Bogan v. Scott-Harris*, 523 U.S. 44, 54–55 (1998) (holding that the doctrine protects local officials); *Lake Country Estates v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 (1979) (same for regional officials); *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732–33 (1980) (same for suits seeking injunctive relief). This common law doctrine is rooted in principles of comity and in a history of immunity for state legislators that predates the Constitution. *See Spallone v. United States*, 493 U.S. 265, 279 (1990) ("[A]ny restriction on a legislator's freedom undermines the 'public good' by interfering

with the rights of the people to representation in the democratic process"); *Tenney*, 341 U.S. at 372 ("Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation").

Moreover, in order to "safeguard this [state] legislative immunity and to further encourage the republican values it promotes," courts have recognized a corresponding privilege "against compulsory evidentiary process" that can apply "whether or not the legislators themselves have been sued." *WSSC*, 631 F.3d at 181. Because legislative immunity and legislative privilege are motivated by the same policy of comity, courts apply them in a parallel manner. *See, e.g.*, *Gravel*, 408 U.S. at 608 (in declining to quash grand jury subpoena for Senator's aide, relying on cases establishing legislative immunity from suit).

All of the witnesses here, including the non-legislator members of the Committee, are eligible to seek legislative privilege. The doctrine protects not only legislators, but also "officials outside the legislative branch . . . when they perform legislative functions" or engage in "integral steps in the legislative process." *Bogan*, 523 U.S. at 55 (holding that local officials performing legislative functions are protected by legislative immunity and indicating that a governor's choice to sign or veto a bill therefore would be protected); *see also Consumers Union*, 446 U.S. at 731–34 (shielding state supreme court and its chief justice from liability for promulgating disciplinary rules). Here, the four members of the Committee who were served with subpoenas — the two state legislators and the two non-legislators — worked together to draw a new congressional district map that was substantially the same as the one adopted by the General Assembly and signed

into law by the Governor. This was a quintessentially legislative process, and thus all of the Committee members are at least *eligible* for legislative privilege.

That does not mean, however, that the witnesses can automatically have the plaintiffs' discovery requests quashed. While legislative privilege is undoubtedly robust, the Supreme Court's decisions make clear that the privilege does not *absolutely* protect state legislative officials from discovery into communications made in their legislative capacity.

Most clearly repudiating an absolute nature of the privilege is the Supreme Court's decision in *United States v. Gillock*, 445 U.S. 360 (1980). There, the Court allowed a state senator's legislative acts, including his introduction of a bill and several of his floor statements, to be used as evidence in a federal bribery prosecution against him. Although it recognized that the "denial of a privilege to a state legislator may have some minimal impact on the exercise of his legislative function," the Court explained that "*where important federal interests are at stake*, as in the enforcement of federal criminal statutes, *comity yields*." *Id.* at 373 (emphasis added); *see also id.* at 372 (distinguishing *Tenney*, which granted immunity for "civil action[s] brought by a private plaintiff to vindicate private rights"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (leaving open the possibility that, "[i]n some extraordinary instances[,] the members [of a legislative body] might be called to the stand at trial to testify concerning

the purpose of the official action," while recognizing that "even then such testimony frequently will be barred by privilege").[8]

Thus, we reject the witnesses' claim of absolute privilege in this context. Instead, we conclude that, in deciding whether legislative privilege protects a state legislative actor from discovery, we must balance the significance of the federal interests at stake against the intrusion of the discovery sought and its possible chilling effect on legislative action. This balancing inquiry ensures that legislative privilege, like all evidentiary privileges, applies "only to the very limited extent that . . . a public good transcend[s] the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel v. United States*, 445 U.S. 40, 50 (1980) (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

---

[8] The witnesses rely on this "extraordinary circumstances" language from *Arlington Heights* and argue that the circumstances of this case are by no means extraordinary. As explained in Part III of this opinion, we disagree. Indeed, if anything, we think that *Arlington Heights* counsels against recognizing an absolute privilege here. In *Arlington Heights*, the Supreme Court held that plaintiffs challenging an official action under the Equal Protection Clause must prove not just that the action had a discriminatory impact, but that the decisionmaker acted with discriminatory intent. 429 U.S. at 265. In evaluating whether the evidence introduced at trial adequately showed that the Village's denial of the plaintiff's rezoning request was motivated by racially discriminatory intent, the Court cited trial testimony from a Village Board member, who had been called to the stand by the plaintiff, and explained that "[n]othing in her testimony supports an inference of invidious purpose." *Id.* at 270. Moreover, the Court assumed for the sake of argument that a Board member could be called to the stand for questioning "about their motivation at the time they cast their votes," and it endorsed the plaintiff's questioning of Board members "about materials and information available to them at the time of decision." *Id.* n.20. This sort of nuanced evaluation of legislative testimony suggests that the Court did not view the Board members' privilege as absolute.

