# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| O. John Benisek, et al., | |
| *Plaintiffs*, | |
|  | Case No. 13-cv-3233 |
| vs. | |
|  | Three-Judge Court |
| Linda H. Lamone, et al., | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' RULE 65(a) MOTION FOR A PRELIMINARY INJUNCTION AND TO ADVANCE AND CONSOLIDATE THE TRIAL ON THE MERITS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Michael B. Kimberly, Bar No. 19086
Paul W. Hughes, Bar No. 28967
Stephen M. Medlock, *pro hac vice*
E. Brantley Webb, *pro hac vice*
Micah D. Stein, *pro hac vice*
Mayer Brown LLP
1999 K Street NW
Washington, D.C. 20006
(202) 263-3127 (office)
(202) 263-3300 (facsimile)

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Factual Background .............................................................................................. 3

    A.   Those responsible for the Plan redrew the lines of Maryland's Sixth Congressional District with the specific intent to impose a burden on Republican voters because of their voting histories ..................................... 3

        1.   The Plan was drafted by NCEC, with principal input and approval from Governor O'Malley, Senate President Miller, Speaker Busch, and their respective aides ................................. 3

        2.   The drafters of the Plan have candidly acknowledged that their express goal was to dilute the votes of Republicans because of their party affiliation and voting histories ............................ 10

    B.   The votes of Republicans in the benchmark Sixth District were diluted and produced concrete, adverse injuries............................................ 16

        1.   The Plan changed the outcome of the congressional elections in the Sixth District in 2012, 2014, and 2016 ................................. 16

        2.   Republicans' participation in the political process in the Sixth District has been chilled and disrupted ................................... 18

    C.   But for the specific intent to burden Republican voters in the old Sixth District, Republican votes would not have been so diluted.................. 19

Argument ............................................................................................................. 25

I.   The Court should enjoin Defendants from enforcing Maryland's 2011 redistricting plan ............................................................................................ 25

    A.   Plaintiffs have established all of the facts necessary for the Court to rule in their favor on the merits ...................................................... 25

        1.   Specific intent ...................................................................... 26

        2.   Vote dilution and concrete injury ........................................... 26

        3.   But-for causation .................................................................. 28

    B.   Plaintiffs and other similarly situated voters will suffer irreparable injury absent an immediate injunction ............................................. 30

    C.   The balance of hardships weighs decisively in favor of an injunction........... 32

    D.   An injunction would be in the public's interest.................................. 33

II.   The Court should either grant summary judgment for Plaintiffs or advance and consolidate the trial on the merits with a hearing on this motion.................. 33

Conclusion ........................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Acevedo–Diaz v. Aponte,*
 1 F.3d 62 (1st Cir. 1993) ........................................................................... 28

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
 135 S. Ct. 2652 (2015) ............................................................................... 33

*Attorney Gen. of Oklahoma v. Tyson Foods, Inc.,*
 565 F.3d 769 (10th Cir. 2009) ................................................................... 35

*Bd. of Cty. Comm'rs v. Umbehr,*
 518 U.S. 668 (1996) ................................................................................... 28

*Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.,*
 550 F.2d 189 (4th Cir. 1977) ..................................................................... 33

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ................................................................................... 34

*Cooper v. McCrory,*
 No. 13-cv-949 (W.D.N.C. Feb. 9, 2016) .................................................... 31

*David E. Watson, P.C. v. United States,*
 668 F.3d 1008 (8th Cir. 2012) ................................................................... 35

*Davis v. Bandemer,*
 478 U.S. 109 (1986) ............................................................................. 26, 27

*Desena v. Maine,*
 No. 11-cv-117 (D. Me. June 22, 2011) ...................................................... 31

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
 952 F.2d 802 (4th Cir. 1991) ..................................................................... 32

*Eng v. Cooley,*
 552 F.3d 1062 (9th Cir. 2009) ................................................................... 28

*Essex v. Kobach,*
 874 F. Supp. 2d 1069 (D. Kan. 2012) ....................................................... 32

*Favors v. Cuomo,*
 2012 WL 928223 (E.D.N.Y. 2012) ............................................................ 32

*Ficker v. Tuohy,*
 305 F. Supp. 2d 569 (D. Md. 2004) ........................................................... 32

*Fleishman v. Cont'l Cas. Co.,*
 698 F.3d 598 (7th Cir. 2012) ..................................................................... 28

*Fletcher v. Lamone,*
 831 F. Supp. 2d 887 (D. Md. 2011) ........................................................... 13

*Johnson v. Mortham,*
 926 F. Supp. 1460 (N.D. Fla. 1996) .................................................... 30, 31

## Cases—continued

*League of Women Voters of N. Carolina v. North Carolina,*
769 F.3d 224 (4th Cir. 2014) ............................................................ 25, 30, 33

*Metavante Corp. v. Emigrant Sav. Bank,*
619 F.3d 748 (7th Cir. 2010) ............................................................ 35

*In re Microsoft Corp. Antitrust Litig.,*
333 F.3d 517 (4th Cir. 2003) ............................................................ 32

*Newsom v. Albemarle Cnty. Sch. Bd.,*
354 F.3d 249 (4th Cir. 2003) ............................................................ 33

*Personhuballah v. Alcorn,*
No. 13-cv-678. (E.D. Va. Jun. 5, 2015) ............................................ 31

*Pub. Citizen Health Research Grp. v. Young,*
909 F.2d 546 (D.C. Cir. 1990) .......................................................... 29

*Purcell v. Gonzalez,*
549 U.S. 1 (2006) .............................................................................. 30, 31

*Reynolds v. Sims,*
377 U.S. 533 (1964) .......................................................................... 30, 32, 33

*Rutan v. Republican Party of Illinois,*
497 U.S. 62 (1990) ............................................................................ 28

*Shapiro v. McManus,*
203 F. Supp. 3d 579 (D. Md. 2016) ..............................................*passim*

*Singleton v. Anson County Bd. of Ed.,*
387 F.2d 349 (4th Cir. 1967) ............................................................ 34

*Tea Party Leadership Fund v. FEC,*
2012 WL 5382844 (D.D.C. 2012) ...................................................... 35

*United States v. Brown,*
415 F.3d 1257 (11th Cir. 2005) ........................................................ 35

*United States v. City of Cambridge,*
799 F.2d 137 (4th Cir.1986) ............................................................. 30

*Vieth v. Jubelirer,*
541 U.S. 267 (2004) .......................................................................... 27, 33

*Wagner v. Jones,*
664 F.3d 259 (8th Cir. 2011) ............................................................ 28

*Whitford v. Gill,*
218 F. Supp. 3d 837 (W.D. Wis. 2016) ............................................. 24, 31

*Wilcox v. Homestake Mining Co.,*
619 F.3d 1165 (10th Cir. 2010) ........................................................ 29

**Cases—continued**

*Winter v. NRDC*,
  555 U.S. 7 (2008) ........................................................................ 25

*Wise v. Lipscomb*,
  437 U.S. 535 (1978) .................................................................... 31

## Other authorities

11A Fed. Prac. & Proc. Civ. § 2950 (3d ed. 2017) ..................................... 34, 35

*Black's Law Dictionary* (7th ed. 1999) ............................................... 27

Fed. Rule Civ. Proc. 56 ............................................................... 25, 34

Fed. Rule Civ. Proc. 65 ........................................................... 3, 25, 34, 35

Josh Hicks, *Everyone in Md. says they want redistricting reform. Here's
  why it won't happen*, Wash. Post (May 27, 2017) ..................................... 31

## INTRODUCTION

A plaintiff challenging a State's congressional redistricting is entitled to injunctive relief under the First Amendment when he demonstrates that (1) "those responsible for the map redrew the lines of his district with the *specific intent* to impose a burden on him and similarly situated citizens because of how they voted or the political party with which they were affiliated," (2) "the challenged map diluted the votes of the targeted citizens to such a degree that it resulted in a tangible and concrete adverse effect," and (3) "the mapmakers' intent to burden a particular group of voters by reason of their views" was a but-for cause of the "adverse impact." *Shapiro v. McManus*, 203 F. Supp. 3d 579, 596-597 (D. Md. 2016). Plaintiffs are substantially likely to establish—and, indeed, have already conclusively established—each of these elements with respect to the 2011 redrawing of Maryland's Sixth Congressional District.

**First,** those responsible for Maryland's 2011 redistricting plan had the specific intent to dilute the votes of Republican citizens because of their voting histories and party affiliation, including their past success electing Republican Roscoe Bartlett to Congress. In his deposition testimony on this point, Governor Martin O'Malley—the man with principal responsibility for the map—described the common-sense strategy: By "look[ing] at voting histories" and "party affiliation" (Ex. A at 65:12-13), the map drawers were able to "put more Democrats and Independents into the Sixth District" (*id*. at 27:12-13), helping ensure "the election of another Democrat" (*id*. at 27:15) in Maryland's eight-member congressional delegation. Governor O'Malley could not have been more clear about this goal: It was "clearly [his] intent" (*id*. at 82:18) and the "intent" of "those of us in leadership positions in our party" (*id*. at 81:1-10) "to create a map that would" result in a "district where the people would be more likely to elect a Democrat than a Republican" (*id*. at 82:15-18).

