# EXHIBIT TT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| O. JOHN BENISEK, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Case No. 13-cv-3233 |
| | * | |
| LINDA H. LAMONE., *et al.*, | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**May 8, 2017**

**Opening Expert Report of Allan J. Lichtman**

# TABLE OF CONTENTS

Page

I.      PURPOSE OF ANALYSIS ...........................................................................................1

II.     QUALIFICATIONS .....................................................................................................1

III.    SUMMARY OF OPINIONS ........................................................................................2

IV.     MARYLAND'S 2011 REDISTRICTING PLAN IS NOT A PARTISAN
        GERRYMANDER...........................................................................................................3

        A.      Deficiency of Plaintiffs' Analysis ...............................................................3

        B.      Multiple Analyses Demonstrate That Maryland's 2011 Congressional Plan
                is Not a Partisan Gerrymander ....................................................................5

                1.      Dr. McDonald's Own Methodology for Detecting Partisan
                        Gerrymanders Demonstrates that Maryland's 2011 Congressional
                        Plan is not a Partisan Gerrymander............................................5

                2.      Efficiency Gap Analysis Shows That the Maryland's 2011
                        Congressional Plan Favors Republicans ....................................9

V.      THE MORRISON REPORT IS FUNDAMENTALLY FLAWED BY
        CONFIRMATION BIAS.............................................................................................11

VI.     Dr. Morrison's Declaration in *Fletcher v. Lamone* Refutes His Report in This
        Litigation...................................................................................................................12

VII.    The Morrison Report Suffers from Serious Errors of Selection and Interpretation. .........23

VIII.   The Morrison Report is Based on a Fundamental Misunderstanding Between the
        Socio-Economic Characteristics of Constituents and Representation ..............................28

IX.     The Reliance on Vote Dilution Analysis Under the Voting Rights Act in Dr.
        McDonald's Report Is Misplaced ...................................................................................32

X.      Dr. McDonald's Report Contradicts His Scholarship and Prior Testimony....................34

XI.     Dr. McDonald's Methodology Cannot Establish Intent .................................................40

XII.    Dr. McDonald Misunderstands Maryland's Reporting of Election Results ....................41

XIII.   Alternative Explanations for the Configuring of CD6....................................................42

A.      Unpacking Prior CD8 ........................................................................42

B.      Realizing the Democratic Majority..................................................44

C.      Responding to the Nationwide Context of Congressional Redistricting ...............44

D.      Responding to the Goal of Realigning Congressional District 1 so That it
        Did Not Cross the Chesapeake Bay ...................................................50

CONCLUSION ........................................................................................52

## I.    PURPOSE OF ANALYSIS

In this report, I examine the reports submitted by plaintiffs' experts, Dr. Peter A. Morrison (henceforth "Morrison Report") and Dr. Michael P. McDonald (henceforth "McDonald Report"). I also consider more broadly whether Maryland's 2011 congressional redistricting plan represents a partisan gerrymander and whether the intent behind the plan was to retaliate against Republican-leaning voters for their political expression.

I am being compensated at the rate of $400 per hour and my compensation does not depend on any outcome of the litigation. I have attached to this report an updated CV and a Table of Cases.

## II.    QUALIFICATIONS

This study draws on my experience in voting rights and redistricting litigation and scholarly expertise in political history, political analysis, and historical and statistical methodology. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 42 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my B.A. in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, and historical and quantitative methodology.

I am the author of numerous scholarly works on quantitative and qualitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, *Journal of Applied Forecasting*, and *Social Science History*, as well as my co-authored book, *Historians and the Living Past*. In addition, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies published in such academic journals as *The Proceedings of the National Academy of Sciences*, *The American Historical Review*, *The International Journal of Forecasting*, *The International Journal of Information Systems & Social Change*, and *The Journal of Social History*. Quantitative and historical analyses also ground my books, *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman).

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America in 2008. My book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the *New York Times* in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, the winner of the Tikkun Olam Award in Holocaust Studies, and a

finalist for the Los Angeles Times Book Prize in history. My most recent book, *The Case for Impeachment* was an independent bookstore best seller, and a bestseller in several academic categories on Amazon.com.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than eighty redistricting, voting and civil rights cases. These include several cases in the state of Maryland. In the U.S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work. I have testified several times for plaintiffs and defendants on the issues of intentional discrimination in the adoption of state redistricting plans and other state laws affecting voter registration and turnout. A three-judge panel in litigation challenging the 2011 state of Illinois redistricting plan also cited my work on behalf of defendants in support of the panel's *rejection* of plaintiffs' claim that the plan intentionally discriminated against minority voters in *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, 2011 U.S. Dist. Lexis 117656 (N.D. Ill. Oct. 12, 2011). I testified on intentional discrimination in the landmark case of *North Carolina State Conference of the NAACP v. McCrory, et al.*, in which a unanimous panel of the Fourth Circuit affirmed my finding of intentional racial discrimination on the part of the state: 831 F.3d 204 (4th Cir. 2016). I was also the plaintiffs' expert on partisan gerrymandering in the case of *Vieth v. Jubelirer* that was ultimately decided by the U.S. Supreme Court. 51 U.S. 267 (2004).

## III.    SUMMARY OF OPINIONS

* After examining the reports of plaintiffs' experts, I conclude that these reports establish only what is already the obvious: that the 2011 Maryland congressional redistricting plan improved Democratic prospects in Maryland's Congressional District 6 as compared to the prior redistricting plan.

* Even taken fully at face value, the reports of plaintiffs' experts fail to establish that Maryland's congressional plan is a partisan gerrymander that unfairly burdens voters inclined to vote for Republican candidates. The reports consider *only* changes made by the plan in CD6. Yet scholarly work in the field, including Dr. McDonald's own published work and expert reports, demonstrate that a partisan gerrymander, as that term is understood in the social science literature, must be evaluated through the analysis of the *entire* plan.

* Scrutiny of Maryland's 2011 congressional plan through multiple modes of analysis demonstrates that the plan is *not* a partisan gerrymander.

* Maryland's 2011 redistricting plan established a community of interest in CD6, according to methodology applied by Dr. Morrison in *Fletcher v. Lamone*.

* The analysis of the intent behind the 2011 congressional plan in the reports of plaintiffs' experts is fundamentally flawed conceptually. The analysis fails to follow standard historical methodology or the framework for intent analysis established by the U.S. Supreme Court in the *Arlington Heights* case.

2

* The analysis of intent also fails to consider four plausible alternative explanations for the crafting of the plan that are unrelated to an intent to retaliate against Republican-leaning voters for their political views, voting decisions, or party affiliation.

* The reports of plaintiffs' experts contain serious errors and omissions and demonstrate a lack of knowledge of circumstances in Maryland essential to the inquiry.

Before examining other issues raised in plaintiffs' expert reports, I first address the critical question of whether Maryland's 2011 congressional plan constitutes an invidious partisan gerrymander that unfairly burdens Republican-leaning voters.

## IV.    MARYLAND'S 2011 REDISTRICTING PLAN IS NOT A PARTISAN GERRYMANDER

### A.    Deficiency of Plaintiffs' Analysis

Both the Morrison Report and the McDonald Report examine only one of the eight congressional districts in Maryland's 2011 plan, CD6. Such a limited study cannot establish whether a redistricting plan represents an invidious partisan gerrymander. The scholarship on this issue makes it clear that the possible existence of a partisan gerrymander must be assessed by examining the plan as a whole.

A redistricting plan is an interactive system, where every district in the plan affects every other district. This is a principle so well-recognized that one of plaintiffs' experts, Dr. McDonald, has espoused it several times himself. The other of plaintiffs' experts, Dr. Morrison, acknowledges that the proper inquiry is statewide but then neglects to address statewide factors in his report in *this* litigation. In his testimony in *Backus v. South Carolina,* plaintiffs' expert Dr. McDonald affirms the principle that districts interact with one another in a plan and that redistricting experts cannot analyze any single district in isolation.

"Well, I don't know if it's a scientific principle, but among people who do redistricting we call it a ripple effect. So one district, if you change one district it's going to affect all of the neighboring districts, and then that in turn, it's like a row of dominoes, can spread entirely across the state. And so *you really can't look at one district in isolation* because it can be affected by changes to other districts."[1]

Much the same point was asserted in his report on partisan gerrymandering in the litigation of Texas' post-2010 redistricting plans, where Dr. McDonald made clear the need to examine all the districts in assessing partisan gerrymandering. Dr. McDonald first observed that "[a] commonly used method to determine the potential political consequences of a redistricting plan is to aggregate statewide election returns *into proposed districts*. The resulting statistics can be used to evaluate if a redistricting plan is a partisan gerrymander. The methodology clearly illustrates the burdens that partisan gerrymanders place upon voters and political parties."[2] Dr. McDonald then

---

[1] McDonald Test. at 55:22-56:4 (emphasis added), *Backus v. South Carolina*, No. 3:11-3120 (D.S.C. March 4, 2012), ECF No. 207.

[2] Designation of Expert Witnesses, Ex. A, McDonald Expert Report at 1, *Perez v. Perry*, No. 5:11-00360 (W.D.

examined three adopted Texas redistricting plans for congressional districts, state house districts and state senate districts, and examined all the districts in each plan before concluding that these plans were partisan gerrymanders. He said, "the adopted redistricting plans are Republican gerrymanders, designed with a purpose to dictate electoral outcomes by strategically grouping voters within districts based on their political orientation and that the representational rights of Democratic voters and the Democratic Party are thereby disfavored on the basis of their political views." [3]

Similarly, Dr. McDonald's scholarly work in partisan gerrymandering litigation also establishes the necessity of examining the complete redistricting plan to assess gerrymandering. This body of work includes his 2015 Social Science Research Network (SSRN) paper; his 2012 article in the *Case Western Reserve Law Review*; and his 2013 article in the *University of Richmond Law Review*. [4] Likewise, the scholarly sources cited in plaintiffs' second amended complaint examine the issue of partisan gerrymandering through a consideration of the entire plan, not just one district. [5]

In his deposition in the South Carolina case of *Backus v. South Carolina*, Dr. McDonald was asked: "is it possible to, if you have a statewide plan with – for instance, in the House map there are 124 districts. Is it possible to draw each one of those 124 districts individually without considering their impact on the surrounding districts?" Dr. McDonald answered simply, "No." [6]

Dr. Morrison, the plaintiffs' other expert, specifically frames his inquiry as pertaining generally to Republicans in Maryland, not just Republicans in CD6:

"I have also been asked to determine whether there is objective demographic evidence supporting the conclusion that the Maryland General Assembly specifically intended to burden *the representational rights of Maryland Republicans* because of how they had voted in the past and the political party with which they had affiliated." [7]

Yet the substance of the Morrison Report considers only CD6 and not the impact of the entirety of the 2011 congressional redistricting plan on "Maryland Republicans."

Likewise, plaintiffs' Second Amended Complaint refers frequently to the plan as a whole, and its scope is not limited to CD6. For example:

---

Tex. Aug. 8, 2011), ECF No. 130-2 (emphasis added).

[3] *Ibid.*, at 5.

[4] Micah Altman & Michael P. McDonald, "Redistricting Principles for the 21st Century," 62 *Case Western Law Review* 1179 (2012); Micah Altman & Michael P. McDonald, "A Half-Century of Virginia Redistricting Battles: Shifting from Rural Malapportionment to Voting Rights and Participation," 47 *University of Richmond Law Review* 771 (2013); and Micah Altman, Brian Amos, Michael P. McDonald, & Daniel R. Smith, "Revealing Preferences: Why Gerrymanders are Hard to Prove and What to do About It," *SSRN* (March 22, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2583528.

[5] Samuel S. H. Wang, "Three Tests for the Practical Evaluation of Partisan Gerrymandering," 68 *Stanford Law Review* 1263 (2016); Nicholas O. Stephanopoulos & Eric M. McGhee, "Partisan Gerrymandering and the Efficiency Gap," 82 University of Chicago Law Review 831 (2015).

[6] McDonald Dep. at 53:7-53:14, *Backus v. South Carolina*, No. 3:11-03120 (D.S.C. Feb. 27, 2012), ECF No. 158.

[7] Opening Expert Report of Dr. Peter A. Morrison (hereinafter Morrison Report) at 4 (emphasis added).

"The Plan is widely regarded as one of the worst partisan gerrymanders in American history." (p. 4)

"The crux of every partisan gerrymander is the dominant party's effort to dilute the effectiveness of the votes in favor of the disfavored party. … This end is achieved by drawing district lines so that the dominant party wins a large number of seats by narrow margins and the disfavored party wins a small number of seats by wide margins." (pp. 9-10)

"As a result of both increasing partisanship and more sophisticated voter data collection and analysis, map-drawers in recent decades have been able to create redistricting plans in ways that crack and pack with unprecedented efficiency and accuracy." (pp. 10-11)

"The 1st District covers Maryland's Eastern Shore and stretches across a portion of the northern border of the State. It is the State's 'packed' Republican district." (p. 19)

Pages 19-29 of the complaint include allegations about every one of the 8 congressional districts in Maryland's 2011 redistricting plan, not limited to CD6.  Yet neither the Morrison nor the McDonald Report provides any detailed analysis of the overall plan, showing that it unfairly packs and cracks Republican voters. Instead their analyses are limited only to CD6.

      **B.**    **Multiple Analyses Demonstrate That Maryland's 2011 Congressional Plan is Not a Partisan Gerrymander**

           **1.**    **Dr. McDonald's Own Methodology for Detecting Partisan Gerrymanders Demonstrates that Maryland's 2011 Congressional Plan is not a Partisan Gerrymander**

In his Texas reports, Dr. McDonald establishes a methodology for assessing whether a redistricting plan represents an unfair partisan gerrymander.  He references my work in *Vieth v. Jubelirer* as a foundation for this methodology.[8]  According to Dr. McDonald's prior testimony, the correct methodology calls for the analyst to take the following steps:

**1)** Calculate statewide election returns within districts. This requires the reaggregation of statewide results into each of the individual districts of a plan.
**2)** Calculate the average share of "two-party" vote across districts.
**3)** Compare the relationship between seats to votes at various average votes for the two major parties across the districts.[9]

Using this methodology, Dr. McDonald found that the adopted Texas congressional, state senate, and state house plans were partisan gerrymanders disfavoring Democrats, the minority party in the Texas legislature.[10] However, as shown below, this same methodology yields a contrary finding for Maryland's 2011 congressional redistricting plan.

---

[8] McDonald Expert Report at 2, *Perez v. Perry*, No. 5:11-00360 (W.D. Tex. Aug. 8, 2011), ECF No. 130-2 .
[9] *Ibid.* at 3-5.
[10] Designation of Expert Witnesses, Ex. B, McDonald Apx. at 3, 7, 9, *Perez v. Perry*, No. 5:11-00360 (W.D. Tex. Aug. 8, 2011), ECF No. 130-3.

Tables 1 and 2 below set forth the results of applying to Maryland's 2011 congressional redistricting plan the same methodology that Dr. McDonald endorsed in the Texas case of *Perez v. Perry*. Table 1 calculates the average share of the "two-party" vote for statewide elections for each of the districts in the 2011 congressional plan from 2012 to 2016.[11] Table 2 examines the relationship between Republican votes and seats for the Maryland plan and compares these results to the results found for Texas by Dr. McDonald.

