# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | * |
| O. JOHN BENISEK, *et al*., | * |
| *Plaintiffs*, | * |
| v. | *    Case No. 13-cv-3233 |
| LINDA H. LAMONE., *et al*., | * |
| *Defendants*. | * |

\*       \*       \*       \*       \*       \*       \*

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Respectfully submitted,

Dated: June 30, 2017

BRIAN E. FROSH
Attorney General of Maryland

JENNIFER L. KATZ (Bar No. 28973)
SARAH W. RICE (Bar No. 29113)
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7005 (tel.); (410) 576-6955 (fax)
jkatz@oag.state.md.us

Attorneys for defendants

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTS ...................................................................................................................... 3

    The Redistricting Process in Maryland ..................................................... 3

    Gathering Input for the 2011 Congressional Map ...................................... 6

    Drawing the 2011 Congressional Map ..................................................... 11

    Characteristics of the 2011 Congressional Redistricting Map ............... 14

    Political Composition of the Sixth District ............................................. 18

    Post-Redistricting Congressional Elections in the Sixth District ........... 21

    Statistical Measures Show the Congressional Plan Lacks Partisan Bias .............. 23

ARGUMENT .......................................................................................................... 24

I.    STANDARD OF REVIEW ................................................................................. 24

II.    PLAINTIFFS HAVE FAILED TO COME FORWARD WITH SUFFICIENT EVIDENCE TO RAISE A GENUINE ISSUE FOR TRIAL ON ANY OF THE ELEMENTS OF FIRST AMENDMENT RETALIATION ..................................................................... 25

    A.    Plaintiffs Have Failed to Raise a Genuine Issue for Trial that the Governor or GRAC Acted With the Specific Intent to Retaliate Against Plaintiffs for Their First Amendment Expression. ...................... 25

    B.    Plaintiffs Have Failed to Raise a Genuine Issue for Trial that the 2011 Congressional Redistricting Plan Resulted in a Demonstrable and Concrete Injury. ....................................................................... 32

        1.    Plaintiffs Provide No Explanation of What Distinguishes Permissible from Impermissible Vote Dilution in the Partisan Context. ............................................................................... 35

        2.    Plaintiffs Have Not Demonstrated the Identified Vote Dilution Burdened Their First Amendment Expression. ............... 38

    C.    Plaintiffs Have Failed to Raise a Genuine Issue for Trial that the Governor's and GRAC's Alleged Retaliatory Animus Was the "But-For" Cause of any Election Outcome. ....................................... 42

III.   PLAINTIFFS' FIRST AMENDMENT RETALIATION CLAIM IS BARRED BY LACHES BECAUSE PLAINTIFFS' INEXCUSABLE DELAY IN BRINGING THE CLAIM HAS PREJUDICED THE STATE. .................................................................. 47

IV.   THE PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUIRED ELEMENTS TO OBTAIN A PRELIMINARY INJUNCTION........................................................................ 50

    A.   Plaintiffs Have Made No Showing of Irreparable Harm. ........................... 51

    B.   The Balance of Equities Does Not Weigh in Favor of Plaintiffs. ............... 54

    C.   A Preliminary Injunction Is Not in the Public Interest. .............................. 54

CONCLUSION ................................................................................................................ 55

## TABLE OF AUTHORITIES

Page

### Cases

*Acevedo-Diaz v. Aponte,* 1 F.3d 62 (1st Cir. 1993) ................................................. 43, 44

*Anne Arundel County Republican Cent. Comm. v. State Admin. Bd. of Election Laws*, 781 F. Supp. 394 (D. Md. 1991), *aff'd*, 504 U.S. 938 (1992) ...................... 4, 15

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). ........................................... 40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................. 24

*Centro Tepeyac v. Montgomery County,* 722 F.3d 184 (4th Cir. 2013) .......................... 51

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ................................................... 37, 53

*Costello v. United States,* 365 U.S. 265 (1961) ............................................... 47

*Davis v. Bandemer*, 478 U.S. 109 (1986) ........................................... 25, 33, 35, 42

*Doe v. Banos*, 713 F. Supp. 2d 404 (D.N.J. 2010), *aff'd on other grounds*, 416 F. App'x 185 (3d Cir. 2010) ......................................................................... 52

*Drewitt v. Pratt*, 999 F.2d 774 (4th Cir. 1993) ................................................ 25

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) .............................................. 43, 44

*Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598 (7th Cir. 2012) ..................................... 43

*Fletcher v. Lamone*, 831 F. Supp. 2d 887 (D. Md. 2011), *aff'd*, 133 S. Ct. 29 (2012) ......................................................................................... 14

*Giddens v. Isbrandtsen Co.,* 355 F.2d 125 (4th Cir. 1966). .................................... 49

*Gill v. Whitford*, --S. Ct.--, 2017 WL 2621675 (June 19, 2017) .............................. 53, 54

*Gill v. Whitford*, --S. Ct.--, 2017 WL 1106512 (June 19, 2017) ................................ 55

*Goff v. Burton*, 7 F.3d 734 (8th Cir. 1993) .................................................... 43

*Greene v. Doruff,* 660 F.3d 975 (7th Cir. 2011) ................................................ 44

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26 (2d Cir. 1996). ............................................................. 44

iii

*Hartman v. Moore*, 547 U.S. 250 (2006) ................................................... 43, 45

*Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412 (2016)............................ 26

*Johnson v. De Grandy*, 512 U.S. 997 (1994). ............................................ 34, 35

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................................ 32

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ............................... 37

*League of Women Voters of North Carolina  v. North Carolina*, 769 F.3d
    224 (4th Cir. 2014)............................................................................ 53, 54

*Legislative Redistricting Cases*, 331 Md. 574 (1993) ........................................ 4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................ 48

*Maryland Citizens Comm. for Fair Cong. Redistricting, Inc. v. Tawes*, 226 F.
    Supp. 80 (D. Md. 1964) .................................................................. 5

*Maryland Citizens Comm. for Fair Cong. Redistricting, Inc. v. Tawes*, 253 F.
    Supp. 731 (D. Md. 1966) ........................................................... 5, 16, 17

*Maryland v. King*, 567 U.S. 1301 (2012) ...................................................... 54

*Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022 (D. Md.
    1994 ............................................................................................ 35

*McCrory v. Harris*, 136 S. Ct. 1001 (2016) ................................................... 53

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................. 24

*McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995) ................................ 43, 44

*Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274
    (1977) ................................................................ 42, 43, 44, 46

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977).................... 54

*Perry v. Judd,* 840 F. Supp. 2d 945 (E.D. Va. 2012), *aff'd,* 471 F. App'x 219
    (4th Cir. 2012)............................................................................ 47

*Perry v. Sindermann*, 408 U.S. 593 (1972). .................................................. 26

*Preston v. Bd. of Trs. of Chicago State Univ.*, 120 F. Supp. 3d 801 (N.D. Ill. 2015)....... 51

*Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001).................................................. 45

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................................... 31

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) ................................. 40

*Scott v. Harris*, 550 U.S. 372 (2007)......................................................... 24, 25

*Shady v. Tyson*, 5 F. Supp. 2d 102 (E.D. N.Y. 1998)......................................... 52

*Swift & Co. v. United States*, 196 U.S. 375 (1905). ........................................... 26

*Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005)................................................ 52

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ........................................... 3, 32, 35, 42

*Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011) ................................................. 45

*Williams v. City of Carl Junction, Missouri*, 480 F.3d 871 (8th Cir. 2007)...................... 45

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................. 50

*Woods v. Smith*, 60 F.3d 1161 (5th Cir. 1995) ................................................. 43

## Constitutional Provisions

Md. Const. art. II, § 17 ...................................................................................... 5

Md. Const. art. III, § 5 .................................................................................... 4, 5

Md. Const. art. XVI.............................................................................................. 5

Md. Const. art. XVI, § 2................................................................................... 5, 6

## Statutes

Fed. R. Civ. P. 56(a) ......................................................................................... 24

Fed. R. Civ. P. 56(c) ......................................................................................... 24

## Miscellaneous

Nicholas O. Stephanopoulos Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015) ................................... 24, 38

Herbert C. Smith & John T. Willis, *Maryland Politics and Government* 270 (2012). ............................................................................................................ 27

Jowei Chen & Jonathan Rodden, *Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures*, 8 Q. J. Pol. Sci. 239 (2013)............. 38

## INTRODUCTION

After ample opportunity for discovery, Plaintiffs' motion and supporting exhibits reveal that they are unable to satisfy "the three elements of intent, injury, and causation" that this Court articulated as forming the basis of Plaintiffs' First Amendment retaliation claim. *See* ECF 88 at 32. Instead, by insisting that the political branches' constitutional authority to undertake redistricting must take place in a vacuum, without regard to the expressed wishes of constituents, Plaintiffs have expressly discarded the "important limitations" this Court has recognized as necessary to "help ensure that courts will not needlessly intervene in what is quintessentially a political process." *Id.*

Plaintiffs have failed to offer any proof (since none exists) to establish the threshold element of intent, *i.e.*, that "the legislature specifically intended to burden the representational rights of certain citizens because of how they had voted in the past and the political party with which they had affiliated." *Id.* at 34. Indeed, Plaintiffs do not make any effort to address whether the legislature intended to burden anyone's rights. Plaintiffs' singular focus on proving that certain State actors were motivated in drawing the boundaries of the Sixth District by a desire to create a competitive or even Democratic-leaning district misses the mark both because (1) it assumes an equivalence that does not exist between a specific intent to burden certain citizens' representational rights and a desire to draw a district with certain characteristics; and (2) it ignores much of the undisputed evidence that exists about the actual intentions of the relevant actors.

Moreover, in failing to make any accounting for the behavior (or even existence) of unaffiliated voters, Plaintiffs have offered no proof of "the tangible and concrete adverse effect" necessary to establish the requisite injury, *id.* at 32, which the Court has described as "dilution of the weight of certain citizens' vote by reason of their views has actually altered the outcome of an election," *id.* at 34. As to the third element of the Court's test, causation, Plaintiffs have expressly disclaimed their duty to demonstrate any causal connection between the elements of intent and injury. Pls.' Mem. (ECF 177-1) at 28-29. In doing so, Plaintiffs effectively concede that they cannot satisfy their burden of proving that "absent the mapmakers' intent to burden a particular group of voters by reason of their views, the concrete adverse impact would not have occurred." ECF 88 at 32.

All of Plaintiffs' arguments hinge on a single false premise: that individuals who affiliate with a party have a right to maintain electoral successes gained by their party under prior redistricting maps. Plaintiffs further compound this error by reasoning from a second, independent logical error—that intent can be inferred purely from effect. This Court has squarely rejected that view, and has instead instructed that it is not sufficient to prove that the legislature "was aware of the likely political impact of its plan and nonetheless adopted it." ECF 88 at 34. But Plaintiffs have produced no evidence that any decisionmaker "specifically intended to burden the representational rights of certain citizens," *id.*—the only evidence produced proves merely that the mapdrawers intended to create a more competitive district, one that slightly advantaged Democrats without considering any particular citizen's political conduct. There is no basis in this Court's test or logic for treating as equivalent a specific intent to burden the rights of certain individuals and a

2

general desire to re-balance the make-up of a district.  Doing so would impose an unreasonable and limitless restraint on the redistricting process.

Plaintiffs' alternative map cannot cure these profound deficiencies in their claim. As discussed below, Plaintiffs' expert admits that the proposed alternative map's configuration would affect the political makeup of the district by making it more Republican, which would inflict the same harm on Democratic voters moved into that alternative district that Plaintiffs allege was inflicted on them.  In other words, the alternative map simply imposes the alleged injury of which Plaintiffs complain on another group, and it does so for partisan purposes.  If Plaintiffs' weak form of intent were adopted as the standard, it would apply equally to condemn an alternative map drawn with the intent to *preserve* Republican voting power.

Ultimately, adoption of Plaintiffs' view would calcify already polarized congressional delegations by prohibiting "vote dilution" even in previously packed and uncompetitive districts.  Moreover, it would require mapmakers to prioritize maintaining false political neutrality (at least with respect to party-affiliated voters) over all other considerations.  Such proscriptive standards are inconsistent with the Supreme Court's recognition of redistricting as "root-and-branch a matter of politics."  *Vieth v. Jubelirer*, 541 U.S. 267, 285 (2004) (Scalia, J., plurality op.).

