```
1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF MARYLAND
2


3    O. JOHN BENISEK, et al.          )
                                      )
4              Plaintiff,             )
          vs.                         )
5                                     ) CIVIL NO.: JKB-13-3233
     LINDA H. LAMONE, et al,          )
6                                     )
               Defendant.             )
7                                     )
     _____)

8


9                    Transcript of Proceedings
                 Before the Honorable Paul V. Niemeyer
10                   the Honorable James K. Bredar
                 the Honorable George Levi Russell, III
11                   Thursday, October 4th, 2018
                        Baltimore, Maryland
12


13   For the Plaintiff:


14       Michael B. Kimberly, Esquire
         Micah D. Stein, Esquire
15       Paul Whitfield Hughes
         E. Brantley Webb, Esquire
16


17   For the Defendant:


18       Sarah W. Rice, Assistant Attorney General
         Jennifer L. Katz, Assistant Attorney General
19


20


21


22


23


24               Christine T. Asif, RPR, FCRR
                 Federal Official Court Reporter
25               101 W. Lombard Street, 4th Floor
                    Baltimore, Maryland 21201
```

1              P R O C E E D I N G S

2              JUDGE NIEMEYER:  Be seated, please.  All right.

3     This morning we've got the case of Benisek versus Lamone.  And

4     we're on cross motions for summary judgment.  And I think it

5     best that we start out with the plaintiffs.  They filed a

6     motion for summary judgment.  And then the State has filed a

7     cross motion for summary judgment.  And we've received your

8     papers.  We've read your papers, studied them.  And so we're

9     ready to hear you out now.

10             Mr. Kimberly.

11             MR. KIMBERLY:  Thank you, Your Honor.  It's good to

12    be back.  So I think --

13             JUDGE BREDAR:  Mr. Kimberly, have you tried to

14    settle this case?

15             MR. KIMBERLY:  No, Your Honor.  We have not

16    attempted to settle.

17             JUDGE BREDAR:  If the plaintiffs were able to

18    achieve, through a settlement, the creation of a nonpartisan

19    commission in Maryland that would be responsible for drawing

20    the lines going forward, that would meet all of the

21    requirements and complaints that your clients have presented

22    to the Court; wouldn't it?

23             MR. KIMBERLY:  Well, it certainly would, Your Honor.

24    There's certainly no impediment from our perspective to a

25    willingness to settle.  We've simply read into the fairly

1    steadfast opposition to our position on the part of the office

2    of the Attorney General that that's not something that's on

3    the table from their perspective, but you'll have to ask

4    them.

5         JUDGE BREDAR:  And the United States Supreme Court

6    has endorsed the lawfulness of such commissions, they did so

7    expressly in the Arizona case; true?

8         MR. KIMBERLY:  True.  We would be very pleased to

9    see that development.  Unfortunately, because it's a

10   development that requires legislation, it's not one that I

11   think we can compel by settlement.  So it's something that I

12   think would fall to the State to undertake.  I think if such a

13   commission were formed and it redrew the present map, that's a

14   process we'd be happy to be involved in and it may well moot

15   our case, but we haven't certainly been given any suggestion

16   that that's something that the State Legislature or the

17   Governor's Office is considering.

18        JUDGE BREDAR:  So you're completely open to it, but

19   you need to see some indication from your opponent, the State

20   of Maryland, that they would similarly be open to at least a

21   dialogue around the possibility of a settlement.  Of course,

22   it's not for the Court to dictate what those terms would be,

23   but that's one possibility.

24        MR. KIMBERLY:  I guess the way that I view it, Your

25   Honor, is that I'm doubtful, in fact, that it could be

1    accomplished via a settlement, I think what it might be is

2    intervening conduct that ends the conduct complained of.  But

3    our settlement, at least vis-a-vis this lawsuit, would have to

4    be with the State Board of Elections and its leaders.

5           JUDGE NIEMEYER:  Why couldn't it be a consent order

6    by the Court?

7           MR. KIMBERLY:  It could be a consent order or much

8    like the sort --

9           JUDGE NIEMEYER:  I mean, to take it out of the

10   political process.  In other words, the commission would be an

11   adjunct of the Court, and the parties would participate and it

12   would be done by consent order in the context of this case, as

13   opposed to having to go back to the legislature.  That's just

14   a thought, spontaneous.

15          MR. KIMBERLY:  I appreciate that, Your Honor.  And

16   if there were such a consent order that indicated that the

17   State would not enforce the map as drawn, and instead would

18   enact or promulgate a map neutrally drawn --

19          JUDGE NIEMEYER:  We might make findings in the

20   consent order and have the agreed upon -- the commission

21   lines, if they were changed, adopted as part of the Court's

22   order directing that it govern the next election.

23          MR. KIMBERLY:  I think that would -- presuming the

24   lines of that map were consistent with our legal theory, and I

25   gather --

1          JUDGE NIEMEYER:  Well, that would be something for

2     that little commission and you guys to work out if that were

3     the course that we were going on.  But probably you have a lot

4     more flexibility than the state.  The State would have to

5     consider something like that too, at some length.  And I think

6     these inquiries or suggestions are not efforts to push one

7     direction or the other, these are just ideas to get around

8     hurdles.

9          MR. KIMBERLY:  I appreciate that and I would say we

10    are indifferent to -- our goal is reaching an end result where

11    we have a neutrally drafted map.  We're indifferent to the

12    means of getting there.  If it's a permanent injunction, that

13    would be great.  If it's a consent order or some settlement by

14    which the State agrees to conduct elections under a neutrally

15    drawn map, we would be perfectly happy with that outcome as

16    well.  Judge Niemeyer, as you suggest, I think the real

17    question as it concerns any of those alternative approaches

18    rests with my friends on the other side.  And the State --

19         JUDGE NIEMEYER:  Well, it takes two to tango.  It

20    just means one may have to take the lead.

21         MR. KIMBERLY:  Well, and I leave them to make the

22    argument.  I think it is also a question of whether it would

23    have to be done by legislation or not, but maybe through

24    something like a consent --

25         JUDGE NIEMEYER:  Why would that be done by

1      legislation if it's before the Court now on a constitutional

2      issue?  In other words, it's a political question initially.

3      The requirements are shared by the State and the Congress in

4      drawing these lines.  But the Courts are involved through

5      arguments that the lines that that process yielded violated

6      the Constitution.  So there would have to be some basis for

7      the Court to keep something like that.  And we recognize that

8      too.

9           The difficulty of saying the legislature has to pass

10     it, we can't dictate how the legislature would vote, number

11     one.  And No. 2 the process probably becomes indeterminate and

12     we might find ourselves back at this --

13          MR. KIMBERLY:  That's right.

14          JUDGE BREDAR:  -- at the gate again, because there

15     have been efforts in the past to do something like that

16     voluntarily.  The idea might be to have a court orchestrate a

17     settlement through --

18          MR. KIMBERLY:  Certainly.

19          JUDGE BREDAR:  -- through a court-created commission

20     and an approval with a consent order.

21          But any way that's just -- these are just ideas.

22     And I don't know if Judge Bredar had any other ways that he

23     was talking about it, but it sounds appetizing if both parties

24     were willing.

25          MR. KIMBERLY:  Certainly.  And I'll confess not to

1    having given a lot of thought to a question of a consent

2    decree.  But as I say, our ultimate objective is ends-oriented

3    not means-oriented.  And if there's another way of getting

4    there apart from a permanent injunction, we would certainly be

5    happy to entertain that possibility.

6             JUDGE BREDAR:  So, Mr. Kimberly, I appreciate your

7    implicit acknowledgment that it's probably an easier call on

8    your side than it is on the other side.  But by virtue of the

9    Court raising it with you, we provide your opponents the

10   opportunity to reflect for a few minutes on their answer to

11   what is probably a much more complex question.

12            MR. KIMBERLY:  Certainly.  Well, while they think

13   about that, if it's all right with --

14            JUDGE NIEMEYER:  Why don't you turn to your

15   motion.

16            MR. KIMBERLY:  I'll proceed to my motion.  What I'd

17   like to do, Your Honors, is first lay out what it is we think

18   that we have to show.  And then I'm going to -- well, why

19   don't I start with this.  So the three elements, according to

20   this Court's decision on the motion to dismiss, is that we

21   have to show specific intent to burden Republicans by reason

22   of their party affiliation and past voting history; we have to

23   show that the redistricting, in fact, resulted in vote

24   dilution that was sufficiently significant that it actually

25   caused a practical consequence in the way that the electoral

machinery works; and finally, we have to show that the vote

dilution would not have come about absent the protected

conduct and the intent to burden that conduct.  And we submit

we've proved all three elements.

Last time we were here on the preliminary injunction

motion, we started out with a discussion of specific intent.

And the Court moved fairly quickly away from that.  What I'd

like to do is just give a very brief sort of three minute

highlight reel of specific intent.  And then I'm certainly

happy to answer any questions that the Court may have on that,

but I don't intend to dwell especially long on the question of

intent.

Throughout our briefing I think we -- and throughout

the record we've demonstrated that the goal in the 2011

redistricting was to move from a 6-2 map to a 7-1 map.  Here

for example is Eric Hawkins the NCEC analyst, who consulted on

the map drawing who confirmed this intent.

(Video played.)

MR. KIMBERLY:  That evidence does not stand on its

own.  Later in his deposition, Mr. Hawkins confirmed again

that they were going to create a quote, "7-1 split," in their

approach to the redistricting in 2011.  This was corroborated

in turn by many other members of the redistricting actors in

the redistricting process, including here Curt Anderson who's

giving a press interview after having been briefed on the

1    redistricting on October 17th, 2011.

2                (Video played.)

3          MR. KIMBERLY:  So this confirms that the goal of the

4    redistricting was to create a 7-1 map that gave Democrats an

5    additional seat in the eight seat congressional delegation.

6               Now, as it turns out there were -- because it was a

7    6-2 map, the map drawers could have targeted either the 1st

8    District or the 6th District.  Here Eric Hawkins, I'll spare

9    you the video, but Eric Hawkins confirms that there were two

10   districts you could look at based on what the line up was, he

11   says.  And so this presents a question whether the map drawers

12   targeted the 1st District, which is predominantly Republican,

13   or the 6th District, which is predominantly Republican.

14              And here is Martin O'Malley confirming in the course

15   of his deposition that a decision was made to go for the 6th.

16                (Video played.)

17         MR. KIMBERLY:  And what this reflects is a decision

18   to crack the Republican majority in the 1st District would

19   have required drawing the 1st District in such a way that it

20   jumped the Chesapeake Bay.  The map drawers and others

21   involved in the process had decided, for political reasons,

22   that they didn't want to jump the Chesapeake Bay.  And so as

23   Governor O'Malley here confirms, the decision, therefore, was

24   made to go for the 6th.

25              And, finally, here is Governor O'Malley confirming

1    that his intent, indeed, as the leader of the redistricting

2    process, was to make the 6th District more favorable for

3    Democrats.

4              (Video played.)

5              MR. KIMBERLY:  Now, we have quite a lot more than

6    this.  But as I mentioned, the last time that we were here the

7    Court indicated that Your Honors didn't have extensive

8    questions about the issue of intent.  And Chief Judge Bredar,

9    you even suggested that at that point that we have proven

10   intent beyond -- beyond the need for a trial.  That is

11   certainly our position and I stand ready to answer any

12   questions --

13             JUDGE NIEMEYER:  On that issue he seems to have had

14   the affirmance of Justice Kagan.

15             MR. KIMBERLY:  Certainly so.  And obviously, there

16   was some push back at the hearing before the Supreme Court,

17   there was no push back on the question of intent, whatever

18   other issues there may have been push back on.  We think that

19   the record here really does not present a genuine dispute as

20   to the objectives of those who were involved in the map

21   drawing.

22             JUDGE BREDAR:  Does the proof of intent with respect

23   to voter dilution easily sort of slide over and also satisfy

24   whatever proof obligation you have on intent with respect to

25   your claim of associational injuries.

1           MR. KIMBERLY:  As in does proof of an intent to

2     dilute offer proof of intent to impose those --

3           JUDGE BREDAR:  Exactly.

4           MR. KIMBERLY:  Yes, I think so.  And it's because

5     those associational harms really grow out of the vote dilution

6     itself.

7           JUDGE BREDAR:  Suppose, though, that we're not

8     focusing on vote dilution ultimately, but on injuries that

9     were sustained to associational rights that people have under

10    the First Amendment, is the proof on intent that you've got in

11    this record nonetheless sufficient to make out those claims as

12    well?

13          MR. KIMBERLY:  I would say so for two reasons.  The

14    first, and I'll get to this in greater depth when I start

15    talking about the question of burden and injury, is our

16    position is that those associational harms themselves, in

17    fact, as I mentioned, grow out of vote dilution.  But even if

18    you didn't think of it that way and you thought of them as --

19          JUDGE BREDAR:  I don't.

20          MR. KIMBERLY:  -- an independent injury, there's no

21    question here that the intent was to make it more difficult

22    for Republicans to win and easier for Democrats to win.  And I

23    would say even more than that, it was an intent to ensure that

24    a Democrat wins the 6th Congressional District.  And certainly

25    one way to do that is to disrupt the associational activities

1    of Republicans by making it more difficult for them to recruit

2    support to their party, by making it more difficult to get

3    their base to turn out to elections, by making it more

4    difficult to raise money, so on and so forth.

5            We have evidence in the record, which I'll get to in

6    a little bit, showing just those kinds of harms.  But I think

7    more generally at the intent stage, the evidence here is that

8    the intent was to make it a 7-1 district.  And disrupting

9    association is part of bringing about this objective.

10           So I think that's a segue to the question now of

11   burden and intent.  And as I say, I'm -- I've come prepared to

12   talk more about intent if Your Honors have any questions about

13   that element, beyond Judge Bredar, what we just discussed.

14           For now what I'd like to do is move on to burden.

15   And before getting to the evidence, I'd like to try to

16   reorient the Court to the legal theory as we understand it, to

17   what this Court had to say in its motion -- in its opinion on

18   the motion to dismiss as we understand it.  The ultimate

19   question on burden is not whether or not we have shown that

20   every election has changed because the gerrymander.  It is

21   instead whether we have shown a real and practical

22   diminishment of political opportunity.  That is what vote

23   dilution is about.  And that is, at least the principle theory

24   of harm that we've put forward, although, as I say, I'll get

25   to these associational harms as well.

1          JUDGE RUSSELL:  Isn't the associational harm easier

2     to prove than the voter dilution?

3          MR. KIMBERLY:  I think we have shown both beyond

4     genuine dispute.  I think both are quite clear on the

5     record.

6          JUDGE RUSSELL:  As a matter of law, though?  We'll

7     get to that in a moment, but as a matter of law you've shown

8     the injury as opposed to the associational theory doesn't

9     appear to be much of a dispute or it may not be much of a

10    dispute that there were 10,000 voters that were taken from one

11    district and placed in another district, with the intent to

12    prevent them from associating with one another for the

13    purposes of supporting a particular party.

14         MR. KIMBERLY:  That, Your Honor, that sounds exactly

15    right to me.

16         JUDGE RUSSELL:  As opposed to winning or losing,

17    establishing winning or losing --

18         MR. KIMBERLY:  Certainly.

19         JUDGE RUSSELL:  -- by saying as a matter of law that

20    there are voters out there that we're going to presume are

21    voting in a -- based upon a historical pattern and statistics

22    are going to be voting in a particular way.  But the

23    associational theory might be a little bit easier to prove

24    because it's established by taking out a certain block of

25    voters and replacing them with another block.

1          MR. KIMBERLY:  I think -- I don't disagree with

2     anything that you've said.  I would say that these are two

3     alternative paths.

4          JUDGE RUSSELL:  Thanks.

5          MR. KIMBERLY:  Thank you.  I think these are two

6     alternative paths to getting to the same place, which is just

7     to show that the redistricting here had a real and practical

8     impact on the First Amendment rights of Republicans in the old

9     6th Congressional District.  We're certainly not giving up on

10    the idea of vote dilution.  And perhaps we can move to the

11    question of --

12         JUDGE RUSSELL:  I didn't mean to disrupt you, but I

13    had a question as you were presenting your case, and -- but I

14    didn't want to disrupt your presentation.

15         MR. KIMBERLY:  Well, I appreciate that, Your Honor.

16    I guess what I would say -- well, why don't I come back to the

17    question of vote dilution.

18         JUDGE RUSSELL:  That's fine.

19         MR. KIMBERLY:  We have slides also on the

20    associational injury.  Let me talk briefly about that right

21    now, the associational injury, as my colleague pulls up that

22    slide.  Sorry, just one moment, Your Honor.

23         JUDGE RUSSELL:  Sorry, Mr. Kimberly, I threw you off

24    and I apologize for that.

25         MR. KIMBERLY:  That's okay.  Your Honor, ultimately

1    my goal is to convince you.  So I'm happy to respond to your

2    questions.

3           So we -- as I said, we have two parallel arguments

4    here with respect to burden.  And one is that there has been a

5    chilled political participation and a disruption of that

6    association.  And I think at a certain level there is an

7    intuitive element to this that doesn't require a whole lot of

8    evidence or thought.  Governor O'Malley put it succinctly in a

9    speech that he gave at Boston College.

10          (Video played.)

11          MR. KIMBERLY:  The idea that redistricting by

12   cracking majorities, and attempting to rig elections by making

13   it impossible, Judge Russell, as you said, for Republicans who

14   are removed to continue associating with Republicans who

15   remain, carves those individuals' voices effectively into

16   irrelevance.

17          This is supported by Justice Kagan's opinion in *Gill*

18   *against Whitford,* which we think is consistent with and very

19   well supported by the Supreme Court's earlier decision in

20   *Anderson against Celebrezze*.  The idea behind this notion of

21   burden is that partisan gerrymanders, and I'm quoting now, may

22   infringe First Amendment rights held by parties, political

23   organizations and their members, by making it more difficult

24   for them to fund raise, to register voters, to attract

25   volunteers, to generate support from independents, and to

1   recruit candidates, good quality candidates to run for office.

2        That is reflective of what the Supreme Court said in

3   *Anderson against Celebrezze,* which was a ballot access case,

4   in which the Court explained, in effect, that what mattered

5   was not necessarily whether the burden -- and the burden in

6   that case was different filing deadlines for independents

7   versus members of the major political parties.  And the Court

8   did not focus there on whether that burden -- what it

9   recognized was a burden on a political opportunity had

10  actually change an electoral outcome.  What it focused on was

11  the way it diminished political opportunity by disrupting this

12  sort of association.

13       JUDGE BREDAR:  And as a consequence, some of the

14  justiciability issues that arise on the other prong are

15  voided; right?

16       MR. KIMBERLY:  Certainly so, Your Honor.  Yes.  And

17  I'll come back to that in a little bit as well.

18       MR. KIMBERLY:  Now the last time that we were here

19  on the motion for the preliminary injunction, we had cited to

20  testimony of our plaintiffs, who had testified that in their

21  efforts to campaign in the 6th District they had run into

22  exactly these sorts of effects.

23       Beyond that, we have actual voter turnout data.  Now

24  we have focused here on Republican primary turn out,

25  because -- for two reasons -- in, I should say, midterm years,

1    for two reasons.  One, it is in the midterm years that the

2    congressional candidate is at the top of the ticket and most

3    likely to drive voters to the ballot box.  And Republican

4    primary elections are where Republicans, because Maryland has

5    a closed primary system, only Republicans can participate,

6    registered Republicans can participate in the election.

7            And what we see is in Allegheny, Carroll, Frederick,

8    Garrett and Washington Counties, all of which span the 6th

9    District, turnout fell, for instance, in Allegheny from 42.77

10   percent, which I can say nationwide is an astronomical turnout

11   for a midterm primary election, dropped by 15 points to 26.65.

12   Every other county here dropped commensurately as well.  The

13   smallest drop was roughly a two percent drop, a six percent

14   drop, but elsewhere other 15 percent drops, which you know

15   when you think about a 15 percent drop as compared to 42

16   percent, that's like one third of the voters who previously

17   had shown up not showing up and staying home.

18           And the reason is exactly what Governor O'Malley had

19   said in that speech, because what's the point of selecting --

20   showing up to the ballot box, engaging in the political

21   process to select a candidate who's almost certain to fail.

22           JUDGE BREDAR:  But did Republican registration go up

23   during the same period?  And if so, what do we make of that?

24           MR. KIMBERLY:  There is a suggestion that Republican

25   registration had gone up.  I don't -- truthfully, I don't know

1    what to make of that, except to say that so far as

2    participation in the political process is concerned,

3    registering people doesn't matter much if they don't show up

4    to the ballot box.  And I think, ultimately, it's got to be

5    participation in the election itself that is the measure of

6    the engagement of the electorate.  But -- and here,

7    incidentally, is a line graph demonstration of the drop off

8    actual voter turnout rather than percentages as actual

9    numbers.  You can see after 2010 there was a precipitous drop

10   off.

11         But I'll say we don't just have the reduction in

12   voter turnout at Republican primaries, we also have drop offs

13   in fundraising by the Republican central committees in

14   Allegheny, Garrett and Washington Counties, we have focused on

15   Allegheny, Garrett, and Washington, because those were the

16   counties that were in the district before the gerrymander and

17   remained entirely in the district after the gerrymander.  And

18   what it shows is that during both midterm years and

19   presidential years, fundraising has dropped off by six to 12

20   percent.

21         And that also is unsurprising, because when the

22   Republican party, essentially, as Governor O'Malley put it,

23   gets carved into irrelevance by a gerrymander you would expect

24   to see lower financial support for that party.

25         And of course, beyond that, Judge Russell, as you

1    noted, it's simply the disruption of association that follows

2    from sorting people on the basis of their part -- excuse me,

3    past electoral behavior, making it more difficult for

4    historical Republican supporters to associate with fellow

5    historical Republican voters by cracking them into surrounding

6    districts where their voices are effectively drowned out by

7    Democratic majorities, that is what gerrymandering is all

8    about.  And we think the evidence here very clearly and

9    strongly supports that conclusion.

10            JUDGE RUSSELL:  But you want that as a matter of

11   law.  In other words, there's no evidence in the record

12   demonstrating, for example, that the low turnout was weather

13   related or is there a contrasting turnout by the Democratic

14   party?

15            MR. KIMBERLY:  And, Your Honor, the simple question

16   to that is yes, there is no genuine dispute in the record on

17   those questions.  The State has not put those issues into

18   dispute.  The record is as it is before this Court.  And I

19   think you can conclude as a matter of law that these

20   disruptions to the associational activities of Republicans in

21   the area have indeed been disrupted.  There's nothing to

22   suggest otherwise.  And so we submit that we're entitled to

23   summary judgment on that question.  Certainly, at the very

24   least, we'd be entitled to a trial.  There's absolutely no

25   basis to suggest that the State would be entitled to summary

1    judgment on its cross motion.

2         Now, if I could, I'd like also to return to the

3    question of vote dilution which I think is relevant.

4         JUDGE NIEMEYER:  Let me just ask on that last point,

5    which was said sort of casually.  If you failed to make your

6    case factually, and we conclude it didn't establish the

7    requirement, that ends it.  You don't get a trial on that.

8    You get a trial on a dispute that's been raised.  And so this

9    is a motion, basically, you're asserting based on affidavits,

10   and your argument based on undisputed evidence, that there

11   were these effects.  And in order to create a dispute, the

12   State would have to come forward with other possibilities and

13   we'd have to resolve that dispute.  But if it turns out that

14   it's just inadequate as a factual matter, that ends the case.

15   You don't get a trial on that; right?

16        MR. KIMBERLY:  That's right, Your Honor, if the

17   Court found that no rational fact finder could -- and that's

18   this Court in this case -- could find in our favor on the

19   basis of the evidence before it, then it would be a basis --

20        JUDGE NIEMEYER:  I just wanted to keep the standard

21   clear on this.

22        MR. KIMBERLY:  Certainly.  And I apologize if I

23   misrepresented that standard.

24        Now, if I could, I'd like to come back to the

25   question briefly of vote dilution.  Recognizing again that

1    this is a entirely independent line of proven burden, and that

2    if you're with us on this question of associational disruption

3    you needn't reach this particular issue.  Before I get to that

4    let me just explain, vote dilution is proved with evidence of

5    block voting and political cohesion.  Those are concepts that

6    are taken from the Section 2 civil rights litigation context

7    where the question is whether minority performing districts

8    have been gerrymandered and diluted impermissibly in violation

9    of Section 2 of the Voting Rights Act, those are quote,

10   unquote, vote dilution claims.  And I'll get in just a bit

11   into the details of that framework.

12        And our position is that they have to -- vote

13   dilution so proved would have to make a practical difference.

14   We get that from this Court's opinion on the motion to

15   dismiss.  And we think there are two ways of showing a

16   practical difference; that's a chilling of political

17   participation, which is related to what we were just talking

18   about, and that it has demonstrably diminished political

19   opportunity and influenced electoral outcomes.  And I should

20   say in saying that we don't need to prove that every electoral

21   outcome has changed as a result of the gerrymander, I want to

22   make sure we avoid that misconception.

23        And here's how the Court put it on the motion to

24   dismiss, the injury is vote dilution.  And to establish this

25   element, the plaintiff must show that the challenged map

diluted the votes of the targeted citizens to such a degree
that it resulted in a tangible and concrete adverse effect.
It has to have made a practical difference.  And so that's
what I'm going to focus on here.

I should say this framework, I think, finds support
in the majority opinion in *Gill against Whitford*.  The
majority opinion there confirmed that the harm of vote
dilution arises from the political composition of a particular
district, when the lines are drawn in such a way that the
vote, quote, "carries less weight than it would carry in
another hypothetical district."

The majority in *Gill* describes this as a burden on
plaintiffs' votes that has to be evaluated district by
district.  And, of course, we have a single district challenge
here.  So our position is that what the Court said, the
majority in *Gill*, is entirely consistent with the approach
that we have taken in this case to date.

So to show vote dilution there are typically three
showings these are called the *Gingles* preconditions.  And
proof of these three preconditions is necessary, and we submit
in this case, sufficient to show that the vote dilution has,
quote, in the language of *Gingles* "impeded the ability of the
targeted voters to elect representatives of their choice."

Now, I'll come back to that in a bit.  The first
element is that the minority group must be sufficiently large

and geographically compact to form the majority of a
reasonably drawn district in the area.  We know that element
is satisfied, because between 1991 and 2011 historical
Republican voters did form the majority of the district and
had succeeded in electing their candidates of choice.

So my focus here is going to be on the second and
third elements, what I mentioned before, the idea that the
targeted minority's politically cohesive, and the majority
into which and among whom they are dispersed, vote as a block,
so that the dispersal of the targeted minority among the
surrounding majority will generally defeat the political will
of the minority.

And this is, in fact, the approach that our expert
Dr. McDonald took to the question of vote dilution.  He said
he approached the question of vote dilution -- this is on page
3 of his report -- in a manner similar to that used in voter
rights litigation.  He evaluated the way that registered
Republicans and registered Democrats behaved in elections and,
unsurprisingly, came to the conclusion that most Democrats
prefer Democratic candidates, most registered Republicans
prefer Republican candidates.

This is evidence that Democrats vote as a block.  If
you are a historical Democratic voter you will generally vote
as a block with other historical Democratic voters in your
area.  And if you are a registered Republican, you are

politically cohesive, you will generally vote together with other registered Republicans.  And it is on this basis that Dr. McDonald found that the current 6th Congressional District has the effect of diluting the votes of Republicans.

This chart was a subject of our preliminary injunction hearing at some length.  I'm presenting it here for a much more modest proposition than we discussed last time. It's just to say that when a district comprises a majority of Democratic voters, it's very likely to elect the Democratic candidate for office.  This supports the inference that Democrats generally vote together as a block.  The more Democrats you get in the district, the more likely it is that the Democratic gets elected.  The more Republicans you have in the district, the more likely it is that the Republican gets elected.

