IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| O. JOHN BENISEK, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.  1:13-cv-03233-JKB |
| | * | |
| LINDA H. LAMONE, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

---

COMMON CAUSE; THE BRENNAN CENTER
FOR JUSTICE AT N.Y.U. SCHOOL OF
LAW; THE CAMPAIGN LEGAL CENTER, INC.,

     Amici Supporting Plaintiffs.

---

MEMORANDUM OPINION

Argued:  October 4, 2018                          Decided:  November 7, 2018

Michael B. Kimberly, Paul W. Hughes, Stephen M. Medlock, E. Brantley Webb, and Micah D. Stein, MAYER BROWN LLP, Washington, D.C., for Plaintiffs.

Sarah W. Rice, Jennifer L. Katz, and Andrea W. Trento, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Defendants.

Benjamin W. Thorpe, Emmet J. Bondurant, BONDURANT MIXSON AND ELMORE LLP, Atlanta, Georgia, Gregory L. Diskant, PATTERSON BELKNAP WEBB AND TYLER LLP, New York, New York, and Michael A. Pretl, Riverton, Maryland, for Amicus Common Cause.  Charles E. Davidow, Washington, D.C., Pietro Signoracci, Robert A. Atkins, New York, New York, PAUL WEISS RIFKIND WHARTON AND GARRISON LLP, and Michael Li, Thomas P. Wolf, New York, New York, for Amicus The Brennan Center for Justice at N.Y.U. School of Law.  Paul March Smith, Washington, D.C., for Amicus The Campaign Legal Center, Inc.

Before NIEMEYER, Circuit Judge; BREDAR, Chief District Judge; and RUSSELL, District Judge.

Judge Niemeyer wrote the opinion, in which Judge Russell joined.  Chief Judge Bredar wrote a separate opinion, in which Judge Russell joined, concurring in the judgment. Judge Russell wrote a separate opinion, concurring.

NIEMEYER, Circuit Judge:

The plaintiffs in this action — seven registered Republican voters who lived in Maryland's Sixth Congressional District prior to the State's enactment of its 2011 congressional redistricting law — challenge the constitutionality of that law and, specifically, the way the State redrew the boundaries of the Sixth District. *See* Md. Code Ann., Elec. Law § 8-701 *et seq.* They contend that in enacting the law, State officials specifically intended to burden Republicans with the overarching goal of achieving a state delegation to the U.S. House of Representatives of seven Democrats and one Republican, as distinct from the previous six Democrats and two Republicans. To do so, the officials targeted Republican voters in the Sixth District by, on net, removing roughly 66,000 of them from the district and adding some 24,000 Democratic voters, thereby effecting a swing of about 90,000 voters and bringing about the single greatest alteration of voter makeup in any district in the Nation following the 2010 census. The plaintiffs point out that before the redistricting, experts regarded the Sixth District as "Solid Republican" and after redistricting, as "Likely Democratic." Based on these factual allegations, the plaintiffs argue that in enacting the 2011 law, the State deliberately diluted their votes and burdened their associational interests based on their party affiliation and voting history, in violation of their First Amendment rights.

The parties have conducted and completed extensive discovery, and neither the plaintiffs nor the State has requested any more. Moreover, no party disputes the material facts in the record, although the parties do dispute the legal consequences that flow from

them.  Following discovery, the plaintiffs filed a motion for summary judgment, and the State filed a cross-motion for summary judgment.

This court conducted a lengthy hearing on the cross-motions for summary judgment on October 4, 2018, and now, for the reasons given herein, the court grants the plaintiffs' motion and denies the State's motion.  The record shows that:

- The State specifically targeted voters in the Sixth Congressional District who were registered as Republicans and who had historically voted for Republican candidates.

- The State specifically intended to diminish the value of those targeted citizens' votes by removing a substantial number of them from the Sixth District and replacing them with Democratic voters for the purpose of denying, as a practical matter, the targeted voters the opportunity to elect the candidate of their choice.

- The State gave effect to its intent by, on net, removing about 66,000 Republican voters from the Sixth District and adding 24,000 Democratic voters in their place.

- The State meaningfully burdened the targeted Republican voters' representational rights by substantially diminishing their ability to elect their candidate of choice.

- The State also burdened the Republican voters' right of association, as demonstrated by voter confusion, diminished participation in Republican

organizational efforts in the Sixth District, and diminished Republican participation in voting, as well as decreased Republican fundraising.

- These injuries were the direct result of the State's purpose to convert the Sixth District from a solid Republican district to a Democratic district.

We thus conclude that the plaintiffs have sufficiently demonstrated that Maryland's 2011 redistricting law violates the First Amendment by burdening both the plaintiffs' representational rights and associational rights based on their party affiliation and voting history.  Because the plaintiffs also satisfy the requirements for injunctive relief, we enter a judgment permanently enjoining the State from using the 2011 congressional redistricting plan after the 2018 congressional election and requiring it promptly to adopt a new plan in conformance with this Memorandum Opinion for use in the 2020 congressional elections.

## I.  FACTS OF RECORD

### A

The facts of record are not disputed.  Following the 2010 decennial census, the State of Maryland redrew the lines of its 8 congressional districts and its 47 state legislative districts, as required to equalize the population in each district.  In particular, the census showed that the Sixth Congressional District had grown somewhat since the prior census, having 10,186 more residents than the ideal adjusted population of 721,529 for a Maryland congressional district, a variation of 1.4%.  Joint Stipulations ¶¶ 9, 52 (ECF No. 104).  Thus, Maryland was required to remove a net of 10,186 residents from

the Sixth District to achieve the required equal population for the District.  With such a modest adjustment, however, the Sixth District would have remained a solid Republican district, which, together with the First District on the Eastern Shore of Maryland, would have given Maryland two reliably Republican districts.

Since 1966, the Sixth District had always been configured to include all of Maryland's five most northwestern counties — Garrett, Allegany, Washington, Frederick, and Carroll Counties.  *See* Expert Report of John T. Willis at 9 & app. A, maps 11–15 (ECF No. 186-17).  After the 2002 redistricting, the District included this identifiable core of five counties, as well as a small pocket of northern Montgomery County and larger portions of Baltimore and Harford Counties, shown as follows:



At the time of the 2010 congressional election — the last held prior to the 2011 redistricting — 47% of the Sixth District's approximately 446,000 registered voters were registered as Republicans, 36% were registered as Democrats, and 16% were registered as Unaffiliated, making the District the most Republican in the State.  Joint Stipulations ¶ 10 & Ex. 2 at 2.   Representative Roscoe Bartlett, a Republican, had continuously represented the District since 1993, and he won reelection in 2010 by a margin of 28%. *Id*. ¶ 8.

In creating the 2011 redistricting plan, the Democratic officials responsible for the plan redrew the Sixth District's boundaries far more dramatically than was necessary to remove 10,186 residents from the District.   Under their plan, the Sixth District retained only one-half of its original population (specifically, the residents of Garrett, Allegany, and Washington Counties, as well as roughly half the population of Frederick County). The other half of the former Sixth District's population — roughly 360,000 residents — was moved to other districts.   Approximately 60% of those removed — those from Frederick County and more than half the population of Carroll County — were shifted into the Eighth Congressional District, which had previously been confined almost entirely to Montgomery County.   In place of those residents, the plan added to the new Sixth District approximately 350,000 residents from Montgomery County — the majority of whom had previously been assigned to the Eighth District.   The exchange thus involved over 700,000 residents.   The final 2011 redistricting map for the Sixth District is shown as follows:



The new Eighth District is shown as follows:



Finally, the map as a whole is shown as follows:



The registered voters removed from the former Sixth District were predominately Republican, while those added were predominately Democratic. Specifically, in the precincts removed from the Sixth District, there were on average approximately 1.5 times as many registered Republicans as Democrats. By contrast, in the precincts added to Sixth District, registered Democrats outnumbered Republicans by more than 2 to 1. In total, the reshuffling of the Sixth District's voters resulted in a net reduction of roughly 66,000 registered Republicans and a net increase of some 24,000 registered Democrats, for a swing of about 90,000 voters. *See* Opening Expert Report of Prof. Michael P. McDonald at 5, 11–12 (ECF No. 177-19); Opening Expert Report of Dr. Peter A. Morrison ¶ 134 & tbl. 1 (ECF No. 177-35). Thus, of the new Sixth District's roughly

437,000 registered voters, 33% were registered as Republicans, 44% were registered as Democrats, and 22% were registered as Unaffiliated. Joint Stipulations ¶ 53 & Ex. 19 at 2. And, in the new Sixth District, Democratic candidate John Delaney defeated Republican incumbent Bartlett by a 21% margin in the 2012 election. *Id.* ¶ 54. Delaney was narrowly reelected in 2014 with a margin of 1.5% but then won the 2016 election by a margin of 14%. *Id.* ¶ 55–56.

The Eighth District, to which the State had shifted the bulk of the Sixth District's removed voters, continued to be a reliable seat for Democrats. Prior to redistricting, registered Democratic voters outnumbered registered Republican voters in the Eighth District by almost 3 to 1 — 58% were Democrats, 20% were Republicans, and 21% were Unaffiliated. Joint Stipulations Ex. 2 at 2. After the redistricting, 51% of the registered voters were Democrats, 27% were Republicans, and 21% were Unaffiliated. *Id.* Ex. 19 at 2. Thus, even though the number of registered Republicans in the Eighth District rose significantly after the transfer of Republicans from the Sixth District, registered Democrats still outnumbered registered Republicans by nearly 2 to 1.

The record shows that this readjustment of the voter composition of the Sixth District was specifically intended by Maryland Governor Martin O'Malley, a Democrat; by the Maryland General Assembly, controlled by Democrats; and by the Democratic members of Maryland's congressional delegation to achieve a 7 to 1 Democratic majority in Maryland's delegation to the U.S. House of Representatives.

As was the custom — and indeed the procedure specified by state law for redrawing state legislative districts — Governor O'Malley took responsibility for creating

10

the 2011 congressional redistricting plan and submitting it to the General Assembly as a joint resolution for adoption.  *See* O'Malley Dep. 8, 10–11 (ECF No. 177–3).  He testified explicitly that he wanted to use the redistricting process to change the overall composition of Maryland's congressional delegation to 7 Democrats and 1 Republican by flipping either the First District on the Eastern Shore of Maryland or the Sixth District in western Maryland.  *See, e.g.*, *id*. at 22–28.  He confirmed that he "set out to draw the borders in a way that was favorable to the Democratic party."  *Id*. at 9–10.  As he stated:

> [T]hose of us in leadership positions in our party, the Speaker, the Senate President, the Democratic Dean of the Delegation, myself, Lieutenant Governor, we all understood that, while our — while we must fulfill our responsibility on redistricting, must be mindful of constitutional guidelines, restrictions, case law, statutes, it was also — part of our intent was to create a map that was more favorable for Democrats over the next ten years and not less favorable to them.  Yes, that was clearly one of our many [goals].

*Id*. at 81.  After brief consideration, Governor O'Malley rejected the notion of flipping the First District because the resulting district would have to jump across the Chesapeake Bay.  *Id*. at 24–27.  Consequently, "*a decision was made to go for the Sixth*."  *Id*. at 27 (emphasis added).