Drawing on these principles, courts ruling on claims of legislative privilege in redistricting cases have frequently adopted a five-factor standard that facilitates case-by-case evaluation of the competing interests at stake. This standard, which derives from cases on deliberative-process privilege for executive actors, requires a court evaluating a claim of legislative privilege to take into account the relative weight of: (1) the relevance of the evidence sought, (2) the availability of other evidence, (3) the seriousness of the litigation, (4) the role of the State, as opposed to individual legislators, in the litigation, and (5) the extent to which the discovery would impede legislative action. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 337–38 (E.D. Va. 2015); *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11-C-5065, 2011 WL 4837508, at *7 (N.D. Ill. Oct. 12, 2011). The first three factors aim to capture the federal interests at stake — courts are more likely to require disclosure of communications that are highly relevant, difficult to obtain elsewhere, and will assist in the enforcement of public rights — while the final two factors reflect our comity interest in minimizing intrusion into the State's legislative process.

Judge Bredar's January 31 and February 3 orders endorsed and relied upon this five-factor standard in concluding that the witnesses were not entitled to legislative privilege, and we now affirm his decision to use that standard. We therefore turn to apply it to the discovery requests at issue here.

III

In applying the first factor — the relevance of the evidence — we consider the degree to which the evidence sought is relevant to the issues in the litigation at hand. In doing so, we readily conclude that the evidence sought here focuses on core issues in the litigation. As we stated in our denial of the defendants' motion to dismiss, the plaintiffs must prove that "in redrawing a district's boundaries, the legislature and its mapmakers were motivated by *a specific intent* to burden the supporters of a particular political party." *Shapiro*, 2016 WL 4445320, at *11 (emphasis added). Thus, in seeking to depose the witnesses who were involved in drawing the map, the plaintiffs are clearly seeking evidence necessary to prove this specific intent.

The witnesses argue, nonetheless, that the depositions in particular should not be permitted because they would seek to reveal *subjective* evidence of intent and motivation rather than *objective* evidence, which we have held is required to prove intent. Stated otherwise, they argue that the plaintiffs propose to ask them directly about *their unexpressed thoughts and motivations*, which is not an effort to pursue objective evidence. For purposes of discovery, however, the distinction is not significant. Unexpressed thoughts and expressed thoughts are closely related, and the line between the two is so fine that questions of *unexpressed* thoughts could reasonably lead to evidence of *expressed* thoughts and other objective evidence of intent. Thus, while only objective evidence is sufficiently reliable to prove intent in these circumstances, the plaintiffs may in discovery inquire into the witnesses' unexpressed thoughts with the

purpose of obtaining admissible objective evidence of intent, which is a core issue in this litigation.

Turning to the second factor — the availability of other evidence — we conclude that the limited availability of other evidence weighs in favor of the plaintiffs, especially since direct evidence, as well as circumstantial evidence, may be used to prove the element of intent. *Shapiro*, 2016 WL 4445320, at *11; *see also Bethune-Hill v. Va. State Bd. of Elections*, No. 15-680, 2017 WL 774194, at *9 (U.S. Mar. 1, 2017) (holding that plaintiffs in racial gerrymandering cases may rely on "direct evidence of the legislative purpose and intent," even where the lines of the electoral map are consistent with traditional redistricting criteria). To be sure, the plaintiffs do have access to many relevant documents, including "transcripts of public hearings of the [Advisory Committee], electronic versions of maps, election and voter data, bill files, draft maps considered by the [Committee]," and other similar pieces of evidence produced by the redistricting process. While this evidence is valuable, it is not a substitute for the ability to depose a witness and obtain *direct* evidence of motive and intent, thus avoiding the potential ambiguity of circumstantial evidence. *See Bethune-Hill*, 2017 WL 774194, at *9 (explaining that, because "[t]raditional redistricting principles . . . are numerous and malleable," there may be cases where a legislature acted with impermissible racial motivation yet the electoral map was nevertheless consistent with those traditional principles).