All of this was confirmed by Eric Hawkins, the political consultant who actually drafted the map that would become Maryland's 2011 redistricting plan. By "tak[ing] into

account past voting history" (Ex. B at 24:17-19), Hawkins drew the lines of the Sixth District with the express purpose of "see[ing] if there was a way to get another Democratic district in the state" (*id.* at 230:19-20). May others have confirmed this express purpose (*see infra*, pages 12-13), as have Plaintiffs' experts in demography and redistricting. There is simply no other explanation for the massive reshuffling of fully half of the Sixth District's population in 2011, apart from an intent to dilute Republican votes there.

*Second,* those responsible for the redistricting plan achieved their specifically intended goal: Experts for both Plaintiffs and the State agree that Republican votes in the Sixth District were substantially diluted as a consequence of moving large majority-Democrat areas into, and majority-Republican areas out of, the district. The upshot of this deliberate vote dilution is a concrete injury: In each of the three elections since 2011, Republicans in the old Sixth District have been unable to elect a candidate of their choice (Ex. C at ¶¶ 54-56), despite that they had been able to do so in each election over the prior two decades (*id.* at ¶ 8). Thus, the vote dilution visited upon Republicans in the Sixth District made a "concrete" and "practical difference." *Shapiro*, 203 F. Supp. 3d at 597.

*Finally,* "absent the mapmakers' intent to burden [Republicans in the old Sixth District] by reason of their views" (*Shapiro*, 203 F. Supp. 3d at 597), Republican votes in the Sixth District would not have been palpably diluted. There is no evidence that any of the other considerations cited by Governor O'Malley would have resulted in so fundamental a rearrangement of the Sixth District's population. Our experts have confirmed, moreover, that no traditional redistricting principles can explain the district's southward contortions into Montgomery County. Finally, there is no room for dispute that the massive vote dilution was a but-for cause of the Democratic victories in the district since.

Against this backdrop, an immediate injunction—either preliminary or permanent—is imperative to protect Plaintiffs' constitutional rights. Those responsible for Maryland's 2011 redistricting plan succeeded in diluting the votes of Republican citizens in

response to their past success electing Roscoe Bartlett to the U.S. House of Representatives. As a direct consequence, they were prevented in 2012, 2014, and 2016 from electing candidates of their choice. To extend this constitutional offense into the 2018 election would be a manifest and irreparable injury. And the balance of hardships and the public's interest all plainly favor an injunction.

Yet the time for action is *now*. As we explain in detail below, any further delay will virtually guarantee that Plaintiffs will continue to suffer injury through the 2018 election cycle. Because discovery is now concluded, Plaintiffs respectfully request (unless the Court enters a summary judgment for Plaintiffs without a hearing) that it advance the trial on the merits with an immediate hearing on this motion, pursuant to Rule 65(a)(2).

## FACTUAL BACKGROUND

**A.    Those responsible for the Plan redrew the lines of Maryland's Sixth Congressional District with the specific intent to impose a burden on Republican voters because of their voting histories**

The evidence shows unequivocally that those responsible for Maryland's 2011 redistricting plan had the specific intent to adversely affect Republicans in the benchmark Sixth District[1] because of their voting histories and political-party affiliations.

### 1.    *The Plan was drafted by NCEC, with principal input and approval from Governor O'Malley, Senate President Miller, Speaker Busch, and their respective aides*

The 2011 redistricting process was overseen predominantly by Governor Martin O'Malley, who set in motion two parallel procedures for the drafting of the map. The first was a superficial, public process led by the Governor's Redistricting Advisory Committee (or GRAC), which was little more than window dressing. The second was a behind-the-scenes process led by Maryland's congressional delegation and a political consulting firm, who actually drafted the map that would become the 2011 plan.

---

[1]    We refer to the pre-2011 Sixth District as the "benchmark" district and the post-2011 Sixth District as the "adopted" district.

*a. The GRAC.* Governor O'Malley established the GRAC by executive order on July 4, 2011. The GRAC was charged with holding public hearings across Maryland and with drafting two redistricting plans—one setting the boundaries of the State's 47 legislative districts, and the other for the eight congressional districts. Ex. C at ¶ 18.

Governor O'Malley appointed five individuals to the GRAC: Jeanne Hitchcock (the chairperson); Speaker of the House of Delegates Michael E. Busch; Senate President Thomas V. "Mike" Miller, Jr.; Richard Stewart, a private business owner who had chaired Governor O'Malley's 2010 campaign in Prince George's County; and former Delegate James J. King, the lone Republican on the committee. The GRAC was assisted by several senior aides to Miller, Busch, and O'Malley. These senior staffers were Patrick Murray and Yaakov Weissman, then both legislative aides to President Miller; Jeremy Baker, a legislative aide to Speaker Busch; and Joseph Bryce, an aide to Governor O'Malley. *See* Ex. D at Supp. Resp. 7; Ex. E at Resp. 1.

The GRAC's first meeting took place on July 6, 2011 in the Governor's Reception Room in the Maryland State Capitol complex. Ex. G at 1. Talking points prepared for Senate President Miller urged him at the time: "Above all else, downplay politics." Ex. H at 2. The talking points explained: "Your comments should not fuel speculation about who is 'on the chopping block,' which will feed the media's fascination with the 'winners and losers' aspect of this process." *Id*. at 1.

Detailed data reflecting citizens' voting histories and party affiliations were available to the GRAC. Ex. C at ¶ 29. A July 30, 2010 memorandum from the Maryland Department of Planning (DOP) to O'Malley and Bryce explained that the DOP would "compile election data . . . including voter registration, voter turnout and election results compiled for primary and general elections for President, U.S. Senate, Congress, Governor, State Senate and House of Delegates so that the redistricting software" that would later be used by the mapdrawers "links to the precinct level polygons used in redistricting." Ex. I at

5. *Accord* Ex. J at 56 (a March 23, 2011 DOP PowerPoint presentation explaining that the DOP was gathering and processing "[p]recinct level election data" for use in redistricting software).

Apart from compiling and relaying election data, the GRAC's "mission was also to solicit public input on the map, hold a number of public hearings all around the state, and allow people to voice their concerns, their desires." Ex. A at 14:18-21. To that end, the GRAC held twelve public hearings around the State during the summer of 2011 concerning both federal congressional and state legislative redistricting plans. Ex. C at ¶ 22. About 1,000 members of the public attended the meetings, giving approximately 350 comments. *Id*. The GRAC also took written comments via electronic mail and a web-based comment form. *Id*. ¶ 26.

Much of the testimony at the public hearings concerning the Sixth District was given by Democratic Party insiders, who appear to have followed scripted talking points. *See, e.g.*, Ex. K at MCM000050-53 (testimony of Sue Hecht, former Democratic delegate, asserting a connection between northwest Maryland and Washington, D.C., along the so-called "I-270 corridor"); *id.* at MCM000021-24 (very similar testimony of Bob Kresslein, Treasurer of Maryland Democratic Party (*see* Ex. UU at 109:1-7)); *id.* at MCM000031-34 (very similar testimony of Myrna Whitworth, Chair of Frederick County Democratic Committee, who also expressed her view that the mapdrawers should "turn the Sixth District blue"); *id.* at MCM000035-38 (very similar testimony of Andrew Duck, former Democratic nominee for Congress); *id.* at MCM000071-73 (very similar testimony of Elizabeth Paul, Washington County Democratic Chair).

Either way, because the GRAC was not itself drafting the map (more on that below), there is no evidence that the public comments were actually taken into account by the mapdrawers. For example, Jeanne Hitchcock, the chair of the GRAC, could not recall "any alterations that were made to the draft congressional maps . . . based on any testimony

that was given at any of the GRAC hearings" (Ex. F at 123:16-20), though she later hedged, explaining that the map "reflected what we heard" insofar as "the line did not cross Montgomery and Prince George's County on the federal side" and "we did not lose representation in Baltimore City" (*id.* 124:4-6, 13-16).

   ***b.  The Maryland congressional delegation and NCEC Services.*** At the same time that the GRAC's public-facing work was moving forward, Governor O'Malley tasked Maryland's congressional delegation—led by Congressman Steny Hoyer—with drafting the redistricting plan behind the scenes.[2] Hoyer, in turn, retained NCEC Services, Inc. (NCEC) to draw the map. *See* Ex. B at 36:4-21.[3] Former Maryland Secretary of State John Willis, who chaired the GRAC in the 2002 redistricting cycle (Ex. L at 46:18-20), confirmed that this is "how it's been done in Maryland": The congressional delegation creates and shares a map with the governor and key legislators, who in turn enact a map that "respect[s]" the delegation's plan (*id.* at 185:18-188:12).[4]

---

[2]    *See* Ex. A at 47:20-48:5 ("So I had asked Congressman Hoyer, knowing he had many times been through the redistricting process, and since he was the dean of the House delegation, I said, Congressman, would you please, mindful of our deadline, lead the effort here to inform the Commission about congressional redistricting, and do your best to come up with a map that a majority of the congressional delegation supports."). *Accord, e.g.*, Ex. M at 97:18-19 ("Like I told you, [the map was] drawn—it primarily was drawn by the congressional people.").

[3]    Hawkins met and discussed proposals for the 2011 redistricting plan, one-on-one, with Congressmen Sarbanes, Hoyer, and Van Hollen, and maybe also Congresswoman Edwards. Ex. B at 50:19-51:7. He also met in person and over the phone with staffers to Congressmen Hoyer, Sarbanes, and Van Hollen. *Id.* at 59:15-62:17, 63:17-64:7.