The results reported in Table 2 indicate that, in contrast to Dr. McDonald's Texas findings, the 2011 Maryland congressional redistricting plan is highly responsive to a hypothetical Republican majority. If Republicans were to achieve a bare majority of 51 percent of the vote, according to Dr. McDonald's methodology they would win 63 percent of the seats. If they won a 54 percent vote majority, Republicans would win 75 percent of the seats. In 2010, Democrats won 75 percent of the seats in Maryland's congressional delegation, but they did so with a majority vote of 64.3 percent across districts, more than 10 percentage points above the 54 percent that Republicans would have needed statewide to win that same percentage of seats. At 54 percent of the vote, under Maryland's 2011 congressional redistricting plan, Republicans would win all six of the districts that are not majority-African American voting rights districts (CD4 and CD7). By contrast, if Democrats won 54 percent of the Texas vote they would win only 49 percent of seats under the state's adopted congressional plan, 33 percent under its adopted state senate plan, and 41 percent under its adopted state house plan. Thus, under Maryland's congressional plan, Democrats are generally at a statewide *disadvantage* in converting their votes to congressional house seats, unlike the Republicans in Texas who established an anti-majoritarian statewide advantage.

---

[11] The Maryland State Board of Elections reports only election night results (e.g., the votes cast on Election Day) by precinct and congressional district. Through a special tabulation from the Board of Elections I also obtained the early votes cast by congressional district. Only the relatively small number of absentee votes and provisional votes (fewer than 10 percent of votes cast) are not available by congressional district.

**TABLE 1**
**REPUBLICAN PERCENTAGE OF TWO-PARTY VOTE, STATEWIDE ELECTIONS, AGGREGATED TO DISTRICTS IN THE 2011 ADOPTED CONGRESSIONAL PLAN**

| CD | 2012 President | 2012 US Senate | 2014 Governor | 2014 Comptr. | 2014 Attorney General | 2016 President | 2016 US Senate | Mean All Elections |
|----|------|------|------|------|------|------|------|------|
| 1 | 62.2 | 56.5 | 78.6 | 53.4 | 66.0 | 65.8 | 64.9 | 63.9 |
| 2 | 36.1 | 28.2 | 55.9 | 34.3 | 41.1 | 38.3 | 37.9 | 38.8 |
| 3 | 38.3 | 31.3 | 54.7 | 36.3 | 41.8 | 34.7 | 36.7 | 39.1 |
| 4 | 21.3 | 19.0 | 34.0 | 25.6 | 28.2 | 20.6 | 22.2 | 24.4 |
| 5 | 33.1 | 28.5 | 46.2 | 37.3 | 38.9 | 33.8 | 33.8 | 35.9 |
| 6 | 44.6 | 42.4 | 58.4 | 47.1 | 50.6 | 43.8 | 42.5 | 47.1 |
| 7 | 23.0 | 20.3 | 37.2 | 24.6 | 28.7 | 21.7 | 25.2 | 25.8 |
| 8 | 37.6 | 33.7 | 48.9 | 37.8 | 40.5 | 33.4 | 34.5 | 38.1 |
|   | 37.0 | 32.5 | 51.7 | 37.0 | 42.0 | 36.5 | 37.2 | 39.1 |

7

**TABLE 2**
**VOTES TO SEATS RATIOS 50% TO 55% FROM MINORITY PARTY IN
LEGISLATURE MARYLAND 2011 CONGRESSIONAL PLAN COMPARED TO
PLANS ANALYZED BY DR. MCDONALD IN TEXAS**

| % of Vote By Minority Party In Legislature | Maryland Adopted 2011 Cong. Plan | Texas Adopted 2011 Cong. Plan | Texas Adopted 2011 State. Senate Plan | Texas Adopted 2011 State House |
|---|---|---|---|---|
| Minority Party 50% | **38%** | **32%** | **33%** | **38%** |
| Minority Party 51% | **63%** | **32%** | **33%** | **38%** |
| Minority Party 52% | **63%** | **39%** | **33%** | **38%** |
| Minority Party 53% | **63%** | **40%** | **33%** | **40%** |
| Minority Party 54% | **75%** | **49%** | **33%** | **41%** |
| Minority Party 55% | **75%** | **50%** | **40%** | **42%** |
|  |  |  |  |  |
| Source: Table 1, McDonald, *Perez* Report. | | | | |

### 2.    Efficiency Gap Analysis Shows That the Maryland's 2011 Congressional Plan Favors Republicans

The analysis of the so-called "efficiency gap" is a methodology for detecting a partisan gerrymander developed by Nicholas Stephanopoulos, Professor at the University of Chicago Law School, and Eric McGhee, Research Fellow at the Public Policy Institute of California. It is explained and illustrated in their 2015 article in the *University of Chicago Law Review*, cited in plaintiffs' complaint and referenced above. As explained by the authors, their efficiency-gap measure accounts *for both the packing and cracking of voters* in any redistricting plan: "The efficiency gap," they write, "essentially aggregates all of a district plan's cracking and packing into a single tidy number."[12] The district court in the Wisconsin gerrymandering litigation relied heavily on their efficiency gap measure in denying defendants' motion for summary judgment in a case alleging that the plan for State Assembly districts represented a partisan gerrymander that unfairly disadvantaged Democrats.[13]

The efficiency gap, Stephanopoulos and McGhee indicate, "represents the difference between the parties' respective wasted votes in an election."[14] They define a wasted vote as a vote that "is cast (1) for a losing candidate, or (2) for a winning candidate but in excess of what she needed to prevail."[15] Wasted votes for a losing candidate, they state, are "a result of the time-honored gerrymandering technique of 'cracking.'"[16] Wasted votes in excess of electoral majorities result from "the equally age-old mechanism of 'packing.'"[17]

The efficiency gap is relatively simple to compute:

1) Sum for each party the number of votes cast for losing candidates in each district.
2) Sum for each party the number of votes cast for winning candidates in excess of 50%.
3) Add together these two sums to obtain the total number of wasted votes for each party.
4) Subtract the total number of wasted votes for the party controlling the redistricting from the total number of wasted votes for the second party.
5) A positive result indicates that the plan disadvantages the second party, e.g., that it has more wasted votes. A negative result indicates that the plan disadvantages the redistricting party, i.e., that it has more wasted votes.
6) Divide the result by the total number of votes cast to obtain the net percentage of wasted votes for the disadvantaged party.
7) This final percentage measure represents the efficiency gap.

Table 3 applies the efficiency gap analysis to Maryland's 2011 plan using the 2012 general election results. This first post-redistricting election is the most critical election in assessing any redistricting plan, for at least two important reasons. First, this election establishes the congressional incumbencies for subsequent elections. It is well established that incumbents have

---

[12] Stephanopoulos & McGhee at 833.
[13] *Whitford v. Nichol*, 180 F. Supp. 3d 583 (W.D.Wis. 2016).
[14] Stephanopoulos & McGhee at 834.
[15] *Ibid.*
[16] *Id.*
[17] *Id.*

a significant electoral advantage over challengers. As plaintiffs' expert Dr. McDonald has noted, "Much electoral competition scholarship focuses on the advantages of incumbents in election to the House of Representatives."[18] Second, circumstances change over time, including demographic and political changes, making outcomes in later elections more difficult to predict at the time of the redistricting. Political scientist Nicholas R. Seabrook explains: "A number of factors can combine to dramatically alter the underlying distribution of voters that had formed the basis of a gerrymander." He cites "generational replacement," electoral realignments, "national electoral swings and turnout variations," changes "between presidential elections and midterm years," and "residential mobility." Thus, "All else being equal, the effectiveness of a partisan gerrymander is expected to decline as the alignment of voters moves further away from that on which the redistricting plan was based."[19]

The results reported in Table 3 indicate that for the 2012 congressional elections in Maryland, the Democrats had 222,259 more wasted votes than Republicans. As also indicated in Table 3, this result translates into *an efficiency gap of 8.0 percent disfavoring Democrats*. In sharp contrast, in Wisconsin, the court cited a report by plaintiffs' expert finding that the Republicans controlling the State Assembly redistricting had created a plan with a *13 percent efficiency gap favoring Republicans*.[20]    I am not suggesting that the Democrats in 2011 deliberately gerrymandered congressional districts to produce more Democratic wasted votes, but rather that this is a consequence of other factors, such as the natural distribution of partisans in the state and the creation of two voting rights districts. These districts -- CD4 and C7 -- are overwhelmingly packed with Democrats, with the winning Democrat in 2012 garnering about 79 percent of the vote in each district.[21] The large efficiency gap in favor of Republicans in Maryland is consistent with Stephanopoulos and McGhee's conclusion; Maryland is not identified as a partisan gerrymander under their applicable threshold test.[22]

---

[18] Michael P. McDonald and John Samples, "The Marketplace of Democracy: Normative and Empirical Issues," in *The Marketplace of Democracy: Electoral Competition and American Politics* 13 (McDonald and Samples, eds., 2006).

[19] Nicholas R. Seabrook, *Constraints on Partisan Gerrymandering in U.S. Politics* 62 (2017).

[20] *Whitford v. Nichol*, 180 F. Supp. 3d at 590.  In the Wisconsin case, one plaintiffs' expert found that the efficiency gap favoring Republicans was 13%.  Another plaintiffs' expert, using a more elaborate district-by-district analysis, found that the overall efficiency gap favoring Republicans was 12%.  *Ibid.*

[21] Maryland State Board of Elections, 2012 General Election, http://www.elections.state.md.us/elections/2012/results/general/gen_results_2012_4_008X.html.

[22] Stephanopoulos & McGhee at 890.

**TABLE 3**
**EFFICIENCY GAP REPUBLICANS VS. DEMOCRATS 2012 CONGRESSIONAL
ELECTIONS MARYLAND**

| Total Votes | "Wasted" Democratic Votes | "Wasted" Republican Votes | Difference in "Wasted Votes" |
|---|---|---|---|
| 2,482,687 | 985,261 | 763,002 | **-222,259 Democrats Disadvantaged** |
| **Efficiency Gap\*** | **222.259/2,482,687 = 8.0% Disadvantaging Democrats** | | |

\* Difference in "Wasted" Votes Divided by Total Votes. Party With More "Wasted" Votes is Disadvantaged. See, Nicholas O. Stephanopoulos & Eric M. McGhee, "Partisan Gerrymandering and the Efficiency Gap," *Chicago Law Review*, 81 (2015), pp. 831-900.

## V.    THE MORRISON REPORT IS FUNDAMENTALLY FLAWED BY CONFIRMATION BIAS

Dr. Morrison has produced a result-driven report that exhibits the flaw of confirmation bias, defined as the marshalling of evidence to support a pre-conceived conclusion rather than the conducting of an open-ended inquiry with no fixed outcome. As explained by Raymond S. Nickerson in his article in the *Review of General Psychology*, confirmation bias occurs when "one selectively gathers, or gives undue weight to, evidence that supports one's position while neglecting to gather, or discounting, evidence that would tell against it."[23] He further elaborates that, "People may treat evidence in a biased way when they are motivated by the desire to defend beliefs that they wish to maintain."[24]

The confirmation bias of the Morrison Report is evident in the contradictory ways in which Dr. Morrison approaches analysis of communities of interest in his declaration in *Fletcher v. Lamone* as compared to the report for this litigation. It is also evident in his failure to frame his intent inquiry in an open-ended form by assessing whether the evidence *supports or refutes* the intention of legislators to burden Republicans. Rather, he considers whether he can muster evidence in support of plaintiffs' pre-set claim of intentional discrimination.

As Dr. Morrison puts it, "I have also been asked to determine whether there is objective demographic evidence *supporting the conclusion* that the Maryland General Assembly specifically intended to burden the representational rights of Maryland Republicans because of how they had voted in the past and the political party with which they had affiliated."[25]

---

[23] Raymond S. Nickerson, "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises," 2 *Review of General Psychology* 175-176 (1998).
[24] *Ibid.*
[25] Morrison Report at 4 (emphasis added).

Dr. Morrison's claim that legislative intent can be inferred from "objective demographic evidence" is also illustrative of confirmation bias. No evidence, whether demographic or otherwise, simply leaps out and speaks for itself. Evidence must be culled, selected, and interpreted, especially as it relates to a complex causal question such as the intent of a legislative body. In addition, Morrison's report is not limited to demographic material, but also attempts to provide a historical analysis of the redistricting process in Maryland primarily based on non-demographic, documentary evidence.

It is also telling that in pursuing this historical inquiry to assess intent, Morrison goes well beyond his role as a demographer. In his statement of qualifications Dr. Morrison cites no expertise, training or publications related to the historical analysis of intent: "My principal expertise centers on applications of demographic analysis in tracking socioeconomic trends and envisioning their consequences for public policy. In particular, I specialize in performing demographic analysis pertaining to the *effects* of Congressional and other redistricting plans."[26] At least one court has previously cited Dr. Morrison for attempting to provide analyses and opinions beyond his demographic expertise.[27]

## VI.   DR. MORRISON'S DECLARATION IN *FLETCHER V. LAMONE* REFUTES HIS REPORT IN THIS LITIGATION.

Only Dr. Morrison's report addresses the key question of whether the 2011 congressional redistricting plan establishes a community of interest in CD6. Dr. Morrison concludes that the 2011 Congressional Plan "dismembered existing communities of interest" by "switch[ing] out" "small-town native-born Marylanders and replac[ing] them with outsiders."[28] But Dr. Morrison's 2011 declaration submitted on behalf on plaintiffs' in *Fletcher v. Lamone*, effectively proves, by the very criteria he deems sufficient, that adopted CD6 represents a community of interest. In his *Fletcher* declaration, Dr. Morrison opines that CD5 in plaintiffs' alternative plan represents a community of interest. As the enclosed map indicates, this district runs nearly the length of the state from Charles County in southern Maryland to Baltimore County in the north (see map below). He reaches this conclusion solely on the basis of alleged commuter flows along this long stretch of Maryland territory:

> "The counties between Baltimore and Washington D.C. comprise a regional corridor that is functionally integrated by regionwide transportation linkages facilitating extensive daily flows of commuting. The commuters between suburban residences and workplaces throughout this regional corridor constitute a natural community of interest defined by the common needs and the shared concerns of workers who reside within the vast commuter shed between Baltimore and

---

[26] Morrison Report at 1.
[27] *Milwaukee Branch of NAACP v. Walker*, 851 N.W.2d 262, 291 (2014) (holding circuit court did not err in finding that Dr. Morrison "did not 'possess sufficient training or experience to prepare or to offer reliable expert testimony as to election procedures generally nor, specifically the proportion of persons eligible to vote in Wisconsin who lack a Photo ID required by Act 23.'").
[28] Morrison Report at 9, 75.

Washington D.C. Plaintiffs' Proposed Congressional District # 5 *encompasses this natural community of shared interest*." [29]

In reaching an opposite conclusion regarding CD6 in Maryland's 2011 redistricting plan, Dr. Morrison does not analyze or even cite any of the factors that he examined in his *Fletcher v. Lamone* declaration. Conversely, in his *Fletcher* declaration regarding CD5, Dr. Morrison does not reference the cultural or educational institutions, media markets, newspapers, urban versus rural residence, socio-economic factors, foreign versus native birth, etc. that are the basis for his conclusions regarding CD6. Rather, in the *Fletcher* case, Dr. Morrison contended that patterns of transportation and commuting *are sufficient*, in and of themselves, to establish a congressional district as representing a community of interest.