## FACTS

### The Redistricting Process in Maryland

Although congressional reapportionment is not specifically mentioned in the Maryland Constitution or Maryland Code, as a matter of custom, the congressional

reapportionment plan is developed and adopted via the same procedure that the Maryland Constitution provides for legislative redistricting.   Article III, § 5 of the Maryland Constitution sets forth the process by which Maryland Senate and House districts are to be drawn after every decennial census.  "[A]fter public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts[.]"  *Id.*  The Governor must then "present the plan to the President of the Senate and Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly, not later than the first day of its regular session in the second year following every census[.]"  *Id.*  "[T]he Governor may call a special session for the presentation of his plan prior to the regular session," *id.*, and the option of calling a special session has been invoked for consideration of a congressional reapportionment plan.   *See, e.g.*, *Anne Arundel County Republican Cent. Comm. v. State Admin. Bd. of Election Laws*, 781 F. Supp. 394, 395 (D. Md. 1991), *aff'd*, 504 U.S. 938 (1992) (competing congressional redistricting bills, each drafted by the Governor's Redistricting Advisory Committee, introduced in Senate and House in special session).

It has become customary for the Governor to appoint a Governor's Redistricting Advisory Committee ("GRAC") to assist in the preparation of the plan.  *See, e.g.*, *Legislative Redistricting Cases*, 331 Md. 574, 579 & n.1 (1993) (describing then-Governor William Donald Schaeffer's appointment of a five-member GRAC).   Because the Governor must present the plans to the President of the Senate and the Speaker of the House of Delegates, these legislative leaders traditionally have served on the GRAC. *See id.*  The GRAC conducts public hearings throughout the State, in accordance with the constitutional

mandate for legislative plans, *see id.*, and also receives public comments submitted in written form, *see* Joint Stipulations (ECF 104) ¶¶ 22, 26.  The GRAC also solicits and receives plan proposals from third parties (ECF 104 ¶ 23), including, among others, the Democratic members of Maryland's congressional delegation. For decades, as part of the redistricting process, Maryland's Democratic congresspersons have "tend[ed] to caucus" and "to then endeavor to come upon some consensus to present to the Governor" with regard to their opinions about the shape of the congressional districts.  Ex. 52 (John T. Willis Dep.) at 174:2-6; 184-88.

Once the Governor introduces the plan to the Senate President and House Speaker, the General Assembly may modify the plan by offering amendments or alternatives.  The Governor retains veto power over any plan passed by the legislature.  Md. Const., art. II, § 17.  Although in other respects congressional redistricting follows the constitutional process for legislative redistricting, congressional redistricting is not considered subject to the provision of Article III, § 5, that authorizes the Governor's legislative redistricting plan to become law if the General Assembly does not act within 45 days.

Redistricting legislation may be petitioned to referendum.  Md. Const., art. XVI; *see also Maryland Citizens Comm. for Fair Cong. Redistricting, Inc. v. Tawes*, 253 F. Supp. 731, 732 (D. Md. 1966) (1965 plan petitioned to referendum); *Maryland Citizens Comm. for Fair Cong. Redistricting, Inc. v. Tawes*, 226 F. Supp. 80, 81 (D. Md. 1964) (original plan after 1960 census petitioned to referendum).  Typically, the General Assembly passes congressional redistricting legislation as "an emergency law," which "shall remain in force" pending the outcome of a referendum petition.  Md. Const., art. XVI, § 2.  If the

redistricting legislation were rejected by referendum, the plan would be "repealed thirty days after having been rejected by a majority of the qualified electors voting thereon." *Id.*

### Gathering Input for the 2011 Congressional Map

In conformance with custom, in July 2011, then-Governor Martin O'Malley appointed five members to the GRAC, including Senate President Thomas V. Mike Miller and House of Delegates Speaker Michael Busch.  ECF 104 ¶¶ 18, 20.  The Governor appointed his Appointments Secretary Jeanne D. Hitchcock to chair the GRAC, and appointed as additional members James J. King, a former Republican member of the House of Delegates from Anne Arundel County, and Richard Stewart, a private business owner. *Id.* ¶¶ 19-20.

In accordance with its charge, the GRAC solicited input from Marylanders across the State, and held 12 public hearings during July through September 2011.  *Id.* ¶ 22. Governor O'Malley sought to have the redistricting process be as "collaborative[] as possible with as broad a consensus as possible," mindful of the constitutional and statutory mandates governing congressional redistricting.  Ex. 2 (Martin O'Malley Dep.) at 16-17. Governor O'Malley kept abreast of the status of these hearings and feedback provided by his constituents through his regular communications with his Appointments Secretary and GRAC Chair, Ms. Hitchcock, and his Chief Legislative Aide, Joseph Bryce.  *Id.* at 18:1-21:21.

At hearings conducted in western Maryland, residents testified about the connections between Montgomery County and Frederick County along Interstate 270 ("I-

270") corridor and into western Maryland, and advocated for adjoining Montgomery County with Frederick County and the other western Maryland Counties in the State's Sixth Congressional District.  *See* Ex. 3 (Public Test.).  These residents testified about transportation patterns between Frederick, Hagerstown, and Montgomery County along I-270 (*id.* at MCM000021-22, 50-51, 71-72); the growing economic and other connections between Frederick and Montgomery Counties (*id.* at MCM000031, 32-33, 37-38, 71-72); Montgomery County's shared natural boundary with the other counties of the Sixth District (*id.* MCM000032-33, 71-72); and the historical connection between Montgomery County and the other counties in the Sixth District (*id.* at MCM000032-33, 47, 71-72; *see also* MCM000217 (testimony of former Plaintiff, Stephen Shapiro)).  For example, former Delegate Sue Hecht testified about how as a State delegate she helped develop the technology corridor along I-270, including one company's expansion from Montgomery County into Frederick County.  Ms. Hecht recalled former Montgomery County Executive Doug Duncan's statement at the time that "There is no such thing as county lines between . . . Frederick and Montgomery County[.]"  Ex. 3 at MCM000052.

These connections between Frederick and Montgomery Counties were not created from thin air, as the Plaintiffs appear to allege, but rather were widely known and supported by data available at the time.  As the Baltimore Sun reported in August 2011 (Ex. 4):

> About one-third of the 131,000 people who moved to Frederick County in the past 10 years came from Montgomery County, according to Internal Revenue Service data.

> The MARC's Brunswick line, which runs from Washington's Union Station to Martinsburg, W.Va., has seen a 34 percent increase in train ridership in

the past decade, and there are roughly 10,000 more cars per day on Interstate 270 than 10 years ago.

Nowhere is the growth more apparent than in the rolling developments in Urbana, the first exit off I-270 in Frederick County.

As stated by former Plaintiff Stephen Shapiro in public testimony before the GRAC, "based on history and geography," pairing "the western third of Montgomery County . . . with Western Maryland . . . would be a reasonable situation and one that existed several decades ago." Ex. 3 at MCM000217. Residents also testified that linking Montgomery County with the other counties in the Sixth District would create a competitive political district to allow for "a good race between two quality candidates" that was focused more on "what they're presenting to the people – to the district," with less emphasis on party affiliation. *Id.* at MCM000014; *see also id.* at MCM000028MCM000218 (Mr. Shapiro expressing concern that non-competitive districts had "decreased turnout and interest" in the general election "where the result is usually a foregone conclusion" and advocating for a more competitive Sixth District). Residents of Frederick, in particular, testified about the shifting demographics of Frederick becoming more Democratic in numbers and yet feeling "shut out of the process" because "their politics weren't represented at all at the national level." *Id.* at MCM00040-41. Andrew Duck, a former candidate for Congress in the Sixth District, testified about the difficulties in campaigning for office across the Sixth District and the distinct and different concerns among communities in the western Maryland panhandle and those proximate to the Baltimore region. *Id.* at MCM00035-38; *see also* MCM000026, 30-31, 48.

GRAC members also heard testimony from constituents of Prince George's County who advocated for having "Prince George's County shared between the [Fourth] and the [Fifth] Congressional Districts" and, thus, placing Montgomery County within "the [Eighth] and the [Sixth] Congressional Districts." *Id.* at MCM000141; *see also id.* at MCM000156, 190-91.

These two concerns – residents of western Maryland discussing connections along the I-270 corridor and residents of Prince George's County not wanting their district to cross into Montgomery County – resonated with Ms. Hitchcock, the GRAC chair. Ex. 5 (Jeanne D. Hitchcock Dep.) at 58-59, 83, 84, 92. She was careful to ensure that these concerns were reflected in the final map. *See id.* at 83-84, 91-92. Governor O'Malley was particularly mindful of testimony reflecting the "anticipation that . . . the borders would change the most out that [I-]270 Corridor in a kind of west-northwesterly direction from the nation's capital." Ex. 2 at 21:15-21.

Given the inherent interests of the congressional delegation in the redistricting process, as part of his collaborative process, Governor O'Malley tasked Congressman Steny Hoyer, the dean of Maryland's House delegation, with developing a consensus map among the Democratic members. *Id.* at 47-48. Toward that end, Governor O'Malley shared with Congressman Hoyer certain parameters for the congressional map, including that the map should respond to "the natural migration" that was occurring "north and west out of the Washington suburbs" and should respect the "natural geographic border" of the Chesapeake Bay; and that the "change in lines would mostly be affecting the Western Shore where the greatest numbers of people live and where the population growth was

best." *Id.* It was generally understood "that the population shift in [Maryland] was out [the I-]270 corridor, . . . and that that's where the congressional lines would change the most." *Id.* at 79:15-18.

Although the Plaintiffs have characterized Governor O'Malley's solicitation of input from the congressional delegation as a "behind-the-scenes process," it was public knowledge that the Democratic members of Maryland's congressional delegation were seeking to create a consensus proposal for the congressional map. *See* Ex. 6 (reporting on congressional delegation's efforts). Such input from the congressional delegation is common in redistricting. Ex. 52 (Willis Dep.) at 185-88. It was no secret that this consensus map would, among other considerations, seek to create a newly competitive district for Democrats. *See* Exs. 4, 6.

The congressional delegation hired a consultant from NCEC Services to draw the map they would submit to the Governor. Ex. 7 (Eric Hawkins Dep.) at 35:16-37:10. According to Eric Hawkins, the democratic consultant from NCEC Services who drafted the congressional delegation map, "one of the goals was, because the state was so Democratic, to see if there was a possibility for another Democratic district." *Id.* at 48: 18-21. Mr. Hawkins believed that an additional Democratic seat would "reflect the state's voting behavior," and that if incumbency protection were not at issue, the Democratic voting strength possibly "could support eight Democratic districts." *Id.* at 230-31. Indeed, it would have been possible to draw a congressional map that favored Democrats in all eight congressional districts in 2012. *See* Ex. 8 (Report of Allan J. Lichtman) at 48-49 & Table 19; Ex. 9 (Decl. of William S. Cooper) ¶¶ 14-16 & Exs.; Ex. 10 (Suppl. Decl. of

William S. Cooper) & Exs.  As Defendants' expert Dr. Allan Lichtman has demonstrated, Maryland's 2002 map did not reflect the voting strength of the Democratic majority in Maryland; in that respect, the congressional map was significantly less favorable to Maryland's dominant political party than were redistricting plans adopted in other similarly-sized states dominated by one party.  Ex. 8 at 44-45 & Table 17.  For example, after the 2010 election Massachusetts and Connecticut had 100 percent of their congressional seats held by Democrats, compared to 75 percent in Maryland, despite the three states' very similar democratic performance in the 2008 presidential election.  *Id.*

Contrary to Plaintiffs' assertion, the map created for the congressional delegation by Mr. Hawkins and submitted to the GRAC, was not the map adopted by the State.  Ex. 11 (Yaakov Weissmann Decl.) ¶ 9; Ex. 2 (O'Malley Dep.) at 78:1-12, 79:11-18.  Governor O'Malley was not satisfied with that map.  Ex. 2 at 78:1-12.  To inform the map drawing process going forward, Governor O'Malley met with each member of Maryland's congressional delegation, including Republicans Roscoe Bartlett and Andy Harris, to solicit their input.  *Id.* at 49-52.