And we have evidence of election day voting from members of the 6th District who were -- who stayed in the district, who were taken out of the district, and who were added to the district.  What this shows is that voters are not automatons, we're not suggesting they are.  Voters exercise choice in every election.  What this does suggest, though, is those areas that were removed had previously voted overwhelmingly, over 60 percent of the time -- excuse me, over 60 percent of the electorate in favor of Republican candidates.  And after they were removed in the district they

1    continued to do so.  Likewise, those areas who were added

2    voted overwhelmingly for Democrats, when they were added to

3    the District they continued to do so.

4          JUDGE BREDAR:  Don't we just have the same problem

5    that we've had every time you and I have discussed this, which

6    is the difference between what happened in 2012, and what

7    happened in 2014, in the 6th.  And, you know, your data, your

8    line drawing in this context shows a nice cluster in terms of

9    results and predictability and so forth, and how then do --

10   what would statisticians say about a nearly 20 percent swing

11   in terms of what happened in that district between those two

12   elections?

13         MR. KIMBERLY:  Well, I guess what I would say is

14   that at this point --

15         JUDGE BREDAR:  The Democrat won both times.  One

16   time by 21.5 percent and one time by 1.5 percent.  Is that

17   roughly correct?

18         MR. KIMBERLY:  That sounds -- yes, here's the graph,

19   so it looks like a 18.5 percent swing.

20         JUDGE BREDAR:  That's a pretty big swing in the

21   context of what we're talking about here where it's all

22   supposed to be so predictable based on how people align

23   themselves.

24         MR. KIMBERLY:  Now, I want to be very clear that at

25   this point I'm not talking about predictability.  I'm talking

1    about only the accepted legal concepts of block voting and

2    political cohesion.

3            JUDGE BREDAR:  Should we accept them in the face of

4    data in our own case that show this kind of a swing?

5            MR. KIMBERLY:  Well, I -- simply put, I think the

6    answer is yes.  And it's because everything else indicates

7    that voters who associate with the Democratic party typically

8    vote as a block.  And those who associate with a Republican

9    party are politically cohesive, which is to say --

10           JUDGE NIEMEYER:  I thought that's what Justice Kagan

11   set out in her examples in *Gill*.  She and Chief Justice

12   Roberts suggested that the injury is not a change in the

13   result, the injury is the disadvantage to the individual voter

14   by diluting his vote.  And the hypothetical that she used, I

15   think, if I understood it, you don't even have to win to prove

16   dilution.  In other words, the Democrats would not even have

17   to have won those elections if it were shown that the

18   Republicans were targeted and their votes were diluted --

19           MR. KIMBERLY:  Right.

20           JUDGE NIEMEYER:  -- disadvantaged in the process.

21   In other words, they focused, they say it several times, they

22   called it diminishment or disadvantaged to the voter in the

23   voting opportunity.  So I -- I'm wondering whether it's

24   productive to get too much into the predictability of results.

25   You would expect a swing in the district, that's what the

1    Governor had said he wanted.  And it, in fact, did happen.

2    But the fact that we have one year where the margin was minor

3    and two years where the margin was pretty comfortable --

4                MR. KIMBERLY:  Right.

5                JUDGE NIEMEYER:  -- I'm not sure detracts from the

6    theory that vote dilution is based on the disadvantage to the

7    voter and has less of an opportunity.

8                MR. KIMBERLY:  Your Honor, that's exactly right.

9    And that's what I'm -- that's ultimately what I'm driving at.

10   I think Justice Kagan made another observation in her opinion

11   that was helpful.  She said only a perfect gerrymander would

12   ensure beyond doubt that every electoral outcome has been

13   changed.  But the standard under the law is not perfection.

14   It can't be that these sorts of targeting of individuals on

15   the basis of the way that they have expressed themselves at

16   the ballot box in prior elections.  And in turn the clear

17   diminishment of their political opportunity as a result is

18   actionable only in the face of flawless perfection in

19   execution.

20               JUDGE BREDAR:  So you would have claims here that

21   would succeed even if Roscoe Bartlett had won the 2012

22   election, despite the best efforts of the state authorities to

23   try to redistrict him out of office.  And if he had continued

24   to win, through this decade, there's no requirement that it

25   actually have the concrete result of flipping the district.

1    MR. KIMBERLY:  Well, I guess I would say that I

2    think that's a more difficult question.  I think you would be

3    a lot less likely to see a lawsuit in that circumstance in any

4    event.  What I would tell you, for certain, our position is

5    that if in 2014 a Republican had won, we'd still have a claim.

6    You know, it's no answer to say, well, we were trying to rig

7    all five elections, but we rigged only three.

8         Rigging an election by manipulating electoral --

9    excuse me, districting lines is a clear -- certainly a clear

10   burden on the voting rights of the Republicans who are

11   targeted.  Their will is being thwarted by game playing with

12   line drawing.  And the standard cannot be that we have to show

13   to a certainty that every electoral outcome has been changed

14   as a result.  That's why I led off by explaining that our goal

15   here is to prove to you that there has been a practical

16   difference that manifests, as Judge Niemeyer was saying, as a

17   diminishment in the political opportunity of the Republicans

18   in the old 6th District.

19        JUDGE NIEMEYER:  I hope it wasn't me.  I'm actually

20   repeating the Supreme Court jurisprudence, which they

21   repeatedly stated based on past, they said it's the

22   diminishment of the votes so that the person, in fact, injured

23   in this instance has a vote of less worth.

24        MR. KIMBERLY:  That's correct, Your Honor.  And

25   that's why I started with *Gingles*, which is what lays out this

1    framework and makes it very clear that that's what the

2    standard is.

3              JUDGE NIEMEYER:  Plaintiff has a right to an equally

4    weighted vote, that's the type -- that's what dilution is.

5              MR. KIMBERLY:  Right.  They're entitled not to be

6    treated differently and in course to have a less weighted,

7    less valuable vote, where the weight of that vote is

8    manipulated by line drawing, because the map drawers in

9    Annapolis disapprove of Republican voters electing Roscoe

10   Bartlett to office.  That's exactly right.  That is the crux

11   of vote dilution.  And we submit to you in -- excuse me, in

12   Dr. McDonald's expert report, he undertook exactly this kind

13   of analysis and found there was exactly this kind of result.

14             And, indeed, you know, he was -- well, actually

15   could we go back to the bar graph?

16             Ultimately, what I would say about election results,

17   because I don't want to say that election results are

18   irrelevant.  But I would point the Court to *Johnson versus De*

19   *Grandy*, a Supreme Court case from 1994, where the Court

20   emphasized that vote dilution and election results are not one

21   in the same, they are distinct, you can have one without the

22   other, and the other without the one.  But lack of electoral

23   success is evidence of meaningful actionable vote dilution.

24   And lack of -- equal electoral opportunity, that's the

25   language that Judge Niemeyer was driving at.

1          And what we have here is evidence of lost elections.

2   So if you look at this graph that's up, you would have to

3   conclude, and there would have to be evidence to suggest that

4   this is really just a coincidence that has nothing to do with

5   the line drawing that took place, so that those red bars up to

6   28.2 percent in 2010, those red bars to the left of the dotted

7   line shifted to those blue bars to the right of the dotted

8   line in a manner that had nothing to do with the

9   redistricting.

10          We -- I suppose what I would say is it is not our

11  burden to show that each -- that the swing from 28.2 to 28.9

12  is 100 percent attributable to the way that the lines were

13  drawn.  But this change in electoral outcomes is clear

14  evidence of meaningful vote dilution.  You don't -- we have

15  searched, we did a search of academic literature in other

16  voting electoral outcomes, we couldn't find a single other

17  instance in history where a vote swing had changed -- this is

18  nearly 50 points from 28.2 plus for Republicans to 20.9 minus

19  for Republicans, nearly a 50-point swing that wasn't

20  associated with an intervening gerrymander.  This sort of

21  thing just doesn't happen in the absence of this kind of

22  manipulation.

23          And so what we submit to you is these changes in

24  electoral outcomes are evidence of precisely the kind of vote

25  dilution that the Supreme Court has said represents a lack of

1  equal electoral opportunity that is an actionable burden

2  within the meaning of the Court's redistricting cases.

3  　　　　JUDGE BREDAR:  But drawing a line so that there will

4  be some level of vote dilution is okay, because as Justice

5  Alito has told us, partisan gerrymandering has been part of

6  the process since the founding.  So how do we know when

7  there's been too much?

8  　　　　MR. KIMBERLY:  Well, I would point The Court, I

9  think in that regard, to the associational harms that we've

10  identified.  Because the two go hand in hand.  And I think

11  putting them together makes a rock solid case.  We have clear

12  vote dilution here.  It is coupled with not only changed

13  electoral outcomes, but as we explained the last time we were

14  here, according to *The Cook Political Report*, the largest

15  partisan swing anywhere in the country.  And you couple that

16  with all of the ways it has disrupted Republican political

17  expression and participation and association in the area, and

18  I think you have a very clear recipe for a First Amendment

19  injury sufficient to warrant injunctive relief.

20  　　　　JUDGE BREDAR:  But the Supreme Court has said

21  there's a flat ban on punishing people by virtue of their

22  political party membership.  No lawful language like, well,

23  there can be some of this, just not too much, which they have,

24  you know, talked about in the context of voter dilution.  I

25  mean they're different.  It's a much crisper analysis, isn't

1      it, in the context of state action designed to interfere with

2      political association than is it with respect to state action

3      that's designed to draw the lines so that there's some

4      political consequence, some partisan consequence in the actual

5      votes that result, but not too much.

6              MR. KIMBERLY:  Your Honor, I don't actually think

7      that distinction really holds up, because the cases that we

8      cited to this Court and to the Supreme Court in our merits

9      briefing, make clear that even in more traditional First

10     Amendment retaliation contexts like employment and handling of

11     prisoners, it isn't enough to show hurt feelings, insults are

12     not the stuff of a First Amendment retaliation claim.  You

13     have to show that the action taken has actually imposed a

14     practical burden.  That's where we got this standard.  This is

15     why we presented it to the Court in this way on the motion to

16     dismiss.

17             And so, you know, for example, you could have

18     somebody who attempts to impose -- some superior in state

19     government attempt to impose a burden but it fails, or says

20     something that hurts the feelings of one of his employees

21     because of the way that employee had behaved at a public rally

22     supporting someone that that superior didn't also support.

23     That's not the stuff of a First Amendment retaliation claim.

24     So courts are constantly in the business of drawing the line

25     between abstract injuries and hurt feelings on the one hand,

and actions that actually make for a concrete burden to

support a First Amendment retaliation claim.

JUDGE BREDAR:  But don't we know that some concrete

burden, some relatively minimal, but some concrete injury

sustained by voters is permittable -- is permissible in terms

of the consequences for an election?  The line drawing to try

to nudge a district to be a little bit more Democratic is

okay, because it's been part of the -- it's root and branch of

a political process.

MR. KIMBERLY:  Sure.  And I guess my response to

that is our position has never been that you have to take all

consideration of political consequences redistricting out of

the mix.  Our view is that there are a range of other sorts of

considerations that can go into the way that lines are drawn

that might nudge political outcomes one way or another, that

have nothing to do with a specific intent to burden voters

because the way they have voted in the past.

So to give one example, the evidence in this case is

that Congressman Ruppersberger wanted Fort Meade in his

district because at the time he was on the Intelligence

Committee, and he thought it would help him politically to

have Fort Meade in his district.  That is a political

consideration designed to make it easier for him to succeed

politically.  It is not the same -- and that --

JUDGE BREDAR:  But not a partisan consideration.

1          MR. KIMBERLY:  No it is a partisan consideration,

2     because to give it instead to the Republican candidate, the

3     1st District, which is probably what it would have gone to

4     based on where it is, would give the Republican an advantage

5     politically, or at least deny the Democrat an advantage

6     politically.  So these are partisan considerations.

7          And Congressman Hoyer wanted College Park in his

8     district because he's an alumnus and can raise money more

9     easily from alumni of the University, if the University is in

10    his district.  He can bring, I guess, federal benefits to the

11    University more easily if it's in his district.  All with a

12    goal of making it easier for him to compete in the political

13    process.  These are partisan considerations, designed to --

14    intended to use redistricting to influence politics.  There's

15    nothing wrong with -- you know, you might have your own

16    judgments about whether or not that's tasteful or appropriate,

17    but under our First Amendment theory it's not unlawful.

18         And so my response to you, in that line of

19    questioning is that there is nothing inconsistent with what

20    you have observed in applying our theory.  It just means that

21    the focus in the redistricting is on those other kinds of

22    political considerations.  What's off the table is a specific

23    intent to single out people on the basis of the way they have

24    voted in the past, and attempt to prevent them from

25    participating meaningfully and on an equal playing field in

the political process as an expression effectively of

disapproval of that past political participation.

Okay.  So that's -- and I'll be happy to come back

to the question of burden.  That's what we have on burden.

I'd like to talk now a little bit about our third and final

element.  And this, I think, is where last time we got -- and

I'll accept my own fault for this confusion -- where we

started talking about *Mt. Healthy* and whether *Mt. Healthy*

burden shifting applied in this context.  And I think there

was a misunderstanding about whether it applied to

demonstrating electoral outcomes were attributable to the

gerrymander.

That is not what this element of the claim is about.

This element of the claim is the question whether there are

alternative explanations for the way that the lines were

drawn, that suggest that even if the map drawers had not

considered past partisan voting patterns and party

affiliation, they would have drawn the district in such a way

that the same results would obtain.  Roughly the same lines,

same sort of vote dilution, same sort of disruption of

association.

And so *Hartman against Moore* puts it this way:  Upon

a prima facie showing of retaliatory harm, the burden shifts

to the defendant to demonstrate that even without the impetus

to retaliate he would have taken the action complained of.

The idea is would the line -- would the 6th District have been drawn --

JUDGE NIEMEYER:  Is this question informed by the nature of the evidence supporting intent?  In other words, if the intent is explicit, the intent here is not implied, the intent here is we want to switch the 6th District from Republican to Democrat.  And to do so we're going to take out a bunch of Republicans and put in a bunch of be Democrats.  It seems to me if that's the intent to do that, then it's not a big step to go to the result, because that's exactly what they did.  Whereas, if there were other reasons for that, then -- and the intent was not explicit, then you get a much stronger case.  But here the explicit intent was to do exactly what they accomplished.

And it seems to me that the first element feeds on to the last element and helps support the last element.  Whereas, the first element they said, well, we just did it for political reasons or we wanted to redo the districts to improve the interests of the people and nothing else was said, then you'd have to go to the last element to see if there's any explanation other than First Amendment violations.

MR. KIMBERLY:  I think that's --

JUDGE BREDAR:  It's not my issue, but I've never understood why you need *Mt. Healthy*.  It's not where I'm going, it's not something -- I don't have a dog in the fight

1    because you know where I am on the broader issue.

2            MR. KIMBERLY:  Sure.

3            JUDGE BREDAR:  But as an abstract matter I've never

4    understood why you need it on this proof.

5            MR. KIMBERLY:  Oh, and I agree, Your Honor, I think

6    it's the right way to think about the law.  I don't think we

7    need it.  I think here the evidence is quite clear that the

8    only reason they drew the map the way that they did is because

9    they wanted to flip the 6th District.

10           JUDGE NIEMEYER:  Because they said so.

11           MR. KIMBERLY:  Because they said so.

12           JUDGE BREDAR:  On TV, in this courtroom they said

13   so.

14           MR. KIMBERLY:  And because every other -- and

15   because every other explanation they gave is just flatly

16   disproved in the evidence.  The only one that was really

17   pressed in the evidence is the I-270 corridor explanation.

18   But, in fact, what the evidence shows is that no one

19   actually -- no one who was actually involved in the

20   redistricting thought one second about the I-270 corridor.

21           Martin O'Malley was very clear that what they were

22   considering in engaging in the redistricting was they wanted

23   to do it in a timely way that was consistent with what the

24   census results were.  That makes sense.  They wanted to comply

25   with the case law concerning one person, one vote, and Section

1    2 of the Voting Rights Act.  That also makes sense.  And then

2    besides those two things, the only thing they cared about was

3    flipping the 6th District.

4         I'm going to skip this.  And, you know, here for

5    instance, is Speaker of the House Busch confirming he didn't

6    think --

7         (Video played.)

8         MR. KIMBERLY:  Nobody was thinking about the I-270

9    corridor.  I'm not going to guild the lily here.  I think the

10   point is pretty clear.  Every witness asked about the I-270

11   corridor, who was involved in the redistricting said, no, I

12   didn't think about that.  Including Eric Hawkins who explained

13   he doesn't -- not only didn't he do it, he didn't recall

14   anybody else thinking about the I-270 corridor.

15        So the only context in which the I-270 corridor

16   comes up are these GRAC public hearings, which the evidence

17   shows, as we explained in our briefing, was really window

18   dressing for the behind the scenes process.  And the only

19   people who raised the I-270 corridor explanation were all

20   Democratic party insiders, who are saying roughly consistent

21   things about a supposed community of interest and linking

22   Frederick and Montgomery Counties.  But when asked whether

23   comments taken at the public hearings influenced the way the

24   map was drawn, a GRAC chair Jeanne Hitchcock said, no, they

25   didn't.

1          And so that leaves, I think, the rest of the

2    permanent injunction framework recognizing that that's at

3    least what we're asking for from the Court at this point.  I

4    think the question of irreparable harm is straight forward.

5    The case law that we cited to this court is straight forward.

6    That elections held under unconstitutional maps --

7          JUDGE NIEMEYER:  What's the remedy you're asking

8    for?

9          MR. KIMBERLY:  The remedy that we're asking for is

10   an order enjoining the defendants from enforcing the map as

11   drawn.  What I would suggest --

12         JUDGE NIEMEYER:  That doesn't go far enough, does

13   it?

14         MR. KIMBERLY:  Well, it would require in turn for

15   the legislature to enact a new map consistent with the legal

16   principles that the Court lays down, if it were to enter an

17   injunction of the kind that we're asking for.

18         Now, if it turns out that the legislature is unable

19   or unwilling to do so, either because there's not enough time

20   or because Democrats and the legislature and Governor Hogan in

21   the Governor's mansion can't agree on a map, I think then it

22   would fall to this Court, as is typical in these kinds of

23   redistricting cases, to adopt a map of its own.  But we would

24   suggest it's appropriate at least as an initial matter to give

25   the legislature and opportunity to --

1          JUDGE NIEMEYER:  The legislature and the Governor

2     could not even agree on giving it to a commission, could they?

3          MR. KIMBERLY:  They couldn't.  And, Your Honor, if

4     this Court concluded that would be a waste of everyone's time,

5     we would certainly be happy --

6          JUDGE NIEMEYER:  I don't know if we can conclude

7     that.  But just as a practical matter, thinking out loud,

8     it's -- if you're thinking about a remedy and if you were to

9     follow through on your particular claims, timing gets to be an

10    issue.

11         MR. KIMBERLY:  It does.

12         JUDGE BREDAR:  But before the Court jumps into it

13    and starts to draw lines or appoint its own expert or appoint

14    its own commission to do that, it seems that it would only be

15    fair and respectful, as much as we can be, of the role of the

16    other branches, to allow them an opportunity to come into

17    compliance on their own through their own means and methods.

18         MR. KIMBERLY:  And so one alternative -- I might

19    suggest, the approach taken in Wisconsin was an injunction was

20    entered against enforcement of the map.  And then the question

21    of remedy was briefed separately.  I think that would be an

22    appropriate course here, because remedy is not something we've

23    briefed at length.

24         I would point the Court also to North Carolina, my

25    recollection is that before the Supreme Court proceedings in

that case there was leeway to the legislature to attempt to

draw a fair map, while in parallel the parties and court

worked on their own map.  And setting a deadline for what the

legislature could accomplish, the Court was -- would then in

theory, if it hadn't been stayed, would then in theory have

been at the ready with a neutrally drawn map of its own if

that deadline passed without any objection by the legislature

and Governor's office.

      But these are all issues that we haven't yet

briefed.  And it might be that the appropriate course, if the

Court were inclined to enter an injunction, would be to order

expeditious briefing on that question after entering an

injunction.

      JUDGE NIEMEYER:  All right.  Why don't we give the

State a little bit of a chance unless you have some --

      JUDGE BREDAR:  I have one more question for Mr.

Kimberly, if I might, Judge Niemeyer.  And that is tell me

about where in this record do we find evidence of

associational injuries and harms, and what are they

specifically in your view?  We've had some theoretical

discussions about what they could be, what they have been

found to be in other cases, but in the record of this case,

assembled by you and your opponents in the discovery phase,

what are we left with as proof of actual injuries in the

context of First Amendment retaliation and in relation to

associational rights?

MR. KIMBERLY:  So I would say it was what we had discussed earlier.  It's the actual election returns, which were disclosed to us in discovery in part of the record.  Those election returns show -- or I should say -- yeah, it's I guess it's properly described as election returns -- show decreased voter turnout in Republican primaries.  That --

JUDGE NIEMEYER:  That's what Justice Kagan focused on, the effect on the party.

MR. KIMBERLY:  Right.

JUDGE NIEMEYER:  She talked about ravaging -- that the injuries are ravaging the party he worked to support.  In other words, people lost -- didn't support it as much and they didn't show up in elections as much.  That would be the best evidence you have; isn't it?

MR. KIMBERLY:  That I think also with the campaign finance disclosure reports, which show --

JUDGE NIEMEYER:  Well, that's the support.

MR. KIMBERLY:  Yes, the decreased financial support.  Exactly.  Yes.  And I think also, as Judge Russell noted, you can also just look at the way that voters here were sorted.  The fact of the matter is 60-some-odd thousand historical Republican voters were removed from the district and are now thwarted in their ability to associate with like-minded Republican supporters who were left in the district.  I think

that too is just a very straight -- I mean, you can't deny the

disruption of association that's associated with that

observation.  Whereas, before they could get together and work

to select a candidate that they wanted to send to Congress,

they can no longer.

JUDGE BREDAR:  Can we just take notice of that or do

we need affidavits from individual Republicans who formerly

were in the 6th, now they're in the 8th or the 3rd, who say I

can't do this anymore, here's what I lost.  I used to belong

to a Republican club and the line split us right down the

middle.  Now I'm not in the same Republican club anymore.  Now

I'm over in the 8th.

MR. KIMBERLY:  I think the more straight forward

observation is simply that those who were moved from the 6th

can't vote in the 6th District anymore.  So they cannot, I

suppose in sort of a, you know, if someone were inclined to

campaign for candidates in districts where they didn't reside

maybe it -- I mean, I think it's commonsensical to think that

Republicans in the 8th District would work to support the 8th

District candidate, but to no avail because they've been

drowned out and diluted by Democrats in the area.  And

Republicans in the 6th District will work to support members,

candidates for congressional office in the 6th District, but

again to no avail, because they've been drowned out by

redistricting.  Whereas, before the gerrymander those two

1    groups could have worked together to -- with greater electoral

2    success.  And the reason they cannot now is because they've

3    been singled out for disfavored treatment, they've been placed

4    on an unequal playing field, and as a consequence have not

5    enjoyed the same political opportunity that they had before.

6           JUDGE BREDAR:  Are there some associational impacts

7    that do not translate directly to voting.  Suppose that one

8    was persuaded that there was something very much awry here,

9    but felt that proving it through actual election returns and

10   voting patterns is problematic because of a history that has

11   been set for us by the United States Supreme Court in the

12   context of voting in particular.  Aren't there other First

13   Amendment rights and interests of an associational character

14   that don't tie so directly to voting?

15          MR. KIMBERLY:  Yes and --

16          JUDGE BREDAR:  Advocacy.

17          MR. KIMBERLY:  Sure.  Financial support is one

18   example.  Which is something that we have.  And, of course, we

19   also have the deposition testimony of our plaintiffs

20   explaining exactly this kind of disruption and confusion more

21   broadly than just showing up to the ballot box.  But I think,

22   of course, showing up to the ballot box is highly relevant,

23   certainly it's an exercise of First Amendment rights.  And the

24   ability of Republicans to associate in the area now has been

25   disrupted.  Thank you all.

```
 1            JUDGE NIEMEYER:  All right.  Who are we going to
 2     hear from, from the State, Ms. Rice?
 3            MS. RICE:  Yes, Your Honor.
 4            JUDGE NIEMEYER:  I'll tell you what, why don't we
 5     take a short recess.  And you can gather all your thoughts, as
 6     have you have already been doing, right after the break.
 7     We'll take a short recess.
 8            (A recess was taken.)
 9            JUDGE NIEMEYER:  All right.  Be seated, please.
10     Ms. Rice, you haven't been standing there the whole time, have
11     you?
12            MS. RICE:  I have not.
13            JUDGE NIEMEYER:  All right.  We'll hear from you.
14            MS. RICE:  Good morning and thank you.  The
15     plaintiffs are seeking an injunction applicable only to
16     the --
17            JUDGE BREDAR:  Let's talk about settlement first.
18            MS. RICE:  Yes.
19            JUDGE BREDAR:  Where does the State stand with
20     respect to the viability of a settlement negotiation?
21            MS. RICE:  Your Honor, as an Assistant Attorney
22     General, I don't know that I can currently make any
23     representations about the viability of a settlement
24     negotiation more to say that the State is always willing to
25     dialogue with any party seeking to settle a case.  We have not
```

1    yet been approached in this matter.  The client, State Board

2    of Elections is not independently empowered to draw

3    congressional district lines.  The reason they're the

4    defendant in this case is because they're charged with

5    implementing that electoral map and that would be the proper

6    subject of the injunction, but there are clearly other --

7              JUDGE NIEMEYER:  Let me suggest something, because

8    I'm fully sensitive to your role and its -- I mean, you're a

9    spokesperson for a very complex process and agencies and so

10   forth, is there any room in your role to have the

11   administration -- and actually it would have to be, I suppose,

12   the Attorney General and the Governor -- but approve some

13   notion where you could yield to a court jurisdiction over this

14   issue, and agree to some kind of commission, say, headed up by

15   a magistrate judge.  And then having a designee of you and a

16   designee of the plaintiffs on there and see if they can't work

17   something out --

18             MS. RICE:  Just to be clear --

19             JUDGE NIEMEYER:  -- to try to obviate the problems

20   you were talking about, which are real, there's no doubt about

21   it.

22             MS. RICE:  Sure.  Just to be clear, the Attorney

23   General's role here is just to defend the constitutionality of

24   the law, he does not take any position in this matter or would

25   likely not be involved in any resolution of the matter.  But

1    in terms of are there options, could we think creatively about

2    a way forward if there was interest on both sides to create a

3    dialogue, I'm sure --

4         JUDGE BREDAR:  I don't hear any state officials

5    within your specific client, or more broadly among the State

6    in general, which the Attorney General represents, overtly

7    defending and advocating for the appropriateness of extreme

8    partisan political gerrymanders.  I don't see that in this

9    record, certainly, and I don't see it more broadly out there

10   in the wider world.

11        If anything, the conventional wisdom seems to be

12   that it's a bad thing, that there's much agreement with what

13   the Supreme Court has said in other cases, that it's

14   repugnant, that it's in conflict with basic principles about

15   how Democratic government ought to operate and ought to work.

16   Even forces in the state of Maryland have gotten behind

17   legislation saying essentially, Maryland would go along with

18   some kind of a more neutral approach, if other states would as

19   well.  That's certainly something that we're all aware of.