To carry out the process, Governor O'Malley appointed the Governor's Redistricting Advisory Committee as the public face of his effort, directing it to hold public hearings and recommend a redistricting plan.  But at the same time, he "asked Congressman [Steny] Hoyer, as the dean of the [U.S.] House delegation," to "lead the effort . . . to inform the [Advisory Committee] about congressional redistricting" and "come up with a map that a majority of the congressional delegation supports."  O'Malley Dep. 47–48; *see also* Willis Dep. 185–88 (ECF No. 177-14).  And the record

11

shows that the work produced under the direction of the Democratic members of Maryland's congressional delegation — including data reflecting how citizens in discrete areas of the State had voted in the past — played a central role in shaping the new Sixth District. *See, e.g.*, Miller Dep. 97 (ECF No. 177-15) (testifying that the map "primarily was drawn by the congressional people").

Thus, while the Advisory Committee was holding public hearings across the State — indeed, even before it began — the Democratic members of Maryland's congressional delegation, led by Representative Hoyer, who has described himself as a "serial gerrymanderer," ECF No. 191-3, began their work to redraw the State's congressional map. Hoyer and other members of the delegation retained NCEC Services, Inc., a political consulting firm that provides "electoral analysis, campaign strategy, political targeting, and GIS [geographic information system] services" to Democratic organizations. ECF No. 177-17; *see also* Hawkins Dep. 28–36 (ECF No. 177-4); ECF No. 177-18. NCEC was specifically charged with drawing a map that maximized "incumbent protection" for Democrats and that changed the congressional delegation from 6 Democrats and 2 Republicans to 7 Democrats and 1 Republican. It was given no additional instruction as to how to draw the map. Hawkins Dep. 40–42, 47–49.

The primary NCEC analyst assigned to the task, Eric Hawkins, analyzed various congressional redistricting plans to inform the Democratic members of the Maryland congressional delegation of how different options would change their districts, and he personally prepared between 10 and 20 different draft congressional maps using a GIS computer software program called Maptitude for Redistricting. Hawkins Dep. 36–38.

12

Maptitude allows users to "[c]reate districts using any level of geography," "[a]dd political data and election results," and "[u]pdate historic election results to new political boundaries." Joint Stipulations ¶ 28. With Maptitude, "data reflecting . . . citizens' political party affiliations and voting histories[] can be used to determine how the outcome of historical elections would have changed . . . if the proposed plan had been in place in prior years," *id.* ¶ 30, thus enabling users to predict accurately the likely outcome of future elections.

Hawkins specifically used a proprietary metric created by NCEC called the Democratic Performance Index ("DPI"), which measures how a generic Democratic candidate would likely perform in a particular district. *See* Hawkins Dep. 24, 110. As Hawkins explained, the DPI considers how "statewide candidates perform over time in competitive elections," is "weighted differently for different election years," and "take[s] into account past voting history in a state or a district." *Id.* at 24. The DPI thus "indicate[s] competitiveness or lack thereof" for Democratic candidates and is based on the principle that "observed party performance correlates with future party performance more strongly than any other single measure." ECF No. 191-7 at 1. It has proven quite predictive in practice. For example, in the 2016 congressional election, U.S. House Democratic candidates almost never won districts with a DPI below 50%, but won 92.5% of districts where the DPI was above 50%. *Id.* at 2. NCEC also calculates separate versions of the DPI specific to federal and state races — with the federal DPI "only us[ing] federal races" and the state DPI "only us[ing] state races" — to better account for "ticket splitting." Hawkins Dep. 25–26.

13

Hawkins testified that he used the DPI to meet the dual "goals" given to NCEC —
namely, to draw a map that would maximize "incumbent protection" for the Democrats
currently representing Maryland districts in Congress and that would "chang[e] the make-
up of Maryland's U.S. House delegation from six Democrats and two Republicans to
seven Democrats and one Republican."   Hawkins Dep. 40–42; *see also id.* at 47–49.
With respect to this 7-1 goal, Hawkins' efforts focused on redrawing the Sixth District's
lines to increase its federal DPI, *id.* at 102–03, which Hawkins calculated under the
preexisting map as standing at 37.4%, indicating low Democratic performance and
correspondingly strong Republican performance, *id.* at 88.   Over the course of working
with Maryland's Democratic congressional representatives and their staff, Hawkins
prepared several different maps under which the Sixth District would have had at least a
51% federal DPI.  *See, e.g.*, *id.* at 97, 157–61.   In preparing these draft maps, Hawkins
considered neither "any measure of compactness," *id.* at 126, nor whether "there was a
community of interest related to the I-270 corridor," *id.* at 128.   Rather, "[t]he intent was
to see if there was a way to get another Democratic district in the state."  *Id.* at 230.

While maps were also proposed during this period by third-party entities, they
resulted in a far lower federal DPI for the Sixth District and were not used further.   For
example, a map proposed by the Maryland Legislative Black Caucus would have resulted
in a federal DPI of 39% for the Sixth District and DPIs below 50% for 2 other districts,
ECF No. 177-34, a proposal a senior congressional staffer worried would be "a recipe for
5–3, not 7–1," ECF No. 177-36.

Ultimately, the Democratic members of Maryland's congressional delegation proposed and forwarded to the state Democratic leadership at least one map prepared by Hawkins.  *See, e.g.*, Weissmann Decl. ¶ 8 (ECF No. 186-11).  Hawkins also traveled to Annapolis to brief a number of state legislative staffers on the proposal, *see* Hawkins Dep. 170–75, and assisted at least some of these staffers as they continued working on the congressional map, *see, e.g.*, ECF No. 191-6.

The record reflects that a group of staffers to the State's most senior Democratic leaders, including the Governor, was "tasked with developing a plan . . . that would be acceptable to the [Governor's Redistricting Advisory Committee]."  Weissmann Decl. ¶ 9; *see also id.* ¶ 7.  Significantly, these senior staffers were given a data file containing NCEC's proprietary DPI information for Maryland at the precinct level — the smallest geographic unit in Maryland (averaging around 3,000 people) at which election results are reported.  *See id.* ¶¶ 4–5.  This data file was loaded onto a laptop used by the staffers to generate maps, and this laptop also contained the Maptitude software and "party registration data and voter turnout data," including data at the census-block level — the smallest geographic unit used by the U.S. Census Bureau.  *Id.* ¶¶ 3–5.  State Democratic officials, through their staffers, thus continued to use the DPI — as well as other information about how local groups of citizens had previously voted and the political party with which they were affiliated — to finalize a map for the Advisory Committee and ultimately the Governor.

One of the staffers involved in this process testified that after the group received a draft map that had been proposed by Maryland's congressional delegation, the group

made a series of changes to the map — chiefly, keeping Washington County intact in the Sixth District; keeping the City of Frederick, but not its suburbs, intact in the Sixth District; connecting the City of Frederick with a swath of Montgomery County by orienting the Sixth District around the I-270 highway; and making adjustments so that the Eighth District no longer went into Prince George's County and the Fourth District no longer went into Montgomery County.  Weissmann Decl. ¶ 9.  While the staffer did not give testimony about whether the group aimed to carry out the Governor's goal of creating a 7-1 map, he did acknowledge that the group briefly considered creating a map such that "eight Democratic and zero Republican congressional representatives could be elected" from Maryland.  *Id.* ¶ 12.

Governor O'Malley appointed the Governor's Redistricting Advisory Committee as the public face of his mapdrawing efforts.  He charged the committee with holding public hearings around the State and recommending two redistricting plans for his consideration — one for the State's 8 congressional districts and the other for its 47 legislative districts.  Joint Stipulations ¶ 18.  The Governor selected Jeanne D. Hitchcock — a Democrat with no prior redistricting experience, who was then the Appointments Secretary in the Governor's Office, *see* Hitchcock Dep. 45–46 (ECF No. 177-8) — to chair the Committee, and he appointed four other individuals to be members of the Committee: state Senate President Thomas V. Mike Miller, Jr.; state House of Delegates Speaker Michael E. Busch; Richard Stewart, a businessman who had chaired the Governor's reelection campaign in Prince George's County; and James J. King, a

businessman from Anne Arundel County who had previously served in the House of Delegates and who was the Committee's sole Republican.  Joint Stipulations ¶¶ 19–20.

The Advisory Committee held 12 public hearings across the State from July through September 2011 and received approximately 350 comments from members of the public.  Joint Stipulations ¶ 22.  At hearings conducted in western Maryland, residents provided suggestions regarding potential changes to the shape of the Sixth District. Several of these residents testified about various connections between Frederick and Montgomery Counties — including Interstate 270 ("I-270"), a 35-mile highway running between the City of Frederick and southern Montgomery County — and advocated for replacing the part of the Sixth District stretching east into Baltimore and Harford Counties, and perhaps even some or all of Carroll County, with territory from Montgomery County.  But none of the speakers contemplated a map that would remove from the Sixth District much of Frederick County *itself*, which had been included in its entirety in the Sixth District since 1872.  *See, e.g.*, Public Hearing Testimony (ECF No. 186-3) at MCM 000029–31 ("[T]he start of the Sixth District is pretty easy, with Garrett, Allegany, Washington, and Frederick, you've got a nucleus there . . . . [O]nce you start with those four counties, . . . your orientation should be to go east into either Howard, or go southeast into Montgomery Counties, to the greatest extent possible, and . . . leave Harford, Baltimore, and even portions of Carroll for a Baltimore-oriented district"); *id.* at MCM000038 ("[B]oth in terms of making it viable for someone to reach the voters, and in terms of better representing the population, it would make more sense to re-orient the district to include more of Montgomery County and less — and none of Harford and

17

Baltimore and less of Carroll, as you put those communities in with the Baltimore County area that they are naturally a part of"); *id.* at MCM 000048 ("Frederick County and the counties west of Frederick have more in common with Montgomery County than they do with Carroll, Baltimore, or Harford").

The Advisory Committee released its proposed congressional redistricting plan to the public on October 4, 2011, with the Committee's lone Republican casting the sole vote against the plan. Joint Stipulations ¶ 32. The Committee's map had a federal DPI of 53% in the Sixth District, which was greeted as "good news" by the man who was widely expected to be the Democratic nominee to represent the newly redrawn District in the upcoming 2012 election. ECF No. 177-25; *see also* Garagiola Dep. 27 (ECF No. 177-24) (agreeing that, in his mind, "one of the purposes[] [was] to make the Sixth Congressional District have [a] 53 percent Democratic performance"). As he succinctly explained at the time, the Advisory Committee's proposed Sixth District would include "[a]ll of Washington, Alleg[a]ny, and Garrett [Counties]"; "southern Frederick [County] and the City of Frederick"; and then "about 40% of Montgomery County, including northern and western parts," while "[t]he rest of Frederick would be in [the Eighth] district." ECF No. 177-25.