Application of the third factor — the seriousness of the litigation and the issues involved — strongly favors the plaintiffs, as the witnesses concede. The plaintiffs have

alleged that the method by which certain Maryland voters selected their congressional representative denied a large portion of those voters their constitutional rights, and few issues could be more serious to preserving our system of representative democracy. *Shapiro*, 2016 WL 4445320, at *9 ("[W]hen a State draws the boundaries of its electoral districts so as to dilute the votes of certain of its citizens, the practice imposes a burden on those citizens' right to 'have an equally effective voice in the election' of a legislator to represent them" (quoting *Reynolds v. Sims*, 377 U.S. 533, 565 (1964)).

Application of the fourth factor — consideration of the role of the State as compared to that of individual legislators — also weighs in favor of the plaintiffs. When individual legislators are the targets of litigation, the possibility of their suffering individualized consequences can significantly increase the need for legislative privilege. But here, the witnesses have no personal stake in the litigation and face no direct adverse consequence if the plaintiffs prevail. The plaintiffs have brought their suit not against individual state legislators but against the State's agents who are, in their official capacity, responsible for the electoral process in Maryland, and the adverse impact on the individual legislators is minimal.

Application of the fifth and final factor — whether allowing the plaintiffs to obtain the evidence would impede state legislative action — presents the closest question. There is a good deal of force to the witnesses' argument that questioning legislators about the conversations in which they engaged as they redrew legislative districts strikes at "the very core" of that protected by the legislative privilege and can tend to undermine the

legislators' ability to speak freely and thereby chill a key aspect of the state legislative process.

It is no doubt true that conversations between and among legislators play a vital role in crafting the substance of legislation. In some contexts, the importance of these conversations would militate in favor of protecting them in the interest of comity. But these conversations could also be the most probative evidence of intent in this case because they relate to moments when unconstitutional intent may have infected the legislative process. Because of the importance of the federal interests at stake and because the evidence of these conversations may be crucial to their vindication, we conclude that "comity yields," *Gillock*, 445 U.S. at 373, and therefore hold in this case that legislative privilege does not protect conversations and other communications between and among legislators.

We believe that weightier concerns favoring comity are implicated when we consider conversations and other communications between each legislator and his or her staff. Legislator-staff communications are often devoted to discussing ideas to which neither party to the communication is committed for purposes of legislative action — such as testing the soundness of ideas by positing wide-ranging positions — and such communications would be less valuable in determining the intent behind the actual legislative action. Indeed, these communications can resemble the deliberations of a judge with his or her clerks. It is important therefore that courts recognize and give yet greater respect to the legislative privilege as it applies to these communications.

But just as legislator-to-legislator communications can provide highly relevant evidence of intent, so too can these legislator-staff communications. They may, for instance, reveal strategies on how to implement a plan to which the legislator is already committed and thus may provide direct evidence of specific intent. Moreover, communications about crucial aspects of the redistricting process may, at times, have been conducted entirely through legislative staff, such as where a staff member may have spoken directly with an expert employed in the mapmaking process and then relayed the contents of that conversation to the legislator. Prohibiting discovery into such conversations and communications could thus obscure important evidence of the purpose and intent of the legislative action.

In the circumstances of this case, therefore, we strike a balance, recognizing that, while some legislator-staff communications may be of limited value, potentially containing even misleading information, others may provide direct evidence of specific intent. Accordingly, while we conclude that the important federal interests at stake in this case involving an allegedly unconstitutional redistricting plan outweigh the comity interest in protecting these legislator-staff communications, we will allow the legislator witnesses to seek post-testimony protection for those legislator-staff communications that do not provide evidence of specific intent. To that end, each legislator witness will be

able, before his or her testimony becomes public,[9] to file a motion for a protective order, should the parties not be able to agree on one.[10]

For the reasons given, this three-judge court of Judge Niemeyer, Judge Bredar, and Judge Russell affirms the orders of Judge Bredar dated January 31, 2017, and February 3, 2017.[11]

Dated this 13th day of March, 2017.

For the Three-Judge Court

/s/
Paul V. Niemeyer
United States Circuit Judge

[9] In affording this protection from public dissemination, we presume that persons attending the witnesses' depositions will be limited to the parties, the witness being deposed, and their attorneys.

[10] Although we conclude that legislative privilege must yield in the context of legislator-staff communications, we nonetheless will, in any post-testimony motion for a protective order, consider other issues that can be raised under Federal Rule of Civil Procedure 26(b)(1) and Federal Rules of Evidence 401 and 403.

[11] In scheduling the depositions of the witnesses, we direct the parties to accommodate President Miller and Speaker Busch and allow them to postpone their depositions until after the conclusion of the regular session of the General Assembly on April 10, 2017, but no later than May 1, 2017.