[4]    Willis is not a neutral expert. He presently works as a Senior Counsel in the Office of the Attorney General, with an office just 25 feet down the hall from counsel for Defendants; is good friends and socializes with Attorney General Frosh; prepared his report for free, which he would not have agreed to if asked by a plaintiff challenging a redistricting plan; formerly chaired the GRAC in 2002; and personally met with and spoke over the phone with staff at NCEC in the course of the 2011 redistricting. Ex. L at 10:5-22:13; 46:18-20; 171:3-172:10; Ex. N. Beyond that, Willis did not review any testimony or documents in the case, which he openly admitted would not have changed his "expert" opinions regardless. Ex. L at 22:14-22; 33:15-34:1

NCEC "specializes in electoral analysis, campaign strategy, political targeting, and GIS services" (Ex. O) for the Democratic Party (Ex. B at 30:10). An NCEC analyst named Eric Hawkins was engaged to analyze Maryland's 2011 redistricting plan and to "draw actual maps" using geographic information system (GIS) software called Maptitude for Redistricting. Ex. B at 37:4-17; *see also* Ex. P at 1 ("Eric Hawkins is drawing the maps"). Maptitude allows users to, among other things, "[c]reate districts using any level of geography," "[a]dd political data and election results," and "[u]pdate historic election results to new political boundaries." Ex. C at ¶ 28. With Maptitude, data concerning party affiliation and voter history (of the sort compiled by the DOP) can be used to accurately predict the outcomes of future elections under various redistricting plans. Ex. B at 202:6-203:4; Ex. R at 51:21-52:21 ("it's obviously not going to be exact," but "it's pretty close"). This follows from the "common sense" conclusion that "if you have more Republicans than Democrats, then maybe you'll have a Republican seat," and "[i]f you have more Democrats than Republicans, you might have a Democratic seat." Ex. F at 130:11-21.

To evaluate the predicted electoral outcomes of the draft maps, Hawkins used a proprietary metric called the Democratic Performance Index, or DPI. Ex. B at 23:19-24:8; 110:6-14. This metric belongs exclusively to NCEC and is neither available to, nor used by, any other consultants or analysts. *Id.* at 110:6-20; Ex. L at 180:9-17. It is a weighted average of how political candidates perform over time and, in a nutshell, "take[s] into account past voting history." Ex. B at 24:5-18. NCEC also calculates versions of the DPI called "federal democratic performance" and "state democratic performance." *Id.* at 24:20-25:3. In some cases, state democratic performance differs from federal democratic performance because voters occasionally "split tickets" and vote for one political party in the federal election and a different party in the state election. *Id.* at 25:4-26:2.

References to "democratic performance" and "DPI" appear throughout documents produced not only by Hawkins and the congressional delegation but also by Maryland state

lawmakers and their staffers. Emails produced as part of a Public Information Act request show, for example, that (1) O'Malley aide Joe Bryce, (2) Miller aides Jake Weissman and Patrick Murray, (3) Busch aide Jeremy Baker, and (4) John McDonough, then the Maryland Secretary of State, discussed the Sixth District's "DPI" under alternative maps proposed by Rep. Donna Edwards. Ex. S at 3-4. Similarly, documents produced by Speaker Busch show that he received at least two spreadsheets containing DPI measurements for each proposed congressional district. One table compares the federal and state DPI (according to the hand annotation, "FED_DPFM" and "ST_DPFM") for each pre-2011 district with its DPI under the draft map:

**Current Districts**          MARYLAND DRAFT 2011 PLAN SUM

| CD | POP10_A | POP10 | DEV. | Current | FED_DPFM | ST_DPFM | GOV06D% | GOV10D% | PRS04D% | PRS08D% | A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 743067 | 744275 | 21538 | 100% | 38.4% | 35.6% | 35.7% | 34.3% | 36.5% | 40.3% | |
| 2 | 703824 | 700893 | -17705 | 100% | 57.9% | 55.1% | 54.2% | 52.8% | 54.7% | 60.7% | |
| 3 | 716808 | 719656 | -4721 | 100% | 57.0% | 53.3% | 52.4% | 52.9% | 54.3% | 59.7% | |
| 4 | 715671 | 714316 | -5858 | 100% | 82.5% | 75.8% | 75.8% | 82.3% | 79.1% | 85.8% | |
| 5 | 768464 | 767369 | 46935 | 100% | 62.1% | 61.8% | 57.6% | 63.3% | 58.0% | 66.2% | |
| 6 | 731718 | 738943 | 10189 | 100% | 37.4% | 35.9% | 35.9% | 34.5% | 34.2% | 40.5% | |
| 7 | 664091 | 659776 | -57438 | 100% | 76.8% | 72.1% | 67.5% | 72.3% | 73.5% | 79.8% | |
| 8 | 728588 | 728124 | 7059 | 100% | 71.9% | 67.1% | 66.0% | 70.8% | 69.2% | 74.5% | |

**MOCD2011A_1-929_v3-Arbutus Change**    DPI

| CD | POP10_A | POP10 | DEV. | Current | FED_DPFM | ST_DPFM | GOV06D% | GOV10D% | PRS04D% | PRS08D% | A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 721529 | 722661 | 0 | 84.4 | 37.0% | 34.3% | 34.7% | 32.6% | 35.0% | 38.8% | |
| 2 | 721529 | 723456 | 0 | 80.2 | 58.4% | 55.3% | 54.2% | 53.6% | 55.1% | 61.5% | |
| 3 | 721528 | 720067 | -1 | 68.0 | 58.6% | 54.8% | 54.0% | 54.5% | 56.0% | 61.2% | |
| 4 | 721529 | 720068 | 0 | 57.6 | 74.7% | 72.8% | 66.6% | 71.2% | 71.3% | 77.7% | |
| 5 | 721529 | 720472 | 0 | 96.3 | 61.8% | 61.5% | 57.5% | 63.0% | 57.7% | 65.9% | |
| 6 | 721529 | 728453 | 0 | 50.6 | 53.0% | 49.8% | 49.3% | 51.0% | 49.3% | 56.6% | |
| 7 | 721529 | 716862 | 0 | 84.5 | 74.2% | 69.5% | 64.7% | 68.4% | 70.9% | 77.2% | |
| 8 | 721529 | 721513 | 0 | 57.4 | 60.0% | 56.8% | 56.1% | 58.0% | 57.7% | 62.5% | |

Ex. T.

Similarly, talking points prepared for Senate President Miller for an October 3, 2011 Democratic caucus meeting instructed him to emphasize that, under the proposed redistricting plan, "[n]ot one of our incumbents will be in a district with less than 58% Democratic performance." Ex. U at 2. And the day following that caucus meeting, Senate Majority Leader Robert Garagiola—the man whom O'Malley and Miller expected to gain the Democratic nomination for the Sixth District after enactment of the redistricting plan (Ex. V at 146:8-17, 149:12-150:3; Ex. A at 83:11-14)—wrote of the draft plan:

The 6th District would comprise about 40% of Montgomery County, including northern and western parts. It would include southern Frederick and the City of Frederick. The rest of Frederick would be in Van Hollen's district. All of Washington, Allegheny, and Garrett would remain in the 6th. *The Dem performance would be 53%*. All good news.

Ex. W (emphasis added); *see also* Ex. V at 76:13-77:20.

The only possible source of these "democratic performance" numbers was NCEC. *See* Ex. B at 23:19-24:8, 110:6-14; *see also* Ex. L at 180:6-19 (confirming that "if I see someone talking about DPI, they're talking about something they got from NCEC").

Hitchcock confirmed that the NCEC statistical analyses, including the "Democratic performance metric," were funneled to the GRAC and other Maryland lawmakers through "Jake and Jeremy and Joe," meaning Miller aide Jake Weissman, Busch aide Jeremy Baker, and O'Malley aide Joe Bryce. Ex. F at 131:2-17. The members of the GRAC were not themselves "focusing on statistics"; it was instead these three staffers, working with NCEC and the congressional delegation, who "were looking at numbers." *Id.* at 131:18-22.

Hawkins met in Annapolis, in a meeting room in the state capitol, with around six or ten state legislative staffers, including Weissman. Ex. B at 170:2-171:22; 173:18-174:5; 174:20-175:6.[5] During the meeting, Hawkins presented the "Delegation Map" to those present at the meeting. *Id.* at 175:10-22; *see also* Exs. DD, EE. This was the plan finalized during Hawkins' earlier meetings with the Democratic members of Maryland's congressional delegation. Ex. B at 181:14-182:22. Using a laptop computer and projector, Hawkins displayed the draft map on a conference room wall and, using Maptitude, manipulated the boundaries of the Congressional districts as he received feedback from those present. *Id.* at

---

[5]    *Accord, e.g.*, Exs. X, Y (emails among Sarbanes staffer Jason Gleason, Hoyer staffer Brian Romick, and Hawkins making suggestions for meetings with staff for O'Malley, Miller, and Busch). Although he was not privy to the details of any such meetings, Governor O'Malley stated that he would have been surprised if his staff had not met with consultants to discuss DPI. Ex. A at 93:2-18. For his part, O'Malley met with Steny Hoyer to discuss the map on Tuesday, September 6, 2011. *See* Exs. Z, AA, BB, CC.

176:1-177:4. As Hawkins made adjustments to district lines, each district's federal DPI was updated in real time. *Id.* at 183:3-184:14.

Hawkins drew somewhere between 10 and 20 draft congressional maps and analyzed how those draft maps would affect the outcomes of future elections held under each. Ex. B at 36:17-38:19. According to a September 15, 2011 NCEC spreadsheet, Hawkins carefully analyzed at least six of the proposed maps in particular alongside proposals submitted by third parties. *See* Ex. FF at 2-3. Each of the six NCEC-drafted options would have resulted in 52% or greater federal DPI for the Sixth District, based on voter histories taken from the 2006 and 2010 Maryland gubernatorial races and the 2004 and 2008 presidential elections. *Id.*; *see also* Ex. GG at 32.