According to Dr. Morrison's *sufficient standard* of transportation and commuting, CD6 represents far more of a community of interest than the CD5 that Dr. Morrison defends in his *Fletcher* declaration. The communities included in the adopted CD6 are united by the I-270 Corridor which establishes a community of interest as affirmed through a recent study by the Maryland State Department of Transportation, State Highway Administration:

"The I-270/US 15 Corridor serves local and long distance trips between the Washington, DC metropolitan area, central and western Maryland, and beyond. Known as the "Technology Corridor", this area is home to many high-tech industries and research facilities as well as commercial, cultural and recreational activities. … The I-270/US 15 Corridor is one of the most traveled north-south transportation corridors in Maryland. The Corridor provides an essential connection between the Washington, DC metropolitan area and central and western Maryland, and is critical from both a personal transport and goods transport perspective." [30]

---

[29] Dr. Peter Morrison Decl. and Rebuttal Report at 1, *Fletcher v. Lamone*, No. 11-3220, (D.Md. Dec. 16, 2011), ECF No. 49-3 (emphasis added).

[30] Maryland State Department of Transportation, State Highway Administration, "Purpose and Need," pp. I-2, 6, https://appsoads.maryland.gov/WebProjectLifeCycle/FR192_11/HTDOCS/Documents/Purpose_and_Need/Purpose%20and%20Need%20(from%20DEIS).pdf.



FLH-PAC
Maryland Districts Plan
July 17, 2011

The State Highway Administration study goes on to elaborate upon other critical connections along the I-270 Corridor that even extend into Allegany and Garrett counties:

"The Corridor also serves a major commuter population that works in the District of Columbia, southern Montgomery County, and Frederick County, and provides access to employment opportunities within the Corridor itself. The majority of these commuters travel from the City of Frederick or upper Montgomery County into central and lower Montgomery County (i.e. Bethesda, Rockville, and Gaithersburg) and Washington, DC. In addition, the Corridor provides the primary travel path from the population centers of the Washington metropolitan area to recreational sites located in western Maryland and to historic resources within/near the project area, such as the Monocacy National Battlefield and the C&O Canal National Historical Park."[31]

Consistent with this analysis, the Maryland State Suburban Alliance has termed the I-270 Corridor "the state's number-one job-creation corridor."[32]

In his *Fletcher* Declaration, Dr. Morrison cites no such studies in support of his contention that there is a transportation corridor comparable to I-270 that links together Charles, Prince George's, Howard, and Baltimore Counties in the *Fletcher* plaintiffs' CD5. He relies solely on his own construction of commuter flow data, which draws on out-of-date information from 2000 and 2003.

Analysis of commuter flow data additionally demonstrates that the commuting linkages existing in CD6 are substantially stronger than those Dr. Morrison found to establish a community of interest in the *Fletcher* plaintiffs' proposed CD5. Table 4 below reports the location of jobs, and corresponding commuter flow, from the District of Columbia northwest through the counties included in CD6 in the 2011 congressional plan. It compares these results to the corresponding commuter flow data from Baltimore City south through the counties included in the proposed CD5 defended by Dr. Morrison in his *Fletcher* declaration. As indicated in Table 4, CD6 establishes a much more united community of interest by Dr. Morrison's standard than did the CD5 analyzed in his *Fletcher* declaration. Only 16.4 percent of jobs are outside the commuting region of DC through counties of CD6, compared to a *more than double* 35.3 percent for the commuting regions from Baltimore City through the counties included in the *Fletcher* plaintiffs' CD5.  In other words, people living in CD6 spend more of their time and work life in the same area, and, to the extent Dr. Morrison has previously indicated that such patterns establish a community of interest, the residents of CD6 exhibit this characteristic more strongly than the district he analyzed in *Fletcher*.

---

[31] *Ibid*. at I-7.

[32] Suburban Maryland Transportation Alliance, "I-270," http://www.mdtransportation.org/category/i-270-corridor/.

**TABLE 4**
**LOCATION OF JOBS, CD6 IN ADOPTED 2011 CONGRESSIONAL PLAN**
**COMPARED TO CD5 IN DR. MORRISON'S *FLETCHER* DECLARATION**

| ADOPTED MARYLAND CONGRESSIONAL PLAN CD6 LOCATION OF JOBS FOR COUNTY RESIDENTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County | Mont. | Frederick | Wash. | DC | Alleg. | Garrett | Other | % Other |
| Montgomery | 298,590 | 4,854 | 299 | 107,123 | 33 | 3 | 91,406 | **18.2%** |
| Frederick | 26,131 | 68,885 | 1,968 | 4,088 | 9 | 0 | 18,381 | **15.4%** |
| Washington | 3,462 | 10,848 | 48,261 | 788 | 132 | 0 | 6,350 | **9.1%** |
| Allegany | 290 | 109 | 588 | 35 | 25,541 | 544 | 3,198 | **10.6%** |
| Garrett | 45 | 47 | 78 | 13 | 1,714 | 10,856 | 1,342 | **9.5%** |
| | | | | | | | | |
| | | | | | | | | |
| **ALL COUNTIES** | 328,518 | 84,743 | 51,194 | 112,047 | 27,429 | 11,403 | 120,677 | **16.4%.** |
| PROPOSED PLAINTIFFS' PLAN, *FLETCHER V. LAMONE*, CD5 LOCATION OF JOBS FOR COUNTY RESIDENTS | | | | | | | | |
| County | Charles | Prince George's | Howard | Balt. | | Balt. City | Other | % Other |
| Charles | 27,746 | 14,641 | 457 | 168 | | 315 | 31,081 | **41.8%** |
| Prince George's | 3,936 | 175,443 | 8,812 | 2,912 | | 6,700 | 245,160 | **55.3%** |
| Howard | 62 | 13,652 | 58,824 | 11,922 | | 15,907 | 47,142 | **32.0%** |
| Baltimore | 72 | 5,201 | 23,385 | 203,234 | | 117,027 | 54,042 | **13.4%** |
| | | | | | | | | |
| **MEAN % OTHER** | 31,816 | 208,937 | 91,478 | 218,236 | | 139,949 | 377,425 | **35.3%** |
| | | | | | | | | |
| Source: 2010 American Community Survey, 5-Year Estimates | | | | | | | | |

**TABLE 5**
**LOCATION OF JOBS, CD6 IN ADOPTED 2011 CONGRESSIONAL PLAN**
**COMPARED TO CD5 IN DR. MORRISON'S *FLETCHER* DECLARATION**

| ADOPTED MARYLAND CONGRESSIONAL PLAN CD6 LOCATION OF JOBS OUTSIDE COUNTY OF RESIDENCE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County | Mont. | Frederick | Wash. | DC | Alleg. | Garrett | Other | % Other |
| Montgomery | | 4,854 | 299 | 107,123 | 33 | 3 | 91,406 | **44.9%** |
| Frederick | 26,131 | | 1,968 | 4,088 | 9 | 0 | 18,381 | **36.3%** |
| Washington | 3,462 | 10,848 | | 788 | 132 | 0 | 6,350 | **29.6%** |
| Allegany | 290 | 109 | 588 | 35 | | 544 | 3,198 | **67.3%** |
| Garrett | 45 | 47 | 78 | 13 | 1,714 | | 1,342 | **41.4%** |
| **ALL COUNTIES** | 29,928 | 15,858 | 2,933 | 112,047 | 1,888 | 547 | 120,667 | **42.5%** |

| PROPOSED PLAINTIFFS' PLAN, *FLETCHER V. LAMONE*, CD5 LOCATION OF JOBS OUTSIDE COUNTY OF RESIDENCE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County | Charles | Prince George's | Howard | Balt. | | Balt. City | Other | % Other |
| Charles | | 14,641 | 457 | 168 | | 315 | 31,081 | **66.6%** |
| Prince George's | 3,936 | | 8,812 | 2,912 | | 6,700 | 245,160 | **91.6%** |
| Howard | 62 | 13,652 | | 11,922 | | 15,907 | 47,142 | **53.2%** |
| Baltimore | 72 | 5,201 | 23,385 | | | 117,027 | 54,042 | **27.5%** |
| **MEAN % OTHER** | 4,070 | 33,494 | 32,654 | 15,002 | | 139,949 | 377,425 | **62.6%** |
| Source: 2010 American Community Survey, 5-Year Estimates | | | | | | | | |

Table 5 provides an additional level of analysis that looks only at jobs outside the county of residence. The results reported in Table 5 indicate that for CD6 a minority of 42.5 percent of non-residential jobs are outside of CD6 and DC, whereas for the *Fletcher* plaintiffs' CD5, a majority of 62.6 percent of non-residential jobs are outside the counties of CD5 and Baltimore City. More residents of CD6 live and work in the same area as each other.

Montgomery County and DC are also connected to western Maryland not just through roadways, but also through the MARC rail line that runs from DC to Martinsburg, West Virginia as indicated in the map below. The map also indicates that there is no comparable rail line that runs from Charles County through Howard County to Baltimore County and Baltimore City.

Dr. Morrison's attack on the idea of the I-270 counties comprising a community of interest is based in part on his assertion that the relevant measure is the number of each county's residents who commute to Washington, D.C. But as the state study cited above makes clear, the I-270 corridor significantly encompasses jobs and commuter flows within the Maryland counties, not just between these counties and DC. For example, Dr. Morrison's Table 2 on page 65 of his report indicates that only 3.4 percent of Frederick County workers hold jobs in DC. However, the Table fails to report that 26,131 Frederick County workers (21.9 percent) hold jobs in Montgomery County. Moreover, in his *Fletcher* Declaration, Dr. Morrison himself focused primarily on commuting within Maryland counties included in CD5, not on commuting into Baltimore City.

Dr. Morrison also claims that the creation of an I-270 based district was not a consideration at the time of the 2011 redistricting. He relies, however, not on contemporaneous evidence but on the post-hoc testimony some six years later from the depositions of Mr. Hawkins and Robert J. Garagiola. Dr. Morrison fails to note that at the time of the redistricting, then State Senator Garagiola said, "I think there's a lot more in common with northern and western Montgomery County and Frederick County and Washington County and even further west than there is with Harford or Baltimore County."[33]

In fact, the concept of a community of interest established by linkages through the I-270 corridor was a main point of emphasis in the presentation to the General Assembly made by the Governor's Advisory Redistricting Commission (GRAC) during the redistricting process.[34] Many citizens testifying in the public hearings held by GRAC in Frederick and Shady Grove in Montgomery County stressed the community of interest along the I-270 corridor. Witnesses also noted that the proposed north/south configuration of CD6 into Montgomery County established more of a community of interest than the previous configuration that included Baltimore, Carroll, Harford counties. The following are examples from the public hearing.

---

[33] Heather Keels, "Proposed Congressional Redistricting Plan Has Local Republicans Crying Foul," *Herald-Mail.Com*, October 8, 2011, http://articles.herald-mail.com/2011-10-08/news/30259492_1_congressional-districts-state-legislative-districts-special-session.
[34] *GRAC*, "Recommended Congressional Plan," http://www.washingtonpost.com/wp-srv/politics/documents/redistricting_advisory_committee_100411.pdf.

## MARYLAND AREA REGIONAL COMMUTER SERVICE*



- Source, *Legislative Handbook, Volume II, Government Services in Maryland*, p. 142, http://dls.state.md.us/data/polanasubare/polanasubare_natresenvntra/Volume-II-Chapter-9.pdfp..

- **Testimony of Bob Kresslein:**

I'd like to see you consider a couple of different factors.  One is, sort of the communities of interest we have – Senator Brinkley indicated -- you know -- if you look at Carroll County and west, we have a lot of similarity, but I would also posit that if you go south and east, you're going to find a lot of things in common. If you look at historically, upper Montgomery County, look toward Frederick, for many, many years that area has picked up quite a lot of population. And if you look at transportation patterns, you'll see that -- you know - -70 and 270 combined right here in Frederick County. And if you're on that road every day going to work you know there's an awful lot of people from Washington County, even into Pennsylvania and West Virginia and Virginia that get on that road and go on into Montgomery County to work or into Washington, D.C. metropolitan area.[35]

- **Testimony of Dan Rupli:**

There is no community of interest between Harford County and Garrett County. There is very little community of interest between Allegany and Carroll. … There is no community of interest either in -- or a shared media that reaches the district. We're a kind of patchwork, and I would like very much to see the district go into northern Montgomery County.[36]

- **Testimony of Don DeArmon (Former Democratic Nominee State Senate D3):**

So my sense is, having campaigned in those areas, that when you start there, that Carroll, and certainly, Baltimore and Harford Counties, their orientation is much more toward a Baltimore County or a Baltimore City direction. And Frederick is increasingly, and it's – as Bob Kresslein pointed out, we're heading southeast, and our orientation is toward Montgomery County.[37]

- **Testimony of Myrna Whitworth (Democratic Chair Frederick County):**

I also understand that you and this commission are looking at two factors, diversity and national natural and political boundaries or – and I strongly believe that if you look at those, you will find that our current configuration, as others here today have indicated, makes little sense. Historic – right now, Frederick is the gateway to Western Maryland. It's the largest population center, and among Frederick County residents are those people from Urbana, who very much look south. Frederick County, many of the people here look south, go down the 270 corridor and have businesses and jobs in the Greater Washington Metropolitan area. And so, to look at Frederick and west, as well as to look at Frederick south, gives a much more natural boundary to what the Sixth Congressional District should look like.[38]

---

[35] GRAC, Public Hearing Tr. at MCM000021-22.
[36] *Ibid*. at MCM000026-27.
[37] *Id*. at 31.
[38] *Id*. at MCM000032-33.

- **Testimony of Andrew Duck (Former Democratic nominee CD6):**

Frederick and Washington counties have really become part of the Washington suburbs, and I think as such, the community of interest makes it more relevant for them to be lumped with Montgomery County than with people from Harford or Baltimore County. So I think, both in terms of making it viable for someone to reach the voters, and in terms of better representing the population, it would make more sense to re-orient the district to include more of Montgomery County and less and none of Harford and Baltimore and less of Carroll, as you put those communities in with the Baltimore County area that they are naturally a part of.[39]

- **Testimony of Retired Democratic Delegate Sue Hecht:**

It's my experience that Frederick County and the greater Hagerstown area, especially along the I-270 corridor, increasingly identifies itself with the exurbia of the Washington D.C., not Baltimore City and its suburbs.  Even though Frederick is in the enviable position of sitting 50 miles as an apex of both Washington and Baltimore City triangle, the more new Western Maryland residents maintain close ties with Montgomery County and D.C. area, not as much with the Baltimore. … We've heard about the thousands of commuters that come down I-270 and Route 15, coming through Frederick. They're most of the majority -- vast majority of those folks are going to jobs in the Washington Metropolitan Area, not Baltimore.  We've heard about our mass transit links that go to Washington through the [MARC], not Baltimore. Frederick is part of the Greater Washington initiative and an affiliate of the Greater Washington Board of Trade. …
We are not included in the similar Greater Baltimore initiative. … Frederick is part of WASHCOG, or the Washington Council of Government.[40]

- **Testimony of Elizabeth Paul (Democratic Chair, Washington County):**

[Y]ou all heard that Montgomery County is part of our district and historically that region has had close ties to the Frederick area, as well as the western counties up here, and certainly more so than upper Baltimore and Harford County which were added in 2002.