**Drawing the 2011 Congressional Map**

The Governor's Office, led by Mr. Bryce, with the assistance of staff members to Senate President Miller and House Speaker Busch, drafted the contours of the map that ultimately became Senate Bill 1.[1]  Ex. 11 (Weissmann Decl.) ¶¶ 7, 9-10, 13.  These staffers

---

[1] Because the congressional map concerned the members of the congressional delegation and was shepherded mainly by the Governor's Office, neither President Miller

11

worked with the census data provided to them and loaded onto a laptop prepared specifically for the redistricting process by the Maryland Department of Legislative Services.  *Id.* ¶ 4.  Also available were data reflecting party registration and voting history at the precinct level.  *Id.*

The map developed by staffers to the Governor and the GRAC differed materially from the congressional delegation's map in at least four pertinent respects.  Unlike the congressional delegation's plan, the map developed by staffers to the Governor and GRAC (1) kept intact Washington County, Frederick City (with the exception of an unintentional split at a fork in the road with zero population), Hagerstown, and Westminster; (2) kept the number of districts in Prince George's County to just two by drawing the Third and the Eighth Districts so that they did not include population from Prince George's County; (3) kept the number of districts in Montgomery County to three by drawing the Fourth District so that it did not include population from Montgomery County; and (4) made the I-270 corridor a major feature of the Sixth District, connecting Frederick with Montgomery County.  *Id.* ¶¶ 8-9.

Governor O'Malley also considered various demographic and geographic factors, including electing to respect the natural boundaries of the Chesapeake Bay and not cross it for purposes of drawing the lines of the First District.  Ex. 2 (O'Malley Dep.) at 24; Ex. 12 (GRAC presentation) at MCM002457.  Governor O'Malley recognized "from the growth patterns on the map, particularly the growth that 270 and into Frederick . . . [that] because

---

nor Speaker Busch was intimately involved in drawing the district boundaries.  *See* Ex. 13 (Thomas V. Mike Miller Dep.) at 81-82; Ex. 46 (Michael Busch Dep.) at 34-35, 38-39.

the growth was mostly westerly out of the Washington suburbs, . . . the entire map on the Western Shore would kind of shift a little bit to the north and to the west." Ex. 2 (O'Malley Dep.) at 24-25.  He was keenly aware that the State's "population had shifted and grown," that the "growth was mostly out West," and that "to accommodate that growth, the borders would change most on the western side of the Eastern Shore."  *Id.* at 24.  He recognized the economic connections along the I-270 corridor, including the reality that many residents of Frederick work "in [the I-]270 Corridor," and that large bio-tech companies are located along that route in both Montgomery and Frederick Counties.  *Id.* at 40-41; *see also* Ex. 13 (Miller Dep.) at 19:14-22 (recognizing map reflected obvious growth in the I-270 corridor); Ex. 46 (Busch Dep.) at 141, 169-73 (discussing growth in Montgomery and Frederick Counties).  The composition of the Sixth and Eighth Districts reflects this population growth, commuting patterns, and other economic and migratory patterns along the I-270 corridor.  Ex. 12 (GRAC presentation) at MCM002463-64, 2466-67.

Further, along with these other considerations, Governor O'Malley intended to develop the "districts in a way that was more advantageous to [the Democratic] party[.]" Ex. 2 (O'Malley Dep.) at 9.  In addition to various factors that impact congressional boundary lines, including geographic limitations, population shifts, the one person-one vote constitutional mandate, and respecting the composition of majority-minority districts, Governor O'Malley intended to develop a map that would "make it more likely rather than less likely that a Democrat . . . is able to prevail in the general election."  *Id.* at 42-43.

These priorities of Governor O'Malley coalesced into the congressional map that was enacted into law:  the First District does not cross the Chesapeake Bay, the districts

west of the Bay reflect population growth north and west out of the Washington, D.C. suburbs, the Sixth District reflects the Frederick-Montgomery County connections along the I-270 corridor, and the Sixth District is a competitive district in which it is "more likely rather than less likely that a Democrat . . . is able to prevail in the general election."

On October 15, 2011, Governor O'Malley submitted his proposed map to the Senate President and House Speaker.  ECF 104 ¶ 33.  On October 18, 2011, the Senate passed Senate Bill 1, and sent it to the House of Delegates, which passed the bill on October 19, 2011.  The Governor signed Senate Bill 1 into law on October 20, 2011.  *Id.* ¶ 34.

Senate Bill 1 was petitioned to referendum.  *Id.* ¶ 39.  The statewide referendum Question 5 on the 2012 ballot asked voters whether they were "for" or "against" the Maryland law "[e]stablish[ing] the boundaries for the State's eight United States Congressional Districts based on recent census figures, as required by the United States Constitution."  *Id.*  The referendum passed overwhelmingly, with 1,549,511 votes (64.1 percent) cast in favor of the referendum and 869,568 votes (35.9 percent) cast against the law.  *Id.*  Only Carroll and Garrett Counties had more votes against than in favor of Question 5.  *Id.*  Voters in Allegany, Frederick, and Washington County voted in favor. *See id.*

### Characteristics of the 2011 Congressional Redistricting Map

Like the two previous congressional redistricting plans, the 2011 plan contains two majority African-American congressional districts, the Seventh and Fourth Districts.  *See Fletcher v. Lamone*, 831 F. Supp. 2d 887, 891 (D. Md. 2011), *aff'd*, 133 S. Ct. 29 (2012).

14

In keeping with a request by the Legislative Black Caucus and others, Prince George's County is now included in only two districts – the Fourth and Fifth Districts – instead of three.  *Id*. at 902; Ex. 3 at MCM000141, 156, 190-91.  The 2011 plan also resulted in a decrease in the number of congressional districts in Harford County and Baltimore County.  *Compare* Ex. 14 (2002 map) *with* Ex. 15 (2011 map).

One of the most visible changes between the 2002 and 2011 maps was the reversal of a choice of the 2002 Governor and General Assembly to "attach[] a portion of Anne Arundel County to the eastern shore by way of the Chesapeake Bay Bridge," "rather than extend District 1 from the eastern shore into Representative [Helen] Bentley's district[.]" *Anne Arundel Cty. Republican Cent. Comm. v. State Admin. Bd. of Election Laws*, 781 F. Supp. 394, 409 (D. Md. 1991), *aff'd*, 504 U.S. 938 (1992) (J. Niemeyer, dissenting); *see also* Ex. 2 (O'Malley Dep.) at 24; Ex. 12 (GRAC presentation) at MCM002457.

Making that change required coordinating changes in other districts.  The portions of Anne Arundel County in the former First District contained 107,577 people, according to the adjusted census numbers.  Ex. 8 (Lichtman) at 51, Table 20; Ex. 9 (Cooper Decl.) ¶¶ 17-19 & Exs.  At the time of redistricting, the Second District, which was the only district other than the Sixth to border the northern portions of the First District, was underpopulated by 17,705 people compared to the ideal population.  Ex. 16 (census data) at MCM001239.  In turn, the Third and Seventh Districts, which bordered the Second, were also underpopulated.  *Id.*  Instead of extending southward into these underpopulated areas to fill the 107,577 person deficit created by elimination of the Chesapeake Bay crossing, the 2011 map extended the First District's reach into portions of what previously had been

the Sixth District: Harford and Baltimore Counties, with the district continuing from Cecil County's northern border along the border of Pennsylvania into Carroll County.  These portions of the 2002 Sixth District contained 106,562 people, nearly matching those lost in Anne Arundel County.  Ex. 8 (Lichtman) at 51, Table 20; Ex. 9 (Cooper Decl.) ¶ 18.

The Sixth District now consists of Garrett, Allegany, and Washington Counties in their entirety and then turns south, following the Potomac River and encompassing Frederick City and the development along the I-270 corridor.  Ex. 15 (2011 map). Following the natural course of the Potomac River to form the southern border of the Sixth District reflects an historic connection that the waterway forged through commerce and transportation corridors.  Ex. 17 (Report of John T. Willis) at 16-17.  Indeed, for much of Maryland's history, dating back to the initial Sixth District for the first federal congressional election in 1789, either the entirety or some portion of Montgomery County has been combined with the westernmost counties of Maryland to comprise Maryland's Sixth District.  *See id.* App. A, Map 1.  For nearly a century from 1872 through 1964, the entirety of Montgomery County was part of the Sixth District along with Allegany, Frederick, Garrett, and Washington counties.  *See id.* App. A, Maps 7 through 10.  Only in 1966, when the United States District Court for the District of Maryland drew Maryland's congressional districts to comply with the Supreme Court's one-person, one-vote decisions, was Montgomery County removed from the Sixth District.  *See Maryland Citizens Comm. for Fair Cong. Redistricting, Inc. v. Tawes*, 253 F. Supp. 731, 736-37 (D. Md. 1966); Ex. 17 (Willis) App. A, Map 11.  At that time, the court-drawn map moved Montgomery County from the Sixth District to the Eighth District and moved Carroll

16

County into the Sixth District, along with small portions of Howard and Baltimore Counties.[2]  *Maryland Citizens Comm. for Fair Cong. Redistricting*, 253 F. Supp. at 736-37.  Following the 1970 Census, the State placed a small portion of Montgomery County back into the Sixth District.  Ex. 17, App. A, Map 12.  Following the 1980 Census, the State redrew the Sixth District to include a much larger portion of Montgomery County running along the Potomac River (*id.* App. A, Map 13), similar to how the District is currently drawn.

The southern border choice also allows the Sixth District to capture highly agricultural areas of northwestern Montgomery County where much of the land is under agricultural preservation easement, Ex. 17 (Willis) at 20, and land is used for "horse farms," "corn, soy, pumpkin[,]" "peaches[,]" "blueberries and strawberries," and "Christmas trees."  Ex. 18 (Robert Garagiola Dep.) at 42-43.  The District similarly groups low-population density portions of Garrett, Allegany, Washington, Frederick and Montgomery Counties together.  *See* Ex. 47 (Maryland Population Density by Census Tract, 2010).  The Sixth District includes centers of concentrated population surrounding Cumberland, Hagerstown, Frederick City and the expansion of the Washington, D.C. suburbs up the I-270 corridor. The Sixth District therefore reflects Western Maryland's longtime trend in population growth.  Ex. 17 (Willis) at 15; *see also* Ex. 8 (Lichtman) at 26-27 & Table 8 (former Sixth District had a majority urban population).

---

[2] The 1966 court-drawn map placed Carroll County in a district with other counties with which it had not been joined since after the 1860 Census.  Ex. 17 App. A, Map 6.

17

The I-270 corridor is one of Maryland's major transportation routes, connecting many residents of the 2011 Sixth District with their jobs.   In 2002, the Maryland Department of Transportation began to plan for the long-term growth in this area and by 2009 an updated analysis of alternatives was available for public comment.   In that study, the Department of Transportation recognized the rapid growth in both population and employment occurring in Montgomery and Frederick Counties along the I-270 corridor. *See* Ex. 49 (2009 Executive Summary).   Consistent with this study, Census data reflects that in the counties comprising the Sixth District, most residents of the Sixth District commute to other parts of the Sixth District.   Ex. 8 (Lichtman) at 18.

### Political Composition of the Sixth District

The Sixth District is characterized by a competitive political geography where no ideology or political party maintains a firm grasp.   According to party registration statistics as of the 2010 general election, no party captured a majority of the registered voters residing in the 2011 Sixth District.   Ex. 19 (Report of Michael McDonald) Table 1. According to Plaintiffs' expert Dr. McDonald, Democrats are the plurality of registered voters in the Sixth District, accounting for 44.8 percent of 2010 registered voters, while Republicans constitute 34.4 percent and unaffiliated voters make up the remaining 20.8 percent of such voters.[3]   According to analysis done by at least one Republican candidate, the Sixth District contains "a larger than average number of Independents who typically

---

[3]   Dr. McDonald does not explain why he omits Green, Constitution, and Libertarian Party voters from his table, or whether he includes them in one of the three categories he does report.   His results are therefore not directly comparable to the statewide statistics.

identify as fiscal conservatives."  Ex. 20 (Sharon Strine Dep.) Ex. 3 at BEN_002076.  In comparison, according to statewide registration figures as of the 2010 gubernatorial election, the Maryland electorate as a whole was 56.4 percent Democratic party affiliated, 26.7 percent Republican party affiliated and 15.2 percent unaffiliated.  *See* Ex. 21 at MCM003841.