20        So, accordingly, is there an opportunity here, a

21   moment when it's appropriate for litigants in the Maryland

22   case to reach out to litigants in another case, say Wisconsin

23   or North Carolina, where the political equities are exactly

24   opposite of what they are in Maryland, and settle two cases

25   simultaneously with a net effect that no one gains political

```
1     advantage, which seems to be what's ultimately driving all

2     this.

3              Everyone condemns it.  Everyone says it's terrible,

4     but nobody will fix it, because nobody's prepared to

5     unilaterally disarm.  Well, then find others who you can get

6     in partnership with and settle the Maryland and Wisconsin

7     cases simultaneously, with no net effect in terms of the

8     politics, other than the people have a more pure Democratic

9     process.  Is anyone thinking along those lines?

10             MS. RICE:  Your Honor, I will certainly bring back

11    the thoughts from this morning's hearings to my clients.  I

12    have not, before this hearing, had the opportunity to discuss

13    settlement with them.  We have not been approached by the

14    plaintiffs in the past about any willingness to settle.  So I

15    just don't have the information --

16             JUDGE BREDAR:  The state of Maryland settles

17    difficult cases in this court every year and perhaps every

18    month.  And some of them require all kinds of steps that have

19    to be taken back with the Board of Public Works, even back to

20    the legislature.  You know that from personal experience, that

21    our magistrate judges resolve those matters on a tentative

22    basis subject to appropriate legislation being adopted, or the

23    BPW ratifying.  But there are ways by which your very complex

24    client can be brought to the settlement table successfully and

25    agreements can be reached that resolve hard thorny problems
```

1    like this, if there's a will.

2          MS. RICE:  Your Honor, I do agree that there are

3    many different methods and that our office would always advise

4    our clients on the availability of different methods and work

5    creatively with the Court and the other parties to settle a

6    case.  I just don't have any information about the willingness

7    to do so at this time.  I would point out that Wisconsin is a

8    state legislative case and in North Carolina the gap is

9    something like it's -- the number of seats at issue is many

10   more than the one at issue in this case.

11         JUDGE BREDAR:  You could sweep away all of these

12   problems by states such as Maryland and Wisconsin agreeing

13   that across the board, nonpartisan commissions would do the

14   districting at the state legislative level, at the level of

15   congressional districts, and clear away all of these issues in

16   both states with one sweeping initiative that is just adopted

17   on a mere basis in both places, to no net -- no significant

18   net political effect.

19         MS. RICE:  Your Honor, we definitely appreciate

20   these comments and the creative direction that they're

21   heading.

22         JUDGE NIEMEYER:  All right.  You have a motion for

23   summary judgment against you, which you've answered, and then

24   you have filed a cross motion for summary judgment.  So

25   however you wish to handle it, we'll hear from you on that.

1        MS. RICE:  Thank you, Your Honor.  I think that

2   we'll start with our cross motion for summary judgment.  And I

3   think it is, again, appropriate to go back to what the

4   plaintiffs have asked for, the context in which they're asking

5   it.  We -- the plaintiffs are looking to enjoin just the 2020

6   election.  That's one -- the 5th and last election under the

7   2011 plan.  The 2011 plan was arrived at only after public

8   comments, compromise between the Governor and the legislature,

9   of all of the incumbents, Republican and Democrat, and

10  approval by the voters of Maryland in referendum.

11       There have also been many changes of circumstance

12  since 2010.  We're actually gearing up right now for the

13  conduct of the 2020 census.  So there are many demographic

14  changes that have happened since 2010.  There is a different

15  match up in the 6th Congressional District.  Congressman

16  Delaney has announced his retirement.  We have two new

17  candidates that are facing off in the 2018 election, and we

18  have no evidence of the plaintiff's preferences in that race.

19       All of this is happening after we have had a long

20  and whirry procedural history of this case in front of this

21  court the plaintiffs did not bring --

22       JUDGE NIEMEYER:  Not many cases have a Supreme Court

23  chiming in twice.

24       MS. RICE:  It's true.  We're lucky --

25       JUDGE NIEMEYER:  And still having to take it

again.

MS. RICE:  We're lucky in that way to have had their
wisdom multiple times.  And because of that we did not even
get this claim from these plaintiffs until March 2016, after
the 2016 primaries had already concluded.  And the third
election cycle under the plan was well underway.  So those
things have not changed since we were here on the preliminary
injunction motion.

Subsequently, the plaintiffs were afforded five
months of fact discovery, an additional month of expert
discovery, and this Court offered to entertain motions to
reopen discovery on remand.  An offer which neither party has
taken them up on.  So that is how we got here.  And we are
here on motions for summary judgment.  The plaintiffs have the
burden of persuasion in their claim.  So under *Ricci* and
*Celotex* you can find in favor of the state in our cross motion
for summary judgment merely by finding that the plaintiffs
have not met the burden of production on one or more of the
elements of their claim.

And we agree with the plaintiffs that there are --
do not appear to be many disputes over the material facts as
to burden and causation.  But what the plaintiffs have done is
asked you to make inferences with respect to causation that
are not supported by evidence.  They can't now hope that
evidence will be developed at trial, they must make those

1    demonstrations on the record that are --

2         JUDGE NIEMEYER:  I think I -- I think I gather you

3    agree with what I tried to clarify with Mr. Kimberly, which is

4    if they failed to advance facts sufficient to carry their

5    case, then they're not entitled to summary judgment.  And the

6    only way to go to trial on that is if they have carried it and

7    then you've created a dispute about those facts.  And that

8    needs to be resolved to resolve the case.  And it looks to me

9    like both parties have spent a lot of time putting forward

10   almost every fact they have.  And I can't foresee anymore

11   facts coming forward.

12        But you're not entitled to that under summary

13   judgment, you don't get a second crack.  If you haven't put

14   your facts forward, sufficiently to carry the day, you lose.

15   And that -- I think that's standard Rule 56 jurisprudence;

16   isn't it?

17        MS. RICE:  That's correct, Your Honor.  And we also

18   need to bear in mind here that the plaintiffs are seeking a

19   permanent injunction.  The four factors are the same, more or

20   less, than a preliminary.  The only difference is that

21   plaintiffs actually must succeed on the merits of their claim,

22   not just show likelihood of success.  This is a high bar, as

23   it should be.  Even if success on the merits were certain,

24   it's not enough.  They must still satisfy those equitable

25   factors.  And there has been no change since the Supreme Court

held in Benisek, that the plaintiffs failed to do so.  They've

put no further facts forward on their irreparable harm.  In

fact they haven't updated the facts that they had about the

effects of future elections in their supplemental motions.

So I think --

JUDGE NIEMEYER:  Well, I don't quite understand

irreparable harm.  I understand some of the other equities

you've mentioned in your papers, but irreparable harm would be

if there has been dilution or injury to their associational

rights, those are things -- those are still in place, the

lines are still in place which have given rise to that.  And

this is not a damage case in terms of dollars.  This is to

rectify, according to them, a First Amendment violation.  And

so on that issue, I have a very hard time conceptualizing what

you're saying, that equity would seem to be the only court

that could address the remedy.  But your other points I

understand them from your papers.

MS. RICE:  Sure.  I think that maybe looking back at

this Court's legal finding three, and the memorandum on the

preliminary injunction would be helpful.  There this Court

quoted *Bryant v. Cheney* for the proposition that standing for

irreparable injury is ongoing.  And that when plaintiffs are

seeking prospective -- sorry, that's paraphrasing, are

asked -- the Court is asked to award prospective equitable

relief for a concrete past harm, and a plaintiff's past injury

1    does not confer standing upon him to enjoin the possibility of

2    future injuries.

3              And I think there we are again, thrown into this

4    complex world of voting causation and what the electoral

5    circumstances actually are on the ground in the 6th District

6    in 2018 and 2020.  We just don't have anymore information.  We

7    don't even have information from the plaintiffs about what

8    their electoral preferences are, whether it would be for David

9    Trone, Amie Hoeber, or some third candidate, or perhaps even

10   to write in Roscoe Bartlett again.  The record's just devoid

11   of that information.

12             And we did, by contrast, have information that each

13   of the plaintiffs, like good voters do, examines each of the

14   candidates for all of their flaws and strengths, and makes a

15   decision based on the candidates.  And each of their

16   depositions each plaintiff admitted at one time or another to

17   voting for a Democrat.  Some of these were for not

18   congressperson, a more local matter, sometimes even a judge,

19   but each could recall a time that they had crossed party lines

20   and voted for the other party.  Out of the plaintiffs that

21   lived in the 6th District and were eligible to vote at a

22   time -- at the time, all four of those plaintiffs Benisek,

23   Strine, Cueman, and Eyler, admitted to voting for a Democrat

24   for Congress, someone other than Roscoe Bartlett, going back

25   that far.

1          So here we have the plaintiffs, as most voters do,

2    making representations that they evaluate the races

3    individually.  And we don't have any information from them

4    about how they would evaluate this match up.  It might be a

5    reasonable inference to draw that they would still disfavor

6    John Delaney in subsequent elections, but now that he is not

7    seeking that seat, we simply must proceed without -- I think

8    it is helpful to look at *Gill's* pronouncements about standing.

9    *Gill* emphasized that standing was an individualized as opposed

10   to a party-wide injury.

11          And I think that that is very important here.  The

12   majority did not embrace Justice Kagan's suggestion of

13   associational injury even to establish standing.  Although, it

14   might be tempting to do so to sort of extend that rationale.

15   And --

16          JUDGE BREDAR:  They didn't reject it either.

17          MS. RICE:  They didn't object to it either.  And an

18   interesting fact is that the Supreme Court remanded both *Gill*

19   and *Rucho* for further proceedings on standing, even though the

20   Courts in those matters had made specific findings about

21   district-wide electoral results.  So I think we can take from

22   that that there's something more that needs to be done, that

23   something extra needs to be done to tie in individual -- the

24   burden on an individual vote, than merely repeating the

25   district wide --

1          JUDGE NIEMEYER:  I thought the Court, if I

2    understood the Court's holding, it was pretty narrow, and the

3    holding basically was that the plaintiffs did not seek -- I'm

4    now quoting -- to show such requisite harm, since on the

5    record it appears that not a single plaintiff sought to prove

6    that he or she lives in a cracked or packed district.  And --

7    end quote.  And the Court pointed out that it's an individual

8    claim and that a person who seeks to assert a right for

9    dilution, or I suppose associational rights too, would have to

10   live in the district that was affected.  And it seems just the

11   opposite of what you're saying, that if they do live in the

12   district they have standing.

13        MS. RICE:  Sure.  So we can look at the Supreme

14   Court, I think it's at page 1933 in the Supreme Court

15   Reporter, has a discussion of two of the plaintiffs in

16   *Whitford v. Gill*, and one is Whitford who admitted his vote

17   was neither cracked nor packed on the stand.  And then there's

18   another plaintiff Donohue.  And the Court says Donohue on the

19   other hand alleges that Act 43 burdened her individual vote.

20   And that was because she claimed residency in one of the

21   districts where Democrats like her have allegedly been

22   deliberately cracked.

23        But the Supreme Court didn't find that allegation

24   sufficient to find that Donohue had standing to proceed with

25   the claim.  If it had, there wouldn't have been the standing

1    problem.  So we're, again, looking at something more,

2    something that actually shows, like this voter had some impact

3    to their own vote.  So I think --

4         JUDGE NIEMEYER:  The Court didn't say that, the

5    Court says to the extent the plaintiffs allege harm is the

6    dilution of their votes, that injury is district specific.

7    This disadvantage to the voter as an individual, therefore,

8    results from the boundaries of the particular district in

9    which he resides.  And the plaintiff's remedy must be limited

10   to the inadequacy of that produced his injury in fact, that is

11   the disadvantage.  In this case the remedy that is proper and

12   sufficient lies in the revision of the boundaries of the

13   individual's own districts.

14        And then the Court went on to point out that in this

15   case they were challenging statewide injury and taking the

16   plaintiff as to where they were.  The plaintiffs argue that

17   their claim of statewide injury is analogous to claims

18   presented in *Baker* and the Court then said that's not true.

19   And that's the only standing it addressed.

20        But it seemed to me, it's pretty clear, and you look

21   at Justice Kagan's opinion too, it's pretty clear that if you

22   live in the district which you are challenging, because it was

23   cracked or packed, you have standing to challenge that.  Now,

24   whether you win or lose is another injury, but the standing is

25   created by the disadvantage of their vote in that district.

1           MS. RICE:  Your Honor, I don't think we're

2      disagreeing --

3           JUDGE NIEMEYER:  Okay.  Fair enough.

4           MS. RICE:  -- disadvantage that exists would be --

5           JUDGE NIEMEYER:  I thought you were suggesting that

6      a couple of people in the *Gill* case actually had standing.

7           MS. RICE:  No, I think what I'm saying is that

8      something more has to be demonstrated about what that cracking

9      or packing is --

10          JUDGE BREDAR:  Well, so when the North Carolina case

11     was remanded, and the Court said very briefly what they said

12     vis-a-vis North Carolina, and that case went back, and the

13     panel reconsidered, and then issued their new opinion and

14     found that there was standing, what -- what more did they

15     actually really find on the road to concluding that there was

16     standing in compliance with what *Gill* said there had to be?

17     Not much.

18          MS. RICE:  Well, actually quite a lot.  And you

19     anticipated where I was going.  And August 27th the *Rucho*

20     court came out with a new opinion.  And there the standing

21     facts were well-developed.  Each individual put on evidence

22     that their precinct would have been better off, in terms of

23     the way that their precinct voted, would be more like the

24     district total, under 2,000 different maps that were computer

25     generated.  So in more than half of those computer generated

maps, they would have been better off.  So they made actually

quite a strong showing that their individual right to vote had

been burdened.  Because they showed that in the possibility of

alternative districts they had been put in one of the

districts that would have most burdened their votes.

So we don't have any of that evidence here.  We

don't have any expert that's come before you to give you that

kind of evidence.  We have a singular map that was -- could

not even be said to have been drawn without reference to

political data.  And if you look at it -- let me put it up

here.  Is that showing up for you?  This is the single

alternative map.

And Dr. McDonald admitted that he himself did not

draw this map, he had his graduate student do it.  When

questioned at deposition he could not guarantee that the

graduate student had not resorted to political data when

drawing that line.  The graduate student had access to the

data and Dr. McDonald did not have a conversation with him

about whether or not he looked at political data.

You can see that the choice was made here to include

both Gaithersburg and Rockville in the alternative 8th

District that was proposed.  And if you look at this is just

the next page in that report, the consequence of that choice

is that the 8th District becomes even more packed with

Democrats than it had been under the prior map.

1          So -- and Dr. McDonald himself admitted that this

2     alternative map -- again, this is to establish standing we're

3     not talking about remedy, we're talking about standing, that

4     this alternative map would also burden the votes of Democrats

5     in the 8th District.  And the reason that's important here at

6     standing -- in standing is because that makes it not a neutral

7     comparitor map.  This map has serious political consequences.

8     It resulted in --

9          JUDGE NIEMEYER:  Sounds to me you're arguing the

10    merits of the case.  Standing just focuses on whether he can

11    be in court and make a claim.  And in this case the plaintiffs

12    are in the very district and voted in the very district that

13    was affected, and they make a claim.  Now, whether their claim

14    is good or not, we have to test that.  But I think on the

15    threshold of standing, then no one would have standing in

16    these cases if it weren't the voters affected in that

17    district.  At least they claim to be affected.  They voted in

18    that district.  And they voted in a district that was redrawn

19    to dilute their vote, allegedly.

20         But I don't know -- I don't quite understand why

21    this doesn't fit exactly with what Justice Roberts and Justice

22    Kagan were pointing out pretty straight forwardly.

23         MS. RICE:  Well, Justice Kagan went on a little bit

24    more at length than Justice Roberts did in explaining how you

25    might demonstrate standing.  One of the things she said, and

1    plaintiffs also pointed this out, you have to demonstrate by

2    way of a neutrally drawn map that such a citizen's vote would

3    carry less weight, have less consequence --

4              JUDGE NIEMEYER:  That's to show dilution.  And then

5    she went on to talk about associational.  But that would -- to

6    have standing, to bring a partisan claim on vote dilution, the

7    plaintiff must prove the value of her own vote has been

8    contracted.

9              MS. RICE:  Correct.  So to show that your own vote

10   had been contracted you can't just refer to what actually

11   happened, because you don't -- you can't see -- and this is

12   part of what we talked about last time, also on the merits --

13   you can't see very well or understand statistically whether

14   that is an effect of the redistricting, it is an effect of

15   where you live and changing demographics.  To demonstrate that

16   you need something more.  And we're at summary judgment, we're

17   not at pleading stage, and evidence is necessary to

18   demonstrate injury at this stage.

19             So for the vote dilution injury and we can talk

20   about in a minute the associational harms and the evidence

21   there, but for the vote dilution injury, this map that does

22   not explain whether or how many voting tabulation districts or

23   census places are split in the line, that wasn't part of Dr.

24   McDonald's report, that has no explanation of the effects on

25   the neighboring districts, and in this case it's just the

8th --

        JUDGE NIEMEYER:  What about the evidence that's been

advanced that you only needed to remove 10,000 people from the

6th District to comply with the census.  Instead, 66,000

Republicans were removed and 20-some thousand Democrats were

reintroduced into the district, with the results that the

Republicans still continued to vote and the Democrats still

continued to vote as they did in prior deals, but their vote

didn't have as much value.  And that evidence is in the

record, whether it carries the day is something we have to

make a judgment on, but it seems to me, for standing purposes,

they have alleged that there -- the value of their vote has

been contracted.

        MS. RICE:  That evidence, I think we've discussed at

length in the past and the -- there's a fallacy in saying that

only 10,000 people needed to be removed.  Because we're

talking about redistricting an entire state.  We didn't --

Maryland didn't redistrict the 6th District in isolation.

There were severe population deficits in other parts of the

state that needed to be remedied somehow.  And in doing that,

making those choices, some of which very clearly, including

taking the 4th district out of Montgomery County, had

absolutely nothing to do with big P partisan politics,

*Fletcher v. Lamone* talks about at length about the

legislature's intent and adopting the proposal of the Black

1    Legislative Caucus in that move that --

2          JUDGE NIEMEYER:  I don't understand, I thought the

3    6th District only needed to be reduced in population by some

4    10,000 people.  And those 10,000 people could either be moved

5    into the 3rd or the 8th Districts.  And the question is why

6    such a big change when that's a very modest change.  I'm sure

7    there are other districts that might be affected by the

8    census, but that -- you would expect that if they told the

9    mapmakers we want to get rid of a Republican candidate and

10   have a Democrat win there, that was the goal that the Governor

11   said he had and that's what the map drawer was told that, give

12   us a 7 to 1 map.

13         MS. RICE:  If we're looking at what needed to be

14   done to accomplish the legislature's goals, there's no

15   indication that the legislature and the Governor would have

16   changed their mind about the Chesapeake Bay crossing if it had

17   not helped them --

18         JUDGE NIEMEYER:  I was focusing on just the 10,000

19   which is a very modest --

20         MS. RICE:  Sure.  But I guess what I would counter

21   with is that you cannot focus just on the 10,000.  To do so

22   would be to make very grave error about the way that these

23   things are done.  The 1st, the 2nd and the 7th all had massive

24   population deficits that needed to be made up.  They were

25   bordering the 6th at the time.

1          So when you look at the shed portions, and this is a

2     page from Dr. McDonald's expert report, he's the one that did

3     this analysis, you can see that the 7th District -- for

4     example, the 6th District gave 17,203 people to the 7th

5     District.  That's because the 7th District had a massive

6     population deficit.  And the 1st District over 100,000 voters

7     needed to be made up for when the Chesapeake Bay crossing was

8     eliminated.

9          The 6th District had, in the prior map, extended all

10    the way to the Susquehanna River.  It went across the entire

11    northern border of the state to border the 1st District.  So

12    the legislature, I think, pretty reasonably moved that border

13    westward, back towards the core historic shape of the 6th

14    District.  So to say that these population moves were not

15    occasioned by other goals of the legislature is to --

16              JUDGE NIEMEYER:  Let me ask you --

17              MS. RICE:  -- reality.

18              JUDGE NIEMEYER:  -- what evidence do we have that

19    they had other goals?  In other words, we have the direct

20    evidence of the people who made the maps and directed the

21    making the maps.  And what you're describing isn't what they

22    said.

23              MS. RICE:  It was, Your Honor.  So Governor O'Malley

24    talks about the respecting the natural boundaries of the

25    Chesapeake Bay in his deposition --

1    JUDGE NIEMEYER:  Well, that was when he made the

2    decision to not go across the bay.  He said he had to make a

3    choice in order to get a 7-1 state, he had to make a choice

4    either to focus on the Eastern Shore or to focus on western

5    Maryland.  And he said the problem with folks on the Eastern

6    Shore were jumping across the Chesapeake Bay, but he didn't

7    back off from the notion that he wanted a 7-1 state and that's

8    what they directed the mapmaker to do.

9    MS. RICE:  I think that if you read that colloquy in

10   context, what he says, that all other things being equal,

11   meaning all other goals of the legislature being met, which

12   include these goals about the 4th District, which was very

13   important to the legislature and proved to be a contentious

14   issue that was litigated before this Court before this case

15   was brought, that those were other goals.

16   And so the fact that that goal of moving eliminating

17   the Chesapeake Bay crossing, which is a very wide overwater

18   crossing, also allowed the Democrats to create a competitive

19   district where for the first time they would see a fighting

20   chance in that district to elect a candidate of their choice,

21   after they had heard extensive testimony at the GRAC that that

22   was a concern, including testimony from a former plaintiff in

23   this case, who said that it was eminently reasonable to return

24   the 6th District to its former shape, which would have

25   included the western third of Montgomery County.  Again,

1    that's consistent with this I-270 corridor.  That's about

2    where I-270 splits the county.  That evidence was before the

3    GRAC, that evidence was on the mind of the mapmaker.  We have

4    evidence affidavits from the --

5              JUDGE NIEMEYER:  Were there GRAC hearings after the

6    map had been drawn?

7              MS. RICE:  No, the GRAC hearings were before the map

8    had been drawn and the documentation --

9              JUDGE NIEMEYER:  There was no map -- there was no

10   proposed map in consideration when they had those hearings?

11             MS. RICE:  Correct.  But the time line is that the

12   GRAC hearings were held.  The map was drawn and completed at

13   the same time the Governor was gathering input from the

14   congressional delegation, including in-person meetings with

15   both Congressman Bartlett and Congressman Harris, to get their

16   input about what they would like to see from their districts.

17   And the GRAC map was proposed.  That's where that slide show

18   comes in, that again mentions the I-270 corridor as a major

19   organizing point of the geography of the 6th District.

20             The map was then put up on the public website.

21   Additional public comments were held from e-mail comments.

22   And then the Governor, with minor changes that we've

23   stipulated do not bear on this cause of action, adopted his

24   recommended map, sent it to the legislature.  Again, there

25   were a few changes, mostly metes and bounds descriptions type

changes.  It was passed.  Then the entire map was voted on by

the people of Maryland.

So there isn't evidence, unlike in North Carolina,

where the map had already been drafted and it was only after,

you know, there's some evidence that that time line was not

adhered to.  Here there's no evidence of that.  There's no

evidence that a map had been drafted before the GRAC

hearings.

JUDGE NIEMEYER:  There is evidence, though, that the

GRAC hearings were superficial, just to accommodate the

public, and that the real map was going to be drawn by certain

legislatures with the map drawer and the governor, according

to the governor's wishes.

MS. RICE:  So there's also really no evidence of

that.  And the plaintiffs put before you testimony from Eric

Hawkins on intent.  And this is kind of getting a little bit

far astray, but since we're talking about it.  We introduced

affidavit testimony from Jake Weissmann, who was a staffer to

the GRAC, about just how seriously they took the congressional

map.  Both Jake and also Governor O'Malley stated that they

had to scrap the congressional delegation's version of the

map.

And I'm going to put it here so you can kind of see

that this is the map that Mr. Weissmann testified was the

proposal from the congressional delegation.  Although, as

1    governor O'Malley would be quick to point out, it was not a

2    unanimous proposal.  So you can see how the 6th District

3    here --

4              JUDGE RUSSELL:  Why don't you use a pen or something

5    and use the ELMO as a visual, if you could.  Are you following

6    me?

7              MS. RICE:  I am following you.  Let's see if I can

8    do it.

9              JUDGE RUSSELL:  Oh, no, just write on the ELMO.

10             MS. RICE:  Oh, write on the ELMO.

11             JUDGE RUSSELL:  Use your pen and point it out as

12   you're describing it.

13             MS. RICE:  I got it.  So you can see this is the 6th

14   District, the proposed 6th District, congressional delegation,

15   it's green.  And this is the proposed 8th, the pink one.  The

16   I-270 corridor is not intact.

17             JUDGE BREDAR:  Laughable.

18             JUDGE NIEMEYER:  That's a fairly complex map; isn't

19   it?

20             MS. RICE:  It is.  And as you can see it is not the

21   map that was adopted.  And if we want to we can look --

22             JUDGE BREDAR:  Highly reflective of what the

23   politicians intentions were.

24             MS. RICE:  Yes.

25             JUDGE BREDAR:  Absurd on its face.

```
 1            MS. RICE:  So here you can see that the map that was

 2     ultimately adopted, actually hews to the I-270 corridor,

 3     incorporating both Frederick and all of the Montgomery County

 4     portions that would be on the Montgomery corridor down to

 5     Rockville, which is too populous to include in a district with

 6     Frederick.  So that's pretty good evidence that the I-270

 7     justification was important, it was something that actually

 8     mattered to the mapmakers, because they altered that map that

 9     Mr. Hawkins was testifying about so profoundly in terms of

10     what areas it picks up.

11            So I think that this just goes to demonstrate that

12     there is a causation element that is missing here.  We do not

13     have specific testimony about specific borders about where the

14     plaintiffs live in relation to those borders, why those

15     borders were placed the way that they were.  And what effect

16     that had on the plaintiffs in terms of whether or not they

17     would have been burdened under any alternative map or if it

18     was just this one that did it.  And I think that's why this is

19     relevant in the standing context.  Although, it of course also

20     goes to the burden on the merits.

21            I think it's worth too exploring a little bit about

22     whether they've met their showing for an associational harm on

23     even at a standing level.  First, if we look at *Gill*, and I

24     think that Your Honors each pointed this out, that the

25     associational harm that Justice Kagan is talking about is
```

really one that would enure most to parties or political
organizations.  There's not a lot of evidence here about the
effect on the Republican party.

We have kind of unsupported cherry picking from
campaign finance reports, that show at most a $4,000 decline
in raising funds from one period to the next.  But no
explanation if that's unusual.  No comparison to the statewide
performance, none of the things that would allow this court to
make a causal inference that that kind of decline in
fundraising had anything to do with the redistricting or this
map.

JUDGE BREDAR:  Well, are we talking standing or
merits right now?

MS. RICE:  I think that these deficits are so
profound that they do go to standing.  We also need to think
about the fact that standing is not dispensed in gross and
that this associational harm is fairly new to the case in the
way that the plaintiffs articulate it.  They've talked about
chilling, certainly, as another way to demonstrate their
burden under the retaliation cause of action, but that's
different than an associational harm, which would be actual
damage to their associational rights.

So to the extent that the Court believes that
associational harm could yield standing, I think we can kind
of kill two birds with one stone there.

1          JUDGE BREDAR:  Well, a lot of the answer is rooted

2     in the word "association," right?  I mean, if you can't

3     associate, you have an associational harm.  And if you're

4     divided from those with whom you previously meaningfully

5     associated, isn't that the end of it?

6          MS. RICE:  I think there too we need to think about

7     what that means in terms of justiciability.  If we look just

8     at this map versus the immediately prior map, there's a lot of

9     people in a lot of districts that are not going to be able to

10    associate with the same people that they associated with.

11         JUDGE BREDAR:  Well, that's true, for certain, every

12    time there has been redistricting and there have been

13    population changes in the a state.  Without a doubt there are

14    associational consequences from redistricting.  But that's not

15    the point.  The point is what was the motivation in dividing

16    these people from each other in this particular instance.