Members and staff of the Advisory Committee briefed a joint session of the state House and Senate Democratic Caucuses about their recommended congressional plan on October 3, 2011. Joint Stipulations ¶ 35. Talking points prepared for Senate President Miller's introductory remarks encouraged him to emphasize that "[e]ven though the map isn't pretty, it accomplishes a few important goals," including "creat[ing] an opportunity

for Montgomery County to control two congressional districts"; "preserv[ing] all six incumbent Democrats in 'safe' districts," none of which would have "less than 58% Democratic performance"; and "giv[ing] Democrats a real opportunity to pick up a seventh seat in the delegation by targeting Roscoe Bartlett."   ECF No. 177-23.   The talking points continued, "In the face of Republican gains in redistricting in other states around the nation, we have a serious obligation to create this opportunity."   *Id.*

Following Senate President Miller's remarks, Chairwoman Jeanne Hitchcock delivered a PowerPoint presentation that stated that the Sixth and Eighth Districts had been "[c]onfigured to reflect the North-South connections between Montgomery County, the I-270 Corridor, and western portions of the State."   Joint Stipulations, Ex. 6.   The record suggests that those in attendance were skeptical that the I-270 corridor justified dramatically redrawing both the Sixth and the Eighth Districts.   For example, immediately after Hitchcock's presentation, Democratic Delegate Curt Anderson told a reporter, "It reminded me of a weather woman standing in front of the map saying, 'Here comes a cold front,' and in this case the cold front is going to be hitting Roscoe Bartlett pretty hard."   Joint Stipulations ¶ 46.   And, while listening to Hitchcock give a similar presentation earlier in the day, one senior congressional aide who had been intimately involved in the redistricting process wrote to another, "This is painful to watch. . . . I'm not sure I buy the themes they are selling.   Hopefully they have some better ones for the public face of it."   ECF No. 177-58.

On October 15, 2011, Governor O'Malley announced that he was submitting a map to the General Assembly that was substantially the same as the Advisory

Committee's proposal, Joint Stipulations ¶ 33, and two days later, on October 17, Senate President Miller introduced the Governor's proposed redistricting map as Senate Bill 1 at a special legislative session.  With only minor technical amendments, Senate Bill 1 was signed into law on October 20, 2011, three days after it had been introduced.  *Id.* ¶ 34; *see* Md. Code Ann., Elec. Law §§ 8-701–8-709.   In the 2012 general election, Maryland voters were asked whether they were "for" or "against" the law that "[e]stablishes the boundaries for the State's eight United States Congressional Districts based on recent census figures, as required by the United States Constitution," and 64% of voters who responded to that question voted in favor of the law.  Joint Stipulations ¶ 39.

"No Republican Senator or Delegate voted for Senate Bill 1 in committee or on the floor in recorded roll call votes."   Joint Stipulations ¶ 36.   Moreover, while the legislation was progressing rapidly through the General Assembly, numerous legislators made comments reflecting their clear understanding that the massive redrawing of the Sixth District was designed primarily to give the eventual Democratic nominee a distinct electoral advantage over the Republican nominee.  For example, one Delegate bluntly stated in a floor speech that he supported the map because it meant "more Democrats in the House of Representatives."  *Id.* ¶ 44.   Another Delegate stated in an October 17 interview that, "What we're doing is we are trying to get more, in terms of — currently we have two Republican districts and six Democratic Congressional districts and we're going to try to move that down to seven and one, with the additional Congressional district coming more out of Montgomery county and going into western Maryland that would give the Democrats more."  *Id.* ¶ 47.   One Democratic Senator who voted for the

bill nonetheless lamented in a floor speech that partisan gerrymandering was a problem across America, adding that "it's a process where we dress up partisan and political ambition on both sides of the aisle in high principle, *but we can all tell what's really going on*." Joint Stipulations ¶ 43(a) (emphasis added). And the only Democratic Senator to vote against the bill stated in an October 14 interview, "[W]hen you look at the way these districts are drawn, they're absolutely drawn with one thing in mind. . . . *[I]t's certainly drawn so that you can minimize the voice of the Republicans*." ECF No. 177-41 at 16 (emphasis added).

The result of the wholesale recomposition of the Sixth District was precisely as intended and predicted. In October 2012, the Cook Political Report released an analysis of "all 435 newly redrawn Congressional districts in the country" using its Partisan Voter Index ("Cook PVI"), ECF No. 177-52 at 1, a well-respected "measurement of how strongly a United States congressional district or state leans toward the Democratic or Republican Party, compared to the nation as a whole," ECF No. 177-51; *see also* Lichtman Dep. 131 (ECF No. 177-49) (testimony of State's expert witness that the Cook PVI is a "well respected" and "well regarded" metric). Specifically, a Cook PVI of D+2 means that in the last two presidential elections, "that district performed an average of two points more Democratic than the nation did as a whole." ECF No. 177-52 at 9. In addition to calculating PVIs, the Cook Report also assigns each congressional district a label based on its assessment of the political parties' electoral prospects.

Using these metrics, the Cook Report examined "which districts underwent the most dramatic alterations in redistricting" following the 2010 census and found that

Maryland's Sixth District experienced the single largest swing of any district in the Nation.  ECF No. 177-52 at 6–8.  Specifically, before the 2011 redistricting, the Sixth District had a Cook PVI of "R+13" and a "Solid Republican" label; after redistricting, the District received a Cook PVI of "D+2" and a "Likely Democratic" label.  *Id.* at 8.  An academic analysis that looked at the accuracy of the Cook Report's forecasting over the course of 11 congressional elections helps unpack the significance of this swing.  When the Cook Report has rated a district "Solid Republican" on the eve of a congressional election, the Republican candidate has won the race 99.7% of the time; what is more, when a district has been rated as "Likely Democratic," the Democratic candidate has won 94% of the time.  *See* James E. Campbell, *The Seats in Trouble Forecast of the 2010 Elections to the U.S. House*, 43 Pol. Sci. & Politics 627, 628 (2010) (ECF No. 191-8).

Moreover, the Cook Report's analysis of the effect of redistricting on the Sixth District was consistent with NCEC's own DPI data.  According to NCEC, in the 2016 congressional election cycle, "Democrats [nationwide] won only four districts where DPI was below 50 percent"; in none of those districts was the DPI below 40%, as it was in the Sixth District prior to redistricting.  ECF No. 191-7 at 1–2.  Conversely, among the 160 districts across the country with a DPI above 50%, all but 12 were won by the Democratic candidate.  *See id.*  Thus, given that the new Sixth District's DPI was 53%, NCEC's data, like Cook's, confirmed that the Democrats held a clear electoral advantage in the District as a result of its redistricting.

The record demonstrates further that, in addition to the reduced opportunity to elect a candidate of their choice, the plaintiffs and other active members of Maryland's

Republican Party faced new difficulties in their organizational efforts as a result of the redistricting.  For example, Plaintiff Sharon Strine — a registered Republican voter who had consistently voted for Republican candidates — testified that until the 2011 redistricting plan reassigned her residence to the Eighth District, she had lived and voted in the Sixth District ever since registering to vote on her 18th birthday in the early 1980s. Strine Dep. 9–15 (ECF No. 177-53).  Even though she no longer lived in the Sixth District, she nonetheless worked for over a year on Sixth District Republican nominee Dan Bongino's 2014 congressional campaign, eventually serving as the campaign's manager.  *Id.* at 8, 59, 61–62.  She testified that over the course of the campaign — "between festivals, knocking on doors, parades, anything you can imagine" — she spoke to thousands of people in the Sixth District and that "every time we were out [campaigning], we met somebody who said, it's not worth voting anymore, every single time. . . . [T]hey just [felt] disenfranchised that . . . they don't have somebody that represents them anymore . . . [a]fter the redistricting."  *Id.* at 61–63.

Similarly, Plaintiff Alonnie L. Ropp — also a registered Republican voter who had consistently voted for Republican candidates and whose residence was also reassigned to the Eighth District — testified that, at the time of the 2014 congressional election, she served on the Frederick County Republican Central Committee and played a role in "promot[ing] all of our Republican candidates running in our geographic territory."  Ropp Dep. 16–23, 33 (ECF No. 177-54).  She described how, when she engaged with potential voters in that capacity, she routinely spent a lot of the conversation helping the voter figure out which congressional district the voter lived in,

23

the Sixth or the Eighth.  *Id.* at 34–38.  As she stated, "[A] large percentage of folks, if they had historically voted, they were confused about the candidates.  They didn't know who they should be engaging.  It was a very confusing situation for them that year."  *Id.* at 37.  She added that "we spent most of our time" trying to ascertain the voter's district and that, "by the time [we] [got] through 20 minutes of that conversation," some people "felt as though they didn't want to participate that time because it seemed too confusing." *Id.* at 37–38.

And Plaintiff Edmund Cueman — a longtime resident of Carroll County and registered Republican voter whose residence was reassigned to the Eighth District — described personally feeling "disoriented" by and "disconnected" from his new congressional district: "[M]y feelings were that every time there's a census, yeah, you may have to make some adjustments.  You can't freeze it in time but this . . . was a chop job. . . . I have absolutely no connection with what is in this district except the portions of Frederick that were thrown in."  Cueman Dep. 11–16, 36–37 (ECF No. 177-55).

Other record evidence corroborates these plaintiffs' experiences, including evidence showing that Sixth District registered Republican voters' participation declined in primary elections in midterm years — *i.e.*, when congressional candidates topped the federal ticket.  For example, in Garrett County, 48% of registered Republican voters participated in the 2010 Republican primary election, but that number fell to 35% in 2014; in Allegany County, there was a 43% turnout for the 2010 Republican primary, a number that fell to 27% in 2014; and in Washington County, the percentage of

Republicans participating in the primary fell from 37% in 2010 to 25% in 2014.  ECF No. 191-11 at 3, 9–10.

Similarly, the record shows a decline in fundraising by the Republican Central Committees of the three counties that remained entirely within the Sixth District after the 2011 redistricting.   Specifically, in the 2014 filing period, the Republican Central Committees for Garrett, Allegany, and Washington Counties received 6.5% less than in the 2010 filing period, the prior midterm election year.  ECF No. 210, Ex. C-8 to C-11. Fundraising by these committees during presidential election years has suffered as well — comparing the contributions received in the 2008 filing period with those received in the 2012 filing period reveals a drop of 12%.  *Id.*

## B

Three Maryland citizens, acting *pro se*, commenced this action in November 2013, naming as defendants the Chair and the Administrator of the State Board of Elections and alleging that the 2011 redistricting plan violated their rights under the First Amendment and Article I, § 2, of the U.S. Constitution.  A district court judge granted the State's motion to dismiss, *Benisek v. Mack*, 11 F. Supp. 3d. 516 (D. Md. 2014), and the Fourth Circuit summarily affirmed, 584 F. App'x 140 (4th Cir. 2014).  The Supreme Court, however, reversed that judgment in December 2015, concluding that the plaintiffs' constitutional challenge was not "wholly insubstantial" and that therefore it had to be decided by a district court composed of three judges, as required by 28 U.S.C. § 2284. *Shapiro v. McManus*, 136 S. Ct. 450, 455–56 (2015) (quoting *Bell v. Hood*, 327 U.S. 678,

682 (1946)).  In doing so, the Court observed that the theory underlying the plaintiffs'
First Amendment claim had originally been suggested by Justice Kennedy in his
concurring opinion in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), and was "uncontradicted
by the majority in any of [the Court's] cases." *Shapiro*, 136 S. Ct. at 456.

On remand, the plaintiffs, then represented by counsel, promptly filed a second
amended complaint in February 2016 — roughly one week after this three-judge court
was empaneled.  The amended complaint added six additional plaintiffs and refined the
theory underlying their constitutional challenge.  Two of the original plaintiffs later
agreed to their dismissal from the action, leaving seven plaintiffs, all of whom are
registered Republicans who lived in the Sixth District prior to the 2011 redistricting.
Three of these plaintiffs still reside in the Sixth District, while four of them now live in
the Eighth District as a result of the redistricting.