The maps proposed by third parties would have resulted in a far smaller federal DPI for the Sixth District. The same September 15, 2011 NCEC spreadsheet noted that the map proposed by the Maryland Legislative Black Caucus, for example, would have resulted in 39% federal DPI. *See* Ex. FF at 3-4. As Jason Gleason, the chief of staff to Rep. Sarbanes explained in an email to the chief of staff to Rep. Hoyer, the Black Caucus proposal was "a recipe for 5-3 not 7-1." *See* Ex. HH.

### 2. *The drafters of the Plan have candidly acknowledged that their express goal was to dilute the votes of Republicans because of their party affiliation and voting histories*

There is no genuine dispute in the record that those responsible for Maryland's 2011 redistricting plan had the specific intent to dilute the votes of Republicans in the benchmark Sixth District because of their previous success casting votes for incumbent Republican Congressman Roscoe Bartlett.

*a. Direct evidence.* There is substantial direct evidence of the relevant individuals' specific intent, beginning with Eric Hawkins, the map's draftsman. According to Hawkins, the dual "goals" of his consulting arrangement with Maryland's congressional delegation were to maximize "incumbent protection" for Democrat members of Congress

and to increase the DPI of the Sixth District "to see if there was a possibility for another Democratic district." Ex. B at 47:17-49:2. That is, Hawkins was retained to draw a map that would protect *Democratic* incumbents and unseat at least one Republican incumbent, changing the composition of the delegation from six Democrats and two Republicans (a "6-2 plan") to seven Democrats and one Republican (a "7-1 plan"). *Id.* at 42:11-16; *accord, e.g.*, *id.* 48:12-49:2; Ex. II at 1 (email to Jason Gleason stating that Hawkins "worked out a new version of the 7-1 plan").[6]

Hawkins explored two ways of drawing a 7-1 map. He could create a map that attempted to crack the Republican majority in either the First District or the Sixth District. Ex. B at 44:9-45:11. Because Maryland lawmakers were concerned that targeting the First District would require "jumping over the Chesapeake Bay," which in their view "didn't make a lot of sense" (Ex. A at 79:6-7), they ultimately chose to target the Sixth District (*id.* at 26:22-27:4). As Governor O'Malley explained at his deposition: "Was a decision made? I suppose in the sense that we decided not to try to cross the Chesapeake Bay, that a decision was made to go for the Sixth." *Id.*[7]

Governor O'Malley, time and again, confirmed this express goal: He and others in the party leadership wanted to "re[draw] the lines" of the Sixth District to "put more Democrats and Independents into the Sixth District" and ensure "the election of another Democrat" in Maryland's delegation. Ex. A at 27:11-15. Thus, Governor O'Malley candidly acknowledged that, in addition to complying with the one-person-one-vote principle and

---

[6]   Hawkins also considered an "8-0 map," but this proved infeasible given concern for protecting incumbent Democrats. Ex. B at 42:18-43:3. An 8-0 map also would have necessitated drawing a district across the Chesapeake Bay (*see* Exs. JJ, KK), which those responsible for the plan rejected as imprudent. Ex. A at 79:6-7.

[7]   *Accord, e.g.*, Ex. U at 2 (document acknowledging that the map "target[ed] Roscoe Bartlett"); Ex. LL (email between Hoyer staffer Brian Romick and Mark Gersh of NCEC stating that "Donna is telling us we have to do the 6th district"); Ex. D at Supp. Resp. 7 (then-Attorney General Douglas Gansler stating that "[t]hey chose Western Maryland").

the non-retrogression rule of Section 2 of the Voting Rights Act, "it was also my intent to . . . create a district where the people would be more likely to elect a Democrat than a Republican, yes, this was clearly my intent." Ex. A at 82:14-18.

Indeed, Governor O'Malley went on:

[T]hose of us in leadership positions in our party, the Speaker, the Senate President, the Democratic Dean of the Delegation [Steny Hoyer], myself, [and the] Lieutenant Governor, we all understood that, while our—while we must fulfill our responsibility on redistricting, must be mindful of constitutional guidelines, restrictions, case law, statutes, it was also—part of our intent was to create a map that was more favorable for Democrats over the next ten years and not less favorable to them. Yes, that was clearly one of our many [goals]."

Ex. A at 81:1-11; *see also*, *e.g.*, *id.* at 47:1-5 ("And as I've said many, many times here before, part of my intent was to create a map that, all things being legal and equal, would, nonetheless, be more likely to elect more Democrats rather than less.").

Governor O'Malley's testimony, sufficient in its own right to establish specific intent, is corroborated by ample other direct evidence. For example:

- Senate Majority Leader Robert Garagiola answered with a straightforward "Yes" in response to the question, "[I]n your mind, was that one of the purposes, to make the Sixth Congressional District have 53 percent Democratic performance?" Ex. V at 27:3-9.

- Democratic Delegate Curt Anderson stated in an interview on October 17, 2011: "What we're doing is we are trying to get more, in terms of—currently we have two Republican districts and six Democratic congressional districts and we're going to try to move that down to seven and one, with the additional congressional district coming more out of Montgomery county and going into western Maryland that would give the Democrats more." Ex. C at ¶ 47.

- Delegate Anderson, describing a briefing given by Hitchcock, separately recounted: "It reminded me of a weather woman standing in front of the map saying, 'Here comes a cold front,' and in this case the cold front is going to be hitting Roscoe Bartlett pretty hard." *Id.* at ¶ 46.

- State Senator C. Anthony Muse, in a speech on the floor of the Maryland Senate, likewise agreed that the central purpose of the map was "to strengthen the chances of a Democrat being elected" in the Sixth District and ensure that "the party walks away with maybe seven seats." Ex. C at ¶ 42(a)-(b).

12

- Senator Muse separately stated in a radio interview that the Congressional Districts were "absolutely drawn with one thing in mind. Is it right or wrong? You be the judge of that. *But it's certainly drawn so that you can minimize the voice of the Republicans.*" Ex. MM at 16 (emphasis added).

- Talking points for Senate President Mike Miller instructed him to emphasize that the map "gives Democrats a real opportunity to pick up a seventh seat in the delegation by targeting Roscoe Bartlett." Ex. U at 2.[8]

- Delegate Emmett C. Burns, Jr., supported the map because it would mean "more Democrats in the House of Representatives." Ex. C at ¶ 44.

- Even the Office of the Attorney General itself acknowledge in its brief in *Fletcher v. Lamone*, 831 F. Supp. 2d 887 (D. Md. 2011), "the plan was driven, to a large extent, by the desire to make an additional district more politically competitive while protecting the other current incumbents." Ex. OO at 42.

To achieve the goal of diluting Republican votes in the Sixth District (making the district "more likely to elect a Democrat than a Republican" (Ex. A at 82:17-18)), moreover, those responsible for the map moved citizens in and out of the district because of their vote histories and party affiliations. The federal DPI—NCEC's proprietary metric, which "takes account of past voting history" (Ex. B at 24:17-19)—was the key metric that Hawkins used to flip the Sixth District.[9] And Governor O'Malley expressly confirmed that, to help "create

---

[8]  President Miller later denied at his deposition that he had "target[ed] specific Republican representatives with the intent of flipping their congressional districts" (Ex. M at 54:7-12) and insisted that he was "bipartisan" and had "work[ed] for [both] Republicans and Democrats" (*id*. at 42:18-19). But Miller could not square that claim with the contemporaneous talking points, except to say "I don't remember this document at all." *Id*. at 70:3-4. Nor could he explain his prior conduct, including that—during the 2002 redistricting—he had boasted of Republican Congresswoman Connie Morella, "She's gone. She's gone. Lost and found in the border town, looking for the diamond ring, she is gone." Congresswoman Morella lost the Congressional seat that she had held for 18 years after the 2002 redistricting. *Id*. at 58:6-10. *See also id*. at 62:9-63:8 (prior statements from 2002 and 2006 that President Miller intended to "break out the machine guns" against Republicans and to "bury the Republicans six feet deep, faces up, so they won't come out for 20 years.").

[9]  Although it is unclear whether Hawkins personally produced the final Maptitude file that was actually enacted into law—Governor O'Malley "guess[ed]" that "staff people, cartographers, mapmakers, from [the] department of planning" may have done it (Ex. A at 54:3-5)—there is no question that DPI was used to evaluate each proposed map and its effect on the Sixth District (*e.g.*, Exs. NN, PP, QQ), which was shared with and known by Maryland lawmakers (*see supra*, pages 6-10).

a district that was more favorable rather than less favorable to Democratic nominees" (Ex. A at 63:1-4), the mapdrawers "look[ed] at voting histories in addition to voting registration—party affiliation" (*id.* at 65:12-13).

> **b. *Circumstantial evidence.*** There is also strong circumstantial evidence indicating a specific intent to dilute the votes of Republicans because of their past success casting votes for former Republican Congressman Bartlett.

Both redistricting expert Professor Michael McDonald and demographics expert Dr. Peter Morrison agreed that no other traditional redistricting factors could explain the wholesale recomposition of the Sixth District. As Professor McDonald explained, the Sixth District "could have reasonably been immune to substantial changes" after the 2010 census because "the benchmark district was located in the northwest corner of the state and needed only to shed 10,189 total population—among whom are children and other unregistered voters—in order to reach population equality." Ex. Q at 6. In other words, given the relatively modest population growth in the district over the prior decade, the alterations to the district's lines necessary to comply with the one-person-one-vote mandate were slight.