Residents of the more populated parts of the sixth district are more aligned with Washington, D.C. suburbs by transportation routes such as I-270 and the MARC Commuter Trains, by employment in the D.C. Metro area and Northern Montgomery County as opposed to Baltimore suburbs or Harford County.[41]

---

[39] *Id*. at MCM000037-38.
[40] *Id*. at MCM000050-51.
[41] *Id*. at MCM000071-72.

The final testimony that I present is from Steve Shapiro. This testimony is particularly significant because Mr. Shapiro was an original plaintiff in this litigation, although he has since withdrawn.

- **Testimony of Steve Shapiro:**

Ideally, Montgomery County, with its fairly large population, would have one district entirely within its borders and share about one half of a district with an adjoining part of the state. A reasonable option to do this would be to maybe take the western third of Montgomery County and pair it with Western Maryland, which, based on history and geography, would be a reasonable situation and one that existed several decades ago. Keeping the Montgomery section about equal in size to the Western Maryland section I think would keep it from being overly dominated by the Montgomery section and, thus, would be fair to the Western Maryland residents, as well as to the Montgomery County residents.[42]

The idea of a district representing the growing communities along the I-270 corridor was also discussed in the press at the time of the redistricting process, which culminated in the 2012 referendum on the congressional plan. "'Congressional Districts 6 and 8 are drawn to reflect the North-South connections between Montgomery County, the I-270 Corridor, and western portions of the State,' the plan outline says," reported the *Herald Mail*.[43] "Maryland's congressional districts are being redrawn to conform with population changes in the 2010 census. Supporters of the changes say the new map reflects a demographic shift along the Interstate 270 corridor," reported the Associated Press.[44] "The MARC's Brunswick line, which runs from Washington's Union Station to Martinsburg, W.Va., has seen a 34 percent increase in train ridership in the past decade, and there are roughly 10,000 more cars per day on Interstate 270 than 10 years ago. Nowhere is the growth more apparent than in the rolling developments in Urbana, the first exit off I-270 in Frederick County," reported the *Baltimore Sun*.[45]

Irrespective of whether they reviewed statistical data, members of the Maryland legislature, like the citizens who testified in the public hearings, were familiar with the I-270 corridor and the role it played for commuting, jobs, and culture in the state. For example, Senate President Mike Miller, arguably the most influential member of the General Assembly, was asked in deposition if he had reviewed "any data concerning commuting patterns on I-270 before you voted on the proposed congressional map in 2011?"[46] Miller responded that "I drive it every second week or so. I spoke to the people in Frederick last week. … Plus I'm familiar with economic development part of the state. My job is to bring jobs to the state and improve economic development, and I-

---

[42] *Id.* at MCM000217.

[43] Heather Keels, "Proposed Congressional Redistricting Plan Has Local Republicans Crying Foul," *Herald Mail*, October 8, 2011, http://articles.herald-mail.com/2011-10-08/news/30259492_1_congressional-districts-state-legislative-districts-special-session.

[44] Brian Witte, "O'Malley Releases Congressional Redistricting Plan," Associated Press, October 11, 2011, available at, e.g. http://baltimore.cbslocal.com/2011/10/15/aide-omalley-redistricting-map-set-for-release/.

[45] Bret Lake, "Congressional Redistricting: Democrats Eyeing Western Maryland," *Baltimore Sun*, August 6, 2011, http://www.baltimoresun.com/news/maryland/.

[46] Miller Depo. Tr. at 19:11-13.

270 is very important to link areas that need economic development within the Washington Metropolitan Area."[47]

## VII.   THE MORRISON REPORT SUFFERS FROM SERIOUS ERRORS OF SELECTION AND INTERPRETATION.

The one-sided and erroneous approach to the evidence that Dr. Morrison uses in his report for this litigation further reflects its confirmation bias as well as a lack of essential knowledge of Maryland circumstances. The following are examples of such issues:

1)      **Frostburg State University**. Dr. Morrison cites this University in Allegany County to claim that "western Maryland has its own institutions of higher learning." He fails to recognize that Frostburg is a cosmopolitan institution that draws students from across the state of Maryland, from out of state, and even from other countries, as indicated in Table 6.

**2)      The Maryland Symphony Orchestra**. Morrison cites this orchestra located in Hagerstown, Maryland in Washington County as another example of the distinction between Western Maryland and the Washington suburbs. He cites no evidence in support of his claim that the orchestra has an audience primarily from Western Maryland and the claim is refuted by the Orchestra itself. According to the Orchestra's website: "It is one of only four professional symphony orchestras in Maryland and audience members from South Central Pennsylvania, West Virginia's Eastern Panhandle, the Shenandoah Valley of Virginia and *the Baltimore-Washington Metropolitan area* are drawn to concerts held at the historic Maryland Theatre in downtown Hagerstown."[48]

**3)      Local Television**. While Dr. Morrison admits that "some Western Maryland residents can view local affiliates from Washington, D. C. or Baltimore," he goes on to state that there are also local stations in Hagerstown.[49] However, he fails to note that Frederick and Garrett counties also have local TV stations WFPT TV in Frederick and WGPT TV in Oakland. He incorrectly identifies WWPX as located in Hagerstown, when it is actually located in Martinsburg, West Virginia. The station's website notes that "a sale to Benchmark Communications (which would have converted the station to a CBS affiliate for Winchester, Virginia and Hagerstown, Maryland under the WUSQ-TV callsign) fell through."[50]

---

[47] Miller Depo. Tr. at 19:14-22.

[48] Maryland Symphony Orchestra, "About the MSO," http://www.marylandsymphony.org/about-mso (emphasis added).

[49] Morrison Report at 8 n.6.

[50] *WWPX-TV*, https://www.revolvy.com/topic/WWPX&item_type=topic.

**TABLE 6**
**GEOGRAPHIC DISTRIBUTION OF STUDENTS AT FROSTBURG STATE**
**UNIVERSITY**

| County | Number | Percent |
|---|---|---|
|  |  |  |
| Allegany County | 919 | 17.0% |
| Garrett County | 192 | 3.5% |
| Washington County | 375 | 6.9% |
| Frederick County | 360 | 6.7% |
| Carroll County | 146 | 2.7% |
| Montgomery County | 461 | 8.5% |
| Prince George's County | 581 | 10.7% |
| Baltimore County | 360 | 6.7% |
| Baltimore City | 209 | 3.9% |
| Anne Arundel County | 258 | 4.8% |
| Other Maryland Counties | 882 | 16.3% |
| Out-of-State | 551 | 10.2% |
| Foreign | 116 | 2.1% |
|  |  |  |
| **TOTAL** | **5,410** |  |
|  |  |  |
| Source: "Enrollment Geography, Fall 2013," received from Maryland Higher Education Commission, 2 June 2015. | | |

24

**4)      Local Newspapers**. Dr. Morrison again admits that "individuals in western Maryland subscribe to *The Washington Post* and *Baltimore Sun*."[51]   He goes on to state that  "western Maryland has its own daily newspapers," citing *The Herald-Mail* in Hagerstown.[52]  Frederick, however, also has its own local newspaper, the *Frederick News-Post*; as does Allegany County, the *Cumberland Times-News*; and Garrett County, *The Republican* in Oakland. Thus, the local press actually divides rather than unites the counties associated with western Maryland.

**5)      Common Media Market**: In examining media, Dr. Morrison fails to take into account the testimony of several witnesses at the public hearings who stated that western Maryland and Montgomery County share a common greater-Washington, DC media market, whereas Carroll, Harford, and Baltimore counties are oriented to the greater-Baltimore media market.  For example, Elizabeth Paul, Chair of the Washington County Democratic Central Committee testified that, "We are linked by media outlets including print and television. For example, many more people subscribe to the Washington Post than the Baltimore Sun in this area. The TV markets include us in the Greater D.C. Metro area and not Baltimore, unlike Carroll, upper Baltimore and Harford."[53] Similarly, Bob Kresslein a resident of Frederick County testified that, "Those of us here in Frederick County and west primarily in our media [*sic*] from Washington, D.C. market, if you look --- where, if you've got a satellite T.V., you're pretty much getting channels 4, 9, and 7. That's what you're going to get your local news. Many more people get the Washington Post than the Baltimore Sun."[54]

Data on media markets in Maryland confirms this testimony. According to the advertising company, Truck Ads, the Washington media market includes the counties of Montgomery, Frederick, Washington, and Allegany, encompassing every county within the 2011 CD6, except for the thinly populated Garrett County. Echo Star Knowledge Base, designates these same counties as part of the Washington, DC TV Market, but not the counties of Carroll, Harford, and Baltimore, which it designates as part of the Baltimore TV market.[55]

**6)      The Secession Movement**. Dr. Morrison devotes two pages to describing a secession movement in western Maryland as indicative of the distinctiveness of the area of the state. Yet Dr. Morrison never demonstrates that this movement represents anything more than a small number of extremists who do not represent the people of western Maryland. According to the CBS News story that Dr. Morrison cites in his report, "more than a thousand have signed petitions" for secession. That number amounts to less than one-sixth of one percent of the total population of the five counties involved, which are home to more than 660,000 people.[56]

**7)      The Referendum Vote on the 2011 Congressional Redistricting Plan**. Dr. Morrison discusses the miniscule secession movement for two pages of his report, but ignores the fact that the voters of the counties in CD6 had an opportunity to vote up or down on Maryland's 2011

---

[51] Morrison Report at 8 n.7.

[52] *Ibid.*

[53] GRAC, Public Hearing Tr. at MCM000072-73

[54] GRAC, Public Hearing Tr. at MCM000023.

[55]  Truck Ads, "Designated Market Map," http://www.truckads.com/Designated_Market/Washington_DC.htm#map; Echo Star Knowledge Base, "TV Markets," http://www.dishuser.com/TVMarkets/.

[56] Mary Bubula, "Some Western Md. Residents Want to Form Their Own State," *CBS Baltimore*, February 10, 2014, http://baltimore.cbslocal.com/2014/02/10/some-western-md-residents-want-to-form-their-own-state/.

congressional redistricting plan, which opponents petitioned for referendum in the general election of 2012. As indicated in Table 7, voters in 4 of the 5 counties included in CD6 voted in favor of the adopted congressional plan. Voters rejected the plan only in Garrett County, which cast just 11,616 votes in the referendum election and rejected the plan by just 770 votes. Voters in the other western Maryland counties of Allegany, Washington, and Frederick voted in favor of the plan.

It is most unusual for a state's redistricting plan to be tested by a vote of the people in a referendum. This vote cuts to the heart of plaintiffs' claim that the legislature sought to retaliate against the people of western Maryland in crafting Congressional District 6. If the voters in western Maryland believed that the legislature had retailed against them, the referendum gave the voters in the opportunity to express their displeasure directly and concretely. *They could have voted down the plan.  They did not.* Only the very lightly populated Garrett County voted against it, by a small margin. Because of its low population, in any possibly configured congressional district, Garrett County was to be at the mercy of the other counties in congressional elections.

**8)     The Rural Composition of Prior CD6**. The Morrison Report as well as the McDonald Report characterizes the prior CD6 as comprising counties that are largely rural in their demography. However, as indicated in Table 8, according to "objective" U.S. Census classifications, these counties were predominantly urban, not rural. The only exception is the very lightly populated Garrett County. It is true that these counties do not contain any major cities like Baltimore, but neither does Montgomery County.

As these examples indicate, Dr. Morrison's analysis is not "objective," but is guided by his own assumptions about what counts demographically for people as a community of interest and how to interpret the information that he does present. Dr. McDonald has criticized such a subjective approach to using demographic data for defining communities of interest, explaining that "'identifying' neighborhoods using demographic data . . .*requires making assumptions about what demographic characteristics are most relevant to community*."[57] Dr. McDonald instead advocates the inference of "neighborhoods and communities from common patterns of activity and/or shared activities," through data collection that would "identify travel patterns[ and] land usage patterns." An analysis of travel patterns is provided in Section VI of this report above.[58]

---

[57] Altman & McDonald, "Redistricting Principles for the 21st Century" at 1196 (emphasis added).
[58] *Ibid.* at 1195-96.

**TABLE 7**
**RESULTS OF 2012 REFERENDUM ON ADOPTED CONGRESSIONAL**
**REDISTRICTING PLAN, 4 COUNTIES IN CD6**

| County | Number For Plan | Number Against Plan | Percent For Plan |
|---|---|---|---|
| | | | |
| Allegany County | 13,250 | 12,671 | **51.1%** |
| | | | |
| Garrett County | 5,423 | 6,193 | **46.7%** |
| | | | |
| Washington County | 28,414 | 27,776 | **50.7%** |
| | | | |
| Frederick County | 59,538 | 45,863 | **56.5%** |
| | | | |
| Montgomery County | 261,122 | 139,546 | **65.2%** |
| Source: Maryland State Board of Elections, "Congressional Districting Plan, November 2012, http://www.elections.state.md.us/elections/2012/results/general/gen_detail_qresults_2012_4_0 005S-.html. | | | |

27

**TABLE 8**
**URBAN PERCENTAGE OF POPULATION IN COUNTIES IN CD6 UNDER MARYLAND'S 2001 CONGRESSIONAL PLAN**

| County | Total Population | Urban Population | Percent Urban |
|---|---|---|---|
|  |  |  |  |
| Allegany County | 75,087 | 54,624 | 72.7% |
| Garrett County | 30,097 | 4,846 | 16.1% |
| Washington County | 147,430 | 103,953 | 70.3% |
| Frederick County | 233,385 | 174,554 | 74.8% |
| Carroll County | 167,134 | 101,106 | 60.5% |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTAL** | **653,133** | **434,078** | **66.5%** |
|  |  |  |  |
| U.S. Census, 2010, URBAN AND RURAL Universe: Total population, 2010 Census Summary File 1. | | | |

## VIII. THE MORRISON REPORT IS BASED ON A FUNDAMENTAL MISUNDERSTANDING BETWEEN THE SOCIO-ECONOMIC CHARACTERISTICS OF CONSTITUENTS AND REPRESENTATION

Both Dr. Morrison and Dr. McDonald claim that major differences between Montgomery County and the four more western counties in adopted 2011 CD6 are socio-economic. A series of tables that Dr. Morrison highlights in his report show that residents in western Maryland have relatively high poverty and unemployment rates, and low incomes and levels of educational attainment. As shown in Dr. Morrison's tables, the residents are also heavily dependent on welfare assistance programs such as food stamps and Medicaid. But Dr. Morrison's analysis stops here. He does not analyze whether grouping such commonalities translate into effective representation for persons sharing these socio-economic disadvantages.

Tables 9 to 11 below examine key votes by Roscoe Bartlett, the representative from the prior CD6, on education, welfare, employment, and poverty issues that affect the lives of persons who share the socio-economic characteristics of western Maryland. The results reported in these Tables demonstrate that Representative Bartlett voted no on the key programs that would benefit persons of lower socio-economic standing. Representative Bartlett's no votes cannot be explained by party affiliation given that in most of these votes Bartlett was out of line with the great majority of voters in the House of Representatives.[59]

---

[59] The source of key votes is VoteSmart, Roscoe Bartlett's Voting Records, https://votesmart.org/candidate/key-votes/26891/roscoe-bartlett#.WQk1DRPyvIU.