Election results underscore the competitive nature of the district.  The mean of the two-party vote across all statewide elections since 2012 is 47.1 percent Republican in the Sixth District, as compared to 39.1 percent Republican statewide.  Ex. 8 (Lichtman) at 7, Table 1.  In the political science literature, a district is usually categorized as competitive when this mean is between 45 and 55 percent.  *Id.* at 36 & n.79.

The Sixth District historically has been characterized by moderate policies and politicians.   Only in the last two decades, when it was stretched across nearly the entirety of the northern Maryland border, has the Sixth District been skewed toward one party, and elected one of the most conservative Republican politicians in the House of Representatives. Through the majority of the Twentieth Century, Sixth District voters elected moderate Democrats and Republicans, including David J. Lewis, a Democrat who introduced the Social Security Act in the House of Representatives, *see* https://www.ssa.gov/history/tally.html, and Charles Mac Mathias, Jr., a moderate Republican who later represented Maryland in the United States Senate.[4]  For two decades during the 1970s and 1980s, Democrats Goodloe Byron and Beverly Butcher Byron

---

[4] *See* Govtrack, "Sen. Charles Mathias, Jr.," https://www.govtrack.us/congress/members/charles_mathias/407259.

represented the Sixth District.  Some of the Plaintiffs eligible to vote at that time recall voting for Representative Beverly Byron, and one Plaintiff recalled doing so because "she and her husband were both proficient at providing good representation."  Ex. 24 (Charles Eyler Dep.) at 15-17; *see also* Ex. 25 (Ned Cueman Dep.) at 17; Ex. 20 (Strine Dep.) at 14. Former constituents have described Representative Byron as a "moderate Democrat . . . who supported the military while also supporting the common sense programs that support working and middle class citizens."  Ex. 26 (Andrew Duck Decl.) ¶ 11; *see also* Ex. 13 (Miller Dep.) at 147 (describing Rep. Beverly Byron as a "moderate" politician).  Prior to the 1990 redistricting cycle, when the Sixth District was composed of a significant portion of Montgomery County, registered Democrats in the district slightly outnumbered registered Republicans (ECF 104 ¶ 13), making the District competitive and thus unlikely to be represented by a politician on an extreme end of the political spectrum.

After the 1992 redistricting plan went into effect, registered Republicans in the Sixth District outnumbered registered Democrats, and that trend continued after the adoption of the 2002 redistricting plan added greater numbers of registered Republicans into the district.  ECF 104 ¶¶ 10-12, 14.  In contrast to the historic moderate representation of the Sixth District, Roscoe Bartlett, the Republican who represented the Sixth District in Congress from 1993 through 2012, was among the most conservative members of the U.S. House of Representatives in his last term in office.  Ex. 8 (Lichtman) at 37; *see also id.* at 28-30 (listing Representative Bartlett's voting record).

Notably, the western Maryland counties have not always held the same political positions as the other counties included in the former Sixth District.  In the 2012 election,

for example, Frederick County joined the majority of Marylanders in approving the Civil Marriage Protection Act, which was rejected by residents in Carroll and Harford Counties. Ex. 27 (election results).  In that same election, the residents of Frederick, Allegany, and Washington Counties voted together to approve gaming expansion, while residents in Caroll and Harford Counties rejected the measure.  *Id.*  And although in the 2008 general election Roscoe Bartlett won Garrett, Allegany, and Carroll Counties by wide margins, in Frederick County, the most populous County in the former Sixth District, he garnered only 52 percent of the vote.  Ex. 28 (2008 election results).

### Post-Redistricting Congressional Elections in the Sixth District

John Delaney, the current representative of the Sixth District, like Beverly Byron before him, is considered a moderate or conservative Democrat as compared to other members of his party.  *See* Ex. 8 (Lichtman) at 37; Ex. 2 (O'Malley Dep.) at 26:7-11, 29:11-16, 8311-20.  In the 2012 congressional primary, Representative Delaney defeated Rob Garagiola, a more progressive state senator with name recognition who was favored by the Democratic Party establishment.  *See* Ex. 29.  Although Congressman Delaney handily defeated the incumbent Roscoe Bartlett in the general election, the conventional wisdom at the time was that then-Representative Bartlett, an 85-year old viewed as being on the far right of his party, lacked a robust fundraising apparatus, *see* ECF 104-13, and was facing waning popularity within his own party.   Indeed, Representative Bartlett faced a competitive field in the Republican primary that year, and won only a plurality of the vote (43.6 percent).   Ex. 30 (2012 primary election results).   In the general election,

Representative Bartlett lost Washington County, which he had won in the 2008 general election (with roughly equivalent turnout), and underperformed in Allegany County as compared with the prior presidential election year. *Compare* Ex. 31 (2012 election results) *with* Ex. 28 (2008 election results).

The competitiveness of the Sixth District was further confirmed in 2014 when, despite his incumbent status, Congressman Delaney nearly lost reelection as the Republican candidate Dan Bongino came within 1.5 percentage points and 2,774 votes of unseating him. Ex. 32 (2014 election results). Representative Delaney's near miss is even more remarkable because Mr. Bongino lived in Severna Park, well outside the Sixth District, to which some would-be supporters objected. Ex. 20 (Strine Dep.) at 18, 36 (30% of those polled "cared" that he did not live in the District) & Ex. 7. Mr. Bongino was also at a severe fundraising disadvantage compared to Representative Delaney, who self-funded his race. *Id.* at 37:8-10; Ex. 2 (O'Malley Dep.) at 26. And at least some voters in the Sixth District who were willing to vote Republican were not aligned behind Mr. Bongino's candidacy, as evidenced by Governor Hogan outperforming Mr. Bongino in the Sixth District.[5] Other election-specific factors may have affected the outcome of the race as well, including (1) an artificial boost to Democratic turnout in Frederick County from a

---

[5] Looking only at Governor Hogan's election day vote count (the only data available by congressional district), he received 92,500 votes in the Sixth District, while Mr. Bongino's total vote count was 91,930. *Compare* Results reported in State_Congressional_Districts_2014_General.csv (available at http://elections.state.md.us/elections/2014/election_data/State_Congressional_Districts_2014_General.csv *with* Ex. 32 (2014 D6 election results).

contentious city council race with an unpopular Republican candidate, *see* Ex. 33, (2) "complaints" about Mr. Bongino's campaign from, among others, a group of Second Amendment voters, Ex. 20 (Strine Dep.) Ex. 9, and (3) intra-party squabbling that led to a Republican state delegate encouraging her likely voters to vote for Congressman Delaney over Mr. Bongino. *Id.* at 43:14-44:8. Yet, despite Mr. Bongino's flawed candidacy, he came within a few thousand votes of unseating an incumbent Congressman who the Frederick News-Post described "as pragmatic and not political, and there's no question he has represented the county well during his first term in office." Ex. 33.

### Statistical Measures Show the Congressional Plan Lacks Partisan Bias

In addition to being a competitive district, the Sixth District is part of a congressional plan that lacks features of partisan bias. Under multiple measures, the Maryland 2011 congressional plan returns symmetric results for Republicans and Democrats, or, paradoxically, the plan is biased toward Republican performance. Under the hypothetical model used by many redistricting experts, including Plaintiffs' experts, Republicans need only capture 51 percent of the statewide vote in a congressional election to hold 63 percent of the seats. Ex. 8 (Lichtman) at 8, Table 2. Such performance by Republicans is not merely hypothetical—Republicans actually captured 51.0 percent of the vote in the 2014 gubernatorial election, resulting in the election of current Governor Larry Hogan. Ex. 22 (2014 election results). And to regain a second congressional seat under the model, Republicans need only a congressional election where they achieve 43 percent of the vote. That is, the model predicts a party gaining 43 percent of the statewide vote in

Maryland, whether that party is Democratic or Republican, will capture 25 percent, or two, of the seats under the plan.  Ex. 23 (Lichtman Suppl.) at 5.  Other measures of fairness that have been proposed include analyses of the "efficiency gap," or measures of "wasted" votes.  *See* Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015), *available at* https://www.brennancenter.org/sites/default/files/events/Efficiency_Gap_Stephanopoulos _McGhee_2015.pdf.  Dr. Lichtman and Stephanopolous and McGhee propose two such calculations; both also support the conclusion that the plan is unbiased or biased slightly in favor of Republican votes.  Ex. 8 (Lichtman) at 10; Ex. 23 (Lichtman Suppl.) at 5-6; Stephanopoulos & McGhee, 82 U. Chi. L. Rev. at  880.  Across multiple measures, Republicans are at no systemic disadvantage in leveraging their votes into congressional seats, and under some measures they are at an advantage.

## ARGUMENT

### I.   STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "facts must be viewed in the light most favorable to the non-moving party," but "only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586-87 (1986). "[G]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1993) (citations omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## II. PLAINTIFFS HAVE FAILED TO COME FORWARD WITH SUFFICIENT EVIDENCE TO RAISE A GENUINE ISSUE FOR TRIAL ON ANY OF THE ELEMENTS OF FIRST AMENDMENT RETALIATION.

### A. Plaintiffs Have Failed to Raise a Genuine Issue for Trial that the Governor or GRAC Acted With the Specific Intent to Retaliate Against Plaintiffs for Their First Amendment Expression.

Plaintiffs have offered proof only that "the likely political consequences of the reapportionment were intended," Pls.' Mem. (ECF 177-1) at 26 (quoting *Davis v. Bandemer*, 478 U.S. 109, 129 (1986)), a showing that does not suffice to establish the requisite intent, for at least two reasons the Court has already identified. First, this Court expressly rejected the notion that such awareness of political consequences could equate to a specific intent "to burden the representational rights of certain citizens because of how they had voted in the past and the political party with which they had affiliated." ECF 88 at 34. Second, while plaintiffs also note that it is undisputed that Maryland decisionmakers had access to various forms of data to assess the political behavior of certain precincts, this Court also cautioned that "the use of data reflecting citizens' voting history and party affiliation" alone was not sufficient to support the First Amendment retaliation cause of action. *Id.* at 33. Plaintiffs have therefore failed to satisfy their burden of establishing the

requisite intent.  Moreover, there being no evidence that would support such a finding of intent, summary judgment should be entered in favor of State defendants.

Under the Court's articulation of the intent element, Plaintiffs must provide "objective evidence" of "specific intent," *id.*, which the Supreme Court has defined as an "intent to bring . . . to pass" "a result which the law seeks to prevent." *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905).  In this case, the proscribed "result" is vote dilution that is "sufficiently serious to produce a demonstrable and concrete adverse effect on a group of voters' right to have 'an equally effective voice in the election' of a representative." ECF 88 at 34.  To be liable for First Amendment retaliation, the decisionmaker must have acted "in retaliation for [the voter's] exercise of the constitutional right of free speech."  *Perry v. Sindermann*, 408 U.S. 593, 598 (1972).  In assessing whether an action was retaliatory, it is "the government's reason" for acting that is the proper object of consideration. *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1418 (2016).

Plaintiffs have made no effort to satisfy this Court's test or the pertinent Supreme Court precedent.  That is, Plaintiffs have not attempted to offer objective proof that Governor O'Malley or any other state decisionmaker intended to burden any of the Plaintiffs' representational rights because of their party affiliation.  Instead, Plaintiffs point only to Governor O'Malley's and other decisionmakers' statements that they intended, along with other considerations, to develop a map that would "make it more likely rather than less likely that a Democrat . . . is able to prevail in the general election."  Ex. 2 (O'Malley Dep.) at 42-43.  That aspiration arose in the particular context of Maryland politics in 2010, when Democrats had a 29.7 percent lead over Republicans in statewide

26

voter registration, *see* above at page 18-19, there had been no Republican senator elected since 1987, and no Republican presidential candidate had captured Maryland's electoral college votes since 1988.  Herbert C. Smith & John T. Willis, *Maryland Politics and Government* 270, 304 (2012).  Moreover, the hope of increasing the electability of Democratic candidates was formed after two successive congressional elections where none of the seven incumbents received less than 57.8 percent of the vote, and no Democratic incumbent received less than 61 percent.  Exs. 34, 35 (2008 and 2010 election results).  The GRAC also heard testimony from constituents who had felt shut out of the process, as Democrats in a district that had been maintained as an overwhelmingly Republican district despite the strong statewide Democratic majority.  *See* discussion above at page 8.  As Governor O'Malley explained, "just as Frederick has grown with the growth of the Washington suburbs, and in that growth become more Democratic as well as more Independent, . . . the Sixth District, when the borders were drawn, however they were drawn, would likely pick up more Democratic votes and more Independent votes." Ex. 2 (O'Malley Dep.) at 26:16-21.  Plaintiffs have offered no explanation, and certainly no proof, of why the intent to recognize the changing political geography of Maryland is equivalent to an intent to burden the representational rights of these plaintiffs.