17         MS. RICE:  But I think that's why --

18         JUDGE BREDAR:  If the motivation was, look those

19    Republicans concentrated together like that as they are, are

20    able to fund raise and advocate together, strength in numbers

21    in terms of the broader political process, not even talking

22    yet about voting, we're going to break that up.  We're going

23    to do this to them because of the -- their identifying as

24    Republicans.

25         MS. RICE:  So I think that that's why it's important

to think about this in a standing context, that we have to
show that that injury is not a statewide injury or a injury
that enures generally to anybody because of redistricting.
*Gill* reiterated that much at least, that we have to show
something more.  So when plaintiffs got up here and you asked
them what evidence is there of associational harm, one of the
things that they said was just the splitting of the districts.
That needs to be rejected as a matter of law, because the
splitting of the districts breaks up these associations
throughout the State in every redistricting cycle, as you just
explained.

So then we're left with the supplemental briefing
information, and we do have from them the assertion that
primary turnout is somehow, in gubernatorial election years,
is somehow the thing that we should be looking at.  But if we
look at some of the other data, and this was actually in our
origin until summary judgment motion produced, you can see
that turnout actually increased in most of these counties.  In
Frederick there's a percentage decrease, but the number went
up.  This is general elections, not primaries.

And here, let me just -- my pen disappeared.  The --
this is the Republican turnout difference.  So here in
Frederick the percentage did go down, but the number of
Republicans went up, who voted.  Garrett went up, and
Washington it went up.  We also have evidence that Republican

1       registration went up year over year in all of these counties.

2               So at most we have mixed evidence on any effects of

3       associational harm.  And that doesn't necessarily -- it

4       doesn't generate a dispute of material fact, what it does is

5       call into question the causal link that plaintiffs are asking

6       you guys to draw, that there is some causal inference that

7       would be permissible to be made from those 20 -- those primary

8       year -- gubernatorial year primary turnout results.

9               So this defeats the blind assertion that there's

10      some clear causal inference.  And what's missing, what the

11      plaintiffs failed to meet the burden to produce, is any expert

12      testimony about turnout, what it meant, if this was a

13      particular effect seen just among Republicans in the 6th

14      District.  If it reflected broader trends.  That's not our

15      burden to disprove.  The plaintiffs needed to come forward

16      with evidence to show that their associational -- their

17      claimed associational harm was in some way connected or caused

18      by the redistricting.

19              Because it's only through that causal link that you

20      guys -- that Your Honors all rec -- or two of this Court, set

21      forth in the decision on the preliminary injunction, that

22      causal link is still very important in this claim.  That

23      otherwise we're getting into the realm of not justiciable

24      claims where we have burdens that are felt by the entire

25      state, or burdens that are being felt by members of both

parties.  So if we don't have the tools, the statistical

tools, the expert evidence to distinguish those burdens, then

the plaintiffs haven't met their burden of production on those

elements.

JUDGE BREDAR:  It's not enough that they're

simply -- that Republicans are divided from each other by a

line that was drawn solely for partisan political purposes?

MS. RICE:  It's not enough because that's not --

JUDGE BREDAR:  That has to somehow manifest itself

in some more detailed consequence than the obvious, which is

they cannot associate with each other anymore in the way that

is meaningful because they're no longer in the same

district.

MS. RICE:  So it's not enough because of the

standing element as articulated by *Gill*, that there has to be

some differentiation between plaintiffs and nonplaintiffs.  It

cannot be enough to establish standing that you've established

a burden that occurs in every election to every person that is

moved.  It has to be something more.  I think that --

JUDGE NIEMEYER:  I don't fully understand, because

if -- and I can put it in very course terms that may not be

fully satisfied here, but if the government says we are going

to target you, Republicans, in this city, and make sure that

you don't work together and that your vote doesn't have the

full amount, and then they divide them in half, after that

1    statement, don't we have standing to challenge that by the

2    people who are in those -- in that city?

3              JUDGE BREDAR:  The Republican people, can I modify

4    it to that extent?  The Republican people who are in that

5    city.

6              MS. RICE:  That -- I think that the Republican

7    people in that city would have evidence --

8              JUDGE NIEMEYER:  Not evidence, do they have standing

9    to challenge the conduct?

10             MS. RICE:  They would be able to prove their

11   standing through evidence that that conduct had in fact --

12             JUDGE NIEMEYER:  -- the evidence was that the

13   government said we are going to target the Republicans in this

14   city and cut them in half and divide them so as to dilute

15   their vote and to ruin their party.  And then they go ahead

16   and they divide the Republicans.  Do the Republicans in that

17   city who have been divided and whose vote was diluted have a

18   right to challenge it in a court?

19             MS. RICE:  They might have a right under a First

20   Amendment claim that hasn't been brought here.  What the

21   plaintiffs have claimed --

22             JUDGE NIEMEYER:  I'm not talking about here, let's

23   just get some foundational principles.  And you're so

24   reluctant to acknowledge that to me, a straight forward

25   standing case, I tried to make it as clear as I could, and if

1  you reject that I'm not sure what your argument is.

2          MS. RICE:  Judge Niemeyer, I think it's important,

3  though, to remember that standing is not dispensed in gross,

4  it's dispensed according to the requisites --

5          JUDGE NIEMEYER:  It depends whether the person hurt,

6  as distinguished from the person not hurt, the person hurt can

7  sue the person who caused the hurt.  And in this case, the

8  harm the Supreme Court talked about is the disadvantage in the

9  voting opportunity, the diminishment of the voting

10 opportunity.  That's the harm.  Now, if somebody says I'm one

11 of those persons, the Court should say, okay, let me hear your

12 claim.  And we'll look at the evidence then.

13         JUDGE BREDAR:  None of the proof in this case is

14 along the lines of we're going to attack voters, we're going

15 to attack Republicans.

16         MS. RICE:  Your Honor, I wouldn't submit that any of

17 this proof in this case says anything about attacking

18 anyone.

19         JUDGE BREDAR:  We're going to attack the 6th, that's

20 a direct quote from our former governor.

21         MS. RICE:  The proof in this case shows that the

22 general assembly and the governor intended to create a

23 competitive 6th District.

24         JUDGE NIEMEYER:  Is that a nice way of saying we

25 want to take it away from the Republicans by moving the

1   Republicans out and putting in Democrats.  In other words, we

2   want a 7-1 state.

3            JUDGE BREDAR:  And if not that, at least we are

4   going to punish Republicans, regardless of vote -- how they

5   vote --

6            JUDGE NIEMEYER:  -- organize --

7            JUDGE BREDAR:  We're going to interfere with their

8   capacity to associate with each other to achieve their

9   political aims.

10            MS. RICE:  Again, this problem now is steering us

11   away the solution that this Court had arrived at to find a

12   claim justiciable and into the realm of nonjusticiable

13   claims.

14            JUDGE NIEMEYER:  -- I thought we were talking

15   about --

16            JUDGE RUSSELL:  We're steering in the right

17   direction.  We just need an answer to the question.

18            JUDGE NIEMEYER:  I thought we were talking about

19   standing; right?

20            MS. RICE:  Right.  Yes.

21            JUDGE NIEMEYER:  Okay.

22            JUDGE BREDAR:  I'm not going to deny we got some

23   help from Justice Kagan.

24            MS. RICE:  That may remain to be seen.  I think that

25   it is also worth going a little bit into, back to the vote

1    dilution proof that's been proffered by the plaintiffs.  When

2    plaintiffs for the first time in their supplemental briefing

3    attempt to put forward proof of a *Gingles*-type analysis, they

4    do so without the benefit of any expert testimony that is

5    usually the subject of the *Gingles*-type analysis.  Actually,

6    Dr. McDonald disclaimed that he was doing the kind of analysis

7    that he would normally do in a racial gerrymandering case,

8    because the data was not available to him.  He could not do an

9    ecological inference study about the existence of cohesion

10   voting or block voting.

11          The plaintiffs also get the law wrong when they talk

12   about Cooper v. Harris.  In that case the State was actually

13   looking to Section 2 district as a justification for what was

14   found to be a racial gerrymander.  So the burdens were a

15   little bit different than in your typical Section 2 case.

16   There, the Supreme Court said that the past performance of

17   that district showed the absence of block voting.  And then

18   they went on to find that the State had put on no evidence of

19   the proposed district's performance.  So here where we didn't

20   have any evidence of the actual district as it performed, the

21   crossover voting, the block voting, it's not enough to rely

22   just on past election results by that same case.

23          I think it might be helpful to look at -- I

24   apologize -- those election results that the plaintiffs did

25   add in their supplemental briefing.  Because what's

interesting here is in the precincts retained, so these are

precincts that they purport to represent to you were in both

the old 6th and the new 6th, there's a sharp drop off in

Republican voting strength in the 2012 election.  In other

words, it's evidence that there's crossover voting between

Republicans and the Democratic congressional candidate, in

this case John Delaney, in that election among the precincts

that were retained.

You can also see that there's an increase in the

precincts that were removed in Republican voting strength.

And that makes sense because now those people are in the 8th

District.  So their choice would be either Representative Van

Hollen or Representative Raskin, who were very different

candidates from Congressman Delaney, in terms of their

political ideology.

So these results, insofar as they can mean anything,

don't even seem to, by their face, be what the plaintiffs

said, because of those different candidates and different

elections among these three groups.

We also again, don't have any information about

exactly which plaintiffs are in which of those groups.  The

kind of information that seems to be called for by the Supreme

Court's action in *Gill* and *Rucho* and that is the kind of

information that -- was present in *Rucho* when the Court there

moved forward in that case.

1          Also, with regard to the *Gingles* criteria the

2     various threshold requirement, plaintiffs talk about the maps

3     in 1991 and 2001 showing that there was a compact region of

4     Republicans.  But those maps are some of the only maps in the

5     entire history of the 6th District that exclude Montgomery

6     County, or in the more recent map extend the 6th District into

7     the eastern part of the state.  So they're not very good

8     evidence that there's any compact concentration of Republicans

9     in that area.  We just don't have any of that information, the

10    general kinds of proper analyses that would accompany a

11    *Gingles*-type proof.

12          Again, because we're talking about injunctive relief

13    it's important to bear in mind that there have been other

14    times when the Court has been asked to enter an injunction

15    when there's only one election left.  And in those cases,

16    especially when there has been delay by the plaintiffs in

17    bringing their claim, like there was in *White v. Daniel*, and

18    there was in this case as acknowledged by the Supreme Court --

19          JUDGE NIEMEYER:  Is that the role of a court to say

20    we recognize you have suffered First Amendment injury, but

21    just hold up, you can suffer that injury for another election

22    and then we'll take care of you.  That's really what that

23    argument says, doesn't it?

24          MS. RICE:  I think what the argument is saying --

25          JUDGE NIEMEYER:  In other words, if there's one

1    election where they are going to sustain First Amendment

2    injury, it seems to me that injury should be redressed if it

3    is a First Amendment injury.

4              MS. RICE:  I think what the Court in *White* was

5    recognizing is that --

6              JUDGE NIEMEYER:  I'm asking you as a general

7    proposition.

8              MS. RICE:  I think as a general proposition, either

9    way, the Court might take into account the First Amendment

10   burdens, burdens on other citizens not before this Court, that

11   would accrue were there to be three successive congressional

12   elections under three successive maps.  If we're talking about

13   associational injury we have the 2018, 2020, and 2022

14   elections that would be undertaken under different maps,

15   different shape of the district --

16             JUDGE NIEMEYER:  Let's make it a little more dicey

17   how about if we have a racial, we find there was a severe

18   racial redistricting and that the plaintiffs were racially

19   diluted.  And we say -- you're asking us to say, well, there's

20   only one more election, put up with it, we'll fix it in the

21   next election --

22             MS. RICE:  Judge Niemeyer, respectfully I don't

23   think we have to make it more dicey because what we're talking

24   about is invoking the powers of equity.

25             JUDGE NIEMEYER:  I understand, but your argument is

1       because there's only one more election, we shouldn't enter

2       injunctive relief.  And my point is if there's a violation we

3       should redress it.  And there will be another -- there will be

4       another bill down the road, but -- and of course, the outcome

5       of this particular mapping, if we were to change it, would

6       inform future maps and maybe get into something that doesn't

7       raise the same constitutional violation.

8               But I have a little trouble diminishing or demeaning

9       the First Amendment injury, if it is there.  They've

10      demonstrated First Amendment injury, it seems to me they

11      should be entitled to a remedy, even if it's only one more

12      election out of five.

13              JUDGE BREDAR:  And apart from that, are First

14      Amendment associational injuries only inflicted on election

15      day?  Not just the election.

16              MS. RICE:  Your Honor, but it would just not be --

17      it would be not just the election for all other members of the

18      public, not just those that are bringing these claims as well.

19      The injunction standard requires this Court to look beyond the

20      merits of the case and to find definitively on the other three

21      prongs, and in doing that laches is a major component of

22      equity.  And that's what courts in the 4th Circuit have done

23      in the past --

24              JUDGE NIEMEYER:  Well, you've got a point, this

25      thing really has dragged on, but it was filed in 2013, and

it's changed shape, it's been to the Supreme Court twice,

there's been discovery, there have been motions.  It has a

procedural history that I think none of us should be proud of

as persons in the 3rd branch, but that's a fact of life.  It

may affect the preliminary injunction, the Supreme Court

pointed out that they waited three years I think after filing

before seeking a preliminary injunction to stay.  But the

permanent injunction was asserted in 2013, and we still have

an election cycle in front of us.

MS. RICE:  In *White v. Daniel* the Court was

considering a permanent injunction, looked at the equities,

looked at the laches that had been displayed by the plaintiffs

in this case, and also looked at the harm to the public of

successive and frequent redistricting, to find that the

equities in that case did not favor entering an injunction for

one remaining election.

We would submit that that's an instructive and

persuasive case, especially given the procedural history here,

the uncertainty of the constitutional claims issue, the

novelty of those claims to the general assembly, there's no

reason to believe that any election in 2022, any map would

suffer from the same deficits.  And in those cases permanent

injunctive relief has been in the past withheld.  And so we --

JUDGE NIEMEYER:  So plaintiffs --

MS. RICE:  We do think that's an appropriate

outcome --

JUDGE NIEMEYER:   -- so individual plaintiffs who

suffer First Amendment rights have to be told we can't remedy

your rights, because there are interests of other people who

are going to be confused and are going to be having be

effected with different maps.

MS. RICE:   So --

JUDGE NIEMEYER:   It doesn't quite make sense.   It

seems to me what you're saying are factors for exercising

equity.   But I was trying to load the facts up for you to find

out how much equity you get.   And I'm suggesting that

hypothetically, if we find a violation of the Constitution,

ongoing and existing, both in the next election and both in

the organizational efforts within a political party from now

going forward, do we just ignore it?   Don't we have an

absolute duty to remedy it.

MS. RICE:   In *Perry v. Judd*, which was another --

JUDGE NIEMEYER:   Is that yes or no?

MS. RICE:   I don't think that there is any

affirmative duty one way or the other.   I think that these are

equitable factors that must be found in addition to the

merits.   So if --

JUDGE BREDAR:   How can one reasonably even say in

Maryland that voters are all that settled in the districts

they are in, given the make -- given the appearance of the

map?  Half the people in the state probably don't even know

what district they're in, because you can't look at a map and

figure it out without a microscope.  So, implicit in your

argument is this notion of sort of regularity and the value of

the status quo, but there's an argument to be made in contrast

with that, that the situation itself in this -- under the

current map is so convoluted and susceptible of

misunderstanding, the public is not well-served at all by it,

in terms of just a fundamental understanding of their role and

place in the Democratic process.

        MS. RICE:  The public will have been going to the

same polling place, voting in the same set of elections for

four successive elections at this point when they go to the

polls again in November.  So to the extent that redistricting

always involves some shuffling of people, that it always

involves some confusion, there -- maryland has taken the

position that they will redistrict every ten years.  And --

        JUDGE NIEMEYER:  And if somebody was hurt during

each one of those elections by unconstitutional conduct, but

we should not remedy it.

        MS. RICE:  It is certainly --

        JUDGE NIEMEYER:  Because it's been going on for four

elections and, therefore, we just discount it.

        MS. RICE:  It is certainly the case that that is

what has happened in other cases in the 4th Circuit in the

past, that courts have declined to give remedies to plaintiffs

that have been dilatory in their pursuit of claims, even First

Amendment claims, when elections are at issue, because of the

great public interest in the regularity of elections.

It is not only that plaintiffs have brought this

case late, too late, they have also failed to meet their

burden of production.  They have not given this court

sufficient evidence of causation.  They have not -- which and

maybe now is a good time to say a little bit about *Hartman v.*

*Moore* and *Mt. Healthy*.  I think there has been some confusion

about what *Mt. Healthy* burden shifting relieves a plaintiff

of, even if it were to apply.  It's causation that it

substitutes for.

So that burden shifting substitutes for showing of

causation.  But it's inappropriate to do that here.  It can't

substitute for intent or for harm, both of those things still

need to be shown under *Mt. Healthy*.  It just relieves the

party, the moving party, the plaintiffs of showing causation

and instead flips the burden to show that the action was not

caused by the intent to the State.  And it should not be

imposed here.

*Lozman* clarified that even further last term, by

expressly analyzing the facts of that case and saying that the

only reason that the Supreme Court would apply *Mt. Healthy* was

because the facts in that case showed that there was no

1   distance between the decision maker and the retaliatory

2   action, that the decision maker had, in fact, ordered the

3   retaliatory action.  In that case kicking Mr. Lozman out of a

4   public council meeting.  They said that if the facts were to

5   develop in some other way that their analysis would not

6   necessarily hold.

7        And it is that other way that we exactly have here,

8   where we have an attenuated causal chain, where there are

9   multiple potential causes and the plaintiffs have simply not

10  given the Court enough aid in disentangling those for

11  inferences to be made about causation.  And in that case they

12  have failed to meet their burden and summary judgment should

13  be granted for the State on those grounds.

14       JUDGE NIEMEYER:  Okay.  Thank you.  What I think

15  we'll do, it's better to keep it together.  How about if I

16  give you each ten minutes on rebuttal, is that -- can you

17  handle that?

18       MR. KIMBERLY:  That would be acceptable, Your Honor.

19  I wonder if I might ask for a restroom break before --

20       JUDGE NIEMEYER:  Of course.  Why don't we take a

21  five minute break and then we'll allow each side short

22  rebuttal.  I'm not going to cut anybody off arbitrarily,

23  because we do want to hear the views of the parties, but I

24  think we're hearing the same thing from both sides again and

25  again.  So we'll take a five minute break then.

1          (A recess was taken.)

2          JUDGE NIEMEYER:  All right.  Mr. Kimberly, I think

3    we're going to start with a ten minute time.  And I know down

4    at the Court of Appeals we have little lights that come on,

5    there's an orange light and then there's a red light, you get

6    a ticket if you go through.  But we'll start with that for

7    both sides, since there are cross motions here.  And if it

8    turns out that something really productive and something new

9    is working we can be a little flexible, but let's start out

10   with a ten minute --

11         MR. KIMBERLY:  I appreciate that, Your Honor.  And

12   I'll endeavor to be even shorter than that unless the Court

13   has questions.  I'd like to start just very quickly, a

14   substantial amount of Ms. Rice's presentation concerned

15   intent.  I want just very briefly to rehabilitate a few points

16   on that score.  The first is that really the -- there's no

17   question that NCEC was at the heart of the redistricting here.

18   So if you can -- I'm sorry, I don't have my clicker.  I'm

19   sorry, just one moment.

20         (Video played.)

21         MR. KIMBERLY:  And so it was clear that at least so

22   far as the confessional map was concerned there was

23   predominantly outsourcing to the congressional delegation.

24   That was confirmed by former Secretary of State John Willis

25   and also by sitting Senate President Mike Miller, Mike Miller

who said like I told you the map was drawn, it was primarily

drawn by the congressional people.

Now Ms. Rice showed you a map that she said Eric

Hawkins put before the commission and that map doesn't in any

way resemble what actually was adopted.  In fact, what the

evidence shows is Mr. Hawkins drafted some dozen maps.  And it

was ultimately too broad blue prints that were put before the

GRAC.  There's the one that you see on the left is the one

that Ms. Rice was talking about.  And it's true, the GRAC did

not proceed with that proposal.  The second proposal is

Congressional Proposal 2, which also is not precisely what was

adopted, but you can see much more closely resembles the

blueprint that was adopted.

So the GRAC, and really when I say the GRAC, I mean

the staffers who were working on this project rejected

Congressional Proposal 1, which coincidentally did not have as

high EPI as the other one.  And this is what we ended up with.

This is the adopted map.  You can see the close resemblance to

the map that had been proposed by Eric Hawkins as one of the

dozen or so maps that he drafted.

Ms. Rice also suggested that it was unnecessary --

or excuse me, there were reasons that it was necessary to

fundamentally reshuffle the map in such a way that huge

numbers of voters were going to have to be shuffled no matter

what.  Well, in fact, the only evidence that we have on this,

1    the testimonial evidence, suggests the exact opposite.  This

2    is Speaker of the House Michael Busch.

3            (Video played.)

4            MR. KIMBERLY:  All right.  Unless there are

5    additional questions from the panel on the question about --

6            JUDGE NIEMEYER:  Yes, I have one question, is it

7    clear in the record as to the instructions given to Hawkins in

8    drawing the map?

9            MR. KIMBERLY:  The record is clear that Hawkins

10   understood that his -- and I can bring up slides if it would

11   be helpful there -- that his directive was to protect

12   Democratic incumbents and otherwise to flip one of the two

13   Republican districts.

14           JUDGE NIEMEYER:  All right.  Okay.

15           MR. KIMBERLY:  And that's in his own testimony.

16           Your Honor, I'm sorry, if I may just very briefly, I

17   meant just to move on.  Just briefly to suggest there is no

18   First Amendment right to infrequent redistricting.  In fact,

19   there's no reason to think that a state couldn't redistrict

20   every election, that wouldn't be a First Amendment violation.

21   So it's, I think, hard to square that reality with what

22   Ms. Rice was suggesting about frequent redistricting being a

23   First Amendment burden on other voters.

24           And just a point of clarification concerning

25   confusion and the like.  Polling places don't change when

1    redistricting changes.  And precincts, as a general matter,

2    are fairly stable.  They actually change from election to

3    election, occasionally independent of redistricting because of

4    changes in population.  But they are relatively stable.  So

5    this kind of disruption that Ms. Rice suggested would follow

6    from adopting a new map here I don't think actually holds

7    up.

8            JUDGE BREDAR:  What do you say also about the notion

9    that associational harms don't occur only on election day, is

10   there anything to that?  That it isn't solely about the impact

11   on how someone votes.

12           MR. KIMBERLY:  I wouldn't disagree, Your Honor.  I

13   guess as you pointed out, so far as the Constitution is

14   concerned, the question is not whether this effect happens,

15   what makes it an unconstitutional burden is that it's coupled

16   with the specific intent to impose it on a particular segment

17   of the --

18           JUDGE NIEMEYER:  I think the question was whether

19   the harm --

20           JUDGE BREDAR:  The burden.

21           JUDGE NIEMEYER:  The burden caused by damage in the

22   associational right is given effect only at an election, or

23   does it continue on an ongoing basis.

24           MR. KIMBERLY:  No, I think it continues on an

25   ongoing basis.

1          JUDGE NIEMEYER:  That's because the organizational

2    efforts of the parties.

3          MR. KIMBERLY:  That's exactly right.  That's exactly

4    right.  Thank you, Your Honors.

5          JUDGE NIEMEYER:  All right.  Ms. Rice.

6          MS. RICE:  I will similarly keep this brief and very

7    much related to Mr. Kimberly's presentation.  Again, on

8    intent, and this just shows why summary judgment can't be

9    granted on this issue, this is -- I apologize, I don't have

10   the video, but this is Governor O'Malley's deposition.  If you

11   go here, Governor O'Malley --

12         JUDGE RUSSELL:  Why don't you go ahead and use the

13   ELMO and focus down on it -- that particular portion.  There

14   you go.

15         MS. RICE:  Talks about how Congressman Hoyer might

16   have come in with a map to which he confessed nobody

17   supported.  So when you say I was given a map, I was given a

18   map with the caveat that -- that there's no consensus

19   supporting the congressional delegation for this map.

20         So Governor O'Malley talks about and then the first

21   declaration of Mr. Weissmann, which I didn't bring up with me,

22   but it's Exhibit 11 to our motion for summary judgment, also

23   discusses how there was only one map provided and how they

24   didn't really use it because they didn't think it had

25   consensus and couldn't be used.  More specifically, as to the

1    point about Congressional Option 1 and Congressional Option 2,

2    the only evidence that Congressional Option 2 came from NCEC

3    comes from a supplemental declaration of Dr. McDonald upon his

4    examination of some computer files.

5         In our reply we attached the second declaration of

6    Mr. Weissmann, who says that he does not recall receiving

7    anything other than what was attached to his first

8    declaration, that those file names that Dr. McDonald relied on

9    were chosen by him to mark those draft maps as the two main

10   options, and that he didn't use those names to explain that

11   they were from the congressional delegation, but to merely

12   denote that they were congressional maps as opposed to

13   legislature maps, which he was simultaneously drawing the

14   legislative maps, those redistricting processes happen

15   simultaneously in Maryland.  That's the continuation of that

16   affidavit.

17        And relying again on Speaker Busch's lack of recall

18   on this issue, which plaintiffs have done a number of times,

19   just goes to show that laches was actually damaging to the

20   pursuit of this case, that people's memories have faded, that

21   they could not recall with specificity what had happened when

22   they were deposed in 2017, their thoughts about this in 2011.

23        And there really are many examples of courts

24   declining to disrupt elections.  One of the most famous is

25   *Reynolds v. Sims*, in that case the Court declined to enter an

1   injunction even when it did find a pretty severe violation of

2   constitutional rights.  So that is typical in election law,

3   that it is not just the rights of the plaintiffs before the

4   Court, but the interests of the public in the elections.

5          As for whether precincts are redrawn, it really

6   depends if those precinct boundaries need to shift because of

7   the census and the redistricting process, the redistricting

8   time that the State Board of Elections works in concert with

9   the Department of Planning, but it's certainly possible that

10  those precincts shift.  Certainly, who is on the ballot would

11  shift for many people.

12         So, with those points, unless the Court has further

13  questions --

14         JUDGE NIEMEYER:  Well, thank you very much.  And

15  thank both counsel not only for the arguments but for the

16  papers and clear presentations of what this record is.

17         Is there anything further we need to take into

18  account today?  Otherwise, we'll take this under counsel and

19  see if three judges can get together and decide something.

20         MS. RICE:  Thank you, Your Honor.

21         JUDGE NIEMEYER:  Okay.  Will you please adjourn

22  court.

23         (The proceedings were concluded.)
    I, Christine Asif, RPR, FCRR, do hereby certify that
24  the foregoing is a correct transcript from the stenographic
    record of proceedings in the above-entitled matter.
25         _____/s/_____
            Christine T. Asif, Official Court Reporter

< Dates >.
August 27th 58:19.
March 2016 51:4.
October 17th, 2011
  9:1.
one may 5:20.
"7-1 8:21.
$4,000 70:5.
.
.
< 1 >.
1 63:12, 89:16,
  93:1.
1.5 25:16.
10,000 13:10, 62:3,
  62:16, 63:4,
  63:18.
10,000. 63:21.
100 30:12.
100,000 64:6.
101 1:48.
11 92:22.
12 18:19.
15 17:11, 17:14,
  17:15.
17,203 64:4.
18.5 25:19.
1933 56:14.
1991 23:3, 80:3.
1994 29:19.
1st 9:7, 9:12, 9:18,
  9:19, 34:3, 63:23,
  64:6, 64:11.
.
.
< 2 >.
2 6:11, 21:6, 21:9,
  38:1, 78:13,
  78:15, 89:11,
  93:1, 93:2.
2,000 58:24.
20 25:10, 73:7.
20-some 62:5.
20.9 30:18.
2001 80:3.
2010 18:9, 30:6.
2010. 50:12,
  50:14.
2011 8:14, 23:3,
  50:7.