In an opinion issued August 24, 2016, we denied the State's motion to dismiss,
concluding that the plaintiffs had adequately alleged a justiciable claim for relief.
*Shapiro v. McManus*, 203 F. Supp. 3d 579, 586, 600 (D. Md. 2016).  Drawing on First
Amendment retaliation principles, we held that to succeed on their claim, the plaintiffs
would have to prove three elements: first, *specific intent* — "that those responsible for the
map redrew the lines of [their] district with the specific intent to impose a burden on
[them] and similarly situated citizens because of how they voted or the political party
with which they were affiliated"; second, *injury* — that the plaintiffs had, in fact,
experienced a concrete burden on their legally protected interests; and third, *causation* —
"that, absent the mapmakers' intent to burden a particular group of voters by reason of

26

their views, the concrete adverse impact would not have occurred." *Id.* at 596–97 (emphasis omitted).

Following the completion of extensive discovery, the plaintiffs filed a motion for a preliminary injunction in May 2017 to prevent the use of the challenged map during the 2018 elections. The plaintiffs' motion alternatively sought summary judgment, and the State subsequently filed a cross-motion for summary judgment. In August 2017, we denied the plaintiffs' motion for a preliminary injunction and stayed further proceedings — including resolution of the parties' cross-motions for summary judgment — for the Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018). *See Benisek v. Lamone*, 266 F. Supp. 3d 799 (D. Md. 2017). The Supreme Court affirmed our denial of the plaintiffs' motion for a preliminary injunction in June 2018, *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–45 (2018), and, on remand, the parties agreed not to reopen discovery. They did, however, file supplemental summary judgment memoranda, and we conducted a lengthy hearing on the parties' cross-motions for summary judgment on October 4, 2018.

## II.  LEGAL PRINCIPLES OF THE DISTRICTING PROCESS

The process of creating districts from which members of the U.S. House of Representatives are elected is rooted in the authority granted by the U.S. Constitution to both state legislatures and Congress — political departments of the respective governments. In establishing the U.S. House of Representatives, the Constitution provides that "[t]he House of Representatives shall be composed of Members chosen

every second Year by the People of the several States," U.S. Const. art. I, § 2, cl. 1, and further that "[t]he Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof," *id*. § 4, cl. 1.  Article I thus "leaves with the States primary responsibility for apportionment of their federal congressional . . . districts." *Growe v. Emison*, 507 U.S. 25, 34 (1993).

While Maryland has enacted no law codifying procedures for discharging the responsibilities conferred on it by Article I, § 4, it has codified procedures for redrawing the lines of state legislative districts following each decennial census.  The Maryland Constitution, Article III, § 5, provides:

> Following each decennial census of the United States and after public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts for electing the members of the Senate and the House of Delegates.
>
> The Governor shall present the plan to the President of the Senate and the Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly. . . .  [The] plan shall conform to Sections 2, 3, and 4 of this Article.

And Section 4, in particular, requires that each legislative district "consist of adjoining territory, be compact in form, and of substantially equal population.  Due regard shall be given to natural boundaries and the boundaries of political subdivisions." *Id*. § 4.  The Maryland Constitution provides further that if the General Assembly fails to adopt the Governor's plan, that plan "shall become law." *Id*. § 5.  The Maryland General Assembly implemented a state legislative district plan pursuant to these provisions following the 2010 census. *See* Md. Code Ann., State Gov. § 2-201 *et seq*.

28

With no law codifying the congressional redistricting procedure, Maryland has, by custom, substantially followed the procedure set forth in the Maryland Constitution for adopting state legislative districts.  Thus, following each decennial census, the Maryland Governor takes charge of congressional redistricting by holding advisory hearings and creating a redistricting plan, which he then submits to the General Assembly as a joint resolution for adoption.  And that process was followed after the 2010 census.  The process, however, did not incorporate the restrictions contained in the Maryland Constitution, Article III, § 4, that provide for contiguity, compactness, regard for natural boundaries, and regard for boundaries of political subdivisions.

While Article I of the U.S. Constitution gives the States primary responsibility for the apportionment of federal congressional districts, it also reserves to Congress the power to override decisions made by the States.  Article I, § 4, provides that "the Congress may at any time by Law make or alter such [state] Regulations" pertaining to the election of federal representatives.  U.S. Const., art. I, § 4, cl. 1.  And over the years Congress has exercised that authority in various ways.  In 1842, it required that members of the House of Representatives be elected from single-member districts composed of contiguous territory.  Apportionment Act of 1842, ch. 47, 5 Stat. 491.  In 1872, it required further that districts contain, "as nearly as practicable[,] an equal number of inhabitants."  Apportionment Act of 1872, ch. 11, § 2, 17 Stat. 28.  In 1901, it added a compactness requirement.  Apportionment Act of 1901, ch. 93, § 3, 31 Stat. 733, 734.  In 1911, it again imposed requirements of contiguity, compactness, and equality of population.  Apportionment Act of 1911, ch. 5, § 3, 37 Stat. 13, 14.  But as it stands

today, Congress only requires that the States create single-member districts. *See* 2 U.S.C. § 2c. The single-member-district requirement "produce[s] a different . . . result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats." *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). Thus, while the single-member-district requirement effects a more democratic result, it is this requirement that gives rise to apportionment disputes and gerrymandering.

As the Supreme Court has observed, "[i]t is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area." *Gaffney*, 412 U.S. at 753. And those state officials charged with redistricting will of course "recognize the political consequences of drawing a district line along one street rather than another." *Id*. The practical "reality is that districting inevitably has and is intended to have substantial political consequences." *Id*.; *see also Vieth*, 541 U.S. at 285 (plurality opinion) ("The Constitution clearly contemplates districting by political entities, *see* Art. I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics"). Thus, because the Constitution commits district apportionment to political departments, it is quintessentially a political process, and courts cannot invalidate a redistricting map merely because its drafters took political considerations into account in some manner. *See Gaffney*, 412 U.S. at 752–53.

Nonetheless, when political considerations are taken into account to an extreme, the public perceives an abuse of the democratic process without fully understanding how it can be resolved within the existing structure. Indeed, partisan gerrymandering, as it is

called, is widely considered to be repugnant to representative democracy.  As stated earlier in this case:

> The widespread nature of gerrymandering in modern politics is matched by the almost universal absence of those who will defend its negative effect on our democracy.  Indeed, both Democrats and Republicans have decried it when wielded by their opponents but nonetheless continue to gerrymander in their own self interest when given the opportunity.  The problem is cancerous, undermining the fundamental tenets of our form of democracy.

*Benisek v. Lamone*, 266 F. Supp. 3d at 818 (Niemeyer, J., dissenting); *see also Shapiro*, 203 F. Supp. 3d at 600 (Bredar, J., dissenting) (noting that gerrymandering is a "noxious" practice with "no place in a representative democracy").  Moreover, the Supreme Court, with no disagreement from any Justice, has concluded repeatedly that severe partisan gerrymandering is incompatible with democratic principles, *see, e.g.*, *Vieth*, 541 U.S. at 292 (plurality opinion), as it threatens "the core principle of republican government" — "that the voters should choose their representatives, not the other way around," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (internal quotation marks and citation omitted).

Consistent with these concerns, in an earlier case addressing alleged racial discrimination with respect to the same 2011 redistricting plan, we noted that the shape of Maryland's Third Congressional District resembled a "broken-winged pterodactyl lying prostrate across the center of the State."  *Fletcher v. Lamone*, 831 F. Supp. 2d 887, 902 n.5 (D. Md. 2011) (Niemeyer, J.).  And, to be sure, that pterodactyl still lies there, broken-winged.  Yet, any effort to address misshapen districts simply based on shape would likely stray beyond the province of the courts.  We thus begin with the recognition

that reviewing the political activity giving rise to the 2011 redistricting law ordinarily is not a role conferred on the courts.

But, even as we recognize that the districting process is largely political in nature, we also understand that state officials are always limited by specific provisions of the U.S. Constitution.  *Cf. Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) ("To the victor belong only those spoils that may be *constitutionally* obtained" (emphasis added)). And when state officials violate specific provisions of the Constitution in carrying out their districting responsibilities, courts must not hesitate to fulfill their constitutionally assigned role.  As the Supreme Court has stated, the political nature of redistricting does not "immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction, a power recognized at least since our decision in *Marbury v. Madison*. . . .  The right to vote is too important in our free society to be stripped of judicial protection . . . ."  *Wesberry v. Sanders*, 376 U.S. 1, 6–7 (1964) (citations omitted).

In this vein, the Supreme Court has over the years applied specific constitutional provisions to regulate particular apportionment plans.  In *Baker v. Carr*, 369 U.S. 186 (1962), the Court held justiciable a claim alleging that a state legislative map establishing districts with unequal populations violated the Equal Protection Clause.  Similarly, in *Wesberry*, the Court held that Article I, § 2's provision for the election of representatives "by the People" meant that "one man's vote in a congressional election is to be worth as much as another's," 376 U.S. at 7–8, so that today congressional districts must be drawn

"with populations as close to perfect equality as possible," *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016).

The Court has also held that racial discrimination in the districting process violates the Equal Protection Clause, *see Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Shaw v. Reno*, 509 U.S. 630 (1993), and has approved remedial redistricting in cases of racial gerrymandering, *see*, *e.g.*, *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018) (per curiam).

And in *Davis v. Bandemer*, 478 U.S. 109 (1986), the Court recognized that diluting the votes of one political party's members in the districting process could violate the Equal Protection Clause.  But establishing a standard under the Equal Protection Clause to give effect to *Bandemer*'s conclusion has proven elusive for the Court.  *See Gill*, 138 S. Ct. at 1926–29 (describing the Court's efforts over the years in *Gaffney*, *Bandemer*, *Vieth*, and *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006), to articulate a standard).  Nonetheless, when a districting plan, even though the product of a political process, is alleged to have injured those before the court in violation of a specific provision of the Constitution, the court must exercise its role by applying the standards attending the constitutional right at issue.

In this case, we have concluded that the plaintiffs' claims state a viable cause of action in alleging that Maryland's 2011 redistricting plan violated the First Amendment by burdening their representational and associational rights based on their party affiliation and voting history.  *See Shapiro*, 203 F. Supp. 3d 579.  To be sure, the Supreme Court has not directly addressed allegations that a redistricting plan has violated

the First Amendment, but it has indicated clearly that such a challenge is not precluded by its decisions or by the Constitution.  *See Vieth*, 541 U.S. at 315 (Kennedy, J., concurring in the judgment) ("If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State show[ed] some compelling interest"); *id.* ("The First Amendment may offer a sounder and more prudential basis for intervention than does the Equal Protection Clause. . . .  The First Amendment analysis concentrates on whether the legislation burdens the representational rights of the complaining party's voters for reasons of ideology, beliefs, or political association"); *Shapiro*, 136 S. Ct. at 456 (noting that the plaintiffs' legal theory in this case — which is premised on the First Amendment rather than the Equal Protection Clause — is "uncontradicted by the majority in any of [the Court's] cases"); *see also Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring) (recognizing that "partisan gerrymanders may infringe the First Amendment rights of association held by parties, political organization, and their members").  As Justice Kennedy explained, "After all, . . . allegations [of unconstitutional partisan gerrymandering] involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views."  *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment).  Relying on decisions such as *Elrod v. Burns*, 427 U.S. 347 (1976), and *California Democratic Party v. Jones*, 530 U.S. 567 (2000), he stated:

34

> As these precedents show, First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views. In the context of partisan gerrymandering, that means that First Amendment concerns arise where an apportionment has the purpose and effect of burdening a group of voters' representational rights.