But the alterations were far from slight; instead, the map moved over 360,000 citizens out of—and nearly as many into—the district, shuffling fully *half* of the district's population. Ex. Q at 11-12. In total, 189 precincts were interchanged between the Sixth and Eighth Districts. Ex. GG at 59. The plan removed all areas of Harford, Baltimore, and Carroll counties that previously were within the Sixth District. *Id.* at 60-61. In Frederick County, the plan removed all but the Democrat-leaning areas of Frederick City, southern areas of the county, and a narrow geographic connector to the Sixth District (Ex. Q at 13-14 & Fig. 6), splitting the county between two congressional districts for the first time since 1840 (Ex. L at 122:8-19). Carroll County also was split for the first time since 1964 (*id.* at 121:22-123:5).

14

Tellingly, "[i]n the course of redrawing the district, 66,417 registered Republicans were removed from the district and 24,460 registered Democrats were added to the district." Ex. Q at 6. Also added to the Sixth District were 7,643 Independent registered voters. *Id*. at 5. This "massive interchange of territory" upended the political complexion of the district (Ex. GG at 67), after which Democrats "outnumbered Republicans by 1.3 to 1 among eligible active voters, and Republicans' share stood at just 33%" (*id*. at 59).

There is no plausible explanation for the wholesale geographic, demographic, and political reshuffling of the Sixth District other than the attempt to dilute Republican votes to make it impossible for them to reelect Roscoe Bartlett. As Dr. Morrison opined, "[t]he reconfiguration of CD6 caused by the 2011 Congressional Plan cannot be explained by legitimate districting considerations, such as the preservation of existing communities of interest." Ex. GG at 7. "In fact, the 2011 Congressional Plan dismembered existing communities of interest in CD6 through the excessive interchange of territory and population." *Id*. Professor McDonald agreed: "[P]aying due respect to traditional redistricting principles, a clearly superior alternative district exists that would produce a Sixth Congressional District that would not impair as greatly the ability of registered Republicans to elect candidates of their choice." Ex. Q at 3. This leaves just one conclusion: "Maryland's adopted Sixth Congressional District was drawn in an intentional manner to affect the ability of registered Republicans to elect candidates of their choice compared to the previous, benchmark district." *Id*.

But don't take the experts' words for it—all of this was succinctly confirmed by Speaker Busch himself. Asked whether "it was necessary to move 30 percent of Marylanders from one congressional district to another in order to achieve the GRAC's goals with respect to congressional redistricting," Speaker Busch answered straightforwardly, "No." Ex. RR at 146:12-19.

The secrecy and speed with which the 2011 redistricting plan was enacted are also indicative of a specific intent to burden Republicans. No draft plans were shared with the public until the GRAC submitted its NCEC-drafted proposal to the governor on October 4, 2011; even most Democratic lawmakers saw the map for the first time only a day before that, at the October 3 caucus meeting. *E.g.*, Ex. W. After Senate President Miller introduced the final map in the Senate, Democrats jammed the bill through both chambers of the General Assembly in just two days (Ex. C at ¶ 34)—lightning fast by any measure, leaving no time for debate. And the bill was enacted without the support of a single Republican lawmaker (*id.* ¶ 36), none of whom even saw the final map until it was introduced in the General Assembly.[10]

## B. The votes of Republicans in the benchmark Sixth District were diluted and produced concrete, adverse injuries

### 1. *The Plan changed the outcome of the congressional elections in the Sixth District in 2012, 2014, and 2016*

To make good on the goal of ensuring that the Republican majority in the benchmark Sixth District would not be able to reelect Congressman Bartlett, Hawkins changed the boundaries of the Sixth District so that they extended deeply southward, into the Democratic stronghold of Montgomery County. Ex. B at 47:15-16. The net effect is undeniable: "Maryland's adopted Sixth Congressional District was drawn in a manner that has the effect of diminishing the ability of registered Republican voters to elect candidates of their choice compared to the previous, benchmark district." Ex. Q at 3; *see id.* at 5-9. And "[t]his vote dilution had a concrete impact on electoral outcomes because Republican voters

---

[10]  The intent to crack the Sixth District was widely reported at the time. *See, e.g.*, Ex. C-12 at 2 (report that "the mapmakers drew lines to pack suburban Washington Democrats into Western Maryland's conservative 6th District"). One article, titled "Sources: Congressional delegation Dems eye Bartlett as redistricting target" was described by Romick as "a good read of how we got to where we ended up." Ex. SS.

in the adopted district have, as a consequence, been unable to elect a candidate of their choice." *Id.* at 3; *see also id.* at 9-10.

The numbers speak for themselves. There were 208,024 Republican and 159,715 Democrat registered eligible voters in the district on October 17, 2010; on that date, Republicans comprised 46.68% and Democrats comprised 35.84% of registered eligible voters in the Sixth District. Ex. C at ¶ 10. Shortly after the redistricting, on October 21, 2012, there were 145,620 Republican and 192,820 Democrat registered eligible voters in the District; on that date, Republicans comprised 33.32% and Democrats comprised 44.11% of registered eligible voters in the District. *Id.* at ¶ 53. The result was straightforward vote dilution, meaning that the relative value of votes cast in favor of Republicans was diminished by the drawing of district lines. *See* Ex. Q at 5 & tbl. 1 (66,417 registered Republicans were removed from the district and 24,460 registered Democrats were added).

Thus, as Professor McDonald explained, "the evidence is incontrovertible" that the lines of the adopted Sixth District made it more difficult for Republican voters to elect candidates of their choice because of vote dilution. Ex. Q at 3. The State's principal expert, history professor Allan Lichtman, agreed: "the 2011 Maryland congressional redistricting plan improved Democratic prospects in Maryland's Congressional District 6 as compared to the prior redistricting plan." Ex. TT at 2; *see also* Ex. UU at 39:1-4 (describing the dilution of Republican votes in the Sixth District as "obvious[]," and "No doubt. That is a fact.").

What is more, this vote dilution changed the outcomes of the congressional elections in the Sixth District in 2012, 2014, and 2016. Ex. Q at 9-10. Whereas Republican Roscoe Bartlett had consistently won re-election in the Sixth District by huge, double-digit margins over the past two decades (*see* Ex. C at ¶ 8), Democrat John Delaney defeated Bartlett in 2012 by a stunning 20.9% margin (*id.* at ¶ 54). And Delaney won re-election in 2014 (*id.* at ¶ 55), even as the 2014 "elections saw sweeping gains by the Republican Party

17

in the Senate, House, and in numerous gubernatorial, state, and local races" throughout the rest of the Nation (Ex. VV). Needless to say, he won again in 2016. Ex. C at ¶ 56.

The deliberate dilution of Republican votes is a but-for cause of these election results. Take, for example, the Cook Political Report's Partisan Voter Index, which predicts likely congressional-election outcomes using the voter histories of districts' constituents. *See* Ex. WW. The State's own expert, Prof. Lichtman, described the PVI as a "well respect-ed" metric among those in the field for "dealing with predictions" in elections. Ex. UU at 131:6-21. Because of the massive reshuffling of its population in 2011, the Sixth District changed from a PVI of R+13 ("Safe Republican") in 2010, to D+2 ("Likely Democrat") in 2011—*the single largest redistricting swing of any district anywhere in the Nation*. Ex. XX at 8. Lichtman explained that a "Likely Democratic" PVI indicates that it is "more likely than not" that a Democrat will win the election as a result of the partisan composition of the district. Ex. UU at 136:17-20. This was confirmed by NCEC's federal DPI for the Sixth District, which swung from 37.4% in 2010 (indicating that a Republican was more likely to win) to 53% in 2011 (indicating that a Democrat was more likely to win), based solely on changes to the district's lines. *See* Ex. QQ.

### 2. Republicans' participation in the political process in the Sixth District has been chilled and disrupted

Though it is more than sufficient that the redistricting changed the outcome of the congressional elections in 2012, 2014, and 2016, there is yet more: Constituents living in and around the Sixth District have been chilled from participating in the political process, not only because they feel that voting is a lost cause in light of gerrymandering, but also because they feel disconnected from their congressional district and are confused about who represents them and which of their neighbors share their district with them.

As plaintiff Sharon Strine explained at her deposition, when she went canvassing in support of Republic candidates, "every time we were out [campaigning], we met somebody

who said, it's not worth voting anymore, every single time . . . they just feel disenfranchised that they can't, they don't have somebody that represents them anymore." Ex. YY at 61:2-64:2. Plaintiff Lonnie Ropp shared a similar impression: Voters in the former Sixth District stopped voting after the redistricting because "they were confused about the candidates." Ex. ZZ at 34:15-38:4. "They didn't know who they should be engaging. It was a very confusing situation for them." *Id.*

> Plaintiff Ned Cueman was more direct:
>
> It was a chop job. I don't know how—I mean what can [I] express what took place but to say that I was disoriented or felt disconnected. Those are the kind of words that go into my own speaking for myself. I have absolutely no connection with what is in this district except the portions of Frederick that were thrown in.

Ex. AAA at 36:14-37:2.

### C. But for the specific intent to burden Republican voters in the old Sixth District, Republican votes would not have been so diluted

The evidence is incontrovertible that the political complexion of the Sixth District would not have been completely reconfigured *but for* the specific intent to dilute the votes of Republicans because of their voting histories and, in particular, their past success casting votes for Republican Roscoe Bartlett.