The point is that economic statistics do not speak for themselves in identifying "communities of interest." The voters of former CD6 continued to elect Roscoe Bartlett regardless of the record I note below, and I am not criticizing that choice in any way. However, it is further evidence that communities may not coalesce or identify *themselves* based on certain commonalities that a demographer could point to as "objective demographic fact." Instead, any such socio-economic statistics must be analyzed and interpreted with respect to what they mean politically for disadvantaged communities in a congressional district.

## TABLE 9
## KEY VOTES ON EDUCATION, REPRESENTATIVE BARTLETT

| Bill | Central Provisions | Bartlett | House Vote |
|------|--------------------|----------|------------|
|      |                    |          |            |
| Student Loan Lenders & Grants 2007 HR2699 | Increases Pell Grants and lowers interest rates on student loans, allows 180-day loan deferment for veterans. | No | 292Y 97N |
|      |                    |          |            |
| Reverse the Raid on Student Aid 2007 H Amend 772 | Reduces student loan interest rates. Appropriations funds for graduate education of low income and Hispanic students. | No | 199Y 220N |
|      |                    |          |            |
| Higher Education Amendments of 2008 HR4137 | Expands & increases value of Pell Grants for low income students. Requires publication of college costs. | No | 380Y 49N |
|      |                    |          |            |
| National Volunteer Program Expansion 2009 HR 1388 | Expands opportunities for student service, especially disadvantaged youth, and expands Americorps teacher program. | No | 321Y 105N |
|      |                    |          |            |

**TABLE 10**
**KEY VOTES ON HEALTH, REPRESENTATIVE BARTLETT**

| Bill | Central Provisions | Bartlett | House Vote |
|---|---|---|---|
| Extension of Funding for Transitional Medical Assistance and Abstinence Education 2007 S1701 | Extends Medicaid coverage for families with increased earnings up to 185 percent above poverty level, continues abstinence education. | No | 291Y 126N |
| | | | |
| State Children's Health Insurance Program (CHIP) Reauthorization 2007 HR 976 | Appropriations for the Children's Health Insurance (CHIP) program. | No | 265Y 159N |
| | | | |
| Medicare Bill 2008 HR 6331 | Expands Medicare benefits, especially for low-income seniors. | No | 355Y 59N |
| | | | |
| Medicaid Extensions & Changes 2008 HR 5613 | Prevents certain Medicaid regulations from being changed until April 1, 2009, including regulations for the Children's Health Insurance Program, graduate medical education, optional case management services, outpatient hospital services, and provider taxes. | No | 349Y 62N |
| | | | |
| Children's Health Insurance Program Reauthorization and Expansion 2009 HR 2 | Expands coverage of CHIP program. Prohibits aid to undocumented immigrants. Raises cigarette tax for funding. | No | 289Y 139N |
| | | | |

**TABLE 11**
**KEY VOTES ON UNEMPLOYMENT AND PUBLIC ASSISTANCE,**
**REPRESENTATIVE BARTLETT**

| Bill | Central Provisions | Bartlett | House Vote |
|------|--------------------|----------|------------|
| Section 8 Voucher Adjustments Act 2007 HR 1851 | Improves access to housing assistance for low income families. | No | 333Y 83N |
| Farm, Nutrition, & Energy Act 2007 HR 2419 | Increases spending on certain forms of agricultural assistance, extends selected agricultural assistance programs until 2012, provides funding for the purchase of certain foods for domestic nutrition programs, lowers income tax credits for ethanol producers, | No | 231Y 191N |
| Emergency Extended Unemployment Compensation Act 2008 HR 5749 | Allows states to enter into an agreement with the federal government to extend unemployment compensation for individuals who have already received the maximum regular compensation under state law. | No | 274Y 137N |
| Medicaid Extensions & Changes 2008 HR 5613 | Prevents certain Medicaid regulations from being changed until April 1, 2009, including regulations for the Children's Health Insurance Program, graduate medical education, optional case management services, outpatient hospital services, and provider taxes. | No | 349Y 62N |
| Unemployment Benefits Extension 2010 HR 4851 | Extends unemployment benefits. | No | 289Y 112N |

31

IX.    THE  RELIANCE  ON  VOTE  DILUTION  ANALYSIS  UNDER  THE
       VOTING RIGHTS ACT IN DR. MCDONALD'S REPORT IS MISPLACED

      In his report, Dr. McDonald purports to apply standard vote dilution analysis under the
Voting  Rights  Act  to  analyze  alleged  partisan  gerrymandering  in  CD6,  identifying  his
methodology as "[t]he approach typically used in voting rights litigation."[60] There are several
problems with this approach. Dr. McDonald never explains why standards developed for protected
minority groups under the Voting Rights Acts should be applied to political partisans. Unlike racial
groups, there is no reliable way to identify partisan groups. Party registration or identification is a
highly imperfect form of identification because party registration does not assure voting for the
party in any given election. For example, Dr. McDonald's own survey data presented on page 8 of
his report indicated that only 69 percent of self-identified Democrats indicated an intent to vote
for Democratic candidate John Delaney in the 2012 congressional election in CD6 and only 64
percent of self-identified Republicans indicated an intent to vote for Republican candidate Roscoe
Bartlett. Moreover, as of the general election of 2016, 23 percent of registered voters in CD6 were
not registered as either Democrats or Republicans.[61] Dr. McDonald's survey data indicates no clear
party preference in voting for this group. Their political partisan loyalties regarding Maryland's
two major parties defy any clear definition.

      Unlike racial identifications, people change their party affiliations. A study by the Pew
Research  Center  found  that  identification  as  an  independent  serves  as  a  transition  for  people
moving in and out of identification as Republicans or Democrats. "The recent changes in partisan
identification," the study found, "serve as a reminder that affiliation with a party is an attitude, one
which can and does change. Previous research has shown that few people switch immediately from
Republican to Democratic identification or vice versa. Most of the movement is from independents
who assume a party label or from partisans who no longer identify with their former party." The
study  found  that  72  percent  of  independents  had  at  one  time  identified  as  a  Democrat  or
Republican, or both.[62]

Even more unstable than changes in party identification are shifts in party voting, which can
change according to the issues and personalities presented by given elections. Consider, for
example, voters in Washington County, which was entirely contained within CD6 both in the 2001
and  the  2011  redistricting  plans.  As  indicated  in  Table  12  political  loyalties  in  congressional
elections in Washington County shifted from the presidential election year of 2008 to the
presidential  election  year  of  2012.  In  2008,  the  Republican  congressional  candidate  Roscoe
Bartlett prevailed in Washington County with 57.1 percent of the two-party vote, whereas in 2012,
Bartlett  lost  Washington  County  with  49.3  percent  of  the  two-party  vote.  Both  years  were
presidential  election  years,  with  the  same  Democratic  candidate  on  the  ticket.    So,  should

---

[60] McDonald Report at 3.

[61] *Ibid.* at 3, 8; Maryland State Board of Elections, "Turnout by Party and Congressional District, 2016,"
http://www.elections.state.md.us/elections/2016/turnout/general/Official%20by%20Party%20and%20Congressional
.pdf.

[62] Pew Research Center, "Trends in Party Affiliation," September 23, 2010, http://www.people-
press.org/2010/09/23/section-3-trends-in-party-affiliation/.

Washington County be considered a Democratic or a Republican County? Its racial composition can be objectively determined through Census data, but not its partisan composition.

### TABLE 12
### PARTISAN VOTING IN WASHINGTON COUNTY, CONGRESSIONAL ELECTIONS OF 2008 AND 2012

| Election | Vote For Democratic Candidate | Vote For Republican Candidate | Percent Republican |
|---|---|---|---|
| | | | |
| 2012 | 29,381 | 28,565 | **49.3%** |
| | | | |
| 2008 | 24,277 | 32,278 | **57.1%** |
| | | | |
| Source: Maryland State Board of Election, 2008 and 2012 General Elections, http://elections.state.md.us/elections/2008/results/general/gen_detail_results_2008_4_BOT008 06.html; http://elections.state.md.us/elections/2012/results/general/gen_detail_results_2012_4_BOT008 06.html. | | | |

In addition, Dr. McDonald's analysis omits a crucial component of voting rights analysis, an examination of the totality of circumstances facing the protected racial group. A voting rights analysis considers whether, under the "totality of circumstances," an electoral system interacts with social and historical conditions to cause an inequality in the political process. The United States Department of Justice, in explaining how litigation is conducted under the Voting Rights Act, highlights the consideration of the "totality of circumstances" as follows:

"In 1982, Congress extended certain provisions of the Act such as Section 5 that were set to expire, and added protections for voters who required assistance in voting. At the same time, it examined the history of litigation under Section 2 since 1965 and concluded that Section 2 should be amended to provide that a plaintiff could establish a violation of the section if the evidence established that, in the context of the "totality of the circumstance of the local electoral process," the standard, practice, or procedure being challenged had the result of denying a racial or language minority an equal opportunity to participate in the political process."[63]

---

[63] United States Department of Justice, Section 2 of the Voting Rights Act, https://www.justice.gov/crt/section-2-voting-rights-act.

In his *Backus* deposition, Dr. McDonald recognized that examination of the totality of the circumstances is an essential component of the "typical" voting rights analysis:

> "Well, Section 2, in the terms of the effect prong of Gingles, is that there have to be three conditions present in order to require the drawing of an effective minority district. One, that there must be a presence of racially polarized voting. One, that it's possible to draw the district in a compact manner. And thirdly, what's known as the totality of the circumstances. It's a number of other factors outside the electoral system. Essentially, they're about the past history of discrimination within the jurisdiction."[64]

While Dr. McDonald asserts that his analysis in this litigation is based in the typical voting rights analysis, he provides no such totality analysis in his current report. He has not demonstrated that Maryland has a history of officially discriminating against Republicans or whether as a result of any alleged discrimination Republicans suffer disadvantages relative to Democrats in socio-economic conditions such as income, poverty, education, housing, and health.

Without scrutiny of the totality of circumstances, Dr. McDonald's standard would lead to a violation whenever the ability of a partisan group (however defined) "to elect a candidate of their choice was diminished by district lines that had an effect of diluting their vote." By that standard, unless all district lines are frozen in place with respect to their partisan leanings, virtually every redistricting plan would exhibit vote dilution.

Consider, for example, the case of the swing state of Pennsylvania. Barack Obama won Pennsylvania with 52.7 percent of the two-party vote in 2012 and the state was closely divided in 2016, with Trump winning 50.4 percent of the two-party vote. Yet under a plan drawn by a Republican legislature, in 2012 Republicans won 13 U. S. House seats in Pennsylvania (72%), compared to only 5 won by Democrats (28%). In 2016, Republicans again won 13 U. S. House seats in Pennsylvania (72%), compared to only 5 won by Democrats (28%). An application of Dr. McDonald's voting rights standard to the partisan alignment in Pennsylvania would preclude a more equitable redistricting of House seats, because any such redistricting would require diluting the votes of Republicans in several of the current districts.

## X.   DR. MCDONALD'S REPORT CONTRADICTS HIS SCHOLARSHIP AND PRIOR TESTIMONY

Dr. McDonald purports to be assessing the intent of Maryland legislators "by examining how well the Sixth Congressional District followed traditional redistricting principles of minimizing county splits and compactness."[65] This, however, is not a meaningful standard. Dr. McDonald's own scholarship indicates that adherence to so-called "traditional redistricting principles" is not a "hedge" against gerrymandering:

---

[64] McDonald Dep. at 57:22-25, 58:1-8, *Backus v. South Carolina*, No. 3:11-03120 (D.S.C. Feb. 27, 2012), ECF No. 158.

[65] McDonald Report at 4.

"Some posit that traditional redistricting principles can act as a hedge against gerrymandering. One should be cautious, however, about putting one's faith in traditional redistricting principles to produce politically neutral outcomes. Chief Justice Brennan pessimistically noted that following traditional criteria, such as drawing pleasing shapes, is a not a gerrymandering cure, stating that, 'this politically mindless approach may produce, whether intended or not, the most grossly gerrymandered results' . . . And, as the next section describes, facially neutral criteria such as geographic compactness are likely to systematically favor one party."[66]

In this same article, Dr. McDonald further notes that there are many purported "traditional redistricting principles," beyond minimizing county splits and compactness: "population equality, contiguity, compactness, respect for existing political boundaries, respect for communities of interest, preservation of district cores, and nesting of districts."[67] In his *Backus* deposition Dr. McDonald states that, "All of these traditional redistricting principles could be or are indicators. They're not by themselves determinative."[68]

In addition, Dr. McDonald states that compactness is not a coherent standard by which to judge districts: "Compactness refers to the shape of a district, but is formally ill-defined. Scholars have proposed over fifty compactness measures, which have not resulted in clarity, since these measures conflict and can be manipulated."[69] Dr. McDonald also criticizes the use of compactness criteria because they have an inherent bias to favor Republicans: "Furthermore, computation-intensive analysis of process measures, enabled by computing advances, has identified potential biases--such as the tendency of compactness criteria to advantage the Republican party, because its support tends to be more evenly distributed geographically."[70] Similarly, Jowei Chen and Jonathan Rodden examined "automated districting simulations based on precinct-level 2000 presidential election results in several states."[71] They found that, "results illustrate a strong relationship between the geographic concentration of Democratic voters and electoral bias favoring Republicans."[72]

In his scholarship, Dr. McDonald stresses the importance of creating competitive districts. "There is also a greater issue of accountability. A legislature composed solely of uncompetitive districts is not accountable to the people. … Without the fear of defeat, majority legislative parties are not responsive to the needs of the nation or their state; they are at best responsive to their base. Restoring accountability of incumbent members through competition within their districts will encourage accountability of national and state parties, and thus uphold the principles of voter choice that are necessary for a functioning democracy to work."[73]

---

[66] Altman & McDonald "Redistricting Principles for the 21st Century," p. 1187.

[67] *Ibid.*, pp.1189-1190.

[68] McDonald Dep. at 38:22-25, *Backus v. South Carolina*, No. 3:11-03120 (D.S.C. Feb. 27, 2012), ECF No. 158.

[69] Altman and McDonald, "Redistricting Principles for the 21st Century," p. 1190.

[70] *Ibid.*, pp. 1195.

[71] Jowei Chen and Jonathan Rodden, "Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures," 8 *Quarterly Journal of Political Science* 239, 240 (2013).

[72] *Ibid.*

[73] Michael P. McDonald, "Redistricting and Competitive Districts," in *Electoral Competition and American Politics* 241 (Michael P. McDonald and John Samples, eds., 2006).