The objective facts establish that it was Maryland decisionmakers' intent, "all things being legal and equal," *id.* at 47:3, to create a competitive district reflecting the reality that Maryland's "population had shifted and grown," *id.* at 24:9, including "the growth [along] 270 and into Frederick where actually they have more biotech jobs than in all of Baltimore now," *id.* at 26:3-5; while at the same time respecting the desire not to "jump the

27

Chesapeake Bay," *id.* at 24:16.  On all measures of political strength posited as actually available to Maryland decisionmakers, the new plan maintained a Sixth District that was in reach of a Republican candidate.  The proof is in the numbers.  It is undisputed that the enacted Sixth District had a federal NCEC Democratic Performance Index score, the data available to Eric Hawkins and Maryland mapmakers, of 53 percent and that the Cook Political Voting Index scored the Sixth District as a +2 Democratic advantage for the 2012 election.  In the run-up to the 2012 election, at least nine Republicans held seats in districts with the same or greater Democratic advantage.  *See* Pls.' Ex. XX (ECF 177-52) at 4.[6]  As Mr. Hawkins testified, enhancing the Democratic performance of a district "doesn't necessarily mean that a Republican wouldn't win there," although any change to a district "makes it more difficult for the incumbent."  Ex. 7 (Hawkins Dep.) at 228:3-13.  After redistricting, Mr. Hawkins would "have called that district a marginal district, because it wasn't overwhelmingly Democratic."  *Id.* at 230:3-6.  The objective facts suggest that Maryland decisionmakers intended to create a new opportunity for Democratic electoral success, but that does not equate to an intention to burden Plaintiffs' representational rights.

The intent to create the opportunity for a Democratic candidate to win in the Sixth District, even if it were to have the incidental *effect* of burdening Republicans' representational rights, cannot be the basis of a First Amendment retaliation cause of action

---

[6] That the degree to which the Sixth District leans Democratic according to these indices is no guarantee of continued Democratic victories is further evidenced by the statewide victory of Governor Hogan in 2014, as the percentage of Republican voters statewide is significantly lower than the percentage of Republican voters in the Sixth District. Ex. 50.

because, among other reasons, it is not retaliatory.  The plaintiffs have produced no evidence, objective or otherwise, that a Maryland decisonmaker took any action for the purposes of punishing or denying a benefit to any of the plaintiffs.

Furthermore, Plaintiffs have not even offered an explanation of the conduct they allege was the target of Maryland decisionmakers' alleged ire.  Was it their voting frequency or whether they voted early, absentee, at the polls, or provisionally?  Those are the only points of information that can be derived from voting history.  Was it their party affiliation?  Plaintiffs have not pointed to any evidence that any Maryland decisionmaker examined or was aware of any particular Plaintiff's party registration or voter history.  *See, e.g.*, Ex. 13 (Miller Dep.) at 188-89 (denying that he knew any of the Plaintiffs). Mr. Benisek, for example, was unaffiliated with any political party at the time of the 2010 gubernatorial election and testified only that he re-registered as a Republican "[p]rior to 2011." Ex. 36 (O. John Benisek Dep.) at 19:22; Ex. 53 (Mary Wagner Decl.) ¶ 5 & Ex. A. Therefore his expressive conduct, at least with respect to registration, was not before any Maryland decisionmaker, even in an aggregated form.

And, although party registration was one datapoint available to the mapdrawers, they considered it along with many other factors and never in units smaller than census block levels. Ex. 11 (Weissmann) ¶¶ 4-5.  Plaintiffs have offered no proof that any decision was made to locate any particular Plaintiff within or outside of the new Sixth District based on party affiliation.  Moreover, Plaintiffs lack any basis for their contention that Democratic performance could have any bearing on retaliation against "Republicans[]" (Pls.' Mem. (ECF 177-1) at 26).  Democratic performance is, as more accurately described

by Mr. Hawkins, "an average of how statewide candidates perform over time in competitive elections . . . weighted differently for different election years." Ex. 7 at 24:12-16.  In other words, it is a compilation of election data.  Given the secret ballot, there is no way for the government or anyone else to retaliate against someone on the basis of their cast vote or to look at election results and determine who is or is not a Republican.

Further, it is relevant to intent that Maryland decisionmakers expressly recognized their ability to draw a map that might produce eight Democratic representatives, but did not.  Ex. 11 (Weissmann) ¶ 12 (8-0 map not seriously considered); Ex. 7 (Hawkins Dep.) at 230-31 (testifying it would have been possible to draw an 8-0 map); Ex. 8 (Lichtman) at 48-49 & Table 19; Ex. 9 (Cooper) ¶¶ 14-16 & Exs.; Ex. 10 (Cooper Suppl.) & Exs.

Moreover, although Plaintiffs' expert Dr. Morrison contends that the percentage of census designated places that are split in this plan is 59 percent (Ex. 37 at 66-68),[7] the

---

[7] Dr. Morrison's unfounded assertion cannot create a genuine dispute of material fact.  During his deposition, Dr. Morrison made clear that he had no factual support for this statement, because he had abdicated responsibility over this part of his analysis to a graduate assistant recommended by Plaintiffs' counsel.  Mr. Amos, the graduate student, performed work that, in the words of Dr. Morrsion, "required GIS skills that I understand but don't actually possess."  Ex. 40 (Peter Morrison Dep.) at 10:7-8.  Although Dr. Morrison claimed that he "gave [Mr. Amos] detailed instructions on how to do" the requested analyses, Dr. Morrison could not (1) identify the source of the data used in the table, *id.* at 136-38; (2) recall why the 111th Congress was selected as a comparator, *id.* at 140:21; (3) confirm whether his own table referenced census designated place definitions in the 2000 or 2010 census, *id.* at 148:17-21; (4) recall what definition he or Mr. Amos had used to produce the table, *id.* at 151:18-20; or (5) name any city or town included either in the Sixth District or Table 3 of his report, *id.* at 152:20-153:6.  Because the Plaintiffs failed to produce any actual evidence to support Dr. Morrison's assertion concerning split census designated places, Dr. Morrison himself had no support for that assertion, and because the publicly available census data is clearly to the contrary, Ex. 38, Plaintiffs have failed to create any genuine issue for trial.

30

actual percentage is only nine percent, up only slightly from the previous four percent.  Ex. 23 (Lichtman Suppl.) at 3; Ex. 38 (Maryland Congressional Districts by Place (113th Congress)).  Even that overstates the actual splits, as all major cities were maintained as intact for all practical purposes.  Ex. 39 (Shelley Aprill Decl.) ¶¶ 5-7.  Rockville and Frederick were technically split because of very small areas of overlapping precinct and municipal boundary lines, or, in Frederick's case, due to a mismatch between metes and bounds descriptions and the municipal boundary lines.  *Id.* ¶¶ 5-6.  The total adjusted census population involved in these splits was four people.  *Id.* ¶ 7.  These de minimis and unintentional (Ex. 11 (Weissmann) ¶ 11) splits support the conclusion that Maryland decisionmakers made careful efforts to keep communities intact.

The only intent evident on this record concerning political composition is to create a competitive district that, under all metrics known or available to Maryland decisionmakers, was similar in composition to districts held by Republican congressional representatives around the country; in other words, to allow Democrats to have "'an equally effective voice in the election' of a representative."  ECF 88 at 26-27 (quoting *Reynolds v. Sims*, 377 U.S. 533, 565 (1964)).  Such an intent cannot be equated with an intent to burden the representational rights of registered Republicans, and certainly cannot be equated with an intent to burden the representational rights of Plaintiffs who brought this suit. Otherwise, under Plaintiffs' interpretation, the standard articulated by this Court (ECF 88) provides no guidance to legislators and their mapmakers concerning whether and how they can ever intend to draw newly competitive districts or whether they must intend to preserve non-competitive districts created under a prior plan, even in the face of shifting

31

demographics.  Nor would the standard guide the "political entities" who make districting decisions in what has always been "root-and-branch a matter of politics," *Vieth*, 541 U.S. at 285 (plurality op.), about whether and to what extent they can respond to calls for change from a growing number of constituents who live in a non-competitive district.

Although a government may not indirectly burden First Amendment expression, the government cannot be said to retaliate unless it directs some action against individuals due to their conduct.  *See Laird v. Tatum*, 408 U.S. 1, 11–14 (1972) (to establish standing, plaintiffs must allege government acted against them as the result of First Amendment expression).  When the government has not formed an intent specific to the plaintiffs or any class to which the plaintiffs belong, no retaliation can be found.

**B.   Plaintiffs Have Failed to Raise a Genuine Issue for Trial that the 2011 Congressional Redistricting Plan Resulted in a Demonstrable and Concrete Injury.**

Plaintiffs have adopted an impoverished definition of vote dilution that is inconsistent with that term's common legal usage and, in so doing, they have failed to articulate a First Amendment harm.  Plaintiffs have articulated their conception of vote dilution as drawing a district "in a manner that has the effect of diminishing the ability of registered Republican voters to elect candidates of their choice compared to the previous, benchmark district."  Pls.' Mem. (ECF 177-1) at 27 (quoting McDonald at 3).  Such a formulation directly contradicts this Court's caution that the First Amendment retaliation standard "does not . . . include a presumption of fairness of the status quo ante."  ECF 88 at 35.

Moreover, the harm identified by Plaintiffs cannot be remedied without inflicting reciprocal harm on another group.  Plaintiffs' expert, Dr. McDonald, has proposed an alternative map that purports to demonstrate that the Sixth District may be maintained as a safe seat for Republicans that nevertheless accomplishes other redistricting goals (including not crossing the Chesapeake Bay and reducing the number of districts located within Prince George's County) by adding enough residents from the former Eighth District to achieve population equality.  *See* Ex 19 (McDonald Report) at 15, 25.  As Dr. McDonald acknowledges, however, under his suggested alternative map, "[t]he Democratic voters that were formerly within the Eighth District would have their ability to elect a candidate of their choice diminished[.]"  Ex. 41 (Michael McDonald Dep.) at 62:21-63:2.  Because Maryland decisionmakers' long experience campaigning in the state and familiarity with their own districts make them aware of "the likely political consequences of" any electoral map, *Davis v. Bandemer*, 478 U.S. at 129, Plaintiffs' proposed remedy of moving easily identifiable Democratic precincts from the Eighth District into the Sixth District in order to maintain a Republican super-majority there would constitute First Amendment retaliation against Democratic voters.  That result, which would be a mirror image of the harm Plaintiffs claim to have suffered, cannot be the measure of harm articulated by this Court.

When identifying vote dilution as the type of representational harm suffered under Plaintiffs' alleged cause of action, this Court drew on case law developed in the one-person one-vote and Voting Rights Act § 2 contexts.  ECF 88 at 27-28.  But Plaintiffs have not attempted to relate their claimed harm to any concept of vote dilution that has evolved out

33

of those prior cases.   An examination of that case law reveals why thoughtful analysis requires rejection of Plaintiffs' simple assertion that a reduction in the number of Republicans relative to the number of Democrats in a district inflicts constitutionally cognizable harm on Republicans.   As the Supreme Court has explained, single-member districts present more complicated claims of vote dilution because plaintiffs challenging such districts are claiming "not total submergence, but partial submergence; not the chance for some electoral success in place of none, but the chance for more success in place of some."   *Johnson v. De Grandy*, 512 U.S. 997, 1012-13 (1994).   There is an inherent difficulty in distinguishing permissible from impermissible vote dilution because "some dividing by district lines and combining within them is virtually inevitable and befalls any population group of substantial size."   *Id.* at 1015.   Merely affixing "the labels 'packing' and 'fragmenting' to these phenomena, without more, does not make the result vote dilution . . . ."   *Id.* at 1015-16.   Instead, testing for the presence of vote dilution demands at least some analysis of the "totality of the facts," *id.* at 1013, surrounding the minority's position vis-à-vis the entire map; in the case of racial minority-majority districts, the measure is "rough proportionality." *Id.* at 1023.