2011. 8:22, 93:22.
2012 25:6, 27:21,
  79:4.
2013 82:25, 83:8.
2014 25:7, 28:5.
2016 51:5.
2017 93:22.
2018 1:21, 50:17,
  54:6, 81:13.
2020 50:5, 50:13,
  81:13.
2020. 54:6.
2022 81:13, 83:21.
21.5 25:16.
21201 1:49.
26.65. 17:11.
28.2 30:6, 30:11,
  30:18.
28.9 30:11.
2nd 63:23.
.
.
< 3 >.
3 23:16.
3rd 43:8, 63:5,
  83:4.
.
.
< 4 >.
42 17:15.
42.77 17:9.
43 56:19.
4th 1:48, 62:22,
  65:12, 82:22,
  85:25.
.
.
< 5 >.
50 30:18.
50-point 30:19.
56 52:15.
5th 50:6.
.
.
< 6 >.
6-2 8:15, 9:7.
60 24:23, 24:24.
60-some-odd 42:22.
66,000 62:4.
6th 9:8, 9:13, 9:15,

9:24, 10:2, 11:24,
  14:9, 16:21, 17:8,
  24:3, 24:17, 25:7,
  28:18, 36:1, 36:6,
  37:9, 38:3, 43:8,
  43:14, 43:15,
  43:22, 43:23,
  50:15, 54:5,
  54:21, 62:4,
  62:18, 63:3,
  63:25, 64:4, 64:9,
  64:13, 65:24,
  66:19, 68:2,
  68:13, 68:14,
  73:13, 76:19,
  76:23, 79:3, 80:5,
  80:6.
.
.
< 7 >.
7 63:12.
7-1 8:15, 9:4, 12:8,
  65:3, 65:7,
  77:2.
7th 63:23, 64:3,
  64:4, 64:5.
.
.
< 8 >.
8th 43:8, 43:12,
  43:19, 59:21,
  59:24, 60:5, 62:1,
  63:5, 68:15,
  79:11.
_____/s/_____
  _____ 94:27.
.
.
< A >.
ability 22:22,
  42:24, 44:24.
able 2:17, 71:9,
  71:20, 75:10.
above-entitled
  94:26.
absence 30:21,
  78:17.
absent 8:2.
absolute 84:16.
absolutely 19:24,

62:23.
abstract 32:25,
   37:3.
Absurd 68:25.
academic 30:15.
accept 26:3, 35:7.
acceptable 87:18.
accepted 26:1.
access 16:3,
   59:17.
accommodate 67:10.
accompany 80:10.
accomplish 41:4,
   63:14.
accomplished 4:1,
   36:14.
according 7:19,
   31:14, 53:13,
   67:12, 76:4.
accordingly 47:20.
account 81:9,
   94:18.
accrue 81:11.
achieve 2:18,
   77:8.
acknowledge 75:24.
acknowledged
   80:18.
acknowledgment
   7:7.
across 49:13, 64:10,
   65:2, 65:6.
Act 21:9, 38:1,
   56:19.
action 32:1, 32:2,
   32:13, 35:25,
   66:23, 70:20,
   79:23, 86:19,
   87:2, 87:3.
actionable 27:18,
   29:23, 31:1.
actions 33:1.
activities 11:25,
   19:20.
actors 8:23.
actual 16:23, 18:8,
   32:4, 41:24, 42:3,
   44:9, 70:21,
   78:20.
Actually 7:24,

16:10, 27:25,
   28:19, 29:14,
   32:6, 32:13, 33:1,
   37:19, 46:11,
   50:12, 52:21,
   54:5, 57:2, 58:6,
   58:15, 58:18,
   59:1, 61:10, 69:2,
   69:7, 72:16,
   72:18, 78:5,
   78:12, 89:5, 91:2,
   91:6, 93:19.
add 78:25.
added 24:19, 25:1,
   25:2.
addition 84:21.
Additional 9:5,
   51:10, 66:21,
   90:5.
address 53:16.
addressed 57:19.
adhered 67:6.
adjourn 94:21.
adjunct 4:11.
administration
   46:11.
admitted 54:16,
   54:23, 56:16,
   59:13, 60:1.
adopt 39:23.
adopted 4:21, 48:22,
   49:16, 66:23,
   68:21, 69:2, 89:5,
   89:12, 89:13,
   89:18.
adopting 62:25,
   91:6.
advance 52:4.
advanced 62:3.
advantage 34:4,
   34:5, 48:1.
adverse 22:2.
advise 49:3.
Advocacy 44:16.
advocate 71:20.
advocating 47:7.
affect 83:5.
affected 56:10,
   60:13, 60:16,
   60:17, 63:7.

affidavit 67:18,
   93:16.
affidavits 20:9,
   43:7, 66:4.
affiliation 7:22,
   35:18.
affirmance 10:14.
affirmative 84:20.
afforded 51:9.
agencies 46:9.
agree 37:5, 39:21,
   40:2, 46:14, 49:2,
   51:20, 52:3.
agreed 4:20.
agreeing 49:12.
agreement 47:12.
agreements 48:25.
agrees 5:14.
ahead 75:15,
   92:12.
aid 87:10.
aims 77:9.
align 25:22.
Alito 31:5.
allegation 56:23.
allege 57:5.
alleged 62:12.
allegedly 56:21,
   60:19.
alleges 56:19.
Allegheny 17:7,
   17:9, 18:14,
   18:15.
allow 40:16, 70:8,
   87:21.
allowed 65:18.
almost 17:21,
   52:10.
already 45:6, 51:5,
   67:4.
altered 69:8.
alternative 5:17,
   14:3, 14:6, 35:15,
   40:18, 59:4,
   59:12, 59:21,
   60:2, 60:4,
   69:17.
Although 12:24,
   55:13, 67:25,
   69:19.

alumni 34:9.

alumnus 34:8.

Amendment 11:10,
14:8, 15:22,
31:18, 32:10,
32:12, 32:23,
33:2, 34:17,
36:21, 41:25,
44:13, 44:23,
53:13, 75:20,
80:20, 81:1, 81:3,
81:9, 82:9, 82:10,
82:14, 84:3, 86:3,
90:18, 90:20,
90:23.

Amie 54:9.

among 23:9, 23:10,
47:5, 73:13, 79:7,
79:19.

amount 74:25,
88:14.

analogous 57:17.

analyses 80:10.

analysis 29:13,
31:25, 64:3, 78:3,
78:5, 78:6,
87:5.

analyst 8:16.

analyzing 86:23.

Anderson 8:24,
15:20, 16:3.

Annapolis 29:9.

announced 50:16.

answer 7:10, 8:10,
10:11, 26:6, 28:6,
71:1, 77:17.

answered 49:23.

anticipated 58:19.

anybody 38:14, 72:3,
87:22.

apart 7:4, 82:13.

apologize 14:24,
20:22, 78:24,
92:9.

Appeals 88:4.

appear 13:9,
51:21.

appearance 84:25.

appears 56:5.

appetizing 6:23.

applicable 45:15.

applied 35:9,
35:10.

apply 86:12,
86:24.

applying 34:20.

appoint 40:13.

appreciate 4:15,
5:9, 7:6, 14:15,
49:19, 88:11.

approach 8:22,
22:16, 23:13,
40:19, 47:18.

approached 23:15,
46:1, 48:13.

approaches 5:17.

appropriate 34:16,
39:24, 40:22,
41:10, 47:21,
48:22, 50:3,
83:25.

appropriateness
47:7.

approval 6:20,
50:10.

approve 46:12.

arbitrarily 87:22.

area 19:21, 23:2,
23:25, 31:17,
43:21, 44:24,
80:9.

areas 24:22, 25:1,
69:10.

argue 57:16.

arguing 60:9.

argument 5:22,
20:10, 76:1,
80:23, 80:24,
81:25, 85:4,
85:5.

arguments 6:5, 15:3,
94:15.

arise 16:14.

arises 22:8.

Arizona 3:7.

around 3:21, 5:7.

arrived 50:7,
77:11.

articulate 70:18.

articulated 74:15.

Asif 1:46, 94:24,
94:28.

assembled 41:23.

assembly 76:22,
83:20.

assert 56:8.

asserted 83:8.

asserting 20:9.

assertion 72:13,
73:9.

Assistant 1:35,
1:36, 45:21.

associate 19:4,
26:7, 26:8, 42:24,
44:24, 71:3,
71:10, 74:11,
77:8.

associated 30:20,
43:2, 71:5,
71:10.

associating 13:12,
15:14.

association 12:9,
15:6, 16:12, 19:1,
31:17, 32:2,
35:21, 43:2,
71:2.

associational 10:25,
11:5, 11:9, 11:16,
11:25, 12:25,
13:1, 13:8, 13:23,
14:20, 14:21,
19:20, 21:2, 31:9,
41:19, 42:1, 44:6,
44:13, 53:9,
55:13, 56:9, 61:5,
61:20, 69:22,
69:25, 70:17,
70:21, 70:22,
70:24, 71:3,
71:14, 72:6, 73:3,
73:16, 73:17,
81:13, 82:14,
91:9, 91:22.

associations 72:9.

astray 67:17.

astronomical
17:10.

attached 93:5,
93:7.

attack 76:14, 76:15,
    76:19.
attacking 76:17.
attempt 32:19,
    34:24, 41:1,
    78:3.
attempted 2:16.
attempting 15:12.
attempts 32:18.
attenuated 87:8.
Attorney 1:35, 1:36,
    3:2, 45:21, 46:12,
    46:22, 47:6.
attract 15:24.
attributable 30:12,
    35:11.
authorities 27:22.
automatons 24:20.
avail 43:20,
    43:24.
availability 49:4.
available 78:8.
avoid 21:22.
award 53:24.
aware 47:19.
away 8:7, 49:11,
    49:15, 76:25,
    77:11.
awry 44:8.
.
.
< B >.
B. 1:27.
back 2:12, 4:13,
    6:12, 10:16,
    10:17, 10:18,
    14:16, 16:17,
    20:24, 22:24,
    29:15, 35:3,
    48:10, 48:19,
    50:3, 53:18,
    54:24, 58:12,
    64:13, 65:7,
    77:25.
bad 47:12.
Baker 57:18.
ballot 16:3, 17:3,
    17:20, 18:4,
    27:16, 44:21,
    44:22, 94:10.

Baltimore 1:22,
    1:49.
ban 31:21.
bar 29:15, 52:22.
bars 30:5, 30:6,
    30:7.
Bartlett 27:21,
    29:10, 54:10,
    54:24, 66:15.
base 12:3.
based 9:10, 13:21,
    20:9, 20:10,
    25:22, 27:6,
    28:21, 34:4,
    54:15.
basic 47:14.
basically 20:9,
    56:3.
basis 6:6, 19:2,
    19:25, 20:19,
    24:2, 27:15,
    34:23, 48:22,
    49:17, 91:23,
    91:25.
Bay 9:20, 9:22,
    63:16, 64:7,
    64:25, 65:2, 65:6,
    65:17.
bear 52:18, 66:23,
    80:13.
becomes 6:11,
    59:24.
behaved 23:18,
    32:21.
behavior 19:3.
behind 15:20, 38:18,
    47:16.
believe 83:21.
believes 70:23.
belong 43:9.
benefit 78:4.
benefits 34:10.
Benisek 2:3, 53:1,
    54:22.
besides 38:2.
best 2:5, 27:22,
    42:14.
better 58:22, 59:1,
    87:15.
Beyond 10:10, 12:13,

13:3, 16:23,
    18:25, 27:12,
    82:19.
big 25:20, 36:10,
    62:23, 63:6.
bill 82:4.
birds 70:25.
bit 12:6, 13:23,
    16:17, 21:10,
    22:24, 33:7, 35:5,
    41:15, 60:23,
    67:16, 69:21,
    77:25, 78:15,
    86:9.
Black 62:25.
blind 73:9.
block 13:24, 13:25,
    21:5, 23:9, 23:22,
    23:24, 24:11,
    26:1, 26:8, 78:10,
    78:17, 78:21.
blue 30:7, 89:7.
blueprint 89:13.
Board 4:4, 46:1,
    48:19, 49:13,
    94:8.
border 64:11,
    64:12.
bordering 63:25.
borders 69:13,
    69:14, 69:15.
Boston 15:9.
boundaries 57:8,
    57:12, 64:24,
    94:6.
bounds 66:25.
box 17:3, 17:20,
    18:4, 27:16,
    44:21, 44:22.
BPW 48:23.
branch 33:8, 83:4.
branches 40:16.
Brantley 1:30.
break 45:6, 71:22,
    87:19, 87:21,
    87:25.
breaks 72:9.
brief 8:8, 92:6.
briefed 8:25, 40:21,
    40:23, 41:10.

briefing 8:13, 32:9,
    38:17, 41:12,
    72:12, 78:2,
    78:25.
briefly 14:20,
    20:25, 58:11,
    88:15, 90:16,
    90:17.
bring 34:10, 48:10,
    50:21, 61:6,
    90:10, 92:21.
bringing 12:9,
    80:17, 82:18.
broad 89:7.
broader 37:1, 71:21,
    73:14.
broadly 44:21, 47:5,
    47:9.
brought 48:24,
    65:15, 75:20,
    86:5.
Bryant 53:21.
bunch 36:8.
burden 7:21, 8:3,
    11:15, 12:11,
    12:14, 12:19,
    15:4, 15:21, 16:5,
    16:8, 16:9, 21:1,
    22:12, 28:10,
    30:11, 31:1,
    32:14, 32:19,
    33:1, 33:4, 33:16,
    35:4, 35:9, 35:23,
    51:15, 51:18,
    51:22, 55:24,
    60:4, 69:20,
    70:20, 73:11,
    73:15, 74:3,
    74:18, 86:7,
    86:11, 86:14,
    86:19, 87:12,
    90:23, 91:15,
    91:20, 91:21.
burdened 56:19,
    59:3, 59:5,
    69:17.
burdens 73:24,
    73:25, 74:2,
    78:14, 81:10.
Busch 38:5, 90:2,

    93:17.
business 32:24.
.
.
< C >.
call 7:7, 73:5.
called 22:19, 26:22,
    79:22.
campaign 16:21,
    42:16, 43:17,
    70:5.
candidate 17:2,
    17:21, 24:10,
    34:2, 43:4, 43:20,
    54:9, 63:9, 65:20,
    79:6.
candidates 16:1,
    23:5, 23:20,
    23:21, 24:25,
    43:17, 43:23,
    50:17, 54:14,
    54:15, 79:14,
    79:18.
capacity 77:8.
care 80:22.
cared 38:2.
Carolina 40:24,
    47:23, 49:8,
    58:10, 58:12,
    67:3.
carried 52:6.
carries 22:10,
    62:10.
Carroll 17:7.
carry 22:10, 52:4,
    52:14, 61:3.
carved 18:23.
carves 15:15.
cases 31:2, 32:7,
    39:23, 41:22,
    47:13, 47:24,
    48:7, 48:17,
    50:22, 60:16,
    80:15, 83:22,
    85:25.
casually 20:5.
Caucus 63:1.
causal 70:9, 73:5,
    73:6, 73:10,
    73:19, 73:22,

    87:8.
causation 51:22,
    51:23, 54:4,
    69:12, 86:8,
    86:12, 86:15,
    86:18, 87:11.
cause 66:23,
    70:20.
caused 7:25, 73:17,
    76:7, 86:20,
    91:21.
causes 87:9.
caveat 92:18.
Celebrezze 15:20,
    16:3.
Celotex 51:16.
census 37:24, 50:13,
    61:23, 62:4, 63:8,
    94:7.
central 18:13.
certain 13:24, 15:6,
    17:21, 28:4,
    52:23, 67:11,
    71:11.
Certainly 2:23,
    2:24, 3:15, 6:18,
    6:25, 7:4, 7:12,
    8:9, 10:11, 10:15,
    11:24, 13:18,
    14:9, 16:16,
    19:23, 20:22,
    28:9, 40:5, 44:23,
    47:9, 47:19,
    48:10, 70:19,
    85:21, 85:24,
    94:9, 94:10.
certainty 28:13.
certify 94:24.
chain 87:8.
chair 38:24.
challenge 22:14,
    57:23, 75:1, 75:9,
    75:18.
challenged 21:25.
challenging 57:15,
    57:22.
chance 41:15,
    65:20.
change 16:10, 26:12,
    30:13, 52:25,

63:6, 82:5, 90:25,
91:2.
changed 4:21, 12:20,
21:21, 27:13,
28:13, 30:17,
31:12, 51:7,
63:16, 83:1.
changes 30:23,
50:11, 50:14,
66:22, 66:25,
67:1, 71:13, 91:1,
91:4.
changing 61:15.
character 44:13.
charged 46:4.
chart 24:5.
Cheney 53:21.
cherry 70:4.
Chesapeake 9:20,
9:22, 63:16, 64:7,
64:25, 65:6,
65:17.
Chief 10:8, 26:11.
chilled 15:5.
chilling 21:16,
70:19.
chiming 50:23.
choice 23:5, 24:21,
59:20, 59:23,
65:3, 65:20,
79:12.
choice. 22:23.
choices 62:21.
chosen 93:9.
Christine 1:46,
94:24, 94:28.
Circuit 82:22,
85:25.
circumstance 28:3,
50:11.
circumstances
54:5.
cited 16:19, 32:8,
39:5.
citizen 61:2.
citizens 22:1,
81:10.
city 74:23, 75:2,
75:5, 75:7, 75:14,
75:17.

CIVIL 1:9, 21:6.
claim 10:25, 28:5,
32:12, 32:23,
33:2, 35:13,
35:14, 51:4,
51:15, 51:19,
52:21, 56:8,
56:25, 57:17,
60:11, 60:13,
60:17, 61:6,
73:22, 75:20,
76:12, 77:12,
80:17.
claimed 56:20,
73:17, 75:21.
claims 11:11, 21:10,
27:20, 40:9,
57:17, 73:24,
77:13, 82:18,
83:19, 83:20,
86:2, 86:3.
clarification
90:24.
clarified 86:22.
clarify 52:3.
clear 13:4, 20:21,
25:24, 27:16,
28:9, 29:1, 30:13,
31:11, 31:18,
32:9, 37:7, 37:21,
38:10, 46:18,
46:22, 49:15,
57:20, 57:21,
73:10, 75:25,
88:21, 90:7, 90:9,
94:16.
clearly 19:8, 46:6,
62:21.
clicker 88:18.
client 46:1, 47:5,
48:24.
clients 2:21, 48:11,
49:4.
close 89:18.
closed 17:5.
closely 89:12.
club 43:10, 43:11.
cluster 25:8.
cohesion 21:5, 26:2,
78:9.

cohesive 23:8, 24:1,
26:9.
coincidence 30:4.
coincidentally
89:16.
colleague 14:21.
College 15:9,
34:7.
colloquy 65:9.
comes 38:16, 66:18,
93:3.
comfortable 27:3.
coming 52:11.
commensurately
17:12.
comments 38:23,
49:20, 50:8,
66:21.
commission 2:19,
3:13, 4:10, 4:20,
5:2, 6:19, 40:2,
40:14, 46:14,
89:4.
commissions 3:6,
49:13.
Committee 33:21.
committees 18:13.
commonsensical
43:18.
community 38:21.
compact 23:1, 80:3,
80:8.
compared 17:15.
comparison 70:7.
comparitor 60:7.
compel 3:11.
compete 34:12.
competitive 65:18,
76:23.
complained 4:2,
35:25.
complaints 2:21.
completed 66:12.
completely 3:18.
complex 7:11, 46:9,
48:23, 54:4,
68:18.
compliance 40:17,
58:16.
comply 37:24,

62:4.
component 82:21.
composition 22:8.
comprises 24:8.
compromise 50:8.
computer 58:24,
    58:25, 93:4.
concentrated
    71:19.
concentration
    80:8.
concepts 21:5,
    26:1.
conceptualizing
    53:14.
concern 65:22.
concerned 18:2,
    88:14, 88:22,
    91:14.
concerning 37:25,
    90:24.
concerns 5:17.
concert 94:8.
conclude 19:19,
    20:6, 30:3,
    40:6.
concluded 40:4,
    51:5.
concluded. 94:23.
concluding 58:15.
conclusion 19:9,
    23:19.
concrete 22:2,
    27:25, 33:1, 33:3,
    33:4, 53:25.
condemns 48:3.
conduct 4:2, 5:14,
    8:3, 50:13, 75:9,
    75:11, 85:19.
confer 54:1.
confess 6:25.
confessed 92:16.
confessional
    88:22.
confirmed 8:17,
    8:20, 22:7,
    88:24.
confirming 9:14,
    9:25, 38:5.
confirms 9:3, 9:9,

9:23.
conflict 47:14.
confused 84:5.
confusion 35:7,
    44:20, 85:16,
    86:10, 90:25.
Congress 6:3, 43:4,
    54:24.
Congressional 9:5,
    11:24, 14:9, 17:2,
    24:3, 43:23, 46:3,
    49:15, 50:15,
    66:14, 67:19,
    67:21, 67:25,
    68:14, 79:6,
    81:11, 88:23,
    89:2, 89:11,
    89:16, 92:19,
    93:1, 93:2, 93:11,
    93:12.
Congressman 33:19,
    34:7, 50:15,
    66:15, 79:14,
    92:15.
congressperson
    54:18.
connected 73:17.
consensus 92:18,
    92:25.
consent 4:5, 4:7,
    4:12, 4:16, 4:20,
    5:13, 5:24, 6:20,
    7:1.
consequence 7:25,
    16:13, 32:4, 44:4,
    59:23, 61:3,
    74:10.
consequences 33:6,
    33:12, 60:7,
    71:14.
consider 5:5.
consideration 33:12,
    33:23, 33:25,
    34:1, 66:10.
considerations
    33:14, 34:6,
    34:13, 34:22.
considered 35:17.
considering 3:17,
    37:22, 83:11.

consistent 4:24,
    15:18, 22:16,
    37:23, 38:20,
    39:15, 66:1.
constantly 32:24.
Constitution 6:6,
    84:12, 91:13.
constitutional 6:1,
    82:7, 83:19,
    94:2.
constitutionality
    46:23.
consulted 8:16.
contentious 65:13.
context 4:12, 21:6,
    25:8, 25:21,
    31:24, 32:1, 35:9,
    38:15, 41:25,
    44:12, 50:4,
    65:10, 69:19,
    72:1.
contexts 32:10.
continuation
    93:15.
continue 15:14,
    91:23.
continued 25:1,
    25:3, 27:23, 62:7,
    62:8.
continues 91:24.
contracted 61:8,
    61:10, 62:13.
contrast 54:12,
    85:5.
contrasting 19:13.
conventional
    47:11.
conversation
    59:18.
convince 15:1.
convoluted 85:7.
Cook 31:14.
Cooper 78:12.
core 64:13.
Correct 25:17,
    28:24, 52:17,
    61:9, 66:11,
    94:25.
corridor 37:17,
    37:20, 38:9,

38:11, 38:14,
38:15, 38:19,
66:1, 66:18,
68:16, 69:2,
69:4.
corroborated 8:22.
council 87:4.
counsel 94:15,
94:18.
counter 63:20.
Counties 17:8,
18:14, 18:16,
38:22, 72:18,
73:1.
country 31:15.
County 17:12, 62:22,
65:25, 66:2, 69:3,
80:6.
couple 31:15,
58:6.
coupled 31:12,
91:15.
course 3:21, 5:3,
9:14, 18:25,
22:14, 29:6,
40:22, 41:10,
44:18, 44:22,
69:19, 74:21,
82:4, 87:20.
court-created
6:19.
courtroom 37:12.
Courts 6:4, 32:24,
55:20, 82:22,
86:1, 93:23.
crack 9:18, 52:13.
cracked 56:6, 56:17,
56:22, 57:23.
cracking 15:12,
19:5, 58:8.
create 8:21, 9:4,
20:11, 47:2,
65:18, 76:22.
created 52:7,
57:25.
creation 2:18.
creative 49:20.
creatively 47:1,
49:5.
crisper 31:25.

criteria 80:1.
cross 2:4, 2:7,
20:1, 49:24, 50:2,
51:16, 88:7.
crossed 54:19.
crossing 63:16,
64:7, 65:17,
65:18.
crossover 78:21,
79:5.
crux 29:10.
Cueman 54:23.
current 24:3,
85:7.
currently 45:22.
Curt 8:24.
cut 75:14, 87:22.
cycle 51:6, 72:10,
83:9.
.
.
< D >.
D. 1:28.
damage 53:12, 70:22,
91:21.
damaging 93:19.
Daniel 80:17,
83:10.
data 16:23, 25:7,
26:4, 59:10,
59:16, 59:18,
59:19, 72:16,
78:8.
date 22:17.
David 54:8.
day 24:16, 52:14,
62:10, 82:15,
91:9.
De 29:18.
deadline 41:3,
41:7.
deadlines 16:6.
deals 62:8.
decade 27:24.
decide 94:19.
decided 9:21.
decision 7:20, 9:15,
9:17, 9:23, 15:19,
54:15, 65:2,
73:21, 87:1,

87:2.
declaration 92:21,
93:3, 93:5,
93:8.
decline 70:5,
70:9.
declined 86:1,
93:25.
declining 93:24.
decrease 72:19.
decreased 42:7,
42:19.
decree 7:2.
defeat 23:11.
defeats 73:9.
defend 46:23.
Defendant 1:12,
1:33, 35:24,
46:4.
defendants 39:10.
defending 47:7.
deficit 64:6.
deficits 62:19,
63:24, 70:14,
83:22.
definitely 49:19.
definitively
82:20.
degree 22:1.
Delaney 50:16, 55:6,
79:7, 79:14.
delay 80:16.
delegation 9:5,
66:14, 67:21,
67:25, 68:14,
88:23, 92:19,
93:11.
deliberately
56:22.
demeaning 82:8.
Democrat 11:24,
25:15, 34:5, 36:7,
50:9, 54:17,
54:23, 63:10.
Democratic 19:7,
19:13, 23:20,
23:23, 23:24,
24:9, 24:13, 26:7,
33:7, 38:20,
47:15, 48:8, 79:6,

85:10, 90:12.
Democrats 9:4, 10:3,
   11:22, 23:18,
   23:19, 23:22,
   24:11, 24:12,
   25:2, 26:16, 36:8,
   39:20, 43:21,
   56:21, 59:25,
   60:4, 62:5, 62:7,
   65:18, 77:1.
demographic 50:13.
demographics
   61:15.
demonstrably
   21:18.
demonstrate 35:24,
   60:25, 61:1,
   61:15, 61:18,
   69:11, 70:19.
demonstrated 8:14,
   58:8, 82:10.
demonstrating 19:12,
   35:11.
demonstration
   18:7.
demonstrations
   52:1.
denote 93:12.
deny 34:5, 43:1,
   77:22.
Department 94:9.
depends 76:5,
   94:6.
deposed 93:22.
deposition 8:20,
   9:15, 44:19,
   59:15, 64:25,
   92:10.
depositions 54:16.
depth 11:14.
described 42:6.
describes 22:12.
describing 64:21,
   68:12.
descriptions
   66:25.
designed 32:1, 32:3,
   33:23, 34:13.
designee 46:15,
   46:16.