541 U.S. at 314. The plaintiffs in this case make these very allegations, contending that the partisan gerrymander effected by Maryland's 2011 congressional redistricting plan injured both their representational rights and their associational rights by reason of their political views, in violation of the First Amendment.

## III. Representational Rights

It is fundamental that "the Constitution of the United States protects the right of all qualified citizens to vote," *Reynolds v. Sims*, 377 U.S. 533, 554 (1964), and that a citizen's right to vote is "individual and personal in nature," *id.* at 561. Indeed, "the right of qualified voters, *regardless of their political persuasion*, to cast their votes effectively . . . rank[s] among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (emphasis added). Expounding on the significance of this representational right, the Supreme Court has explained:

> [R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in th[is] political process[] . . . . Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. *Full and effective participation by all citizens . . . requires, therefore, that each citizen have an equally effective voice in the election of [a representative].*

*Reynolds*, 377 U.S. at 565 (emphasis added).

Based on these foundational principles, the Supreme Court has long recognized that the Constitution prohibits States from drawing legislative districts with unequal populations — for "[i]f districts of widely unequal population elect an equal number of representatives, the voting power of each citizen in the larger constituencies is debased and the citizens in those districts have a smaller share of representation than do those in the smaller districts." *Bd. of Estimate of N.Y.C. v. Morris*, 489 U.S. 688, 693–94 (1989). Indeed, when a State discharges its constitutionally conferred duty to create congressional districts, it must draw "districts with populations as close to perfect equality as possible." *Evenwel*, 136 S. Ct. at 1124.

While a State can thus literally contract the value of a citizen's vote by placing the citizen in an overpopulated district, it can similarly contract the value of a citizen's vote by placing the citizen in a district where the citizen's political party makes up a smaller share of the electorate, thereby reducing the citizen's chance to help elect a candidate of choice. *Cf. Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) ("The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government").

To be sure, citizens have no constitutional right to be assigned to a district that is likely to elect a representative that shares their views. But they do have a right under the First Amendment not to have the value of their vote diminished *because of* the political views they have expressed through their party affiliation and voting history. Put simply, partisan vote dilution, when intentionally imposed, involves the State penalizing voters for expressing a viewpoint while, at the same time, rewarding voters for expressing the

36

opposite viewpoint.  This targeting of a citizen's viewpoint is typical of First Amendment violations in other contexts.  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant"); *Bd. of Educ. v. Pico*, 457 U.S. 853, 870–71 (1982) ("If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books").  As the Supreme Court has explained, "[E]ven though a person has no right to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely," chief among them, a person's political viewpoint, as expressed in his party affiliation and voting history.  *Rutan*, 497 U.S. at 72 (internal quotation marks and citation omitted).

Applying traditional First Amendment jurisprudence to government action in redistricting, we previously held in this case that a plaintiff states a claim under the First Amendment when he demonstrates (1) that "those responsible for [a redistricting] map redrew the lines of his district with the *specific intent* to impose a burden on him and similarly situated citizens because of how they voted or the political party with which they were affiliated," (2) that "the challenged map diluted the votes of the targeted citizens to such a degree that it resulted in a tangible and concrete adverse effect," and (3) that "the mapmakers' intent to burden a particular group of voters by reason of their views" was a but-for cause of the "adverse impact." *Shapiro*, 203 F. Supp. 3d at 596–97.

When the plaintiff makes a sufficient showing of these requirements, "the State can still avoid liability by showing that its redistricting legislation was narrowly tailored to achieve a compelling government interest." *Id.* at 597.

Before turning to address the merits, however, we address the threshold argument raised by the State that the "[p]laintiffs here have failed to produce evidence sufficient to establish that they suffered legally cognizable individual harm," as necessary to satisfy the injury-in-fact component of Article III standing.

A

Consistent with Article III of the Constitution, which limits the jurisdiction of federal courts to "Cases" and "Controversies," courts must "exercise power that is judicial in nature," rather than "serv[ing] as a forum for generalized grievances." *Lance v. Coffman*, 549 U.S. 437, 439, 441 (2007). As such, "a plaintiff may not invoke federal-court jurisdiction unless he can show 'a personal stake in the outcome of the controversy,'" *Gill*, 138 S. Ct. at 1929 (quoting *Baker*, 369 U.S. at 204), which he does by "satisfy[ing] the familiar three-part test for Article III standing: that he '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision,'" *id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "Foremost among these requirements is injury in fact — a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.*, which 'affect[s] the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560 & n.1 (1992)).  The "irreducible constitutional minimum of standing" is "not [a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case," which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof . . . at the successive stages of the litigation."  *Lujan*, 504 U.S. at 560–61.

The Supreme Court applied these principles specifically to the context of a partisan gerrymandering claim premised on vote dilution in *Gill v. Whitford*.  In *Gill*, a group of Democratic voters from Wisconsin filed a complaint challenging the 2011 redistricting plan for that State's legislature, alleging that the plan constituted an unconstitutional partisan gerrymander that "unfairly favor[ed] Republican voters and candidates" by "cracking" and "packing" Democratic voters throughout the State.  138 S. Ct. at 1923–24 (internal quotation marks omitted).  Several of the *Gill* plaintiffs alleged that they lived in districts where Democrats had been cracked or packed, and all of them alleged that, regardless of whether they personally lived in such a district, they had been harmed because the manipulation of district boundaries across the State affected the legislature's overall composition.  *Id.* at 1924.  The case proceeded to trial, where the plaintiffs focused on their theory of *statewide* injury rather than offering proof that any of their particular districts had been cracked or packed.  *Id.* at 1932.

On appeal, the Supreme Court vacated the district court's judgment in favor of the plaintiffs and remanded for further proceedings, holding that the plaintiffs had failed to show "standing under the theory upon which they based their claims for relief."  *Gill*, 138 S. Ct. at 1929.  The Court explained that because "a person's right to vote is 'individual

and personal in nature,'" *id*. (quoting *Reynolds*, 377 U.S. at 561), "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage," *id.* (quoting *Baker*, 369 U.S. at 206). The *Gill* plaintiffs did allege "that they suffered such injury from partisan gerrymandering, which works through 'packing' and 'cracking' voters of one party to disadvantage those voters." *Id.* at 1930. But the Court explained, "[t]o the extent the plaintiffs' alleged harm [was] the dilution of their votes, *that injury [was] district specific*" because the voter "votes for a single representative." *Id.* (emphasis added). As a result, it is "the boundaries of the particular district in which [a voter] resides" — "and the composition of its voters" — that determine whether and to what extent that voter has been "'disadvantage[d] . . . as an individual.'" *Id.* (brackets omitted) (quoting *Baker*, 369 U.S. at 206). The Court noted that the remedy for such partisan gerrymandering "lies in the revision of the boundaries of the individual's own district." *Id.* In sum, the voter alleging a dilution violation *in his district* has standing to sue for that violation.

But the Court rejected the plaintiffs' theory of a "*statewide harm* to their interest 'in their collective representation in the legislature,'" reasoning that "[a] citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative" and that "the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes," which in turn "arises through a voter's placement in a 'cracked' or 'packed' district." *Gill*, 138 S. Ct. at 1931 (emphasis added). Because the plaintiffs did not seek to show the requisite harm "that he or she live[d] in a cracked or packed district" but proceeded "on their theory of statewide injury," the Court

40

concluded that the plaintiffs had failed to demonstrate Article III standing. *Id*. at 1932. But "in light of the plaintiffs' allegations that [certain of them] live[d] in districts where Democrats like them have been packed or cracked," the Court "decline[d] to direct dismissal" and instead "remand[ed] the case to the District Court so that the plaintiffs [might] have an opportunity to prove concrete and particularized injuries using evidence . . . that would tend to demonstrate a burden on their individual votes." *Id.* at 1934.

The plaintiffs in this case, unlike the plaintiffs in *Gill*, have brought and pursued the kind of single-district challenge that *Gill* recognized as providing such plaintiffs with standing. Here, all seven plaintiffs are registered Republicans who lived in Maryland's Sixth District prior to the 2011 redistricting plan. Three still live in the Sixth District, while the other four were moved to the neighboring Eighth District. And ever since the filing of their Second Amended Complaint, their theory of the case has been that those responsible for the redistricting plan intentionally and successfully "cracked" the formerly Republican Sixth District by removing many of the precincts that had historically supported Republican candidates and replacing them with overwhelmingly Democratic precincts.

After *Gill*, it is clear that if the plaintiffs show, as they have alleged, that the State deliberately acted to flip the former Sixth District from one very likely to elect the Republican candidate for Congress to one quite likely to elect the Democrat, they will have established that the State made it materially harder for them to play a role in electing a candidate of choice. They would, in short, establish a "disadvantage to themselves" in

their capacity as individual voters and their "'standing to sue' to remedy that disadvantage." *Gill*, 138 S. Ct. at 1929 (quoting *Baker*, 369 U.S. at 206).

B

Turning to the merits, we conclude, based on the summary judgment record, that the plaintiffs have sufficiently established each element of their First Amendment claim that their representational rights have been impermissibly burdened by reason of their political views and voting history.  Relying on undisputed facts, the plaintiffs have shown that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

*First*, with respect to the mapmakers' intent, the process described in the record admits of no doubt.  Maryland Democratic officials worked to establish Maryland's congressional district boundaries in 2011 with a narrow focus on diluting the votes of Republicans in the Sixth Congressional District in an attempt to ensure the election of an additional Democratic representative in the State's congressional delegation.  Governor O'Malley, who was responsible for the redistricting process, asked Congressman Hoyer to lead the redistricting effort, and Hoyer retained NCEC to draw up district maps that (1) protected Democratic incumbents and (2) flipped the Sixth District from Republican to Democratic control.  Hawkins, an NCEC analyst, followed those two commands and prepared district maps using NCEC's proprietary DPI metric to assess the likelihood that a district would elect a Democratic candidate.  He homed in on maps where the data predicted a Democratic victory in the Sixth District, unlike maps submitted by third parties, which had sub-50% DPI values for the Sixth District.  Hawkins submitted maps

to the Democratic members of Maryland's congressional delegation, at least one of which the delegation passed on to Maryland Democratic officials who were members of the Governor's Redistricting Advisory Committee.  Moreover, the underlying precinct-level DPI data were shared with the officials' staffers, who then used that information, along with State data on party registration and voter turnout, to develop a final map with a 53% DPI for the Sixth District, which the Governor submitted to the General Assembly and the General Assembly promptly adopted.  Reliance on the DPI in finalizing a map was essential to achieving the specific intent to flip the Sixth District from safely Republican to likely Democratic.