1. Governor O'Malley was clear that state officials' effort to change the outcome of future elections in the Sixth District was subordinated only to their concern to comply with the one-person-one-vote doctrine and to avoid "discriminat[ing] in any way against under-represented minority groups." Ex. A at 42:15-43:10. Yet there is not an iota of evidence suggesting that compliance with the one-person-one-vote standard or Section 2 of the Voting Rights Act, taken alone, would have necessitated *any* dilution of Republican votes in the Sixth District, much less dilution so substantial that it would have changed the outcome of the elections there from 2012 through today.

2.   Nor does the record reveal any other plausible explanations for the reconfiguration of the Sixth District. Dr. Morrison opined that "[t]he reconfiguration of CD6 caused by the 2011 Congressional Plan cannot be explained by legitimate districting considerations, such as the preservation of existing communities of interest." Ex. GG at 7; *see also id*. at 58. Prof. McDonald likewise "rule[d] out that respecting traditional redistricting principles, such as minimizing splits of local political boundaries and improving compactness, were the guiding principles behind the crafting of the adopted Sixth Congressional District." Ex. Q at 13. On the contrary, Prof. McDonald concluded that "but for the consideration of partisan goals—aided by map drawers, use of party registration and voting history data—the lines of the Sixth District would not have been drawn as they were, and Republican votes would not have been so diluted." *Id*.

If the mapdrawers had truly been concerned with compactness and keeping counties intact, an alternative Sixth District "can be constructed that is more compact and results in fewer county splits in the entire plan by assigning to the Sixth District portions of Frederick County and the split portion of Carroll County, which are currently assigned to the Eighth Congressional District." Ex. Q at 15.

According to this "simple solution" (*id*. at 13),

[p]opulation traded to the Sixth can be easily balanced back in Montgomery County, where the Sixth and Eighth Congressional Districts also share a common border. These trades could reduce the number of split [voting-tabulation districts] between the Sixth and Eight districts in Frederick and Montgomery counties, in a compact manner. As a by-product, the shape of the Eighth Congressional District can also be greatly improved . . . [because it] is now entirely contained within Montgomery County and no longer has a narrow neck connecting portions of Montgomery County with portions of Carrol and Frederick counties.



**Figure Eight. Alternative Sixth and Eighth Congressional Districts**

*Id* at 15, 25. Because the Sixth District borders only the Eighth District, this alternative configuration would not have changed the configuration of a single other congressional district other than the Eighth District. *Id*.at 15; *see also* Ex. BBB at 15. But this simple alternative configuration—which would not have pulled nearly so many Democrats into the district (*see* Ex. Q at fig. 9)—was not adopted.

3.  State officials have occasionally cited respect for the "I-270 corridor" as a supposed "community of interest" as one rationale for the shape of the Sixth District. *See, e.g.*, Ex. C-6 at 12, 14. This is nothing but litigation-inspired pretext.

For starters, not a single fact witness testified that he or she had actually considered the I-270 corridor when drafting or evaluating the redistricting plan. For example, when asked whether he had considered "a community of interest related to the I-270 corridor when analyzing potential maps in the 2011 Maryland congressional redistricting process," Eric Hawkins replied resolutely, "No." Ex. B at 128:18-129:1. Likewise, when asked whether he had "at all consider[ed] commuting patterns on I-270 when [he] voted on the proposed congressional map," Speaker Busch responded "No. It never—never crossed my mind." Ex. RR at 100:12-16.

For her part, GRAC Chair Jeanne Hitchcock confirmed that she was not provided with, and did not request, any information concerning the so-called I-270 corridor during the redistricting process. Ex. F at 169:16-171:15. So did Senate President Miller. Ex. M at 20:2-18.[11] And Senator Garagiola, in addition to not recalling "any sort of analysis of commuting patterns on I-270," affirmatively "doubt[ed] that that data was made available." Ex. V at 45:13-46:11. The absence of any evidence that anyone actually *considered* the I-270 corridor or its commuting patterns cannot be squared with the purported "I-270 corridor" justification.

Indeed, the "I-270 corridor" story was so transparently pretextual that it was dismissed out of hand by Jason Gleason, one of the senior congressional staffers who played a central role in the redistricting. At a GRAC briefing for the Maryland congressional delegation, Gleason wrote to a fellow senior congressional aide of the I-270 story: "This is painful to watch" and "I'm not sure I buy the themes they are selling. Hopefully they have some better ones for the public face of it." Ex. DDD.

Nor would the "I-270 corridor" story make sense even if it had been honestly considered. To begin with, the Sixth District does not, in fact, preserve the I-270 corridor as a community of interest. As both Prof. Lichtman and Willis admitted, the corridor is split between the Eighth and Sixth Districts. Ex. UU at 83:19-86:9; Ex. L at 102:8-104:8.

---

[11] Miller later changed his story, expressing his view that the new lines of the Sixth District would "*create*[] a community of interest" along the I-270 Corridor. Ex. M at 144:2-17 (emphasis added). He could not explain, however, why forcing conservative voters from areas that "are very challenged economically" to accept the representation of a congressman elected by liberal voters from "areas that are developed" would create a community of interest. *Id.* More fundamentally, Miller's revised testimony concerning I-270 got matters backwards: District lines do not dictate communities of interest; rather, communities of interest are supposed to dictate district lines. Ex. CCC at 15-16. *Accord* Ex. UU at 91:11-19 (district lines do not "create" communities of interest).

What is more, Dr. Morrison observed that the redrawing of the Sixth District, quite apart from *respecting* communities of interest, resulted in the "dismemberment of many existing communities of interest." Ex. GG at 67. In particular:

> Prior to redistricting, all the three incorporated cities and all 14 incorporated towns within the [benchmark] CD6 were wholly intact; not a single one of these established communities of interest was split. After redistricting, two of the three incorporated cities and one of the four incorporated towns within the [adopted] CD6 was split. . . . [A]n unincorporated CDP is an officially recognized community that bears a locally recognized name. Prior to redistricting, only 22% of the 18 CDPs within the [old] CD6 [were] split. After redistricting, 67% of the 15 CDPs within the [adopted] CD6 were split.

*Id.* In short, "[e]ven granting the existence of that purported shared interest" along I-270, Dr. Morrison opined, "its significance pales relative to the collective shared interests of the 13 established Census places whose boundaries ended up being split in the [adopted] CD6." *Id.* at 68. Thus respect for communities of interest is not a plausible explanation for reconfiguring the Sixth District absent the mapdrawers' intent to dilute Republican votes.

4.    Prof. Lichtman posited "four plausible alternative explanations for the crafting of the plan that are unrelated to an intent to retaliate against Republican-leaning voters for their political views, voting decisions, or party affiliation." Ex. TT at 3; *id.* at 42-52. Yet a cursory examination of those purportedly "alternative" explanations reveals that each is just a different way of saying that those responsible for the redistricting plan specifically intended to dilute Republican votes in the benchmark Sixth District.

Take first Prof. Lichtman's observations concerning the Eighth District. He asserts that one "reasonable alternative" rationale for the map, as drawn, was "unpacking CD8" and thereby reducing the "wasted" Democratic votes in that district. Ex. TT at 42. But in saying this, Prof. Lichtman ignores the obvious: The only way to "unpack" the Eighth District and reduce "wasted" Democratic votes is by deliberately diluting Republican votes *and flipping the Sixth District. See* Ex. BBB at 14-15. Without changing the outcome of

future congressional elections in the Sixth District, it would be logically impossible to reduce the number of "wasted" Democratic votes. *Id.* at 15.

Prof. Lichtman's next two rationales suffer the same problem. He opines that because gerrymandering is even *worse* in some other States, and because Republicans have historically gerrymandered more effectively than Democrats, it was "reasonable" to deepen the pro-Democratic gerrymander in the Old Line State by deliberating diluting Republican votes in the Sixth District. Ex. TT at 44, 48. This tit-for-tat explanation is not a standalone "rationale" for the map at all; it is instead an *excuse* for what Prof. Lichtman effectively concedes was a deliberate effort to flip the Sixth District.

Finally, Professor Lichtman observes that "[t]he state of Maryland explicitly indicated at the time of the redistricting process that one of the goals of the congressional plan was to conform to traditional redistricting principles by reconfiguring Congressional District 1 so that it no longer crossed the Chesapeake Bay." Ex. TT at 50. That only explains why Democrats decided to target Republicans in the Sixth District rather than in the First District. *See supra*, pages 11-12 (testimony confirming same). Like the other supposedly alternative rationales for the mass reconfiguration of the Sixth District, Prof. Lichtman's observations on this score merely confirm that the only real goal reflected in the shape of the Sixth District is the dilution of Republican votes.[12]

---

[12]  Prof. Lichtman's postulations are hardly the stuff of expert analysis in any event. There are mere stabs in the dark—guesses at what *might* have explained the contortions of the Sixth District, paying no mind to documents and testimony in this case that demonstrate the actual considerations of those responsible. Other than that, the great majority of Prof. Lichtman's report is irrelevant to this litigation. Make no mistake, Plaintiffs have *not* attempted to define the circumstances under which "a redistricting plan represents an invidious partisan gerrymander" taken as a whole. Ex. TT at 3. That sort of analysis might be relevant to a map-wide Equal Protection Clause claim, like the one presented in *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); the theory in that case turns, at bottom, on the question of "when the line between 'acceptable' and 'excessive' has been crossed." *Id.* at *18. But it has no bearing on Plaintiffs' single-district First Amendment retaliation theory.