The three co-authors of a 2014 article in the Journal of Elections, concluded that "[c]ompetitive campaigns have been found to increase citizens' participation, engagement and learning."[74] These scholars found that "competitive elections have positive effects that endure for at least a year beyond the campaign season, reinforcing the idea that political competition plays a robust role in American representative democracy."[75]

However, Dr. McDonald fails to consider the competitiveness criteria in his evaluation of CD6 in Maryland, even though the Maryland legislature created CD6 as a competitive district. Legislators acknowledged the goal of a competitive CD6 at the time of the redistricting process. According to Democratic State Senator Rich Madaleno, "If you go with a competitive western Maryland district, the way that works is clearly that district comes further into Montgomery County, substantially into Montgomery County. Which historically that district did have. If you remember Congresswoman Byron, Beverly Byron, and her husband before her that district comprised roughly half of Montgomery County at one time. So, we are used to being associated with a western Maryland District."[76]  State House Speaker Mike Busch said, "I think the numbers will show that it makes it [CD6] pretty competitive."[77]

The Cook Political Report in 2012 included Maryland's CD6 among its competitive U.S. House districts, rating it a narrow Democrat +2 percentage points. Cook calculates such ratings by comparing the district's average Democratic or Republican Party share of the two-party presidential vote in two presidential contests to the national average. Cook said that the district was "likely Democratic," and the *New York Times* evaluation rated it as "leans Democratic."[78] The average Republican vote across all statewide elections held in this district from 2012 to 2016 is 47 percent (Table 1), which places it within Dr. McDonald's "competitive" range of 45 to 55 percent.[79]

The district also emerges as competitive, although favoring Democrats, under Dr. McDonald's methodology of the "normalized presidential vote." He calculates this measure by subtracting from the two-party presidential vote in the district the two- party presidential vote nationwide. He says "I then add back 50 percent to conceptualize district competitiveness around 50 percent."[80] In 2012 Obama won 52.7 percent of the national vote and 55.4 percent of the District 6 vote for a normalized presidential vote of 52.7 percent, well within the competitive range. In 2016 Clinton won 51.7 percent of the national vote and 56.2 percent of the District 6 vote for a normalized presidential vote of 54.5 percent, also within the competitive range.[81] Table 1 above indicates that Republicans overwhelmingly won CD6 in the 2014 gubernatorial election and very

---

[74] Heather Evans, Michael J. Ensley, and Edward G. Carmines, "The Enduring Effects of Competitive Elections," 24 Journal of Elections, Public Opinion, and Parties, 455 (2014).

[75] *Ibid.* at 455.

[76] Video at http://www.marylandjuice.com/2011/09/2012-redistricting-sen-rich-madaleno.html#more;

[77] Associated Press, "6th Congressional District Would Include More of Montgomery County," *Daily Record*, October 4, 2011, http://thedailyrecord.com/2011/10/04/6th-congressional-district-would-include-more-of-montgomery-county/.

[78] Cook Political Report, "2012 Competitive House Race Chart," http://cookpolitical.com/archive/chart/house/race-ratings/2012-07-26_14-08-01; Ballotpedia, "Maryland's Sixth Congressional District Elections, 2012," https://ballotpedia.org/Maryland%27s_6th_Congressional_District_elections,_2012.

[79] McDonald, "Redistricting and Competitive Districts" at 224.

[80] *Ibid.*

[81] *Id.* at 223.

narrowly in the 2014 election for Attorney General. In the 2014 congressional election, John Delany came with just 1,525 votes of losing CD 6 (fewer than 1 percent of votes cast), despite the advantages of incumbency.[82]

Consistent with Dr. McDonald's assessment of competitive districts, CD6 in 2012 elected the moderate Democrat John Delaney, rather than the outlier Republican Roscoe Bartlett. Delaney won the Democratic nomination by defeating the more liberal Garagiola, a sitting State Senator.[83] According to an analysis by GovTrack, Bartlett was among the 25 most conservative members of the U. S. House of Representatives in his last term. In contrast, GovTrack ranked Delaney in 2015 as only the 160th most liberal member of the House, making him the 34th most conservative Democrat out of 192 fellow Democrats.[84] As Dr. McDonald has concluded, in his scholarship, "District competition also affects other aspects of politics, such as the degree of political polarization in Congress, as 'more competitive districts tend to produce more moderate candidates.'"[85]

Dr. McDonald also fails to note that Delaney was not elected with the votes of Montgomery County only, but, as indicated in Table 13, he also won Washington County and the parts of Frederick County included in CD6. Table 13 also indicates that when combined, Delaney carried the four Maryland counties wholly or partially in CD6 under both maps. In addition, as indicated in Table 14, there was no diminution in congressional turnout in the three western Maryland counties included entirely within CD6, when the congressional election of 2012 is compared to the congressional election in the prior presidential year of 2008 under the 2001 congressional redistricting plan. Rather, turnout increased in each county.

---

[82] http://elections.state.md.us/elections/2014/results/General/gen_results_2014_2_00806.html.
[83] John Fritze, "Democrats Fall in Behind Outsider Delaney," *Baltimore Sun*, April 4, 2012, http://www.baltimoresun.com/news/breaking/bs-md-sixth-battle-begins-20120404-story.html.
[84] Govtrack, "Roscoe Bartlett," https://www.govtrack.us/congress/members/roscoe_bartlett/400017; "John Delaney, https://www.govtrack.us/congress/members/john_delaney/412544/report-card/2015.
[85] McDonald, "Redistricting and Competitive Districts," p. 233.

**TABLE 13**
**COUNTY BREAKDOWN OF VOTE, 2012 GENERAL ELECTION FOR U.S. CONGRESS, WESTERN COUNTIES CD6**

| County | John Delaney (D) | Roscoe Bartlett (R) | Percent Delaney |
|---|---|---|---|
| Allegany | 11,966 | 15,730 | 43.2% |
| Frederick | 31,079 | 20,148 | 60.7% |
| Garrett | 3,864 | 8,445 | 31.4% |
| Washington | 29,381 | 28,565 | 50.7% |
| **Total Western Maryland** | **76,290** | **72,888** | **51.1%** |
| | | | |
| Source: Maryland State Board of Elections, http://www.elections.state.md.us/elections/2012/results/general/gen_detail_results_2012_4_BOT00806.html. | | | |

**TABLE 14**
**COUNTY BREAKDOWN OF CHANGES IN VOTER TURNOUT, 2008 AND 2012**
**GENERAL ELECTIONS COMPARED**

| County | Voters 2008 | Voters 2012 | Percent Change |
|---|---|---|---|
| Allegany | 28,190 | 28,761 | **+2.0%** |
| Garrett | 12,364 | 12,700 | **+2.7%** |
| Washington | 58,915 | 60,761 | **+3.1%** |
| **Total** | **99,469** | **102,222** | **+2.8%** |
| | | | |
| Statewide | 2,661,905 | 2,734,176 | **+2.7%** |
| | | | |
| Source: Maryland State Board of Elections, 2008 General Election and 2012 General Election, http://www.elections.state.md.us/elections/2008/turnout/general/2008_Presidential_General_Congressional_District_06.html; . | | | |

39

Dr. McDonald correctly indicates that it was possible to create an alternative district more favorable to Republicans than the adopted 2011 CD6. He says that the district is purportedly more compact, although Dr. McDonald has criticized the use of compactness criteria, which he says is biased toward Republicans. Moreover, there are always a myriad of alternative districts that can be created in any plan that are "better" on some selected criteria than the districts in the adopted plan.  Dr. McDonald has failed to demonstrate that the alternative district would serve other legitimate redistricting purposes of the plan.  The creation of the alternative district would also change the adopted plan beyond CD6 and CD8, since moving counties and precincts out of adopted CD6 would ripple across the state in the adopted plan.  Dr. McDonald gave no assurance that the proposed district would respect the legitimate redistricting goals of other areas of the state, such as respecting the non-retrogression mandate of § 2 of the Voting Rights Act in Districts 4 and 7; disallowing a crossing of the Chesapeake Bay; ensuring that District 2 continued to contain all major military installations in Maryland; ensuring all incumbents continued to reside in their district; and ensuring precise mathematical population equality.

## XI.    DR. MCDONALD'S METHODOLOGY CANNOT ESTABLISH INTENT

Dr. McDonald's methodology is inadequate to prove that the Maryland legislature intentionally discriminated against Republican-leaning voters in CD6 for their political expression. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the U.S. Supreme Court outlined several factors that it identified as relevant to ascertaining whether legislation was enacted with intentional discriminatory intent: (1) discriminatory impact; (2) historical background; (3) the sequence of events leading up to the decision; (4) procedural or substantive deviations from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decision-makers. This methodology is consistent with the approach followed by historians in evaluating intent.

Dr. McDonald does not examine the historical background to demonstrate a history of official discrimination in Maryland against Republican-leaning voters. He does not explore the sequence of events leading to the adoption of the 2011 Maryland congressional redistricting plan. He does not evaluate the procedures for adopting the plan, including the referendum on the plan in the November 2012 general election. He does not consider the testimony at public hearings or the presentation of the GRAC to the Maryland General Assembly. He does not cite a single contemporaneous statement by anyone involved in the adoption of the congressional redistricting plan. Dr. Morrison's report, although it does examine some contemporary statements, also fails to consider most of the *Arlington Heights* elements.

Neither Dr. McDonald nor Dr. Morrison considers several possible alternative explanations for the adoption of the plan and CD6, that are separate from any intent to retaliate against voters in CD6 for their political expression. These include, for example, the creation of a community of interest, the unpacking of prior CD8, the reflection of Maryland's domination by the Democratic Party, and the response to Republican gerrymandering in other states, and the assurance that CD1 will not cross the Chesapeake Bay. All these alternative considerations will be addressed below.[86]

---

[86] Democratic Party has won every statewide election for national office (president and US Senate) during the past three decades. As of the time of redistricting in 2011 the Democrats held a better than 2 to 1 registration advantage

## XII.   DR. MCDONALD MISUNDERSTANDS MARYLAND'S REPORTING OF ELECTION RESULTS

Dr. McDonald describes as follows his procedure for allocating statewide election results to CD6 from 2012 to 2016:

> "I did some estimation to construct statewide election results within the adopted Sixth Congressional District. Maryland reports complete election results by county *and election results for early voters only by precinct.* Election results are thus available for Allegany, Garrett, and Washington counties, which are entirely contained within the Sixth Congressional District. I estimated precinct-level Election Day candidate tallies for the parts of the Sixth Congressional District contained in Frederick and Montgomery counties. I apportioned the county total Election Day vote for the candidates by the proportion of the early vote a candidate received within a given precinct, relative to the county. I added the known early vote total and estimated Election Day vote total for each precinct, and sum the votes across Frederick and Montgomery counties' precincts assigned to the Sixth Congressional District. I then summed the votes for all counties to produce district-wide totals for the Sixth Congressional District."[87]

However, as indicated above and demonstrated by the precinct results excerpt for the 2012 general election, reproduced exactly from the Maryland State Board of Elections website without modification, Maryland does not report not early votes by precinct.  Instead, Maryland reports by precinct only election night votes, that is, votes cast on Election Day.  This excerpt clearly shows that the only results reported by the Board of Elections by precinct are for the election night votes and not as Dr. McDonald indicates for early votes. Thus, Dr. McDonald's fails to accurately reflect how Maryland reports election results and is estimating procedure is corresponding flawed by this error.

### EXCERPT FROM MARYLAND STATE BOARD OF ELECTIONS PRECINCT RESULTS

### 2012 General Election,
### http://www.elections.state.md.us/elections/2012/election_data/index.html,
### All_By_Precinct_2012_General

"County","Election District","Election Precinct","Cong","Legs","Candidate Name","Party","Office Name","Office District","Winner","Write-In?","Election Night Votes","Election Night Votes Against"
"01","001","000","06","01C","Barack Obama","DEM","President - Vice Pres","","Y","","66",""
"01","001","000","06","01C","Mitt Romney","REP","President - Vice Pres","","","","351",""

---

over Republicans and have maintained that edge through the elections of 2016.
http://elections.state.md.us/elections/2010/turnout/general/2010_Congressional_District.html#Dem;
http://elections.state.md.us/elections/2016/turnout/general/Official%20by%20Party%20and%20County.pdf
[87] McDonald Report at 9 (emphasis added).

### XIII.   ALTERNATIVE EXPLANATIONS FOR THE CONFIGURING OF CD6

Both the Morrison Report and the McDonald Report are incomplete. Plaintiffs' experts fail to consider several plausible and reasonable explanations for the new configuration of CD6 that have nothing to do with any intent to retaliate against voters for their political expression.

#### A.   Unpacking Prior CD8

One of the ways in which a district plan disadvantages a political party is through the packing of its voters into a district well beyond what is needed for election of that party's candidates. The result of packing is large numbers of wasted voters to the detriment of the party that dominates the packed districts. Adam B. Cox in his article in the Supreme Court Review explains the impact of packing, using Democratic voters as his example: "Packing Democratic voters into a small number of districts where they constitute large supermajorities ensures Democratic victories in those districts but reduces the total number of seats Democrats capture by increasing the number of wasted Democratic votes-that is, votes cast for Democrats that are either unnecessary or insufficient to win a seat."[88]

By 2008, CD8 under the 2001 redistricting plan was an overwhelmingly packed district. Plaintiffs' expert Dr. McDonald defines for districts "two competitiveness ranges, 45–55 and 48–52 percent."[89]  As indicated in Table 15, congressional election results in 2008 and 2010 for CD8 under the 2001 redistricting plan were some 23 to 25 percentage points beyond McDonald's outer range for competitive districts.  These results clearly showed former CD8 to be a packed district to the disadvantage of Democrats. For these two elections, the number of wasted Democratic votes is an extraordinary 264,581 votes. I am not claiming here that Democrats deliberately packed CD8 in the prior redistricting, but, as noted above, packing can be a natural result of the distribution of voters and of demographic change over time.

CD8 under the 2001 plan bordered only CD4 and CD6. CD4, which is an African-American voting rights district, was already packed with Democrats and did not present an alternative for the unpacking of CD8. That left CD6 as the reasonable alternative for unpacking CD8 and the 2011 redistricting plan did precisely that. As indicated in Table 16, the 2011 plan succeeded in substantially unpacking CD 8. For the congressional elections of 2012 and 2014, (also, one presidential and one midterm year election), the Democratic percentage in CD8 dropped by some 12 to 14 percentage points. The number of wasted votes plummeted from 264,581 to 153,362, a decline of 111,219 wasted votes.

---

[88] Adam B. Cox, "Gerrymandering and Disaggregated Districts,' *Supreme Court Review*, 2004 429 (2004).

[89] Michael P. McDonald, "Redistricting and Competitive Districts," in *The Marketplace of Democracy: Electoral Competition and American Politics* 224 (McDonald and Samples, eds., 2006).  Similarly, Barack Obama prevailed in the 2008 presidential election with 74.5 percent of the vote, not counting absentee and provisional ballots, which statewide were more favorable to Democrats. Maryland State Board of Elections, State Precinct Reference for 2008 Election, http://www.elections.state.md.us/elections/2008/election_data/index.html.

**TABLE 15**
**PACKING IN CD8 UNDER MARYLAND'S 2001 REDISTRICTING PLAN AND**
**WASTED VOTES**
**2**

| Election | Democratic Votes | Republican Votes | Democratic Percentage | Wasted Democratic Votes |
|---|---|---|---|---|
| | | | | |
| 2008 | 229,740 | 66,351 | **77.6%** | **163,389** |
| | | | | |
| 2010 | 153,613 | 52,421 | **74.6%** | **101,192** |
| | | | | |
| | | | | |
| **Total** | **383,353** | **118,772** | **76.3%** | **264,581** |
| | | | | |

Source, Maryland State Board of Elections, General Elections of 2008 and 2010, http://www.elections.state.md.us/elections/2008/results/general/gen_results_2008_4_00808.html; http://www.elections.state.md.us/elections/2010/results/General/gen_results_2010_2_00808.html.