Proportionality is not an appropriate measure of fairness in assessing the strength of political party votes, however, because the American political system is not designed to produce proportional results in party representation, unlike parliamentary systems where seats are awarded on a party-share basis.   Instead, the American electoral process produces a seats-votes curve, observed over many years and elections, that is not directly proportional but instead reflects a natural majoritarian bias.   Ex. 23 (Lichtman Suppl.) at

4-5 & Chart 1.  "Nor do political groups have any right to a district map under which their candidates are likely to win seats in proportion to the party's overall level of support in the State."  ECF 88 at 17 (citing *Davis v. Bandemer*, 478 U.S. 109, 130 (1986); *Vieth*, 541 U.S. at 288).  However, absent the numerical dilution that results from one-person, one-vote violations and multimember district dilution, some assessment of the overall impact to the plaintiff's asserted minority class must be made.  Failure to circumscribe potential plaintiffs' claims with some outside measure of fairness would "mandate bizarre results," *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022, 1045 (D. Md. 1994), such as the reciprocal harms inflicted by remedial plans discussed above.  Plaintiffs have not done any such an assessment or offered any rational limiting principle in this case; failure to offer that type of proof should be fatal to their claim.

> **1.  Plaintiffs Provide No Explanation of What Distinguishes Permissible from Impermissible Vote Dilution in the Partisan Context.**

Plaintiffs' expert Dr. McDonald's analyses provide nothing that would assist in establishing why the harm to Plaintiffs is not equivalent to the harm inflicted on "any population group of substantial size" in the course of redistricting.  *Johnson v. DeGrandy*, 512 U.S at 1015.  All Dr. McDonald has done is make an extended demonstration that the Sixth District has been generally Democratic performing in three congressional elections.  But, according to Dr. McDonald, (1) a Republican won the 2014 gubernatorial election in the Sixth District by a margin of 14 points; (2) a Republican outperformed the statewide republican vote for 2014 Attorney General by 7.3 points and came within one percentage

point of winning the District; (3) in the 2012 Senate race the well-known, popular incumbent Ben Cardin won only 50 percent of the vote, underperforming his statewide average by 6 points; and (4) again in the 2012 Senate race, a third-party candidate was twice as popular in the Sixth as statewide. Ex. 19 at 10, Table 3; Ex. 42 (SBE election results). In all of his analysis, Dr. McDonald does not explain the effect of the Democratic migration into Frederick and Washington Counties during the relevant time period. Nor does he mention that Washington County, which was wholly contained in both versions of the Sixth District, had a 7.8 point increase in Democratic votes from the 2008 to the 2012 congressional elections. Ex. 8 (Lichtman) at 33, Table 12. Dr. McDonald also fails to account for any incumbency effects or specific electoral circumstances of the elections. Ex. 41 (McDonald Dep.) at 52:3-10.

Perhaps the most puzzling omission in Dr. McDonald's so-called vote dilution analysis is a failure to make any account of the voting behavior of unaffiliated voters. *Id.* at 48:5-6 (acknowledging that he did not evaluate crossover voting in either Maryland or the Sixth District). While Dr. McDonald does provide a crude proxy of polarization analysis, which he himself acknowledges is "a challenging approach to determine partisan polarized voting since the estimates are preelection candidate preferences and not post-election vote choice," he makes no effort to analyze the effects of crossover voting, either presently or historically. Ex. 19 (McDonald report) at 8. This omission is striking when a cursory examination of Dr. McDonald's Table 2 reveals that the candidate capturing the plurality of the unaffiliated vote preference was successful in all but one instance, the 2014 House race. *Id.* at 8, Table 2. Where "a crossover district would also allow the minority

36

group to elect its favored candidates," there has been no impermissible vote dilution. *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017).  In failing to analyze the behavior of unaffiliated voters or crossover voting more generally, Plaintiffs offer no evidence that the Sixth District is not winnable by Republican candidates (who may or may not be the candidates of choice of Republican *or* unaffiliated voters in any given election).

Dr. McDonald also made no assessment of totality of the circumstances or any analysis whatsoever of the probability that a Republican could win the election in the future.  Ex. 41 (McDonald dep.) at 34:14-35:6.  He instead relied on actual election results to reach his conclusions that the map had the effect of "diminishing the ability of registered Republican voters to elect candidates of their choice compared to the previous, benchmark district," Ex. 19 (McDonald report) at 3, which constitutes Dr. McDonald's definition of "vote dilution," *id.*  But "[t]he circumstance that a group does not win elections does not resolve the issue of vote dilution."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006).

Not only have Plaintiffs failed to analyze the totality of the facts related to the Sixth Districts' Republican voters, but analysis of those facts leads to the conclusion that those voters have suffered no diminution in *opportunity* to elect a candidate of their choice, or at least not a diminution sufficient to alter the outcome of an election.  Examination of any measure of partisan fairness proposed by Plaintiffs' or Defendants' experts in this case yields a result within the normal range.  Ex. 8 (Lichtman) at 5-11; Ex. 48 (McDonald response) at 10-11 (efficiency gap even under his methodology within zone of chance identified by Stephanopolous and McGhee); Ex. 23 (Lichtman suppl.) at 5-6.  The political

37

science literature concurs, with both Stephanopolous and McGhee and Rodden and Chen demonstrating that Maryland's map is within the zone of expected variation in seats-votes distribution. *See* Stephanopolous & McGhee, *Partisan Gerrymandering and the Efficiency Gap*; Jowei Chen & Jonathan Rodden, *Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures*, 8 Q. J. Pol. Sci. 239 (2013), http://www-personal.umich.edu/~jowei/florida.pdf. Analyses conducted using Dr. McDonald's own preferred methodology show the map to be symmetrically responsive to swings in Republican or Democratic votes up and down the seats-votes curve. Ex. 23 (Lichtman suppl.) at 5-6, App., Chart 1.

> **2. Plaintiffs Have Not Demonstrated the Identified Vote Dilution Burdened Their First Amendment Expression.**

An inquiry into the totality of the facts in a First Amendment case may also properly encompass the extent to which a First Amendment right was actually burdened by alleged retaliatory action. Although Plaintiffs have not bothered to identify any instance of their First Amendment speech or expression that formed the basis of the alleged retaliation, given the information available to government officials, it must be either voting in elections at all or registering as a Republican. But plaintiffs have offered no proof that they were chilled from voting or registering as a Republican, or that the objective person of ordinary firmness would be so chilled by redistricting. Indeed, Plaintiffs maintained consistent voting habits both before and after redistricting. *See* Ex. 20 (Strine) at 11:22-12:10; Ex. 43 (Jeremiah DeWolf Dep.) at 10:16-18; Ex. 44 (Kat O'Connor Dep.) at 13:15-17; Ex. 25 (Cueman) at 15:10-16; Ex. 24 (Eyler) at 11:6-12; Ex. 45 (Alonnie Ropp Dep.) at 18:12-18;

Ex. 36 (Benisek) at 12:15-17.   Moreover, multiple Plaintiffs notably increased their political involvement after redistricting.   Jeremiah DeWolf, for example, "started to become politically active" after redistricting and "joined [Dan Bongino's] campaign to try to effect change."  Ex. 43 (DeWolf) at 14:7-12.  Sharon Strine also started working on local campaigns in 2010 when "the census was coming up" and she "knew [she] had to step up." Ex. 20 (Strine) at 49:14-16.   In the 2014 election cycle, Ms. Strine again "stepped up as campaign manager" for Dan Bongino's Congressional campaign, reaching out to an estimated 60,000 voters "between festivals, knocking on doors, parades, anything you can imagine."  *Id.* at 59:14, 61:10-62:16.   Similarly, Alonnie Ropp began volunteering for the Frederick County Republican Committee in 2011 to "educate the public on the new realities within [the redistricting] map" and "spent the 2012 and even the 2014 election really educating voters on the differences."  Ex. 45 (Ropp) at 61:1-2, 64:15-17.  Thus, not only did redistricting not stymy Plaintiffs' political expression, but in several cases spurred increased involvement in local politics.   Mr. Benisek even switched his status from an unaffiliated voter in elections preceding redistricting to Republican in elections following redistricting.  Ex. 36 (Benisek) at 19-20; Ex. 53 ¶ 5 & Ex. A.

The only harm identified by Plaintiffs is something else—a small disadvantage in the ability to elect a candidate of shared party affiliation to the House of Representatives. Without evidence that a slight diminution in ability to elect a preferred candidate to one specific office has any chilling effect whatsoever on protected speech activities of voting or party registration generally, that harm alone is not one cognizable by the First Amendment.

First Amendment harms do not need to be direct restraints on speech, but they must demonstrate *some relation* to a suppressive effect on speech, constituting a "means of coercion, persuasion, and intimidation" implemented in response to speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). When acknowledging that failure to promote could produce a chilling effect on speech, the Supreme Court noted that employees subjected to patronage practices would feel "a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 73 (1990).

No such chilling effect logically proceeds when voters are moved into a district where their ability to elect a same-party candidate is reduced by some undefined quantum. A person of ordinary firmness would not respond to a diminution in her current ability to elect a same-party representative with a decrease in voting frequency or disaffiliation with her party because such action would not achieve her aim of electing a same-party representative. Nor would it result in more favorable treatment during the redistricting process—the voter who ceases to vote or changes party affiliation would not be rewarded with districting that favored his preferred candidate by the government. A person of ordinary firmness would redouble their effort, which, as discussed above, is exactly the sentiment expressed by Plaintiffs and others in this case. *See, e.g.*, Ex. 26 (Duck) ¶¶ 14-16 (describing political efforts he and fellow Democrats in western Maryland undertook to register Democratic voters and enhance the political strength of Democratic voters in order to restore the Sixth District to one that more closely resembled the district prior to the

1990s, when Democrat Beverly Byron held the seat).  That reaction is logical because it is completely within the power of the individual voter to undo the aims of the government, if she believes them to be incorrect and can persuade a majority of her fellow citizens to join her.  This is especially true in Maryland where the map can be (and in this case was, successfully) petitioned to referendum and where subsequent gubernatorial elections can switch the party in charge of redistricting.

Moreover, unlike most First Amendment cases, there is publicly available evidence that contradicts Plaintiffs' unsupported anecdotes of chilling and demonstrates the relative constancy of voting behavior in counties encompassed in the former Sixth District.  For example, in Allegany, Carroll, Frederick, Garrett, and Washington Counties, Republican voter registration uniformly increased in each year, measuring at the general election, from 2010 to 2016.  Ex. 50.  Similarly, Republican turnout increased between the presidential election year of 2008 and the presidential election year of 2012 in each of the counties in absolute terms, and decreased only very slightly in percentage terms in Frederick County, which had experienced a 4,194 voter increase in registration over the same time period.  Ex. 51.  And, while turnout was down across the board in the 2014 gubernatorial election compared to the 2010 election, Republican turnout outpaced Democratic turnout in every one of the six counties originally wholly within the Sixth District.  *Id.*  In the face of this overwhelming evidence of an undaunted electorate, and with no explanation as to how a departure from political proportionality that is entirely consistent with general electoral behavior in the United States could prove injurious, Plaintiffs have failed to offer any viable method of proving a burden to their representational rights.  Any proof they have offered

41

of a burden on their representational rights has been merely a plea for proportional representation, which is exactly the proposition rejected by the pluralities in *Bandemer* and *Vieth*.  Judgment should be granted in favor of State defendants on this ground alone.

>    **C.   Plaintiffs Have Failed to Raise a Genuine Issue for Trial that the Governor's and GRAC's Alleged Retaliatory Animus Was the "But-For" Cause of any Election Outcome.**

Having failed to adequately describe any harm suffered by any plaintiff, and having failed to establish that Maryland decisionmakers acted with any retaliatory intent, Plaintiffs unsurprisingly abandon any effort to prove that the alleged intent caused the supposed harm.  Instead of explaining how the map would have been drawn so as not to dilute their votes if Maryland decisionmakers did not harbor a retaliatory intent against them, Plaintiffs have instead disclaimed the requirement that they prove intent.  As support for their position, Plaintiffs cite *Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274 (1977), which sets forth "a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused," *id.* at 575, by allowing defendants to demonstrate as a defense, that, even when there are multiple proximate causes, the cause-in-fact of the injury is not constitutional in dimension.  *Mt. Healthy* does not relieve Plaintiffs of their obligation to prove causation.