despite 27:22.
detailed 74:10.
details 21:11.
detracts 27:5.
develop 87:5.
developed 51:25.
development 3:9,
   3:10.
devoid 54:10.
dialogue 3:21,
   45:25, 47:3.
dicey 81:16,
   81:23.
dictate 3:22,
   6:10.
difference 21:13,
   21:16, 22:3, 25:6,
   28:16, 52:20,
   72:22.
different 16:6,
   31:25, 49:3, 49:4,
   50:14, 58:24,
   70:21, 78:15,
   79:13, 79:18,
   81:14, 81:15,
   84:6.
differentiation
   74:16.
differently 29:6.
difficult 11:21,
   12:1, 12:2, 12:4,
   15:23, 19:3, 28:2,
   48:17.
difficulty 6:9.
dilatory 86:2.
dilute 11:2, 60:19,
   75:14.
diluted 21:8, 22:1,
   26:18, 43:21,
   75:17, 81:19.
diluting 24:4,
   26:14.
dilution 7:24, 8:2,
   10:23, 11:5, 11:8,
   11:17, 12:23,
   13:2, 14:10,
   14:17, 20:3,
   20:25, 21:4,
   21:10, 21:13,
   21:24, 22:8,

22:18, 22:21,
   23:14, 23:15,
   26:16, 27:6, 29:4,
   29:11, 29:20,
   29:23, 30:14,
   30:25, 31:4,
   31:12, 31:24,
   35:20, 53:9, 56:9,
   57:6, 61:4, 61:6,
   61:19, 61:21,
   78:1.
diminished 16:11,
   21:18.
diminishing 82:8.
diminishment 12:22,
   26:22, 27:17,
   28:17, 28:22,
   76:9.
direct 64:19,
   76:20.
directed 64:20,
   65:8.
directing 4:22.
direction 5:7,
   49:20, 77:17.
directive 90:11.
directly 44:7,
   44:14.
disadvantage 26:13,
   27:6, 57:7, 57:11,
   57:25, 58:4,
   76:8.
disadvantaged 26:20,
   26:22.
disagree 14:1,
   91:12.
disagreeing 58:2.
disappeared 72:21.
disapproval 35:2.
disapprove 29:9.
disarm 48:5.
disclaimed 78:6.
disclosed 42:4.
disclosure 42:17.
discount 85:23.
discovery 41:23,
   42:4, 51:10,
   51:11, 51:12,
   83:2.
discuss 48:12.

discussed 12:13,
24:7, 25:5, 42:3,
62:14.
discusses 92:23.
discussion 8:6,
56:15.
discussions 41:21.
disentangling
87:10.
disfavor 55:5.
disfavored 44:3.
dismiss 7:20, 12:18,
21:15, 21:24,
32:16.
dispensed 70:16,
76:3, 76:4.
dispersal 23:10.
dispersed 23:9.
displayed 83:12.
disprove 73:15.
disproved 37:16.
dispute 10:19, 13:4,
13:9, 13:10,
19:16, 19:18,
20:8, 20:11,
20:13, 52:7,
73:4.
disputes 51:21.
disrupt 11:25,
14:12, 14:14,
93:24.
disrupted 19:21,
31:16, 44:25.
disrupting 12:8,
16:11.
disruption 15:5,
19:1, 21:2, 35:20,
43:2, 44:20,
91:5.
disruptions 19:20.
distance 87:1.
distinct 29:21.
distinction 32:7.
distinguish 74:2.
distinguished
76:6.
district-wide
55:21.
district. 22:11.
districting 28:9,

49:14.
Districts 9:10,
19:6, 21:7, 36:18,
43:17, 49:15,
56:21, 57:13,
59:4, 59:5, 61:22,
61:25, 63:5, 63:7,
66:16, 71:9, 72:7,
72:9, 84:24,
90:13.
divide 74:25, 75:14,
75:16.
divided 71:4, 74:6,
75:17.
dividing 71:15.
documentation
66:8.
dog 36:25.
doing 45:6, 62:20,
78:6, 82:21.
dollars. 53:12.
done 4:12, 5:23,
5:25, 51:22,
55:22, 55:23,
63:14, 63:23,
82:22, 93:18.
Donohue 56:18,
56:24.
dotted 30:6, 30:7.
doubt 27:12, 46:20,
71:13.
doubtful 3:25.
down 39:16, 43:10,
69:4, 72:23, 82:4,
88:3, 92:13.
dozen 89:6, 89:20.
draft 93:9.
drafted 5:11, 67:4,
67:7, 89:6,
89:20.
dragged 82:25.
draw 32:3, 40:13,
41:2, 46:2, 55:5,
59:14, 73:6.
drawer 63:11,
67:12.
drawers 9:7, 9:11,
9:20, 29:8,
35:16.
drawing 2:19, 6:4,

8:17, 9:19, 10:21,
25:8, 28:12, 29:8,
30:5, 31:3, 32:24,
33:6, 59:17, 90:8,
93:13.
drawn 4:17, 4:18,
5:15, 22:9, 23:2,
30:13, 33:14,
35:16, 35:18,
36:2, 38:24,
39:11, 41:6, 59:9,
61:2, 66:6, 66:8,
66:12, 67:11,
74:7, 89:1,
89:2.
dressing 38:18.
drew 37:8.
drive 17:3.
driving 27:9, 29:25,
48:1.
drop 17:13, 17:14,
17:15, 18:7, 18:9,
18:12, 79:3.
dropped 17:11,
17:12, 18:19.
drops 17:14.
drowned 19:6, 43:21,
43:24.
during 17:23, 18:18,
85:18.
duty 84:16, 84:20.
dwell 8:11.
.
.
.
< E >.
e-mail 66:21.
E. 1:30.
earlier 15:19,
42:3.
easier 7:7, 11:22,
13:1, 13:23,
33:23, 34:12.
easily 10:23, 34:9,
34:11.
Eastern 65:4, 65:5,
80:7.
ecological 78:9.
effect 16:4, 22:2,
24:4, 42:9, 47:25,
48:7, 49:18,

61:14, 69:15,
70:3, 73:13,
91:14, 91:22.
effected 84:6.
effectively 15:15,
19:6, 35:1.
effects 16:22,
20:11, 53:4,
61:24, 73:2.
efforts 5:6, 6:15,
16:21, 27:22,
84:14, 92:2.
eight 9:5.
either 9:7, 39:19,
55:16, 55:17,
63:4, 65:4, 79:12,
81:8.
elect 22:23, 24:9,
65:20.
elected 24:13,
24:15.
electing 23:5,
29:9.
election 4:22,
12:20, 17:6,
17:11, 18:5,
24:16, 24:21,
27:22, 28:8,
29:16, 29:17,
29:20, 33:6, 42:3,
42:5, 42:6, 44:9,
50:6, 50:17, 51:6,
72:14, 74:18,
78:22, 78:24,
79:4, 79:7, 80:15,
80:21, 81:1,
81:20, 81:21,
82:1, 82:12,
82:14, 82:15,
82:17, 83:9,
83:16, 83:21,
84:13, 90:20,
91:2, 91:3, 91:9,
91:22, 94:2.
Elections 4:4, 5:14,
12:3, 15:12, 17:4,
23:18, 25:12,
26:17, 27:16,
28:7, 30:1, 39:6,
42:14, 46:2, 53:4,

55:6, 72:20,
79:19, 81:12,
81:14, 85:12,
85:13, 85:19,
85:23, 86:3, 86:4,
93:24, 94:4,
94:8.
electoral 7:25,
16:10, 19:3,
21:19, 21:20,
27:12, 28:8,
28:13, 29:22,
29:24, 30:13,
30:16, 30:24,
31:1, 31:13,
35:11, 44:1, 46:5,
54:4, 54:8,
55:21.
electorate 18:6,
24:24.
element 12:13, 15:7,
21:25, 22:25,
23:2, 35:6, 35:13,
35:14, 36:15,
36:16, 36:17,
36:20, 69:12,
74:15.
elements 7:19, 8:4,
23:7, 51:19,
74:4.
eligible 54:21.
eliminated 64:8.
eliminating 65:16.
ELMO 68:5, 68:9,
68:10, 92:13.
elsewhere 17:14.
embrace 55:12.
eminently 65:23.
emphasized 29:20,
55:9.
employee 32:21.
employees 32:20.
employment 32:10.
empowered 46:2.
enact 4:18, 39:15.
end 5:10, 56:7,
71:5.
endeavor 88:12.
ended 89:17.
endorsed 3:6.

ends 4:2, 20:7,
20:14.
ends-oriented 7:2.
enforce 4:17.
enforcement 40:20.
enforcing 39:10.
engagement 18:6.
engaging 17:20,
37:22.
enjoin 50:5, 54:1.
enjoining 39:10.
enjoyed 44:5.
enough 32:11, 39:12,
39:19, 52:24,
58:3, 74:5, 74:8,
74:14, 74:17,
78:21, 87:10.
ensure 11:23,
27:12.
enter 39:16, 41:11,
80:14, 82:1,
93:25.
entered 40:20.
entering 41:12,
83:15.
entertain 7:5,
51:11.
entire 62:17, 64:10,
67:1, 73:24,
80:5.
entirely 18:17,
21:1, 22:16.
entitled 19:22,
19:24, 19:25,
29:5, 52:5, 52:12,
82:11.
enure 70:1.
enures 72:3.
EPI 89:17.
equal 29:24, 31:1,
34:25, 65:10.
equally 29:3.
equitable 52:24,
53:24, 84:21.
equities 47:23,
53:7, 83:11,
83:15.
equity 53:15, 81:24,
82:22, 84:10,
84:11.

Eric 8:16, 9:8, 9:9,
   38:12, 67:15,
   89:3, 89:19.
error 63:22.
especially 8:11,
   80:16, 83:18.
Esquire 1:27, 1:28,
   1:30.
essentially 18:22,
   47:17.
establish 20:6,
   21:24, 55:13,
   60:2, 74:17.
established 13:24,
   74:17.
establishing
   13:17.
evaluate 55:2,
   55:4.
evaluated 22:13,
   23:17.
event 28:4.
Everyone 40:4,
   48:3.
everything 26:6.
exact 90:1.
Exactly 11:3, 13:14,
   16:22, 17:18,
   27:8, 29:10,
   29:12, 29:13,
   36:10, 36:13,
   42:20, 44:20,
   47:23, 60:21,
   79:21, 87:7,
   92:3.
examination 93:4.
examines 54:13.
example 8:16, 19:12,
   32:17, 33:18,
   44:18, 64:4.
examples 26:11,
   93:23.
except 18:1.
exclude 80:5.
excuse 19:2, 24:23,
   28:9, 29:11,
   89:22.
execution 27:19.
exercise 24:20,
   44:23.

exercising 84:9.
Exhibit 92:22.
existence 78:9.
existing 84:13.
exists 58:4.
expect 18:23, 26:25,
   63:8.
expeditious 41:12.
experience 48:20.
expert 23:13, 29:12,
   40:13, 51:10,
   59:7, 64:2, 73:11,
   74:2, 78:4.
explain 21:4, 61:22,
   93:10.
explained 16:4,
   31:13, 38:12,
   38:17, 72:11.
explaining 28:14,
   44:20, 60:24.
explanation 36:21,
   37:15, 37:17,
   38:19, 61:24,
   70:7.
explanations
   35:15.
explicit 36:5,
   36:12, 36:13.
exploring 69:21.
expressed 27:15.
expression 31:17,
   35:1.
expressly 3:7,
   86:23.
extend 55:14,
   80:6.
extended 64:9.
extensive 10:7,
   65:21.
extent 57:5, 70:23,
   75:4, 85:14.
extra 55:23.
extreme 47:7.
Eyler 54:23.
.
.
< F >.
face 26:3, 27:18,
   68:25, 79:17.
facie 35:23.

facing 50:17.
fact 3:25, 7:23,
   11:17, 20:17,
   23:13, 27:1, 27:2,
   28:22, 37:18,
   42:22, 51:10,
   52:10, 53:3,
   55:18, 57:10,
   65:16, 70:16,
   73:4, 75:11, 83:4,
   87:2, 89:5, 89:25,
   90:18.
factors 52:19,
   52:25, 84:9,
   84:21.
facts 51:21, 52:4,
   52:7, 52:11,
   52:14, 53:2, 53:3,
   58:21, 84:10,
   86:23, 86:25,
   87:4.
factual 20:14.
factually 20:6.
faded 93:20.
fail 17:21.
failed 20:5, 52:4,
   53:1, 73:11, 86:6,
   87:12.
fails 32:19.
Fair 40:15, 41:2,
   58:3.
fairly 2:25, 8:7,
   68:18, 70:17,
   91:2.
fall 3:12, 39:22.
fallacy 62:15.
famous 93:24.
far 18:1, 39:12,
   54:25, 67:17,
   88:22, 91:13.
fault 35:7.
favor 20:18, 24:24,
   51:16, 83:15.
favorable 10:2.
FCRR 1:46, 94:24.
Federal 1:47,
   34:10.
feeds 36:15.
feelings 32:11,
   32:20, 32:25.

fell 17:9.
fellow 19:4.
felt 44:9, 73:24,
 73:25.
few 7:10, 66:25,
 88:15.
field 34:25, 44:4.
fight 36:25.
fighting 65:19.
figure 85:3.
file 93:8.
filed 2:5, 2:6,
 49:24, 82:25.
files 93:4.
filing 16:6, 83:6.
final 35:5.
finally 8:1, 9:25.
finance 42:17,
 70:5.
Financial 18:24,
 42:19, 44:17.
find 6:12, 20:18,
 30:16, 41:18,
 48:5, 51:16,
 56:23, 56:24,
 58:15, 77:11,
 78:18, 81:17,
 82:20, 83:14,
 84:10, 84:12,
 94:1.
finder 20:17.
finding 51:17,
 53:19.
findings 4:19,
 55:20.
finds 22:5.
fine 14:18.
First 7:17, 11:10,
 11:14, 14:8,
 15:22, 22:24,
 31:18, 32:9,
 32:12, 32:23,
 33:2, 34:17,
 36:15, 36:17,
 36:21, 41:25,
 44:12, 44:23,
 45:17, 53:13,
 65:19, 69:23,
 75:19, 78:2,
 80:20, 81:1, 81:3,

81:9, 82:9, 82:10,
 82:13, 84:3, 86:2,
 88:16, 90:18,
 90:20, 90:23,
 92:20, 93:7.
fit 60:21.
five 28:7, 51:9,
 82:12, 87:21,
 87:25.
fix 48:4, 81:20.
flat 31:21.
flatly 37:15.
flawless 27:18.
flaws 54:14.
Fletcher 62:24.
flexibility 5:4.
flexible 88:9.
flip 37:9, 90:12.
flipping 27:25,
 38:3.
flips 86:19.
Floor 1:48.
focus 16:8, 22:4,
 23:6, 34:21,
 63:21, 65:4,
 92:13.
focused 16:10,
 16:24, 18:14,
 26:21, 42:8.
focuses 60:10.
focusing 11:8,
 63:18.
folks 65:5.
follow 40:9, 91:5.
following 68:5,
 68:7.
follows 19:1.
forces 47:16.
foregoing 94:25.
foresee 52:10.
form 23:1, 23:4.
formed 3:13.
former 65:22, 65:24,
 76:20, 88:24.
formerly 43:7.
Fort 33:19, 33:22.
forth 12:4, 25:9,
 46:10, 73:21.
forward 2:20, 12:24,
 20:12, 39:4, 39:5,

43:13, 47:2, 52:9,
 52:11, 52:14,
 53:2, 73:15,
 75:24, 78:3,
 79:25, 84:15.
forwardly 60:22.
found 20:17, 24:3,
 29:13, 41:22,
 58:14, 78:14,
 84:21.
foundational
 75:23.
founding 31:6.
four 52:19, 54:22,
 85:13, 85:22.
framework 21:11,
 22:5, 29:1,
 39:2.
Frederick 17:7,
 38:22, 69:3, 69:6,
 72:19, 72:23.
frequent 83:14,
 90:22.
friends 5:18.
front 50:20, 83:9.
full 74:25.
fully 46:8, 74:20,
 74:22.
fund 15:24, 71:20.
fundamental 85:9.
fundamentally
 89:23.
fundraising 18:13,
 18:19, 70:10.
funds 70:6.
future 53:4, 54:2,
 82:6.
.
.
< G >.
gains 47:25.
Gaithersburg
 59:21.
game 28:11.
gap 49:8.
Garrett 17:8, 18:14,
 18:15, 72:24.
gate 6:14.
gather 4:25, 45:5,
 52:2.

gathering 66:13.
gave 9:4, 15:9,
  37:15, 64:4.
gearing 50:12.
General 1:35, 1:36,
  3:2, 45:22, 46:12,
  46:23, 47:6,
  72:20, 76:22,
  80:10, 81:6, 81:8,
  83:20, 91:1.
generally 12:7,
  23:11, 23:23,
  24:1, 24:11,
  72:3.
generate 15:25,
  73:4.
generated 58:25.
genuine 10:19, 13:4,
  19:16.
geographically
  23:1.
geography 66:19.
George 1:20.
gerrymander 12:20,
  18:16, 18:17,
  18:23, 21:21,
  27:11, 30:20,
  35:12, 43:25,
  78:14.
gerrymandered
  21:8.
gerrymandering 19:7,
  31:5, 78:7.
gerrymanders 15:21,
  47:8.
gets 18:23, 24:13,
  24:14, 40:9.
getting 5:12, 7:3,
  12:15, 14:6,
  67:16, 73:23.
Gill 15:17, 22:6,
  22:12, 22:16,
  26:11, 55:8, 55:9,
  55:18, 56:16,
  58:6, 58:16,
  69:23, 72:4,
  74:15, 79:23.
Gingles 22:19,
  22:22, 28:25,
  80:1.

Gingles-type 78:3,
  78:5, 80:11.
give 8:8, 33:18,
  34:2, 34:4, 39:24,
  41:14, 59:7,
  63:11, 86:1,
  87:16.
given 3:15, 7:1,
  53:11, 83:18,
  84:25, 86:7,
  87:10, 90:7,
  91:22, 92:17.
giving 8:25, 14:9,
  40:2.
goal 5:10, 8:14,
  9:3, 15:1, 28:14,
  34:12, 63:10,
  65:16.
goals 63:14, 64:15,
  64:19, 65:11,
  65:12, 65:15.
gotten 47:16.
govern 4:22.
government 32:19,
  47:15, 74:22,
  75:13.
Governor 3:17, 9:23,
  9:25, 15:8, 17:18,
  18:22, 27:1,
  39:20, 39:21,
  40:1, 41:8, 46:12,
  50:8, 63:10,
  63:15, 64:23,
  66:13, 66:22,
  67:12, 67:13,
  67:20, 68:1,
  76:20, 76:22,
  92:10, 92:11,
  92:20.
GRAC 38:16, 38:24,
  65:21, 66:3, 66:5,
  66:7, 66:12,
  66:17, 67:7,
  67:10, 67:19,
  89:8, 89:9,
  89:14.
graduate 59:14,
  59:16, 59:17.
Grandy 29:19.
granted 87:13,

92:9.
graph 18:7, 25:18,
  29:15, 30:2.
grave 63:22.
great 5:13, 86:4.
greater 11:14,
  44:1.
green 68:15.
gross 70:16, 76:3.
ground 54:5.
grounds 87:13.
group 22:25.
groups 44:1, 79:19,
  79:21.
grow 11:5, 11:17.
guarantee 59:15.
gubernatorial 72:14,
  73:8.
guess 3:24, 14:16,
  25:13, 28:1,
  33:10, 34:10,
  42:6, 63:20,
  91:13.
guild 38:9.
guys 5:2, 73:6,
  73:20.
.
.
< H >.
Half 58:25, 74:25,
  75:14, 85:1.
hand 31:10, 32:25,
  56:19.
handle 49:25,
  87:17.
handling 32:10.
happen 27:1, 30:21,
  93:14.
happened 25:6, 25:7,
  25:11, 50:14,
  61:11, 85:25,
  93:21.
happening 50:19.
happens 91:14.
happy 3:14, 5:15,
  7:5, 8:10, 15:1,
  35:3, 40:5.
hard 48:25, 53:14,
  90:21.
harm 12:24, 13:1,

22:7, 35:23, 39:4,
53:2, 53:7, 53:8,
53:25, 56:4, 57:5,
69:22, 69:25,
70:17, 70:21,
70:24, 71:3, 72:6,
73:3, 73:17, 76:8,
76:10, 83:13,
86:16, 91:19.
harms 11:5, 11:16,
12:6, 12:25, 31:9,
41:19, 61:20,
91:9.
Harris 66:15,
78:12.
Hartman 35:22,
86:9.
Hawkins 8:16, 8:20,
9:8, 9:9, 38:12,
67:16, 69:9, 89:4,
89:6, 89:19, 90:7,
90:9.
headed 46:14.
heading 49:21.
Healthy 35:8, 36:24,
86:10, 86:11,
86:17, 86:24.
hear 2:9, 45:2,
45:13, 47:4,
49:25, 76:11,
87:23.
heard 65:21.
hearing 10:16, 24:6,
48:12, 87:24.
hearings 38:16,
38:23, 48:11,
66:5, 66:7, 66:10,
66:12, 67:8,
67:10.
heart 88:17.
held 15:22, 39:6,
53:1, 66:12,
66:21.
help 33:21, 77:23.
helped 63:17.
helpful 27:11,
53:20, 55:8,
78:23, 90:11.
helps 36:16.
hereby 94:24.

hews 69:2.
high 52:22, 89:17.
highlight 8:9.
Highly 44:22,
68:22.
historic 64:13.
historical 13:21,
19:4, 19:5, 23:3,
23:23, 23:24,
42:22.
history 7:22, 30:17,
44:10, 50:20,
80:5, 83:3,
83:18.
Hitchcock 38:24.
Hoeber 54:9.
Hogan 39:20.
hold 80:21, 87:6.
holding 56:2,
56:3.
holds 32:7, 91:6.
Hollen 79:13.
home 17:17.
Honor 2:11, 2:15,
2:23, 3:25, 4:15,
13:14, 14:15,
14:22, 14:25,
16:16, 19:15,
20:16, 27:8,
28:24, 32:6, 37:5,
40:3, 45:3, 45:21,
48:10, 49:2,
49:19, 50:1,
52:17, 58:1,
64:23, 76:16,
82:16, 87:18,
88:11, 90:16,
91:12, 94:20.
Honorable 1:18,
1:19, 1:20.
Honors 7:17, 10:7,
12:12, 69:24,
73:20, 92:4.
hope 28:19, 51:24.
House 38:5, 90:2.
Hoyer 34:7, 92:15.
huge 89:23.
Hughes 1:29.
hurdles 5:8.
hurt 32:11, 32:25,

76:5, 76:6, 76:7,
85:18.
hurts 32:20.
hypothetical 22:11,
26:14.
hypothetically
84:12.
.
.
< I >.
I-270 37:17, 37:20,
38:8, 38:10,
38:14, 38:15,
38:19, 66:1, 66:2,
66:18, 68:16,
69:2, 69:6.
idea 6:16, 14:10,
15:11, 15:20,
23:7, 36:1.
ideas 5:7, 6:21.
identified 31:10.
identifying 71:23.
ideology 79:15.
ignore 84:15.
III 1:20.
immediately 71:8.
impact 14:8, 57:2,
91:10.
impacts 44:6.
impeded 22:22.
impediment 2:24.
impermissibly
21:8.
impetus 35:24.
implementing 46:5.
implicit 7:7,
85:3.
implied 36:5.
important 55:11,
60:5, 65:13, 69:7,
71:25, 73:22,
76:2, 80:13.
impose 11:2, 32:18,
32:19, 91:16.
imposed 32:13,
86:21.
impossible 15:13.
improve 36:19.
in-person 66:14.
inadequacy 57:10.

inadequate 20:14.
inappropriate
  86:15.
incidentally 18:7.
inclined 41:11,
  43:16.
include 59:20,
  65:12, 69:5.
included 65:25.
Including 8:24,
  38:12, 62:21,
  65:22, 66:14.
inconsistent
  34:19.
incorporating
  69:3.
increase 79:9.
increased 72:18.
incumbents 50:9,
  90:12.
independent 11:20,
  21:1, 91:3.
independently
  46:2.
independents 15:25,
  16:6.
indeterminate
  6:11.
indicated 4:16,
  10:7.
indicates 26:6.
indication 3:19,
  63:15.
indifferent 5:10,
  5:11.
individual 26:13,
  43:7, 55:23,
  55:24, 56:7,
  56:19, 57:7,
  57:13, 58:21,
  59:2, 84:2.
individualized
  55:9.
individually 55:3.
individuals 15:15,
  27:14.
inference 24:10,
  55:5, 70:9, 73:6,
  73:10, 78:9.
inferences 51:23,

87:11.
inflicted 82:14.
influence 34:14.
influenced 21:19,
  38:23.
inform 82:6.
information 48:15,
  49:6, 54:6, 54:7,
  54:11, 54:12,
  55:3, 72:13,
  79:20, 79:22,
  79:24, 80:9.
informed 36:3.
infrequent 90:18.
infringe 15:22.
initial 39:24.
initially 6:2.
initiative 49:16.
injunction 5:12,
  7:4, 8:5, 16:19,
  24:6, 39:2, 39:17,
  40:19, 41:11,
  41:13, 45:15,
  46:6, 51:8, 52:19,
  53:20, 73:21,
  80:14, 82:19,
  83:5, 83:7, 83:8,
  83:11, 83:15,
  94:1.
injunctive 31:19,
  80:12, 82:2,
  83:23.
injured 28:22.
injuries 10:25,
  11:8, 32:25,
  41:19, 41:24,
  42:12, 54:2,
  82:14.
injury 11:15, 11:20,
  13:8, 14:20,
  14:21, 21:24,
  26:12, 26:13,
  31:19, 33:4, 53:9,
  53:22, 53:25,
  55:10, 55:13,
  57:6, 57:10,
  57:15, 57:17,
  57:24, 61:18,
  61:19, 61:21,
  72:2, 80:20,

80:21, 81:2, 81:3,
  81:13, 82:9,
  82:10.
input 66:13,
  66:16.
inquiries 5:6.
insiders 38:20.
insofar 79:16.
instance 17:9,
  28:23, 30:17,
  38:5, 71:16.
Instead 4:17, 12:21,
  34:2, 62:4,
  86:19.
instructions 90:7.
instructive 83:17.
insults 32:11.
intact 68:16.
Intelligence
  33:20.
intend 8:11.
intended 34:14,
  76:22.
intent 7:21, 8:3,
  8:6, 8:9, 8:12,
  8:17, 10:1, 10:8,
  10:10, 10:17,
  10:22, 10:24,
  11:1, 11:2, 11:10,
  11:21, 11:23,
  12:7, 12:8, 12:11,
  12:12, 13:11,
  33:16, 34:23,
  36:4, 36:5, 36:6,
  36:9, 36:12,
  36:13, 62:25,
  67:16, 86:16,
  86:20, 88:15,
  91:16, 92:8.
intentions 68:23.
interest 38:21,
  47:2, 86:4.
interesting 55:18,
  79:1.
interests 36:19,
  44:13, 84:4,
  94:4.
interfere 32:1,
  77:7.
intervening 4:2,

30:20.
interview 8:25.
introduced 67:17.
intuitive 15:7.
invoking 81:24.
involved 3:14, 6:4,
    9:21, 10:20,
    37:19, 38:11,
    46:25.
involves 85:15,
    85:16.
irrelevance 15:16,
    18:23.
irrelevant 29:18.
irreparable 39:4,
    53:2, 53:7, 53:8,
    53:22.
isolation 62:18.
issue 6:2, 10:8,
    10:13, 21:3,
    36:23, 37:1,
    40:10, 46:14,
    49:9, 49:10,
    53:14, 65:14,
    83:19, 86:3, 92:9,
    93:18.
issued 58:13.
issues 10:18, 16:14,
    19:17, 41:9,
    49:15.
itself 11:6, 18:5,
    74:9, 85:6.
.