Moreover, the record is replete with direct evidence of this precise purpose.  For example, notes prepared for state Senate President Miller's remarks to the state House and Senate Democratic Caucuses about the redistricting plan emphasized that the map "create[d] an opportunity for Montgomery County to control two congressional districts"; "preserve[d] all six incumbent Democrats in 'safe' districts," none of which would have "less than 58% [DPI]"; and "g[ave] Democrats a real opportunity to pick up a seventh seat in the delegation by targeting Roscoe Bartlett."   ECF No. 177-23.   Governor O'Malley admitted that he intended to "create a district where the people would be more likely to elect a Democrat than a Republican."  O'Malley Dep. 82; *see also id.* at 27–28 (describing aim of "put[ting] more Democrats and Independents into the Sixth District" to help ensure "the election of another Democrat").  Senate Majority Leader Garagiola admitted that "one of the purposes[] [was] to make the Sixth Congressional District have 53 percent Democratic performance."  Garagiola Dep. 16, 27.  These sorts of statements,

particularly by delegates and state senators during the General Assembly's abbreviated consideration of the proposed map, are legion. *See, e.g.*, Joint Stipulations ¶¶ 40–51.

The State's argument that its officials intended only "to allow Democrats to have an equally effective voice in the election of a representative" in the Sixth District — an intent that it argues "cannot be equated with an intent to burden [Republicans'] representational rights" — rings hollow.  Even if the intent to make one party "more competitive" were constitutionally permissible, the record shows something materially different.  Democratic officials, with the help of NCEC, worked to craft a map that would specifically transform the Sixth District into one that would *predictably* elect a Democrat by removing Republicans from the District and adding Democrats in their place.

Moreover, the State's argument fails to appreciate the requirements of the law.  If the government uses partisan registration and voting data purposefully to draw a district that disfavors one party, it cannot escape liability by recharacterizing its actions as intended to favor the other party.  The First Amendment does not — indeed, cannot — distinguish between these intents because they are one and the same when applicable to two-party elections.  It is impossible to flip a seat to the Democrats without flipping it away from the Republicans.  Thus, when the government targets a class of persons based on the persons' political affiliation and voting and then acts so as to burden their representational rights, it has run afoul of the First Amendment, no matter how it characterizes its intent.

The State also argues that its officials did not act with impermissible intent because they did not target *specific* voters based on their individual party affiliation or

voting history.  This argument, too, is based on a misunderstanding of First Amendment jurisprudence.  Here, the plaintiffs have shown that they were targeted for disfavored treatment because of a shared marker of political belief — their Republican Party affiliation.  The fact that the State intentionally moved Republican voters out of the Sixth District en masse, based on precinct-level data, and did not examine each individual voter's history does not make its action permissible under the First Amendment.  *Cf. Miller*, 515 U.S. at 920 (condemning State's *targeting of areas* with "dense majority-black populations" for inclusion in district).

At bottom, given the overwhelming direct and circumstantial evidence, there can be no doubt that at every stage of the process, the State's Democratic officials who put the 2011 redistricting plan in place specifically intended to flip control of the Sixth District from Republicans to Democrats and then acted on that intent.  The plaintiffs have amply established the intent element of their claim.

*Second*, with respect to the injury element, the plaintiffs have shown that the redrawn Sixth District did, in fact, meaningfully burden their representational rights.  At the threshold, it is important to reiterate that, under the standard set forth in our denial of the State's motion to dismiss, a plaintiff who has shown that the State acted with impermissible retaliatory intent need not show that the linedrawing altered the outcome of an election — though such a showing would certainly be relevant evidence of the extent of the injury.  *See Shapiro*, 203 F. Supp. 3d at 598.  And, contrary to the State's argument, the plaintiffs need not show that the new Sixth District was *certain* to produce a Democratic congressman to establish injury to their rights as voters.  Indeed, it would

only be a "perfect" gerrymander where "a voter [who] lives in a cracked district" stands "*no* chance" of having her preferred candidate prevail.  *Gill*, 138 S. Ct. at 1936 (Kagan, J., concurring) (emphasis added).   Rather, *the plaintiffs must show only that their electoral effectiveness — i.e., their opportunity to elect a candidate of choice — was meaningfully burdened*, and, of course, that this burden was intentionally imposed for partisan reasons.   That is, the plaintiffs must have experienced a "demonstrable and concrete adverse effect" on their "right to have 'an equally effective voice in the election' of a representative,'" which they can establish by showing that they have been placed at a concrete electoral disadvantage.  *Shapiro*, 203 F. Supp. 3d at 598 (quoting *Reynolds*, 377 U.S. at 565).

The plaintiffs here have made that showing.   By several measures, the dramatic redrawing of the Sixth District's boundaries disfavored Republican voters.   In creating the map, the State, on net, removed roughly 66,000 registered Republicans from the Sixth District and added some 24,000 registered Democrats, such that Republican voters went from outnumbering Democrats 1.3 to 1 (47% of the District's registered eligible voters being Republicans and 36% Democrats) to nearly the exact inverse (44% Democrats, 33% Republicans).   Joint Stipulations ¶¶ 10, 53.  According to the DPI metric used by the mapmakers themselves, as well as the Cook PVI metric endorsed by the State's expert, Republican voters in the new Sixth District were, in *relative* terms, much less likely to elect their preferred candidate than before the 2011 redistricting, and, in *absolute* terms, they had no real chance of doing so.  Indeed, the Cook report deemed the district's swing — from R+13  and "Solid Republican" to D+2 and "Likely Democratic" — the largest of

any district in the country.   ECF No. 177-52 at 6–8.   And, historically, "Likely Democratic" districts elect a Democrat 94% of the time.  *See* Campbell*, supra*, at 628.

Moreover, while the State's linedrawing need not have changed the outcome of an election to be culpable, the fact that the Democratic candidate was elected in the three elections following the 2011 redistricting provides additional evidence that the Republican voters have suffered a cognizable injury.  In other words, the Democratic officials who drew the map achieved exactly what they aimed to do — to make Republican voters in the Sixth District less effective.

*Finally*, as to causation, the plaintiffs have established that, without the State's retaliatory intent, the Sixth District's boundaries would not have been drawn to dilute the electoral power of Republican voters nearly to the same extent.

The 2010 census required shifting only a small number of residents — 10,186 — from a district consisting of over 720,000 residents.  While adjustments to other districts to achieve equal population or other legitimate goals might also have resulted in some additional adjustments to the Sixth District, the record shows no legitimate basis for the wholesale removal of 360,000 residents in the northern, more Republican portion of the Sixth District and their replacement with 350,000 residents from Montgomery County, a heavily Democratic area.   To the contrary, the record conclusively shows that an illegitimate basis — the intent to flip party control — dictated the decision to so radically reshape the Sixth District.

All of these facts were consistent with the actual intent expressed by those responsible for the 2011 redistricting plan.  Thus, the causal link between the State's

intent and the harm to the targeted voters' representational rights could not be clearer.  In short, the record refutes the conclusion that the actions were taken for any other reason than to carry out the specific intent expressed.

The State suggests that other causes were involved, but it fails to explain how the other causes gave rise to the massive shifts of population and the specific targeting of Republicans.  It notes, for example, that the need to prevent the new First District from crossing the Chesapeake Bay gave rise to extending the First District around the northern part of the State, effectively requiring that the eastern boundary of the Sixth District be moved westward.  Even accepting this suggestion — and, indeed, other similar adjustments to accommodate precise populations and other legitimate redistricting goals — none explains the dramatic exchange of populations between the Sixth and Eighth Districts.  Moreover, the State's suggestions do not explain the undisputed fact that virtually all the Democratic officials involved stated that the redistricting operation was guided by the expressed plan to protect existing Democratic seats and flip the Sixth District from Republican to Democratic control.

The State separately suggests that there was an expressed interest in grouping residents along the Interstate 270 corridor in one district.  As for this argument, however, there is no evidence that the presence of an interstate highway running from the City of Frederick to southern Montgomery County was the reason for the reconfiguration of both the Sixth and Eighth Districts, as distinct from a post-hoc rationalization.  In fact, there is affirmative evidence that the I-270 corridor was *not* a reason for the reconfigurations,

including both the utter implausibility of the rationale and statements from key decisionmakers.

In short, while there may have been other causes that could have marginally altered the Sixth District, the striking actions complained of are not explained by the State's proffers.

Moreover, for these same reasons, the State has certainly not shown that its redistricting law was narrowly tailored to achieve a compelling government interest.

In sum, the record amply demonstrates that the State violated the First Amendment under the standard we previously set forth in this case; indeed, there is no way, based on this record, that we could conclude otherwise.

## IV.  ASSOCIATIONAL RIGHTS

It is likewise well settled that the First Amendment protects the independent right to associate.  *See NAACP v. Button*, 371 U.S. 415, 430 (1963) (noting that the First Amendment protects "the right 'to engage in association for the advancement of beliefs and ideas'" (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958))); *id.* at 431 ("Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association.  This right was enshrined in the First Amendment. . . .  Exercise of these basic freedoms in America has traditionally been through the media of political associations" (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion))); *Patterson*, 357 U.S. at 460–61 (noting that "[e]ffective advocacy of both public and private points of view, particularly controversial

49

ones, is undeniably enhanced by group association").   And this right of association specifically includes the right to associate with political parties.   *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (noting that "[r]epresentative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views" and that the "First Amendment protects 'the freedom to join together in furtherance of common political beliefs'" (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986))).   The Court has explained the importance of this right to associate with political parties, noting that "political belief and association constitute the core of those activities protected by the First Amendment."   *Elrod*, 427 U.S. at 356; *see also Kusper v. Pontikes*, 414 U.S. 51, 58 (1973) (explaining that, while restriction on primary voting did not "deprive [voters] of all opportunities to associate with the political party of their choice," it was nonetheless "a 'substantial restraint' and a 'significant interference' with the exercise of the constitutionally protected right of free association").   And the kinds of injury resulting from such associational violations are readily discernable and significant: "Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign." *Anderson v. Celebrezze*, 460 U.S. 780, 792 (1983).

It is therefore unremarkable that Supreme Court Justices have repeatedly recognized these principles in the context of partisan gerrymandering.   Explaining that the First Amendment may be "more relevant" than the Equal Protection Clause for assessing partisan gerrymandering, Justice Kennedy reasoned that the First Amendment

protects the interest "of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, *their association with a political party*, or their expression of political views." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment) (emphasis added). And focusing on political association in particular, Justice Kagan likewise observed only recently that plaintiffs can prove injury in the form of associational harm, as "distinct from vote dilution," by showing that the State has "burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects." *Gill*, 138 S. Ct. at 1938–39 (Kagan, J., concurring). As she explained:

> [T]he associational harm of a partisan gerrymander is distinct from vote dilution. Consider an active member of the Democratic Party in Wisconsin who resides in a district that a partisan gerrymander has left untouched (neither packed nor cracked). His individual vote carries no less weight than it did before. But if the gerrymander ravaged the party he works to support, then he indeed suffers harm, as do all other involved members of that party. . . . Members of the "disfavored party" in the State, . . . deprived of their natural political strength by a partisan gerrymander, may face difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives). *See Anderson v. Celebrezze*, 460 U.S. 780, 791–792, and n. 12 (1983) (concluding that similar harms inflicted by a state election law amounted to a "burden imposed on . . . associational rights"). . . . By placing a state party at an enduring electoral disadvantage, the gerrymander weakens its capacity to perform all its functions.

*Id.* at 1938 (citation omitted).