## ARGUMENT

"To win such a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). And summary judgment is appropriate where "there is no genuine dispute as to any material fact," obviating a trial. Fed. Rule Civ. Proc. 56(a).

As we demonstrate below, the undisputed evidence establishes each element of Plaintiffs' constitutional claim as set out in this Court's opinion denying the State's motion to dismiss. Because fact discovery has concluded, and because full pre-trial motions would be duplicative and cause injurious delay, we respectfully request that—unless the Court expeditiously grants summary judgment for Plaintiffs—it advance the trial with a hearing on this motion for a preliminary injunction, pursuant to Rule 65(a)(2).

## I.   THE COURT SHOULD ENJOIN DEFENDANTS FROM ENFORCING MARYLAND'S 2011 REDISTRICTING PLAN

### A.   Plaintiffs have established all of the facts necessary for the Court to rule in their favor on the merits

According to the Court's opinion denying the State's motion to dismiss, Plaintiffs challenging a State's congressional redistricting are entitled to injunctive relief under the First Amendment when he demonstrates that (1) "those responsible for the map redrew the lines of his district with the *specific intent* to impose a burden on him and similarly situated citizens because of how they voted or the political party with which they were affiliated," (2) "the challenged map diluted the votes of the targeted citizens to such a degree that it resulted in a tangible and concrete adverse effect," and (3) "the mapmakers' intent to burden a particular group of voters by reason of their views" was a but-for cause of the "adverse impact." *Shapiro*, 203 F. Supp. 3d at 596-597.

25

Each of those elements is established beyond genuine dispute.

### 1.    *Specific intent*

According to the Supreme Court, "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Davis v. Bandemer*, 478 U.S. 109, 129 (1986). That assuredly is the case here. Eric Hawkins, the man who actually drew the draft plans, confirmed that his expressly assigned task was "to see if there was a possibility for another Democratic district." Ex. B at 47:17-49:2. Governor O'Malley, the man ultimately responsible for the plan, confirmed that "it was also my intent to . . . create a district where the people would be more likely to elect a Democrat than a Republican, yes, this was clearly my intent." Ex. A at 82:14-18. And virtually every contemporaneous public statement and document corroborates the same. *See supra*, page 12-13. All of the circumstantial evidence (*see supra*, pages 14-16 & n.8) does as well.

There also is no question that the specific intent to dilute Republican votes in the benchmark Sixth District was *because of* Republicans' voting history, including previously having cast votes successfully for Representative Bartlett. As we noted above, the federal DPI—NCEC's proprietary metric, which "take[s]… account of past voting history" (Ex. B at 24:17-19)—was the key metric that Hawkins used to flip the Sixth District. And Governor O'Malley confirmed that, to help "create a district that was more favorable rather than less favorable to Democratic nominees" (Ex. A at 63:1-4), those responsible for the 2011 redistricting "look[ed] at voting histories in addition to voting registration—party affiliation" (*id*. at 65:12-13).

### 2.    *Vote dilution and concrete injury*

The parties' experts agree that the reconfiguration of the Sixth District substantially diluted Republican votes in the benchmark district, so much so that it changed the outcome of the congressional elections in the district in 2012, 2014, and 2016.

The purpose of "vote dilution" is to ensure that the disfavored group has "'less opportunity . . . to elect candidates of their choice.'" *Bandemer*, 478 U.S. at 131 (plurality). *See also Vieth v. Jubelirer*, 541 U.S. 267, 271 n.1 (2004) (plurality) ("The Term 'political gerrymander' has been defined as '[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength'") (quoting *Black's Law Dictionary* 696 (7th ed. 1999)).

That is exactly what happened here: "the evidence is incontrovertible that Maryland's adopted Sixth Congressional District was drawn in a manner that has the effect of diminishing the ability of registered Republican voters to elect candidates of their choice compared to the previous, benchmark district." Ex. Q at 3; *accord, e.g.*, Ex. TT at 2; Ex. BBB at 2. This was "a clear result of a classic partisan gerrymandering strategy known as cracking," whereby "[a] district that was predominantly rural and Republican in character was transformed into a district where the political strength of Democratic suburbs of the Washington, D.C. suburbs outweighs the Republican rural areas, predominantly in the panhandle." Ex. Q at 17.

As a result of the deliberate dilution of Republican votes, the Sixth District is now a safe Democratic district, whereas it had been a safe Republican district prior to 2011. Ex. BBB at 3-4; *cf.* Ex. XX at 2, 8; Ex. UU at 136:21-137:17. Thus, Democrat John Delaney defeated Republican Roscoe Bartlett in the 2012 election by a whopping 21-point margin (Ex. C at ¶ 54). This was the single largest redistricting swing of any congressional district *anywhere in the country. See* Ex. XX at 8. And Delaney has won re-election every cycle since. Ex. C at ¶¶ 55-56.

Such a concrete impact on Republicans' representational rights is more than enough to satisfy the injury element of a First Amendment retaliation claim. As the Supreme Court explained in an employment case, the First Amendment protects citizens "from 'even

an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'" *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75n.8 (1990). Flipping the Sixth is that, and more.

### 3.    *But-for causation*

There is no room for debate that the specific intent to burden Republican voters by reason of their views is a but-for cause of the vote dilution visited upon them, which in turn changed the outcome of the elections in 2012, 2014, and 2016. Not a single fact witness identified any other objectives capable of independently explaining the decision to push the Sixth District, piecemeal, into Montgomery County.

a.    Before going further, however, we pause to note that it is not Plaintiffs' burden to affirmatively prove but-for causation. To be sure, "[t]he First Amendment's guarantee of freedom of speech protects" citizens from adverse governmental action "*because of* their speech on matters of public concern." *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) (public employment case). But it is settled that "constitutional claims, such as First Amendment retaliation cases, . . . proceed under the *Mt. Healthy* burden-shifting framework." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012). *Accord, e.g.*, *Wagner v. Jones*, 664 F.3d 259, 270 (8th Cir. 2011) ("the *Mt. Healthy* burden-shifting mechanism appl[ies] to a First Amendment political discrimination claim") (quoting *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993)); *Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009) (similar). Accordingly, when a plaintiff "prove[s] that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor" in the adverse action, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Umbehr*, 518 U.S. at 675.

b.    The State cannot meet its burden on this score. Governor O'Malley, for example, repeatedly explained that the only other goals he and others considered were compliance with the one-person-one-vote standard and Section 2 of the Voting Rights Act. *See* Ex. A at

42:15-43:10. Yet the adjustments to district lines necessary to meet those parallel goals was slight (Ex. Q at 6) and cannot alone explain the wholesale reconfiguration of the district.

What is more, Prof. McDonald and Dr. Morrison both opined that no other traditional redistricting principles—including compactness and respect for communities of interest—can explain the Sixth District's lines. Ex. GG at 7, 58; Ex. Q at 15. Indeed, those considerations point decidedly *away* from the manipulations reflected in the lines of the adopted Sixth District. Ex. GG at 7, 58; Ex. Q at 15.

That leaves the implausible "I-270 corridor" explanation. But the evidence is clear that those responsible for the map never actually considered any data or analysis concerning the I-270 corridor and didn't offer it as an explanation until after the map was complete. *See supra*, pages 21-23. Even those at the center of the redistricting found the I-270 explanation "painful" and unpersuasive. Ex. DDD. There is thus no evidentiary basis to believe that the Sixth District would have been drawn to crack the Republican majority in the Sixth District absent the specific intent to dilute Republican votes.

c.   Nor is there any room for doubt that the cracking of the Republican majority in the Sixth District affected the outcome of the elections in 2012, 2014, and 2016. In civil cases, but-for causation "does not require proof to an absolute certainty" and instead "connote[s] proof that a causal connection is more probable than not." *Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1169 (10th Cir. 2010). *Accord, e.g.*, *Pub. Citizen Health Research Grp. v. Young*, 909 F.2d 546, 550 (D.C. Cir. 1990) (describing the "traditional" formulation of "'but for' causation" as whether "it is more probable than not" that the outcome would have been the same "absent" the challenged conduct).

That is just what the evidence shows here: As we have already explained (*see supra*, page 18), the dramatic dilution of Republican votes in the Sixth District, taken alone, made it "more likely than not" that a Democrat would win in 2012 (Ex. UU at 136:17-20; Ex. XX

29

at 8). And no surprise, the outcome was as predicted: A Democrat has been elected in every election since the redistricting.

### B. Plaintiffs and other similarly situated voters will suffer irreparable injury absent an immediate injunction

Plaintiffs will suffer irreparable harm absent an immediate injunction. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters*, 769 F.3d at 247. As the Fourth Circuit recently recognized, "discriminatory voting procedures in particular are 'the kind of serious violation . . . for which courts have granted immediate relief.'" *Id.* (citing *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir.1986)). "This makes sense," the court explained, because "once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin [the challenged] law." *Id.*

These concerns apply here with full force. As the Supreme Court repeatedly has observed, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizens vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). That is just what Plaintiffs here have shown.

And injunctive relief must be granted without further delay in light of the upcoming 2018 election. The candidate-filing deadline for the 2018 congressional election is fewer than eight months away, on February 27, 2018. *See* perma.cc/6L4H-V8R8. But a new map will have to be in place long before then: "Potential candidates (including incumbents) will need to know the contours of the state's congressional districts, so they can organize their campaigns accordingly." *Johnson v. Mortham*, 926 F. Supp. 1460, 1494 (N.D. Fla. 1996). Likewise, Defendants "will need to set up the appropriate administrative features within its voting precinct structure" to accommodate the necessary filings and other logistics. *Id.* Thus, a new redistricting plan (if there is to be one) cannot wait to the eleventh hour,

particularly because "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls," and "[a]s an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4-5.