**TABLE 16**
**UNPACKING OF CD8 UNDER MARYLAND'S 2011 REDISTRICTING PLAN AND**
**WASTED VOTES**

| Election | Democratic Votes | Republican Votes | Democratic Percentage | Wasted Democratic Votes |
|---|---|---|---|---|
| | | | | |
| 2012 | 217,531 | 113,033 | **65.8%** | **104,499** |
| | | | | |
| 2014 | 136,722 | 87,859 | **60.9%** | **48,863** |
| | | | | |
| **Total** | 354,254 | 200,892 | **63.8%** | **153,362** |
| | | | | |

Source: Maryland State Board of Elections, 2012 and 2014 General Elections, http://www.elections.state.md.us/elections/2012/results/general/gen_results_2012_4_00808.html; http://elections.state.md.us/elections/2014/results/General/gen_results_2014_2_00808.html.

## B.    Realizing the Democratic Majority

Maryland is one of the most Democratic-dominated states in the nation. Yet Maryland Democrats' position, holding 75 percent of congressional seats after the 2010 elections, lagged behind the percentage of congressional seats held by the dominant party in most other states that were dominated by either political party. Table 17 reports the percentage of congressional seats held after 2010—the last election before redistricting--by relatively medium-sized states like Maryland (4 to 12 congressional districts) in which one party gained at least 60 percent of the vote in the 2008 vote for president. As indicated in Table 17, Maryland's percentage of the two-party presidential vote was about comparable to other states. Yet Maryland's percentage of congressional seats was *13 percentage points below* the average percentage of congressional seats won by the respective party that controlled the redistricting process in the 5 states.

An instructive comparison is provided by Massachusetts, which has just one more congressional seat than Maryland. Democrats about equally dominate the two states. However, all 9 congressional seats in Massachusetts were held by Democrats after 2010, compared to 6 of 8 seats in Maryland.

After the 2011 redistricting Maryland was in line with other party-dominated states. As indicated in Table 18, Maryland's percentage of the two-party presidential vote was about comparable to other states; so too was its percentage of seats held by the dominant party as compared to other states. Once again Democrats held all 9 congressional seats in the comparable state of Massachusetts.[90]

## C.    Responding to the Nationwide Context of Congressional Redistricting

Plaintiffs' experts fail to draw the important distinction between state legislative and congressional redistricting. Each state establishes a redistricting plan that is dispositive for the seats comprising its state legislature. But the composition of the U. S. Congress reflects the results of redistricting plans by all states with more than a single representative. Thus, the context for any one state's congressional redistricting decisions includes the redistricting processes taking place in other states. Adam B. Cox explains that, "Congressional political gerrymanders pose different analytic, normative, and constitutional questions than do state legislative gerrymanders. The latter implicate the composition of the whole legislative body, while the former affect only a part."[91]

The Maryland Constitution explicitly recognizes the distinction between state legislative and congressional redistricting. The Constitution stipulates specific requirements for legislative redistricting plans, but none for congressional redistricting plans. [92]

---

[90] For uncontested elections, results are imputed from presidential election results.

[91] Adam B. Cox, "Partisan Gerrymandering and Disaggregated Redistricting," *Supreme Court Review* 2004 451 (2004).

[92] The Constitution of Maryland, Article III, Section 4 specifies that "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions. There is no requirement in the constitution for congressional districts.  http://msa.maryland.gov/msa/mdmanual/43const/html/const.html.

**TABLE 17**
**DOMINANT PARTY STATES: PERCENT VOTES CONGRESS AND PRESIDENT**
**2008, PERCENT CONGRESSIONAL SEATS WON\***

| State | Dominant Party | Vote For Dominant Party 2008 President | Congressional Seats Won by Dominant Party 2010 | Congressional Seats Won by Second Party 2010 |
|---|---|---|---|---|
| Alabama | Republican | 60.9% | 6 (86%) | 1 (14%) |
| | | | | |
| Connecticut | Democrat | 61.3% | 5 (100%) | 0 (0%) |
| | | | | |
| Arkansas | Republican | 60.2% | 3(75%) | 1(25%) |
| | | | | |
| Maryland | Democrat | 62.9% | 6 (75%) | 2 (25%) |
| | | | | |
| Massachusetts | Democrat | 63.2% | 9 (100%) | 0 (0%) |
| | | | | |
| Oklahoma | Republican | 65.7% | 4 (75%) | 1(25%) |
| | | | | |
| | | | | |
| **All States** | | **62.4%** | **33 (87%)** | **5 (13%)** |
| | | | | |
| **Difference MD All States** | | **+0.5%** | **-12%** | **+12%** |
| | | | | |

**TABLE 18**
**DOMINANT PARTY STATES: PERCENT VOTES CONGRESS AND PRESIDENT**
**2012, PERCENT CONGRESSIONAL SEATS WON\***

| State | Dominant Party | Vote For Dominant Party 2012 President | Congressional Seats Won by Dominant Party 2012 | Congressional Seats Won by Second Party 2012 |
|---|---|---|---|---|
| Alabama | Republican | 61.2% | 6 (86%) | 1 (14%) |
| Arkansas | Republican | 62.2% | 4 (100%) | 0 (0%) |
| Kansas | Republican | 61.1% | 4 (100%) | 0 (0%) |
| Kentucky | Republican | 61.5% | 5 (83%) | 1 (17%) |
| Maryland | Democrat | 63.3% | 7 (88%) | 1 (12%) |
| Massachusetts | Democrat | 61.8% | 9 (100%) | 0 (0%) |
| Oklahoma | Republican | 66.8% | 5 (100%) | 0 (0%) |
| Tennessee | Republican | 60.4% | 7 (78%) | 2 (22%) |
| Utah | Republican | 74.6% | 3 (75%) | 1 (25%) |
| **All States** | | **63.7%** | **50 (91%)** | **6 (11%)** |
| **Difference MD All States** | | **-0.4%** | **-1%** | **+1%** |
| | | | | |

In formulating its 2011 redistricting plan for its contribution to the U. S. Congress, Maryland's legislators faced two critical contextual issues. First, Republicans, having gained the advantage in more state governments than Democrats during the period of post-2000 redistricting had used partisan gerrymandering to boost their representation in Congress. Second, Republicans had gained control of additional states for the post-2010 redistricting and were poised for another round of gerrymandering that would further expand their edge in congressional elections.

Plaintiffs' expert Dr. McDonald, writing in 2011, clearly explicated this political context of the Republican-dominated gerrymandering of congressional seats.

> "The defining characteristic of the 2010 midterm elections is likely the historic success of Republican candidates in federal and state races, following back- to-back decisive victories for Democrats. A fairly clear picture has now emerged as to who will control redistricting in each state. *Republicans appear well-poised to cash in on their electoral wins by creating redistricting plans that will tilt the electoral balance for the upcoming decade in their favor in large, battleground states where partisan gerrymandering is most potent*."

> "Republicans control 16 states, Democrats control six states, and the remaining 15 states have divided government. As several political commentators, including myself, have noted, the Republicans' prize states include Florida, Michigan, North Carolina, Ohio, Pennsylvania, and Texas. Democrats were stripped of their largest prize- California- by the passage of a ballot initiative in 2010 that gave control of congressional redistricting to a state legislative commission established in 2008, and they only control one state where they can greatly alter the congressional balance of power, Illinois. … *Republicans were also in a great position 10 years ago.* Now, they control only three more critical states- North Carolina, Ohio, and Tennessee- than they did 10 years ago (numerically, they control more states, but these three are the most consequential)."[93]

Similarly, Gary Jacobson, arguably the nation's foremost scholar of congressional elections, found that "Republicans enjoyed two advantages in redistricting after the 2000 Census. First, the states that gained seats after 2000 were more Republican in their voting habits that were the states that lost seats … Second, Republicans controlled the redistricting process in several of the large states that were set to lose or gain seats, and they used that control effectively to boost their House representation."[94] In an article published in the *Yale Law and Policy Review*, J. Gerald Hebert, the former Acting Chief of the U. S. Justice Voting Rights Section, who contributed an amicus brief on behalf of plaintiffs in earlier stages of this litigation, cites three examples of invidious partisan gerrymandering following the 2000 U.S. Census, all in Republican controlled states. "The redistricting experiences in Florida, Michigan, and Texas following the 2000 U.S. census provide compelling examples of the danger of unfettered partisan redistricting."[95]

---

[93] Michael P. McDonald, "The 2010 Midterm Elections: Signs and Portents for the Decennial Redistricting,"44 *PS: Political Science and Politics* 311, 312 (2011). (emphasis added).

[94] Gary Jacobson, *The Politics of Congressional Elections*, 7th ed., (New York: Pearson, 2009), p. 10.

[95] J. Gerald Hebert and Marina K. Jenkins, "The Need for State Redistricting Reform To Rein in Partisan Gerrymandering," 29 *Yale Law and Policy Review* 543, 552 (2011).

Legislatures do not blind themselves to these realities of congressional as opposed to state legislative redistricting. To offset the large Republican advantage in more heavily populated, and in many cases, competitive states, with significant consequences for representation in Congress, it was reasonable for the Maryland legislature to make CD6 into a more competitive district for Democrats.

District 6 Republican Representative Roscoe Bartlett himself recognized during his 2012 reelection campaign that the Maryland legislature's congressional plan was not intended to retaliate against himself or his supporters. Rather, it responded to Republican gerrymandering across the nation. "*'It's not personal'" Bartlett said about the redistricting plan. 'They just needed another Democrat seat. The Democrats only control, I think, six states and the District [of Columbia]. Republicans control, I think, four times that. So they had to find pick-up opportunities anywhere they could.'*"[96]

Then-state Senator Jamie Raskin, an advocate of redistricting reform, explained that the Maryland legislature could not have been expected to "unilaterally disarm," given Republican legislatures' advancement of party goals in larger competitive states when those gains were of much greater consequence on the partisan composition of congress. He cites the examples of North Carolina and Ohio, which both created supermajority districts of each party, resulting in a loss of representation for Democrats.[97]

As indicated by the report of demographer Bill Cooper, the Maryland legislature could have adopted a plan which would have given Democrats an edge in all 8 congressional districts, creating the potential for Democrats to control all congressional seats as they did in Massachusetts. Table 20, taken from the Cooper Report indicates that the alternative map contains 8 majority-Democratic districts. The Table also indicates that the 8-0 map preserves two majority African American districts.

The map included in the Cooper report demonstrates that the plan creates reasonably compact districts, given Maryland's unique geography. This further shows that there is no particular correlation between so-called "traditional redistricting principles" and the partisan composition of a redistricting plan. Dr. Morrison quotes Mr. Hawkins to the effect that incumbent Democratic members of Congress opposed such a redistricting plan even if it was more favorable to Democrats.[98] However, although incumbent members have an important influence on congressional redistricting, they are not the final decision-makers, and if the goal of the legislature had been to retaliate against Republican inclined voters in Maryland they could have done so more aggressively through an alternative redistricting plan. The 8-0 map would also maintain the cross-Bay configuration that was present in the 2002 congressional map, a violation of traditional redistricting principles rejected by the 2011 congressional map drawers even at the expense of achieving a more effective Democratic map (see Section XII.4 below).

---

[96] Evan Serpick, "The Last Stand of Roscoe Bartlett," *Baltimore Magazine*, May 2012, http://www.baltimoremagazine.com/2012/5/5/the-last-stand-of-roscoe-bartlett (emphasis added).

[97] Jamin B. Raskin, "Nonrepresentational Line-Drawing and the Universal Representational Imperative: Why Judges Should Replace Gerrymandering with Proportional Representation," *Yale Law and Policy Review*, (Winter, 2012), http://ylpr.yale.edu/inter_alia/nonrepresentational-line-drawing-and-universal-representational-imperative-why-judges.

[98] Morrison Report at 15-16.

**TABLE 19**
**ILLUSTRATIVE DEMOCRATIC REDISTRICTING PLAN WITH 8 DEMOCRATIC DISTRICTS**

| District | Population | % African American 18+ | Democratic Percentage President 2008 |
|---|---|---|---|
| 1 | 722,429 | 19.6% | 54.9% |
| 2 | 720,465 | 22.4% | 52.5% |
| 3 | 720,600 | 25.1% | 61.8% |
| 4 | 721,571 | 55.8% | 79.0% |
| 5 | 721,786 | 30.1% | 57.0% |
| 6 | 721,529 | 11.3% | 56.2% |
| 7 | 721,892 | 52.2% | 72.1% |
| 8 | 721,959 | 11.3% | 62.5% |
| | | | |

Source: Report of Bill Cooper. The Democratic percentages are slightly understated because the Harvard Archive on which the report relies, does not include the absentee and provisional votes (9.1 percent of all votes), which are more Democratic (67.1%) than the election day votes (62.5%), Maryland State Board of Elections, 2012 General Election, President, http://www.elections.state.md.us/elections/2008/results/general/gen_results_2008_4_001-.html.

### D.    Responding to the Goal of Realigning Congressional District 1 So That it Did Not Cross the Chesapeake Bay

The state of Maryland explicitly indicated at the time of the redistricting process that one of the goals of the congressional plan was to conform to traditional redistricting principles by reconfiguring Congressional District 1 so that it no longer crossed the Chesapeake Bay. In its presentation to the General Assembly, GRAC expressly outlined the goal of devising a plan for Congressional District 1 that, unlike the previous plan, did not cross the Chesapeake Bay. In its presentation on CD1 GRAC noted that, "9 Eastern Shore Counties are kept together. District no longer crosses the Chesapeake Bay into more urban areas of Anne Arundel County and instead runs into rural portions of Carroll County."[99] State Democratic Delegate Kathleen Dumais, one of the legislative decision-makers, in defending the 2011 congressional plan prior to the November 2012 referendum also highlighted the realignment of CD1 so that it met the goal of not crossing the Bay. In an Op Ed published on October 29, 2012, Delegate Dumais reiterated the GRAC statement on the priority of not crossing the Bay in new CD1. She wrote, "District 1 keeps the nine Eastern Shore counties together and no longer crosses the Chesapeake Bay into more urban areas of Anne Arundel County. Instead, it runs into rural portions of Carroll County."[100]

To maintain the required population for the new CD1 that did not cross the Bay, it was necessary to add in not only the population from Carroll County, which had previously been in CD6, but also the parts of Harford County and Baltimore County that were also in the prior CD6. As indicated in Table 20, taken from the Report of Bill Cooper, the amount of Anne Arundel population removed from prior CD 1 almost exactly equals the amount of population added in from Carroll County, Harford County, and Baltimore County. To assure that the new CD6 conformed to the one-person, one-vote requirement, the legislature included additional population from Montgomery County, parts of which were already in CD6 under the 2002 congressional redistricting plan. As indicated in Table 20, the transfer in and out of CD1 had no effect on racial opportunities since the areas of exchange were overwhelmingly white with very small black and Hispanic voting age populations.

---

[99] GRAC "Recommended Congressional Plan."
[100] Kathleen Dumais, "Md. Congressional Map is Fair, Legal," *Baltimore Sun*, October 29, 2012, http://www.baltimoresun.com/news/opinion/oped/bs-ed-redistricting-20121029-story.html.