First, as indicated by divergent federal appellate decisions involving various factual scenarios, it is altogether unclear whether or to what extent *Mt. Healthy* is applicable to

First Amendment retaliation claims outside an employment law context.[8]  *See, e.g.*, *Hartman v. Moore*, 547 U.S. 250 (2006) (rejecting *Mt. Healthy*'s application in retaliatory prosecution); *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995) ("but-for" causation required in prisoner retaliation claim); *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir. 1993) ("but-for" causation required in prisoner retaliation claim); *Williams v. City of Carl Junction, Missouri*, 480 F.3d 871, 876 (8th Cir. 2007) (applying *Hartman* in retaliatory arrest claim); *but see*, *e.g.*, *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001).

Second, even assuming that *Mt. Healthy* applies to other types of non-employment claims, it does not apply to this one, at least not in the manner implied by Plaintiffs.  Under this Court's opinion, it is undeniably Plaintiffs' burden to prove by a preponderance of the evidence that "absent the mapmakers' intent to burden a particular group of voters by reason of their views, the concrete adverse impact would not have occurred."  ECF 88 at 32.  This measure is one type of "'but-for causation' or a showing that 'the adverse action would not have been taken' but for the officials' retaliatory motive." *Id.* at 29 (quoting *Hartman*, 547 U.S. at 260).

Third, *Mt. Healthy* was developed in the context of a claim "in which two motives were said to be operative in" a single "decision to fire an employee."  *McKennon v.*

---

[8] All of the cases cited by plaintiffs in support of the proposition that *Mt. Healthy* applies to this claim arise in the employment law context, even those labeled "political discrimination," and some are not First Amendment retaliation cases at all.  *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598 (7th Cir. 2012) (ADA and ADEA case); *Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011) (adjunct law professor applicant); *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) (assistant district attorney demotion); *Acevedo-Diaz v. Aponte,* 1 F.3d 62 (1st Cir. 1993) (municipal employee terminations).

*Nashville Banner Pub. Co.*, 513 U.S. 352, 359 (1995). Here, there are multiple motives and multiple decisions, including decisions to no longer allow the First District to cross the Chesapeake Bay. In other words, *Mt. Healthy* applies to "unitary events" where "the defendant does not dispute that it acted in response to the plaintiff's conduct." *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 33 (2d Cir. 1996). That is not the case here, where the dispute is over a series of decisions that resulted in a number of different acts of line drawing by different people and the ultimate enactment of a plan that was ratified by referendum.

Even if *Mt. Healthy* were the correct framework to analyze this claim, Plaintiffs have failed to offer the initial proof of causation required under that standard. *Mt. Healthy* is not a burden-shifting framework as that term is traditionally understood, because it requires more than proof of a prima facie case in the first instance. Instead, "plaintiffs must bear the threshold burden of producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that plaintiffs' constitutionally protected conduct . . . was a 'substantial' or 'motivating' factor behind their dismissal." *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir. 1993); *accord Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009) (*Mount Healthy* defense is "distinct from[] plaintiff's burden" to prove action was a substantial or motivating cause). It is not enough to prove that an intent was "on the minds" of the individuals responsible for the decision. *Mt. Healthy*, 429 U.S. at 285-86. If the motivating factor "while in the picture, . . . had no actual causal force; present or absent, the result would have been the same" and plaintiffs would fail to meet their burden. *Greene v. Doruff,* 660 F.3d 975, 978-80 (7th Cir. 2011).

Even if it were appropriate to conflate an intent to make the Sixth District more competitive with an intent to burden the representational rights of Plaintiffs, as Plaintiffs do, they are simply factually incorrect in their statement that "[n]ot a single fact witness identified any other objectives capable of independently explaining the decision to push the Sixth District, piecemeal, into Montgomery County." Pls.' Mem. (ECF 177-1) at 28. An objective comparison of the 2002 and 2011 maps manifestly reveals two such objectives: to (1) eliminate the Chesapeake Bay crossing in the First District, and (2) keep the I-270 corridor intact. *See also* Ex. 12 (GRAC Presentation). Fact witnesses including Ms. Hitchcock (Ex. 5 at 81, 83-84), Governor O'Malley (Ex. 2 at 24-25, 40-41), Senate President Miller (Ex. 13 at 19-20, 42-44), and Mr. Weissmann (Ex. 11 ¶¶ 9-10) have provided testimony that support these aims and contemporaneous explanations of the map included both objectives, Ex. 12 (GRAC Presentation). Moreover, fact witnesses have stated that respecting concerns of the congressional delegation, including incumbency protection, were among the main motivating factors of the shape of the districts. *See* Ex. 2 (O'Malley) at 49-52 (discussing meeting with members of the congressional delegation to solicit their input); Ex. 11 (Weissmann) ¶ 10 (identifying incumbency protection as a priority of the decisionmakers); Ex. 7 (Hawkins) at 41 (identifying incumbency protection as the first priority of the congressional delegation); ECF 104 ¶ 50-51 (Senate President Miller recognizing that different members of Congress wanted to represent certain areas of the State). And Plaintiffs' own expert demonstrates that significant portions of Montgomery County must be incorporated into the Sixth District if the decisions related to

45

incumbent protection and not crossing the Chesapeake Bay are respected.   Ex. 19 (McDonald report) at 25.

Plaintiffs have made no effort to demonstrate how a general intent to see a map that was more competitive for Democrats translates to the specific harm of vote dilution they allege.  There is no such evidence to offer.  As is objectively demonstrable, once 107,577 people were removed from the former Anne Arundel County portions of the First District to avoid that district crossing the Chesapeake Bay, similar numbers of people would need to be added to the Sixth District from Montgomery County.  Ex. 8 (Lichtman) at 50, Table 20.  Moreover, including the I-270 corridor substantially in a single district was an express aim of the mapmakers (*see, e.g.*, Ex. 12), and this motivation is again objectively demonstrable from the decision to alter the map proposed by the Congressional delegation in just this way.  Ex. 11 (Weissmann) ¶ 9.

Plaintiffs again seek to reduce their burden by stating that they have demonstrated that the changes to the Sixth District "made it 'more likely than not' that a Democrat would win in 2012."  Pls.' Mem. (ECF 177-1) at 29.  But that showing is unconnected to the harm they must prove.  Instead they must show that it was action taken by State decisionmakers, *for the purposes of retaliating* against Plaintiffs, that caused vote dilution of a magnitude that actually altered the outcome of the election.  As discussed above, at pages 32-42, they cannot meet this burden of proof, which remains theirs under this Court's articulation of the causation standard and under the *Mt. Healthy* framework.

III.   **PLAINTIFFS' FIRST AMENDMENT RETALIATION CLAIM IS BARRED BY LACHES BECAUSE PLAINTIFFS' INEXCUSABLE DELAY IN BRINGING THE CLAIM HAS PREJUDICED THE STATE.**

Plaintiffs unreasonably delayed bringing their First Amendment retaliation claim, and they did so to the detriment of the State.  Thus, their claim is barred by laches.  Laches, which arises from a "lack of diligence by the party against whom the defense is asserted, and . . . prejudice to the party asserting the defense," *Costello v. United States,* 365 U.S. 265, 282 (1961), "can serve as a defense to First Amendment claims," *Perry v. Judd,* 840 F. Supp. 2d 945, 953 (E.D. Va. 2012), *aff'd,* 471 F. App'x 219 (4th Cir. 2012).

The initial complaint in this case, filed more than a year after the first election under the Plan, did not bring any claims challenging or in any way dependent on legislative motive and intent.  Rather, the pleadings highlighted that the standard offered "for determining the adequacy of representational rights" "d[id] not rely on the reason or intent of the legislature – partisan or otherwise" in drawing the districts.  Am. Compl. (ECF 11) ¶ 2.  Nor did Plaintiffs' original First Amendment claim have anything to do with alleged retaliation or indirect burdens on First Amendment rights.  *See id.* ¶ 5 (alleging that the "structure and composition of the abridged sections" of the 4th, 6th, 7th, and 8th congressional districts infringed upon plaintiffs' direct First Amendment rights of political association).

Not until March 3, 2016, nearly four years after the first election under the Plan, did any plaintiff allege that Maryland lawmakers retaliated against Republican voters in the former Sixth District by diluting their votes such that they were unable to continue to elect

47

a Republican to represent them in Congress.[9]   *See* Sec. Am. Compl. (ECF 44) ¶¶ 7-7.c.

Plaintiffs' claims changed so substantially that two of the original three plaintiffs who lived

in the Eighth District both before and after the plan have since been dismissed from the

lawsuit for lack of standing.  (ECF 105.)  The third original plaintiff, O. John Benisek,

similarly should be dismissed for lack of standing because leading up to and at the time of

the 2010 gubernatorial election, Mr. Benisek was not a registered Republican.[10]   *See* Ex.

53.  Thus, he could not have suffered any concrete and particularized harm arising from

Maryland lawmakers' alleged dilution of the weight of "certain citizens' votes . . . *because*

*of* the political views they have expressed through their voting histories and party

affiliations[.]"  ECF 88 at 28 (emphasis in original).  *See Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-61 (1992) (requiring a "concrete and particularized" injury to establish

standing).

    Moreover, Plaintiffs delayed bringing their First Amendment retaliation claim

despite knowing about the plan at least since the 2012 election when it was petitioned to

referendum.  Ex. 36 (Benisek) at 32; Ex. 25 (Cueman) at 29-30; Ex. 43 (DeWolf) at 13-14;

Ex. 24 (Eyler) at 24; Ex. 44 (O'Connor) at 25-26; Ex. 45 (Ropp) at 58-60; Ex. 20 (Strine)

---

[9] To the extent the initial plaintiffs were busy litigating their case before the Supreme Court, that accounts only for Mr. Benisek of the seven current plaintiffs.  The other plaintiffs could have brought separate suit during that time and been in the same posture as today, where all original plaintiffs have been or should be dismissed for lack of standing.

[10] The 2010 general election would have been the last source of data "compiled for primary and general elections" prior to the 2011 redistricting process.  *See* Pls.' Mem. (ECF 177-1) at 4 (citing Department of Planning memorandum concerning data compiled for redistricting).

at 53-55.  Such "inexcusable or inadequately excused delay" gives rise to a laches defense. *Giddens v. Isbrandtsen Co.,* 355 F.2d 125, 128 (4th Cir. 1966).

Plaintiffs' delay in bringing their First Amendment retaliation claim has prejudiced the State, particularly because the initial plaintiffs to this lawsuit disclaimed any reliance on the specific intent of legislators.  As Plaintiffs have repeatedly asserted, their cause of action requires discovery of lawmakers' specific intent, which they were permitted to probe through depositions taken nearly six years after the law was enacted.  In many instances, deponents could not recall the events of nearly six years ago and could not recall all of the sources of data presented to them or that they requested to view.  *See, e.g.*, Ex. 13 (Miller) at 20-21, 115-17, 136-37.

Plaintiffs have sought to take advantage of this by relying on deponents' inability to recall or provide answers to highly specific questions.  *See, e.g.*, Pls. Mem. (ECF 177-1) at 5 (highlighting Ms. Hitchcock's inability to recall specifics about the redistricting process).  Plaintiffs further compound this problem by misrepresenting that testimony.  For example, in their memorandum, Plaintiffs state:  "Asked whether 'it was necessary to move 30 percent of Marylanders from one congressional district to another in order to achieve the GRAC's goals with respect to congressional redistricting,' Speaker Busch answered straightforwardly, 'No.'"  *Id.* at 15.  In actuality, Plaintiffs' counsel asked, "*Do you know whether it was necessary to move 30 percent of Marylanders from one congressional district to another in order to achieve the GRAC's goals with respect to congressional redistricting?*"  Ex. 46 (Michael Busch Dep.) at 146:12-16 (emphasis added).  And, rather than the one word answer Plaintiffs misleadingly provide, Speaker Busch's actual answer,

six years after the fact, was "No.  You know, I – I don't know that it was necessary."  *Id.* at 146:19-20.