.
< J >.
Jake 67:18, 67:20.
James 1:19.
Jeanne 38:24.
Jennifer 1:36.
JKB-13-3233 1:9.
John 55:6, 79:7,
    88:24.
Johnson 29:18.
Judd 84:17.
judges 48:21,
    94:19.
judgment 2:4, 2:6,
    2:7, 19:23, 20:1,
    49:23, 49:24,
    50:2, 51:14,

51:17, 52:5,
    52:13, 61:16,
    62:11, 72:17,
    87:12, 92:8,
    92:22.
judgments 34:16.
jump 9:22.
jumped 9:20.
jumping 65:6.
jumps 40:12.
jurisdiction
    46:13.
jurisprudence 28:20,
    52:15.
Justice 10:14,
    15:17, 26:10,
    26:11, 27:10,
    31:4, 42:8, 55:12,
    57:21, 60:21,
    60:23, 60:24,
    69:25, 77:23.
justiciability
    16:14, 71:7.
justiciable 73:23,
    77:12.
justification 69:7,
    78:13.
.

.
< K >.
K. 1:19.
Kagan 10:14, 15:17,
    26:10, 27:10,
    42:8, 55:12,
    57:21, 60:22,
    60:23, 69:25,
    77:23.
Katz 1:36.
keep 6:7, 20:20,
    87:15, 92:6.
kicking 87:3.
kill 70:25.
Kimberly 1:27, 2:10,
    2:13, 7:6, 9:17,
    14:23, 25:18,
    41:17, 52:3, 88:2,
    92:7.
kind 26:4, 29:12,
    29:13, 30:21,
    30:24, 39:17,

44:20, 46:14,
    47:18, 59:8,
    67:16, 67:23,
    70:4, 70:9, 70:24,
    78:6, 79:22,
    79:23, 91:5.
kinds 12:6, 34:21,
    39:22, 48:18,
    80:10.
.

.
< L >.
L. 1:36.
laches 82:21, 83:12,
    93:19.
lack 29:22, 29:24,
    30:25, 93:17.
Lamone 2:3, 62:24.
language 22:22,
    29:25, 31:22.
large 22:25.
largest 31:14.
Last 8:5, 10:6,
    16:18, 20:4, 24:7,
    31:13, 35:6,
    36:16, 36:20,
    50:6, 61:12,
    86:22.
late 86:6.
Later 8:20.
Laughable 68:17.
law 13:6, 13:7,
    13:19, 19:11,
    19:19, 27:13,
    37:6, 37:25, 39:5,
    46:24, 72:8,
    78:11, 94:2.
lawful 31:22.
lawfulness 3:6.
lawsuit 4:3, 28:3.
lay 7:17.
lays 28:25, 39:16.
lead 5:20.
leader 10:1.
leaders 4:4.
least 3:20, 4:3,
    12:23, 19:24,
    34:5, 39:3, 39:24,
    60:17, 72:4, 77:3,
    88:21.

leave 5:21.
leaves 39:1.
led 28:14.
leeway 41:1.
left 30:6, 41:24,
  42:25, 72:12,
  80:15, 89:8.
legal 4:24, 12:16,
  26:1, 39:15,
  53:19.
legislation 3:10,
  5:23, 6:1, 47:17,
  48:22.
Legislative 49:8,
  49:14, 63:1,
  93:14.
Legislature 3:16,
  4:13, 6:9, 6:10,
  39:15, 39:18,
  39:20, 39:25,
  40:1, 41:1, 41:4,
  41:7, 48:20, 50:8,
  62:25, 63:14,
  63:15, 64:12,
  64:15, 65:11,
  65:13, 66:24,
  93:13.
legislatures
  67:12.
length 5:5, 24:6,
  40:23, 60:24,
  62:15, 62:24.
less 22:10, 27:7,
  28:3, 28:23, 29:6,
  29:7, 52:20,
  61:3.
level 15:6, 31:4,
  49:14, 69:23.
Levi 1:20.
lies 57:12.
life 83:4.
light 88:5.
lights 88:4.
like-minded 42:24.
likelihood 52:22.
likely 17:3, 24:9,
  24:12, 24:14,
  28:3, 46:25.
Likewise 25:1.
lily 38:9.

limited 57:9.
LINDA H. LAMONE, et
  al 1:10.
line 9:10, 18:7,
  21:1, 25:8, 28:12,
  29:8, 30:5, 30:7,
  30:8, 31:3, 32:24,
  33:6, 34:18, 36:1,
  43:10, 59:17,
  61:23, 66:11,
  67:5, 74:7.
lines 2:20, 4:21,
  4:24, 6:4, 6:5,
  22:9, 28:9, 30:12,
  32:3, 33:14,
  35:15, 35:19,
  40:13, 46:3, 48:9,
  53:11, 54:19,
  76:14.
link 73:5, 73:19,
  73:22.
linking 38:21.
literature 30:15.
litigants 47:21,
  47:22.
litigated 65:14.
litigation 21:6,
  23:17.
little 5:2, 12:6,
  13:23, 16:17,
  33:7, 35:5, 41:15,
  60:23, 67:16,
  69:21, 77:25,
  78:15, 81:16,
  82:8, 86:9, 88:4,
  88:9.
live 56:10, 56:11,
  57:22, 61:15,
  69:14.
lived 54:21.
lives 56:6.
load 84:10.
local 54:18.
Lombard 1:48.
long 8:11, 50:19.
longer 43:5,
  74:12.
look 9:10, 30:2,
  42:21, 55:8,
  56:13, 57:20,

59:10, 59:22,
  64:1, 68:21,
  69:23, 71:7,
  71:18, 72:16,
  76:12, 78:23,
  82:19, 85:2.
looked 59:19, 83:11,
  83:12, 83:13.
looking 50:5, 53:18,
  57:1, 63:13,
  72:15, 78:13.
looks 25:19, 52:8.
lose 52:14, 57:24.
losing 13:16,
  13:17.
lost 30:1, 42:13,
  43:9.
lot 5:3, 7:1, 10:5,
  15:7, 28:3, 52:9,
  58:18, 70:2, 71:1,
  71:8, 71:9.
loud 40:7.
low 19:12.
lower 18:24.
Lozman 86:22,
  87:3.
lucky 50:24, 51:2.
.
.
< M >.
machinery 8:1.
magistrate 46:15,
  48:21.
main 93:9.
major 16:7, 66:18,
  82:21.
majorities 15:12,
  19:7.
majority 9:18, 22:6,
  22:7, 22:12,
  22:16, 23:1, 23:4,
  23:8, 23:11, 24:8,
  55:12.
maker 87:1, 87:2.
manifest 74:9.
manifests 28:16.
manipulated 29:8.
manipulating 28:8.
manipulation
  30:22.

manner 23:16,
  30:8.
mansion 39:21.
mapmaker 65:8,
  66:3.
mapmakers 63:9,
  69:8.
mapping 82:5.
maps 39:6, 58:24,
  59:1, 64:20,
  64:21, 80:2, 80:4,
  81:12, 81:14,
  82:6, 84:6, 89:6,
  89:20, 93:9,
  93:12, 93:13,
  93:14.
margin 27:2, 27:3.
mark 93:9.
Martin 9:14,
  37:21.
Maryland 1:2, 1:22,
  1:49, 2:19, 3:20,
  17:4, 47:16,
  47:17, 47:21,
  47:24, 48:6,
  48:16, 49:12,
  50:10, 62:18,
  65:5, 67:2, 84:24,
  85:16, 93:15.
massive 63:23,
  64:5.
match 50:15, 55:4.
material 51:21,
  73:4.
matter 13:6, 13:7,
  13:19, 18:3,
  19:10, 19:19,
  20:14, 37:3,
  39:24, 40:7,
  42:22, 46:1,
  46:24, 46:25,
  54:18, 72:8,
  89:24, 91:1,
  94:26.
mattered 16:4,
  69:8.
matters 48:21,
  55:20.
Mcdonald 23:14,
  24:3, 29:12,

59:13, 59:18,
  60:1, 61:24, 64:2,
  78:6, 93:3,
  93:8.
Meade 33:19,
  33:22.
mean 4:9, 14:12,
  31:25, 43:1,
  43:18, 46:8, 71:2,
  79:16, 89:14.
meaning 31:2,
  65:11.
meaningful 29:23,
  30:14, 74:12.
meaningfully 34:25,
  71:4.
means 5:12, 5:20,
  34:20, 40:17,
  71:7.
means-oriented
  7:3.
meant 73:12,
  90:17.
measure 18:5.
meet 2:20, 73:11,
  86:6, 87:12.
meeting 87:4.
meetings 66:14.
members 8:23, 15:23,
  16:7, 24:17,
  43:22, 73:25,
  82:17.
membership 31:22.
memorandum 53:19.
memories 93:20.
mentioned 10:6,
  11:17, 23:7,
  53:8.
mentions 66:18.
mere 49:17.
merely 51:17, 55:24,
  93:11.
merits 32:8, 52:21,
  52:23, 60:10,
  61:12, 69:20,
  70:13, 82:20,
  84:22.
met 51:18, 65:11,
  69:22, 74:3.
metes 66:25.

methods 40:17, 49:3,
  49:4.
Micah 1:28.
Michael 1:27,
  90:2.
microscope 85:3.
middle 43:11.
midterm 16:25, 17:1,
  17:11, 18:18.
Mike 88:25.
Miller 88:25.
mind 52:18, 63:16,
  66:3, 80:13.
minimal 33:4.
minor 27:2, 66:22.
minority 21:7,
  22:25, 23:8,
  23:10, 23:12.
minus 30:18.
minute 8:8, 61:20,
  87:21, 87:25,
  88:3, 88:10.
minutes 7:10,
  87:16.
misconception
  21:22.
misrepresented
  20:23.
missing 69:12,
  73:10.
misunderstanding
  35:10, 85:8.
mix 33:13.
mixed 73:2.
modest 24:7, 63:6,
  63:19.
modify 75:3.
moment 13:7, 14:22,
  47:21, 88:19.
money 12:4, 34:8.
Montgomery 38:22,
  62:22, 65:25,
  69:3, 69:4,
  80:5.
month 48:18,
  51:10.
months 51:10.
Moore 35:22,
  86:10.
moot 3:14.

morning 2:3, 45:14, 48:11.
mostly 66:25.
motion 2:6, 2:7, 7:15, 7:16, 7:20, 8:6, 12:17, 12:18, 16:19, 20:1, 20:9, 21:14, 21:23, 32:15, 49:22, 49:24, 50:2, 51:8, 51:16, 72:17, 92:22.
motions 2:4, 51:11, 51:14, 53:4, 83:2, 88:7.
motivation 71:15, 71:18.
move 8:15, 12:14, 14:10, 63:1, 90:17.
moved 8:7, 43:14, 63:4, 64:12, 74:19, 79:25.
moves 64:14.
moving 65:16, 76:25, 86:18.
Mt 35:8, 36:24, 86:10, 86:11, 86:17, 86:24.
multiple 51:3, 87:9.
.
.
< N >.
names 93:8, 93:10.
narrow 56:2.
nationwide 17:10.
natural 64:24.
nature 36:4.
NCEC 8:16, 88:17, 93:2.
nearly 25:10, 30:18, 30:19.
necessarily 16:5, 73:3, 87:6.
necessary 22:20, 61:17, 89:22.
need 3:19, 10:10, 21:20, 36:24, 37:4, 37:7, 43:7,

52:18, 61:16, 70:15, 71:6, 77:17, 86:17, 94:6, 94:17.
needed 62:3, 62:16, 62:20, 63:3, 63:13, 63:24, 64:7, 73:15.
needn't 21:3.
needs 52:8, 55:22, 55:23, 72:8.
negotiation 45:20, 45:24.
neighboring 61:25.
neither 51:12, 56:17.
net 47:25, 48:7, 49:17, 49:18.
neutral 47:18, 60:6.
neutrally 4:18, 5:11, 5:14, 41:6, 61:2.
new 39:15, 50:16, 58:13, 58:20, 70:17, 79:3, 88:8, 91:6.
next 4:22, 59:23, 70:6, 81:21, 84:13.
nice 25:8, 76:24.
No. 1:9, 6:11.
Nobody 38:8, 48:4, 92:16.
None 70:8, 76:13, 83:3.
nonetheless 11:11.
nonjusticiable 77:12.
nonpartisan 2:18, 49:13.
nonplaintiffs 74:16.
nor 56:17.
normally 78:7.
North 40:24, 47:23, 49:8, 58:10, 58:12, 67:3.
NORTHERN 1:2, 64:11.

noted 19:1, 42:20.
nothing 19:21, 30:4, 30:8, 33:16, 34:15, 34:19, 36:19, 62:23.
notice 43:6.
notion 15:20, 46:13, 65:7, 85:4, 91:8.
novelty 83:20.
November 85:14.
nudge 33:7, 33:15.
number 6:10, 49:9, 72:19, 72:23, 93:18.
numbers 18:9, 71:20, 89:24.
.
.
< O >.
O'malley 9:14, 9:23, 9:25, 15:8, 17:18, 18:22, 37:21, 64:23, 67:20, 68:1, 92:10, 92:11, 92:20.
O. JOHN BENISEK, et al. 1:5.
object 55:17.
objection 41:7.
objective 7:2, 12:9.
objectives 10:20.
obligation 10:24.
observation 27:10, 43:3, 43:14.
observed 34:20.
obtain 35:19.
obviate 46:19.
obvious 74:10.
obviously 10:15.
occasionally 91:3.
occasioned 64:15.
occur 91:9.
occurs 74:18.
October 4th 1:21.
offer 11:2, 51:12.
offered 51:11.
Office 3:1, 3:17, 16:1, 24:10,

27:23, 29:10, 41:8, 43:23, 49:3.
Official 1:47, 94:28.
officials 47:4.
offs 18:12.
Okay 14:25, 31:4, 33:8, 35:3, 58:3, 76:11, 77:21, 87:14, 90:14, 94:21.
old 14:8, 28:18, 79:3.
one. 6:11, 29:22, 68:15, 89:17.
ongoing 53:22, 84:13, 91:23, 91:25.
open 3:18, 3:20.
operate 47:15.
opinion 12:17, 15:17, 21:14, 22:6, 22:7, 27:10, 57:21, 58:13, 58:20.
opponent 3:19.
opponents 7:9, 41:23.
opportunity 7:10, 12:22, 16:9, 16:11, 21:19, 26:23, 27:7, 27:17, 28:17, 29:24, 31:1, 39:25, 40:16, 44:5, 47:20, 48:12, 76:9, 76:10.
opposed 4:13, 13:8, 13:16, 55:9, 93:12.
opposite 47:24, 56:11, 90:1.
opposition 3:1.
Option 93:1, 93:2.
options 47:1, 93:10.
orange 88:5.
orchestrate 6:16.

order 4:5, 4:7, 4:12, 4:16, 4:20, 4:22, 5:13, 6:20, 20:11, 39:10, 41:11, 65:3.
ordered 87:2.
organizational 84:14, 92:1.
organizations 15:23, 70:2.
organize 77:6.
organizing 66:19.
origin 72:17.
others 9:20, 48:5.
Otherwise 19:22, 73:23, 90:12, 94:18.
ought 47:15.
ourselves 6:12.
outcome 5:15, 16:10, 21:21, 27:12, 28:13, 82:4, 84:1.
outcomes 21:19, 30:13, 30:16, 30:24, 31:13, 33:15, 35:11.
outsourcing 88:23.
overtly 47:6.
overwater 65:17.
overwhelmingly 24:23, 25:2.
own 8:20, 26:4, 34:15, 35:7, 39:23, 40:13, 40:14, 40:17, 41:3, 41:6, 57:3, 57:13, 61:7, 61:9, 90:15.
.
.
< P >.
packed 56:6, 56:17, 57:23, 59:24.
packing 58:9.
page 23:15, 56:14, 59:23, 64:2.
panel 58:13, 90:5.
papers 2:8, 53:8, 53:17, 94:16.

parallel 15:3, 41:2.
paraphrasing 53:23.
Park 34:7.
part 3:1, 4:21, 12:9, 19:2, 31:5, 33:8, 42:4, 61:12, 61:23, 80:7.
participate 4:11, 17:5, 17:6.
participating 34:25.
participation 15:5, 18:2, 18:5, 21:17, 31:17, 35:2.
particular 13:13, 13:22, 21:3, 22:8, 40:9, 44:12, 57:8, 71:16, 73:13, 82:5, 91:16, 92:13.
parties 4:11, 6:23, 15:22, 16:7, 41:2, 49:5, 52:9, 70:1, 74:1, 87:23, 92:2.
partisan 15:21, 31:5, 31:15, 32:4, 33:25, 34:1, 34:6, 34:13, 35:17, 47:8, 61:6, 62:23, 74:7.
partnership 48:6.
parts 62:19.
party 7:22, 12:2, 13:13, 18:22, 18:24, 19:14, 26:7, 26:9, 31:22, 35:17, 38:20, 42:9, 42:12, 45:25, 51:12, 54:19, 54:20, 70:3, 75:15, 84:14, 86:18.
party-wide 55:10.
pass 6:9.
passed 41:7, 67:1.
past 6:15, 7:22, 19:3, 28:21,

33:17, 34:24,
35:2, 35:17,
48:14, 53:25,
62:15, 78:16,
78:22, 82:23,
83:23, 86:1.
paths 14:3, 14:6.
pattern 13:21.
patterns 35:17,
  44:10.
Paul 1:29.
Paul V. Niemeyer
  1:18.
pen 68:4, 68:11,
  72:21.
people 11:9, 18:3,
  19:2, 25:22,
  31:21, 34:23,
  36:19, 38:19,
  42:13, 48:8, 58:6,
  62:3, 62:16, 63:4,
  64:4, 64:20, 67:2,
  71:9, 71:10,
  71:16, 75:2, 75:3,
  75:4, 75:7, 79:11,
  84:4, 85:1, 85:15,
  89:2, 93:20,
  94:11.
percent 17:10,
  17:13, 17:14,
  17:15, 17:16,
  18:20, 24:23,
  24:24, 25:10,
  25:16, 25:19,
  30:6, 30:12.
percentage 72:19,
  72:23.
percentages 18:8.
perfect 27:11.
perfection 27:13,
  27:18.
perfectly 5:15.
performance 70:8,
  78:16, 78:19.
performed 78:20.
performing 21:7.
perhaps 14:10,
  48:17, 54:9.
period 17:23,
  70:6.

permanent 5:12, 7:4,
  39:2, 52:19, 83:8,
  83:11, 83:22.
permissible 33:5,
  73:7.
permittable 33:5.
Perry 84:17.
person 28:22, 37:25,
  56:8, 74:18, 76:5,
  76:6, 76:7.
personal 48:20.
persons 76:11,
  83:4.
perspective 2:24,
  3:3.
persuaded 44:8.
persuasion 51:15.
persuasive 83:18.
phase 41:23.
picking 70:4.
picks 69:10.
pink 68:15.
place 14:6, 30:5,
  53:10, 53:11,
  85:10, 85:12.
placed 13:11, 44:3,
  69:15.
places 49:17, 61:23,
  90:25.
Plaintiff 1:7, 1:25,
  21:25, 29:3,
  50:18, 53:25,
  54:16, 56:5,
  56:18, 57:9,
  57:16, 61:7,
  65:22, 86:11.
plan 50:7, 51:6.
Planning 94:9.
played. 8:18, 9:2,
  9:16, 10:4, 15:10,
  38:7, 88:20,
  90:3.
playing 28:11,
  34:25, 44:4.
pleading 61:17.
please 2:2, 45:9,
  94:21.
pleased 3:8.
plus 30:18.
point 10:9, 17:19,

20:4, 25:14,
  25:25, 29:18,
  31:8, 38:10,
  40:24, 49:7,
  57:14, 66:19,
  68:1, 68:11,
  71:15, 82:2,
  82:24, 85:13,
  90:24, 93:1.
point. 39:3,
  71:15.
pointed 56:7, 61:1,
  69:24, 83:6,
  91:13.
pointing 60:22.
points 17:11, 30:18,
  53:16, 88:15,
  94:12.
Political 4:10, 6:2,
  9:21, 12:22, 15:5,
  15:22, 16:7, 16:9,
  16:11, 17:20,
  18:2, 21:5, 21:16,
  21:18, 22:8,
  23:11, 26:2,
  27:17, 28:17,
  31:14, 31:16,
  31:22, 32:2, 32:4,
  33:9, 33:12,
  33:15, 33:22,
  34:12, 34:22,
  35:1, 35:2, 36:18,
  44:5, 47:8, 47:23,
  47:25, 49:18,
  59:10, 59:16,
  59:19, 60:7, 70:1,
  71:21, 74:7, 77:9,
  79:15, 84:14.
politically 23:8,
  24:1, 26:9, 33:21,
  33:24, 34:5,
  34:6.
politicians 68:23.
politics 34:14,
  48:8, 62:23.
Polling 85:12,
  90:25.
polls 85:14.
population 62:19,
  63:3, 63:24, 64:6,

64:14, 71:13, 91:4.
populous 69:5.
portion 92:13.
portions 64:1, 69:4.
position 3:1, 10:11, 11:16, 21:12, 22:15, 28:4, 33:11, 46:24, 85:17.
possibilities 20:12.
possibility 3:21, 3:23, 7:5, 54:1, 59:3.
possible 94:9.
potential 87:9.
powers 81:24.
practical 7:25, 12:21, 14:7, 21:13, 21:16, 22:3, 28:15, 32:14, 40:7.
precinct 58:22, 58:23, 94:6.
precincts 79:1, 79:2, 79:7, 79:10, 91:1, 94:5, 94:10.
precipitous 18:9.
precisely 30:24, 89:11.
preconditions 22:19, 22:20.
predictability 25:9, 25:25, 26:24.
predictable 25:22.
predominantly 9:12, 9:13, 88:23.
prefer 23:20, 23:21.
preferences 50:18, 54:8.
preliminary 8:5, 16:19, 24:5, 51:7, 52:20, 53:20, 73:21, 83:5, 83:7.
prepared 12:11,

48:4.
present 3:13, 10:19, 79:24.
presentation 14:14, 88:14, 92:7.
presentations 94:16.
presented 2:21, 32:15, 57:18.
presenting 14:13, 24:6.
presents 9:11.
President 88:25.
presidential 18:19.
press 8:25.
pressed 37:17.
presume 13:20.
presuming 4:23.
pretty 25:20, 27:3, 38:10, 56:2, 57:20, 57:21, 60:22, 64:12, 69:6, 94:1.
prevent 13:12, 34:24.
previously 17:16, 24:22, 71:4.
prima 35:23.
primaries 18:12, 42:7, 51:5, 72:20.
primarily 89:1.
primary 16:24, 17:4, 17:5, 17:11, 72:14, 73:7, 73:8.
principle 12:23.
principles 39:16, 47:14, 75:23.
prints 89:7.
prior 27:16, 59:25, 62:8, 64:9, 71:8.
prisoners 32:11.
probably 5:3, 6:11, 7:7, 7:11, 34:3, 85:1.
problem 25:4, 57:1, 65:5, 77:10.

problematic 44:10.
problems 46:19, 48:25, 49:12.
procedural 50:20, 83:3, 83:18.
proceed 7:16, 55:7, 56:24, 89:10.
Proceedings 1:17, 40:25, 55:19, 94:23, 94:26.
process 3:14, 4:10, 6:5, 6:11, 8:24, 9:21, 10:2, 17:21, 18:2, 26:20, 31:6, 33:9, 34:13, 35:1, 38:18, 46:9, 48:9, 71:21, 85:10, 94:7.
processes 93:14.
produce 73:11.
produced 57:10, 72:17.
production 51:18, 74:3, 86:7.
productive 26:24, 88:8.
proffered 78:1.
profound 70:15.
profoundly 69:9.
project 89:15.
promulgate 4:18.
prong 16:14.
prongs 82:21.
pronouncements 55:8.
proof 10:22, 10:24, 11:1, 11:2, 11:10, 22:20, 37:4, 41:24, 76:13, 76:17, 76:21, 78:1, 78:3, 80:11.
proper 46:5, 57:11, 80:10.
properly 42:6.
Proposal 62:25, 67:25, 68:2, 89:10, 89:11, 89:16.
proposed 59:22,

66:10, 66:17,
68:14, 68:15,
78:19, 89:19.
proposition 24:7,
53:21, 81:7,
81:8.
prospective 53:23,
53:24.
protect 90:11.
protected 8:2.
proud 83:3.
prove 13:2, 13:23,
21:20, 26:15,
28:15, 56:5, 61:7,
75:10.
proved 8:4, 21:4,
21:13, 65:13.
proven 10:9, 21:1.
provide 7:9.
provided 92:23.
proving 44:9.
Public 32:21, 38:16,
38:23, 48:19,
50:7, 66:20,
66:21, 67:11,
82:18, 83:13,
85:8, 85:11, 86:4,
87:4, 94:4.
pulls 14:21.
punish 77:4.
punishing 31:21.
pure 48:8.
purport 79:2.
purposes 13:13,
62:11, 74:7.
pursuit 86:2,
93:20.
push 5:6, 10:16,
10:17, 10:18.
put 12:24, 15:8,
18:22, 19:17,
21:23, 26:5, 36:8,
52:13, 53:2,
58:21, 59:4,
59:10, 66:20,
67:15, 67:23,
74:21, 78:3,
78:18, 81:20,
89:4, 89:7.
puts 35:22.

putting 31:11, 52:9,
77:1.
.
.
< Q >.
quality 16:1.
question 5:17, 5:22,
6:2, 7:1, 7:11,
8:11, 9:11, 10:17,
11:15, 11:21,
12:10, 12:19,
14:11, 14:13,
14:17, 19:15,
19:23, 20:3,
20:25, 21:2, 21:7,
23:14, 23:15,
28:2, 35:4, 35:14,
36:3, 39:4, 40:20,
41:12, 41:16,
63:5, 73:5, 77:17,
88:17, 90:5, 90:6,
91:14, 91:18.
questioned 59:15.
questioning 34:19.
questions 8:10,
10:8, 10:12,
12:12, 15:2,
19:17, 88:13,
90:5, 94:13.
quick 68:1.
quickly 8:7,
88:13.
quite 10:5, 13:4,
37:7, 53:6, 58:18,
59:2, 60:20,
84:8.
quo 85:5.
quote 8:21, 21:9,
22:10, 22:22,
56:7, 76:20.
quoted 53:21.
quoting 15:21,
56:4.
.
.
< R >.
race 50:18.
races 55:2.
racial 78:7, 78:14,
81:17, 81:18.

racially 81:18.
raise 12:4, 15:24,
34:8, 71:20,
82:7.
raised 20:8,
38:19.
raising 7:9, 70:6.
rally 32:21.
range 33:13.
Raskin 79:13.
rather 18:8.
ratifying 48:23.
rational 20:17.
rationale 55:14.
ravaging 42:11,
42:12.
reach 21:3, 47:22.
reached 48:25.
reaching 5:10.
read 2:8, 2:25,
65:9.
ready 2:9, 10:11,
41:6.
real 5:16, 12:21,
14:7, 46:20,
67:11.
reality 64:17,
90:21.
really 10:19, 11:5,
30:4, 32:7, 37:16,
38:17, 58:15,
67:14, 70:1,
80:22, 82:25,
88:8, 88:16,
89:14, 92:24,
93:23, 94:5.
realm 73:23,
77:12.
reason 7:21, 17:18,
37:8, 44:2, 46:3,
60:5, 83:21,
86:24, 90:19.
reasonable 55:5,
65:23.
reasonably 23:2,
64:12, 84:23.
reasons 9:21, 11:13,
16:25, 17:1,
36:11, 36:18,
89:22.