Accordingly, plaintiffs can prove a First Amendment partisan gerrymandering claim involving associational harm by demonstrating the elements of such a claim involving representational rights, but in lieu of the harm involving a burden on

representational rights, they must prove a harm involving a burden on their associational rights. Thus, they must prove (1) intent, as described in Part III, *supra*; (2) that the challenged map burdened the targeted citizens' ability to associate in furtherance of their political beliefs and aims; and (3) causation, again as described in Part III, *supra*.

Before turning to address the merits of the plaintiffs' claim premised on associational harm, however, we again address in this context the State's threshold argument that the plaintiffs have "failed to produce evidence sufficient to establish that they suffered legally cognizable individual harm," as necessary to satisfy the injury-in-fact component of Article III standing.

## A

The State's argument that the plaintiffs lack standing to bring a partisan gerrymandering claim premised on harm to their associational rights under the First Amendment is governed by the same principles applicable to the plaintiffs' claim for injury to their representational rights. *See* Part III.A, *supra*. Only the nature of the injury is distinct. While vote dilution diminishes the targeted voters' opportunity to elect a candidate of their choice, the associational injury is the burden imposed on the targeted party members' ability to affiliate with their political party to carry out its activities and achieve its aims. As Justice Kagan explained in *Gill*, "if the gerrymander ravaged the party [the plaintiff] works to support, then he indeed suffers harm, as do all other involved members of that party." 138 S. Ct. at 1938 (Kagan, J., concurring).

In this case, the plaintiffs claim that by moving, on net, 66,000 Republican voters — over 30% of the Republican voters — from the Sixth District and replacing them with a net of 24,000 Democratic voters, the Republican Party in the Sixth District was indeed "ravaged."   As they showed and as described in more detail below, interest among potential Republican voters in the Sixth District declined, fundraising diminished, and enthusiasm among members of the Republican Party was damaged.   And certain of the plaintiffs specifically described facing this type of waning interest.   We conclude that the plaintiffs, as the ones claiming to have personally suffered associational injury by reason of the 2011 redistricting, have standing to challenge its constitutionality.

B

Turning to the merits, we conclude, based on the summary judgment record, that the plaintiffs have sufficiently established their First Amendment partisan gerrymandering claim as premised on harm to their associational rights. The plaintiffs, relying on undisputed facts of record, again have shown that they are entitled to judgment as a matter of law.

*First*, as explained in Part III.B, *supra*, which is also applicable here, in redrawing the lines of the Sixth District, the State acted with constitutionally impermissible intent to disadvantage certain citizens based on their party affiliation and voting history.

*Second*, with respect to the injury element, the plaintiffs have shown that the 2011 redistricting plan did indeed burden their associational rights.   Before the 2011 redistricting, the Sixth District was safely Republican.   The Republican congressional

53

representative in the District had been elected to represent the District since 1993, and he won reelection in 2010 by a margin of 28%.  But to break that hold by the Republican Party, State officials moved over 30% of registered Republican voters from the District based on their voting history and replaced them with Democratic voters.  The plaintiffs have shown that thereafter voter engagement in support of the Republican Party dropped significantly.

Specifically, they demonstrated that, in midterm election years, Republican participation in Republican primaries in the counties that remained entirely in the Sixth District fell significantly.  In Allegany County, for example, Republican voter participation went from 42.8% in the 2010 primary to 26.7% in the 2014 primary.  ECF No. 191-11 at 3, 9–10.  And for all counties that remained entirely in the District, Republican voter turnout in the primaries declined by roughly 30% from 2010 to 2014. The plaintiffs provided comparable statistics for other elections.

Further, testimony provided by several of the plaintiffs revealed a lack of enthusiasm, indifference to voting, a sense of disenfranchisement, a sense of disconnection, and confusion after the 2011 redistricting by voters — clear evidence that the plaintiffs were burdened in their ability to "band together in promoting among the electorate candidates who espouse their political views."  *Cal. Democratic Party*, 530 U.S. at 574.  Plaintiff Strine described how, after the redistricting, "every time we were out [campaigning], we met somebody who said, it's not worth voting anymore, every single time."  Strine Dep. 61.  As she put it, "[T]hey just [felt] disenfranchised that . . . they don't have somebody that represents them anymore." *Id.* at 63.  Similarly, Plaintiff

Ropp described how, while promoting Republican candidates, she frequently met potential Republican voters who "didn't want to participate that time because it seemed too confusing." Ropp Dep. 37–38. And Plaintiff Cueman described personally feeling "disoriented" by and "disconnected" from his new congressional district in that he had "absolutely no connection with what is in [the] district except the portions of Frederick that were thrown in." Cueman Dep. 36–37.

The plaintiffs also demonstrated that fundraising by the Republican Central Committees of the counties that remained entirely within the Sixth District after the 2011 redistricting dropped off after the redistricting in both midterm and presidential elections.

We conclude that this undisputed evidence amply demonstrates that the plaintiffs' associational rights were burdened. Members of the Republican Party in the Sixth District, "deprived of their natural political strength by a partisan gerrymander," were burdened in fundraising, attracting volunteers, campaigning, and generating interest in voting in an atmosphere of general confusion and apathy. *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring) (citing *Anderson*, 460 U.S. at 791–92 & n.12).

*Third*, as to causation, the same evidence we cited in Part III.B, *supra*, also supports causation here. The massive and unnecessary reshuffling of the Sixth District, involving one-half of its population and dictated by party affiliation and voting history, had no other cause than the intended actions of the controlling Democratic officials to burden Republican voters by converting the District into a Democratic district. And it was this reshuffling that caused the associational harms noted.

In short, the record amply demonstrates that the State burdened the plaintiffs' associational rights, which, when coupled with the plaintiffs' successful showing of causation and constitutionally impermissible intent, establishes that the State violated the First Amendment.  Indeed, based on this record, it is hard to conclude otherwise.

## V. REMEDY

While the plaintiffs thus prevail on the merits, to obtain a permanent injunction, they must also establish (1) that they will suffer irreparable harm absent the injunction; (2) that remedies available at law, such as monetary damages, are inadequate; (3) that the balance of equities tips in their favor; and (4) that such an injunction would serve the public interest.  *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 31–33 (2008).

We conclude that in this case, absent an injunction, the plaintiffs will suffer irreparable harm that cannot be remedied at law.  Because the State's enactment of the 2011 redistricting law violated the plaintiffs' First Amendment rights, it is well recognized that the plaintiffs are, and will be, experiencing ongoing constitutional injury in the absence of a new redistricting map.  *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury").  And only an injunction mandating a new, lawful map, not money damages, can remedy this injury.

While the State does not really challenge these conclusions, it argues that the plaintiffs' interest in redress is weakened by the fact that any new map will only be in

place for the 2020 election cycle.  This argument presupposes that because there are five congressional elections after each decennial census, one unconstitutional election somehow lacks sufficient importance to justify a remedy.  Unfortunately, this argument overlooks the fact that plaintiffs have ongoing associational injury and will suffer additional representational injury during both the 2020 primary election and the 2020 general election if the injunction is not entered.  These are injuries resulting from a serious constitutional violation and do not deserve to be demeaned by an approach that tells the plaintiffs essentially "to bear it because it will be over soon" — "soon" meaning in two years.  Every election employing constitutionally deficient districts causes irreparable harm.  "[O]nce the election occurs, there can be no do-over and no redress.  The injury to these voters is real and completely irreparable if nothing is done to enjoin this law." *League of Women Voters of N.C.*, 769 F.3d at 247.

With respect to the balance of the equities, the State relies on the Supreme Court's explanation for affirming the denial of preliminary injunctive relief in this case based on the plaintiffs' delay in seeking that relief to argue that the balance tips in the State's favor with respect to now granting *vel non* a permanent injunction.  *See Benisek*, 138 S. Ct. at 1944.  But the difference between the plaintiffs' request for a preliminary injunction and their efforts to obtain a permanent injunction cannot be so quickly overlooked.  The plaintiffs asked for a preliminary injunction, which operates only *pendente lite*, some three and a half years after this action was commenced, and the Supreme Court concluded that such delay was significant with respect to the interim relief being sought.  But a permanent injunction, which we are now addressing, is the ultimate remedy that

was sought in this action, and it was requested when the litigation was first commenced in 2013. While it is true that the case has dragged on, that protraction cannot be attributed to the plaintiffs, but to process. This case traveled to the Supreme Court twice and came back to us twice, and we have not seen any dilatory efforts during the process that was before us — either by the plaintiffs or by the State.

Finally, we conclude that a permanent injunction in this case will serve the public interest. It will redress a serious, ongoing constitutional injury and enable a large number of Maryland voters to more fully participate in congressional elections. While the State argues that a permanent injunction will be unduly disruptive, we note our judgment is being issued two years before the next general election — a time period that will allow the State to comply in an orderly fashion. The relief sought in this case is discrete and limited, seeking only to remedy the redrawing of the Sixth District's lines in a manner that renders them constitutional. Indeed, the plaintiffs have proposed a map that would require modifying only the border between the Sixth and Eighth Districts. We are confident that the State, if it acts diligently, will have little trouble devising an alternative map in time for the 2020 election. Finally, we believe that redrawing district lines to comply with the Constitution will not sow any additional confusion beyond that caused by the illegal lines themselves.

Accordingly, we will enter an injunction (1) permanently enjoining the State from conducting any further elections for members of the U.S. House of Representatives under the 2011 congressional redistricting plan and (2) directing the State to adopt promptly a

new congressional districting plan that addresses the constitutional violations found here with respect to the Sixth District for use in the 2020 elections.

BREDAR, Chief District Judge, concurring in the judgment:

Partisan gerrymandering is noxious, a cancer on our democracy.  *See Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality opinion) (concluding that severe partisan gerrymanders are incompatible with democratic principles); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (stating that to curb partisan gerrymandering is to restore "the core principle of republican government" that "voters should choose their representatives, not the other way around") (quoting Mitchell N. Berman, *Managing Gerrymandering*, 83 Texas L. Rev. 781, 781 (2005)); *Gill v. Whitford*, 138 S. Ct. 1916, 1940–41 (2018) (Kagan, J., concurring) ("At its most extreme, [partisan gerrymandering] amounts to 'rigging elections.'").  The present danger of partisan gerrymandering is obvious to courts and scholars alike.  *See, e.g.*, Nicholas Stephanopoulos & Eric McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831, 838 (2015) ("[T]he problem of gerrymandering has never been worse in modern American history.").  Yet, setting a standard by which to measure the lawfulness of particular partisan gerrymanders has, to date, proven impossible.  Today, this Court addresses partisan gerrymandering against the backdrop of this case's long legal history and the many precedential cases that have come before.  While I do not agree with all of Judge Niemeyer's analysis, I wholeheartedly join the conclusion that the current Maryland gerrymander infringes the plaintiffs' valuable associational rights protected by the First Amendment.  Accordingly, I concur in the judgment invalidating the 2011 reconfiguration of Maryland's Sixth Congressional District.