For all of these reasons, Maryland has enacted its last two redistricting plans between 8 and 12 weeks prior to the immediately subsequent candidate filing deadline. Taking **December 19, 2017** as the target for completion of a new plan (10 weeks in advance of the February 27, 2018 deadline) leaves no leeway for additional delay. "When a federal court declares an existing apportionment scheme unconstitutional, it is . . . appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). Yet drafting and enacting a new map will take time; courts typically allow between one and three months for the State to hammer out a new plan. *See, e.g.*, *Personhuballah v. Alcorn*, No. 13-cv-678. (E.D. Va. Jun. 5, 2015) (ECF No. 171) (three months); *Desena v. Maine*, No. 11-cv-117 (D. Me. June 22, 2011) (ECF No. 34) (just over three months); *Johnson*, 926 F. Supp. at 1495 (just over one month).[13]

At the same time, the Court must account for the possibility that the General Assembly (led by Democrats) and the Governor's Office (led by a Republican) will not be able to agree upon and enact a replacement map within the allotted time. *Cf.* Josh Hicks, *Everyone in Md. says they want redistricting reform. Here's why it won't happen*, Wash. Post (May 27, 2017), perma.cc/ PS7Z-FB6M. The Court therefore must additionally budget time to take proposals for, and briefing and argument on, a court-imposed map in the event

---

[13] It is no answer to suppose that the State will seek a stay of the Court's judgment if the Court ultimately enjoins enforcement of the 2011 redistricting plan. For the same reasons courts enter injunctive relief in the first place, they rarely grant stays in redistricting cases pending appeal. *See, e.g.*, Order, *Harris v. McCrory*, No. 13-cv-949 (M.D.N.C. Feb. 9, 2016) (ECF No. 148) (denying stay of final judgment);Opinion and Order, *Whitford v. Gill*, No. 15-cv-421 (W.D. Wisc. Jan. 27, 2017) (ECF No. 182) (same).

that the State's efforts are ultimately unsuccessful. *See, e.g.*, *Essex v. Kobach*, 874 F. Supp. 2d 1069 (D. Kan. 2012); *Favors v. Cuomo*, 2012 WL 928223 (E.D.N.Y. 2012). This would be a weighty task, and if the Court finds itself in the position of having to impose a Court-devised map, it should not be unduly rushed.

If the Court sets a December 19, 2017 deadline and provides just *four months* for the adoption of a new congressional redistricting plan—giving the State two months to enact a map of its own, and leaving two additional months for the Court to take proposals, briefing, and argument on a Court-imposed map, if that process fails—it must enter an injunction by **Friday, August 18, 2017**. That leaves less than three months from today for the Court to hold a trial and issue its decision.

If the Court were to delay judgment any further than that, the State doubtless would argue that injunctive relief is inappropriate prior to the 2018 election. *See Reynolds*, 377 U.S. at 585 (1964) ("where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding . . . relief"). Against this backdrop, time is of the essence.

## C.    The balance of hardships weighs decisively in favor of an injunction

Plaintiffs' burden under the balance-of-hardships prong is minimal. The general rule is that "[t]he moving party may meet its burden by demonstrating *either* (1) a combination of probable success on the merits and the possibility of irreparable injury *or* (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 813 (4th Cir. 1991) (emphasis added). *See also Ficker v. Tuohy*, 305 F. Supp. 2d 569, 571 (D. Md. 2004) (when the first two factors "weigh[] strongly in favor of the plaintiff" it "demands less of a showing" on balance of hardships) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003)).

Whatever minimal burden Plaintiffs bear on the balance of hardships is easily met. Refusal to grant an immediate injunction will (as we have just demonstrated) irreparably prejudice Plaintiffs. *See supra*, pages 30-32. And aside from the unacceptable prospect of another congressional election under an unconstitutional map, voters in the Sixth District are being chilled from political participation. *See supra*, pages 18-19. By contrast, an injunction will not unduly burden the State.

### D.   An injunction would be in the public's interest

Finally, an injunction would manifestly serve the public's interest. As a baseline matter, "'upholding constitutional rights [always] serves the public interest.'" *League of Women Voters*, 769 F.3d at 248 (quoting *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)). Said another way, it serves the public interest "where, as here, the private controversy may possibly vindicate public policy." *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 197 (4th Cir. 1977).

An injunction here plainly would vindicate important public rights. The point of redistricting is to "establish 'fair and effective representation for all citizens.'" *Vieth*, 541 U.S. at 307 (quoting *Reynolds*, 377 U.S. at 565-566). Political gerrymanders have the opposite goal, "to give one political party an unfair advantage by diluting the opposition's voting strength." *Shapiro*, 203 F. Supp. 3d at 592. Thus, "[p]artisan gerrymanders . . . are incompatible with democratic principles." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) (quoting *Vieth*, 541 U.S. at 292). To say that Plaintiffs are likely to succeed on the merits but that an injunction would not serve the public interest would make no sense.

## II.   THE COURT SHOULD EITHER GRANT SUMMARY JUDGMENT FOR PLAINTIFFS OR ADVANCE AND CONSOLIDATE THE TRIAL ON THE MERITS WITH A HEARING ON THIS MOTION

Because time is of the essence in this case, Plaintiffs respectfully request expedited consideration of this motion and as speedy a hearing as possible.

First, if the Court is persuaded that there are no genuine disputes of material fact, it can and should construe this motion as a motion for summary judgment and enter an injunction without a hearing or trial. Summary judgment for Plaintiffs is warranted because are no genuine disputes in the evidence that (1) those responsible for Maryland's 2011 redistricting plan redrew the lines of the Sixth District with the specific intent to impose a burden on Plaintiffs and other similarly-situated Republicans because of how they had voted in past elections; (2) the map in fact diluted the votes of the targeted citizens to such a degree that it changed the outcome of the congressional elections in the Sixth District in 2012, 2014, and 2016; and (3) the intent to dilute Republican votes was a but-for cause of that outcome. *Shapiro*, 203 F. Supp. 3d at 596-597.

The fact witnesses testified consistently—and there are no material disputes among the expert witnesses—on these points. Summary judgment for Plaintiffs accordingly is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("Rule 56(c) mandates the entry of summary judgment" when the evidence "before the district court demonstrates that" there are no genuine issues of material fact).

But if the Court is not prepared to enter an immediate summary judgment for Plaintiffs without a hearing, it should instead set an evidentiary hearing on the motion and advance and consolidate the full trial with the hearing, pursuant to Rule 65(a)(2).

Rule 65(a)(2) "wisely permits the district court in an appropriate case to hear a motion for preliminary injunction and conduct a hearing on the merits at the same time," and "[c]ivil rights cases are especially suitable for such" treatment. *Singleton v. Anson County Bd. of Ed.*, 387 F.2d 349, 351 (4th Cir. 1967). In such cases, "a quick disposition of the merits shortens the period in which plaintiff may be threatened by irreparable harm." 11A Fed. Prac. & Proc. Civ. § 2950 (3d ed. 2017) (hereinafter "FPP"). It also avoids duplicative proceedings on the motion for a preliminary injunction, motions for summary judgment, motions in limine under *Daubert*, and trial. *Id.*; *accord, e.g.*, *Tea Party*

*Leadership Fund v. FEC*, 2012 WL 5382844, at *1 (D.D.C. 2012) (Rule 65(a)(2) "is designed to conserve judicial resources and avoid duplicative proceedings").

These considerations weigh strongly in favor of advancing and consolidating the trial with any hearing on this motion. As we have explained (*supra*, pages 30-32), any further delay risks irreparable injury with respect to the forthcoming 2018 election. And holding a hearing on the instant motion separate and apart from a trial on the merits would ensure, with no purpose, that "the same evidence [is] presented both at the preliminary injunction stage and later at trial," and considered by the Court twice. 11A FPP § 2950. What is more, discovery is now complete, and separate summary judgment and *Daubert* motions prior to trial would be needlessly duplicative: Each would require the Court to weigh the reliability and probative value of the evidence—but in an inefficient, piecemeal fashion rather than all at once, in a single hearing. *Daubert* briefing—which by itself could delay trial by months—would be particularly inappropriate, given that "the usual concerns [under *Daubert*] regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009); *accord, e.g.*, *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

## CONCLUSION

Unless the Court enters an immediate summary judgment for Plaintiffs, it should set a hearing date on this motion as soon as possible following the completion of briefing, consolidate the hearing with a trial on the merits, and, at the conclusion of the trial, enter an injunction forbidding the State from enforcing the 2011 redistricting plan.

Dated: May 31, 2017                    Respectfully submitted,

                                       /s/ *Michael B. Kimberly*

                                       Michael B. Kimberly, Bar No. 19086
                                           mkimberly@mayerbrown.com
                                       Paul W. Hughes, Bar No. 28967
                                       Stephen M. Medlock, *pro hac vice*
                                       E. Brantley Webb, *pro hac vice*
                                       Micah D. Stein, *pro hac vice*
                                       Mayer Brown LLP
                                       1999 K Street NW
                                       Washington, D.C. 20006
                                       (202) 263-3127 (office)
                                       (202) 263-3300 (facsimile)

                                       *Attorneys for Plaintiffs*