**TABLE 20**
**DEMOGRAPHIC STATISTICS POPULATION TRANSFERS 2011 CONGRESSIONAL PLAN CD1**

| CD1 | Adj. Pop | Black % | Black 18+ % | Hispanic 18+ % | NH White |
|---|---|---|---|---|---|
| **Removed From Anne Arundel** | **107,577** | 4.3% | 4.2% | 2.5% | 89.9% |
| | | | | | |
| **Added From CD6 in Harford, Baltimore & Carroll** | **106,562** | 2.0% | 1.9% | 1.4% | 95.0% |
| | | | | | |
| Source: Report of Bill Cooper. | | | | | |

## CONCLUSION

In sum, the reports of plaintiffs' experts fail to establish any of the key elements of their claims. Moreover, the weight of the evidence and analysis contradicts these claims. Standard methods for assessing partisan gerrymandering, including the procedure used by Dr. McDonald in prior testimony, demonstrate that Maryland's 2011 congressional redistricting plan was not a partisan gerrymander. Dr. McDonald's effort to apply the standards used in voting rights analysis, moreover, does not withstand scrutiny. Similarly, application of methodology on jobs and commuting used by Dr. Morrison in a prior challenge to Maryland's 2011 congressional plan demonstrates that the new CD6 comprises a community of interest. Citizens testifying at public hearings and the Governor's Advisory Redistricting Committee stressed these aspects of the community of interest in new CD6.

Neither Dr. Morrison nor Dr. McDonald deploy a social science methodology sufficient to establish the intent of decision-makers for the 2011 congressional plan. The supposition that decision-makers intended to retaliate against Republican-leaning voters is refuted by the failure to create a partisan gerrymander, the statement of former Representative Roscoe Bartlett, the votes of the people of western Maryland themselves, and the fact that Democrats could have created a plan that gave Democrats an edge in all 8 Maryland districts. It is additionally refuted by four alternative explanations for the crafting of the 2011 congressional districts, all of them unexamined by plaintiffs' experts. These include:

1.    Unpacking Congressional District 8, with its large numbers of wasted Democratic votes.

2.    Realizing the Democratic majority in Maryland in conformity with other states largely dominated by one party in national elections.

3.    Responding to the nationwide context of congressional redistricting that the Maryland constitution treats differently from state legislative redistricting.

4.    Meeting the criterion of not crossing the Chesapeake Bay in the drawing of new Congressional District 1.

Date: May 8, 2017

_____
Allan J. Lichtman

# Curriculum Vitae

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

## EDUCATION

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

## PROFESSIONAL EXPERIENCE

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

**Expert witness in more than 80 redistricting, voting rights and civil rights cases**

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

## HONORS AND AWARDS

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

1

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000 meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

 Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Finalist for the 2008 National Book Critics Circle Award in general nonfiction for WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT.

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS designated for Belknap Imprint of the Harvard University Press, reserved

for works of special distinction and lasting value; *New York Times* editors choice book for 2013, submitted for Pulitzer Prize 2013, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History.

THE CASE FOR IMPEACHMENT, Independent bookstore bestseller, Amazon.com bestseller in several academic categories, *Newsweek*, best new book releases, April 18, 2017.

**SCHOLARSHIP**

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).

THE KEYS TO THE WHITE HOUSE, 2016 EDITION (Lanham: Rowman & Littlefield)

HISTORY OF THE VOTE IN AMERICA (Under Contract, Harvard University Press)

THE CASE FOR IMPEACHMENT (HarperCollins, April 2017)

Monograph:

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001


B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

4

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:`Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION  60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

 "What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL

6

OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010) REF

 "The Keys to the White House:  Forecast for 2012," FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

"The Keys to the White House: Prediction for 2016," SOCIAL EDUCATION (February 2016)

"The Keys to the White House," SOCIAL EDUCATION (October 2016)

"The Keys to the White House: Forecast for 2016," WORLD FINANCIAL REVIEW (January-February 2016)

 "The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency,`" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted: LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February 17, 1982)

"How to Bet in 1984. A Presidential Election Guide," WASHINGTONIAN MAGAZINE (April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6, 1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page, (December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All, (May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page, (April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May, 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op

Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

 "Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPORTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

"Democrats Have No One to Blame But Themselves,' THE HILL, November 7, 2014

"Donald Trump's Best Friend: Bernie Sanders," THE HILL March 10, 2016

"Trump Had One Thing Right About Abortion," THE HILL, April 1, 2016

"What is so Progressive About Sanders' Old-Fashioned Protectionism," April 7, 2016

"Sanders is Only Helping Trump by Staying in Race," THE HILL, June 30, 2016

"7 Pieces of Advice for Hillary Clinton," THE HILL, July 25, 2016

"Donald Trump's Call For Russia To Hack Hillary Clinton's Email Is A New Low For American Politics — And Maybe A Crime, NEW YORK DAILY NEWS, July 27, 2016

"Here's the Big Speech Clinton Needs to Make," THE HILL, September 9, 2016

"The Real Story Behind Trump's Tax Returns," THE HILL, October 3, 2016

"Trump is Establishment No Matter What He Says," THE HILL, October 12, 2016

"Trump Brings the Big Lie About Voter Fraud," THE HILL, October 19, 2016

"How a New Clinton Presidency Will Change American Politics Forever," THE HILL, October 22, 2016

"The Media is Rigging the Election by Reporting WikiLeaks Emails," THE HILL,  October 26, 2016

"Why James Comey Must Resign Now," THE HILL, November 3, 2016

"Why Trump is Vulnerable to Impeachment," USA TODAY, April 18, 2017

"Donald Trump Meet the Real Andrew Jackson," THE HILL, May 5, 2017

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

Contributor: *The Hill*, 2014-present

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.


**TEACHING**

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), **Historians and the Living Past for Honors Students**, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, **Government and the Citizen (Honors Program),** Introduction to Historical Quantification, Public Policy in U. S. History, **Honors Seminar in U.S. Presidential Elections**, America's Presidential Elections, What Is America?, **Honors Seminar on FDR, Jews, and the Holocaust**.


**TELEVISION APPEARANCES**

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

**RADIO SHOWS**

I have participated in more than 2000 radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

**PRESS CITATIONS**

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

## SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

14

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April, 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April, 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November, 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February, 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August, 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, **"Election 2008: What Happened and Why?" Boston, February 2009**

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, **"The Keys for 2012" Chicago, April 2010**

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October, 2010, 2011

17

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forun, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department
of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle
States Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

19

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

    1.  directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
    2. chairing a public session at the Smithsonian on how to do the history of one's own family.
    3. helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
    4. editing the volume of essays from the symposium.

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (<u>Anderson v. Celebreeze</u>

1983).  According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

**ALLAN J. LICHTMAN, CASES (DATES APPROXIMATE)**
**DEPOSITION, AFFIDAVIT, OR ORAL TESTIMONY**

North Carolina State Conference of the NAACP v.
McCrory, et al.

Terrebonne Parish NAACP v. Jindal, (United States District Court For The Middle District of Louisiana), 2017.

One Wisconsin Institute v. Nichols (United States District Court for the Western District of Wisconsin) 2016

Brown v. Detzner (United States District Court for the Northern District of Florida) 2016

Lee v. Virginia State Board of Elections (United States District Court for the Eastern District of Virginia) 2016

Romo v. Detzner, (Circuit Court for the Second Judicial Circuit, Leon County) 2015

League of Women Voters v. Detzner, (Circuit Court for the Second Judicial Circuit, Leon County) 2015

North Carolina State Conference of the NAACP v. McCrory (United States District Court Middle District of North Carolina) 2015

Veasey v. Perry (U. S. District Court, Southern District of Texas, Corpus Christi Div.) 2014

Newton, et al.  vs. Alabama (U. S. District Court, Alabama) 2013

North Carolina NAACP v. North Carolina (State Superior Court, North Carolina) 2013

Texas v. United States (Voter ID) (U. S. District Court, District of Columbia) 2012

Texas v. United States (Redistricting) (U. S. District Court, District of Columbia) 2012

Coalition for Equity and Excellence in Higher Education v. Maryland Higher Education Committee, et al. (U. S. District Court, Maryland) 2012, Remedy, 2017

Radogno, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Perez, et al. v. Perry, et al. (U. S. District Court, Texas) 2011

United States vs. Demario James Atwater (U. S. District Court, North Carolina) 2010

Boddie v. Cleveland School Board, Mississippi (U.S. District Court, Mississippi) 2010

Esther V. Madera Unified School District (Superior Court, California) 2008

Negron v. Bethlehem Area School District (U.S. District Court, Pennsylvania) 2008

Farley v. City of Hattiesburg (U.S. District Court, Mississippi) 2008

Jamison v. City of Tupelo (U.S. District Court, Mississippi) 2005

Session v. Perry (U.S. District Court, Texas) 2003

Rodriguez v. Pataki (U.S. District Court, New York) 2003

Boddie v. Cleveland, Mississippi (U.S. District Court, Mississippi) 2003

Levy v. Miami-Dade County (U.S. District Court, Florida) 2002

Martinez v. Bush (U.S. District Court, Florida) 2002

Curry v. Glendening (Maryland, State Court) 2002

O'Lear v. Miller (U.S. District Court, Michigan) 2002

Campuzano v. Illinois Board of Election (U.S. District Court, Illinois) 2002

Vieth v. Commonwealth of Pennsylvania (U.S. District Court, Pennsylvania) 2002

Leroux v. Miller (Michigan, State Supreme Court) 2002

Balderas v. State of Texas (U.S. District Court, Texas) 2001

Del Rio v. Perry (Texas, State Court) 2001

Page V. Bartels (U.S. District Court, New Jersey) 2001

West v. Gilmore (Virginia, State Court), 2001

U.S. v. City of Santa Paula  (California, U.S. District Court) 2001

NAACP v. Fordice (Mississippi, U.S. District Court) 2000

Voting Integrity Project v. Marc Fleisher (Arizona, U.S. District Court) 2000

Packingham v. Metropolitan Dade County (U.S. District Court, Florida) 1999

Houston v. Lafayette County (U.S. District Court, Northern District of Mississippi, Western District) 1991, 1998

Citizens to Establish a Reform Party in Arkansas v. Sharon Priest (U.S. District Court, Eastern District of Arkansas) 1996

National Coalition v. Glendening (U.S. District Court, Maryland) 1996

Vecinos de Barrio Uno v. Holyoke (U.S. District Court, Massachusetts), 1996

Scott v. Florida Senate (U.S. District Court, Middle District of Florida) 1995

King v. Board of Elections (U.S. District Court, Northern District of Illinois) 1995

Vera v. Richards (U.S. District Court, Southern District of Texas) 1994

United States v. Jones (U.S. District Court, Southern District of Alabama) 1994

Johnson v. Miller (U.S. District Court, Southern District of Georgia, Augusta Division) 1994

Hays v. Louisiana (U.S. District Court, Western District of Louisiana, Shreveport Division) 1993

People Who Care v. Rockford Board of Education (U.S. District Court, Northern District of Illinois, Eastern Division) 1993

Republican Party of North Carolina v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Shaw v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Neff v. Austin (State of Michigan, Supreme Court) 1992

Terrazas v. Slagle (U.S. District Court, Western District of Texas, Austin Division) 1992

Gonzalez v. Monterey County (U.S. District Court, Northern District of California) 1992

DeGrandy v. Wetherell (U.S. District Court, Northern District of Florida, Tallahassee Division) 1992

NAACP v. Austin (U.S. District Court, Eastern District of Michigan, Eastern Division) 1992

Good v. Austin (U.S. District Court, Eastern District of Michigan, Southern Division) 1992

<u>Ortiz v. City of Philadelphia</u> (U.S. District Court, Eastern District of Pennsylvania) 1991-1993

<u>FAIR v. Weprin</u> (U.S. District Court, Northern District, of New York) 1992

<u>Davis v. Chiles</u> (U.S. District Court, Northern District of Florida) 1991

<u>McDaniels v. Mehfoud</u> (U.S. District Court, Eastern District of Virginia) 1991

<u>Rollins v. Dallas County Commission</u> (U.S. District Court, Southern District of Alabama) 1991-1992

<u>Ward v. Columbus County</u> (U.S. District Court, Eastern District of North Carolina) 1991

<u>Republican Party State Committee v. Michael J. Connolly</u> (U.S. District Court, Massachusetts) 1991

<u>Jenkins v. Red Clay Consolidated School District</u> (U.S. District Court, District of Delaware) 1991

<u>Watkins v. Mabus</u> (U.S. District Court, Southern District of Mississippi) 1991

<u>Mena v. Richards</u> (Hidalgo County Texas District Court) 1991

<u>Republican Party of Virginia v. Wilder</u> (U.S. District Court, Western District of Virginia) 1991

<u>Nipper v. Chiles</u> (U.S. District Court, Middle District of Florida) 1991-1994

<u>Smith v. Board of Superivsors of Brunswick County</u> (U.S. District Court, Eastern District of Virginia) 1991-1992

<u>New Alliance Party v. Hand</u> (U.S. District Court, Alabama) 1990

<u>Concerned Citizens v. Hardee County</u> (U.S. District Court, Florida) 1990

<u>United Parents Association v. NYC Board of Elections</u> (U.S. District Court, New York) 1990

<u>Garza v. County of Los Angeles</u> (U.S. District Court, California) 1990

<u>Person v. Moore County</u> (U.S. District Court, Middle District of North Carolina, Rockingham Division) 1989

<u>Ewing v. Monroe County</u> (U.S. District Court, Northern District of Mississippi) 1989

<u>White v. Daniel</u> (U.S. District Court, Eastern District of Virginia) 1989

Gunn v. Chickasaw County (U.S. District Court, Mississippi) 1989

SCLC v. State of Alabama (U.S. District Court, Middle District of Alabama, Northern Division) 1989-1995

Bradford County NAACP v. City of Starke (U.S. District Court, Middle District of Florida) 1988

PUSH v. Allain (U.S. District Court, Mississippi) 1988

Baltimore Neighborhoods, Inc. v. C.F. Sauers (U.S. District Court, Maryland) 1988

United States v. Wicomico County (U.S. District Court, Maryland) 1988

Metropolitan Pittsburgh Crusade v. City of Pittsburgh (U.S. District Court, Western District of Pennsylvania) 1987

McNeil v. City of Springfield (U.S. District Court, Central District of Illinois) 1987

Harper v. City of Chicago Heights (U.S. District Court, Northern District of Illinois) 1987-1993

Robinson v. City of Cleveland (U.S. District Court, Delta District of Mississippi) 1987

Martin v. Allain (U.S. District Court, Southern District of Mississippi) 1987

Smith v. Clinton (U.S. District Court, Eastern District of Arkansas) 1987

Burrell v. Allain (U.S. District Court, Southern District, of Mississippi) 1986

United States v. Dallas County (U.S. District Court, Southern District of Alabama) 1986

United States v. Marengo County (U.S. District Court, Southern District of Alabama) 1986

Jordan v. City of Greenwood (U.S. District Court, Mississippi) 1984

Johnson v. Halifax County (U.S. District Court, Eastern District of North Carolina) 1984

Anderson v. Celebreeze (U.S. District Court, Ohio) 1980