Further, by the time Plaintiffs first articulated the current version of their claim, Governor O'Malley's administration had left office with no litigation hold in effect.  As a result of the administration turnover, many State officials and employees involved in redistricting left State service at that time, long before there was notice that documents beyond the Plain itself would be relevant.  These intervening events prejudice the State's ability to defend this lawsuit and have led to frivolous spoliation claims and accusations of discovery misconduct.  (ECF 153-1.)

## IV.   THE PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUIRED ELEMENTS TO OBTAIN A PRELIMINARY INJUNCTION.

For the reasons discussed above, Plaintiffs are not entitled to a preliminary injunction, because they have not established that they are "likely to succeed on the merits" of their claims.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Further, Plaintiffs have failed to establish the other required elements of a request for preliminary injunctive relief: that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Id.*  As the Supreme Court has cautioned, "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  *Id.* at 24.  Plaintiffs must satisfy all four factors to be entitled to relief.  *Id.* at 20.  The grant of a preliminary injunction involves "the exercise of a very far-reaching power, which is to be applied only in [the]

limited circumstances which clearly demand it." *Centro Tepeyac v. Montgomery County,* 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (internal citation and quotation marks omitted).

### A.    Plaintiffs Have Made No Showing of Irreparable Harm.

Plaintiffs contend that they and other similarly situated voters will suffer irreparable injury absent an immediate injunction entered on or before Friday, August 18, 2017.  In making this assertion, Plaintiffs fail to acknowledge the obvious:  that their own delays in filing suit and bringing their specific claims for relief have allowed three congressional elections to occur under the plan.  Moreover, Plaintiffs exacerbated their initial delay in filing suit by initially disclaiming any reliance on the specific intent of the legislature in bringing their First Amendment claim and then amending their complaint in March 2016 to rely primarily on the specific intent of the legislature.  As they have repeatedly asserted, the claim Plaintiffs waited until March 2016 to bring necessitated extensive discovery into the legislative motive and intent of various legislative actors, including depositions of sitting legislators and a former governor, document production by State entities and officials and Maryland's congressional delegation, and the exchange of expert reports concerning these issues.

The Plaintiffs should not now be heard to complain that they will suffer irreparable harm if this Court does not grant them a preliminary injunction halting the operation of a duly enacted State statute that was ratified by the people of Maryland nearly five years ago and has already survived constitutional challenge.  *See, e.g.*, *Preston v. Bd. of Trs. of Chicago State Univ.*, 120 F. Supp. 3d 801 (N.D. Ill. 2015) (finding plaintiff failed to

establish irreparable harm where he did not move for a preliminary injunction until 15 months after the alleged First Amendment violation); *Doe v. Banos*, 713 F. Supp. 2d 404 (D.N.J. 2010), *aff'd on other grounds*, 416 F. App'x 185 (3d Cir. 2010) (delay in seeking preliminary injunctive relief undermined claim of immediate and irreparable harm); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) (finding no irreparable injury where plaintiffs waited three months after their complaint was filed to seek preliminary injunction); *Shady v. Tyson*, 5 F. Supp. 2d 102 (E.D. N.Y. 1998) (considering delay in denying injunctive relief).

To mitigate their own delays in bringing these claims, Plaintiffs place the responsibility for speedy action at the feet of this Court and the State, by contending that any delay from this Court will result in the State's inability to enact a new map in time for the 2018 congressional election (the fourth election under the plan). Plaintiffs thus suggest that the parties must finish briefing their novel claim, and this Court must render its decision, and order a remedy, all in the next six weeks. Their argument assumes that this Court will enjoin the State from continuing to implement the congressional districting legislation that has already been implemented in three congressional elections, and will require that the State redraw its congressional map in time for the 2018 election, but will not grant a stay of the injunction pending Supreme Court review. Given that the Supreme Court has yet to provide any guidance to legislatures on whether and when a partisan gerrymander violates the Constitution, it is not reasonable to force the State to expend enormous resources in a procedure that may or may not ultimately be determined lawful or necessary, particularly in light of the Supreme Court's recent grant of a stay of the three-

judge panel's final judgment in *Gill v. Whitford*, --S. Ct.--, 2017 WL 2621675 (June 19, 2017).[11]

Contrary to Plaintiffs' suggestion, their request for preliminary relief finds no support in the Fourth Circuit's decision in *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014), which granted in part the plaintiffs' motion to preliminarily enjoin certain changes to voting procedures that ultimately were found to violate § 2 of the Voting Rights Act.  Unlike Plaintiffs here, the plaintiffs in *League of Women Voters* acted without delay, by bringing their challenge to the voting restrictions at issue the very same day they were signed into law by the then-governor of North Carolina and moving for a preliminary injunction before the first statewide election that would be held under the new restrictions.  769 F.3d at 232.  Moreover, that case involved changes to electoral procedures that deprived citizens of their ability to vote.  Here, in contrast, the Plaintiffs do not allege that their ability to vote is threatened by the challenged law; as discussed above they have all acknowledged that they have voted consistently since the plan went into effect.

---

[11] Although the Supreme Court denied a stay of the final judgment in *McCrory v. Harris*, 136 S. Ct. 1001 (2016), that case involved a racial gerrymandering claim, not a partisan gerrymandering claim, and the Court ultimately affirmed the three-judge court, unanimously as to one of the two challenged districts in that case.  *Cooper v. Harris*, 137 S. Ct. 1455 (2017).  Moreover, in both *McCrory* and *Whitford*, injunctive relief was ordered after a final judgment, following a bench trial, which was preceded by full briefing and resolution of summary judgment motions.  *See* Dkts.  Neither case provides support for Plaintiffs' contention that this Court must rush to judgment.  In *McCrory*, the three-judge court issued its decision four months after the bench trial concluded, and in *Whitford*, the court issued its decision six months after the trial.  *See id*.

**B.      The Balance of Equities Does Not Weigh in Favor of Plaintiffs.**

Plaintiffs also have failed to establish that the balance of equities tips in their favor. "'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Moreover, rather than merely requiring that the State not implement newly-enacted voting restrictions or resurrect previously-implemented procedures, Plaintiffs seek an injunction requiring that the State expend considerable resources to draw a new congressional plan, pass the plan through the General Assembly in a special session, and have it signed into law by the Governor within two months. *Cf. League of Women Voters* 769 F.3d at 247-48 (finding balance of equities tipped in plaintiffs' favor because the challenged changes to North Carolina's voting laws involved systems that "have existed, do exist, and simply need to be resurrected" or "merely require[d] the revival of previous practices or, however accomplished, the counting of a relatively small number of ballots").

**C.      A Preliminary Injunction Is Not in the Public Interest.**

Given the irreparable harm suffered by a state when a court enjoins implementation of a duly enacted statute, the public resources required to enact new legislation, and the lack of guidance from the Supreme Court on whether and when a partisan gerrymander violates the First Amendment, a preliminary injunction would not be in the public interest. Further, given the Supreme Court's grant of a stay in *Gill v. Whitford*, and the Court's

54

decision to postpone further consideration of the question of jurisdiction until hearing the merits of the case, --S. Ct.--, 2017 WL 1106512 (June 19, 2017), the public interest would best be served by awaiting final resolution in that case before ordering any remedy in this case.

## CONCLUSION

For the reasons discussed above, the Plaintiffs' motion for preliminary injunction and, in the alternative, summary judgment should be denied, and the Defendants' motion for summary judgment should be granted.

Respectfully submitted,

Dated: June 30, 2017

BRIAN E. FROSH
Attorney General of Maryland

___/s/__Jennifer L. Katz_____
JENNIFER L. KATZ (Bar No. 28973)
SARAH W. RICE (Bar No. 29113)
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7005 (tel.); (410) 576-6955 (fax)
jkatz@oag.state.md.us

Attorneys for defendants

## TABLE OF EXHIBITS

Exhibit No.   Title

1.      Intentionally left blank

2.      Martin O'Malley Deposition Transcript (April 26, 2017)

3.      Excerpts from Public Hearings before the Governor's Redistricting Advisory Committee

4.      Annie Linskey, "Congressional Redistricting: Democrats Eyeing Western Maryland," *Baltimore Sun*, August 6, 2011.

5.      Jeanne D. Hitchcock Deposition Transcript (April 7, 2017)

6.      Josh Kurz, "Sources: Congressional delegation Dems eye Bartlett as redistricting target," Center Maryland (July 12, 2011), available at http://articles.centermaryland.org/?p=2898

7.      Eric Hawkins Deposition Transcript (March 3, 2017)

8.      Opening Expert Report of Allan J. Lichtman (May 8, 2017)

9.      Declaration of William S. Cooper with Amended Exhibit B-3 (May 6, 2017)

10.     Supplemental Declaration of William S. Cooper (June 1, 2017)

11.     Declaration of Yaakov Weissmann (June 29, 2017)

12.     Recommended Congressional Plan, Governor's Redistricting Advisory Committee

13.     Thomas V. Mike Miller Deposition Transcript (April 24, 2017)

14.     2002 Congressional Map, as prepared by Maryland Department of Planning

15.     2011 Congressional Map, as prepared by Maryland Department of Planning

16.     Maryland Department of Planning, "Report of Maryland Precinct Population Data, 2010 Census,"  Appendix A-3 (May, 2011)

17.     Opening Expert Report of John T. Willis (May 8, 2017)

18.     Robert Garagiola Deposition Transcript (February 3, 2017)

19.     Opening Report of Professor Michael McDonald (April 7, 2017)

20.　Sharon Strine Deposition Transcript with Exhibits 3, 7 and 9 (January 26, 2017)

21.　Eligible Active Voters on Precinct Register 11/2/10

22.　Official 2014 Gubernatorial General Election Results for Governor/Lt. Governor

23.　Supplemental Expert Report of Allan J. Lichtman (June 2, 2017)

24.　Charles W. Eyler Deposition Transcript (January 31, 2017)

25.　Edmund R. Cueman Deposition Transcript (January 24, 2017)

26.　Declaration of Andrew Duck (April 22, 2017)

27.　Official 2012 Presidential Election Results: Question 6 Civil Marriage Protection Act and Question 7 Gaming Expansion Referendum

28.　Official 2008 Presidential Election Results: Congressional District 6

29.　Ben Pershing, "Delaney defeats Garagiola in Democratic primary for House seat from Maryland," Washington Post (April 3, 2012)

30.　Official 2012 Presidential Primary Election Results: District 6

31.　Official 2012 Presidential General Election Results: District 6

32.　Official 2014 Gubernatorial General Election Results for Representative in Congress District 6

33.　Frederick News-Post Editorial Board, "Why U.S. Rep. Delaney should thank Blaine Young," Frederick News-Post (Nov. 8, 2014)

34.　Official 2008 Presidential General Election results for Representative in Congress

35.　Official 2010 Gubernatorial General Election results for Representative in Congress

36.　O. John Benisek Deposition Transcript (February 3, 2017)

37.　Opening Expert Report of Dr. Peter A. Morrison (April 7, 2017)

38.　Maryland Congressional Districts By Place, 113th Congress

39.　Declaration of Shelly Aprill (June 29, 2017)

40.　Dr. Peter A. Morrison Deposition Transcript (June 2, 2017)

41.     Dr. Michael P. McDonald Deposition Transcript (June 5, 2017)

42.     2012 General Election Results for United States Senate and Congressional Representative, District 6; 2014 General Election Result for Attorney General

43.     Jeremiah DeWolf Deposition Transcript (February 6, 2017)

44.     Kathleen O'Connor Deposition Transcript (February 15, 2017)

45.     Alonnie L. Ropp Deposition Transcript (January 27, 2017)

46.     Michael E. Busch Deposition Transcript (April 19, 2017)

47.     Maryland Population Density by Census Tract, 2010

48.     Dr. Michael P. McDonald Rebuttal Report (May 22, 2017)

49.     Maryland Department of Transportation, "Executive Summary," I-270/US-15 Multi-modal Corridor Study (2009)

50.     Republican Registration 2010-2016 Compiled from State Board of Elections Publicly Available Data

51.     2008-2012 and 2010-2014 Turnout Statistics Compiled from State Board of Elections Publicly Available Data

52.     John T. Willis Deposition Transcript (May 24, 2017)

53.     Declaration of Mary Wagner (June 30, 2017)