rebuttal 87:16,
  87:22.
rec 73:20.
recall 38:13, 54:19,
  93:6, 93:17,
  93:21.
received 2:7.
receiving 93:6.
recent 80:6.
recess 45:5, 45:7,
  45:8, 88:1.
recipe 31:18.
recognize 6:7,
  80:20.
recognized 16:9.
Recognizing 20:25,
  39:2, 81:5.
recollection
  40:25.
recommended 66:24.
reconsidered
  58:13.
record 8:14, 10:19,
  11:11, 12:5, 13:5,
  19:11, 19:16,
  19:18, 41:18,
  41:22, 42:4, 47:9,
  52:1, 54:10, 56:5,
  62:10, 90:7, 90:9,
  94:16, 94:26.
recruit 12:1,
  16:1.
rectify 53:13.
red 30:5, 30:6,
  88:5.
redistrict 27:23,
  62:18, 85:17,
  90:19.
redistricting 7:23,
  8:15, 8:22, 8:23,
  8:24, 9:1, 9:4,
  10:1, 14:7, 15:11,
  30:9, 31:2, 33:12,
  34:14, 34:21,
  37:20, 37:22,
  38:11, 39:23,
  43:25, 61:14,
  62:17, 70:10,
  71:12, 71:14,
  72:3, 72:10,

73:18, 81:18,
  83:14, 85:14,
  88:17, 90:18,
  90:22, 91:1, 91:3,
  93:14, 94:7.
redo 36:18.
redrawn 60:18,
  94:5.
redress 82:3.
redressed 81:2.
redrew 3:13.
reduced 63:3.
reduction 18:11.
reel 8:9.
refer 61:10.
reference 59:9.
referendum 50:10.
reflect 7:10.
reflected 73:14.
reflective 16:2,
  68:22.
reflects 9:17.
regard 31:9, 80:1.
regardless 77:4.
region 80:3.
register 15:24.
registered 17:6,
  23:17, 23:18,
  23:20, 23:25,
  24:2.
registering 18:3.
registration 17:22,
  17:25, 73:1.
regularity 85:4,
  86:4.
rehabilitate
  88:15.
reintroduced 62:6.
reiterated 72:4.
reject 55:16,
  76:1.
rejected 72:8,
  89:15.
related 19:13,
  21:17, 92:7.
relation 41:25,
  69:14.
relatively 33:4,
  91:4.
relevant 20:3,

44:22, 69:19.
relied 93:8.
relief 31:19, 53:25,
  80:12, 82:2,
  83:23.
relieves 86:11,
  86:17.
reluctant 75:24.
rely 78:21.
relying 93:17.
remain 15:15,
  77:24.
remained 18:17.
remaining 83:16.
remand 51:12.
remanded 55:18,
  58:11.
remedied 62:20.
remedies 86:1.
remedy 39:7, 39:9,
  40:8, 40:21,
  40:22, 53:16,
  57:9, 57:11, 60:3,
  82:11, 84:3,
  84:16, 85:20.
remember 76:3.
remove 62:3.
removed 15:14,
  24:22, 24:25,
  42:23, 62:5,
  62:16, 79:10.
reopen 51:12.
reorient 12:16.
repeatedly 28:21.
repeating 28:20,
  55:24.
replacing 13:25.
reply 93:5.
Report 23:16, 29:12,
  31:14, 59:23,
  61:24, 64:2.
Reporter 1:47,
  56:15, 94:28.
reports 42:17,
  70:5.
represent 79:2.
representations
  45:23, 55:2.
Representative
  79:12, 79:13.

representatives
22:23.
represents 30:25,
47:6.
Republican 9:12,
9:13, 9:18, 16:24,
17:3, 17:22,
17:24, 18:12,
18:13, 18:22,
19:4, 19:5, 23:4,
23:21, 23:25,
24:14, 24:24,
26:8, 28:5, 29:9,
31:16, 34:2, 34:4,
36:7, 42:7, 42:23,
42:25, 43:10,
43:11, 50:9, 63:9,
70:3, 72:22,
72:25, 75:3, 75:4,
75:6, 79:4, 79:10,
90:13.
Republicans 7:21,
11:22, 12:1, 14:8,
15:13, 15:14,
17:4, 17:5, 17:6,
19:20, 23:18,
23:20, 24:2, 24:4,
24:13, 26:18,
28:10, 28:17,
30:18, 30:19,
36:8, 43:7, 43:19,
43:22, 44:24,
62:5, 62:7, 71:19,
71:24, 72:24,
73:13, 74:6,
74:23, 75:13,
75:16, 76:15,
76:25, 77:1, 77:4,
79:6, 80:4,
80:8.
repugnant 47:14.
require 15:7, 39:14,
48:18.
required 9:19.
requirement 20:7,
27:24, 80:2.
requirements 2:21,
6:3.
requires 3:10,
82:19.

requisite 56:4.
requisites 76:4.
resemblance 89:18.
resemble 89:5.
resembles 89:12.
reshuffle 89:23.
reside 43:17.
residency 56:20.
resides 57:9.
resolution 46:25.
resolve 20:13,
48:21, 48:25,
52:8.
resolved 52:8.
resorted 59:16.
respect 10:22,
10:24, 15:4, 32:2,
45:20, 51:23.
respectful 40:15.
respectfully
81:22.
respecting 64:24.
respond 15:1.
response 33:10,
34:18.
responsible 2:19.
rest 39:1.
restroom 87:19.
rests 5:18.
result 5:10, 21:21,
26:13, 27:17,
27:25, 28:14,
29:13, 32:5,
36:10.
resulted 7:23, 22:2,
60:8.
results 25:9, 26:24,
29:16, 29:17,
29:20, 35:19,
37:24, 55:21,
57:8, 62:6, 73:8,
78:22, 78:24,
79:16.
retained 79:1,
79:8.
retaliate 35:25.
retaliation 32:10,
32:12, 32:23,
33:2, 41:25,
70:20.

retaliatory 35:23,
87:1, 87:3.
retirement 50:16.
return 20:2,
65:23.
returns 42:3, 42:5,
42:6, 44:9.
revision 57:12.
Reynolds 93:25.
Ricci 51:15.
Rice 1:35, 45:2,
45:10, 64:17,
83:25, 88:14,
89:3, 89:9, 89:21,
90:22, 91:5,
92:5.
rid 63:9.
rig 15:12, 28:6.
rigged 28:7.
Rigging 28:8.
Rights 11:9, 14:8,
15:22, 21:6, 21:9,
23:17, 28:10,
38:1, 42:1, 44:13,
44:23, 53:10,
56:9, 70:22, 84:3,
84:4, 94:2,
94:3.
rise 53:11.
River 64:10.
road 58:15, 82:4.
Roberts 26:12,
60:21, 60:24.
rock 31:11.
Rockville 59:21,
69:5.
role 40:15, 46:8,
46:10, 46:23,
80:19, 85:9.
room 46:10.
root 33:8.
rooted 71:1.
Roscoe 27:21, 29:9,
54:10, 54:24.
Roughly 17:13,
25:17, 35:19,
38:20.
RPR 1:46, 94:24.
Rucho 55:19, 58:19,
79:23, 79:24.

ruin 75:15.
Rule 52:15.
run 16:1, 16:21.
Ruppersberger
 33:19.
RUSSELL 1:20, 13:1,
 13:6, 13:16,
 13:19, 14:4,
 14:12, 14:18,
 14:23, 15:13,
 18:25, 19:10,
 42:20, 68:4, 68:9,
 68:11, 77:16,
 92:12.
.
.
< S >.
Sarah 1:35.
satisfied 23:3,
 74:22.
satisfy 10:23,
 52:24.
saying 6:9, 13:19,
 21:20, 28:16,
 38:20, 47:17,
 53:15, 56:11,
 58:7, 62:15,
 76:24, 80:24,
 84:9, 86:23.
says 9:11, 32:19,
 48:3, 56:18, 57:5,
 65:10, 74:22,
 76:10, 76:17,
 80:23, 93:6.
scenes 38:18.
score 88:16.
scrap 67:21.
search 30:15.
searched 30:15.
seat 9:5, 55:7.
seated 2:2, 45:9.
seats 49:9.
second 23:6, 37:20,
 52:13, 89:10,
 93:5.
Secretary 88:24.
Section 21:6, 21:9,
 37:25, 78:13,
 78:15.
seek 56:3.

seeking 45:15,
 45:25, 52:18,
 53:23, 55:7,
 83:7.
seeks 56:8.
seem 53:15, 79:17.
seemed 57:20.
seems 10:13, 36:9,
 36:15, 40:14,
 47:11, 48:1,
 56:10, 62:11,
 79:22, 81:2,
 82:10, 84:9.
seen 73:13, 77:24.
segment 91:16.
segue 12:10.
select 17:21,
 43:4.
selecting 17:19.
Senate 88:25.
send 43:4.
sense 37:24, 38:1,
 79:11, 84:8.
sensitive 46:8.
sent 66:24.
separately 40:21.
serious 60:7.
seriously 67:19.
set 26:11, 44:11,
 73:20, 85:12.
setting 41:3.
settle 2:14, 2:16,
 2:25, 45:25,
 47:24, 48:6,
 48:14, 49:5.
settled 84:24.
settlement 2:18,
 3:11, 3:21, 4:1,
 4:3, 5:13, 6:17,
 45:17, 45:20,
 45:23, 48:13,
 48:24.
settles 48:16.
several 26:21.
severe 62:19, 81:17,
 94:1.
shape 64:13, 65:24,
 81:15, 83:1.
shared 6:3.
sharp 79:3.

shed 64:1.
shift 94:6, 94:10,
 94:11.
shifted 30:7.
shifting 35:9,
 86:11, 86:14.
shifts 35:23.
Shore 65:4, 65:6.
short 45:5, 45:7,
 87:21.
shorter 88:12.
shouldn't 82:1.
show 7:18, 7:21,
 7:23, 8:1, 14:7,
 18:3, 21:25,
 22:18, 22:21,
 26:4, 28:12,
 30:11, 32:11,
 32:13, 42:5, 42:6,
 42:14, 42:17,
 52:22, 56:4, 61:4,
 61:9, 66:17, 70:5,
 72:2, 72:4, 73:16,
 86:19, 93:19.
showed 59:3, 78:17,
 86:25, 89:3.
showing 12:6, 17:17,
 17:20, 21:15,
 35:23, 44:21,
 44:22, 59:2,
 59:11, 69:22,
 80:3, 86:14,
 86:18.
showings 22:19.
shown 12:19, 12:21,
 13:3, 13:7, 17:17,
 26:17, 86:17.
shows 18:18, 24:19,
 25:8, 37:18,
 38:17, 57:2,
 76:21, 89:6,
 92:8.
shuffled 89:24.
shuffling 85:15.
side 5:18, 7:8,
 87:21.
sides 47:2, 87:24,
 88:7.
significant 7:24,
 49:17.

similar 23:16.
similarly 3:20,
    92:6.
simple 19:15.
simply 2:25, 19:1,
    26:5, 43:14, 55:7,
    74:6, 87:9.
Sims 93:25.
simultaneously
    47:25, 48:7,
    93:13, 93:15.
single 22:14, 30:16,
    34:23, 56:5,
    59:11.
singled 44:3.
singular 59:8.
sitting 88:25.
situation 85:6.
six 17:13, 18:19.
skip 38:4.
slide 10:23, 14:22,
    66:17.
slides 14:19,
    90:10.
smallest 17:13.
solely 74:7,
    91:10.
solid 31:11.
solution 77:11.
somebody 32:18,
    76:10, 85:18.
somehow 62:20,
    72:14, 72:15,
    74:9.
someone 32:22,
    43:16, 54:24,
    91:11.
sometimes 54:18.
Sorry 14:22, 14:23,
    53:23, 88:18,
    88:19, 90:16.
sort 4:8, 8:8,
    10:23, 16:12,
    20:5, 30:20,
    35:20, 43:16,
    55:14, 85:4.
sorted 42:21.
sorting 19:2.
sorts 16:22, 27:14,
    33:13.

sought 56:5.
Sounds 6:23, 13:14,
    25:18, 60:9.
span 17:8.
spare 9:8.
Speaker 38:5, 90:2,
    93:17.
specific 7:21, 8:6,
    8:9, 33:16, 34:22,
    47:5, 55:20, 57:6,
    69:13, 91:16.
specifically 41:20,
    92:25.
specificity 93:21.
speech 15:9,
    17:19.
spent 52:9.
split 8:21, 43:10,
    61:23.
splits 66:2.
splitting 72:7,
    72:9.
spokesperson 46:9.
spontaneous 4:14.
square 90:21.
stable 91:2, 91:4.
staffer 67:18.
staffers 89:15.
stage 12:7, 61:17,
    61:18.
stand 8:19, 10:11,
    45:19, 56:17.
standard 20:20,
    20:23, 27:13,
    28:12, 29:2,
    32:14, 52:15,
    82:19.
Standing 45:10,
    53:21, 54:1, 55:8,
    55:9, 55:13,
    55:19, 56:12,
    56:24, 56:25,
    57:19, 57:23,
    57:24, 58:6,
    58:14, 58:16,
    58:20, 60:2, 60:3,
    60:6, 60:10,
    60:15, 60:25,
    61:6, 62:11,
    69:19, 69:23,

70:12, 70:15,
    70:16, 70:24,
    72:1, 74:15,
    74:17, 75:1, 75:8,
    75:11, 75:25,
    76:3, 77:19.
start 2:5, 7:19,
    11:14, 50:2, 88:3,
    88:6, 88:9,
    88:13.
started 8:6, 28:25,
    35:8.
starts 40:13.
State 2:6, 3:12,
    3:16, 3:19, 4:4,
    4:17, 5:4, 5:14,
    5:18, 6:3, 19:17,
    19:25, 20:12,
    27:22, 32:1, 32:2,
    32:18, 41:15,
    45:2, 45:19,
    45:24, 46:1, 47:4,
    47:5, 47:16,
    48:16, 49:8,
    49:14, 51:16,
    62:17, 62:20,
    64:11, 65:3, 65:7,
    71:13, 72:10,
    73:25, 77:2,
    78:12, 78:18,
    80:7, 85:1, 86:20,
    87:13, 88:24,
    90:19, 94:8.
stated 28:21,
    67:20.
statement 75:1.
States 1:1, 3:5,
    44:11, 47:18,
    49:12, 49:16.
statewide 57:15,
    57:17, 70:7,
    72:2.
statistical 74:1.
statistically
    61:13.
statisticians
    25:10.
statistics 13:21.
status 85:5.
stay 83:7.

stayed 24:17,
  41:5.
staying 17:17.
steadfast 3:1.
steering 77:10,
  77:16.
Stein 1:28.
stenographic
  94:25.
step 36:10.
steps 48:18.
stipulated 66:23.
stone 70:25.
straight 39:4, 39:5,
  43:1, 43:13,
  60:22, 75:24.
Street 1:48.
strength 71:20,
  79:4, 79:10.
strengths 54:14.
Strine 54:23.
strong 59:2.
stronger 36:12.
strongly 19:9.
student 59:14,
  59:16, 59:17.
studied 2:8.
study 78:9.
stuff 32:12,
  32:23.
subject 24:5, 46:6,
  48:22, 78:5.
submit 8:3, 19:22,
  22:20, 29:11,
  30:23, 76:16,
  83:17.
subsequent 55:6.
Subsequently 51:9.
substantial 88:14.
substitute 86:16.
substitutes 86:13,
  86:14.
succeed 27:21,
  33:23, 52:21.
succeeded 23:5.
success 29:23, 44:2,
  52:22, 52:23.
successfully
  48:24.
successive 81:11,

81:12, 83:14,
  85:13.
succinctly 15:8.
sue 76:7.
suffer 80:21, 83:22,
  84:3.
suffered 80:20.
sufficient 11:11,
  22:21, 31:19,
  52:4, 56:24,
  57:12, 86:8.
sufficiently 7:24,
  22:25, 52:14.
suggest 5:16, 19:22,
  19:25, 24:21,
  30:3, 35:16,
  39:11, 39:24,
  40:19, 46:7,
  90:17.
suggested 10:9,
  26:12, 89:21,
  91:5.
suggesting 24:20,
  58:5, 84:11,
  90:22.
suggestion 3:15,
  17:24, 55:12.
suggestions 5:6.
suggests 90:1.
summary 2:4, 2:6,
  2:7, 19:23, 19:25,
  49:23, 49:24,
  50:2, 51:14,
  51:17, 52:5,
  52:12, 61:16,
  72:17, 87:12,
  92:8, 92:22.
superficial 67:10.
superior 32:18,
  32:22.
supplemental 53:4,
  72:12, 78:2,
  78:25, 93:3.
support 12:2, 15:25,
  18:24, 22:5,
  32:22, 33:2,
  36:16, 42:12,
  42:13, 42:18,
  42:19, 43:19,
  43:22, 44:17.

supported 15:17,
  15:19, 51:24,
  92:17.
supporters 19:4,
  42:25.
supporting 13:13,
  32:22, 36:4,
  92:19.
supports 19:9,
  24:10.
Suppose 11:7, 30:10,
  43:16, 44:7,
  46:11, 56:9.
supposed 25:22,
  38:21.
Supreme 3:5, 10:16,
  15:19, 16:2,
  28:20, 29:19,
  30:25, 31:20,
  32:8, 40:25,
  44:11, 47:13,
  50:22, 52:25,
  55:18, 56:13,
  56:14, 56:23,
  76:8, 78:16,
  79:22, 80:18,
  83:1, 83:5,
  86:24.
surrounding 19:5,
  23:11.
susceptible 85:7.
Susquehanna 64:10.
sustain 81:1.
sustained 11:9,
  33:5.
sweep 49:11.
sweeping 49:16.
swing 25:10, 25:19,
  25:20, 26:4,
  26:25, 30:11,
  30:17, 30:19,
  31:15.
switch 36:6.
system 17:5.
.
.
< T >.
T. 1:46, 94:28.
table 3:3, 34:22,
  48:24.

tabulation 61:22.
taken. 45:8, 88:1.
talked 31:24, 42:11,
  61:12, 70:18,
  76:8.
Talks 62:24, 64:24,
  92:15, 92:20.
tangible 22:2.
tango 5:19.
target 74:23,
  75:13.
targeted 9:7, 9:12,
  22:1, 22:23, 23:8,
  23:10, 26:18,
  28:11.
targeting 27:14.
tasteful 34:16.
tempting 55:14.
ten 85:17, 87:16,
  88:3, 88:10.
tentative 48:21.
term 86:22.
terms 3:22, 25:8,
  25:11, 33:5, 47:1,
  48:7, 53:12,
  58:22, 69:9,
  69:16, 71:7,
  71:21, 74:21,
  79:14, 85:9.
terrible 48:3.
test 60:14.
testified 16:20,
  67:24.
testifying 69:9.
testimonial 90:1.
testimony 16:20,
  44:19, 65:21,
  65:22, 67:15,
  67:18, 69:13,
  73:12, 78:4,
  90:15.
Thanks 14:4.
themselves 11:16,
  25:23, 27:15.
theoretical 41:20.
theory 4:24, 12:16,
  12:23, 13:8,
  13:23, 27:6,
  34:17, 34:20,
  41:5.

They've 43:20,
  43:24, 44:2, 44:3,
  53:1, 69:22,
  70:18, 82:9.
thinking 38:8,
  38:14, 40:7, 40:8,
  48:9.
third 17:16, 23:7,
  35:5, 51:5, 54:9,
  65:25.
thorny 48:25.
though 11:7, 13:6,
  24:21, 55:19,
  67:9, 76:3.
thoughts 45:5,
  48:11, 93:22.
thousand 42:22,
  62:5.
three 7:19, 8:4,
  8:8, 22:18, 22:20,
  53:19, 79:19,
  81:11, 81:12,
  82:20, 83:6,
  94:19.
three. 28:7.
threshold 60:15,
  80:2.
threw 14:23.
Throughout 8:13,
  72:10.
thrown 54:3.
Thursday 1:21.
thwarted 28:11,
  42:24.
ticket 17:2, 88:6.
tie 44:14, 55:23.
timely 37:23.
timing 40:9.
today 94:18.
together 24:1,
  24:11, 31:11,
  43:3, 44:1, 71:19,
  71:20, 74:24,
  87:15, 94:19.
took 23:14, 30:5,
  67:19.
tools 74:1, 74:2.
top 17:2.
total 58:24.
towards 64:13.

traditional 32:9.
Transcript 1:17,
  94:25.
translate 44:7.
treated 29:6.
treatment 44:3.
trends 73:14.
trial 10:10, 19:24,
  20:7, 20:8, 20:15,
  51:25, 52:6.
tried 2:13, 52:3,
  75:25.
Trone 54:9.
trouble 82:8.
True 3:7, 3:8,
  50:24, 57:18,
  71:11, 89:9.
truthfully 17:25.
try 12:15, 27:23,
  33:6, 46:19.
trying 28:6,
  84:10.
turn 7:14, 8:23,
  12:3, 16:24,
  27:16, 39:14.
turnout 16:23, 17:9,
  17:10, 18:8,
  18:12, 19:12,
  19:13, 42:7,
  72:14, 72:18,
  72:22, 73:8,
  73:12.
turns 9:6, 20:13,
  39:18, 88:8.
TV 37:12.
twice 50:23, 83:1.
two 5:19, 9:9,
  11:13, 14:2, 14:5,
  15:3, 16:25, 17:1,
  17:13, 21:15,
  25:11, 27:3,
  31:10, 38:2,
  43:25, 47:24,
  50:16, 56:15,
  70:25, 73:20,
  90:12, 93:9.
type 29:4, 66:25.
typical 39:22,
  78:15, 94:2.
typically 22:18,

26:7.
.
.
< U >.
ultimate 7:2,
  12:18.
Ultimately 11:8,
  14:25, 18:4, 27:9,
  29:16, 48:1, 69:2,
  89:7.
unable 39:18.
unanimous 68:2.
uncertainty 83:19.
unconstitutional
  39:6, 85:19,
  91:15.
understand 12:16,
  12:18, 53:6, 53:7,
  53:17, 60:20,
  61:13, 63:2,
  74:20, 81:25.
understanding
  85:9.
understood 26:15,
  36:24, 37:4, 56:2,
  90:10.
undertake 3:12.
undertaken 81:14.
undertook 29:12.
underway 51:6.
undisputed 20:10.
unequal 44:4.
Unfortunately 3:9.
unilaterally 48:5.
United 1:1, 3:5,
  44:11.
University 34:9,
  34:11.
unlawful 34:17.
Unless 41:15, 88:12,
  90:4, 94:12.
unlike 67:3.
unnecessary 89:21.
unquote 21:10.
unsupported 70:4.
unsurprising
  18:21.
unsurprisingly
  23:19.
until 51:4, 72:17.

unusual 70:7.
unwilling 39:19.
updated 53:3.
.
.
< V >.
v. 53:21, 56:16,
  62:24, 78:12,
  80:17, 83:10,
  84:17, 86:9,
  93:25.
valuable 29:7.
value 61:7, 62:9,
  62:12, 85:4.
Van 79:12.
various 80:2.
version 67:21.
versus 2:3, 16:7,
  29:18, 71:8.
via 4:1.
viability 45:20,
  45:23.
Video 8:18, 9:2,
  9:9, 9:16, 10:4,
  15:10, 38:7,
  88:20, 90:3,
  92:10.
view 3:24, 33:13,
  41:20.
views 87:23.
violated 6:5.
violation 21:8,
  53:13, 82:2, 82:7,
  84:12, 90:20,
  94:1.
violations 36:21.
virtue 7:8, 31:21.
vis-a-vis 4:3,
  58:12.
visual 68:5.
voices 15:15,
  19:6.
voided 16:15.
voluntarily 6:16.
volunteers 15:25.
voted 24:22, 25:2,
  33:17, 34:24,
  54:20, 58:23,
  60:12, 60:17,
  60:18, 67:1,

72:24.
voter 10:23, 13:2,
  16:23, 18:8,
  18:12, 23:16,
  23:23, 26:13,
  26:22, 27:7,
  31:24, 42:7, 57:2,
  57:7.
Voters 13:10, 13:20,
  13:25, 15:24,
  17:3, 17:16, 19:5,
  22:23, 23:4,
  23:24, 24:9,
  24:19, 24:20,
  26:7, 29:9, 33:5,
  33:16, 42:21,
  42:23, 50:10,
  54:13, 55:1,
  60:16, 64:6,
  76:14, 84:24,
  89:24, 90:23.
votes 22:1, 22:13,
  24:4, 26:18,
  28:22, 32:5, 57:6,
  59:5, 60:4,
  91:11.
Voting 7:22, 13:21,
  13:22, 21:5, 21:9,
  24:16, 26:1,
  26:23, 28:10,
  30:16, 35:17,
  38:1, 44:7, 44:10,
  44:12, 44:14,
  54:4, 54:17,
  54:23, 61:22,
  71:22, 76:9,
  78:10, 78:17,
  78:21, 79:4, 79:5,
  79:10, 85:12.
vs 1:8.
.
.
< W >.
W. 1:35, 1:48.
waited 83:6.
wanted 20:20, 27:1,
  33:19, 34:7,
  36:18, 37:9,
  37:22, 37:24,
  43:4, 65:7.

warrant 31:19.
Washington 17:8,
  18:14, 18:15,
  72:25.
waste 40:4.
ways 6:22, 21:15,
  31:16, 48:23.
weather 19:12.
Webb 1:30.
website 66:20.
weight 22:10, 29:7,
  61:3.
weighted 29:4,
  29:6.
Weissmann 67:18,
  67:24, 92:21,
  93:6.
well-developed
  58:21.
well-served 85:8.
western 65:4,
  65:25.
westward 64:13.
whatever 10:17,
  10:24.
Whereas 36:11,
  36:17, 43:3,
  43:25.
whether 5:22, 9:11,
  12:19, 12:21,
  16:5, 16:8, 21:7,
  26:23, 34:16,
  35:8, 35:10,
  35:14, 38:22,
  54:8, 57:24,
  59:19, 60:10,
  60:13, 61:13,
  61:22, 62:10,
  69:16, 69:22,
  76:5, 91:14,
  91:18, 94:5.
whirry 50:20.
White 80:17, 81:4,
  83:10.
Whitfield 1:29.
Whitford 15:18,
  22:6, 56:16.
whole 15:7, 45:10.
whom 23:9, 71:4.
wide 55:25, 65:17.

wider 47:10.
Will 23:11, 23:23,
  24:1, 28:11, 31:3,
  43:22, 48:4,
  48:10, 49:1,
  51:25, 82:3,
  85:11, 85:17,
  92:6, 94:21.
willing 6:24,
  45:24.
willingness 2:25,
  48:14, 49:6.
Willis 88:24.
win 11:22, 26:15,
  27:24, 57:24,
  63:10.
window 38:17.
winning 13:16,
  13:17.
wins 11:24.
Wisconsin 40:19,
  47:22, 48:6, 49:7,
  49:12.
wisdom 47:11,
  51:3.
wish 49:25.
wishes 67:13.
withheld 83:23.
within 31:2, 47:5,
  84:14.
Without 29:21,
  29:22, 35:24,
  41:7, 55:7, 59:9,
  71:13, 78:4,
  85:3.
witness 38:10.
won 25:15, 26:17,
  27:21, 28:5.
wonder 87:19.
wondering 26:23.
word 71:2.
words 4:10, 6:2,
  19:11, 26:16,
  26:21, 36:4,
  42:13, 64:19,
  77:1, 79:5,
  80:25.
work 5:2, 43:3,
  43:19, 43:22,
  46:16, 47:15,

49:4, 74:24.
worked 41:3, 42:12,
  44:1.
working 88:9,
  89:15.
Works 8:1, 48:19,
  94:8.
world 47:10, 54:4.
worth 28:23, 69:21,
  77:25.
write 54:10, 68:9,
  68:10.
.
.
< Y >.
year 27:2, 48:17,
  73:1, 73:8.
years 16:25, 17:1,
  18:18, 18:19,
  27:3, 72:14, 83:6,
  85:17.
yield 46:13,
  70:24.
yielded 6:5.