As the Supreme Court made clear in *Vieth*, a legal standard employed to measure the lawfulness of partisan gerrymanders "must be principled, rational, and based upon reasoned distinctions." *Vieth*, 541 U.S. at 278. Otherwise, it is not justiciable.[1] From 1986 until today, the Court has rejected standard after standard as not workable and, consequently, nonjusticiable. *See Davis v. Bandemer*, 478 U.S. 109 (1986) (articulating, as a plurality, that a justiciable partisan gerrymandering claim requires a showing of intent to discriminate and a denial of a group's chance to influence the political process); *Vieth*, 541 U.S. at 306 (holding that the *Bandemer* plurality standard failed and concluding that partisan gerrymandering claims are effectively nonjusticiable); *Vieth*, 541 U.S. at 317 (Stevens, J., dissenting) (proposing a standard); *Vieth*, 541 U.S. at 343 (Souter, J., dissenting) (same); *Vieth*, 541 U.S. at 355 (Breyer, J., dissenting) (same); *see also Radogno v. Ill. State Bd. of Elections*, No. 11-4884, 2011 WL 5868225, at *2–3 (N.D. Ill. Nov. 22, 2011) (listing rejected partisan gerrymandering standards). Here, Judge Niemeyer, joined by my colleague Judge Russell, puts forth an insightful majority opinion, one with which I agree in many respects. Compelling as the opinion is, though, my reading of *Vieth* and its progeny prevent me from joining it.

---

[1]  *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 950 (4th Cir. 1992) ("Justiciability concerns 'the power of the federal courts to entertain disputes, and . . . the wisdom of their doing so.") (alteration in original); *Hamilton v. Pallozzi*, 848 F.3d 614, 619 (4th Cir. 2017) ("Justiciability is an issue of subject-matter jurisdiction, and we have an independent obligation to evaluate our ability to hear a case before reaching the merits of an appeal.").

I cannot join because Judge Niemeyer's opinion leans on the results of elections in assessing the lawfulness of the Maryland gerrymander.   His opinion for the Court considers evidence of electoral outcomes as proof that the gerrymander succeeded—in short, that the map-drawers flipped the Sixth District from red to blue.   In considering this evidence, the opinion performs a causation analysis—under both the representational rights and associational rights theories—that would ask future courts to discern whether a given electoral outcome resulted from a legislative manipulation of voters or from the voters themselves changing their minds.   *Shapiro v. McManus*, 203 F. Supp. 3d 579, 602, 606 (D. Md. 2016) (Bredar, J., dissenting); *see also id.* at 600 ("[T]he courts are not equipped to distinguish those circumstances in which the State has drowned out particular voices from those circumstances in which the chorus voluntarily changed its tune.").   The inherent uncertainty in what causes individuals to vote as they do in a particular election makes it challenging—perhaps impossible—to conclude that a given instance of partisan gerrymandering caused an election to turn out as it did.   The Supreme Court's requirements for a standard are exacting in this context, so much so that the Court has cast aside numerous attempted standards.   Assessing causation by examining the outcome of any given election will always be problematic.   And, such a problematic test probably does not satisfy the requirement of *Vieth* that the tool used to gauge lawfulness be "principled, rational, and based upon reasoned distinction."   *Vieth*, 541 U.S. at 278. Because this problematic causation analysis permeates Judge Niemeyer's opinion, I write separately.

I concur on narrower grounds, rejecting the representational rights theory once again, *Shapiro*, 203 F. Supp. 3d at 602 & n.2, but embracing much of the associational rights theory.  First, the representational rights analysis appears to line up with the many other valiant—though nonetheless rejected—attempts at crafting a standard for partisan gerrymandering claims because it does not articulate a sufficiently concrete and measurable standard.  Beyond the causation problems connected to reliance on electoral outcomes for proof, it also leaves unanswered the line-drawing question: how much political consideration is *de minimis* and how much violates the Constitution?  *See, e.g.*, *Vieth*, 541 U.S. at 291 (rejecting as not judicially manageable a standard that weighs factors "with an eye to ascertaining whether the particular gerrymander has gone too far").  By contrast, an associational rights analysis—one that is stripped of evidence of electoral outcomes—is different; it poses no line-drawing problem.  This narrowed associational rights analysis yields a workable standard that, when applied in this instance, reveals a constitutional violation.  Even without any evidence of electoral outcomes, the plaintiffs have established a retaliation violation of their First Amendment right to associate.  I therefore concur in the judgment.

As articulated by Judge Niemeyer, plaintiffs can establish a partisan gerrymandering First Amendment retaliation violation involving associational harm when they prove that:  (1) those responsible for the redistricting drew the boundaries with the specific intent to impose a burden on plaintiffs and similarly situated citizens because of how they voted or the political party with which they were affiliated; (2) "the challenged map burdened the targeted citizens' ability to associate in furtherance of their political

beliefs and aims"; and (3) the map-drawers' intent to burden was a but-for cause of the adverse impact. Part IV, *ante*, at 52. The plaintiffs presented ample evidence of intent, which Judge Niemeyer lays out in detail. *See* Part III.B, *ante*, at 42–45.[2] His opinion also details how the plaintiffs prove harm and causation, citing sufficient evidence to prove a constitutional violation. I add that no mention of electoral outcomes is necessary to prove such a violation, and, indeed, any mention must be omitted to establish a workable standard under *Vieth*.

Regardless of whether the State succeeded in its obvious intent to increase the likelihood that a Democrat would win the Sixth District, the State certainly caused harm. The State targeted voters because of the political party affiliation they claimed (Republican) and with whom they associated (other Republicans). The State *retaliated* against voters for those associations. This harm differs from a violation of representational rights in that it does not matter if "[a voter's] individual vote carries . . . less weight than it did before." *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring). Rather, the gerrymander of Maryland's Sixth Congressional District deprives the disfavored group of voters of its "natural political strength" by building roadblocks to "fundraising, registering voters, attracting volunteers, generating support from independents, and

---

[2] Evidence of a map-drawer's intent to impact the election does not pose the same justiciability problems as proving that the election was impacted in fact. The latter is dependent on how people vote. Courts cannot and should not try to answer the question of whether a partisan gerrymander succeeded in changing the outcome of an election. There are simply too many variables in play—variables that courts are not equipped to measure.

recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Id.* This harm occurs before Election Day and persists long after. And, it is not measured by the outcome of a given election.

Illustrative examples of associational harm exist in the record before this Court. For one, during the 2011 redistricting process, the State divided Frederick County for the first time since 1840. Willis Dep. at 122 (ECF No. 177-14). Frederick County would constitute a community of interest under almost any definition of the term. The redistricting map shows that the State carved out the county seat, the City of Frederick, and siphoned the City and the County's more competitive precincts away from the more solidly Republican precincts. McDonald Expert Report at 23 & Figure 6 (ECF No. 177-19). Sometimes a state may have to divide communities of interest in order to draw equal districts after a movement in population; however, the division of Frederick County is not such a collateral consequence. Coupled with ample evidence of legislative intent, the scooping out of Frederick's county seat and competitive precincts constitutes a blatant targeting of and retaliation against the Republicans in Frederick County. One Frederick County resident, who was moved from the Sixth to Eighth District, noted that he felt disoriented and disconnected after the redistricting: "I have absolutely no connection with what is in this district except the portions of Frederick that were thrown in." Cueman Dep. at 36–37 (ECF No. 177-55). This is the essence of associational harm.

Here, the plaintiffs establish associational harm because they present evidence, primarily in the form of voter testimony, that the gerrymander "ravaged the party." *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring). The map-drawers removed over 66,000

registered Republicans from the Sixth District and added over 24,000 Democrats.  Joint Stipulations ¶¶ 10, 53 (ECF. No. 177-5).  When the redistricting map arose in committee and, subsequently, on the legislative floor, not a single Republican senator or delegate voted for it.  Joint Stipulations ¶ 36.  The plaintiffs present testimony, which Judge Niemeyer summarizes, Part I.A, *ante*, at 22–25, showing that numerous Republicans from the Sixth District felt disenfranchised and said that their vote no longer mattered. Strine Dep. 61–63 (ECF No. 177-53); Cueman Dep. at 36.  The plaintiffs testified that the 2011 redistricting foiled Republican organizational efforts.  Volunteers spent significant time helping voters determine in which district they were voting.  Ropp Dep. at 36–38 (ECF No. 177-54).  And, Republicans lacked enthusiasm, repeating "there's just no point in voting anymore" because it seemed like "a losing race."  Strine Dep. at 63.  The plaintiffs cite corroborating evidence that Republican voter turnout dropped, and Republican fundraising dropped too. Voter Turnout Statistics for 2010 and 2014 Maryland Congressional Primary Elections at 3 (ECF No. 191-11); Stein Decl. at 8 (ECF No. 210-3).

Turning to causation, I note that the definition of associational harm simplifies the analysis and avoids any line-drawing problem.  For an associational rights violation, the causation analysis stops when the map-drawers sketch the lines, adopt the plan, and make it law.  There is no need to look to Election Day.  The harm has already occurred. Members of the disadvantaged party have been severed from their preferred associates. Consequently, they feel that voting is futile.  Organizers cannot effectively recruit volunteers or fundraise.   Ties to communities of interest are diminished.   The

66

gerrymander has "ravaged the party" before its members can even go to the ballot box. *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring).  Because map-drawers inevitably move, with each redistricting, some voters into districts in which their votes will carry less weight, any theory that relies on measuring vote dilution depends on drawing a line at which point the dilution is too much.  By contrast, under an associational rights theory, any retaliation against a voter based on his or her affiliations is a constitutional violation. For that reason, the theory is more concrete and the violation more measurable.

I conclude that a First Amendment retaliation claim involving associational harm is not only cognizable,[3] it is capable of measurement and assessment by concrete standards.  Such a claim is therefore justiciable in the partisan gerrymandering context. Although I disagree with Judge Niemeyer and Judge Russell's focus on vote dilution and electoral outcomes, I do agree with my colleagues in a principally important respect: the plaintiffs have established as a matter of law that the State retaliated against them in violation of their First Amendment rights.   Accordingly, I concur in the judgment docketed with the Court's opinions.

---

[3]    Arguably, as I frame the problem, this is no longer even an issue of "gerrymandering," if that term is understood to be the purposeful drawing of district boundaries to affect the outcome of elections.  As I have framed the issue and its resolution, the State here may be guilty of "gerrymandering," but they are also guilty of a separate and different misconduct—the intentional retaliation against certain individuals because of their affiliation with a particular political party.  In this sense the case, at least for my purposes, is not about voting or the outcome of particular elections.  But it is most certainly about the unjustified and illegal retaliation, by state actors, against individuals in consequence of their having exercised a core constitutional right.

RUSSELL, District Judge, concurring:

I entirely concur in Judge Niemeyer's fine opinion for the Court. There is an illegal, partisan gerrymander in Maryland, and it succeeded in flipping the Sixth District.

I agree with Judge Niemeyer that evidence of impact on election results is relevant and germane to the adjudication of associational claims, and that such evidence is non-problematic in that context. However, I also agree with Chief Judge Bredar's separate conclusion that a First Amendment retaliation claim is sufficiently stated and justiciable *without reference to the results of particular elections*. Accordingly, on the record of this case, in addition to joining Judge Niemeyer, I join Chief Judge Bredar's narrower opinion because I agree that the Plaintiffs have proven that they were the victims of First Amendment retaliation wholly apart from the impact on any election. In my view, Plaintiffs prevail on *both* the broad theory articulated by Judge Niemeyer *and* the narrow one expressed by Chief Judge Bredar.